5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 1 0 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| VERONICA RAMIREZ, | § | |
| Individually, and as Next Friend of | § | |
| JEREMIAH S. RAMIREZ, a minor, | § | Civil Action No. M-03-155 |
| | § | |
| *Plaintiff*, | § | JURY DEMAND |
| | § | |
| VS. | § | |
| | § | |
| AMERICAN HOME PRODUCTS | § | |
| CORPORATION d/b/a WYETH, ET AL, | § | |
| | § | |
| *Defendants*. | § | |

## VACCINE DEFENDANTS' RULE 12(b) AND 12(c) MOTION TO DISMISS

Pursuant to Federal Rules of Civil Procedure 12(b) and 12(c), the Vaccine Defendants[1] file this Motion to Dismiss the claims brought against them in this action and would show the Court the following:

### INTRODUCTION

Plaintiff Veronica Ramirez alleges that her minor child, Jeremiah S. Ramirez, has sustained neurological injuries from exposure to FDA-approved vaccines containing the preservative thimerosal. *See* Plaintiff's Original Petition (hereinafter "Petition") at ¶¶ 4.01-4.06, 4.09. Plaintiff's Petition asserts strict liability, breach of warranty, and negligence causes of action against the Vaccine Defendants, seeking damages on behalf of her child for pain and suffering, mental anguish, physical impairment and disfigurement, loss of earning capacity, medical expenses, and loss of consortium. Plaintiff's Petition also seeks damages on behalf of the Plaintiff, individually, for loss of earning capacity, mental anguish, and loss of consortium.

---

[1]     The "Vaccine Defendants" are Abbott Laboratories (incorrectly named as Abbott Laboratories, Inc.) SmithKline Beecham Corporation d/b/a GlaxoSmithKline, Aventis Pasteur Inc., Merck & Co., Inc.,

The Court should dismiss these claims because the relief sought relates to a claim for "vaccine-related injury" covered by the National Childhood Vaccine Injury Compensation Act (the "Vaccine Act" or "Act"), 42 U.S.C. §§ 300aa-1 *et seq*. That federal statute bars all civil actions seeking relief for such an injury unless the claimant has first exhausted the administrative remedy the Act provides. *See* 42 U.S.C. § 300aa-11(a)(2)(B).

Plaintiff attempts to avoid the Vaccine Act's tort-suit bar by claiming that the cause of her child's injury is the vaccine preservative thimerosal, rather than the thimerosal-containing vaccines themselves, and that the injury, therefore, is not covered by the Act.[2] *See* Petition at ¶¶ 2.01 and 4.01. However, every one of the numerous courts that have addressed claims like Plaintiff's has rejected this very argument and has held that the Vaccine Act covers claims for injuries attributed to thimerosal in childhood vaccines.[3] Indeed, the United States

---

and Wyeth (incorrectly named as Wyeth Laboratories, Wyeth-Ayerst, Wyeth-Ayerst Laboratories, Wyeth Lederle, Wyeth Lederle Vaccines and Lederle Vaccines).

[2]    *See* 42 U.S.C. § 300aa-33(5) (defining "vaccine-related injury: as "an illness, injury condition, or death associated with one or more of the vaccines set forth in the Vaccine Injury Table, *except that* the term does not include [conditions] associated with an adulterant or contaminant intentionally added to such a vaccine") (emphasis added).

[3]    *See Owens v. American Home Prods. Corp.*, 203 F. Supp. 2d 748, 756 (S.D. Tex. May 8, 2002) (Exhibit 1); *Blackmon v. American Home Prods. Corp.*, Civil Action No. G-02-179 (S.D. Tex. May 8, 2002) (Exhibit 2); *O'Connell v. American Home Prods. Corp.*, Civil Action No. G-02-184 (S.D. Tex. May 7, 2002) (Exhibit 3); *Strauss v. American Home Prods. Corp*, 208 F. Supp. 2d 711 (S.D. Tex. 2002) (Exhibit 4); *Collins v. American Home Products Corp.*, Civil Action No. 3:01CV979LN (S.D. Miss. Aug. 2, 2002) (Exhibit 5); *McDonal[] v. Abbott Laboratories, Inc.*, Civil Action No. 3:02CV77LN (S.D. Miss. Aug. 2, 2002) (Exhibit 6); *Stewart v. American Home Products Corp.*, Civil Action No. 3:02CV437LN (S.D. Miss. Aug. 2, 2002) (Exhibit 7); *Liu v. Aventis Pasteur, Inc.*, 219 F. Supp. 2d 762 (W.D. Tex. 2002) (Exhibit 8); *Russak v. Aventis Pasteur, Inc.*, Civil Action No. A-02-CA-480-SS (W.D. Tex. Sept. 9, 2002) (Exhibit 9); *Carabine v. Aventis Pasteur, Inc.* Civil Action No. A-02-CA-501-SS (W.D. Tex. Oct. 9, 2002) (Exhibit 10); *Holder v. Abbott Labs., Inc.*, Civil Action No. 4:02CV148LN (S.D. Miss. Oct. 16, 2002) (Exhibit 11); *Wax v. Aventis Pasteur Inc.*, CV 02-2018 (JBW) (S.D. N.Y. Dec. 16, 2002) (Exhibit 12); *Greene v. Aventis Pasteur*, Civil Action No. L-1228-02 (N.J. Super. Ct. August 8, 2002) (also Exhibit 12); *Colson v. Aventis Pasteur*, Civil Action No. L-1351-02 (N.J. Super. Ct. August 8, 2002) (Exhibit 13); *Mead v. Aventis Pasteur, Inc.*, No. 0107-07136 (Or. Cir. Ct. Nov. 5, 2002) (Exhibit 14); *Cheskiewicz v. Aventis Pasteur Inc.*, No. 0952 (Pa. C. Dec. 16, 2002) (Exhibit 15); *Botter v. Aventis Pasteur Inc.*, No. 9:02CV181 (E.D. Tex. Jan. 13, 2003) (Exhibit 16); *Radulovic v. American Home Products*, Case No. 02-05033 (Fl. Cir. Ct. March 5, 2003) (Exhibit 17); *Swafford v. Aventis Pasteur Inc.*, Civil Action No. A-03-CA-055-SS (W.D. Tex. March 7, 2002) (Exhibit 18); *Murphey v. Aventis Pasteur,*

District Court for the Southern District of Texas was the first court to address—and reject—this argument.[4]  On the other side of the jurisdictional coin, the specialized "Vaccine Court" created by the Act is actively asserting its exclusive initial jurisdiction over thimerosal-related claims like those asserted here.[5]  Plaintiff will not be able to offer any support for her argument to the contrary.

Each of Plaintiff's individual claims is also barred by state law.   The Texas Supreme Court has expressly declined to recognize a parental claim for loss of consortium with a non-fatally injured child.  Nor does Texas law recognize a parental claim for earning capacity lost due to increased care for an injured child.  Finally, because Plaintiff cannot qualify as a "bystander" under Texas law, her claim for damages for mental anguish must also be dismissed. Consequently, all of Plaintiff's claims are either barred by the Vaccine Act or are not cognizable under Texas law, and the entire Petition should be dismissed as against the Vaccine Defendants.

---

*Inc.*, C.A. No. 1:02-CV-2257 (N.D. Ga. Feb. 24, 2003) (Exhibit 19); *Murphey (Natalie) v. Aventis Pasteur, Inc.*, C.A. No. 1:02-CV-2258 (N.D. Ga. Feb. 24, 2003 (Exhibit 20); *Bertrand v. American Home Prods.*, CV 2001-019657 (Az. Super. Ct. Feb. 20, 2003) (Exhibit 21); *Daigle v. Aventis Pasteur, Inc.*, C.A. No. 02-CV-11664-RGS (D. Mass. June 13, 2003) (Exhibit 22); *Ashton v. Aventis Pasteur, Inc.*, No. 04246, 2003 WL 21361355(Pa. Com. Pl. May 22, 2003) (Exhibit 23); *Nestlen v. Wyeth*, Case No. 0201-00126 (Circuit Ct. for Mulnomah Co., Oregon March 20, 2003) (Exhibit 24); *Shanaughy v. Wyeth*, Case No. 02-1517 CAWS (Fla. Cir. Ct. Jan. 17, 2003) (Exhibit 25); *Agebaku v. Sigma Aldrich, Inc.*, Case No. 24-C-02-004243 (Md. Cir. Ct. June 5, 2003) (Exhibit 26); and *Case v. Merck & Co., Inc.*, No. Civ.A. 02-1779, 2003 WL 145427 (E.D.La. Jan. 17, 2003) (Exhibit 27); *Moss v. Merck & Co., Inc.*, Civ. A. No. 03-0334 (W.D. La. June 19, 2003) (Exhibit 28).

[4]      *See Owens v. American Home Prods. Corp.*, 203 F. Supp. 2d 748, 756 (S.D. Tex. May 8, 2002) (Exhibit 1); *Blackmon v. American Home Prods. Corp.*, Civil Action No. G-02-179 (S.D. Tex. May 8, 2002) (Exhibit 2); *O'Connell v. American Home Prods. Corp.*, Civil Action No. G-02-184 (S.D. Tex. May 7, 2002) (Exhibit 3); *Strauss v. American Home Prods. Corp*, 208 F. Supp. 2d 711 (S.D. Tex. 2002) (Exhibit 4).

[5]      *See Leroy v. Sec'y, Dep't of Health & Human Servs.*, ___ F. Supp. 2d ____, 2002 WL 31730680, slip op. at 9 (Fed. Cl. Spec. Mstr. Oct. 11, 2002) ("'Clearly, the plain language of the Vaccine Act indicates that the [vaccinee's] injuries cannot be "thimerosal-related" without being "vaccine-related" as well.'") (quoting *Owens v. Am. Home Prods. Corp.*, 203 F. Supp. 2d 748, 756 (S.D. Tex. 2002) (Exhibit 29).

**ARGUMENT**

I.    **The Vaccine Act Bars This Civil Action**

    A.    **The Vaccine Act creates a new remedial system for "vaccine-related" injuries.**

        Congress passed the Vaccine Act in 1986, noting that "[v]accination of children against deadly, disabling, but preventable infectious diseases has been one of the most spectacularly effective public health initiatives this country has ever undertaken," H.R. Rep. No. 99-908, at 4 (1986), *reprinted in* 1986 U.S. Code Congressional and Administrative News ("U.S.C.C.A.N.") at 6345, and that the "[u]se of vaccines has prevented thousands of children's deaths each year and has substantially reduced the effects resulting from disease," thereby saving billions in medical costs. *Id.*  Likewise, Congress recognized that the cost of litigation initiated on behalf of children claiming injuries traceable to vaccination had resulted in a significant reduction in the number of manufacturers willing to sell childhood vaccines, and it was concerned that the costs of litigation would discourage manufacturers from continued participation in the vaccine market. *See* H.R. Rep. No. 99-908 at 4, 6-7 (1986), *reprinted in* 1986 U.S.C.C.A.N. at 6345, 6347-48.

        Because of its "real concern about the future of Federal immunization initiatives," and its desire to safeguard the national vaccine supply, Congress included in the Vaccine Act a compensation program to provide claimants a just and efficient remedy while also protecting vaccine manufacturers from excessive litigation costs. *Id.* at 4, *reprinted in* 1986 U.S.C.C.A.N. at 6345; *Schafer v. American Cyanamid Co.*, 20 F.3d 1, 2-3 (1st Cir. 1994).  That Program is a no-fault compensation system, 42 U.S.C. § 300aa-10(a) (1994); *Mazur v. Merck & Co.*, 767 F. Supp. 697, 702 (E.D. Pa. 1991), *aff'd*, 964 F.2d 1348 (3d Cir. 1992), that was intended to depart from the "traditional tort system" that threatens the national vaccine supply.  *O'Connell v.*

*Shalala*, 79 F.3d 170, 173 (1st Cir. 1996). The Act "represents an effort to provide compensation to those harmed by childhood vaccines *outside the framework of traditional tort law*." *Schafer*, 20 F.3d at 2 (emphasis added).

**B.    Plaintiff must first seek relief from the Vaccine Court, or be barred from bringing a civil action in state or federal court.**

To achieve both congressional goals, the Vaccine Act creates a federal cause of action, which requires that any claims in excess of $1,000 for vaccine-related injuries be filed first in the Vaccine Court. 42 U.S.C. § 300aa-11(a)(2)(A). Specifically, a claimant must file a petition for compensation (i) under the Vaccine Compensation Program (ii) in the Vaccine Court (iii) against the Secretary of the Department of Health and Human Services (iv) where the Department of Justice responds on behalf of the government, and (v) the case is heard by a federal special master, who determines whether the Act covers the claim, whether a petitioner is entitled to compensation, and the amount of such compensation. 42 U.S.C. § 300 aa-12(a) (1994).

The express language of the Vaccine Act and its legislative history establish that a plaintiff's exhaustion of the Act's statutory remedy is a condition precedent to the subject matter jurisdiction of any state or federal court to hear the merits of that plaintiff's claim for a vaccine-related injury.[6] Specifically, the Act provides:

> No person may bring a civil action for damages in an amount greater than $1,000 or in an unspecified amount against a vaccine

---

[6]    The Vaccine Act "is jurisdictional in nature because it defines the jurisdiction of state and federal courts with respect to civil actions against a vaccine administrator or manufacturer for vaccine-related injuries." *Gilbert v. Secretary of HHS*, 31 Fed. Cl. 379, 381 (Fed. Cl. 1994), *aff'd*, 51 F.3d 254 (Fed. Cir. 1995); *see also Brown v. Secretary of HHS*, 874 F. Supp. 238, 241 (N.D. Ind. 1994) ("[T]his Court's jurisdiction over a claim for compensation for a vaccine-related injury or death is determined by the [Vaccine Act]."), *aff'd*, 61 F.3d 905, 1995 WL 395753 (7th Cir. 1995) (unpublished opinion); *Greene v. Aventis Pasteur*, Nos. L-1288-02, L-1351-02, at 3 (N.J. Super. Aug. 8, 2002) ("[W]hether the Vaccine Act precludes Plaintiffs' from pursuing their claim in this Count because the Plaintiffs failed to file a petition with the Vaccine court … is a threshold issue of jurisdiction.").

administrator or manufacturer in a State or Federal court for damages arising from a vaccine-related injury or death associated with the administration of a vaccine after October 1, 1988, and no such court may award damages in an amount greater than $1,000 in a civil action for damages for such a vaccine-related injury or death, *unless a petition has been filed, in accordance with section 300aa-16 of this title, for compensation under the Program for such injury or death and —*

> *(i)(I) the United States Court of Federal Claims has issued a judgment under section 300aa-12 of this title on such petition, and*
>
> *(II) such person elects under section 300aa-21(a) of this title to file such an action,*[7] *or*
>
> *(ii) such person elects to withdraw such petition under section 300aa-21(b) of this title or such petition is considered withdrawn under such section.*[8]

42 U.S.C. § 300aa-11(a)(2)(A) (emphasis added).

The Act is equally plain that where a claimant has filed the required petition for compensation but has not yet filed an election under § 300aa-21(a) or § 300aa-21(b), the Act requires that the claimant's civil action for vaccine-related injuries be dismissed: "If a civil action which is barred under subparagraph (A) is filed in a State or Federal court, *the court shall dismiss the action.*" 42 U.S.C. § 300aa-11(a)(2)(B) (emphasis added).[9] In such an instance, the state or federal court lacks subject matter jurisdiction to decide the merits of such claim.[10]

---

[7]     Section 300aa-21(a) allows a claimant to either accept the compensation award of the Vaccine Court or reject the award and file an civil action in state or federal court. *See* 42 U.S.C. § 300aa-21(a)(1)-(2). The claimant file a formal election under § 300aa-21(a) within 90 days of the Vaccine Court's final judgment. *See id.*

[8]     Section 300aa-21(b) allows a claimant to withdraw his or her petition from the Vaccine Court proceedings if the Vaccine Court fails to render a decision on the petition within 240 days of the filing of the petition. *See* 42 U.S.C. § 300aa-21(b)(1). A claimant intending to withdraw from the Vaccine Court proceedings can do so only after receiving notice from the Vaccine Court that the claimant may withdraw his or her petition. *See id.*

[9]     Though Plaintiff's Petition alleges, in the alternative, exhaustion of the Vaccine Court procedures, Vaccine Defendants show, upon information and belief, and based upon the docket information available on PACER, that no petition for compensation has ever been filed by or on behalf of

Moreover, the statute prohibits joining a vaccine manufacturer in *any* civil action until after the plaintiff has completed a compensation proceeding in Vaccine Court:

> No vaccine administrator or manufacturer may be made a party to a civil action (other than a civil action which may be brought under paragraph (2)) for damages for a vaccine-related injury or death associated with the administration of a vaccine. . . .

42 U.S.C. § 300aa-11(a)(3).  The only civil action that Plaintiff is permitted to bring "under paragraph (2)" is a civil action filed *after an election* not to accept the decision of the special master.[11]  The legislative history of § 300aa-11(a)(3) makes clear the Congressional intention that vaccine manufacturers not be named as parties in a civil action until the claimant has completed the compensation proceeding:

> The bill also *prohibits* the act—by impleader, cross-claim, or *separate suit or any other practice—of making a vaccine manufacturer a party to any civil action* brought by a person [who was allegedly injured by a vaccine after the enactment of the legislation] *before that person has completed a compensation proceeding.*

H.R. Rep. No. 99-908 (1986), *reprinted in*, 1986 U.S. Code Cong. and Ad. News, 6344, 6355 (emphasis added).  Thus, under § 300aa-11(a)(3), the Vaccine Defendants may not be parties to any civil action until Plaintiff has completed the compensation proceeding required by the Vaccine Act.

---

the Plaintiff or here minor child.  Thus, Plaintiff has not made either of the elections required by 42 U.S.C. § 300aa-11(a)(2)(B), and the Court lacks subject matter jurisdiction over her claims.

[10]    *See Brown*, 874 F. Supp. at 241 (dismissing claim for lack of subject matter jurisdiction because plaintiffs did not first file a petition for compensation in Vaccine Court); *Greene, supra* at 5 (dismissing claims for thimerosal-related injuries because the "Court holds that the Plaintiffs' alleged injuries are vaccine-related and this Court lacks jurisdiction over those matters").

[11]    Ordinarily the special master issues a decision on a Petition within 240 days, but the proceedings may be suspended for an additional period not to exceed 150 days.  42 U.S.C. § 300aa-12(d)(3).

**C.   Plaintiff alleges a "vaccine-related" injury that falls squarely within the purview of the Vaccine Act.**

At the heart of this case against the Vaccine Defendants is the allegation that Plaintiff's minor child has suffered vaccine-related injuries within the scope of the Act. *See, e.g.,* Petition at ¶ 4.09 ("*As a proximate contributing cause* [sic] *of being injected with mercury,* the Plaintiff has suffered harm, injuries, and other damages . . . .") (emphasis added). The term "vaccine-related injury" is broadly defined in the Vaccine Act as "an illness, injury, condition, or death associated with" a vaccine identified in the Act. 42 U.S.C. § 300aa-33(5). And although it is clear that Plaintiff seeks damages for an injury allegedly "associated with" vaccines, Plaintiff claims that her Petition makes "no claim for personal injuries arising from or associated with the administration of a vaccine as defined under the [Vaccine Act], and thus [there is] no jurisdiction over this claim by the [Vaccine Court]." Petition at ¶¶ 2.01. Plaintiff's conclusory pleading disclaimer is not legally tenable. *See Terran v. Sec'y of Health & Human Servs.,* 195 F.3d 1302, 1310 (Fed. Cir. 1999) (in order to determine jurisdiction, a court "must look to the true nature of the underlying action").

Plaintiff's argument is incorrect as a matter of law, as the wealth of authority— from the plain language of the statute, to the governing regulations, to official determinations by the HHS Secretary and Vaccine Court, to the overwhelming weight of case-law—hold that the Vaccine Act covers claims exactly like those asserted here. *See, e.g., Owens v. American Home Prods. Corp.,* 203 F. Supp. 2d 748, 755-56 & n.11 (S.D. Tex. 2002) ("*[T]he language of the Vaccine Act unambiguously and specifically indicates that injuries caused by vaccine preservatives (i.e. thimerosal) are within its scope,* [and] *it is clear that Congress has spoken to the precise question at issue.*") (emphasis added).

1.    **The Vaccine Court has determined that "thimerosal-related" injuries are "vaccine-related" as a matter of law.**

The question of whether alleged "thimerosal-related" injuries are "vaccine-related" injuries for purposes of the Vaccine Act is a threshold jurisdictional issue and is, therefore, properly resolved as a matter of law. Significantly, the Vaccine Court—the body specially charged with the responsibility to interpret the Act—has determined *as a matter of law* that it has exclusive initial jurisdiction over thimerosal-related claims. *See Leroy v. Sec'y, Dep't of Health & Human Servs.*, ---F. Supp. 2d---, 2002 WL 31730680 (Fed. Cl. Spec. Mstr. Oct. 11, 2002). In *Leroy*, the Honorable Gary J. Golkiewicz, Chief Special Master of the Vaccine Court, engaged in a thorough and careful analysis of the controlling authorities and concluded that claims for thimerosal-related injuries are clearly and necessarily covered by the Vaccine Act:

> The jurisdictional issue raised in this case is whether an injury allegedly caused by the thimerosal preservative within a Table vaccine is a "vaccine-related injury" under § 11(a)(1), as defined by § 33(5) of the Vaccine Act. Petitioners' counsel advances a plethora of unsuccessful arguments to contest this court's jurisdiction over the Leroys' case. In short, petitioners ignore time-honored legal principles, common definitions of relevant statutory language, congressionally-stated Program goals, relevant scientific evidence and case law. The undersigned finds petitioners' numerous arguments, contending that Nicholas' [thimerosal-related] injuries are not "vaccine-related" legally flawed and unsupported by the record.
>
> *       *       *
>
> [B]ased on the plain meaning of the statutory terms ["adulterant," "contaminant," and "vaccine"], any injury arising from the thimerosal preservative in vaccines is encompassed within the statutory definition of "vaccine-related injury," thereby granting jurisdiction over such claims to this court.

*Id.* at 4-5, 8. Because the Leroys' claims—like Plaintiff's here—were for "vaccine-related injur[ies]," they were "statutorily obligated to file their claim . . . in the Court of Federal Claims *in the first instance.*" *Id.* at 26 (emphasis in original).[12]

Moreover, the Office of Special Masters in the Vaccine Court has also issued Autism General Order #1, which establishes a two-step procedure and schedule for petitions pending in the Vaccine Court to determine the general causation question of whether thimerosal-containing vaccines may cause autism. *See* Autism General Order No. 1, *In re: Claims For Vaccine Injuries Resulting in Autism Spectrum Disorder or a Similar Neurodevelopmental Disorder* (Exhibit 30)*; see also Verdon v. Sec'y of Health & Human Servs.*, No. 02-208V (Fed. Cl. June 5, 2002) (Exhibit 31). In that order, the Vaccine Court has created, for petitioners with claims like Plaintiff's here, a Master Autism Petition For Vaccine Compensation, paragraph 3 of which alleges that: "As a direct result of one or more vaccinations covered under the National Vaccine Injury Compensation Program, the vaccinee in question has developed a neurodevelopmental disorder . . . This disorder was caused . . . by the 'thimerosal' ingredient in certain [vaccines]." Exhibit A to Autism General Order No. 1 at 2.

---

[12]    Under applicable Supreme Court precedent, this Court should give the highest deference to the Vaccine Court's holding in *Leroy*. That is, because the Special Masters of the Vaccine Court are charged with adjudicating claims under the Act (42 U.S.C. § 300aa-12), they are empowered to issue decisions on petitions for compensation which include "findings of fact and conclusions of law." *Id.* § 300aa-12(d)(3)(A)(1). When, as in *Leroy*, an agency reaches a generally applicable interpretation of the statute it is charged to apply in the context of a formal adjudication, that interpretation carries the force and effect of law and is owed the highest deference by all courts. *See Chevron U.S.A., Inc., v. Natural Resources Defense Counsel, Inc.*, 467 U.S. 837 (1984); *see also United States v. Mead Corp.*, 533 U.S. 218, 230-31 (2001) ("the overwhelming number of our cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking *or formal adjudication*") (emphasis added)); *see e.g., INS. v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (holding that the Board of Immigration Appeals' construction of its statute "should be accorded *Chevron* deference as it gives ambiguous statutory terms 'concrete meaning through a process of case-by-case adjudication'") (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 448-49 (1987)).

### 2.    Plaintiff's argument has been rejected by the Secretary of Health and Human Services.

It is the unequivocal position of the Secretary of Health and Human Services, who is charged with the responsibility of administering the Vaccine Compensation Program, that any injury claims allegedly caused by thimerosal in covered vaccines are "vaccine-related," and therefore, thimerosal-related claims against vaccine manufacturers require adjudication by the Vaccine Court.  This position was *stated* in a 22-page "Statement of Interest" filed on March 4, 2002, in *King v. Aventis Pasteur Inc.*, CV 01-1305-AS (D. Ore. 2002) (Exhibit 32), one of the first cases in which vaccine recipients have alleged that thimerosal-containing vaccines cause neuro-developmental injuries.    Significantly, the Secretary construed one of HHS' own regulations—21 C.F.R. § 610.15—to determine that injuries related to vaccine preservatives, such as thimerosal, do not fall within the Vaccine Act's "adulterant or contaminant" exception.[13] Promulgated through a notice-and-comment rulemaking in 1973, § 610.15 is captioned "*Constituent materials*," and the very first subsection thereunder is "(a) Ingredients, *preservatives*, diluents, adjuvants."[14]

### 3.    Plaintiffs' argument has been rejected by every court to rule on it.

As noted above, numerous federal and state courts have agreed that claims for thimerosal-related injuries are "vaccine-related" as a matter of law for purposes of determining

---

[13]    Section 300aa-33(5) defines "vaccine-related injury" as "an illness, injury condition, or death associated with one or more of the vaccines set forth in the Vaccine Injury Table, *except that* the term does not include [conditions] associated with an adulterant or contaminant intentionally added to such a vaccine." 42 U.S.C. § 300aa-33(5) (emphasis added). *Every court* to address the merits of the issue has concluded, as a matter of law, that thimerosal is *not* an adulterant or contaminant within the meaning of section 300aa-33(5). *See* note 3, *supra* (collecting cases).

[14]    *See* 21 C.F.R. § 610.15(a) ("Products in multiple-dose containers shall contain a preservative."). Because a "constituent material" is by definition the very opposite of "extraneous material," if thimerosal is a constituent, it cannot be an adulterant or contaminant. *See Amendola v. Secretary of HHS*, 989 F.2d 1180, 1186 (Fed. Cir. 1993) (explaining that the Vaccine Act's "adulterant or contaminant" exception "refers only to 'intentionally added' *extraneous material*") (emphasis added).

jurisdiction under the Vaccine Act.[15]  And the very first judicial decisions on this question were handed down by the United States District Court for the Southern District of Texas.  *See Owens v. American Home Prods. Corp.*, 203 F. Supp. 2d 748, 756 (S.D. Tex. May 8, 2002); *Blackmon v. American Home Prods. Corp.*, Civil Action No. G-02-179 (S.D. Tex. May 8, 2002); *O'Connell v. American Home Prods. Corp.*, Civil Action No. G-02-184 (S.D. Tex. May 7, 2002).  In each of those cases, United States District Judge Samuel Kent dismissed claims virtually identical to those presented here, holding that *"the language of the Vaccine Act unambiguously and specifically indicates that injuries caused by vaccines preservatives (i.e. thimerosal) are within its scope,* [and] *it is clear that Congress has spoken to the precise question at issue."  Owens,* 203 F. Supp. 2d at 756 n.11.  In reaching that conclusion, Judge Kent recognized that, as an ingredient in an FDA-approved vaccine formula, thimerosal was necessarily a "constituent material" of vaccines.  *See id.* at 755 n.10 ("The FDA has long recognized that preservatives (*i.e.* thimerosal) are 'constituent materials' of vaccines.") (citing 21 C.F.R. § 610.15).  "Therefore, because the children's injuries are allegedly linked to a vaccine ingredient, their injuries are definitely 'vaccine-related.'"  *Id.*[16]

Since the *Owens, O'Connell,* and *Blackmon* decisions, every state and federal court to take up this question has agreed with the Southern District's analysis and found that "thimerosal-related" injuries are necessarily "vaccine-related" injuries for purposes of the Vaccine Act.  Each of those courts has dismissed similar claims by children and parents under § 300aa-11(a)(2) so that they could be pursued in accordance with the Vaccine Act.  Thus, the

---

[15]    *See note 3, supra* (collecting cases).

[16]    The district court also dismissed the parent plaintiffs' claims for loss of services and emotional distress, but found that the petition stated a viable claim for loss of consortium under Texas law.  *Owens,* 203 F.Supp.2d at 757-58.  However, as discussed *infra,* the Texas Supreme Court has subsequently held that Texas law does not recognize a parent's claim for loss of consortium with a non-fatally injured child. *See Roberts v. Williamson,* 111 S.W.3d 113, 119 (Tex. 2003).

unanimous voice of the Vaccine Court, the federal district and state trial courts, and the HHS Secretary supports the view that thimerosal claims are covered by the Vaccine Act. Because Plaintiff cannot show that she has complied with the Act, her claims must be dismissed.

**D.    The Vaccine Act Bars Plaintiff's Claims for Her Child's Medical Expenses and Loss of Earning Capacity.**

Plaintiff's claims for her child's medical expenses and alleged loss of earning capacity should be dismissed without prejudice on the same basis as the child's personal injury claims: those claims must first be pursued through the Vaccine Compensation Program.[17] As shown below, Plaintiff's claims for medical expenses and loss of earnings are specifically included within the Vaccine Act's scope and, thus, within its ban on premature tort suits.

Under the Vaccine Act, as in state or federal court, a minor child may not bring a claim in his own name; rather, the claim is brought by his parents or other legal representatives. The Vaccine Act identifies who may bring a petition  as "any person who has sustained a vaccine-related injury [or] *the legal representative of such person if such person is a minor* or is disabled . . . ." 42 U.S.C. § 300aa-11(b)(1)(A) (emphasis added).  Furthermore, the Act provides that the compensation awarded "shall include" medical expenses incurred on behalf of the injured person, specifically "unreimbursable expenses" that are "incurred *by or on behalf of* the person who suffered [a vaccine-related] injury," including  expenses "for *diagnosis and medical or other remedial care* determined to be  reasonably  necessary."   42 U.S.C.  § 300aa-15(a) (emphasis added).

Because the Vaccine Act provides for—and indeed mandates—compensation for medical expenses and loss of earning capacity incurred by or on behalf of the child making a

---

[17]    Section 300aa-15(a)(3)(B) of the Act provides compensation for a petitioner's anticipated loss of earnings.

claim, the Act governs the claims by a plaintiff for these alleged items of damages and requires

that these claims be dismissed without prejudice.   That was the exact holding of the United

States District Court for the Southern District of Texas in the aforementioned case of *Strauss v.*

*American Home Products Corp.*, 208 F. Supp. 2d 711 (S.D. Tex. June 11, 2002).  As Judge Kent

explained:

> [A]lthough Plaintiffs are not barred outright by the Vaccine Act
> from seeking individual damages (*i.e.*, loss of consortium) from the
> Vaccine Manufacturers, *they cannot recover from the Vaccine*
> *Manufacturers for any expenses that they have incurred on [the*
> *minor child's] behalf.*  As explained above, the Vaccine Act
> provides compensation for actual and un-reimbursable expenses
> and projected expenses (incurred by the victim or on the victim's
> behalf) for medical or other remedial care determined to be
> reasonably necessary, actual and *anticipated lost earnings*, actual
> and projected pain and suffering of the victim and reasonable
> attorneys' fees and costs.  *The covered expenses include those*
> *costs which "have been or will be incurred by or on behalf of the*
> *[victim]* . . . for rehabilitation, developmental evaluation, special
> education, vocational training and placement, case management
> services, counseling, emotional or behavioral therapy, residential
> and custodial care and services expenses, and the facilities
> determined to be reasonably necessary."

*Id.* at 715 n.8 (emphasis added) (quoting 42 U.S.C. § 300aa-15(a)(1)).

Additionally, the plaintiffs in *Owens, O'Connell* and *Blackmon* argued that state

law recognizes the right of parents to recover the medical expenses incurred on behalf of a minor

child, and, on that basis, moved for clarification of the Court's decisions dismissing (but not

discussing) the parents' claims for reimbursement of medical expenses.  Rejecting the plaintiffs'

argument, the Court clarified its order as follows:

> The Court acknowledges that in Texas, "[i]t is well settled law that
> because the parent is primarily liable for a minor's medical
> expenses incurred during minority, any cause of action for medical
> expenses incurred up the age of 18 belongs to such parent."
> [citation omitted]  Nevertheless, although Plaintiffs are not barred
> outright by the Vaccine Act from seeking individual damages (i.e.,
> loss of consortium from the Vaccine Manufacturers, *they cannot*

> recover from the Vaccine Manufacturers for such medical expenses at this time. . . . Plaintiffs are therefore <u>required</u> to seek reimbursement for these expenses in the Vaccine Court, rather than attempting to recover damages via an action wherein they assert individual claims against the Vaccine Manufacturers. Allowing them to do so would clearly undermine the stated objectives of the Vaccine Act. This result is not in contravention of Texas law, because the Court is in no way holding that Plaintiffs do not possess a valid claim for the medical expenses at issue. *The Court is simply stating that Plaintiffs cannot seek to recover such expenses from the Vaccine Manufacturers until after they have filed a Vaccine Act petition in accordance with the Vaccine Act.*

*Owens* Clarification Order (Exhibit 33) at 2-3 (emphasis added and in original).

Judge Kent's decisions on this issue are well supported by a line of authority in the Vaccine Court which establishes that the Act covers all claims that seek compensation for, *or on behalf of*, a person who actually suffered a vaccine-related injury. *Cf. Black v. Sec'y of Health & Human Servs.*, 93 F.3d 781, 786 (Fed. Cir. 1996) (holding, as to analogous Vaccine Act provision, that, "[i]n the case of injured minors, . . . the statutory reference to expenses 'incurred' by the injured person was plainly meant to refer to expenses incurred on behalf of the victim by his legal representatives"); *Salceda v. Sec'y, Dep't of Health & Human Servs.*, 30 Fed. Cl. 316, 319 (Fed. Cl. 1994) (holding, in analogous context of the section 11(a)(6) bar to Vaccine Act claims brought in courts prior to 1988, that "person" means the individual "who sustained the vaccine-related injury or death and not . . . the individual who happens to represent the interests of that person in the litigation"); *Benedict v. Sec'y, Dep't of Health & Human Servs.*, 29 Fed. Cl. 587, 591 (Fed. Cl. 1993) ("To hold otherwise would render [the litigation bar] meaningless, as it could be easily circumvented simply by supplying a different representative in each case for an injured person").

Indeed, allowing claims that are compensable under the Act to go forward in a judicial forum—simply because they are alleged by the parent rather than the child—"would

clearly undermine the stated objectives of the Vaccine Act." *Strauss* at 715 n.8. Plaintiff, as the legal representative of her child, could have—and should have—filed a petition in the Vaccine Court to recover on these claims for medical, residential, and custodial expenses. Her claims for any and all medical, residential, and custodial expenses necessitated by the minor child's condition, as well as the claim for the child's loss of earning capacity, are compensable under the Vaccine Act, and thus fall squarely within the Act's tort suit ban and should be dismissed without prejudice.

## II.    Plaintiff Has No Cognizable Claim For Mental Anguish, Emotional Distress, Loss of Consortium, or Her Own Lost Wages

### A.    Plaintiff does not qualify as a "bystander" under Texas law and therefore may not recover damages for mental anguish or emotional distress.

Plaintiff does not qualify as a "bystander" under Texas law for purposes of a mental anguish or emotional distress claim because the alleged injury occurred over time, not as the result of a single traumatic event, and she necessarily learned of her child's alleged injury from others (presumably physicians) well after her child's vaccines were administered. *See United Services Auto. Ass'n v. Keith*, 970 S.W.2d 540, 542 (Tex. 1998) (per curiam) (requiring that bystander plaintiff "suffer shock as a result of a direct emotional impact . . . from a sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence"). Considering parental emotional distress claims in an identical situation, Judge Kent observed that "[parent] Plaintiffs clearly did not witness and perceive the type of shocking accident contemplated by the bystander theory of recovery. . . ." and, consequently, "the bystander theory is inapplicable to the fact of this case, as a matter of Texas law." *Owens*, 203 F. Supp. 2d at 757-58.

Moreover, even if Plaintiff were a "bystander" for purposes of such a claim, she could not recover unless her injured child could also recover. *See Edinburg Hosp. Auth. v.*

*Trevino*, 941 S.W.2d 76, 79 (Tex. 1997).  Thus, because Plaintiff's child cannot yet state a claim

upon which relief can be granted *and* Plaintiff does not qualify as a bystander under Texas law,

*all claims* for damages for mental anguish and emotional distress must also be dismissed.

### B.    Texas does not recognize a parent's cause of action for loss of consortium with a non-fatally injured child.

On July 3, 2003, the Texas Supreme Court expressly held that Texas law does not

recognize a parent's cause of action for loss of consortium with a non-fatally injured child.  *See*

*Roberts v. Williamson*, 111 S.W.3d 113, 119 (Tex. 2003) ("We . . . decline to extend a claim for

loss of consortium to parents of children who have been seriously injured.") (attached hereto as

Exhibit 34).  Accordingly, Plaintiff's claims for loss of consortium must be dismissed as to all

Defendants with prejudice.[18]

### C.    Plaintiff may not recover her own lost wages incurred in caring for her child.

The right to recover for necessary services rendered because of injury to a third

person belongs to the injury party, not the provider of the services.  Moreover, the measure of

damages for such services is the reasonable value of the care, not the earnings or wages earned

by the care-giver in other employment.  *See, e.g., Pressey v. Patterson*, 898 F.2d 1018 (5th Cir.

1990 (under Texas law, an injured plaintiff may recover for the nursing care provided by his

mother at the wage rate for unlicensed medical care); *Gulf States Utils. Co. v. Reed*, 659 S.W.2d

849, 853 (Tex. App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.) (Texas law does not permit a

parent to recover his or her own lost earnings as a result of caring for an injured child).

---

[18]    Neither does Texas law recognize a cause of action for personal injuries under the Texas Deceptive Trade Practices Act ("DTPA").  *See* Petition at ¶¶ 9.01-9.04.  In fact, the DTPA expressly excludes "cause[s] of action for bodily injury or death or for the infliction of mental anguish."  Tex. Bus. & Com. Code § 17.49(e); *see also Davis v. Mazda Motor Corp.*, No. 04-98-00844-CV, 1999 WL 1037916 (Tex. App.—San Antonio Nov. 17, 1999, pet. denied) (affirming directed verdict granted "on the ground that the . . . DTPA preclude[s] suits for personal injuries under the DTPA") (not designated for publication).

These rules are consistent with the general rule in other jurisdictions:

> The general rule is that *one who has been injured by tortious conduct is entitled to recover the reasonable value of medical and nursing services reasonably required by the injury*, even if those services were furnished gratuitously, and this rule applies when the services are furnished by a family member. The amount of the defendant's liability is the amount for which reasonably competent nursing and attendance by others could have been obtained. *A corollary of this rule is that what the person rendering the services has earned in the past or could earn in a different employment cannot be considered, it being immaterial to the reasonable value of the services*, even if the relative leaves his or her regular employment to render such services.

22 Am.Jur. 2d Damages, Section 209 (footnotes omitted) (emphasis added). *See also Jackson v. United States,* 526 F. Supp. 1149, 1154 (E.D. Ark. 1981), *aff'd without op.*, 696 F.2d 999 (8th Cir. 1982); *Heritage v. Pioneer Brokerage and Sales, Inc.*, 604 P.2d 1059, 1064-65 (Alaska); *Rodriguez v. Bethlehem Steel Corporation*, 12 Cal.3d 382, 409, 115 Cal. Rptr. 765, 525 P.2d 669, 687; *Burns v. Stauder,* No. CV 9970421S, 1999 WL 989412, *3 (Super. Conn. Oct. 13, 1999), *Polio v. Derby Center CVS., Inc.*, No. CV 950372045, 1996 WL 521133, *3 (Super. Conn. Sept. 6, 1996); *Harris v. Hardman*, 133 Ga. App. 941, 947-48, 212 S.E.2d 883 (1975); *Kotsiris v. Ling*, 451 S.W.2d 411, 412 (Ky. 1970); *Scanlon v. Kansas City*, 336 Mo. 1058, 81 S.W.2d 939, 942 (1935); *Redepenning v. Dore*, 56 Wis. 2d 129, 136, 201 N.W.2d 580 (1972).

Thus, as an element of care furnished to the child because of his alleged injury, the recovery, if any, for the services provided by Plaintiff must be through the Vaccine Compensation Program, and Plaintiff's claim for these "costs," which are derivative of the child's claim is barred by the Vaccine Act. *See* 42 U.S.C. § 300aa-15(a), and Texas law.

## CONCLUSION

Because Plaintiff has failed to comply with the Vaccine Act, this Court must dismiss her claims and those of her minor child. These include the claims for medical expenses

expended "on behalf of" her child and the alleged loss of earning capacity of her child. The remainder of Plaintiff's individual claims must be dismissed because they are not cognizable under Texas law. For all of these reasons, the Court should dismiss Plaintiff's Complaint as against the Vaccine Defendants. The Vaccine Defendants request such other and further relief as the Court deems appropriate.

Respectfully submitted,

BAKER BOTTS L.L.P.

By _____ /by permission

Richard L. Josephson
Attorney-in-Charge
State Bar No. 11031500
One Shell Plaza
910 Louisiana
Houston, TX  77002
(713) 229-1460
(713) 229-1522 (fax)
richard.josephson@bakerbotts.com

COUNSEL FOR DEFENDANT MERCK & CO., INC. AND
DEFENDANT ABBOTT LABORATORIES

OF COUNSEL:

BAKER BOTTS L.L.P.

Paul R. Elliott
State Bar No. 06547500
Douglas B. Roberson
State Bar No. 24013409
One Shell Plaza
910 Louisiana
Houston, TX  77002
(713) 229-1460
(713) 229-1522 (fax)

By: _Michael L. Klatt / by permission dll_

Michael R. Klatt
Attorney-in-Charge
State Bar No. 11554200
P. O. Box 1148
Austin, TX  78767
(512) 472-8800
(512) 474-1129 (fax)

COUNSEL FOR WYETH F/K/A AMERICAN
HOME PRODUCTS

OF COUNSEL

CLARK, THOMAS & WINTERS

Susan E. Burnett
P. O. Box 1148
Austin, TX  78767
(512) 472-8800
(512) 474-1129 (fax)

By: _Jeffrey S. Wolff / by permission JWL_

Jeffrey S. Wolff
Attorney-in-Charge
State Bar No. 21865900
1301 McKinney, Suite 5100
Houston, TX  77010-3095
(713) 651-5151
(512) 651-5246 (fax)

COUNSEL FOR SMITHKLINE BEECHAM
CORPORATION D/B/A GLAXOSMITHKLINE

OF COUNSEL:

FULBRIGHT & JAWORSKI L.L.P.

By: _R. Jo Reser / by permission_

R. Jo Reser
Attorney-in-Charge
State Bar No. 16789500
7550 W. IH 10, Suite 800
San Antonio, Texas 78229
210.349.6484
210.349.0041 (Fax)

COUNSEL FOR AVENTIS PASTEUR INC.

## Certificate of Service

I certify that on this 9th day of September 2003, I served the above pleading on all counsel of record via facsimile, First Class U.S. Mail, and/or certified mail, return receipt requested.

Richard L. Josephson / by permission

203 F.Supp.2d 748
(Cite as: 203 F.Supp.2d 748)

Page 1

**C**

United States District Court,
S.D. Texas,
Galveston Division.

Jessica OWENS individually and as next friend to
Jarrett Ross SCHAFER; Kenneth
Brown and Cynthia Brown, individually and as next
friends to Zachary Taylor
Brown; and David Ward and Felicia Ward,
individually and as next friends to
Morgan Elizabeth Ward Plaintiffs,
v.
AMERICAN HOME PRODUCTS
CORPORATION, et al. Defendants.

No. CIV.A.G-02-185.

May 7, 2002.

Parents and legal representatives of minors who
were allegedly exposed to harmful levels of mercury
via routine childhood vaccinations with vaccines
containing thimerosal, a mercury laden preservative,
brought a products liability suit in state court against
manufacturers of the vaccines and manufacturers of
thimerosal. Manufacturers removed the action from
state court. On defense motions to dismiss, the
District Court, Kent, J., held that: (1) thimerosal was
not an "adulterant or contaminant," but rather, a
"constituent material" of the vaccines; (2) National
Childhood Vaccine Injury Act did not bar parents'
individual claims for loss of consortium, emotional
distress and loss of services; (3) parents stated a
viable claim for loss of consortium; (4) parents could
not maintain a cause of action for loss of services; (5)
parents could not recover on their derivative claims
of emotional distress via a bystander action; and (6)
Vaccine Act's tort suit bar did not apply to thimerosal
manufacturers.

Ordered accordingly.

West Headnotes

[2] Statutes ⌐⟶188
361k188

When attempting to discern a statute's meaning, a
court must initially look to the plain meaning of the
statute's language.

[4] Death ⌐⟶88

117k88

Under Texas law, parents may recover for loss of
companionship for the wrongful death of a child.

[5] Parent and Child ⌐⟶7.5
285k7.5

Parents of minors who were allegedly exposed to
harmful levels of mercury via routine childhood
vaccinations with vaccines containing thimerosal, a
mercury laden preservative, stated a viable claim for
loss of consortium under Texas law.

[6] Parent and Child ⌐⟶7(.5)
285k7(.5)

Under Texas law, parents of minors who were
allegedly exposed to harmful levels of mercury via
routine childhood vaccinations with vaccines
containing thimerosal, a mercury laden preservative,
could not maintain a cause of action for loss of
services based upon the children's alleged injuries.

[7] Damages ⌐⟶51
115k51

Under Texas law, parents of minors who were
allegedly exposed to harmful levels of mercury via
routine childhood vaccinations with vaccines
containing thimerosal, a mercury laden preservative,
could not recover on their derivative claims of
emotional distress via a bystander action; they did not
witness and perceive the type of shocking accident
contemplated by the bystander theory of recovery,
but rather, they witnessed the routine vaccination of
their children and the children's subsequent medical
problems, and they did not even learn of the
children's alleged mercury poisoning until the
children's neurological problems were diagnosed by a
physician, well after the suspect vaccines were
administered.

[8] Damages ⌐⟶49
115k49

[8] Damages ⌐⟶50
115k50

[8] Damages ⌐⟶51
115k51

[8] Death ⌐⟶89
117k89

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

203 F.Supp.2d 748                                                   Page 2
(Cite as: 203 F.Supp.2d 748)

In Texas, emotional distress damages are recoverable in a very limited set of circumstances: (1) as the foreseeable result of a breach of a duty arising out of certain special relationships; (2) for common law torts involving intentional or malicious conduct; (3) for wrongful death; (4) in personal injury cases where the defendant's conduct causes the plaintiff serious bodily injury; and (5) in bystander actions.

**[9] Damages** 🔑51
115k51

In Texas, bystanders may recover damages for mental anguish suffered as a result of witnessing a serious or fatal accident involving a close family member.

**[10] Damages** 🔑51
115k51

To successfully recover emotional distress damages under Texas law, a bystander plaintiff must establish that: (1) the plaintiff was located near the scene of the accident, as contrasted with one who was a distance away from it; (2) the plaintiff suffered shock as a result of a direct emotional impact upon the plaintiff from a sensory and contemporaneous observation of the accident, as contrasted with learning of the accident from others after its occurrence; and (3) the plaintiff and victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

**[11] Damages** 🔑51
115k51

Texas law requires a bystanders's presence when the accident occurred and the contemporaneous perception of the accident for the bystander to recover emotional distress damages.
*750 C. Andrew Waters, Walter & Kraus, Dallas, TX, Peter Andresen Moir, Quilling Selander, Dallas, TX, Dana Casselli Fox, Waters & Kraus, LLP, Dallas, TX, for Plaintiffs.

Susan E. Burnett, Clark, Thomas & Winters, Austin, TX, Rebecca Jo Reser, Ray McChristian, San Antonio, TX, Marsha M. Piccone, Freeborn & Peters, Denver, CO, Russell O. Stewart, Faegre & Benson, LLP, for American Home Products Corp., Aventis Pasteur Inc.

John R. Gilbert, John Ralph Gilbert, Gilbert & Moore PLLC, Angelton, TX, for Dow Chemical Co.

Marie S. Woodbury, Deborah A. Moeller, Shook, Hardy & Bacon, Kansas City, MO, Diana L. Panian, Shook Hardy, Houston, TX, for Eli Lilly & Co.

Marc A. Sheiness, Sheiness Scott, Houston, TX, for EM Industries Inc.

*751 John Martin Ribarits, Abbott Simses, Houston, TX, for GDL Intern.

Barclay A. Manley, Fulbright & Jaworski, Houston, TX, Stephanie A. Smith, Fullbright and Jaworski, Austin, TX, for Glaxosmithkline.

Richard L. Josephson, Baker & Botts, Houston, TX, for Merck & Co. Inc.

David Michael MacDonald, McCauley, MacDonald & Devin, Dallas, TX, for Sigma-Aldrich Corp., Sigma Aldrich, Inc.

John A. Scully, Cooper & Scully, Dallas, TX, John A. Scully, Houston, TX, Marcos A. Adrogue, Cooper & Scully, PC, Houston, TX, for Spectrum Chemical Manufact.

*ORDER GRANTING IN PART AND DENYING IN PART WYETH, AVENTIS, MERCK AND SMITH KLINE'S MOTION TO DISMISS, DENYING SIGMA AND EM'S MOTION TO DISMISS, ORDERING PLAINTIFFS TO CONDUCT JURISDICTIONAL DISCOVERY OF GDL AND DENYING DEFENDANTS' REQUEST FOR ORAL ARGUMENT AS MOOT*

KENT, District Judge.

Plaintiffs Jessica Owens, individually and as legal representative of her minor child Jarrett Ross Schafer ("Jarrett"); Kenneth Brown and Cynthia Brown, individually and as legal representatives of their minor child Zachary Taylor Brown ("Zachary"); and David Ward and Felicia Ward, individually and as legal representatives of their minor child Morgan Elizabeth Ward ("Elizabeth"); bring this products liability lawsuit against Defendants Sigma Aldrich Corporation ("Sigma Corp."); Sigma Aldrich, Inc. ("Sigma Inc."); Eli Lilly and Company ("Eli Lilly"); The Dow Chemical Company ("Dow"); EM Industries, Inc. ("EM"); Wyeth ("Wyeth") f/k/a American Home Products, Corp.; Aventis Pasteur, Inc. ("Aventis") f/k/a Connaught Laboratories f/d/b/a

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

203 F.Supp.2d 748                                               Page 3
(Cite as: 203 F.Supp.2d 748)

Pasteur Merieux Connaught; Merck and Company, Inc. ("Merck"); Smith Kline Beecham Corporation ("Smith Kline") d/b/a GlaxoSmithKline; Spectrum Laboratory Products, Inc. ("Spectrum"); and GDL International, Inc. ("GDL") pursuant to Texas state law. Now before the Court are three Motions to Dismiss filed by various Defendants: (1) a Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b) and the National Childhood Vaccine Injury Act ("Vaccine Act"), 42 U.S.C. § § 300aa-1-300aa-34, filed by Wyeth, Aventis, Merck and Smith Kline; (2) a Motion to Dismiss pursuant to the Vaccine Act and Fed.R.Civ.P. 19 filed by Sigma Corp. and Sigma Inc. (collectively, "Sigma") and joined by EM; and (3) a Motion to Dismiss for Lack of Personal Jurisdiction filed by GDL. For the reasons articulated below, Wyeth, Aventis, Merck and Smith Kline's Motion to Dismiss pursuant to the Vaccine Act is **GRANTED IN PART and DENIED IN PART**, Sigma and EM's Motion to Dismiss pursuant to the Vaccine Act is **DENIED** and Plaintiffs are hereby **ORDERED** to conduct jurisdictional discovery of GDL before responding to that Defendant's Motion to Dismiss.

## I. Background

While they were infants, Jarrett, Zachary and Elizabeth were allegedly exposed to harmful levels of mercury via routine childhood vaccinations administered to them by their pediatricians. All or some of the vaccines contained thimerosal, a mercury laden preservative. At that time, vaccine manufacturers routinely added thimerosal to multiple-use vials of vaccines to extend each vial's shelf life. The thimerosal (and thus, mercury) introduced into the children's bodies by way of vaccination allegedly afflicted them with serious and lasting neurological injuries. Plaintiffs filed this action in a Texas state court *752 seeking damages for the children's personal injuries both individually and on behalf of their children (as legal representatives). In their Original Petition, Plaintiffs assert four causes of action (strict liability, negligence, gross negligence and conspiracy) against two distinct categories of Defendants: (1) the manufacturers of thimerosal containing vaccines-Wyeth, Aventis, Merck and Smith Kline ("Vaccine Manufacturers"); and (2) the manufacturers of thimerosal itself-Eli Lilly, EM, Sigma, Dow, Spectrum and GDL ("Chemical Manufacturers"). [FN1] Defendants subsequently removed the action pursuant to this Court's diversity jurisdiction.

FN1. In their Original Petition Plaintiffs do not distinguish between the Vaccine

Manufacturers and the Thimerosal Manufacturers. The Court finds, however, that making such a distinction is essential.

## II. The Vaccine Act

The "[v]accination of children against deadly, disabling, but preventable infectious diseases has been one of the most spectacularly effective public health initiatives this country has ever undertaken. Use of vaccines has prevented thousands of children's deaths each year and has substantially reduced the effects resulting from disease." H.R.Rep. No. 99-908, at 4 (1986), reprinted in 1986 U.S.C.C.A.N. 6344, 6345. However, while most children enjoy measurable benefit from immunization programs, "a small but significant number of have been gravely injured." Id. Two significant concerns accompany these vaccine-related injuries: the inconsistency, expense, delay and unpredictability of the tort system in compensating claims of vaccine-injured children; and the instability and uncertainty of the childhood vaccine market inevitably caused by the risks of tort litigation. See id. at 7, 1986 U.S.C.C.A.N. at 6348. Fortunately, the National Vaccine Injury Compensation Program ("Program") ameliorates these concerns. The Program provides an avenue of recovery for injuries and deaths traceable to vaccinations that works with greater ease and on a faster timetable than the civil tort system. [FN2] See Shalala v. Whitecotton, 514 U.S. 268, 269, 115 S.Ct. 1477, 1478, 131 L.Ed.2d 374 (1995). In effect, it "ensure[s] that all children who are injured by vaccines have access to sufficient compensation for their injuries," H.R.Rep. No. 99-908 at 6345-6346, and "free[s] manufacturers from the specter of large, uncertain tort liability, and thereby ... keep[s] manufacturers in the market." Schafer v. Am. Cyanamid Co., 20 F.3d 1, 4 (1st Cir.1994).

FN2. The Program became effective on October 1, 1988.

The Program, set forth in the Vaccine Act, requires that vaccine-related claims are initially heard by special masters in the United States Court of Federal Claims ("Vaccine Court"), adjudicated informally and then accorded expeditious review. See Whitecotton, 514 U.S. at 270, 115 S.Ct. at 1478. This system streamlines the claims process by establishing standards of proof, under which individuals who suffer injuries within specified intervals after being administered a vaccine, benefit from a presumption

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

203 F.Supp.2d 748
(Cite as: 203 F.Supp.2d 748)

Page 4

that a vaccine caused those injuries. *See* 42 U.S.C. § § 300aa-11(c)(1)(C)(i), 300aa-13(a)(1), 300aa-14; *Haggerty v. Wyeth Ayerst Pharm.,* 79 F.Supp.2d 182, 184 (E.D.N.Y.2000). A Program claimant may not file a civil action against a vaccine manufacturer or administrator unless the claimant initially files a timely petition in accordance with the Program's guidelines. [FN3] *See* 42 U.S.C. § 300aa-11(2)(A); *Whitecotton,* 514 U.S. at 270, 115 S.Ct. at 1478 (explaining that a *753 claimant alleging an injury after the Vaccine Act's effective date "must exhaust the Act's procedures ...before filing any *de novo* civil action in state or federal court"). If a claimant seeks compensation in a state or federal court for vaccine-related injuries prior to exhausting his or her remedies under the Vaccine Act, the Court must dismiss the action. *See* 42 U.S.C. § 300aa-11(a)(2)(B). Simply put, individuals who qualify as Program claimants *must* file petitions in the Vaccine Court in order to pursue any vaccine-related claims at all. [FN4] Nonetheless, if an individual who prevails in the Vaccine Court is ultimately dissatisfied with his or her Program award, that individual may reject the award and pursue a traditional tort action in any forum. [FN5] *See* 42 U.S.C. § 300aa-21(a).

FN3. A proper claimant, or "petitioner," under the Vaccine Act is "any person who has sustained a vaccine-related injury," or the legal representative of such person. 42 U.S.C. § 300aa-11(b)(1)(A).

FN4. There are a few exceptions. *De minimis* claims for less than $1,000 may be brought in state or federal courts without prior filing under the Vaccine Program. *See* 42 U.S.C. § 300aa-11(a)(2)(A). However, the Vaccine Act requires that any vaccine-related action seeking an unspecified amount of damages (such as the instant lawsuit) be filed under the Program. *See id.*

FN5. Under the Program, the compensation awarded to a petitioner for a vaccine-related injury may include actual and un-reimbursable expenses and projected expenses for medical or other remedial care determined to be reasonably necessary; actual and anticipated lost earnings; and actual and projected pain and suffering subject to a statutory cap of $250,000. *See* 42 U.S.C. § 300aa-15(a). Punitive and exemplary damages are prohibited. *See* 42

U.S.C. § 300aa-15(d). Reasonable attorneys' fees and costs are awarded even if the petition is denied, so long as the special master determines that the petition was brought in good faith and that a reasonable basis for asserting the claim existed. *See* 42 U.S.C. § 300aa-15(c). In the event that a petitioner chooses to reject a Program award, the Vaccine Act limits the tort remedies that become available. For instance, the Vaccine Act establishes compliance with Food and Drug Administration ("FDA") requirements as a partial defense for manufacturers, *see* 42 U.S.C. § 300aa-22(b)(2), and requires tort suits to be tried in three phases (liability, general damages and punitive damages). *See* 42 U.S.C. § 300aa-23(a). Moreover, a manufacturer's compliance with FDA guidelines generally precludes an award of punitive damages. *See* 42 U.S.C. § 300aa-23(d).

**III. Vaccine Manufacturers' Motion to Dismiss**

In this case, it is undisputed that Plaintiffs have not filed a petition in the Vaccine Court in accordance with the Program. In their Motion to Dismiss, filed March 28, 2002, the Vaccine Manufacturers highlight this fact and argue that Plaintiffs' failure to file a Program petition requires the Court to dismiss all claims filed against them pursuant to Fed.R.Civ.P. 12(b). [FN6] In response, Plaintiffs contend that they are not required to file a petition in the Vaccine Court because the children's injuries fall outside the scope of the Vaccine Act. Thus, the Court must initially determine whether Plaintiffs are required to file a Program petition for: (1) the claims they have filed on behalf of their children ("Representative Claims"); or (2) their individual claims that are derivative of the children's injuries ("Individual Claims").

FN6. Although the Vaccine Manufacturers do not specify which provision of Rule 12(b) they are moving for dismissal under, the Court assumes that they are seeking a dismissal under Rule 12(b)(3) for improper venue, or in the alternative, under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12(b)(3); Fed.R.Civ.P. 12(b)(3).

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

### Representative Claims Filed Against the Vaccine Manufacturers

[1] A proper claimant under the Vaccine Act is "any person who has sustained *754 a vaccine-related injury" *or* the legal representative of that person. 42 U.S.C. § 300aa-11(b)(1)(A). Therefore, if the children sustained "vaccine-related injuries," Plaintiffs are proper claimants under the Vaccine Act with respect to the Representative Claims. The Vaccine Act defines "vaccine-related injury" as "an illness, injury, condition or death associated with one or more of the vaccines set forth in the Vaccine Injury Table [42 C.F.R. § 100.3], except that term does not include an illness, injury, condition, or death associated with an adulterant or a contaminant intentionally added to such a vaccine." [FN7] 42 U.S.C. § 300aa-33(5). Plaintiffs maintain that because thimerosal is an "adulterant or contaminant intentionally added to ...a vaccine," this lawsuit does not involve a "vaccine- related" injury as defined by the Vaccine Act. [FN8] Conversely, the Vaccine Manufacturers contend that thimerosal is not an "adulterant or contaminant," but rather, a "constituent material" of vaccines. The Court agrees with the Vaccine Manufacturers.

> FN7. The vaccines currently listed in the Vaccine Injury Table are diptheria, tetanus, pertussis, measles, mumps, rubella, poliovirus, hepatitis B, haemophilil influenzae type b, varicella zoster virus, rotavirus and streptococcus pneumoniae. *See* 42 C.F.R. § 100.3 (Vaccine Injury Table). In addition to listing eligible vaccines, the Vaccine Injury Table also lists types of injuries associated with each vaccine. *See id.* Individuals who suffer a listed injury after being dosed with the corresponding vaccine make out a *prima facie* case for compensation that may be rebutted only by proof that such injury was caused by factors unrelated to the vaccine. *See* 42 U.S.C. § § 300aa-11(c)(1)(C)(i), 300aa-13(a)(1)(B). Individuals who suffer injuries not listed in the Vaccine Injury Table may still obtain compensation, but they must prove by a preponderance of the evidence that the injury was in fact caused by a listed vaccine. *See id.*

> FN8. The Court notes that Plaintiffs' Original Petition does not specify which thimerosal containing vaccines were

administered to the children. Rather, the Petition generally refers to vaccines that are "routinely administered to children" according to the "typical immunization schedule during the first 18 months of life." The Recommended Childhood Immunization Schedule published by the Centers for Disease Control and Prevention ("CDC") specifies that the routine vaccinations for American children within their first eighteen months are (1) hepatitis B vaccine; (2) diphtheria, tetanus and pertussis vaccine; (3) haemophilus *influenzae* type b vaccine; (4) poliovirus vaccine; (5) measles-mumps-rubella vaccine; and (6) varicella zoster virus vaccine. *See Morbidity and Mortality Weekly Report* (Centers for Disease Control and Prevention) Vol. 44 Nos. 52 & 52, January 5, 1996, at 942 (Figure 1). Thus, the Court presumes that the reference to vaccines "routinely administered to children" in Plaintiffs' Original Petition refers to the six CDC- recommended vaccines. And because all six of these vaccines are covered by the Vaccine Injury Table, *see* 42 C.F.R. § 100.3, the Court further assumes that the children's injuries are "table injuries" within the scope of the Vaccine Act. This assumption is supported by the fact that Plaintiffs do not assert that the children were injured by an unlisted vaccine in response to the Vaccine Manufacturers' Motion to Dismiss.

[2] When attempting to discern a statute's meaning, a court must initially look to the plain meaning of the statute's language. *See Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992).* Here, because "adulterant" and "contaminant" are not specifically defined by the Vaccine Act, dictionary definitions provided the Court with guidance as to the plain meaning of these terms. The definition of an "adulterant" *is* "a substance which makes an item impure, spurious, or inferior by adding extraneous or improper ingredients." *The American Heritage Dictionary* 58 (2d ed.1992). A medical dictionary similarly defines adulterant as "[a]n impurity; an additive that is considered to have an undesirable effect or to dilute the active material so as to *755 reduce its therapeutic or monetary value." *Stedman's Medical Dictionary* 30 (27th ed.2000). And a contaminant is "[s]omething that makes impure or corrupt by contact or mixture." *Webster's 9th New Collegiate*

203 F.Supp.2d 748
(Cite as: 203 F.Supp.2d 748)

*Dictionary* 283 (9th ed.1991).

Thimerosal, when used in vaccines, fails to correspond with any of these definitions. Vaccine manufacturers intentionally add thimerosal to vaccine formulas because it deters microbial and fungal growth, thereby maintaining the safety, purity and potency of vaccines. In fact, thimerosal has been widely used as a vaccine preservative since the 1930s, *see* Statement by William Egan, Ph.D., FDA, before the Committee on Government Reform, U.S. House of Representatives, July 18, 2000, and its use satisfies the FDA's requirement that preservatives be added to vaccines distributed in multi-use vials. *See* 21 C.F.R. § 610.15(a) ("Products in multiple-dose containers shall contain a preservative"). As such, thimerosal cannot be said to "make impure or corrupt" a vaccine or to reduce a vaccine's therapeutic value. Furthermore, thimerosal cannot be characterized as having an undesirable effect or diluting the active material found within a vaccine. In fact, the precise opposite is true. As a preservative, thimerosal *prevents* a vaccine's corruption. Hence, neither the plain meaning of "adulterant" nor "contaminant" applies to thimerosal when, as here, it is purposefully used as an ingredient in the approved formulation of a vaccine.

The remainder of the language used by Congress to define "vaccine-related injury" (i.e. "associated with one or more ...vaccines") likewise requires a finding that the Representative Claims are covered by the Program. A "vaccine" is defined as a "suspension of attenuated or killed microorganisms," *Dorland's Medical Dictionary* 1799 (27th ed.1988), and "a preparation of killed microorganisms, living attenuated organisms, or living fully virulent organisms." *Webster's 9th New Collegiate Dictionary* 1301 (9th ed.1991). Neither of these definitions indicate that a vaccine is comprised of microorganisms alone. On the contrary, they indicate that a vaccine is a "suspension" or "preparation" composed of both microorganisms and additional ingredients. [FN9] And, as explained above, manufacturers of vaccines add thimerosal to the "preparation" or "suspension" of vaccines. [FN10]

FN9. A suspension is "a class of pharmacopeial preparations of finely divided undissolved drugs [or in this case, microorganisms] ... dispersed in liquid vehicles for oral or parenteral use." *Stedman's Medical Dictionary* 1713 (26th ed.1995). A preparation is "a medicinal substance made ready for use." *Webster's*

*9th New Collegiate Dictionary* 929 (9th ed.1991).

FN10. The FDA has long recognized that preservatives (i.e.thimerosal) are "constituent materials" of vaccines. *See* 21 C.F.R. § 610.15 (indicating that constituents of biological materials include ingredients, preservatives, diluents and adjuvants).

Therefore, because the children's injuries are allegedly linked to a vaccine ingredient, their injuries are definitely "vaccine-related." *See, e.g., Brausewetter v. Sec'y of Health and Human Servs.,* No.99-278V, 1999 WL 562700, at *3 (Fed.Cl. July 16, 1999) (stating that claims fall under the Vaccine Act when a claimant is exposed to the "chemical/biological components of the tetanus vaccine"); *Pannell v. Sec'y of Health and Human Servs.,* No. 94-658V, 1995 WL 432643, at *2 (Fed.Cl. July 7, 1995) (referring to "vaccine- related injury" as one "caused by the vaccine or by something contained therein"); *see also Grant v. Sec'y of Health and Human Servs.,* 956 *756 F.2d 1144, 1149-50 (Fed.Cir.1992)* (affirming award where vaccine's preservative was an alleged cause of claimant's injury). Clearly, the plain language of the Vaccine Act indicates that the children's injuries cannot be "thimerosal-related" without being "vaccine-related" as well. [FN11] Therefore, Plaintiffs are required to file a Program petition as a pre- requisite to filing any civil action seeking damages from the Vaccine Manufacturers for injuries to their children. Accordingly, the Vaccine Manufacturers' Motion to Dismiss is **GRANTED** with respect to the Representative Claims asserted against them. These claims are hereby **DISMISSED WITHOUT PREJUDICE** and Plaintiffs are urged to re-file such claims in the Vaccine Court if they so desire.

FN11. In this case, because the language of the Vaccine Act unambiguously and specifically indicates that injuries caused by vaccine preservatives (i.e.thimerosal) are within its scope, it is clear that Congress has spoken to the precise question at issue. And the Court has given effect to such Congressional intent. However, the Court's decision would remain the same even if Congressional intent was not clearly expressed. In that event, the Court would have adopted the position taken by the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

203 F.Supp.2d 748
(Cite as: 203 F.Supp.2d 748)

Secretary of the Department of Health and Human Services ("Secretary"). *See Chevron U.S.A. v. Nat'l Resources Def. Council, Inc., 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984)* (explaining that when Congress has not directly spoken to an issue, courts must adopt the interpretation of the administrative agency charged with the duty of enacting the regulation in question "unless they are arbitrary, capricious, or manifestly contrary to the statute"). The Secretary, who is charged with the responsibility of administering the Program, *see* 42 U.S.C. § § 300aa-10-300aa34, maintains that any injury claims allegedly caused by thimerosal in covered vaccines are "vaccine related" and therefore, thimerosal-related claims against vaccine manufacturers require adjudication by the Vaccine Court. *See, e.g.,* The National Vaccine Injury Compensation Program web-page, *available at* < http://www.hrsa.gov/osp/vicp/quanda.htm> ("Because thimerosal is not an adulterant or contaminant, individuals who have claims relating to thimerosal in vaccines covered under the [Vaccine Act] ... must first file the claim with the [Program] before pursuing any other civil litigation").

### Individual Claims Against the Vaccine Manufacturers

Having dismissed the Representative Claims against the Vaccine Manufacturers, the Court now turns to Plaintiffs' Individual Claims for loss of consortium, emotional distress and loss of services. In their Motion to Dismiss, the Vaccine Manufacturers argue that Plaintiffs are also required to file a Program petition as a pre-requisite to asserting the Individual Claims. Moreover, the Vaccine Manufacturers assert that even if the Individual Claims are not barred by the Vaccine Act, Plaintiffs' causes of action for loss of consortium, loss of services and emotional distress cannot be maintained in accordance with Texas law. The Court will address each of these contentions in turn.

*Vaccine Act Petition*

[3] By its own terms, the Vaccine Act's proscription against bringing a civil action for damages prior to the filing of a Program petition "applies only to a person who has sustained a vaccine-related injury or death and who is qualified to file a petition for compensation under the Program." 42 U.S.C. § 300aa-11(a)(9). As such, Plaintiffs are not barred from bringing their Individual Claims against the Vaccine Manufacturers unless they are "qualified to file a petition." An individual becomes eligible to file a petition if he or she suffers a specified injury after receiving a vaccine. *See* 42 U.S.C. § § 300aa-11(b)(1)(A), 300aa-11(c)(1)(A). Thus, unless an individual received a vaccine (or is the legal representative of such an individual), that individual cannot file a petition in *757 the Vaccine Court. *See Schafer,* 20 F.3d at 7; *Head v. Sec'y of Health and Human Servs.,* 26 Cl.Ct. 546, 547 n. 1 (1992), *aff'd,* 996 F.2d 318 (Fed.Cir.1993). In this case, none of the Plaintiffs allege to have "suffered a relevant injury... after he or she received a vaccine." Accordingly, Plaintiffs need not (and cannot, for that matter) file a Program petition with respect to their Individual Claims, and are consequently permitted to file such claims in this forum. *See Schafer,* 20 F.3d at 5 (explaining that the Vaccine Act's tort suit ban does not apply to individuals who cannot file petition in the Vaccine Court except in a representative capacity); *Head,* 26 Cl.Ct. at 550 (holding that an award to a mother in her individual capacity in an action arising from vaccine-related injuries received by her daughter did not bar the daughter's subsequent action under the Vaccine Act); *McDonald v. Lederle Labs., 341 N.J.Super. 369, 775 A.2d 528, 535 (2001)* ("The [Vaccine] Act does not preclude parents from filing an individual civil action for losses incurred by them."). Having determined that Plaintiffs' Individual Claims are not barred by the Vaccine Act, the Court now considers the merits of these claims under Texas law.

*Loss of Consortium*

[4][5] In *Sanchez v. Schindler, 651 S.W.2d 249 (Tex.1983),* the Texas Supreme Court recognized that injuries to the familial relationship are significant injuries worthy of compensation. *See id.* at 251. Accordingly, parents may recover for loss of companionship for the wrongful death of a child. *See id.* At least two Texas courts have extended the *Sanchez* holding to cover situations involving a non-fatally injured child. *See Roberts v. Williamson, 52 S.W.3d 343, 352 (Tex.App.-Texarkana 2001)* ("To hold that a parent cannot recover [for the loss of consortium of a non-fatally injured child] would ignore the basic idea behind recovery for loss of consortium: to attempt to compensate for the loss of love and companionship"), *petition for review filed* (August 20, 2001); *Enochs v. Brown, 872 S.W.2d 312, 322 (Tex.App.-Austin 1994, no writ)* ("Within the [Texas] Supreme Court's express recognition of a

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

common law cause of action for a serious injury to a spouse or parent lies the implicit recognition of a parent's claims for loss of companionship for a similar injury to a child"); *Cf. Reagan v. Vaughn, 804 S.W.2d 463, 466 (Tex.1990)* ("[T]he two relationships likely to be most severely affected by a negligent injury to a person are the husband and wife relationship and that of parent and child[.]") Therefore, in light of these decisions, the Court concludes that Plaintiffs have stated a viable claim for loss of consortium under Texas law.

*Loss of Services*

[6] On the other hand, the Texas Supreme Court rejected the "antiquated concept of the child as an economic asset," when it explained that "[t]he real loss sustained by a parent is not the loss of any financial benefit to be gained from the child, but is the loss of love, advice, comfort, companionship and society." *Sanchez, 651 S.W.2d at 251.* Therefore, the Court concludes that, as a matter of Texas law, Plaintiffs cannot maintain a cause of action for loss of services based upon the children's alleged injuries.

*Emotional Distress*

[7][8] Similarly, Plaintiffs cannot recover on their derivative claims of emotional distress. In Texas, emotional distress damages are recoverable in a very limited set of circumstances: (1) as the foreseeable result of a breach of a duty arising out of certain special relationships; (2) for common law torts involving intentional or malicious conduct; (3) for wrongful death; (4) in personal injury cases where the defendant's conduct causes the plaintiff serious bodily injury; and (5) in bystander *758 actions. *See Verinakis v. Med. Profiles, Inc., 987 S.W.2d 90, 95 (Tex.App.-Houston [14th Dist.] 1998, pet. denied).* In this case, Plaintiffs have not alleged any facts signaling a special relationship, intentional or malicious conduct or wrongful death. And the only personal injuries alleged were incurred by the children-not by Plaintiffs. Thus, the only possible avenue by which Plaintiffs may attempt to recover emotional distress damages is the bystander action. However, given the facts of this case, this method proves similarly inapplicable.

[9][10][11] In Texas, bystanders may recover damages for mental anguish suffered as a result of witnessing a serious or fatal accident involving a close family member. *See City of Tyler v. Likes, 962 S.W.2d 489, 496 (Tex.1997).* In order to successfully recover emotional distress damages, a bystander plaintiff must establish that: (1) the plaintiff was located near the scene of the accident, as contrasted with one who was a distance away from it; (2) the plaintiff suffered shock as a result of a direct emotional impact upon the plaintiff from a sensory and contemporaneous observation of the accident, as contrasted with learning of the accident from others after its occurrence; and (3) the plaintiff and victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship. *See United Servs. Auto Ass'n v. Keith, 970 S.W.2d 540, 541-42 (Tex.1998).* Texas law requires the bystanders's presence when the accident occurred and the contemporaneous perception of the accident. *See id. at 542.*

Here, Plaintiffs clearly did not witness and perceive the type of shocking accident contemplated by the bystander theory of recovery. Rather, Plaintiffs witnessed the routine vaccination of their children and the children's subsequent medical problems that are allegedly linked to thimerosal. Moreover, Plaintiffs did not even learn of the children's alleged mercury poisoning until the children's neurological problems were diagnosed by a physician, well after the suspect vaccines were administered. However anguishing these belated circumstances may have been, the bystander theory is inapplicable to the facts of this case, as a matter of Texas law.

As stated above, although none of the Individual Claims are barred by the Vaccine Act, Plaintiffs' derivative claims for loss of services and emotional distress cannot be maintained in conformity with Texas law. On the other hand, Plaintiffs' cause of action for loss consortium remains viable. As such, the Vaccine Manufacturers' Motion to Dismiss is hereby **GRANTED IN PART** with respect to Plaintiffs' Individual Claims for loss of services and emotional distress; and hereby **DENIED IN PART** with respect to Plaintiffs' Individual Claims for loss of consortium. The Court further **ORDERS** that Plaintiffs' Individual Claims for loss of services and emotional distress against the Vaccine Manufacturers are **DISMISSED WITH PREJUDICE.**

**IV. Sigma's Motion to Dismiss**

[12] The Court now turns to the Motion to Dismiss filed by Sigma on March 22, 2002 and joined by EM on March 27, 2002 (both Sigma and EM are Chemical Manufacturer Defendants). [FN12] Sigma and EM contend that the Vaccine Act also requires dismissal of the Representative Claims and Individual Claims brought against them. This argument contains a fatal flaw, however, because the Vaccine *759 Act only prohibits the filing of any

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

203 F.Supp.2d 748
(Cite as: 203 F.Supp.2d 748)

Page 9

civil action against a "vaccine *manufacturer* or *administrator* " prior to the filing of a Program petition. 42 U.S.C. § 300aa-11(2)(A) (emphasis added). Because Sigma and EM allegedly supplied thimerosal (a raw material) to the Vaccine Manufacturers, but do not manufacture or administer vaccines themselves, Plaintiffs' claims against Sigma and EM are not subject to the Vaccine Act's tort suit bar. Nevertheless, for the reasons discussed previously in conjunction with the Individual Claims against the Vaccine Manufacturers, Sigma and EM's Motion to Dismiss is hereby GRANTED IN PART with respect to Plaintiffs' derivative claims for loss of services and emotional distress. Those claims are hereby DISMISSED WITH PREJUDICE. Regarding all other claims asserted by Plaintiffs against Sigma and EM, their Motion to Dismiss is hereby DENIED. [FN13]

FN12. On May 1, 2002, Sigma filed a second Motion to Dismiss and alternatively, a Motion to Stay. The Court is not making any ruling on Sigma's second Motion to Dismiss at this time. The Court will address that Motion, along with Sigma's request for a stay, after Plaintiffs have responded thereto.

FN13. Sigma and EM's Motion to Dismiss also argues for a dismissal pursuant to Fed.R.Civ.P. 19 in the event that the Court dismisses "any other Defendant or other Defendants." Because the Court has not dismissed any Defendants (only certain claims), the Court does not need to address Sigma and EM's Rule 19 request.

### V. GDL's Motion to Dismiss

The Court recently issued an Order denying Plaintiffs leave to conduct jurisdictional discovery of GDL pending further Order of the Court. Having determined that Plaintiffs' claims against the Chemical Manufacturers are not barred by the Vaccine Act, the Court finds that such discovery is indeed warranted. As such, the Court hereby ORDERS that Plaintiffs have sixty (60) days from the date of this Order to conduct discovery pertaining solely to whether this Court may validly exercise personal jurisdiction over GDL. At the end of that time period, Plaintiffs are ORDERED to file their Response to GDL's Motion to Dismiss for Lack of Personal Jurisdiction. The Court will rule on that

Motion as soon as it can be reached.

In conclusion, the Court reiterates that all Representative Claims asserted against the Vaccine Manufacturers fall squarely within the jurisdiction of the Vaccine Court and are hereby DISMISSED WITHOUT PREJUDICE. Hence, the only claims against the Vaccine Manufacturers that Plaintiffs may properly assert in this forum are those seeking compensation for loss of consortium. On the other hand, Plaintiffs' Representative Claims and Individual Claims against the Chemical Manufacturers are subject to adjudication in this forum, with the exception of Plaintiffs' derivative claims for emotional distress and loss of services. GDL's Motion to Dismiss remains pending. Finally, this Order renders the Vaccine Manufacturers' Request for Oral Argument on their Motion to Dismiss MOOT. The Court will address all other pending concerns as soon as they are ripe for consideration.

IT IS SO ORDERED.

203 F.Supp.2d 748

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| JAY BLACKMON and KENDEL BLACKMON, individually and as next friends to TODD CHRISTOPHER BLACKMON; NORMAN KUEHN and MELISSA KUEHN, individually and as next friends to BRANDON HILTON KUEHN; and TIM SCOTT and SHARON SCOTT, individually and as next friends to COLBY BRENNAN SCOTT, Plaintiffs, | § § § § § § § § § § | |
| v. | § § | CIVIL ACTION NO. G-02-179 |
| AMERICAN HOME PRODUCTS CORPORATION, et al. Defendants. | § § § | |

ORDER GRANTING IN PART AND DENYING IN PART WYETH, AVENTIS,
MERCK AND SMITH KLINE'S MOTION TO DISMISS, DENYING
SIGMA'S MOTION TO DISMISS, GRANTING PLAINTIFFS' MOTION FOR
LEAVE TO CONDUCT DISCOVERY AND TO EXTEND THE RESPONSE
DATE TO GDL'S AMENDED MOTION TO DISMISS AND DENYING
DEFENDANTS' REQUEST FOR ORAL ARGUMENT AS MOOT

Plaintiffs Jay Blackmon and Kendel Blackmon, individually and as legal representatives of

their minor child Todd Christopher Blackmon ("Todd"); Norman Kuehn and Melissa Kuehn,

individually and as legal representatives of their minor child Brandon Hilton Kuehn ("Brandon");

and Tim Scott and Sharon Scott, individually and as legal representatives of their minor child Colby

Brennan Scott ("Colby"); bring this products liability lawsuit against Defendants Sigma Aldrich

Corporation ("Sigma Corp."); Sigma Aldrich, Inc. ("Sigma Inc."); Eli Lilly and Company ("Eli

Lilly"); The Dow Chemical Company ("Dow"); EM Industries, Inc. ("EM"); Wyeth ("Wyeth") f/k/a

American Home Products, Corp.; Aventis Pasteur, Inc. ("Aventis") f/k/a Connaught Laboratories

f/d/b/a Pasteur Merieux Connaught; Merck and Company, Inc. ("Merck"); Smith Kline Beecham

Corporation ("Smith Kline") d/b/a GlaxoSmithKline; Spectrum Laboratory Products, Inc. ("Spectrum"); and GDL International, Inc. ("GDL") pursuant to the state laws of Texas. Now before the Court are three Motions to Dismiss filed by various Defendants: (1) a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b) and the National Childhood Vaccine Injury Act ("Vaccine Act"), 42 U.S.C. §§ 300aa-1-300aa-34, filed by Wyeth, Aventis, Merck and Smith Kline; (2) a Motion to Dismiss pursuant to the Vaccine Act and Fed. R. Civ. P. 19 filed by Sigma Corp. and Sigma Inc. (collectively, "Sigma"); and (3) a Motion to Dismiss for Lack of Personal Jurisdiction filed by GDL. For the reasons articulated below, Wyeth, Aventis, Merck and Smith Kline's Motion to Dismiss pursuant to the Vaccine Act is GRANTED IN PART and DENIED IN PART, Sigma's Motion to Dismiss pursuant to the Vaccine Act is DENIED and Plaintiffs are hereby ORDERED to conduct jurisdictional discovery before responding to the Motion to Dismiss filed by GDL.

## I. Background

While they were infants, Todd, Brandon and Colby were allegedly exposed to harmful levels of mercury via routine childhood vaccinations administered to them by their pediatricians. All or some of the vaccines contained thimerosal, a mercury laden preservative. At that time, vaccine manufacturers routinely added thimerosal to multiple-use vials of vaccines to extend each vial's shelf life. The thimerosal (and thus, mercury) introduced into the children's bodies by way of vaccination allegedly afflicted them with serious and lasting neurological injuries. Plaintiffs filed this action in a Texas state court seeking damages for the children's personal injuries both individually and on behalf of their children (as legal representatives). In their Original Petition, Plaintiffs assert four causes of action (strict liability, negligence, gross negligence and conspiracy) against two distinct

2

categories of Defendants: (1) the manufacturers of thimerosal containing vaccines–Wyeth, Aventis, Merck and Smith Kline ("Vaccine Manufacturers"); and (2) the manufacturers of thimerosal itself–Eli Lilly, EM, Sigma, Dow, Spectrum and GDL ("Chemical Manufacturers").[1] Defendants subsequently removed the action pursuant to this Court's diversity jurisdiction.

## II.  The Vaccine Act

The "[v]accination of children against deadly, disabling, but preventable infections diseases has been one of the most spectacularly effective public health initiatives this country has ever undertaken. Use of vaccines has prevented thousands of children's deaths each year and has substantially reduced the effects resulting from disease." H.R. Rep. No. 99-908, at 4 (1986), reprinted in 1986 U.S.C.C.A.N. 6344, 6345. However, while most children enjoy measurable benefit from immunization programs, "a small but significant number of have been gravely injured." Id. Two significant concerns accompany these vaccine-related injuries: the inconsistency, expense, delay and unpredictability of the tort system in compensating claims of vaccine-injured children; and the instability and uncertainty of the childhood vaccine market inevitably caused by the risks of tort litigation. See id. at 7, 1986 U.S.C.C.A.N. at 6348. Fortunately, the National Vaccine Injury Compensation Program ("Program") ameliorates these concerns. The Program provides an avenue of recovery for injuries and deaths traceable to vaccinations that works with greater ease and on a faster timetable than the civil tort system.[2] See Shalala v. Whitecotton, 514 U.S. 268, 269, 115 S.

---

[1] In their Original Petition Plaintiffs do not distinguish between the Vaccine Manufacturers and the Thimerosal Manufacturers. The Court finds, however, that making such a distinction is essential.

[2] The Program became effective on October 1, 1988.

3

Ct. 1477, 1478, 131 L.Ed.2d 374 (1995). In effect, it "ensure[s] that all children who are injured by vaccines have access to sufficient compensation for their injuries," H.R. Rep. No. 99-908 at 6345-6346, and "free[s] manufacturers from the specter of large, uncertain tort liability, and thereby . . . keep[s] manufacturers in the market." Schafer v. Am. Cyanamid Co., 20 F.3d 1, 4 (1st Cir. 1994).

The Program, set forth in the Vaccine Act, requires that vaccine-related claims are initially heard by special masters in the United States Court of Federal Claims ("Vaccine Court"), adjudicated informally and then accorded expeditious review. See Whitecotton, 514 U.S. at 270, 115 S. Ct. at 1478. This system streamlines the claims process by establishing standards of proof, under which individuals who suffer injuries within specified intervals after being administered a vaccine, benefit from a presumption that a vaccine caused those injuries. See 42 U.S.C. §§ 300aa-11(c)(1)(C)(i), 300aa-13(a)(1), 300aa-14; Haggerty v. Wyeth Ayerst Pharm., 79 F. Supp. 2d 182, 184 (E.D.N.Y. 2000). A Program claimant may not file a civil action against a vaccine manufacturer or administrator unless the claimant initially files a timely petition in accordance with the Program's guidelines.[3] See 42 U.S.C. § 300aa-11(2)(A); Whitecotton, 514 U.S. at 270, 115 S. Ct. at 1478 (explaining that a claimant alleging an injury after the Vaccine Act's effective date "must exhaust the Act's procedures . . . before filing any de novo civil action in state or federal court"). If a claimant seeks compensation in a state or federal court for vaccine-related injuries prior to exhausting his or her remedies under the Vaccine Act, the Court must dismiss the action. See 42 U.S.C. § 300aa-11(a)(2)(B). Simply put, individuals who qualify as Program claimants must file petitions in the

---

[3] A proper claimant, or "petitioner," under the Vaccine Act is "any person who has sustained a vaccine-related injury," or the legal representative of such person. 42 U.S.C. § 300aa-11(b)(1)(A).

Vaccine Court in order to pursue any vaccine-related claims at all.[4] Nonetheless, if an individual who prevails in the Vaccine Court is ultimately dissatisfied with his or her Program award, that individual may reject the award and pursue a traditional tort action in any forum.[5] See 42 U.S.C. § 300aa-21(a).

### III. Vaccine Manufacturers' Motion to Dismiss

In this case, it is undisputed that Plaintiffs have not filed a petition in the Vaccine Court in accordance with the Program. In their Motion to Dismiss, filed March 28, 2002, the Vaccine Manufacturers highlight this fact and argue that Plaintiffs' failure to file a Program petition requires the Court to dismiss all claims filed against them pursuant to Fed. R. Civ. P. 12(b).[6] In response, Plaintiffs contend that they are not required to file a petition in the Vaccine Court because the children's injuries fall outside the scope of the Vaccine Act. Thus, the Court must initially determine

---

[4] There are a few exceptions. *De minimis* claims for less than $1,000 may be brought in state or federal courts without prior filing under the Vaccine Program. See 42 U.S.C. § 300aa-11(a)(2)(A). However, the Vaccine Act requires that any vaccine-related action seeking an unspecified amount of damages (such as the instant lawsuit) be filed under the Program. See id.

[5] Under the Program, the compensation awarded to a petitioner for a vaccine-related injury may include actual and un-reimbursable expenses and projected expenses for medical or other remedial care determined to be reasonably necessary; actual and anticipated lost earnings; and actual and projected pain and suffering subject to a statutory cap of $250,000. See 42 U.S.C. § 300aa-15(a). Punitive and exemplary damages are prohibited. See 42 U.S.C. § 300aa-15(d). Reasonable attorneys' fees and costs are awarded even if the petition is denied, so long as the special master determines that the petition was brought in good faith and that a reasonable basis for asserting the claim existed. See 42 U.S.C. § 300aa-15(e). In the event that a petitioner chooses to reject a Program award, the Vaccine Act limits the tort remedies that become available. For instance, the Vaccine Act establishes compliance with Food and Drug Administration ("FDA") requirements as a partial defense for manufacturers, see 42 U.S.C. § 300aa-22(b)(2), and requires tort suits to be tried in three phases (liability, general damages and punitive damages). See 42 U.S.C. § 300aa-23(a). Moreover, a manufacturer's compliance with FDA guidelines generally precludes an award of punitive damages. See 42 U.S.C. § 300aa-23(d).

[6] Although the Vaccine Manufacturers do not specify which provision of Rule 12(b) they are moving for dismissal under, the Court assumes that they are seeking a dismissal under Rule 12(b)(3) for improper venue, or in the alternative, under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. See Fed. R. Civ. P. 12(b)(3); Fed. R. Civ. P. 12(b)(6).

whether Plaintiffs are required to file a Program petition for: (1) the claims they have filed on behalf of their children ("Representative Claims"); or (2) their individual claims that are derivative of the children's injuries ("Individual Claims").

### Representative Claims Filed Against the Vaccine Manufacturers

A proper claimant under the Vaccine Act is "any person who has sustained a vaccine-related injury" or the legal representative of that person. 42 U.S.C. § 300aa-11(b)(1)(A). Therefore, if the children sustained "vaccine-related injuries," Plaintiffs are proper claimants under the Vaccine Act with respect to the Representative Claims. The Vaccine Act defines "vaccine-related injury" as "an illness, injury, condition or death associated with one or more of the vaccines set forth in the Vaccine Injury Table [42 C.F.R. § 100.3], except that term does not include an illness, injury, condition, or death associated with an adulterant or a contaminant intentionally added to such a vaccine."[7] 42 U.S.C. § 300aa-33(5). Plaintiffs maintain that because thimerosal is an "adulterant or contaminant intentionally added to . . . a vaccine," this lawsuit does not involve a "vaccine-related" injury as defined by the Vaccine Act.[8] Conversely, the Vaccine Manufacturers contend that thimerosal is not

---

[7] The vaccines currently listed in the Vaccine Injury Table are diptheria, tetanus, pertussis, measles, mumps, rubella, poliovirus, hepatitus B, haemophilii influenzae type b, varicella zoster virus, rotavirus and streptococcus pneumoniae. See 42 C.F.R. § 100.3 (Vaccine Injury Table). In addition to listing eligible vaccines, the Vaccine Injury Table also lists types of injuries associated with each vaccine. See id. Individuals who suffer a listed injury after being dosed with the corresponding vaccine make out a *prima facie* case for compensation that may be rebutted only by proof that such injury was caused by factors unrelated to the vaccine. See 42 U.S.C. §§ 300aa-11(c)(1)(C)(i), 300aa-13(a)(1)(B). Individuals who suffer injuries not listed in the Vaccine Injury Table may still obtain compensation, but they must prove by a preponderance of the evidence that the injury was in fact caused by a listed vaccine. See id.

[8] The Court notes that Plaintiffs' Original Petition does not specify which thimerosal containing vaccines were administered to the children. Rather, the Petition generally refers to vaccines that are "routinely administered to children" according to the "typical immunization schedule during the first 18 months of life." The Recommended Childhood Immunization Schedule published by the Centers for Disease Control and Prevention ("CDC") specifies that the routine vaccinations for American children within their first eighteen months are (1) hepatitis B vaccine; (2) diphtheria, tetanus and pertussis vaccine; (3)

an "adulterant or contaminant," but rather, a "constituent material" of vaccines. The Court agrees with the Vaccine Manufacturers.

When attempting to discern a statute's meaning, a court must initially look to the plain meaning of the statute's language. See Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992). Here, because "adulterant" and "contaminant" are not specifically defined by the Vaccine Act, dictionary definitions provided the Court with guidance as to the plain meaning of these terms. The definition of an "adulterant" is "a substance which makes an item impure, spurious, or inferior by adding extraneous or improper ingredients." The American Heritage Dictionary 58 (2d ed. 1992). A medical dictionary similarly defines adulterant as "[a]n impurity; an additive that is considered to have an undesirable effect or to dilute the active material so as to reduce its therapeutic or monetary value." Stedman's Medical Dictionary 30 (27th ed. 2000). And a contaminant is "[s]omething that makes impure or corrupt by contact or mixture." Webster's 9th New Collegiate Dictionary 283 (9th ed. 1991).

Thimerosal, when used in vaccines, fails to correspond with any of these definitions. Vaccine manufacturers intentionally add thimerosal to vaccine formulas because it deters microbial and fungal growth, thereby maintaining the safety, purity and potency of vaccines. In fact, thimerosal has been widely used as a vaccine preservative since the 1930s, see Statement by William Egan, Ph.D.,

---

haemophilus influenzae type b vaccine; (4) poliovirus vaccine; (5) measles-mumps-rubella vaccine; and (6) varicella zoster virus vaccine. See Morbidity and Mortality Weekly Report (Centers for Disease Control and Prevention) Vol. 44 Nos. 52 & 52, January 5, 1996, at 942 (Figure 1). Thus, the Court presumes that the reference to vaccines "routinely administered to children" in Plaintiffs' Original Petition refers to the six CDC-recommended vaccines. And because all six of these vaccines are covered by the Vaccine Injury Table, see 42 C.F.R. § 100.3, the Court further assumes that the children's injuries are "table injuries" within the scope of the Vaccine Act. This assumption is supported by the fact that Plaintiffs do not assert that the children were injured by an unlisted vaccine in response to the Vaccine Manufacturers' Motion to Dismiss.

FDA, before the Committee on Government Reform, U.S. House of Representatives, July 18, 2000, and its use satisfies the FDA's requirement that preservatives be added to vaccines distributed in multi-use vials. See 21 C.F.R. § 610.15(a) ("Products in multiple-dose containers shall contain a preservative"). As such, thimerosal cannot be said to "make impure or corrupt" a vaccine or to reduce a vaccine's therapeutic value. Furthermore, thimerosal cannot be characterized as having an undesirable effect or diluting the active material found within a vaccine. In fact, the precise opposite is true. As a preservative, thimerosal prevents a vaccine's corruption. Hence, neither the plain meaning of "adulterant" nor "contaminant" applies to thimerosal when, as here, it is purposefully used as an ingredient in the approved formulation of a vaccine.

The remainder of the language used by Congress to define "vaccine-related injury" (i.e. "associated with one or more . . . vaccines") likewise requires a finding that the Representative Claims are covered by the Program. A "vaccine" is defined as a "suspension of attenuated or killed microorganisms," Dorland's Medical Dictionary 1799 (27th ed. 1988), and "a preparation of killed microorganisms, living attenuated organisms, or living fully virulent organisms." Webster's 9th New Collegiate Dictionary 1301 (9th ed. 1991). Neither of these definitions indicate that a vaccine is comprised of microorganisms alone. On the contrary, they indicate that a vaccine is a "suspension" or "preparation" composed of both microorganisms and additional ingredients.[9] And, as explained above, manufacturers of vaccines add thimerosal to the "preparation" or "suspension" of vaccines.[10]

---

[9] A suspension is "a class of pharmacopeial preparations of finely divided undissolved drugs [or in this case, microorganisms] . . . dispersed in liquid vehicles for oral or parenteral use." Stedman's Medical Dictionary 1713 (26th ed. 1995). A preparation is "a medicinal substance made ready for use." Webster's 9th New Collegiate Dictionary 929 (9th ed. 1991).

[10] The FDA has long recognized that preservatives (i.e. thimerosal) are "constituent materials" of vaccines. See 21 C.F.R. § 610.15 (indicating that constituents of biological materials include ingredients,

8

Therefore, because the children's injuries are allegedly linked to a vaccine ingredient, their injuries are definitely "vaccine-related." See, e.g., Brausewetter v. Sec'y of Health and Human Servs., No.99-278V, 1999 WL 562700, at *3 (Fed. Cl. July 16, 1999) (stating that claims fall under the Vaccine Act when a claimant is exposed to the "chemical/biological components of the tetanus vaccine"); Pannell v. Sec'y of Health and Human Servs., No. 94-658V, 1995 WL 432643, at *2 (Fed. Cl. July 7, 1995) (referring to "vaccine-related injury" as one "caused by the vaccine or by something contained therein"); see also Grant v. Sec'y of Health and Human Servs., No. 956 F.2d 1144, 1149-50 (Fed. Cir. 1992) (affirming award where vaccine's preservative was an alleged cause of claimant's injury). Clearly, the plain language of the Vaccine Act indicates that the children's injuries cannot be "thimerosal-related" without being "vaccine-related" as well.[11] Therefore, Plaintiffs are required to file a Program petition as a pre-requisite to filing any civil action seeking damages from the Vaccine Manufacturers for injuries to their children. Accordingly, the Vaccine Manufacturers' Motion to Dismiss is GRANTED with respect to the Representative Claims asserted

---

preservatives, diluents and adjuvants).

[11] In this case, because the language of the Vaccine Act unambiguously and specifically indicates that injuries caused by vaccine preservatives (i.e. thimerosal) are within its scope, it is clear that Congress has spoken to the precise question at issue. And the Court has given effect to such Congressional intent. However, the Court's decision would remain the same even if Congressional intent was not clearly expressed. In that event, the Court would have adopted the position taken by the Secretary of the Department of Health and Human Services ("Secretary"). See Chevron U.S.A. v. Nat'l Resources Def. Council, Inc., 467 U.S. 837, 843-44, 104 S. Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984) (explaining that when Congress has not directly spoken to an issue, courts must adopt the interpretation of the administrative agency charged with the duty of enacting the regulation in question "unless they are arbitrary, capricious, or manifestly contrary to the statute"). The Secretary, who is charged with the responsibility of administering the Program, see 42 U.S.C. §§ 300aa-10-300aa34, maintains that any injury claims allegedly caused by thimerosal in covered vaccines are "vaccine related" and therefore, thimerosal-related claims against vaccine manufacturers require adjudication by the Vaccine Court. See, e.g., The National Vaccine Injury Compensation Program web-page, available at <http://www.hrsa.gov/osp/vicp/quanda.htm> ("Because thimerosal is not an adulterant or contaminant, individuals who have claims relating to thimerosal in vaccine covered under the [Vaccine Act] . . . must first file the claim with the [Program] before pursuing any other civil litigation").

against them. These claims are hereby DISMISSED WITHOUT PREJUDICE and Plaintiffs are urged to re-file such claims in the Vaccine Court if they so desire.

<u>Individual Claims Against the Vaccine Manufacturers</u>

Having dismissed the Representative Claims against the Vaccine Manufacturers, the Court now turns to Plaintiffs' Individual Claims for loss of consortium, emotional distress and loss of services. In their Motion to Dismiss, the Vaccine Manufacturers argue that Plaintiffs are also required to file a Program petition as a pre-requisite to asserting the Individual Claims. Moreover, the Vaccine Manufacturers assert that even if the Individual Claims are not barred by the Vaccine Act, Plaintiffs' causes of action for loss of consortium, loss of services and emotional distress cannot be maintained in accordance with Texas law. The Court will address each of these contentions in turn.

<u>Vaccine Act Petition</u>

By its own terms, the Vaccine Act's proscription against bringing a civil action for damages prior to the filing of a Program petition "applies only to a person who has sustained a vaccine-related injury or death and who is qualified to file a petition for compensation under the Program." 42 U.S.C. § 300aa-11(a)(9). As such, Plaintiffs are not barred from bringing their Individual Claims against the Vaccine Manufacturers unless they are "qualified to file a petition." An individual becomes eligible to file a petition if he or she suffers a specified injury after receiving a vaccine. <u>See</u> 42 U.S.C. §§ 300aa-11(b)(1)(A), 300aa-11(c)(1)(A). Thus, unless an individual received a vaccine (or is the legal representative of such an individual), that individual cannot file a petition in the Vaccine Court. <u>See</u> <u>Schafer</u>, 20 F.3d at 7; <u>Head v. Sec'y of Health and Human Servs.</u>, 26 Cl. Ct. 546, 547 n.1 (1992), <u>aff'd</u>, 996 F.2d 318 (Fed. Cir. 1993). In this case, none of the Plaintiffs allege to have

10

"suffered a relevant injury. . . after he or she received a vaccine." Accordingly, Plaintiffs need not (and cannot, for that matter) file a Program petition with respect to their Individual Claims, and are consequently permitted to file such claims in this forum. See Schafer, 20 F.3d at 5 (explaining that the Vaccine Act's tort suit ban does not apply to individuals who cannot file petition in the Vaccine Court except in a representative capacity); Head, 26 Cl. Ct. at 550 (holding that an award to a mother in her individual capacity in an action arising from vaccine-related injuries received by her daughter did not bar the daughter's subsequent action under the Vaccine Act); McDonald v. Lederle Labs., 775 A.2d 528, 535 (N.J. 2001) ("The [Vaccine] Act does not preclude parents from filing an individual civil action for losses incurred by them."). Having determined that Plaintiffs' Individual Claims are not barred by the Vaccine Act, the Court now considers the merits of these claims under Texas law.

### Loss of Consortium

In Sanchez v. Schindler, 651 S.W.2d 249 (Tex. 1983), the Texas Supreme Court recognized that injuries to the familial relationship are significant injuries worthy of compensation. See id. at 251. Accordingly, parents may recover for loss of companionship for the wrongful death of a child. See id. At least two Texas courts have extended the Sanchez holding to cover situations involving a non-fatally injured child. See Roberts v. Williamson, 52 S.W.3d 343, 352 (Tex. App.–Texarkana 2001) ("To hold that a parent cannot recover [for the loss of consortium of a non-fatally injured child] would ignore the basic idea behind recovery for loss of consortium: to attempt to compensate for the loss of love and companionship"), petition for review filed (August 20, 2001); Enochs v. Brown, 872 S.W.2d 312, 322 (Tex. App.–Austin 1994, no writ) ("Within the [Texas] Supreme Court's express recognition of a common law cause of action for a serious injury to a spouse or

11

parent lies the implicit recognition of a parent's claims for loss of companionship for a similar injury to a child"); Cf. Reagan v. Vaughn, 804 S.W.2d 463, 466 (Tex. 1990) ("[T]he two relationships likely to be most severely affected by a negligent injury to a person are the husband and wife relationship and that of parent and child[.]") Therefore, in light of these decisions, the Court concludes that Plaintiffs have stated a viable claim for loss of consortium under Texas law.

### Loss of Services

On the other hand, the Texas Supreme Court rejected the "antiquated concept of the child as an economic asset," when it explained that "[t]he real loss sustained by a parent is not the loss of any financial benefit to be gained from the child, but is the loss of love, advice, comfort, companionship and society." Sanchez, 752 S.W.2d at 251. Therefore, the Court concludes that, as a matter of Texas law, Plaintiffs cannot maintain a cause of action for loss of services based upon the children's alleged injuries.

### Emotional Distress

Similarly, Plaintiffs cannot recover on their derivative claims of emotional distress. In Texas, emotional distress damages are recoverable in a very limited set of circumstances: (1) as the foreseeable result of a breach of a duty arising out of certain special relationships; (2) for common law torts involving intentional or malicious conduct; (3) for wrongful death; (4) in personal injury cases where the defendant's conduct causes the plaintiff serious bodily injury; and (5) in bystander actions. See Verinakis v. Med. Profiles, Inc., 987 S.W.2d 90, 95 (Tex. App.–Houston [14th Dist.] 1998, pet. denied). In this case, Plaintiffs have not alleged any facts signaling a special relationship, intentional or malicious conduct or wrongful death. And the only personal injuries alleged were incurred by the children–not by Plaintiffs. Thus, the only possible avenue by which Plaintiffs may

12

attempt to recover emotional distress damages is the bystander action. However, given the facts of this case, this method proves similarly inapplicable.

In Texas, bystanders may recover damages for mental anguish suffered as a result of witnessing a serious or fatal accident involving a close family member. See City of Tyler v. Likes, 962 S.W.2d 489, 496 (Tex. 1997). In order to successfully recover emotional distress damages, a bystander plaintiff must establish that: (1) the plaintiff was located near the scene of the accident, as contrasted with one who was a distance away from it; (2) the plaintiff suffered shock as a result of a direct emotional impact upon the plaintiff from a sensory and contemporaneous observation of the accident, as contrasted with learning of the accident from others after its occurrence; and (3) the plaintiff and victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship. See United Servs. Auto Ass'n v. Keith, 970 S.W.2d 540, 541-42 (Tex. 1998). Texas law requires the bystanders's presence when the accident occurred and the contemporaneous perception of the accident. See id. at 542.

Here, Plaintiffs clearly did not witness and perceive the type of shocking accident contemplated by the bystander theory of recovery. Rather, Plaintiffs witnessed the routine vaccination of their children and the children's subsequent medical problems that are allegedly linked to thimerosal. Moreover, Plaintiffs did not even learn of the children's alleged mercury poisoning until the children's neurological problems were diagnosed by a physician, well after the suspect vaccines were administered. However anguishing these belated circumstances may have been, the bystander theory is inapplicable to the facts of this case, as a matter of Texas law.

As stated above, although none of the Individual Claims are barred by the Vaccine Act, Plaintiffs' derivative claims for loss of services and emotional distress cannot be maintained in

13

conformity with Texas law. On the other hand, Plaintiffs' cause of action for loss consortium remains viable. As such, the Vaccine Manufacturers' Motion to Dismiss is hereby GRANTED IN PART with respect to Plaintiffs' Individual Claims for loss of services and emotional distress; and hereby DENIED IN PART with respect to Plaintiffs' Individual Claims for loss of consortium. The Court further ORDERS that Plaintiffs' Individual Claims for loss of services and emotional distress against the Vaccine Manufacturers are DISMISSED WITH PREJUDICE.

## IV. Sigma's Motion to Dismiss

The Court now turns to the Motion to Dismiss filed by Sigma on March 22, 2002.[12] In that Motion, Sigma contends that the Vaccine Act requires dismissal of the Representative Claims and Individual Claims brought against itself and the other Chemical Manufacturers. This argument contains a fatal flaw, however, because the Vaccine Act only prohibits the filing of any civil action against a "vaccine *manufacturer* or *administrator*" prior to the filing of a Program petition. 42 U.S.C. § 300aa-11(2)(A) (emphasis added). Because Sigma allegedly supplies thimerosal (a raw material) to the Vaccine Manufacturers, but does not manufacture or administer vaccines itself, Plaintiffs' claims against Sigma are not subject to the Vaccine Act's tort suit bar. Nevertheless, for the reasons discussed previously in conjunction with the Individual Claims against the Vaccine Manufacturers, Sigma's Motion to Dismiss is hereby GRANTED IN PART with respect to Plaintiffs' derivative claims for loss of services and emotional distress. Those claims are hereby DISMISSED WITH

---

[12] On April 29, 2002, Sigma filed a second Motion to Dismiss and, alternatively, a Motion to Stay. The Court is not making any ruling on Sigma's second Motion to Dismiss at this time. The Court will address that Motion, along with Sigma's request for a stay, after Plaintiffs have responded thereto.

PREJUDICE. Regarding all other claims asserted by Plaintiffs against Sigma, its Motion to Dismiss is hereby DENIED.[13]

### V. GDL's Motion to Dismiss

GDL (a Chemical Manufacturer) filed its Amended 12(b) Motion to Dismiss for Lack of Personal Jurisdiction on March 20, 2002. In response, Plaintiffs filed a Motion for Leave to Conduct Jurisdictional Discovery of GDL. The Court finds that such jurisdictional discovery is indeed warranted. Accordingly, the Court hereby ORDERS that Plaintiffs have sixty (60) days from the date of this Order to conduct discovery pertaining solely to whether this Court may validly exercise personal jurisdiction over GDL. At the end of that time period, Plaintiffs are ORDERED to file their Response to GDL's Motion to Dismiss. The Court will rule on that Motion as soon as it can be reached.

In conclusion, the Court reiterates that all Representative Claims asserted against the Vaccine Manufacturers fall squarely within the jurisdiction of the Vaccine Court and are hereby DISMISSED WITHOUT PREJUDICE. Hence, the only claims against the Vaccine Manufacturers that Plaintiffs may properly assert in this forum are those seeking compensation for their individual loss of consortium. On the other hand, Plaintiffs' Representative Claims and Individual Claims against the Chemical Manufacturers are subject to adjudication in this forum, with the exception of Plaintiffs' derivative claims for emotional distress and loss of services. GDL's Motion to Dismiss remains pending. Finally, this Order renders the Vaccine Manufacturers' Request for Oral Argument on their

---

[13] Sigma's Motion to Dismiss also argues for a dismissal pursuant to Fed. R. Civ. P. 19 in the event that the Court dismisses "any other Defendant or other Defendants." Because the Court has not dismissed any Defendants (only certain claims), the Court does not need to address Sigma's Rule 19 request.

Motion to Dismiss MOOT. The Court will address all other pending concerns as soon as they are ripe for consideration.

     IT IS SO ORDERED.

     DONE this _2_ day of May, 2002, at Galveston, Texas.

SAMUEL B. KENT
UNITED STATES DISTRICT JUDGE

16

3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

United States Courts
Southern District of Texas
ENTERED

MAY 7 ~ 2002

Michael N. Milby, Clerk

| | | |
|---|---|---|
| MICHAEL O'CONNELL and EILEEN O'CONNELL, individually and as next friends to MICHAEL JOSEPH O'CONNELL Plaintiffs, | § § § § § | |
| v. | § § | CIVIL ACTION NO. G-02-184 |
| AMERICAN HOME PRODUCTS CORPORATION, et al. Defendants. | § § § § | |

**ORDER GRANTING IN PART AND DENYING IN PART WYETH, AVENTIS,
MERCK AND SMITH KLINE'S MOTION TO DISMISS, DENYING SIGMA
AND EM'S MOTION TO DISMISS, ORDERING PLAINTIFFS TO CONDUCT
JURISDICTIONAL DISCOVERY OF GDL AND DENYING DEFENDANTS'
REQUEST FOR ORAL ARGUMENT AS MOOT**

Plaintiffs Michael O'Connell and Eileen O'Connell, individually and as legal representatives

of their minor child Michael Joseph O'Connell ("Michael"), bring this products liability lawsuit

against Defendants Sigma Aldrich Corporation ("Sigma Corp."); Sigma Aldrich, Inc. ("Sigma Inc.");

Eli Lilly and Company ("Eli Lilly"); The Dow Chemical Company ("Dow"); EM Industries, Inc.

("EM"); Wyeth ("Wyeth") f/k/a American Home Products, Corp.; Aventis Pasteur, Inc. ("Aventis")

f/k/a Connaught Laboratories f/d/b/a Pasteur Merieux Connaught; Merck and Company, Inc.

("Merck"); Smith Kline Beecham Corporation ("Smith Kline") d/b/a GlaxoSmithKline; Spectrum

Laboratory Products, Inc. ("Spectrum"); and GDL International, Inc. ("GDL") pursuant to the state

laws of Texas. Now before the Court are three Motions to Dismiss filed by various Defendants: (1)

a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b) and the National Childhood Vaccine Injury

Act ("Vaccine Act"), 42 U.S.C. §§ 300aa-1-300aa-34, filed by Wyeth, Aventis, Merck and Smith

Kline; (2) a Motion to Dismiss pursuant to the Vaccine Act and Fed. R. Civ. P. 19 filed by Sigma

RECEIVED

MAY 1 0 2002

Corp. and Sigma Inc. (collectively, "Sigma") and subsequently joined by EM; and (3) a Motion to Dismiss for Lack of Personal Jurisdiction filed by GDL. For the reasons articulated below, Wyeth, Aventis, Merck and Smith Kline's Motion to Dismiss pursuant to the Vaccine Act is **GRANTED IN PART** and **DENIED IN PART**, Sigma and EM's Motion to Dismiss pursuant to the Vaccine Act is **DENIED** and Plaintiffs are hereby **ORDERED** to conduct jurisdictional discovery before responding to the Motion to Dismiss filed by GDL.

## I. Background

During the first eighteen months of his life, Michael was allegedly exposed to harmful levels of mercury via routine childhood vaccinations administered to him by his pediatrician. All or some of the vaccines contained thimerosal, a mercury laden preservative. At that time, vaccine manufacturers routinely added thimerosal to multiple-use vials of vaccines to extend each vial's shelf life. The thimerosal (and thus, mercury) introduced into Michael's body by way of vaccination allegedly afflicted him with serious and lasting neurological injuries. Plaintiffs filed this action in a Texas state court seeking damages for Michael's personal injuries both individually and on Michael's behalf (as his legal representatives). In their Original Petition, Plaintiffs assert four causes of action (strict liability, negligence, gross negligence and conspiracy) against two distinct categories of Defendants: (1) the manufacturers of thimerosal containing vaccines–Wyeth, Aventis, Merck and Smith Kline ("Vaccine Manufacturers"); and (2) the manufacturers of thimerosal itself–Eli Lilly, EM, Sigma, Dow, Spectrum and GDL ("Chemical Manufacturers").[1] Defendants subsequently removed the action pursuant to this Court's diversity jurisdiction.

---

[1] In their Original Petition Plaintiffs do not distinguish between the Vaccine Manufacturers and the Thimerosal Manufacturers. The Court finds, however, that making such a distinction is essential.

2

## II.  The Vaccine Act

The "[v]accination of children against deadly, disabling, but preventable infectious diseases has been one of the most spectacularly effective public health initiatives this country has ever undertaken. Use of vaccines has prevented thousands of children's deaths each year and has substantially reduced the effects resulting from disease." H.R. Rep. No. 99-908, at 4 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6345. However, while most children enjoy measurable benefit from immunization programs, "a small but significant number of have been gravely injured." Id. Two significant concerns are accompany these vaccine-related injuries: the inconsistency, expense, delay and unpredictability of the tort system in compensating claims of vaccine-injured children; and the instability and uncertainty of the childhood vaccine market inevitably caused by the risks of tort litigation. See id. at 7, 1986 U.S.C.C.A.N. at 6348. Fortunately, the National Vaccine Injury Compensation Program ("Program") ameliorates these concerns. The Program provides an avenue of recovery for injuries and deaths traceable to vaccinations that works with greater ease and on a faster timetable than the civil tort system.[2] See Shalala v. Whitecotton, 514 U.S. 268, 269, 115 S. Ct. 1477, 1478, 131 L.Ed.2d 374 (1995). In effect, it "ensure[s] that all children who are injured by vaccines have access to sufficient compensation for their injuries," H.R. Rep. No. 99-908 at 6345-6346, and "free[s] manufacturers from the specter of large, uncertain tort liability, and thereby . . . keep[s] manufacturers in the market." Schafer v. Am. Cyanamid Co., 20 F.3d 1, 4 (1st Cir. 1994).

The Program, set forth in the Vaccine Act, requires that vaccine-related claims are initially heard by special masters in the United States Court of Federal Claims ("Vaccine Court"), adjudicated informally and then accorded expeditious review. See Whitecotton, 514 U.S. at 270, 115 S. Ct. at

---

[2] The Program became effective on October 1, 1988.

3

1478. This system streamlines the claims process by establishing standards of proof, under which individuals who suffer injuries within specified intervals after being administered a vaccine, benefit from a presumption that a vaccine caused those injuries. See 42 U.S.C. §§ 300aa-11(c)(1)(C)(i), 300aa-13(a)(1), 300aa-14; Haggerty v. Wyeth Ayerst Pharm., 79 F. Supp. 2d 182, 184 (E.D.N.Y. 2000). A Program claimant may not file a civil action against a vaccine manufacturer or administrator unless the claimant initially files a timely petition in accordance with the Program's guidelines.[3] See 42 U.S.C. § 300aa-11(2)(A); Whitecotton, 514 U.S. at 270, 115 S. Ct. at 1478 (explaining that a claimant alleging an injury after the Vaccine Act's effective date "must exhaust the Act's procedures . . .before filing any *de novo* civil action in state or federal court"). If a claimant seeks compensation in a state or federal court for vaccine-related injuries prior to exhausting his or her remedies under the Vaccine Act, the Court must dismiss the action. See 42 U.S.C. § 300aa-11(a)(2)(B). Simply put, individuals who qualify as Program claimants must file petitions in the Vaccine Court in order to pursue any vaccine-related claims at all.[4] If an individual who prevails in the Vaccine Court is ultimately dissatisfied with his or her Program award, that individual may reject the award and pursue a traditional tort action in any forum.[5] See 42 U.S.C. § 300aa-21(a).

---

[3] A proper claimant, or "petitioner," under the Vaccine Act is "any person who has sustained a vaccine-related injury," or the legal representative of such person. 42 U.S.C. § 300aa-11(b)(1)(A).

[4] There are a few exceptions. *De minimis* claims for less than $1,000 may be brought in state or federal courts without prior filing under the Vaccine Program. See 42 U.S.C. § 300aa-11(a)(2)(A). However, the Vaccine Act requires that any vaccine-related action seeking an unspecified amount of damages (such as the instant lawsuit) be filed under the Program. See id.

[5] Under the Program, the compensation awarded to a petitioner for a vaccine-related injury may include actual and un-reimbursable expenses and projected expenses for medical or other remedial care determined to be reasonably necessary; actual and anticipated lost earnings; and actual and projected pain and suffering subject to a statutory cap of $250,000. See 42 U.S.C. § 300aa-15(a). Punitive and exemplary damages are prohibited. See 42 U.S.C. § 300aa-15(d). Reasonable attorneys' fees and costs are awarded even if the petition is denied, so long as the special master determines that the petition was brought in good faith

### III.  Vaccine Manufacturers' Motion to Dismiss

In this case, it is undisputed that Plaintiffs have not filed a petition in the Vaccine Court in accordance with the Program. In their Motion to Dismiss, filed March 28, 2002, the Vaccine Manufacturers highlight this fact and argue that Plaintiffs' failure to file a Program petition requires the Court to dismiss all claims filed against them pursuant to Fed. R. Civ. P. 12(b).[6] In response, Plaintiffs contend that they are not required to file a petition in the Vaccine Court because Michael's injuries fall outside the scope of the Vaccine Act. Thus, the Court must initially determine whether Plaintiffs are required to file a Program petition for: (1) the claims they have filed on Michael's behalf ("Representative Claims"); or (2) their individual claims that are derivative of Michael's injuries ("Individual Claims").

<u>Representative Claims Filed Against the Vaccine Manufacturers</u>

A proper claimant under the Vaccine Act is "any person who has sustained a vaccine-related injury" <u>or</u> the legal representative of that person. 42 U.S.C. § 300aa-11(b)(1)(A). Therefore, if Michael sustained a "vaccine-related injury," Plaintiffs are proper claimants under the Vaccine Act with respect to the Representative Claims. The Vaccine Act defines "vaccine-related injury" as "an illness, injury, condition or death associated with one or more of the vaccines set forth in the Vaccine

---

and that a reasonable basis for asserting the claim existed. <u>See</u> 42 U.S.C. § 300aa-15(c). In the event that a petitioner chooses to reject a Program award, the Vaccine Act limits the tort remedies that become available. For instance, the Vaccine Act establishes compliance with Food and Drug Administration ("FDA") requirements as a partial defense for manufacturers, <u>see</u> 42 U.S.C. § 300aa-22(b)(2), and requires tort suits to be tried in three phases (liability, general damages and punitive damages). <u>See</u> 42 U.S.C. § 300aa-23(a). Moreover, a manufacturer's compliance with FDA guidelines generally precludes an award of punitive damages. <u>See</u> 42 U.S.C. § 300aa-23(d).

[6] Although the Vaccine Manufacturers do not specify which provision of Rule 12(b) they are moving for dismissal under, the Court assumes that they are seeking a dismissal under Rule 12(b)(3) for improper venue, or in the alternative, under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. <u>See</u> Fed. R. Civ. P. 12(b)(3); Fed. R. Civ. P. 12(b)(3).

Injury Table [42 C.F.R. § 100.3], except that term does not include an illness, injury, condition, or death associated with an adulterant or a contaminant intentionally added to such a vaccine."[7] 42 U.S.C. § 300aa-33(5). Plaintiffs maintain that because thimerosal is an "adulterant or contaminant intentionally added to . . . a vaccine," this lawsuit does not involve a "vaccine-related" injury as defined by the Vaccine Act.[8] Conversely, the Vaccine Manufacturers contend that thimerosal is not an "adulterant or contaminant," but rather, a "constituent material" of vaccines. The Court agrees with the Vaccine Manufacturers.

When attempting to discern a statute's meaning, a court must initially look to the plain meaning of the statute's language. See Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992). Here, because "adulterant" and "contaminant" are not specifically defined by the Vaccine Act,

---

[7] The vaccines currently listed in the Vaccine Injury Table are diptheria, tetanus, pertussis, measles, mumps, rubella, poliovirus, hepatitis B, haemophilil influenzae type b, varicella zoster virus, rotavirus and streptococcus pneumoniae. See 42 C.F.R. § 100.3 (Vaccine Injury Table). In addition to listing eligible vaccines, the Vaccine Injury Table also lists types of injuries associated with each vaccine. See id. Individuals who suffer a listed injury after being dosed with the corresponding vaccine make out a prima facie case for compensation that may be rebutted only by proof that such injury was caused by factors unrelated to the vaccine. See 42 U.S.C. §§ 300aa-11(c)(1)(C)(i), 300aa-13(a)(1)(B). Individuals who suffer injuries not listed in the Vaccine Injury Table may still obtain compensation, but they must prove by a preponderance of the evidence that the injury was in fact caused by a listed vaccine. See id.

[8] The Court notes that Plaintiffs' Original Petition does not specify which thimerosal containing vaccines were administered to Michael. Rather, the Petition generally refers to vaccines that are "routinely administered to children" according to the "typical immunization schedule during the first 18 months of life." The Recommended Childhood Immunization Schedule published by the Centers for Disease Control and Prevention ("CDC") specifies that the routine vaccinations for American children within their first eighteen months are (1) hepatitis B vaccine; (2) diphtheria, tetanus and pertussis vaccine; (3) haemophilus influenzae type b vaccine; (4) poliovirus vaccine; (5) measles-mumps-rubella vaccine; and (6) varicella zoster virus vaccine. See Morbidity and Mortality Weekly Report (Centers for Disease Control and Prevention) Vol. 44 Nos. 52 & 52, January 5, 1996, at 942 (Figure 1). Thus, the Court presumes that the reference to vaccines "routinely administered to children" in Plaintiffs' Original Petition refers to the six CDC-recommended vaccines. And because all six of these vaccines are covered by the Vaccine Injury Table, see 42 C.F.R. § 100.3, the Court further assumes that Michael's injuries are "table injuries" within the scope of the Vaccine Act. This assumption is supported by the fact that Plaintiffs do not assert that Michael was injured by an unlisted vaccine in response to the Vaccine Manufacturers' Motion to Dismiss.

6

dictionary definitions provided the Court with guidance as to the plain meaning of these terms. The definition of an "adulterant" is "a substance which makes an item impure, spurious, or inferior by adding extraneous or improper ingredients." The American Heritage Dictionary 58 (2d ed. 1992). A medical dictionary similarly defines adulterant as "[a]n impurity; an additive that is considered to have an undesirable effect or to dilute the active material so as to reduce its therapeutic or monetary value." Stedman's Medical Dictionary 30 (27th ed. 2000). And a contaminant is "[s]omething that makes impure or corrupt by contact or mixture." Webster's 9th New Collegiate Dictionary 283 (9th ed. 1991).

Thimerosal, when used in vaccines, fails to correspond with any of these definitions. Vaccine manufacturers intentionally add thimerosal to vaccine formulas because it deters microbial and fungal growth, thereby maintaining the safety, purity and potency of vaccines. In fact, Thimerosal has been widely used as a vaccine preservative since the 1930s, see Statement by William Egan, Ph.D., FDA, before the Committee on Government Reform, U.S. House of Representatives, July 18, 2000, and its use satisfies the FDA's requirement that preservatives be added to vaccines distributed in multi-use vials. See 21 C.F.R. § 610.15(a) ("Products in multiple-dose containers shall contain a preservative"). As such, thimerosal cannot be said to "make impure or corrupt" a vaccine or to reduce a vaccine's therapeutic value. Furthermore, thimerosal cannot be characterized as having an undesirable effect or diluting the active material found within a vaccine. In fact, the precise opposite is true. As a preservative, thimerosal prevents a vaccine's corruption. Hence, neither the plain meaning of "adulterant" nor "contaminant" applies to thimerosal when, as here, it is purposefully used as an ingredient in the approved formulation of a vaccine.

The remainder of the language used by Congress to define "vaccine-related injury" (i.e. "associated with one or more . . .vaccines") likewise requires a finding that the Representative Claims are covered by the Program. A "vaccine" is defined as a "suspension of attenuated or killed microorganisms," Dorland's Medical Dictionary 1799 (27th ed. 1988), and "a preparation of killed microorganisms, living attenuated organisms, or living fully virulent organisms." Webster's 9th New Collegiate Dictionary 1301 (9th ed. 1991). Neither of these definitions indicate that a vaccine is comprised of microorganisms alone. On the contrary, they indicate that a vaccine is a "suspension" or "preparation" composed of both microorganisms and additional ingredients.[9] And, as explained above, manufacturers of vaccines add thimerosal to the "preparation" or "suspension" of vaccines.[10]

Therefore, because Michael's injuries are allegedly linked to a vaccine ingredient, his injuries are definitely "vaccine-related." See, e.g., Brausewetter v. Sec'y of Health and Human Servs., No.99-278V, 1999 WL 562700, at *3 (Fed. Cl. July 16, 1999) (stating that claims fall under the Vaccine Act when a claimant is exposed to the "chemical/biological components of the tetanus vaccine"); Pannell v. Sec'y of Health and Human Servs., No. 94-658V, 1995 WL 432643, at *2 (Fed. Cl. July 7, 1995) (referring to "vaccine-related injury" as one "caused by the vaccine or by something contained therein"); see also Grant v. Sec'y of Health and Human Servs., No. 956 F.2d 1144, 1149-50 (Fed. Cir. 1992) (affirming award where vaccine's preservative was an alleged cause of

---

[9] A suspension is "a class of pharmacopeial preparations of finely divided undissolved drugs [or in this case, microorganisms] . . . dispersed in liquid vehicles for oral or parenteral use." Stedman's Medical Dictionary 1713 (26th ed. 1995). A preparation is "a medicinal substance made ready for use." Webster's 9th New Collegiate Dictionary 929 (9th ed. 1991).

[10] The FDA has long recognized that preservatives (i.e. thimerosal) are "constituent materials" of vaccines. See 21 C.F.R. § 610.15 (indicating that constituents of biological materials include ingredients, preservatives, diluents and adjuvants).

claimant's injury). Clearly, the plain language of the Vaccine Act indicates that Michael's injuries cannot be "thimerosal-related" without being "vaccine-related" as well.[11] Therefore, Plaintiffs are required to file a Program petition as a pre-requisite to filing any civil action seeking damages from the Vaccine Manufacturers for Michael's injuries. Accordingly, the Vaccine Manufacturers' Motion to Dismiss is **GRANTED** with respect to the Representative Claims asserted against them. These claims are hereby **DISMISSED WITHOUT PREJUDICE** and Plaintiffs are urged to re-file such claims in the Vaccine Court if they so desire.

<u>Individual Claims Against the Vaccine Manufacturers</u>

Having dismissed the Representative Claims against the Vaccine Manufacturers, the Court now turns to Plaintiffs' Individual Claims for loss of consortium, emotional distress and loss of services. In their Motion to Dismiss, the Vaccine Manufacturers argue that Plaintiffs are also required to file a Program petition as a pre-requisite to asserting the Individual Claims. Moreover, the Vaccine Manufacturers assert that even if the Individual Claims are not barred by the Vaccine Act, Plaintiffs' causes of action for loss of consortium, loss of services and emotional distress cannot

---

[11] In this case, because the language of the Vaccine Act unambiguously and specifically indicates that injuries caused by vaccine preservatives (i.e. thimerosal) are within its scope, it is clear that Congress has spoken to the precise question at issue. And the Court has given effect to such Congressional intent. However, the Court's decision would remain the same even if Congressional intent was not clearly expressed. In that event, the Court would have adopted the position taken by the Secretary of the Department of Health and Human Services ("Secretary"). See Chevron U.S.A. v. Nat'l Resources Def. Council, Inc., 467 U.S. 837, 843-44, 104 S. Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984) (explaining that when Congress has not directly spoken to an issue, courts must adopt the interpretation of the administrative agency charged with the duty of enacting the regulation in question "unless they are arbitrary, capricious, or manifestly contrary to the statute"). The Secretary, who is charged with the responsibility of administering the Program, see 42 U.S.C. §§ 300aa-10-300aa34, maintains that any injury claims allegedly caused by thimerosal in covered vaccines are "vaccine related" and therefore, thimerosal-related claims against vaccine manufacturers require adjudication by the Vaccine Court. See, e.g., The National Vaccine Injury Compensation Program web-page, *available at* <http://www.hrsa.gov/osp/vicp/quanda.htm> ("Because thimerosal is not an adulterant or contaminant, individuals who have claims relating to thimerosal in vaccines covered under the [Vaccine Act] . . . must first file the claim with the [Program] before pursuing any other civil litigation").

be maintained in accordance with Texas law. The Court will address each of these contentions in turn.

### Vaccine Act Petition

By its own terms, the Vaccine Act's proscription against bringing a civil action for damages prior to the filing of a Program petition "applies only to a person who has sustained a vaccine-related injury or death and who is qualified to file a petition for compensation under the Program." 42 U.S.C. § 300aa-11(a)(9). As such, Plaintiffs are not barred from bringing their Individual Claims against the Vaccine Manufacturers unless they are "qualified to file a petition." An individual becomes eligible to file a petition if he or she suffers a specified injury after he or she receiving a vaccine. See  42 U.S.C. §§ 300aa-11(b)(1)(A), 300aa-11(c)(1)(A). Thus, unless an individual received a vaccine (or is the legal representative of such an individual), that individual cannot file a petition in the Vaccine Court. See Schafer, 20 F.3d at 7; Head v. Sec'y of Health and Human Servs., 26 Cl. Ct. 546, 547 n.1 (1992), aff'd, 996 F.2d 318 (Fed. Cir. 1993). In this case, neither Plaintiff alleges to have "suffered a relevant injury. . . after he or she received a vaccine." Accordingly, Plaintiffs need not (and cannot, for that matter) file a Program petition with respect to their Individual Claims, and are consequently permitted to file such claims in this forum. See Schafer, 20 F.3d at 5 (explaining that the Vaccine Act's tort suit ban does not apply to individuals who cannot file petition in the Vaccine Court except in a representative capacity); Head, 26 Cl. Ct. at 550 (holding that an award to a mother in her individual capacity in an action arising from vaccine-related injuries received by her daughter did not bar the daughter's subsequent action under the Vaccine Act); McDonald v. Lederle Labs., 775 A.2d 528, 535 (N.J. 2001) ("The [Vaccine] Act does not preclude parents from filing an  individual civil action for losses incurred by them.").

10

Having determined that Plaintiffs' Individual Claims are not barred by the Vaccine Act, the Court now considers the merits of these claims under Texas law.

### Loss of Consortium

In Sanchez v. Schindler, 651 S.W.2d 249 (Tex. 1983), the Texas Supreme Court recognized that injuries to the familial relationship are significant injuries worthy of compensation. See id. at 251. Accordingly, parents may recover for loss of companionship for the wrongful death of a child. See id. At least two Texas courts have extended the Sanchez holding to cover situations involving a non-fatally injured child. See Roberts v. Williamson, 52 S.W.3d 343, 352 (Tex. App.–Texarkana 2001) ("To hold that a parent cannot recover [for the loss of consortium of a non-fatally injured child] would ignore the basic idea behind recovery for loss of consortium: to attempt to compensate for the loss of love and companionship"), petition for review filed (August 20, 2001); Enochs v. Brown, 872 S.W.2d 312, 322 (Tex. App.–Austin 1994, no writ) ("Within the [Texas] Supreme Court's express recognition of a common law cause of action for a serious injury to a spouse or parent lies the implicit recognition of a parent's claims for loss of companionship for a similar injury to a child"); Cf. Reagan v. Vaughn, 804 S.W.2d 463, 466 (Tex. 1990) ("[T]he two relationships likely to be most severely affected by a negligent injury to a person are the husband and wife relationship and that of parent and child[.]") Therefore, in light of these decisions, the Court concludes that Plaintiffs have stated a viable claim for loss of consortium under Texas law.

### Loss of Services

On the other hand, the Texas Supreme Court rejected the "antiquated concept of the child as an economic asset," when it explained that "[t]he real loss sustained by a parent is not the loss of any financial benefit to be gained from the child, but is the loss of love, advice, comfort,

11

companionship and society." Sanchez, 752 S.W.2d at 251. Therefore, the Court concludes that, as a matter of Texas law, Plaintiffs cannot maintain a cause of action for loss of services based upon Michael's alleged injuries.

### Emotional Distress

Similarly, Plaintiffs cannot recover on their derivative claims of emotional distress. In Texas, emotional distress damages are recoverable in a very limited set of circumstances: (1) as the foreseeable result of a breach of a duty arising out of certain special relationships; (2) for common law torts involving intentional or malicious conduct; (3) for wrongful death; (4) in personal injury cases where the defendant's conduct causes the plaintiff serious bodily injury; and (5) in bystander actions. See Verinakis v. Med. Profiles, Inc., 987 S.W.2d 90, 95 (Tex. App.–Houston [14th Dist.] 1998, pet. denied). In this case, Plaintiffs have not alleged any facts signaling a special relationship, intentional or malicious conduct or wrongful death. And the only personal injuries alleged were incurred by Michael–not by Plaintiffs. Thus, the only possible avenue by which Plaintiffs may attempt to recover emotional distress damages is the bystander action. However, this method proves similarly inapplicable.

In Texas, bystanders may recover damages for mental anguish suffered as a result of witnessing a serious or fatal accident involving a close family member. See City of Tyler v. Likes, 962 S.W.2d 489, 496 (Tex. 1997). In order to successfully recover emotional distress damages, a bystander plaintiff must establish that: (1) the plaintiff was located near the scene of the accident, as contrasted with one who was a distance away from it; (2) the plaintiff suffered shock as a result of a direct emotional impact upon the plaintiff from a sensory and contemporaneous observation of the accident, as contrasted with learning of the accident from others after its occurrence; and (3) the

plaintiff and victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship. See United Servs. Auto Ass'n v. Keith, 970 S.W.2d 540, 541-42 (Tex. 1998) (per curiam). Texas law requires the bystanders's presence when the accident occurred and the contemporaneous perception of the accident. See id. at 542.

Here, Plaintiffs clearly did not witness and perceive the type of shocking accident contemplated by the bystander theory of recovery. Rather, Plaintiffs witnessed Michael's routine vaccination and his subsequent physical deterioration that is allegedly linked to thimerosal. Moreover, Plaintiffs did not learn of Michael's alleged mercury poisoning until Michael's neurological problems were diagnosed by a physician, well after his vaccinations were administered. However anguishing these belated circumstances may have been, the bystander theory is inapplicable to the facts of this case, as a matter of Texas law.

As stated above, although none of the Individual Claims are barred by the Vaccine Act, Plaintiffs' derivative claims for loss of services and emotional distress cannot be maintained in conformity with Texas law. However, Plaintiffs' cause of action for loss consortium remains viable. As such, the Vaccine Manufacturers' Motion to Dismiss is hereby GRANTED IN PART with respect to Plaintiffs' Individual Claims for loss of services and emotional distress; and hereby DENIED IN PART with respect to Plaintiffs' Individual Claims for loss of consortium. Plaintiffs' Individual Claims for loss of services and emotional distress against the Vaccine Manufacturers are hereby DISMISSED WITH PREJUDICE.

13

## IV. Sigma and EM's Motion to Dismiss

The Court now turns to the Motion to Dismiss filed by Sigma on March 22, 2002 and joined by EM on March 27, 2002 (both Sigma and EM are Chemical Manufacturer Defendants).[12] Sigma and EM contend that the Vaccine Act requires dismissal of the Representative Claims and Individual Claims brought against them. This argument contains a fatal flaw, however, because the Vaccine Act only prohibits the filing of any civil action against a "vaccine *manufacturer* or *administrator*" prior to the filing of a Program petition. 42 U.S.C. § 300aa-11(2)(A) (emphasis added). Because Sigma and EM allegedly supply thimerosal (a raw material) to the Vaccine Manufacturers, but do not manufacture or administer vaccines themselves, Plaintiffs' claims against Sigma and EM are not subject to the Vaccine Act's tort suit bar. Nevertheless, for the reasons discussed previously in conjunction with the Individual Claims against the Vaccine Manufacturers, Sigma and EM's Motion to Dismiss is hereby **GRANTED IN PART** with respect to Plaintiffs' derivative claims for loss of services and emotional distress. Regarding all other claims asserted by Plaintiffs against Sigma and EM, their Motion to Dismiss is hereby **DENIED**.[13]

## V. GDL's Motion to Dismiss

The Court recently issued an Order denying Plaintiffs leave to conduct jurisdictional discovery of GDL pending further Order of the Court. Having determined that Plaintiffs' claims

---

[12] On May 1, 2002, Sigma filed a second Motion to Dismiss and alternatively, a Motion to Stay. The Court is not making any ruling on Sigma's second Motion to Dismiss at this time. The Court will address that Motion, along with Sigma's request for a stay, after Plaintiffs have responded thereto.

[13] Sigma and EM's Motion to Dismiss also argues for a dismissal pursuant to Fed. R. Civ. P. 19 in the event that the Court dismisses "any other Defendant or other Defendants." Because the Court has not dismissed any Defendants (only certain claims), the Court does not need to address Sigma and EM's Rule 19 request.

14

against the Chemical Manufacturers are not barred by the Vaccine Act, the Court finds that such discovery is indeed warranted. As such, the Court hereby **ORDERS** that Plaintiffs have sixty (60) days from the date of this Order to conduct discovery pertaining solely to whether this Court may validly exercise personal jurisdiction over GDL. At the end of that time period, Plaintiffs are **ORDERED** to file their Response to GDL's Motion to Dismiss for Lack of Personal Jurisdiction. The Court will rule on that Motion as soon as it can be reached.

In conclusion, the Court reiterates that all Representative Claims asserted against the Vaccine Manufacturers fall squarely within the jurisdiction of the Vaccine Court and are hereby **DISMISSED WITHOUT PREJUDICE.** The only claims against the Vaccine Manufacturers that Plaintiffs may properly assert in this forum are those seeking compensation for loss of consortium. On the other hand, Plaintiffs' Representative Claims and Individual Claims against the Chemical Manufacturers are subject to adjudication in this forum. GDL's Motion to Dismiss remains pending. Finally, this Order renders the Vaccine Manufacturers' Request for Oral Argument on their Motion to Dismiss **MOOT.** The Court will address all other pending concerns as soon as they are ripe for consideration.

**IT IS SO ORDERED.**

**DONE** this 7 day of May, 2002, at Galveston, Texas.

SAMUEL B. KENT
UNITED STATES DISTRICT JUDGE

15

4

208 F.Supp.2d 711
(Cite as: 208 F.Supp.2d 711)
c

Page 11

United States District Court,
S.D. Texas,
Galveston Division.

Alan R. **STRAUSS** and Tracy D. Strauss,
Plaintiffs,
v.
**AMERICAN** HOME PRODUCTS
CORPORATION, et al., Defendants.

No. Civ.A.G-02-226.

June 11, 2002.

Parents filed products liability suit against vaccine manufacturers in state court to recover for loss of consortium arising from child's vaccine-related injuries. After removal to federal court, manufacturers moved to dismiss, and parents moved to remand to state court. The District Court, Kent, J., held that: (1) parents were not required by National Childhood Vaccine Injury Act to file petition with Court of Federal Claims before bringing state court action; (2) failure to timely file child's claims against manufacturers barred parents' derivative claims; and (3) removal was proper.

Motion to remand denied; motion to dismiss granted.

West Headnotes

[1] Health ☞389
198Hk389

Parents seeking to recover for their injuries arising from their child's vaccine-related injuries were not required by National Childhood Vaccine Injury Act to file petition with Court of Federal Claims before bringing civil action in state court against vaccine manufacturers; parents did not themselves receive vaccine, and did not assert claims in representative capacity. Public Health Service Act, § 2111, as amended, 42 U.S.C.A. § 300aa-11.

[2] Health ☞389
198Hk389

Under Texas law, parents' claims against vaccine manufacturers for loss of consortium as result of their child's vaccine-related injuries were derivative of child's claims against manufacturers, and thus

child's failure to file timely petition under National Vaccine Injury Compensation Program, pursuant to National Childhood Vaccine Injury Act, barred parents' state court tort action. Public Health Service Act, § 2116(a)(2), as amended, 42 U.S.C.A. § 300aa-16(a)(2).

[3] Removal of Cases ☞94
334k94

Defendant may amend its removal petition in order to cure defective technical allegations of jurisdiction, even after expiration of statutory thirty-day period for amendment. 28 U.S.C.A. §§ 1446(b), 1653.
*711 Martin Jonathan Siegel, Watts & Heard LLP, Houston, TX, for plaintiffs.

Michael R. Klatt, Clark Thomas and Winters, Austin, TX, Rebecca Jo Reser, Ray McChristian, San Antonio, TX, Lee Davis Thames, Butler Snow O'Mara Stevens & Cannada, Jackson, MS, Gene M. Williams, Mehaffey & Weber, Beaumont, TX, John R. Gilbert, Gilbert & Moore PLLC, Angleton, TX, Douglas W. Poole, McLeod Alexander, Galveston, TX, Winstol D. Carter, Jr., Attorney at Law, Bryan, TX, Barclay A. Manley, Fulbright & Jaworski, Houston, TX, David Michael Macdonald, McCauley Macdonald & Devin, Dallas, TX, Raymond, G. Kolts, Kathlene Landgraf Kolts, Dean & Kolts, Coeur d'Alene, ID, for defendants.

*712 *ORDER GRANTING BAXTER, WYETH, AVENTIS AND SMITH KLINE'S MOTIONS TO DISMISS, GRANTING BAXTER'S MOTION TO AMEND NOTICE OF REMOVAL AND DENYING PLAINTIFFS' MOTION FOR REMAND*

KENT, District Judge.

Plaintiffs Alan D. **Strauss** and Tracy D. **Strauss,** parents of minor child Alan C. Strauss ("Alan"), bring this products liability lawsuit against Defendants Wyeth ("Wyeth") f/k/a **American** Home Products, Corp. d/b/a Wyeth- Ayerst, Wyeth Ayerst-Laboratories, Wyeth Lederle, Wyeth Lederle Vaccines and Lederle Laboratories; Aventis Pasteur, Inc. ("Aventis"), individually and as successor-in-interest to Connaught Laboratories, Inc., Pasteur Merieux and Pasteur Merieux Connaught; Baxter International, Inc. ("Baxter"), individually and as successor-in-interest to North **American** Vaccine, Inc.; Dow Chemical Company

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

208 F.Supp.2d 711
(Cite as: 208 F.Supp.2d 711, *712)

Page 12

("Dow"); Eli Lilly and Company ("Eli Lilly"); Smith Kline Beecham Corporation ("Smith Kline") d/b/a GlaxoSmithKline; Sigma-Aldrich ("Sigma"); and Meridian Pharmaceuticals, Inc. ("Meridian"), individually and as successor- in-interest to Meridian Chemical and Equipment, Inc., pursuant to the state laws of Texas. Now before the Court are four Motions filed by various Parties: (1) a Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b) filed by Baxter and subsequently joined by Wyeth and Aventis; (2) a Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b) filed by Smith Kline; (3) a Motion to Amend Notice of Removal filed by Baxter; and (4) a Motion to Remand for Lack of Subject Matter Jurisdiction filed by Plaintiffs. For the reasons articulated below, the Motions to Dismiss filed by Baxter, Aventis, Wyeth and Smith Kline are GRANTED, Baxter's Motion to Amend Notice of Removal is GRANTED and Plaintiffs' Motion to Remand is DENIED.

## I. Background

The tragic facts averred by Plaintiffs can be summarized concisely. Alan, who was born on November 26, 1989, received several routine childhood vaccinations between January of 1990 and June of 1991. A few months after Alan's first round of vaccinations, his language and learning skills began to regress. Eventually, Alan's ability to accomplish basic tasks (i.e. feeding and dressing himself) deteriorated ' and his motor skill development languished. Alan was subsequently diagnosed as mentally retarded. Today, Alan's learning and communication skills are severely limited and Alan often acts in a manner that is overly aggressive towards other children and injurious to himself. Alan cannot experience a "normal" teenage life, as he is in need of constant care. Most likely, Alan will require regular medical attention for the remainder of his life.

Plaintiffs believe that Alan's retardation was caused by the vaccines introduced into his body during his infancy. Based upon this hypothesis, Plaintiffs filed this lawsuit in a Texas state court on February 25, 2002, seeking damages from the companies that were involved in producing the vaccines administered to Alan twelve years ago. In their Original Petition, Plaintiffs aver an assortment of tort claims against two distinct categories of Defendants: (1) the manufacturers of vaccines-- Baxter, Wyeth, Aventis, Meridian, Eli Lilly and

Smith Kline; and (2) the manufacturers of one or more chemical constituents found within vaccines-- Sigma and Dow. [FN1] On April 3, 2002, Baxter removed the action pursuant to this Court's diversity and federal *713 question jurisdiction. Smith Kline and Sigma joined Baxter's Notice of Removal. [FN2]

FN1. This case is the latest in a string of childhood vaccine-related cases filed in this forum since the start of 2002. In presiding over these cases, the Court has become familiar with the Defendants' respective roles in the vaccine industry and finds it essential to distinguish between those who manufacture vaccines and those who manufacture the raw materials used to formulate vaccines. Thus, while Plaintiffs' Original Petition fails to distinguish between the two categories of Defendants, the Court will draw such a distinction itself.

FN2. Apparently, Aventis, Eli Lilly, Wyeth, Sigma and Dow had not yet been served with process at the time of Baxter's removal. There is apparently some conflict as to whether Meridian was served prior to the time of removal or shortly thereafter. However, whether Meridian was served before or after Baxter's removal is of no consequence to the instant Motions.

## II. The Vaccine Act

The "[v]accination of children against deadly, disabling, but preventable infectious diseases has been one of the most spectacularly effective public health initiatives this country has ever undertaken. Use of vaccines has prevented thousands of children's deaths each year and has substantially reduced the effects resulting from disease." H.R.Rep. No. 99- 908, at 4 (1986), reprinted in 1986 U.S.C.C.A.N. 6344, 6345. However, while most children enjoy measurable benefit from immunization programs, "a small but significant number of have been gravely injured." Id. Two significant concerns are accompany these vaccine-related injuries: the inconsistency, expense, delay and unpredictability of the tort system in compensating claims of vaccine-injured children; and the instability and uncertainty of the childhood vaccine market inevitably caused by the risks of tort litigation. See id. at 7, 1986 U.S.C.C.A.N. at 6348. Fortunately, the National Vaccine Injury Compensation Program ("Program") ameliorates these concerns. The Program provides an avenue of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

recovery for injuries and deaths traceable to vaccinations that works with greater ease and on a faster timetable than the civil tort system. [FN3] *See Shalala v. Whitecotton,* 514 U.S. 268, 269, 115 S.Ct. 1477, 1478, 131 L.Ed.2d 374 (1995). In effect, it "ensure[s] that all children who are injured by vaccines have access to sufficient compensation for their injuries," H.R.Rep. No. 99-908 at 6345-6346, and "free[s] manufacturers from the specter of large, uncertain tort liability, and thereby ... keep[s] manufacturers in the market." *Schafer v. Am. Cyanamid Co.,* 20 F.3d 1, 4 (1st Cir.1994).

FN3. The Program became effective on October 1, 1988.

The Program, set forth in the Vaccine Act, requires that vaccine-related claims are initially heard by special masters in the United States Court of Federal Claims ("Vaccine Court"), adjudicated informally and then accorded expeditious review. *See Whitecotton,* 514 U.S. at 270, 115 S.Ct. at 1478. This system streamlines the claims process by establishing standards of proof, under which individuals who suffer injuries within specified intervals after being administered a vaccine, benefit from a presumption that a vaccine caused those injuries. *See* 42 U.S.C. §§ 300aa-11(c)(1)(C)(i), 300aa-13(a)(1), 300aa-14; *Haggerty v. Wyeth Ayerst Pharm.,* 79 F.Supp.2d 182, 184 (E.D.N.Y.2000). A Program claimant may not file a civil action against a vaccine manufacturer or administrator unless the claimant initially files a timely petition in accordance with the Program's guidelines. [FN4] *See* 42 U.S.C. § 300aa-11(2)(A); *Whitecotton,* 514 U.S. at 270, 115 S.Ct. at 1478 (explaining that a claimant alleging an injury after the Vaccine Act's effective date "must exhaust the Act's procedures ... before filing any *de novo* civil action in state or federal court"). If a claimant seeks compensation in a state *714 or federal court for vaccine-related injuries prior to exhausting his or her remedies under the Vaccine Act, the Court must dismiss the action. *See* 42 U.S.C. § 300aa-11(a)(2)(B). Simply put, individuals who qualify as Program claimants *must* file petitions in the Vaccine Court in order to pursue any vaccine-related claims at all. [FN5] If an individual who prevails in the Vaccine Court is ultimately dissatisfied with his or her Program award, that individual may reject the award and pursue a traditional tort action in any forum. [FN6] *See* 42 U.S.C. § 300aa-21(a).

FN4. A proper claimant, or "petitioner," under the Vaccine Act is "any person who has sustained a vaccine-related injury," or the legal representative of such person. 42 U.S.C. § 300aa-11(b)(1)(A).

FN5. There are a few exceptions. *De minimis* claims for less than $1,000 may be brought in state or federal courts without prior filing under the Vaccine Program. *See* 42 U.S.C. § 300aa-11(a)(2)(A). However, the Vaccine Act requires that any vaccine-related action seeking an unspecified amount of damages (such as the instant lawsuit) be filed under the Program. *See id.*

FN6. Under the Program, the compensation awarded to a petitioner for a vaccine-related injury may include actual and un-reimbursable expenses and projected expenses for medical or other remedial care determined to be reasonably necessary; actual and anticipated lost earnings; and actual and projected pain and suffering subject to a statutory cap of $250,000. *See* 42 U.S.C. § 300aa-15(a). Punitive and exemplary damages are prohibited. *See* 42 U.S.C. § 300aa-15(d). Reasonable attorneys' fees and costs are awarded even if the petition is denied, so long as the special master determines that the petition was brought in good faith and that a reasonable basis for asserting the claim existed. *See* 42 U.S.C. § 300aa-15(e). In the event that a petitioner chooses to reject a Program award, the Vaccine Act limits the tort remedies that become available. For instance, the Vaccine Act establishes compliance with Food and Drug Administration ("FDA") requirements as a partial defense for manufacturers, *see* 42 U.S.C. § 300aa-22(b)(2), and requires tort suits to be tried in three phases (liability, general damages and punitive damages). *See* 42 U.S.C. § 300aa-23(a). Moreover, a manufacturer's compliance with FDA guidelines generally precludes an award of punitive damages. *See* 42 U.S.C. § 300aa-23(d).

III. Motions to Dismiss

Plaintiffs candidly admit that they never filed a Program petition seeking compensation for Alan's injuries. In their Motions to Dismiss, Baxter, Wyeth, Aventis and Smith Kline (collectively "Vaccine Manufacturers") highlight this fact and argue that Plaintiffs' failure to file a Program petition requires the Court to dismiss all claims filed against them pursuant to Fed.R.Civ.P. 12(b). [FN7] The Vaccine Manufacturers further allege that even if Plaintiffs did not need to file a Program petition

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

prior to instituting this action, Plaintiffs' claims are nevertheless time-barred under Texas law. The Court will address each of the Vaccine Manufacturer's contentions in turn.

> FN7. Although the Vaccine Manufacturers do not specify which provision of Rule 12(b) they are moving for dismissal under, the Court assumes that they are seeking a dismissal under Rule 12(b)(3) for improper venue, or in the alternative, under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12(b)(6); Fed.R.Civ.P. 12(b)(3).

*Plaintiffs' Failure to File a Program Petition*

[1] By its own terms, the Vaccine Act's proscription against bringing a civil action for damages prior to the filing of a Program petition "applies only to a person who has sustained a vaccine-related injury or death and who is qualified to file a petition for compensation under the Program." 42 U.S.C. § 300aa-11(a)(9). An individual becomes eligible to file a Program petition only if: (1) he or she suffers a specified injury after receiving a vaccine; or (2) if he or she is the legal representative of such a person. *See* 42 U.S.C. §§ 300aa-11(b)(1)(A), 300aa-11(c)(1)(A); *see also Schafer,* 20 F.3d at 7; *Head v. Sec'y of Dept. of Health and Human Servs.,* 26 Cl.Ct. 546, 547 n. 1 (1992), *aff'd,* 996 F.2d 318 (Fed.Cir.1993). In this *715 case, neither Plaintiff alleges to have "suffered a relevant injury ... after he or she received a vaccine." Nor have Plaintiffs asserted any claims in a representative capacity. Therefore, the Vaccine Act's requirement that petitioners file a Program petition prior to a lawsuit does not bar Plaintiffs from filing the instant action against the Vaccine Manufacturers. [FN8] *See Schafer,* 20 F.3d at 5 (explaining that the Vaccine Act's tort suit ban does not apply to individuals who cannot file petition in the Vaccine Court except in a representative capacity); *Head,* 26 Cl.Ct. at 550 (holding that an award to a mother in her individual capacity in an action arising from vaccine-related injuries received by her daughter did not bar the daughter's subsequent action under the Vaccine Act); *McDonald v. Lederle Labs.,* 341 N.J.Super. 369, 775 A.2d 528, 535 (2001) ("The [Vaccine] Act does not preclude parents from filing an individual civil action for losses incurred by them."); *see also* 42 U.S.C. § 300aa-11(b)(1)(A) (expressly prohibiting Program "compensation for other than the health,

education, or welfare of the person who suffered the vaccine-related injury").

> FN8. However, the Court wishes to clarify that although Plaintiffs are not barred outright by the Vaccine Act from seeking individual damages (i.e. loss of consortium) from the Vaccine Manufacturers, they cannot recover from the Vaccine Manufacturers for any expenses that they have incurred on Alan's behalf. As explained above, the Vaccine Act provides compensation for actual and un-reimbursable expenses and projected expenses (incurred by the victim or on the victim's behalf) for medical or other remedial care determined to be reasonably necessary, actual and anticipated lost earnings, actual and projected pain and suffering of the victim and reasonable attorneys' fees and costs. The covered expenses include those costs which "have been or will be incurred by or on behalf of the [victim] ... for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and services expenses, and facilities determined to be reasonably necessary." 42 U.S.C. § 300aa-15(a)(1). Because Plaintiffs failed to seize their opportunity to seek reimbursement for these expenses in the Vaccine Court, Plaintiffs are ineligible to recover damages via an action wherein they assert individual claims against the Vaccine Manufacturers. Allowing them to do so would clearly undermine the stated objectives of the Vaccine Act.

*Statute of Limitations*

As stated above, this lawsuit arises from personal injuries allegedly sustained by *Alan* --not by Plaintiffs themselves. [FN9] Plaintiffs' instant claims are therefore wholly derivative of Alan's underlying personal injury claims and consequently, the viability of Plaintiffs' claims against the Vaccine Manufacturers depends upon the validity of Alan's underlying cause of action. *See Reed Tool Co. v. Copelin,* 610 S.W.2d 736, (Tex.1980) (establishing that a plaintiff is barred from bringing a derivative claim unless the tortfeasor's liability for the underlying injury has been previously established); *see also Owens ex rel. Schafer v. American Home Prods. Corp.,* 203 F.Supp.2d 748, 753-55 (S.D.Tex.2002) (explaining that in a case brought by parents of a child allegedly injured by a vaccine, parents' individual claims are derivative of the child's claims).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

208 F.Supp.2d 711                                                                                          Page 15
(Cite as: 208 F.Supp.2d 711, *715)

FN9. The Court reaches this conclusion because Plaintiffs make no suggestion that they suffered any personal injuries (i.e. emotional distress). While Plaintiffs do allege monetary losses related to Alan's condition, the Court has already established that any attempt to recover such costs is barred by the Vaccine Act. Thus, the only injuries at issue are those that Alan allegedly sustained.

*Alan's Vaccine Court claim is time-barred*

Notably, Plaintiffs contend that they noticed symptoms of Alan's alleged vaccine-related injuries "a few months" after Alan *716 was vaccinated in 1990 and 1991. As such, because the Vaccine Act mandates that "no petition may be filed for compensation under the Program for such injury after the expiration of 36 months after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of such injury," *see* 42 U.S.C. § 300aa-16(a)(2), Plaintiffs are no longer eligible to seek compensation for Alan's alleged injuries in the Vaccine Court. [FN10]

FN10. Plaintiffs argue that the Vaccine Act's thirty-six month limitations period does not apply in this case because they only recently discovered that Alan's injuries were vaccine-related. However, the "discovery rule" does not apply to the Act's limitations period and the Act fails to provide for an equitable tolling period. *See Brice v. Secretary of Health and Human Servs.*, 240 F.3d 1367, 1373 (2001) (explaining that Congress intended the Vaccine Act's limitations period to commence upon the onset of injury and it should not be delayed until the time that petitioner actually knows that the vaccine recipient suffered from an injury compensable under the Act).

*Plaintiffs' derivative claims are time-barred*

[2] This Court concurs with the New Jersey Supreme Court's recent determination that "[t]he plain meaning of the [Vaccine] Act and the Congressional intent are consistent with the conclusion that failure to file a timely petition under the Program bars the later pursuit of a State tort action through the Program's election procedure." *McDonald*, 775 A.2d at 532. Thus, when Plaintiffs failed to file a Program petition within thirty-six months after first detecting Alan's symptoms, they became ineligible to file a tort suit against the Vaccine Manufacturers on Alan's behalf. And because Alan's underlying tort claims against the

Vaccine Manufacturers are time- barred, Plaintiffs' derivative claims against the Vaccine Manufacturers are time-barred as well. *See Am. Industries Life Ins. Co. v. Ruvalcaba*, 64 S.W.3d 126, 144 (Tex.App.--Houston [14th Dist.] 2001, pet. filed) (explaining that loss of consortium claims are derivative of the underlying personal injury claim and therefore barred if the personal injury claimant has no recovery); *Howard v. Fiesta Texas Show Park, Inc.*, 980 S.W.2d 716, 719 (Tex.App.--San Antonio, 1998, pet. denied) ("Claims for loss of consortium and loss of services are derivative of the injured family member's cause of action for personal injuries and are subject to the same statute of limitations and defenses that preclude liability."). Plaintiffs simply cannot assert derivative claims that are premised upon an extinct cause of action.

The Court emphasizes that it certainly sympathizes with Plaintiffs' plight and is genuinely sorry that Plaintiffs, for whatever reason, neglected to file a Program petition in a timely fashion. Nevertheless, the principle that "[e]quity aids the vigilant and not those who slumber on their rights" is firmly rooted in our legal system. *Nat'l Assoc. of Gov't Employees v. City Pub. Service Bd. of San Antonio, Texas*, 40 F.3d 698, 708 (5th Cir.1994). Accordingly, the Court is bound to find that Baxter, Aventis, Wyeth and Smith Kline's Motions to Dismiss must be GRANTED and as such, Plaintiffs' ill-timed derivative claims against those Defendants are hereby DISMISSED WITH PREJUDICE. [FN11]

FN11. The Court suspects that the reasoning behind its decision to dismiss Plaintiffs' claims against Baxter, Aventis, Wyeth and Smith Kline applies with equal force to Eli Lilly and Meridian (the other two Vaccine Manufacturer Defendants). However, because Eli Lilly and Meridian have not requested dispositive relief at this time, Plaintiffs' claims against them remain pending. With regard to Sigma and Dow, the Court points out that the Vaccine Act only prohibits the filing of any civil action against a "vaccine *manufacturer* or *administrator* " prior to the filing of a Program petition. 42 U.S.C. § 300aa-11(2)(A) (emphasis added). Because Sigma and Dow supply vaccine constituents (the raw materials used to formulate vaccines) to the Vaccine Manufacturers, but do not manufacture or administer vaccines themselves, Plaintiffs' claims against Sigma and Dow are not subject to the Vaccine Act's tort suit ban. Accordingly, the Court's reasoning in Part III of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

208 F.Supp.2d 711
(Cite as: 208 F.Supp.2d 711, *716)

Page 16

this Opinion in no way affects Plaintiffs' pending claims against the chemical manufacturer Defendants. However, the Court notes that the general limitations period for tort actions in Texas applies to those claims. If Sigma and Dow believe that the Texas statute of limitations bars Plaintiffs action against them (and the Court is in no way suggesting that it does), they are free to seek dispositive relief on that basis in due course.

### *717 IV. Motion to Amend Notice of Removal

[3] Within the thirty-day period prescribed by § 1446(b), a defendant may freely amend its notice of removal. *Blakeley v. United Cable System,* 105 F.Supp.2d 574, 578 (S.D.Miss.2000). And the majority of courts--including the Fifth Circuit--recognize that even after expiration of this thirty-day period, a defendant may still amend its removal petition in order to cure defective allegations of jurisdiction. *See Howery v. Allstate Ins. Co.,* 243 F.3d 912, 920 n. 9 (5th Cir.2001); ("[P]rior to judgment, a party may amend its pleadings to allege omitted jurisdictional facts"); *Whitmire v. Victus, Ltd.,* 212 F.3d 885, 888 (5th Cir.2000) (emphasizing that § 1653 should be broadly construed); *D.J. McDuffie, Inc. v. Old Reliable Fire Ins. Co.,* 608 F.2d 145, 146 (5th Cir.1979) (holding that amendment of removal petition was properly allowed to correct jurisdictional allegations in removal petition which were defective or faulty due to defendants' failure to specifically allege the citizenship of the parties at the time the suit was brought and at the time the removal petition was filed; missing allegation was not a fatal omission which could not be cured by amendment).

The authorization for such amendments derives from 28 U.S.C. § 1653, which states in pertinent part: "Defective allegations of jurisdiction may be amended ... in the trial or appellate courts." 28 U.S.C. § 1653. Thus, "where a defendant, for example, has alleged the existence of diversity jurisdiction in its removal petition but has failed to allege all of the specific facts, or has incorrectly alleged some of the facts underlying its jurisdictional conclusion, courts ... allow[ ] amendments to cure these deficiencies." *Blakeley,* 105 F.Supp.2d at 578-79. However, there is an important caveat to this principle: A defendants' ability to amend its removal petition after the thirty-day time period for removal prescribed by § 1446(b) extends only to amendments that correct *technical* defects in the

defendant's original jurisdictional allegations. *See id.* at 579. A defendant may *not* amend its removal notice to remedy a *substantive* defect (i.e., to add a new basis for federal jurisdiction) after the thirty-day time limit expires. *See id.; Briarpatch Ltd. v. Pate,* 81 F.Supp.2d 509, 516- 17 (S.D.N.Y.2000).

Baxter's Notice of Removal alleges federal jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1332 (diversity jurisdiction). Now Baxter seeks to amend the following language to its Removal Notice:

[Plaintiffs state court] Petition alleges that Defendant "Meridian Chemical and Equipment, Inc., doing business as Meridian Pharmaceuticals, Inc." is a foreign corporation with its headquarters and principal place of business in Texas. However, there is no corporation or other business entity known as "Meridian Chemical & Equipment, Inc." doing business as Meridian Pharmaceuticals, Inc .. "Meridian Pharmaceuticals, Inc." is the successor corporation to Meridian Chemical & Equipment, Inc.. The acquisition of Meridian Chemical & Equipment, Inc. by Meridian Pharmaceuticals, *718 Inc. occurred before [the date that Plaintiffs' Petition was filed]. Meridian Pharmaceuticals, Inc. is incorporated in the state of Alabama and has been since before [the date that Plaintiffs' Petition was filed]. Meridian Pharmaceuticals, Inc. has its principal place of business in the State of Alabama and has never had it elsewhere. These facts are conclusively established by the May 21, 2002 Affidavit of Mickey Letson attached hereto.

Evidently, the proposed amendment does not attempt to add a new basis for federal subject matter jurisdiction. Rather, Baxter seeks only to remedy a technical defect in its Notice of Removal by clarifying the facts that underlie its prior allegation of diversity jurisdiction. Thus, the applicable case law overwhelmingly counsels in favor of allowing Baxter to add the requested language to its jurisdictional allegations. The Court therefore ascertains that Baxter's Motion to Amend must be GRANTED.

### V. Motion to Remand

Finally, the Court turns to Plaintiffs' Motion to Remand. In their Motion, Plaintiffs maintain that the Court lacks jurisdiction over this action because both Plaintiffs and Meridian are Texas citizens. [FN12] However, Plaintiffs' Motion to Remand

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

208 F.Supp.2d 711
(Cite as: 208 F.Supp.2d 711, *718)

Page 17

refers to the citizenship of Meridian Chemical and Equipment, Inc., the predecessor-in-interest to Meridian, not to the citizenship of Meridian itself. Baxter's amendment to its Notice of Removal (previously set forth in full) addresses this distinction and professes that Meridian is a citizen of Alabama for diversity purposes. The Affidavit of Mickey Letson, submitted in conjunction with Baxter's Motion to Amend, lends convincing support to this notion. Letson, Meridian's President, avers that:

> FN12. For diversity purposes, a corporation qualifies as a citizen "of any State by which it has been incorporated and the State where it has its principal place of business." 28 U.S.C. § 1332(c).

Meridian is incorporated in the State of Alabama and ... has its principal place of business in the State of Alabama. Meridian operates out of its main corporate headquarters in Decatur, Alabama. All senior management, officers and directors for Meridian are located in the State of Alabama. Corporate decisions and strategy originate in the corporate headquarters in Decatur, Alabama.

Further, an overwhelming majority of the manufacturing and distribution conducted by Meridian occurs within the state of Alabama.

Notably, Plaintiffs do not offer any competent evidence rebutting Letson's Affidavit. Thus, in light of Letson's uncontroverted pronouncement and Baxter's clarification to its jurisdictional allegations, the Court finds that Meridian is an Alabama citizen for all jurisdictional purposes. Accordingly, Plaintiffs' Motion to Remand is hereby DENIED.

In conclusion, the Court reiterates that all claims asserted by the Plaintiffs against Baxter, Aventis, Wyeth and Smith Kline are hereby DISMISSED WITH PREJUDICE. A final judgment reflecting this determination will be issued in due course. Finally, Plaintiffs' claims against Meridian, Eli Lilly, Sigma and Dow remain pending and subject to future adjudication by the Court.

IT IS SO ORDERED.

208 F.Supp.2d 711

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

5



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

BRYAN D. COLLINS AND ALLYSON M.
COLLINS, PARENTS AND NEXT FRIEND
OF ZACHARY W. COLLINS, ET AL.                    PLAINTIFF!

VS.                              CIVIL ACTION NO. 3:01CV979L!

AMERICAN HOME PRODUCTS CORPORATION
D/B/A WYETH, ET AL.                              DEFENDANT!

## ORDER

This cause is before the court on the motions of several
defendants to dismiss.  The court has considered the motions and
concludes that they are well taken and should be granted.  By their
complaint in this cause, each plaintiff herein seeks recovery for
more than $1,000 in damages on account of "vaccine-related
injuries" and yet none has first filed a petition for compensation
with the Court of Federal Claims, as required by the National
Childhood Vaccine Injury Act.  Accordingly, in keeping with the
explicit directive of the Vaccine Act, 42 U.S.C. §§ 300aa-1, this
cause must be dismissed.  See 42 U.S.C. § 300aa-11(a)(2)(A)
(providing that "[n]o person may bring a civil action . . . against
a vaccine administrator or manufacturer in a state or federal court
for damages arising from a vaccine-related injury or death . . .
unless a petition has been filed" first in the Court of Federal
Claims); 42 U.S.C. § 300aa-11(a)(2)(B) (stating that if a claimant
files such a suit "in a State or Federal court" prior to
petitioning the Court of Federal Claims, such state or federal
court "shall dismiss the action").  See also Shalala v.

Whitecotton, 514 U.S. 268, 270, 115 S. Ct. 1477, 1478, 131 L. Ed. 2d 374 (1995) ("A claimant alleging that more than $1,000 in damages resulted from a vaccination after the Act's effective date in 1988 must exhaust the Act's procedures and refuse to accept the resulting judgment before filing any de novo civil action in state or federal court.").

Based on the foregoing, it is ordered that the motions of the defendants to dismiss are granted, and it is therefore ordered that this cause is dismissed without prejudice.

SO ORDERED this 2nd day of August, 2002.

UNITED STATES DISTRICT JUDGE

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION



BRYAN D. COLLINS AND ALLYSON M.
COLLINS, PARENTS AND NEXT FRIEND
OF ZACHARY W. COLLINS, ET AL.

PLAINTIFFS

VS.

CIVIL ACTION NO. 3:01CV979LN

AMERICAN HOME PRODUCTS CORPORATION
D/B/A WYETH, ET AL.

DEFENDANTS

ORDER

This cause is before the court on the motion of defendants American Home Products Corporation, Abbott Laboratories, Inc., Aventis Pasteur, Inc., Baxter International, Inc., BioPort Corporation, Inc., Eli Lilly and Company, Merck & Company, and SmithKline Beecham Corporation for reconsideration of this court's June 21, 2002 order granting plaintiffs' motion to remand. Plaintiffs have not filed a formal response in opposition to the motion, but have advised the court by letter that they do oppose the motion. For the reasons that follow, the court concludes that defendants' motion to reconsider should be granted and that this court's previous order remanding the case should be vacated.

Among other things, this court expressed the view in its June 21 opinion and order that "defendants unquestionably ha[d] the better of the argument on the issue of whether injuries alleged to have resulted from thimerosal in vaccines constitute vaccine-related injuries under the [National Childhood Vaccine Injury Act (Vaccine Act)]" so as to be consequently barred by the Vaccine

Act's ban on tort claims,[1] and that the court had no doubt that it would conclude that the plaintiffs' claims were vaccine-related if the issue were presented to the court in a context other than fraudulent joinder. The court, though, held that it could not say there was no reasonable possibility of recovery. In other words, the court expressed the view that there existed a reasonable possibility that a court might accept the plaintiffs' argument that thimerosal was an adulterant or contaminant so that their claims for injuries from thimerosal in vaccines were not vaccine-related and hence were not barred by the Vaccine Act.

While the court is not persuaded that its conclusion in this regard was manifestly erroneous, the court is persuaded that events which have occurred since entry of the court's order foreclose any reasonable possibility that the plaintiffs have stated a currently cognizable claim against the resident defendants. To the point, on July 3, 2002, the Court of Federal Claims Office of Special Masters entered Autism General Order #1, in which it expressly assumed

---

[1]     As explained at length in its earlier opinion, the Vaccine Act provides that "[n]o person may bring a civil action . . . against a vaccine administrator or manufacturer in a state or federal court for damages arising from a vaccine-related injury or death . . . unless a petition has been filed" first in the Court of Federal Claims, and mandates that if a claimant files such a suit "in a State or Federal court" prior to petitioning the Court of Federal Claims, such state or federal court "shall dismiss the action." 42 U.S.C. § 300aa-11(a); see also Shalala v. Whitecotton, 514 U.S. 268, 270, 115 S. Ct. 1477, 1478, 131 L. Ed. 2d 374 (1995) ("A claimant alleging that more than $1,000 in damages resulted from a vaccination after the Act's effective date in 1988 must exhaust the Act's procedures and refuse to accept the resulting judgment before filing any de novo civil action in state or federal court.").

2

jurisdiction under the Vaccine Act over Vaccine Program claims alleging a causal relationship between autism, or neurodevelopment disorders similar to autism, and certain vaccinations, including the Measles-Mumps-Rubella vaccinations, and/or "by the 'thimerosal' ingredient contained in certain Diphtheria-Tetanus-Pertusis ("DTP"), Diphtheria-Tetanus-acellar Pertussis ("dTaP"), Hepatitis B, and Hemophilus Influenza Type B ("HIB") vaccinations," or by some combination of the two. Since the Court of Federal Claims has jurisdiction only to grant relief under the Vaccine Act for "vacine-related" injuries, and since the Office of Special Masters has explicitly assumed jurisdiction over claims for injuries alleged to have been caused by thimerosal in certain vaccines, it necessarily follows that the Office of Special Masters has implicitly rejected the notion that thimerosal is an adulterant or contaminant and has concluded that such claims for these injuries are "vaccine related." Thus, even assuming that this court was correct in its earlier assessment of plaintiffs' possibility of recovery against the resident defendants, given this more recent circumstance, the court now concludes that there no longer exists any reasonable possibility that the claims asserted by the plaintiffs against the resident defendants are presently cognizable in any forum other than the Court of Federal Claims. Accordingly, the court will vacate its order remanding the case.

3

Based on the foregoing, it is ordered that defendants' motion to vacate the court's remand order is granted.

SO ORDERED this 1ˢᵗ day of August, 2002.

_____
UNITED STATES DISTRICT JUDGE

4



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

JAMIELEE HUGHES MCDONALD, ET AL.                    PLAINTIFF

VS.                                    CIVIL ACTION NO. 3:02CV77LN

ABBOTT LABORATORIES, INC., ET AL.,                  DEFENDANTS

ORDER

This cause is before the court on the motions of several
defendants to dismiss.  The court has considered the motions and
concludes that they are well taken and should be granted.  By their
complaint in this cause, each plaintiff herein seeks recovery for
more than $1,000 in damages on account of "vaccine-related
injuries" and yet none has first filed a petition for compensation
with the Court of Federal Claims, as required by the National
Childhood Vaccine Injury Act.  Accordingly, in keeping with the
explicit directive of the Vaccine Act, 42 U.S.C. §§ 300aa-1, this
cause must be dismissed.  See 42 U.S.C. § 300aa-11(a)(2)(A)
(providing that "[n]o person may bring a civil action . . . against
a vaccine administrator or manufacturer in a state or federal court
for damages arising from a vaccine-related injury or death . . .
unless a petition has been filed" first in the Court of Federal
Claims); 42 U.S.C. § 300aa-11(a)(2)(B) (stating that if a claimant
files such a suit "in a State or Federal court" prior to
petitioning the Court of Federal Claims, such state or federal
court "shall dismiss the action").  See also Shalala v.
Whitecotton, 514 U.S. 268, 270, 115 S. Ct. 1477, 1478, 131 L. Ed.
2d 374 (1995) ("A claimant alleging that more than $1,000 in

damages resulted from a vaccination after the Act's effective date in 1988 must exhaust the Act's procedures and refuse to accept the resulting judgment before filing any de novo civil action in state or federal court.").

Based on the foregoing, it is ordered that the motions of the defendants to dismiss are granted, and it is therefore ordered that this cause is dismissed without prejudice.

SO ORDERED this 2ᵈᵈ day of August, 2002.

_____
UNITED STATES DISTRICT JUDGE

2



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

JAMIELEE HUGHES MCDONALD, ET AL.                                 PLAINTIFF

VS.

ABBOTT LABORATORIES, INC., ET AL.              CIVIL ACTION NO. 3:02CV77LN

                                                                DEFENDANTS

ORDER

This cause is before the court on the motion of defendants
Abbott Laboratories, Inc., Wyeth, Aventis Pasteur, Inc., Baxter
International, Inc., Eli Lilly and Company, Merck & Company, and
SmithKline Beecham Corporation d/b/a GlaxoSmithKline for
reconsideration of this court's June 21, 2002 order granting
plaintiffs' motion to remand. Plaintiffs have not filed a formal
response in opposition to the motion, but have advised the court by
letter that they do oppose the motion. For the reasons that
follow, the court concludes that defendants' motion to reconsider
should be granted and that this court's previous order remanding
the case should be vacated.

Among other things, this court expressed the view in its June
21 opinion and order that "defendants unquestionably ha[d] the
better of the argument on the issue of whether injuries alleged to
have resulted from thimerosal in vaccines constitute vaccine-
related injuries under the [National Childhood Vaccine Injury Act
(Vaccine Act)]" so as to be consequently barred by the Vaccine
Act's ban on tort claims,[1] and that the court had no doubt that it

_____

[1]    As explained at length in its earlier opinion, the
Vaccine Act provides that "[n]o person may bring a civil action . . .

would conclude that the plaintiffs' claims were vaccine-related if the issue were presented to the court in a context other than fraudulent joinder. The court, though, held that it could not say there was no reasonable possibility of recovery. In other words, the court expressed the view that there existed a reasonable possibility that a court might accept the plaintiffs' argument that thimerosal was an adulterant or contaminant so that their claims for injuries from thimerosal in vaccines were not vaccine-related and hence were not barred by the Vaccine Act.

While the court is not persuaded that its conclusion in this regard was manifestly erroneous, the court is persuaded that events which have occurred since entry of the court's order foreclose any reasonable possibility that the plaintiffs have stated a currently cognizable claim against the resident defendants. To the point, on July 3, 2002, the Court of Federal Claims Office of Special Masters entered Autism General Order #1, in which it expressly assumed jurisdiction under the Vaccine Act over Vaccine Program claims alleging a causal relationship between autism, or neurodevelopment

---

. against a vaccine administrator or manufacturer in a state or federal court for damages arising from a vaccine-related injury or death . . . unless a petition has been filed" first in the Court of Federal Claims, and mandates that if a claimant files such a suit "in a State or Federal court" prior to petitioning the Court of Federal Claims, such state or federal court "shall dismiss the action." 42 U.S.C. § 300aa-11(a); see also Shalala v. Whitecotton, 514 U.S. 268, 270, 115 S. Ct. 1477, 1478, 131 L. Ed. 2d 374 (1995) ("A claimant alleging that more than $1,000 in damages resulted from a vaccination after the Act's effective date in 1988 must exhaust the Act's procedures and refuse to accept the resulting judgment before filing any de novo civil action in state or federal court.").

2

disorders similar to autism, and certain vaccinations, including the Measles-Mumps-Rubella vaccinations, and/or "by the `thimerosal' ingredient contained in certain Diphtheria-Tetanus-Pertussis ("DTP"), Diphtheria-Tetanus-acellar Pertussis ("dTaP"), Hepatitis B, and Hemophilus Influenza Type B ("HIB") vaccinations," or by some combination of the two. Since the Court of Federal Claims has jurisdiction only to grant relief under the Vaccine Act for "vaccine-related" injuries, and since the Office of Special Masters has explicitly assumed jurisdiction over claims for injuries alleged to have been caused by thimerosal in certain vaccines, it necessarily follows that the Office of Special Masters has implicitly rejected the notion that thimerosal is an adulterant or contaminant and has concluded that such claims for these injuries are "vaccine related." Thus, even assuming that this court was correct in its earlier assessment of plaintiffs' possibility of recovery against the resident defendants, given this more recent circumstance, the court now concludes that there no longer exists any no reasonable possibility that the claims asserted by the plaintiffs against the resident defendants are presently cognizable in any forum other than the Court of Federal Claims. Accordingly, the court will vacate its order remanding the case.

Based on the foregoing, it is ordered that defendants' motion to vacate the court's remand order is granted.

SO ORDERED this 1st day of August, 2002.

_____
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

JOHN W. STEWART III AND
ANNETTE C. STEWART, ET AL.                          PLAINTIFFS

VS.                                 CIVIL ACTION NO. 3:02CV427LN

AMERICAN HOME PRODUCTS CORPORATION
D/B/A WYETH, WYETH LABORATORIES,
ET AL.                                               DEFENDANTS

ORDER

This cause is before the court on the motions of several
defendants to dismiss.  The court has considered the motions and
concludes that they are well taken and should be granted.  By their
complaint in this cause, each plaintiff herein seeks recovery for
more than $1,000 in damages on account of "vaccine-related
injuries" and yet none has first filed a petition for compensation
with the Court of Federal Claims, as required by the National
Childhood Vaccine Injury Act.  Accordingly, in keeping with the
explicit directive of the Vaccine Act, 42 U.S.C. §§ 300aa-1, this
cause must be dismissed.  See 42 U.S.C. § 300aa-11(a)(2)(A)
(providing that "[n]o person may bring a civil action . . . against
a vaccine administrator or manufacturer in a state or federal court
for damages arising from a vaccine-related injury or death . . .
unless a petition has been filed" first in the Court of Federal
Claims); 42 U.S.C. § 300aa-11(a)(2)(B) (stating that if a claimant
files such a suit "in a State or Federal court" prior to
petitioning the Court of Federal Claims, such state or federal

court "shall dismiss the action"). See also Shalala v. Whitecotton, 514 U.S. 268, 270, 115 S. Ct. 1477, 1478, 131 L. Ed. 2d 374 (1995) ("A claimant alleging that more than $1,000 in damages resulted from a vaccination after the Act's effective date in 1988 must exhaust the Act's procedures and refuse to accept the resulting judgment before filing any de novo civil action in state or federal court.").

Based on the foregoing, it is ordered that the motions of the defendants to dismiss are granted, and it is therefore ordered that this cause is dismissed without prejudice.

SO ORDERED this 2nd day of August, 2002.

UNITED STATES DISTRICT JUDGE

2

960 - 6902

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION



JOHN W. STEWART III AND
ANNETTE C. STEWART, ET AL.

                                           **PLAINTIFFS**

VS.
                         CIVIL ACTION NO. 3:02CV427LN

AMERICAN HOME PRODUCTS CORPORATION
D/B/A WYETH, WYETH LABORATORIES,
ET AL.

                                       **DEFENDANTS**

<u>MEMORANDUM OPINION AND ORDER</u>

This cause is before the court on plaintiffs' motion to remand. Defendants have responded in opposition, and the court, having considered the memoranda of authorities, together with attachments, submitted by the parties, concludes that plaintiffs' motion to remand is due to be denied.

The plaintiffs in this case are the parents of children who are alleged to have suffered injuries as a result of their having received one or more childhood vaccines containing a preservative known as thimerosal. In a companion case, <u>Collins, et al. v. American Home Products Corp., et al.</u>, Civil Action No. 3:01CV979LN, these same plaintiffs sued in their capacity as parents and next friends of their respective children, seeking to recover damages for their children's injuries alleged to have been caused by the thimerosal-containing vaccines,. In this case, these same plaintiffs seek to recover medical expenses incurred by them and reasonably expected to be incurred by them in the future on account of their children's injuries, as well as damages for their own emotional distress alleged to have proximately resulted from their

children's injuries.

The Collins case, like the present case, was originally filed in the Circuit Court of Hinds County, and was removed to this court by the nonresident defendants.  In Collins, this court, after initially concluding in a memorandum opinion and order dated June 21, 2001, that it lacked either federal question jurisdiction or jurisdiction based on diversity of citizenship, concluded upon reconsideration that there was diversity jurisdiction, as there was no reasonable possibility that the plaintiffs could establish a basis for recovery against the resident defendants.  The court then dismissed the case since all the plaintiffs' claims were barred by the National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300aa-1.[1] The question is whether that same result should occur here; and in the court's opinion it should, for just as these plaintiffs had no cognizable claims against the resident defendants in Collins, they have no cognizable claims of their own against the resident defendants.

As respects the ultimate source of their alleged right of

_____

[1]    The Vaccine Act provides that "[n]o person may bring a civil action . . . against a vaccine administrator or manufacturer in a state or federal court for damages arising from a vaccine-related injury or death . . . unless a petition has been filed" first in the Court of Federal Claims, and mandates that if a claimant files such a suit "in a State or Federal court" prior to petitioning the Court of Federal Claims, such state or federal court "shall dismiss the action."  42 U.S.C. § 300aa-11(a); see also Shalala v. Whitecotton, 514 U.S. 268, 270, 115 S. Ct. 1477, 1478, 131 L. Ed. 2d 374 (1995) ("A claimant alleging that more than $1,000 in damages resulted from a vaccination after the Act's effective date in 1988 must exhaust the Act's procedures and refuse to accept the resulting judgment before filing any de novo civil action in state or federal court.").

2

recovery, plaintiffs' claims in this case are the same as their claims as parents and next friends in Collins, namely, that their children have been harmed from exposure to mercury contained in thimerosal, which was used as a preservative in vaccines administered to their children.[2] All that distinguishes this case from Collins is the fact that the plaintiffs herein purport to seek recovery in their own right, and not on behalf of their children, of medical expenses incurred for their children, and that they seek to recover damages for their own emotional distress. So far as the propriety of removal goes, however, these distinctions are immaterial, for plaintiffs have no cognizable claim for these alleged damages.

First, plaintiffs' claim for medical expenses is barred by the Vaccine Act to the same extent as their claim in Collins to recover such expenses in their capacity as representatives of their respective children. Under the Vaccine Act, a petition for compensation may be brought by "any person who has sustained a vaccine-related injury [or] *the legal representative of such person if such person is a minor or is disabled* . . . ." 42 U.S.C. § 300aa-11(b)(1)(A) (emphasis added). The Act further provides that compensation "shall include" medical and remedial expenses incurred "by or on behalf of" the injured person. See 42 U.S.C. § 300aa-15(a). Thus, plaintiffs cannot avoid applicability of the

---

[2]     As in Collins, the plaintiffs in this case have alluded to over-the-counter products; but it is plain that they have traced their children's injuries to having been injected with thimerosal-containing vaccines.

3

Vaccine Act, and the Act's tort suit ban, merely by suing in their own name for costs that are compensable under the Act. See Shafer v. American Cyanamid Co., 20 F.3d 1, 5 (1st Cir. 1994) (stating that "if [the plaintiff] cannot file a petition with the Vaccine Court, the Act says a tort suit does not apply to him," but if he can file such a petition, then the tort suit ban does apply).[3]

Moreover, as defendants correctly argue, Mississippi law does not recognize a claim for emotional distress damages on behalf of parents for injuries alleged to have resulted in the manner charged by plaintiffs herein. Cf. Downtown Grill, Inc. v. Connell, 721 So. 2d 1113, 1122 (Miss. 1989) (stating, "If this Court is unwilling to allow parents to recover damages for the severe personal injury of their child, we certainly will not allow recovery of damages by a parent for the alleged malicious prosecution of one's minor child.") (citing Butler v. Chrestman, 264 So. 2d 812, 817 (Miss. 1972), and Fowler Butane Gas Co. v. Varner, 244 Miss. 130, 156, 141 So. 2d 226, 236 (1962)), in which the court stated that ". . . if a minor sustains personal injuries under such circumstances of wilfulness, aggravation, or oppression as to justify an imposition of exemplary or punitive damages, upon the wrongdoer, the right of recovery thereof is in the child, and that there can be no recovery

---

[3]    The court agrees with defendants that plaintiffs would be precluded from suing for these costs in any event since they have already sued in Collins for these same damages on behalf of their respective children. See Lane v. Webb, 220 So. 2d 281, 285 (Miss. 1969) (holding that "where the father . . . brings a suit as next friend of his minor child, he waives on the child's favor his right to recover the expenses of hospital treatment, and is thereafter estopped to claim them in a separate suit.").

4

of the item by the parent in his own right.' It is also said: `. .
. that the measure of damages in a parent's action for injuries to
a minor child, other than a case of seduction, is the actual damage
which the plaintiff has suffered . . .'").

Accordingly, for the same reason this court ultimately denied
plaintiffs' motion to remand in Collins, the court herein concludes
that plaintiffs' motion to remand should be denied.

It is therefore ordered that plaintiffs' motion to remand is
denied.

SO ORDERED this 1st day of August, 2002.

UNITED STATES DISTRICT JUDGE

5



219 F.Supp.2d 762
(Cite as: 219 F.Supp.2d 762)

Page 1

C

United States District Court,
W.D. Texas,
Austin Division.

Kevin LIU, Individually and as next friend of
Nicholas Liu; and Mache Liu,
Individually and as next friend of Nicholas Liu,
Plaintiffs,
v.
AVENTIS PASTEUR, INC., Individually and as
successor-in-interest to Connaught
Laboratories, Inc., Pasteur Merieux, and Pasteur
Merieux Connaught; et al.,
Defendants.

No. A-02-CA-395-SS.

Aug. 23, 2002.

Parents of minor who allegedly suffered injuries
from preservative used in the vaccines administered
to him during first two years of his life brought
product liability action, both as individuals and on
behalf of minor, against various vaccine
manufacturers. Vaccine manufacturers moved to
dismiss, and alternatively to stay action. The District
Court, Sparks, J., held that: (1) injuries were vaccine-
related, and thus, action was required to be filed
initially in the Court of Federal Claims; (2) discovery
was barred pending determination of action in the
Court of Federal Claims; and (3) stay of parents'
individual tort claims was warranted.

Motions granted in part, and denied in part.

West Headnotes

[1] Health 389
198Hk389
      (Formerly 198Hk402)

The purpose of the National Childhood Vaccine
Injury Act, which sets forth a scheme for
compensation for vaccine-related injuries, is to
streamline the process of seeking compensation for
vaccine-related injuries and to avoid the
inconsistency, expense and unpredictability of the
tort system. Public Health Service Act, § 2111, as
amended, 42 U.S.C.A. § 300aa-11.

[2] Federal Courts 1141
170Bk1141

[2] Health 389
198Hk389
      (Formerly 198Hk402)

Minor child's injuries allegedly resulting from
preservative used in vaccines administered to him
were "vaccine-related," and thus, parents' action
against vaccine manufacturers to recover for child's
injuries was required to be filed initially in the Court
of Federal Claims, pursuant to the National
Childhood Vaccine Injury Act; preservative was
component of vaccines, rather than adulterant or
contaminant, as it was impossible to get the vaccines
without preservative. Public Health Service Act, §
2111, as amended, 42 U.S.C.A. § 300aa-11.

[3] Courts 96(1)
106k96(1)

The Court of Federal Claims' acceptance of
jurisdiction and creation of procedures to handle
similar vaccine-related tort claims was not binding on
the district court when determining whether it had
jurisdiction over action brought to recover for injuries
allegedly caused by preservative used in vaccines
administered to minor child. Public Health Service
Act, § 2111, as amended, 42 U.S.C.A. § 300aa-11.

[4] Federal Civil Procedure 1264
170Ak1264

Discovery was barred, in products liability action
brought by parents of minor child, who was allegedly
injured due to preservative in vaccines administered
to him, against vaccine manufacturers, pending initial
determination of action in the Court of Federal
Claims, as required by the National Childhood
Vaccine Injury Act. Public Health Service Act, §
2111, as amended, 42 U.S.C.A. § 300aa-11.

[5] Health 389
198Hk389
      (Formerly 198Hk402)

Parents of minor child who allegedly suffered injuries
from preservative used in vaccines administered to
him during the first two years of his life could only
pursue action on behalf of minor child, and were
barred from bringing individual claims for their costs,
lost wages and income, emotional distress, and loss
of consortium and services, under the National
Childhood Vaccine Injury Act. Public Health
Service Act, § 2111, as amended, 42 U.S.C.A. §
300aa-11.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

219 F.Supp.2d 762
(Cite as: 219 F.Supp.2d 762)

**[6]** Action ⬥69(5)
13k69(5)

District Court's stay of parents' individual state law tort claims for damages, arising from minor child's injuries allegedly caused by preservative used in vaccines administered to him, was warranted, where minor's claim was required to be dismissed without prejudice and filed in the Court of Federal Claims, pursuant to the National Childhood Vaccine Injury Act, and dismissal of parents' individual claims during pendency of the Court of Federal Claims jurisdiction could preclude parents from bringing their individual claims in any forum, due to statute of limitations. Public Health Service Act, § 2111, as amended, 42 U.S.C.A. § 300aa-11.

**[7]** Limitation of Actions ⬥105(2)
241k105(2)

The National Childhood Vaccine Injury Act does not toll the statute of limitations for the parents' individual state law tort claims while they are representing their child in the Court of Federal Claims. Public Health Service Act, § 2111, as amended, 42 U.S.C.A. § 300aa-11.

*764 Charles S. Siegel, Waters & Kraus, LLP, Dallas, TX, Scott M. Hendler, Lowell Brickman, The Hendler Law Firm, P.C., Austin, TX, for Kevin Liu, Mache Liu, Individually and as Next Friend of Nicholas Liu, plaintiffs.

Rebecca Jo Reser, Ray, McChristian & Jeans, San Antonio, TX, Brian D. Metcalf, Ray, McChristian & Jeans, San Antonio, TX, Catherine A. Lemon, Faegre & Benson, LLP, Denver, CO, Marsha M. Piccone, Kimberley P. Cronin, Faegre & Benson, LLP, Denver, CO, for Aventis Pasteur, Inc., defendant.

John R. Gilbert, Gilbert & Gilbert, P.C., Angleton, TX, Laurence E. Boyd, Angleton, TX, Lawrence P. Hampton, Angleton, TX, for Dow Chemical Co., defendant.

Erik V. Larson, Sandra L. Phillips, Diana L. Panian, Shook Hardy & Bacon, LLP, Houston, TX, Deborah A. Moeller, Jeffery A. Kruse, Shook Hardy & Bacon, LLP, Kansas City, MI, for Eli Lilly & Co., defendant.

Marc A. Sheiness, Sheiness, Scott, Grossman & Cohn, LLP, Houston, TX, for RM Industries, Inc., defendant.

Maurice Delaney, GDL International, Inc., St.

Joseph, MO, for GDL Intern., Inc.

Stephanie A. Smith, Fulbright & Jaworski, Austin, TX, Barclay A. Manley, Fulbright & Jaworsky, LLP, Houston, TX, for GlaxoSmithKline, defendant.

Richard L. Josephson, Baker & Botts, LLP, Houston, TX, Paul R. Elliott, Houston, TX, Douglas B. Roberson, Baker Botts LLP, Houston, TX, for Merck & Co., Inc., defendant.

David M. MacDonald, McCauley, MacDonald et al., Dallas, TX, Jennifer Liebhauser, Sudie Thompson, McCauley MacDonald & Devin, Dallas, TX, for Sigma-Aldrich Corp., defendant.

John A. Scully, Cooper & Scully, Dallas, TX, Marcos A. Adrogue, Cooper & Scully, PC, Houston, TX, for Spectrum Chemical Mfg., defendant.

Michael R. Klatt, Randall L. Christian, Susan E. Burnett, Clark, Thomas & Winters, Austin, TX, Daniel J. Thomasch, Orrick, Herrington & Sutcliffe, L.L.P., New York, NY, for Wyeth, defendant.

### ORDER

SPARKS, District Judge.

BE IT REMEMBERED on the 16th day of August 2002 the Court called the above-styled cause for hearing, and the parties appeared through counsel of record. Before the Court are the Vaccine Manufacturers' 12(b) Motion to Dismiss and Alternative Motion to Stay [# 8], Plaintiffs' response in opposition thereto [# 16] and the Vaccine Manufacturers' reply [# 22]; Dow Chemical Company's Motion to Dismiss and Motion for Summary Judgment [# 41]; Spectrum Laboratory Product, Inc's Motion to Dismiss [# 10]; Sigma-Aldrich Corporation's Motion to Dismiss [# 3] and memorandum in support thereof [# 30] and Plaintiffs' response in opposition thereto [# 14]; Sigma-Aldrich's Alternative Motion to Stay [# 31], and Eli Lilly's Amended Motion to Dismiss [# 49] and Plaintiffs' response [# 15]. Having considered the motions and responses, the case file as a whole and the applicable law, the Court enters the following opinion and orders.

### Factual and Procedural Background

The plaintiffs, Kevin Liu and Mache Liu, are Texas residents and the parents of Nicholas Liu, who is approximately four *765 years old. See First

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Amended Petition, at ¶ ¶ 5; 24. They appear in this lawsuit as individuals and as next friend of Nicholas Liu. *Id.* at ¶ 5. The plaintiffs contend their son suffered neurological damage when he was poisoned by mercury contained in thimerosal, a preservative used in vaccines administered to him during the first two years of his life. *Id.* at ¶ ¶ 24-26. Nicholas received the vaccines between May 20, 1998 and July 23, 1999. *Id.* at ¶ 24.

On May 30, 2002, the plaintiffs filed this lawsuit in the 353rd Judicial District Court of Travis County, Texas. The plaintiffs raise causes of actions for strict liability; negligence in the manufacture and/or sale of mercury contained in vaccine products; gross negligence; fraud and conspiracy; and negligence in the marketing, licensing, and design of thimerosal. *See* First Amended Petition. As an alternative theory of liability and causation, the plaintiffs allege Merck & Co., Inc's Measles, Mumps & Rubella ("MMR") vaccine caused their injuries. *Id.* at ¶ 72. The plaintiffs seek compensatory damages for expenditures necessitated by Nicholas Liu's injuries, Nicholas' pain and suffering, all plaintiffs' lost wages and income, all plaintiffs' emotional distress, the parents' loss of consortium, and the plaintiffs' lost services. *Id.* at 17. Defendant Aventis Pasteur Inc., having obtained consent of all other served defendants, [FN1] removed the case to this Court on June 21, 2002 on the basis of diversity and federal question jurisdiction. *See* Notice of Removal [# 1].

> FN1. The record does not include a consent form signed by defendant Taylor Medical. However, the record does not establish Taylor Medical was ever served, and it has not filed an answer.

Defendant Aventis Pasteur Inc. ("Aventis"), Wyeth, SmithKline Beecham Corporation ("SmithKline"), and Merck & Co., Inc. ("Merck") (collectively, "the Vaccine Manufacturers") move to dismiss or, in the alternative, to stay because the plaintiffs did not first file an administrative claim in the Court of Federal Claims as required by the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-11(a)(2)(A). Defendants Spectrum Laboratory Products, Inc. ("Spectrum") has filed a motion to dismiss on the same basis. Defendants Eli Lilly and Company ("Eli Lilly"), Dow Chemical Company ("Dow"), Sigma-Aldrich Corporation and Sigma-Aldrich, Inc. have filed motions to dismiss and for summary judgment arguing they did not manufacture the vaccines or thimerosal that caused Nicholas Liu's injuries and,

therefore, cannot be held liable.

**Analysis**
**I. The Vaccine Act's Requirements**

[1] The Vaccine Manufacturers move to dismiss or, in the alternative, to stay the case because the plaintiffs did not first file in the United States Court of Federal Claims. The National Childhood Vaccine Injury Act of 1986 ("the Vaccine Act") sets forth a scheme for compensation for vaccine-related injuries or death. 42 U.S.C. § 300aa-11. Congress enacted the Vaccine Act to streamline the process of seeking compensation for vaccine-related injuries and to avoid the inconsistency, expense and unpredictability of the tort system. *Shalala v. Whitecotton,* 514 U.S. 268, 270, 115 S.Ct. 1477, 1478, 131 L.Ed.2d 374 (1995) ("For injuries and death traceable to vaccinations, the Act establishes a scheme of recovery designed to work faster and with greater ease than the civil tort system."); H.R.Rep. No. 99-908 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6347 (noting for those injured by vaccines, "the opportunities for redress and restitution are limited, time-consuming, expensive, and often unanswered."). The Vaccine Act prevents plaintiffs from initiating lawsuits against *766 vaccine administrators or manufacturers in state or federal court for unspecified amounts of damages resulting from vaccine-related injuries unless they first file a timely petition in the Court of Federal Claims for compensation under the Vaccine Act. 42 U.S.C. § 300aa-11(a)(2)(A); *see also Shalala,* 514 U.S. at 270, 115 S.Ct. at 1478. Petitions filed in the Court of Federal Claims are assigned to a special master familiar with Vaccine Act claims. 42 U.S.C. § § 300aa-11(a)(1) & 300aa-12(d). The statute directs courts to dismiss such causes of action that were not first filed in the Court of Federal Claims. 42 U.S.C. § 300aa-11(a)(2)(B).

The plaintiffs have not filed a petition in the Court of Federal Claims. They contend the Vaccine Act does not require them to do so, because Nicholas Liu's injuries are not vaccine-related. The Vaccine Act defines a "vaccine- related injury" as "an illness, injury, condition, or death associated with one or more of the vaccines set forth in the Vaccine Injury Table, except that the term does not include an illness, injury, condition, or death associated with an adulterant or contaminant intentionally added to such vaccine." 42 U.S.C. § 300aa-33(5). The plaintiffs contend Nicholas Liu's injuries are not "vaccine-related" because they were caused not by the vaccines themselves but by the thimerosal added to the vaccines as a preservative to deter microbial and fungal growth--an "adulterant ... intentionally added

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

219 F.Supp.2d 762
(Cite as: 219 F.Supp.2d 762)

Page 4

to such vaccine." 42 U.S.C. § 300aa-33(5). [FN2] The terms "adulterant" and "contaminant" are not defined in the Vaccine Act.

> FN2. The plaintiffs alternative theory of liability and causation, that Merck's Measles, Mumps and Rubella ("MMR") vaccine caused Nicholas Liu's injuries, does not involve thimerosal and is blatantly a vaccine- related claim that must first be filed in Vaccine Court.

[2] The plaintiffs are unable to provide the Court any legal authority for their interpretation of the Vaccine Act as applied to thimerosal. [FN3] On the contrary, it appears every federal court to have ruled on the issue has held injuries resulting from thimerosal contained in vaccines are vaccine- related under the meaning of the Vaccine Act. *E.g., Strauss v. American Home Prod. Corp., et al.,* 208 F.Supp.2d 711 (S.D.Tex.2002) (finding injuries from thimerosal are "vaccine-related" under the Vaccine Act); *Blackmon, et al v. American Home Prod. Corp.,* Cause No. G-02-179 (S.D.Tex. May 8, 2002) (same); *Owens v. American Home Prod. Corp.,* 203 F.Supp.2d 748 (S.D.Tex.2002) (same). Additionally, the Department of Health and Human Services ("HHS") has taken the position that thimerosal is not an adulterant or contaminant of vaccines. [FN4] Indeed, the HHS's determination that thimerosal is a component of vaccines, [FN5] not an adulterant, comports with common sense, since at *767 the time Nicholas Liu received the vaccines it was impossible to get the vaccines without thimerosal.

> FN3. The only legal authority the plaintiffs provide for this proposition is an intimation by special master John F. Edwards that thimerosal may be an adulterant in an order directing the government to file a brief on the issue. *See* Plaintiffs' Response to Vaccine Manufacturers' Motion, Ex. B. As the plaintiffs note, this order was later withdrawn.

> FN4. While the HHS's position is official, in that it is posted on the HHS web site and HHS has taken the position in court papers, it is not a regulation or other agency action entitled to judicial deference under the *Chevron* doctrine. *Chevron U.S.A., Inc. v.*

*Natural Res. Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). However, the HHS's official position holds persuasive authority.

> FN5. The HHS regulations for general biological products standards, it includes "preservatives" in the category of "constituent materials," indicating its view that preservatives are components of vaccines, not adulterants. 21 C.F.R. § 610.15.

[3] Moreover, the special masters in the Court of Federal Claims are experienced in Vaccine Act claims and are better equipped to handle thimerosal cases. The Court of Federal Claims has been inundated with cases alleging the thimerosal contained in vaccines or the MMR vaccination, or a combination of the two, caused neurodevelopmental disorders such as autism. *See* Vaccine Manufacturers' Reply, Ex. 1 ("Autism General Order # 1"), at 1-2. The plaintiffs' claims are identical to hundreds of those already before the Court of Federal Claims. The Office of Special Masters within that court recently established procedures to accommodate the thousands of thimerosal cases it expects to receive. *Id.* While the Court of Federal Claims' acceptance of jurisdiction and creation of procedures is not binding on this Court, it indicates the entity with the most experience applying the Vaccine Act finds thimerosal cases within the statute's definition of a "vaccine-related injury" and is prepared and willing to handle such cases. *See also Collins v. American Home Prod. Corp.,* Cause No. 3:01-CV-979LN (S.D.Miss. Aug. 1, 2002) (dismissing thimerosal claims because Autism Order # 1 "foreclose[d] any reasonable possibility that the plaintiffs have stated a currently cognizable claim against the resident defendants."). The Court holds thimerosal is not an adulterant or contaminant under the Vaccine Act and, thus, Nicholas Liu's alleged injuries are vaccine-related. Accordingly, the Vaccine Act requires the Court to dismiss the parents' claims brought on behalf of Nicholas Liu without prejudice to refiling after they have exhausted the requirements under the Vaccine Act.

**II. Claims against Non-Vaccine-Manufacturers**

Eli Lilly and Dow move to dismiss the plaintiffs' claims against them or, in the alternative, for summary judgment because they did not manufacture or distribute the thimerosal or vaccines that allegedly

219 F.Supp.2d 762
(Cite as: 219 F.Supp.2d 762)

Page 5

caused Nicholas Liu's injuries. Eli Lilly contends it stopped distributing childhood vaccines prior to 1980, and all vaccines in 1985, and stopped distributing thimerosal by 1992. *See* Affidavit of Scott Fishman [# 9], at 1-2. Dow states it has not manufactured vaccines since 1978 and its licenses to manufacture vaccines were revoked by that time. *See* Dow's Motion to Dismiss, at 3-4. Sigma-Aldrich Corporation and Sigma-Aldrich, Inc. also move to dismiss or, in the alternative, to stay, claiming they did not manufacture the vaccines or thimerosal at issue in this case.

[4] These defendants ask this Court to enter a no-liability judgment in their favor despite the Court's need to dismiss or stay the plaintiffs' claims against the vaccine manufacturers until they follow the exhaustion requirements of the Vaccine Act. The plaintiffs raise many of the same claims against these defendants as against the vaccine manufacturer defendants, including strict liability, negligence in the manufacture, marketing and/or sale of mercury contained in vaccine products, gross negligence, and fraud and conspiracy. To rule on the merits of some defendants' substantive defenses would require a period of discovery allowing the plaintiffs to investigate the defendants' contentions. The Court will not allow the plaintiffs to conduct discovery on some defendants during the pendency of the minor's claims under the Vaccine Act against other defendants. To do so would be wholly inconsistent with Congress's goal of minimizing litigation costs and, therefore, the Court will not allow any discovery until the plaintiffs *768 have complied with the Vaccine Act. *See* H.R.Rep. No. 99-908 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6347 ("Lawsuits and settlement negotiations can take months or even years to complete. Transaction costs--including attorneys' fees and court payments--are very high. And in the end, no recovery may be available."). Accordingly, the Court will dismiss Nicholas Liu's claims against all defendants rather than allow discovery on some defendants.

### III. Kevin Liu and Mache Liu's Individual Claims

[5] Kevin and Mache Liu bring claims individually and as next friend of Nicholas Liu. Individually, they seek recovery for all past and future costs associated with Nicholas' injuries, lost wages and income, emotional distress, loss of consortium and loss of services. *See* First Amended Petition, at 17. Under the Vaccine Act, "any person who has sustained a vaccine-related injury" or "the legal representative of such person if such person is a minor or is disabled" may file a petition for compensation in the Court of

Federal Claims. 42 U.S.C. § 300aa-11(b)(1)(A). An individual may only file a petition on his own behalf if he received a vaccine and alleges a resulting injury. 42 U.S.C. § § 300aa-11(b)(1)(A) & 300aa-11(c)(1)(A). Thus, Kevin and Mache Liu can only bring their claims as next friend of Nicholas, not their individual claims, in the Court of Federal Claims.

[6][7] The defendants move to dismiss Kevin and Mache Liu's individual claims for damages because they are derivative of Nicholas Liu's claims, are duplicative of damages available under the Vaccine Act, or are not cognizable under Texas law. However, if the Court dismissed the parents' claims, their statutes of limitations could expire while the parents are representing Nicholas' claims in the Court of Federal Claims. [FN6] Tex. Civ. Prac. & Rem. Code § 16.003 (two-year statute of limitations in personal injury cases). The Court has discretion to stay proceedings. *Black Sea Inv., Ltd. v. United Heritage Corp.,* 204 F.3d 647, 649 (5th Cir.2000). Courts often stay proceedings to avoid interference with related proceedings in another forum and to avoid the waste of duplication. *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24,* 751 F.2d 721, 728-29 (5th Cir.1985) ("The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result."). The parents' claims brought on behalf of their minor son must first be heard in the Court of Federal Claims. Dismissing the parents' individual claims during the pendency of that court's jurisdiction might preclude the parents from bringing their claims in any forum. Accordingly, the Court will stay all proceedings in Kevin and Mache Liu's individual causes of action against all defendants until Nicholas' claims have been administered in the Court of Federal Claims under the Vaccine Act.

> FN6. The Vaccine Act does not toll the statute of limitations for the parents' claims while they are representing their child in the Court of Federal Claims. The Vaccine Act does, however, toll the statute of limitations for the minor's state law claims while his petition is pending before the court. 42 U.S.C. § 300aa-16(c). For the child's claims against the defendants who do not manufacture vaccines, the statute of limitations will not begin to run until he reaches the age of majority. *See* Tex. Civ. Prac. & Rem. Code § 16.001.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

219 F.Supp.2d 762
**(Cite as: 219 F.Supp.2d 762)**

Page 6

In accordance with the foregoing:

IT IS ORDERED that the Vaccine Manufacturers' 12(b) Motion to Dismiss [# 8] is GRANTED IN PART as to the claims of Nicholas Liu to be presented in the Court of Federal Claims, and their Alternative Motion to Stay [# 8] is *769 GRANTED IN PART as to Kevin Liu and Mache Liu's individual causes of action;

IT IS FURTHER ORDERED that Sigma-Aldrich Corporation and Sigma Aldrich, Inc.'s Motion to Dismiss [# 3] is GRANTED IN PART as to the claims of Nicholas Liu to be presented in the Court of Federal Claims, and their Alternative Motion to Stay [# 31] is GRANTED IN PART as to Kevin Liu and Mache Liu's individual causes of action;

IT IS FURTHER ORDERED that Spectrum Laboratories' Motion to Dismiss [# 10] is GRANTED IN PART as to the claims of Nicholas Liu to be presented in the Court of Federal Claims, and DENIED IN PART as to Kevin Liu and Mache Liu's individual causes of action;

IT IS FURTHER ORDERED that Eli Lilly and Company's Amended Motion to Dismiss [# 49] is GRANTED IN PART as to the claims of Nicholas Liu to be presented in the Court of Federal Claims, and DENIED IN PART as to Kevin Liu and Mache Liu's individual causes of action;

IT IS FURTHER ORDERED that The Dow Chemical Company's Motion to Dismiss [# 41] is GRANTED IN PART as to the claims of Nicholas Liu to be presented in the Court of Federal Claims, and DENIED IN PART as to Kevin Liu and Mache Liu's individual causes of action;

IT IS FURTHER ORDERED that the Defendants' Unopposed Motion for Stay of Scheduling Order, Initial Disclosures, and Discovery Pending Resolution of Defendants' Motion to Dismiss [# 40] is DISMISSED AS MOOT;

IT IS FURTHER ORDERED that plaintiffs' claims brought as next friend of Nicholas Liu against all defendants are DISMISSED without prejudice to refiling;

IT IS FURTHER ORDERED that plaintiffs' claims brought in their individual capacities are STAYED pending further order of this Court;

IT IS FINALLY ORDERED that the plaintiffs SHALL FILE a status report with this Court on April 23, 2003 informing the Court of the status of their petition, if any, filed on behalf of Nicholas Liu in the Court of Federal Claims.

219 F.Supp.2d 762

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

9

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
AUSTIN DIVISION

2002 SP -9  AM 9: 54

WESTERN DISTRICT OF TEXAS
U.S. CLERK'S OFFICE

BY:_____
DEPUTY

RON RUSSAK and KARLA RUSSAK,
Individually and as Next Friend of JORDAN
RUSSAK,

　　　　　　　　　Plaintiffs,

-vs-                                                      Case No. A-02-CA-480-SS

AVENTIS PASTEUR, INC., Individually and as
Successor-in-Interest to Connaught Laboratories,
Inc., Pasteur Merieux, and Pasteur Merieux
Connaught; *et al.*,

　　　　　　　　　Defendants.

---

### O R D E R

BE IT REMEMBERED on the 7th day of September 2002 the Court reviewed the file in

the above-styled cause, specifically Defendant Eli Lilly and Company's Motion to Dismiss [#5] and

Plaintiffs' response thereto [#15]; Defendant Sigma-Aldrich Corporation and Sigma-Aldrich, Inc.'s

Motion to Dismiss [#3] and Plaintiffs' response thereto [#8]; the Vaccine Manufacturers' 12(b)

Motion to Dismiss and Alternative Motion to Stay [#6] and Plaintiffs' response [attached to #24];

and Defendant Austin Energy's Motion to Dismiss [#9], which was filed on August 13, 2002 and

to which the Plaintiffs have not responded. Having considered the motions, responses, the case file

as a whole and the applicable law, the Court enters the following opinion and orders.

### Factual and Procedural Background

The plaintiffs, Ron Russak and Karla Russak, are Texas residents and the parents of Jordan

Russak, who is approximately five years old. *See* First Amended Petition, at ¶¶ 5; 24. They appear

32

in this lawsuit as individuals and as next friend of Jordan Russak. *Id.* at ¶ 5. The plaintiffs contend their son suffered and continues to suffer neurological damage because he was poisoned by mercury contained in thimerosal, a preservative used in vaccines administered to him. *Id.* at ¶¶ 24-26. Jordan received the vaccines between October 2, 1996 and August 2, 2001. *Id.* at ¶ 24. The plaintiffs further contend Jordan's neurological damage was exacerbated by Austin Energy's emission of air toxins such as mercury from fossil-fuel-burning utilities near his residence. *Id.* at ¶¶ 33-34.

On May 30, 2002, the plaintiffs filed this lawsuit in the 53rd Judicial District Court of Travis County, Texas, Cause No. GN201793. The plaintiffs raise causes of actions for strict liability; negligence in the manufacture, marketing and/or sale of mercury contained in vaccine products; gross negligence; fraud and conspiracy; negligence in the marketing, licensing, and design of thimerosal; and negligence in the release of mercury-containing emissions from the burning of fossil fuels. *See* First Amended Petition. The plaintiffs seek compensatory damages for expenditures necessitated by Jordan's injuries, Ron and Karla Russak's lost wages and income, Ron and Karla Russak's emotional distress and loss of consortium, and the lost services Ron and Karla Russak could have provided to each other and Jordan could have provided to them. *Id.* at 19. The plaintiffs also seek punitive damages for certain causes of action. *Id.* Defendant Wyeth, formerly known as American Home Products Corporation, removed the case to this Court on July 29, 2002 after having obtained consent of all other served defendants except Austin Energy.[1] *See* Notice of Removal [#1].

---

[1] In its motion to dismiss, Austin Energy states it did not learn of the removal until after the fact. In the notice of removal, Wyeth argues it did not need Austin Energy's consent because the plaintiffs' addition of Austin Energy as a defendant was a fraudulent joinder for the sole purpose of defeating diversity jurisdiction. The removing party bears the burden of proving fraudulent joinder. *Carriere v. Sears, Roebuck & Co.*, 893 F.2d 98, 100 (5th Cir.), *cert. denied*, 498 U.S. 817 (1990). The plaintiffs' claims against Austin Energy are based on different facts than their vaccine-related claims against the other defendants. However, because this Court has no jurisdiction over Jordan

Defendant Aventis Pasteur Inc. ("Aventis"), Wyeth, SmithKline Beecham Corporation ("SmithKline"), and Merck & Co., Inc. ("Merck") (collectively, "the Vaccine Manufacturers") move to dismiss or, in the alternative, to stay because the plaintiffs did not first file an administrative claim in the Court of Federal Claims as required by the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-11(a)(2)(A). Sigma-Aldrich Corporation and Sigma-Aldrich, Inc. move to dismiss on the same basis. Defendant Eli Lilly and Company ("Eli Lilly") moves to dismiss arguing it did not manufacture the vaccines or thimerosal that caused Jordan Russak's injuries and, therefore, cannot be held liable. Austin Energy moves to dismiss for lack of subject matter jurisdiction and failure to state a claim.

## Analysis

### I.    The Vaccine Act's Requirements

The Vaccine Manufacturers move to dismiss or, in the alternative, to stay the case because the plaintiffs did not first file a petition in the United States Court of Federal Claims. Sigma-Aldrich Corporation and Sigma-Aldrich, Inc. move to dismiss on the same basis. The National Childhood Vaccine Injury Act of 1986 ("the Vaccine Act") sets forth a scheme for compensation for vaccine-related injuries or death. 42 U.S.C. § 300aa-11. Congress enacted the Vaccine Act to streamline the process of seeking compensation for vaccine-related injuries and to avoid the inconsistency, expense and unpredictability of the tort system. *Shalala v. Whitecotton*, 514 U.S. 268, 270, 115 S.Ct. 1477, 1478 (1995) ("For injuries and death traceable to vaccinations, the Act establishes a scheme of

---

Russak's primary causes of action, the plaintiffs have not moved to remand the case for improper removal, and the record and briefing are too scant to determine the fraudulent joinder issue, the Court will treat Austin Energy the same as the other defendants. This ruling is without prejudice to any party raising the issue after the stay in the case is lifted.

recovery designed to work faster and with greater ease than the civil tort system."); H.R. Rep. No. 99-908 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6347 (noting for those injured by vaccines, "the opportunities for redress and restitution are limited, time-consuming, expensive, and often unanswered."). The Vaccine Act prevents plaintiffs from initiating lawsuits against vaccine administrators or manufacturers in state or federal court for unspecified amounts of damages resulting from vaccine-related injuries unless they first file a timely petition in the Court of Federal Claims for compensation under the Vaccine Act. 42 U.S.C. § 300aa-11(a)(2)(A); *see also Shalala*, 514 U.S. at 270, 115 S.Ct. at 1478. Petitions filed in the Court of Federal Claims are assigned to a special master familiar with Vaccine Act claims. 42 U.S.C. §§ 300aa-11(a)(1) & 300aa-12(d). The statute directs courts to dismiss such causes of action that were not first filed in the Court of Federal Claims. 42 U.S.C. § 300aa-11(a)(2)(B).

The plaintiffs have not filed a petition in the Court of Federal Claims. They contend the Vaccine Act does not require them to do so, because Jordan Russak's injuries are not vaccine-related. The Vaccine Act defines a "vaccine-related injury" as "an illness, injury, condition, or death associated with one or more of the vaccines set forth in the Vaccine Injury Table, except that the term does not include an illness, injury, condition, or death associated with an adulterant or contaminant intentionally added to such vaccine." 42 U.S.C. § 300aa-33(5). The plaintiffs contend Jordan's injuries are not "vaccine-related" because they were caused not by the vaccines themselves but by the thimerosal added to the vaccines as a preservative to deter microbial and fungal growth– an "adulterant . . . intentionally added to such vaccine." 42 U.S.C. § 300aa-33(5). The terms "adulterant" and "contaminant" are not defined in the Vaccine Act.

The plaintiffs are unable to provide the Court any legal authority for their interpretation of the Vaccine Act as applied to thimerosal.[2] On the contrary, it appears every federal court to have ruled on the issue, including this one, has held injuries resulting from thimerosal contained in vaccines are vaccine-related under the meaning of the Vaccine Act. *E.g., Strauss v. American Home Prod. Corp., et al*, Cause No. G-02-226 (S.D. Tex. June 11, 2002) (finding injuries from thimerosal are "vaccine-related" under the Vaccine Act); *Blackmon, et al v. American Home Prod. Corp.*, Cause No. G-02-179 (S.D. Tex. May 8, 2002) (same); *Owens v. American Home Prod. Corp.*, 203 F.Supp.2d 748 (S.D. Tex. 2002) (same). Additionally, the Department of Health and Human Services ("HHS") has taken the position that thimerosal is not an adulterant or contaminant of vaccines.[3] Indeed, the HHS's determination that thimerosal is a component of vaccines,[4] not an adulterant, comports with common sense, since at the time Jordan Russak received the vaccines it was impossible to get the vaccines without thimerosal.

Moreover, the special masters in the Court of Federal Claims are experienced in Vaccine Act claims and are better equipped to handle thimerosal cases. The Court of Federal Claims has been inundated with cases alleging the thimerosal contained in vaccines caused neurodevelopmental

---

[2] The only legal authority the plaintiffs provide for this proposition is an intimation by special master John F. Edwards that thimerosal may be an adulterant in an order directing the government to file a brief on the issue. *See* Plaintiffs' Response to Vaccine Manufacturers' Motion, Ex. B. As the plaintiffs note, this order was later withdrawn.

[3] While the HHS's position is official, in that it is posted on the HHS web site and HHS has taken the position in court papers, it is not a regulation or other agency action entitled to judicial deference under the *Chevron* doctrine. *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984). However, the HHS's official position holds persuasive authority.

[4] The HHS regulation for general biological products standards includes "preservatives" in the category of "constituent materials," indicating the agency's view that preservatives are components of vaccines, not adulterants. 21 C.F.R. § 610.15.

disorders such as autism. *See* Vaccine Manufacturers' Reply, Ex. 1 ("Autism General Order #1"), at 1-2. The plaintiffs' claims are identical to hundreds of those already before the Court of Federal Claims. The Office of Special Masters within that court recently established procedures to accommodate the thousands of thimerosal cases it expects to receive. *Id.* While the Court of Federal Claims' acceptance of jurisdiction and creation of procedures is not binding on this Court, it indicates the entity with the most experience applying the Vaccine Act finds thimerosal cases within the statute's definition of a "vaccine-related injury" and is prepared and willing to handle such cases. *See also Collins vs. American Home Prod. Corp.*, Cause No. 3:01-CV-979LN (S.D. Miss. Aug. 1, 2002) (dismissing thimerosal claims because Autism Order #1 "foreclose[d] any reasonable possibility that the plaintiffs have stated a currently cognizable claim against the resident defendants."). The Court holds thimerosal is not an adulterant or contaminant under the Vaccine Act and, thus, Jordan Russak's alleged injuries are vaccine-related. Accordingly, the Vaccine Act requires the Court to dismiss the parents' claims brought on behalf of Jordan Russak without prejudice to refiling after they have exhausted the requirements of the Vaccine Act.

## II.   Claims against Non-Vaccine-Manufacturers

Eli Lilly moves to dismiss the plaintiffs' claims against it for failure to state a claim upon which relief can be granted because it did not manufacture or distribute the thimerosal or vaccines that allegedly caused Jordan Russak's injuries. Eli Lilly contends it stopped distributing childhood vaccines prior to 1980, and all vaccines in 1985, and stopped distributing thimerosal by 1992. *See* Eli Lilly's Motion to Dismiss [#5], Ex. A ("Fishman Affidavit"), at 1-2.

Eli Lilly asks this Court to adjudicate the merits of the plaintiffs' claims against it despite the Court's need to dismiss or stay the plaintiffs' claims against the vaccine manufacturers until they

-6-

follow the exhaustion requirements of the Vaccine Act. The plaintiffs raise many of the same claims against Eli Lilly as against the vaccine manufacturer defendants, including strict liability, negligence in the manufacture, marketing and/or sale of mercury contained in vaccine products, gross negligence, and fraud and conspiracy. To rule on the merits of Eli Lilly's substantive defenses would require a period of discovery allowing the plaintiffs to investigate its contentions. The Court will not allow the plaintiffs to conduct discovery on one defendant during the pendency of the minor's claims under the Vaccine Act against the other defendants. To do so would be wholly inconsistent with Congress's goal of minimizing litigation costs and, therefore, the Court will not allow any discovery until the plaintiffs have complied with the Vaccine Act. *See* H.R. Rep. No. 99-908 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6347 ("Lawsuits and settlement negotiations can take months or even years to complete. Transaction costs – including attorneys' fees and court payments – are very high. And in the end, no recovery may be available."). Accordingly, the Court will dismiss Jordan Russak's claims against all defendants rather than allow discovery on Eli Lilly.

### III.   Ron Russak and Karla Russak's Individual Claims

Ron and Karla Russak bring claims individually and as next friend of Jordan Russak. Individually, they seek recovery for all past and future costs associated with Jordan's injuries, lost wages and income, emotional distress, loss of consortium and loss of services. *See* First Amended Petition, at 17. Under the Vaccine Act, "any person who has sustained a vaccine-related injury" or "the legal representative of such person if such person is a minor or is disabled" may file a petition for compensation in the Court of Federal Claims. 42 U.S.C. § 300aa-11(b)(1)(A). An individual may only file a petition on his own behalf if he received a vaccine and alleges a resulting injury. 42

U.S.C. §§ 300aa-11(b)(1)(A) & 300aa-11(c)(1)(A). Thus, Ron and Karla Russak can only bring their claims as next friend of Jordan, not their individual claims, in the Court of Federal Claims.

The defendants move to dismiss Ron and Karla Russak's individual claims for damages because they are derivative of Jordan's claims, are duplicative of damages available under the Vaccine Act, or are not cognizable under Texas law. However, if the Court dismissed the parents' claims, their statutes of limitations could expire while the parents are representing Jordan's claims in the Court of Federal Claims.[5] TEX. CIV. PRAC. & REM. CODE § 16.003 (two-year statute of limitations in personal injury cases). The Court has discretion to stay proceedings. *Black Sea Inv., Ltd. v. United Heritage Corp.*, 204 F.3d 647, 649 (5th Cir. 2000). Courts often stay proceedings to avoid interference with related proceedings in another forum and to avoid the waste of duplication. *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728-29 (5th Cir. 1985) ("The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result."). The parents' claims brought on behalf of their minor son must first be heard in the Court of Federal Claims. Dismissing the parents' individual claims during the pendency of that court's jurisdiction might preclude the parents from bringing their claims in any forum. Accordingly, the Court will stay all proceedings in Ron and Karla Russak's individual causes of action against all defendants until Jordan's claims have been administered in the Court of Federal Claims under the Vaccine Act.

---

[5] The Vaccine Act does not toll the statute of limitations for the parents' claims while they are representing their child in the Court of Federal Claims. The Vaccine Act does, however, toll the statute of limitations for the minor's state law claims while his petition is pending before the court. 42 U.S.C. § 300aa-16(c). For the child's claims against the defendants who do not manufacture vaccines, the statute of limitations will not begin to run until he reaches the age of majority. *See* TEX. CIV. PRAC. & REM. CODE § 16.001.

In accordance with the foregoing:

IT IS ORDERED that the Vaccine Manufacturers' 12(b) Motion to Dismiss [#6] is GRANTED IN PART as to the claims of Jordan Russak to be presented in the Court of Federal Claims, and their Alternative Motion to Stay [#6] is GRANTED IN PART as to Ron Russak and Karla Russak's individual causes of action;

IT IS FURTHER ORDERED that Sigma-Aldrich Corporation and Sigma Aldrich, Inc.'s Motion to Dismiss [#3] is GRANTED IN PART as to the claims of Jordan Russak to be presented in the Court of Federal Claims, and DENIED IN PART as to Ron Russak and Karla Russak's individual causes of action;

IT IS FURTHER ORDERED that Eli Lilly and Company's Motion for Leave to File its Amended Motion to Dismiss [#28] is DENIED;

IT IS FURTHER ORDERED that Eli Lilly and Company's Motion to Dismiss [#5] is GRANTED IN PART as to the claims of Jordan Russak to be presented in the Court of Federal Claims, and DENIED IN PART as to Ron Russak and Karla Russak's individual causes of action;

IT IS FURTHER ORDERED that plaintiffs' claims brought as next friend of Jordan Russak against all defendants are DISMISSED without prejudice to refiling;

IT IS FURTHER ORDERED that plaintiffs' claims brought in their individual capacities are STAYED pending further order of this Court;

IT IS FINALLY ORDERED that the plaintiffs SHALL FILE a status report with this Court on **May 9, 2003** informing the Court of the status of their petition, if any, filed on behalf of Jordan Russak in the Court of Federal Claims.

SIGNED this the _7th_ day of September 2002.


SAM SPARKS
UNITED STATES DISTRICT JUDGE



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
AUSTIN DIVISION
2002 OC -8 AM 11: 52
WESTERN DISTRICT OF TEXAS
U.S. CLERK'S OFFICE
BY:_____
                    DEPUTY

PETE CARABINE and HEIDI CARABINE,
Individually and as Next Friend of Collin
Carabine,
                        Plaintiffs,

-vs-                                                          Case No. A-02-CA-501-SS

AVENTIS PASTEUR, INC., et al.,
                        Defendants.

## O R D E R

BE IT REMEMBERED on the _8th_ day of October 2002 the Court reviewed the file in the

above-styled cause, specifically Defendant Eli Lilly & Company's Amended Motion to Dismiss

[#30], Plaintiffs' Response [#28] and Defendant's reply [#32]; Defendants Sigma-Aldrich

Corporation's and Sigma-Aldrich, Inc's Motion to Dismiss [#11] and Plaintiffs' Response [#21];

Defendants' Sigma-Aldrich Corporation and Sigma-Aldrich, Inc.'s Alternative Motion to Stay

Proceedings [#23]; Vaccine Defendants' Motion to Dismiss or Alternatively to Stay Proceedings

[#25] and Plaintiffs' Response [#33]; and Defendant Reliant Energy's Motion for Summary

Judgment [#31]. Having considered the motions and responses, the case file as a whole and the

applicable law, the Court enters the following opinion and orders.

### Factual and Procedural Background

The plaintiffs, Pete Carabine and Heidi Carabine, are Texas residents and the parents of

Collin Carabine, who is approximately six years old. *See* Petition, at ¶¶ 5; 25. They appear in this

lawsuit as individuals and as next friend of Collin Carabine. *Id.* at ¶ 5. The plaintiffs contend their

son suffered and continues to suffer neurological damage because he was poisoned by mercury contained in thimerosal, a preservative used in vaccines administered to him. *Id.* at ¶¶ 25-27. Collin received the vaccines between November 6, 1995 and October 25, 1999.[1] *Id.* at ¶ 25. The plaintiffs further contend Collin's neurological damage was exacerbated by Defendant Houston Lighting and Power Company's ("Reliant") emission of air toxins such as mercury from power plants that burn fossil fuels near his residence. *Id.* at ¶¶ 31-38.

On July 3, 2002, the plaintiffs filed this lawsuit in the 201st Judicial District Court of Travis County, Texas, Cause No. GN202160. The plaintiffs raise causes of actions for strict liability; negligence in the manufacture, marketing and/or sale of mercury contained in vaccine products; gross negligence; fraud and conspiracy; negligence in the marketing, licensing, and design of thimerosal; and negligence in the release of mercury-containing emissions from the burning of fossil fuels. *See* Petition. The plaintiffs seek compensatory damages for expenditures necessitated by Collin's injuries, Collin's pain and suffering, Pete and Heidi Carabine's lost wages and income, Pete and Heidi Carabine's emotional distress and loss of consortium, and the lost services Pete and Heidi Carabine could have provided to each other and Collin could have provided to them. *Id.* at 20. The plaintiffs also seek punitive damages for certain causes of action. *Id.* Defendant SmithKline Beecham Corporation, d/b/a GlaxoSmithKline, ("SmithKline") removed the case to this Court on

---

[1] The petition states Collin received the vaccines through October 25, "199." Because this typographical error prevents the Court from discerning the relevant date, the Court uses the year 1999 merely as a potential correct date.

August 9, 2002 after having obtained consent of all other served defendants.[2]   *See* Notice of Removal [#1].

Defendants Aventis Pasteur Inc. ("Aventis"), Wyeth, SmithKline, and Merck & Co., Inc. ("Merck") (collectively, "the Vaccine Manufacturers") move to dismiss or, in the alternative, to stay because the plaintiffs did not first file an administrative claim in the Court of Federal Claims as required by the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-11(a)(2)(A).   Sigma-Aldrich Corporation and Sigma-Aldrich, Inc. move to dismiss on the same basis. Defendant Eli Lilly and Company ("Eli Lilly") moves to dismiss arguing it did not manufacture the vaccines or thimerosal that caused Collin Carabine's injuries and, therefore, cannot be held liable.  Reliant moves for summary judgment on the merits.

### Analysis

### I.   The Vaccine Act's Requirements

The Vaccine Manufacturers move to dismiss or, in the alternative, to stay the case because the plaintiffs did not first file a petition in the United States Court of Federal Claims. Sigma-Aldrich Corporation and Sigma-Aldrich, Inc. move to dismiss on the same basis. The National Childhood Vaccine Injury Act of 1986 ("the Vaccine Act") sets forth a scheme for compensation for vaccine-

---

[2] Defendant Reliant consented to the removal. Reliant appears to be a Texas corporation, which would defeat diversity jurisdiction. In the notice of removal, SmithKline argues the plaintiffs' addition of Reliant as a defendant was a fraudulent joinder for the sole purpose of defeating diversity jurisdiction. The removing party bears the burden of proving fraudulent joinder. *Carriere v. Sears, Roebuck & Co.*, 893 F.2d 98, 100 (5th Cir.), *cert. denied*, 498 U.S. 817 (1990). The plaintiffs' claims against Reliant are based on different facts than their vaccine-related claims against the other defendants. However, because this Court has no jurisdiction over Collin Carabine's primary causes of action, the plaintiffs have not moved to remand, and the record and briefing are too scant to determine the fraudulent joinder issue, the Court will treat Reliant the same as the other defendants. This ruling is without prejudice to any party raising the issue or challenging this Court's jurisdiction after the stay in the case is lifted.

related injuries or death. 42 U.S.C. § 300aa-11. Congress enacted the Vaccine Act to streamline the process of seeking compensation for vaccine-related injuries and to avoid the inconsistency, expense and unpredictability of the tort system. *Shalala v. Whitecotton*, 514 U.S. 268, 270, 115 S.Ct. 1477, 1478 (1995) ("For injuries and death traceable to vaccinations, the Act establishes a scheme of recovery designed to work faster and with greater ease than the civil tort system."); H.R. Rep. No. 99-908 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6347 (noting for those injured by vaccines, "the opportunities for redress and restitution are limited, time-consuming, expensive, and often unanswered."). The Vaccine Act prevents plaintiffs from initiating lawsuits against vaccine administrators or manufacturers in state or federal court for unspecified amounts of damages resulting from vaccine-related injuries unless they first file a timely petition in the Court of Federal Claims for compensation under the Vaccine Act. 42 U.S.C. § 300aa-11(a)(2)(A); *see also Shalala*, 514 U.S. at 270, 115 S.Ct. at 1478. Petitions filed in the Court of Federal Claims are assigned to a special master familiar with Vaccine Act claims. 42 U.S.C. §§ 300aa-11(a)(1) & 300aa-12(d). The statute directs courts to dismiss such causes of action that were not first filed in the Court of Federal Claims. 42 U.S.C. § 300aa-11(a)(2)(B).

The plaintiffs have not filed a petition in the Court of Federal Claims. They contend the Vaccine Act does not require them to do so, because Collin Carabine's injuries are not vaccine-related. The Vaccine Act defines a "vaccine-related injury" as "an illness, injury, condition, or death associated with one or more of the vaccines set forth in the Vaccine Injury Table, except that the term does not include an illness, injury, condition, or death associated with an adulterant or contaminant intentionally added to such vaccine." 42 U.S.C. § 300aa-33(5). The plaintiffs contend Collin's injuries are not "vaccine-related" because they were caused not by the vaccines themselves

-4-

but by the thimerosal added to the vaccines as a preservative to deter microbial and fungal growth–an "adulterant . . . intentionally added to such vaccine." 42 U.S.C. § 300aa-33(5). The terms "adulterant" and "contaminant" are not defined in the Vaccine Act.

The plaintiffs are unable to provide the Court any legal authority for their interpretation of the Vaccine Act as applied to thimerosal. On the contrary, it appears every federal court to have ruled on the issue, including this one, has held injuries resulting from thimerosal contained in vaccines are vaccine-related under the meaning of the Vaccine Act. *E.g., Strauss v. American Home Prod. Corp., et al*, Cause No. G-02-226 (S.D. Tex. June 11, 2002) (finding injuries from thimerosal are "vaccine-related" under the Vaccine Act); *Blackmon, et al v. American Home Prod. Corp.*, Cause No. G-02-179 (S.D. Tex. May 8, 2002) (same); *Owens v. American Home Prod. Corp.*, 203 F.Supp.2d 748 (S.D. Tex. 2002) (same). Additionally, the Department of Health and Human Services ("HHS") has taken the position that thimerosal is not an adulterant or contaminant of vaccines.[3] Indeed, the HHS's determination that thimerosal is a component of vaccines,[4] not an adulterant, comports with common sense, since at the time Collin received the vaccines it was impossible to get the vaccines without thimerosal.

Moreover, the special masters in the Court of Federal Claims are experienced in Vaccine Act claims and are better equipped to handle thimerosal cases. The Court of Federal Claims has been

---

[3] While the HHS's position is official, in that it is posted on the HHS web site and HHS has taken the position in court papers, it is not a regulation or other agency action entitled to judicial deference under the *Chevron* doctrine. *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984). However, the HHS's official position holds persuasive authority.

[4] The HHS regulation for general biological products standards includes "preservatives" in the category of "constituent materials," indicating the agency's view that preservatives are components of vaccines, not adulterants. 21 C.F.R. § 610.15.

inundated with cases alleging the thimerosal contained in vaccines caused neurodevelopmental disorders such as autism. *See* Vaccine Manufacturers' Reply, Ex. 1 ("Autism General Order #1"), at 1-2. The plaintiffs' claims are identical to hundreds of those already before the Court of Federal Claims. The Office of Special Masters within that court recently established procedures to accommodate the thousands of thimerosal cases it expects to receive. *Id.* While the Court of Federal Claims' acceptance of jurisdiction and creation of procedures is not binding on this Court, it indicates the entity with the most experience applying the Vaccine Act finds thimerosal cases within the statute's definition of a "vaccine-related injury" and is prepared and willing to handle such cases. *See also Collins vs. American Home Prod. Corp.*, Cause No. 3:01-CV-979LN (S.D. Miss. Aug. 1, 2002) (dismissing thimerosal claims because Autism Order #1 "foreclose[d] any reasonable possibility that the plaintiffs have stated a currently cognizable claim against the resident defendants."). The Court holds thimerosal is not an adulterant or contaminant under the Vaccine Act and, thus, Collin Carabine's alleged injuries are vaccine-related. Accordingly, the Vaccine Act requires the Court to dismiss the parents' claims brought on behalf of Collin Carabine without prejudice to refiling after they have exhausted the requirements of the Vaccine Act.

## II.   Claims against Non-Vaccine-Manufacturers

Eli Lilly moves to dismiss the plaintiffs' claims against it for failure to state a claim upon which relief can be granted because it did not manufacture or distribute the thimerosal or vaccines that allegedly caused Collin Carabine's injuries. Eli Lilly contends it stopped distributing childhood vaccines prior to 1980, and all vaccines in 1985, and stopped distributing thimerosal by 1992. *See* Eli Lilly's Amended Motion to Dismiss [#30], Ex. A ("Fishman Affidavit"), at 1.

Eli Lilly asks this Court to adjudicate the merits of the plaintiffs' claims against it despite the Court's need to dismiss or stay the plaintiffs' claims against the Vaccine Manufacturers until they follow the exhaustion requirements of the Vaccine Act. The plaintiffs raise many of the same claims against Eli Lilly as against the vaccine manufacturer defendants, including strict liability, negligence in the manufacture, marketing and/or sale of mercury contained in vaccine products, gross negligence, and fraud and conspiracy. To rule on the merits of Eli Lilly's substantive defenses would require a period of discovery allowing the plaintiffs to investigate its contentions. The Court will not allow the plaintiffs to conduct discovery on one defendant during the pendency of the minor's claims under the Vaccine Act against the other defendants. To do so would be wholly inconsistent with Congress's goal of minimizing litigation costs and, therefore, the Court will not allow any discovery until the plaintiffs have complied with the Vaccine Act. *See* H.R. Rep. No. 99-908 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6347 ("Lawsuits and settlement negotiations can take months or even years to complete. Transaction costs – including attorneys' fees and court payments – are very high. And in the end, no recovery may be available.").

The same reasoning holds true for Reliant's motion for summary judgment, to which the plaintiffs have not responded. Reliant contends it owed no duty to Collin preventing it from exposing him to normal power plant emissions because the risk of mercury poisoning to Collin was not foreseeable. *See* Reliant's Motion for Summary Judgment [#31], at 3-6. Reliant also argues the plaintiffs cannot establish Reliant's power plants caused Collin's injuries because the power plant emissions contain very low levels of mercury and no scientific studies have linked autism to power plant emissions. *Id.* at 7-10. These arguments on the merits obviously involve complicated factual determinations that this Court cannot make before allowing the plaintiffs a period of discovery

(despite the plaintiffs' failure to respond to Reliant's motion which, under the Local Rules, entitles the Court to grant the motion as unopposed). Additionally, the Court will not rule on the merits of the plaintiffs' claims against Reliant before determining if the claims are properly before this Court as an appendage to this cause of action. Accordingly, the Court will dismiss Collin Carabine's claims against all defendants rather than allow discovery on Eli Lilly and Reliant.

## III.    Pete and Heidi Carabine's Individual Claims

Pete and Heidi Carabine bring claims individually and as next friend of Collin Carabine. Individually, they seek recovery for all past and future costs associated with Collin's injuries, lost wages and income, emotional distress, loss of consortium and loss of services. *See* Petition, at 20. Under the Vaccine Act, "any person who has sustained a vaccine-related injury" or "the legal representative of such person if such person is a minor or is disabled" may file a petition for compensation in the Court of Federal Claims. 42 U.S.C. § 300aa-11(b)(1)(A). An individual may only file a petition on his own behalf if he received a vaccine and alleges a resulting injury. 42 U.S.C. §§ 300aa-11(b)(1)(A) & 300aa-11(c)(1)(A). Thus, Pete and Heidi Carabine can only bring their claims as next friend of Collin, not their individual claims, in the Court of Federal Claims.

The defendants move to dismiss Pete and Heidi Carabine's individual claims for damages because they are derivative of Collin's claims, are duplicative of damages available under the Vaccine Act, or are not cognizable under Texas law. However, if the Court dismissed the parents' claims, their statutes of limitations could expire while the parents are representing Collin's claims in the Court of Federal Claims.[5] TEX. CIV. PRAC. & REM. CODE § 16.003 (two-year statute of

---

[5] The Vaccine Act does not toll the statute of limitations for the parents' claims while they are representing their child in the Court of Federal Claims. The Vaccine Act does, however, toll the statute of limitations for the minor's state law claims while his petition is pending before the court.

limitations in personal injury cases). The Court has discretion to stay proceedings. *Black Sea Inv., Ltd. v. United Heritage Corp.*, 204 F.3d 647, 649 (5th Cir. 2000). Courts often stay proceedings to avoid interference with related proceedings in another forum and to avoid the waste of duplication. *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728-29 (5th Cir. 1985) ("The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result."). The parents' claims brought on behalf of their minor son must first be heard in the Court of Federal Claims. Dismissing the parents' individual claims during the pendency of that court's jurisdiction might preclude the parents from bringing their claims in any forum. Accordingly, the Court will stay all proceedings in Pete and Heidi Carabine's individual causes of action against all defendants until Collin's claims have been administered in the Court of Federal Claims under the Vaccine Act.

In accordance with the foregoing:

IT IS ORDERED that Eli Lilly and Company's Motion to Dismiss [#4] is DISMISSED AS MOOT;

IT IS FURTHER ORDERED that the Vaccine Manufacturers' Motion to Dismiss [#25] is GRANTED IN PART as to the claims of Collin Carabine to be presented in the Court of Federal Claims, and their Alternative Motion to Stay [#25] is GRANTED IN PART as to Pete Carabine and Heidi Carabine's individual causes of action;

---

42 U.S.C. § 300aa-16(c). For the child's claims against the defendants who do not manufacture vaccines, the statute of limitations will not begin to run until he reaches the age of majority. *See* TEX. CIV. PRAC. & REM. CODE § 16.001.

IT IS FURTHER ORDERED that Sigma-Aldrich Corporation and Sigma Aldrich, Inc.'s Motion to Dismiss [#11] is GRANTED IN PART as to the claims of Collin Carabine to be presented in the Court of Federal Claims, and their Alternative Motion to Stay Proceedings [#23] is GRANTED IN PART as to Pete Carabine and Heidi Carabine's individual causes of action;

IT IS FURTHER ORDERED that Eli Lilly and Company's Amended Motion to Dismiss [#30] is GRANTED IN PART as to the claims of Collin Carabine to be presented in the Court of Federal Claims, and DENIED IN PART as to Pete and Heidi Carabine's individual causes of action;

IT IS FURTHER ORDERED that Defendant Reliant Energy, Inc's Motion for Summary Judgment [#31] is DISMISSED without prejudice to refiling;

IT IS FURTHER ORDERED that plaintiffs' claims brought as next friend of Collin Carabine against all defendants are DISMISSED without prejudice to refiling;

IT IS FURTHER ORDERED that plaintiffs' claims brought in their individual capacities are STAYED pending further order of this Court;

IT IS FINALLY ORDERED that the plaintiffs SHALL FILE a status report with this Court on **June 7, 2003** informing the Court of the status of their petition, if any, filed on behalf of Collin Carabine in the Court of Federal Claims.

SIGNED this the ___8___ day of October 2002.

SAM SPARKS
UNITED STATES DISTRICT JUDGE

-10-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

ROBERT EDGAR HOLDER AND MATTHEW
CLAYTON HOLDER, BY AND THROUGH
THEIR NATURAL PARENTS AND GENERAL
GUARDIANS, VALLEY HOLDER AND
BRENDA HOLDER                                                                    PLAINTIFFS

VS.                                           CIVIL ACTION NO. 4:02CV148LN

ABBOTT LABORATORIES, INC.,
AMERICAN HOME PRODUCTS D/B/A
WYETH, WYETH LABORATORIES, WYETH-
AYERST, WYETH-AYERES LABORATORIES,
WYETH LEDERLE, WYETH LEDERLE, WYETH
LEDERLE VACCINES, AND LEDERLE
LABORATORIES; AVENTIS PASTEUR, INC.,
INDIVIDUALLY AND AS SUCCESSOR IN
INTEREST TO CONNAUGHT; BAXTER
INTERNATIONAL, INC.; ELI LILLY AND
COMPANY; GDL INTERNATIONAL, INC.;
GLAXOSMITHKLINE, INDIVIDUALLY AND AS
SUCCESSOR IN INTEREST TO SMITHKLINE
BEECHAM CORP.; KINGPHARMACEUTICALS,
INC.; MEDEVA PHARMACEUTICALS, INC.;
MERCK & CO., INC.; SIGMA ALDRICH,
INC.; SPECTRUM CHEMICAL MANUFACTURING
CORP.; GREGORY S. MARANTO, M.D.; RUSH
MEDICAL GROUP, P.A., AND JANE/JOHN DOES                          DEFENDANTS

MEMORANDUM OPINION AND ORDER

This cause is before the court on plaintiffs' motion to
remand this case to the Circuit Court of Hinds County,
Mississippi, and on the motion of several defendants to dismiss.
Briefing on the motion to remand has been completed, and the
court, having considered the parties' arguments, concludes that
for the same reasons assigned by the court in Collins v. American
Home Products Corp., Civil Action No. 3:01CV979LN (S.D. Miss. Aug.
1, 2002), and McDonald v. American Home Products Corp., Civil

Action No. 3:02CV77LN (S.D. Miss. Aug. 1, 2002), the motion to remand should be denied.  The court further concludes, also for the reasons explained in <u>Collins</u> and <u>McDonald</u>, namely that the case is not cognizable unless plaintiffs shall first present their claim in the Vaccine Court, that this case is due to be dismissed.[1]

Based on the foregoing, it is ordered that plaintiffs' motion to remand is denied, and it is further ordered that this cause is dismissed without prejudice.

SO ORDERED this 15th day of October, 2002.

_____
UNITED STATES DISTRICT JUDGE

---

[1]     The court is aware that while defendants have moved to dismiss, plaintiffs have not yet filed their response in opposition.  They have, however, made their position known, and the court is well familiar with their arguments.

2

12

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ OCT 2 6 2002 ★

--------------------------------X

ANDREW WAX, et al.,

                 Plaintiffs,

  -against-

AVENTIS PASTEUR INC., f/k/a/ CONNAUGHT
LABORATORIES, et al.,

                 Defendants.

--------------------------------X

                          MEMORANDUM
                            ORDER

                          CV 02-2018
                          (JBW)

APPEARANCES:

Plaintiffs Attorney:   Parker & Waichman
                        111 Great Neck Road, 1st Floor
                        Great Neck, NY 11021
                        By:  Adena Edwards
                            Jerrold S. Parker

                        Douglas & London
                        111 John Street, 8th Floor
                        New York, NY 10038
                        By:  Michael London

Defendants Attorneys:
Aventis Pasteur Inc.:  Wilson, Elser, Moskowitz, Edelman &
                        Dicker LLP
                        150 East 42nd St.
                        New York, NY 10017-5639
                        By:  Patrick J. Brennan

aka
Connaught Laboratories

1

Lederle, Inc.
Wyeth Pharmacticals,Inc.,
Individually and as
Successor in Interest to
American Home Products,
Inc.:                    Orrick Herrington & Sutcliffe LLP
                         66 Fifth Avenue
                         New York, NY 10103
                         By: Daniel James Thomasch
                             Lauren Jill Elliot


aka
Wyeth-Ayerst Pharmaceutics, Inc.
Merck & Co. Inc.:        Hughes Hubbard & Reed LLP
                         One Battery Park Plaza
                         New York, NY 100004
                         By: Deirdre Joan Sheridan
                             Theodore V. H. Mayer


                         Venable, Baetjer & Howard LLP
                         Two Hopkins Plaza
                         Suite 1800
                         Baltimore, MD 21201
                         By: Dino S. Sangiamo
                             Paul F. Strain


Glaxosmithklein, Individually
and as Successor in
Interest to Smithkline
Beecham Corp.:           Schoeman, Updike & Kaufman, LLP
                         60 East 42nd St., 39th Floor
                         New York, NY 10165
                         By: Beth Lori Kaufman


Parke-Davis & Co.
Baxter Pharmaceutical
Products, Inc.
Abbott Laboratories:  Patterson, Belknap, Webb & Tyler LLPO
                      1133 Avenue of the Americas
                      New York, NY 10036-6710
                      By: Robert D. Wilson, Jr.


Pfizer, Inc., a Subsidiary

                         2

of Warner-Lambert, Inc.

Sigma-Aldrich, Inc.:    Harris Beach LLP

> 500 Fifth Avenue, 5th Floor
> New York, NY 10110
> By:  Frederick Fern
>      Judi Abbott Curry
>      Konrad F. Payne

American International Chemical
Spectrum Laboratory
Products:

> Landman Corsi Ballaine & Ford P.C.
> 120 Broadway, 27th Floor
> New York, NY 10271-0079
> By:  Daniel S. Moretti

> Shook Hardy & Bacon LLP
> One Kansas City Place
> 1200 Main Street
> Kansas City, MO 64105
> By:  James H. Davis
>      Mark A. Dover

> McCarter & English, LLP
> 300 Park Avenue
> New York, N.Y. 10022-7402
> By:  Samuel J. Abate, Jr.

EM Industries, Inc.:    Strongin Rothman & Abrams, LLP

> 50 Broadway, Suite 2003
> New York, NY 10004
> By:  David Abrams

WEINSTEIN, Senior District Judge:

The central question is whether thimerosal is "a part of" a children's "vaccine" for purposes of the National Vaccine Injury Compensation Program (Program). *See* 42 U.S.C. §300aa - 10 et seq. (2000). Plaintiffs allegedly suffer from autism caused by thimerosal.

3

Defendants have moved to dismiss.

The relevant statute, 42 U.S.C. § 300aa-33(5), reads:

the term "vaccine related injury or death" means an illness, injury, condition, or death associated with one or more of the vaccines set forth in the Vaccine Injury Table, except that the term does not include an illness, injury, condition or death associated with an adulterant or contaminant intentionally added to such a vaccine.

and 21 C.F.R. § 610.15, which reads:

Constituent Materials:

(a) Any preservative used shall be sufficiently nontoxic so that the amount present in the recommended dose of the product will not be toxic to the recipient, and in the combination used shall not denature the specific substances in the product to result in a decrease below the minimum acceptable potency within the dating period when stored at recommended temperature.

Depending upon the characterization of thimerosal, the Office of Special Masters (OSM) administering the Program arguably has original jurisdiction to pass upon plaintiffs' claims. If thimerosal were characterized as "constituent material" to a vaccine, the OSM would have jurisdiction. 21 C.F.R. §610.15; 42 U.S.C. §300aa-11(a)(2)(A). If thimerosal were characterized as an "adulterant or contaminant", this court might have jurisdiction. 42 U.S.C. §300aa-33(5).

By Autism General Order #1, the OSM has taken steps to adjudicate related autism claims allegedly caused by a vaccine containing, or consisting in part of, thimerosal. The Secretary of Health and Human Services (HHS) has, in effect, opined that thimerosal is not an adulterant or contaminant. *See "Statement of Interest"* in *King v. Aventis Pasteur, Inc.*, CV 01-1305-AS (D. Ore. June 7, 2002) ("[T]he Secretary has determined that the preservative thimerosal is not an adulterant or contaminant within the meaning of the Vaccine Act"). *See also*, United States Department of Health and Human Services, Health Resources and Services

Administration, "Commonly Asked Questions About the National Vaccine Injury Compensation Program," available at http://www.hrsa.gov/osp/vicp/qanda.htm#17 (August 2002) ("Because Thimerosal is not an adulterant to or contaminant of vaccines, individuals who have claims relating to thimerosal in vaccines . . . must first file claims with the [Vaccine Court] before pursuing any other civil litigation."). The OSM apparently supports this position, at least preliminarily, through Autism General Order #1, asserting jurisdiction under the Program over claims concerning thimerosal-containing vaccines and establishing a schedule for determining whether such vaccines cause autism and related conditions. *In re: Claims For Vaccine Injuries Resulting in Autism Spectrum Disorder of a Similar Neurodevelopmental Disorder* (Ct. Fed. Cl. July 3, 2002) ("Autism General Order No. 1").

The Program was designed by Congress to permit production of children's vaccines without court proceedings and threats of tort judgments that threatened to deter production of vaccines essential to the health of the nation's children. Individual Justice in Mass Tort Litigation, The Effect of Class Actions, Consolidations, and Other Multiparty Devices 123 (1995); *See A Major Revival in Research on Vaccines*, N.Y. Times, Aug. 22, 1990, at D7; *Compensation Cutoff*, Newsday, Sept. 10, 1990, at 2.

There are two issues presented by this motion: (1) the degree of deference this court should give to the position of the HHS and by OSM, tentatively, that thimerosal as found in vaccines is not an adulterant or contaminant within the meaning of the statute; and (2) whether this court is authorized to hold evidentiary hearings to make an independent determination of the statutory meaning of "adulterant" and "contaminant" in the context of this case.

When neither the statute nor interpretive regulations provide an unambiguous

5

authoritative definition or interpretation of words like adulterant and contaminant, a court applies a *Christensen* level of deference to the agency's interpretation. *Christensen v. Harris County*, 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). In *Christensen*, the Supreme Court held that an agency's construction of its own, ambiguous regulation is entitled to deference. *Id.* at 588. *See also*, *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). "[T]he level of deference afforded [the agency's judgment] 'will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control'." *Edelman v. Lynchburg College*, 122 S.Ct. 1145, 152 L.Ed.2d 188 (March 19, 2002), quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944); *Cf. EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 256-258, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (interpretive guidelines do not receive more deferent *Chevron* analysis).

In *Christensen*, the court noted that non-regulatory pronouncements from administrative agencies arrived at without formal adjudicative or notice and comment periods do not warrant a stringent level of deference. 529 U.S. at 587. *See also*, *e.g.*, *Reno v. Koray*, 515 U.S. 50, 61, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (internal agency guidelines, which are not "subject to the rigors of the Administrative Procedur[e] Act, including public notice and comment," are entitled only to "some deference". (internal quotation marks omitted)).

If the views of the Administrator of the Program or the Secretary of HHS constitute statements of general policy, interpretive rules, or a course of precedent developed though informal means - i.e., non-regulatory pronouncements - then a court may give the views some weight, but it is not bound by the agency's interpretation. *Christensen*, 529 U.S. at 587. Opinion

6

letters issued by departments responsible for administering Congressional Acts are "entitled to respect" under the Supreme Court's decision in *Skidmore*, 323 U.S. at 140, but only to the extent that those interpretations have the "power to persuade". *Christensen*, 529 U.S. at 587; *See also, Arabian American Oil Co.*, 499 U.S. at 256-258; *Skidmore*, 323 U.S. at 140 (factors in the level of deference depend on the circumstances as well the degree of agency's care, consistency, formality, relative expertness, and persuasiveness of the agency's position).

While not bound by HHS's interpretation, and possibly that of OSM, the well-reasoned views of the Administrator of the Program "constitute a body of experience and informed judgment to which this court and litigants may properly resort for guidance . . . and considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *United States v. Mead*, 533 U.S. 218, 227-28, 121 S.Ct. 2164, 150 L.Ed.2d. 292 (2001) (quotation marks omitted). This is particularly true since the decision of OSM will be based on adjudicated decisions with opposing interested parties submitting evidence and arguments.

In ruling on the persuasiveness of HHS's and OSM's interpretation, a court must keep in mind the circumstances under which the interpretation was made and the overall purpose of the Act. It must also examine the facts and circumstances surrounding the interpretation by the Administrator of the Program in determining what weight and level of deference to accord the relevant statutory interpretation. *See Skidmore*, 323 U.S. at 140.

While not bound, the court defers, for the purposes of this motion, to HHS's interpretation that injuries caused by thimerosal in vaccines are "vaccine-related" for purposes of the Program. HHS, through "statements of interest" and publications, has expressed the consistent position that

7

injuries caused by thimerosal in vaccines are, "vaccine-related" for purposes of the Program.

In view of the overall purpose of the Program, the court is persuaded that it is appropriate for the present to defer to OSM's experience and expertise on the scientific issues now posed even though resolution of the meaning of the operative terms at issue may determine statutory meanings and jurisdiction of this court.

Defendants argue that, based on the provisions of the Vaccine Act and the stipulations of counsel, plaintiff's position with respect to the statute of limitations will not be worsened by dismissal of their vaccine-related claims in the instant case. The Vaccine Act provides that if the present civil action is dismissed and a petition is filed with the Vaccine Court within one year of the date of dismissal, the date that this case was filed in this court will be deemed the date that the Vaccine Court petition was filed. *See* 42 U.S.C. § 300aa-11(a)(1)(B). While the Vaccine Court petition is pending in the Vaccine Court, limitations on actions under state law "shall be stayed . . . ." *See* 42 U.S.C. § 300aa-16(c). Consequently, defendant's urge, plaintiff's position after the dismissal of this action will be the same as if they had properly followed the mandatory provisions of the Vaccine Act.

Nevertheless, in the exercise of discretion, the court will not dismiss the case, but will stay it pending application by plaintiffs for relief pursuant to the Program and a decision by the OSM. The court will await the Vaccine Court's decision and will defer temporarily to HHS's interpretation in order to permit the Vaccine Court to make a decision after holding hearings.

Dismissal might be inappropriate in view of statute of limitation implications that might be adverse to plaintiffs. The case is important enough to plaintiffs to warrant this careful course of action.

8

The court will put off deciding on whether scientific hearings can be held by this court to

determine the meaning of the statute until after the Vaccine Court has had an opportunity to hold

hearings. Cases cited by defendants which suggest that experts may not be relied upon by a

federal district judge in interpreting statutory language in the main refer to jury determinations.

*See Thimerosal Defendant's Supplemental Brief in Support of Dismissal of Plaintiff's Claims, 5-9*

(Oct. 17, 2002). The court's power to take judicial notice of the meaning of words and to inform

itself by hearings is not limited by jury inhibitions. *Cf.* F.R. of Civ. P. 44.1 ("The court, in

determining foreign law, may consider any relevant material or source, including testimony....").

The case is stayed to permit plaintiffs to proceed administratively under the Program.

Any party may move for a lifting of the stay or other relief upon a change of circumstances. The

case shall be marked closed for statistical administrative purposes only.

SO ORDERED.

JACK B. WEINSTEIN

A TRUE COPY
ATTEST
DATED 10/18 2002
ROBERT C. HEINEMANN
CLERK
BY _____
DEPUTY CLERK

Dated: Brooklyn, New York

October 28, 2002

9



NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, MIDDLESEX COUNTY

| | |
|---|---|
| Steven Alexander Greene, et. al. | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| Aventis Pasteur, et. al. | : |
| Defendants. | : |
| | : |
| | : |
| | : |

DOCKET NO. L-1228-02
CIVIL ACTION

| | |
|---|---|
| Christian Hale Colson, et. al. | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| Aventis Pasteur, et. al. | : |
| Defendants. | : |
| | : |
| | : |

DOCKET NO. L-1351-02
CIVIL ACTION

LETTER OPINION

Lauren E. Handler, Esq.
Porzio, Bromberg & Newman, P.C.
100 Southgate Parkway
Morristown, NJ 07962
Attorneys for Defendant Wyeth

Barry R. Sugarman, Esq.
Wilentz, Goldman & Spitzer, P.C.
90 Woodbridge Center Drive
Suite 900, Box 10
Woodbridge, NJ 070951
Attorneys for Plaintiffs Greene and Colson

1

## INTRODUCTION

On January 28, 2002 the Plaintiffs filed Complaints against the Defendants in the above captioned matters. The Plaintiffs, the fathers of the infants, Stephen Alexander Greene and Christian Colson, allege that the infants were exposed to thimerosal through the vaccines that were prescribed and administered to them. The Greene and Colson parents have also filed claims on their own behalf against the Defendants.

The Defendants in these matters are Wyeth, Aventis Pasteur, Merck & Co., Eli Lilly Company, and Meridian Chemical and Equipment. Defendants Wyeth, Aventis Pasteur, and Meridian Chemical Equipment manufacture the vaccine at issue. The vaccine manufacturer Defendants have filed Motions to Dismiss the Plaintiffs' Complaints for failure to state a claim upon which relief can be granted. See, Rule 4:6-2(e).

The National Childhood Vaccine Injury Act, 42 U.S.C. Sect. 300aa-1 to 300aa-34 (the Act), covers injuries caused by vaccines. The Act vests jurisdiction over vaccine-related injuries with the Vaccine Court. The Act also requires plaintiffs seeking compensation for vaccine-related injuries to file a petition in the Vaccine Court prior to filing suit in a State or Federal Court. If a plaintiff fails to file a petition with the Vaccine Court and files suit in a State or Federal Court, the Court is required to dismiss the plaintiff's claim.

It is undisputed that the Greene and Colson Plaintiffs have not filed petitions with the Vaccine Court. In support of their Motions to Dismiss, the Defendants argue that the Vaccine Court has jurisdiction over the Plaintiffs' claims because the Plaintiffs injuries are vaccine-related; the Plaintiffs' injuries are vaccine-related because they were caused by an ingredient of the vaccine at issue, namely,

2

thimerosal. The Defendants argue that since the Vaccine Court has jurisdiction over the Plaintiffs' claims, the Court should dismiss the Plaintiffs' Complaints for lack of jurisdiction.

The Plaintiffs, on the other hand, argue that their injuries are not vaccine-related because thimerosal is an adulterant or contaminant, not an ingredient; since the Plaintiffs' injuries are not vaccine-related, they fall outside the scope of the Vaccine Act. Accordingly, the Plaintiffs argue that this Court has jurisdiction over the Plaintiffs' claims and request that it deny the Defendants' Motions to Dismiss.

## DISCUSSION

### I. The Defendants' Motions

The Plaintiffs argue that the Court should treat the Defendants' Motions as summary judgment motions because the Defendants have included material in their Motion papers outside the scope of the pleadings. The Court disagrees.

The main issue before the Court is whether the Vaccine Act precludes the Plaintiffs' from pursuing their claims in this Court because the Plaintiffs failed to file a petition with the Vaccine Court. The Defendants' appropriately address this issue in their Motions to Dismiss because it is a threshold issue of jurisdiction. There is no reason for these matters to proceed beyond the stage of the Defendants' Motions to Dismiss before this Court has determined whether it has jurisdiction over the Plaintiffs' claims.

### II. Standard of Review

When considering a motion to dismiss pursuant to Rule 4:6-2(e) for failure to state a claim upon

3

which relief can be granted, the Court is required to search the Complaint to determine if a cause of action can be found within its four corners. Relying on Printing Mart v. Sharp Electronics Corp., 116 N.J. 739, 746 (1989), Judge Drier in Van Natta Mechanical Corp. v. Di Stanlo, 277 N.J. Super. 175, 180 (App. Div. 1994) followed the analysis set forth in prior rulings by stating:

> A reviewing court 'searches the complaint in depth and with great liberality to ascertain whether the fundamental cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary.' At this preliminary stage of the litigation the court is not concerned with the ability of plaintiffs to prove the allegations contained in the complaint ... For the purpose of analysis, plaintiffs are entitled to every reasonable inference of fact ... The examination of a complaint's allegations of fact required by the aforestated principles should be one that is at once painstaking and undertaken with a generous and hospitable approach.

Quoting, DiCrisofaro v. Laurel Grove Memorial Park, 43 N.J. Super. 244, 252 (App. Div.).

## III. Plaintiffs' Claims on Behalf of Infants Greene and Colson

Thimerosal is an FDA-licensed component of the vaccine at issue; it is included in multi-dose vaccine vials and is designed to preserve the vaccine's effectiveness. It is undisputed that the vaccines that were administered to the infants, Greene and Colson, contained thimerosal.

The gravamen of the Plaintiffs' Complaints are that thimerosal is the agent responsible for the infants Greene and Colson's injuries. The Plaintiffs argue that despite thimerosal's proffered "use" as a preservative, thimerosal is an adulterant or contaminant because it contains mercury, a harmful substance. The Plaintiffs argue that since the Vaccine Act does not cover injuries caused by adulterants or contaminants, this Court has jurisdiction over the Plaintiffs' claims.

The Defendants, on the other hand, argue that thimerosal is an FDA-approved ingredient of the vaccine at issue. As an ingredient, thimerosal cannot be considered an adulterant or contaminant; therefore, the Vaccine Act covers the Plaintiffs' claims and the Plaintiffs were required to file a petition with the Vaccine Court before instituting suit in this Court.

The Court agrees with the Defendants. The fact that the Plaintiffs argue that thimerosal is harmful and therefore an adulterant or contaminant does not change the fact that the FDA has approved thimerosal as an ingredient of the vaccine at issue. As the Defendants noted at oral argument, a plaintiff can allege that a seventeen-year-old is not a minor because he has the physical and intellectual maturity of an eighteen-year-old; however, this Court would not have to accept the plaintiff's allegation merely because the allegation was made in opposition to a defendant's motion to dismiss the plaintiff's complaint.

Similarly, this Court is not required to accept the Plaintiffs' allegation that thimerosal is an adulterant or contaminant merely because the Plaintiffs make their allegations in opposition to the Defendants' Motion to Dismiss. The FDA has approved the use of thimerosal as an ingredient and such approval precludes this Court from finding that thimerosal is an adulterant or contaminant. This Court is of the opinion that thimerosal is a constituent material of vaccines. See, 21 C.F.R. Sect. 610.15; Owens v. American Home Products Corp. (S.D. Tex. 2002). The Court holds that the Plaintiffs' alleged injuries are vaccine-related and this Court lacks jurisdiction in these matters; therefore, the Plaintiffs' claims on behalf of the infants, Greene and Colson, are dismissed pursuant to Rule 4:6-2(e).

IV. Plaintiffs' Claims on their Own Behalf

The final issue before this Court is the status of the parents' claims on their own behalf. Sect. 300aa-15 of the Vaccine Act states the following: "Compensation awarded under this Program ... shall include the following: "(1)(A) Actual ... expenses which - (iii)(I) have been or will be incurred by or on behalf of the person who suffered such injury." Furthermore, Schaeffer v. American Cyanamid allowed a suit by the victim's parents only for loss of services and consortium. 20 F.3d 1 (1st Cir. 1994). In Schaeffer, the victim was actually awarded money by the Vaccine Court for medical expenses, etc. The only reason that the Schaeffer Court allowed the parents to recover their claims was because they could not do so in the Vaccine Court.

Here, the Greene and Colson infants' parents could have sought medical expenses on behalf of their infant sons from the Vaccine Court; therefore, their claims for medical expenses are dismissed. As to the Plaintiffs' claims for negligent infliction of emotional distress, Plaintiffs' counsel acknowledged at oral argument that the Plaintiffs' claims do not meet the primacy requirement of Portee v. Jaffe, 84 N.J. 88 (1980); therefore, the Plaintiffs' claims for negligent infliction of emotional distress are dismissed. The Plaintiffs' claims for loss of love and affection are also dismissed because New Jersey does not recognize such claims. Tynan v. Curzi, 332 N.J. Super. 267 (App. Div. 2000). As to the Plaintiffs' claims for loss of services, the Defendants' Motion to Dismiss should be denied because the Plaintiffs could not have pursued these claims in the Vaccine Court. See, Schaeffer v. American Cyanamid 20 F.3d 1 (1st Cir. 1994).

6

## CONCLUSION

The Plaintiffs' claims on behalf of the Greene and Colson infants are dismissed because the Plaintiffs' injuries are vaccine-related and therefore this Court lacks jurisdiction over them. See, 21 C.F.R. Sect. 610.15; Owens v. American Home Products Corp, (S.D. Tex. 2002).

The Greene and Colson parents' claims for medical expenses should also be dismissed because the parents could have sought medical expenses on behalf of their infant sons from the Vaccine Court.

The Plaintiffs' claims for negligent infliction of emotional distress should be dismissed because Plaintiffs' counsel acknowledged at oral argument that the Plaintiffs' claims do not meet the primacy requirement of Portee v. Jaffe 84 N.J. 88 (1980). The Plaintiffs' claims for loss of love and affection should also be dismissed because New Jersey does not recognize such claims. Tynan v. Curzi, 332 N.J. Super. 267 (App. Div. 2000).

As to the Plaintiffs' claims for loss of services, the Defendants' Motion to Dismiss should be denied because the Plaintiffs could not have pursued these claims in the Vaccine Court. See Schaefer v. American Cyanamid 20 F.3d 1 (1st Cir. 1994).

Nicholas J. Stroumtsos Jr., J.S.C.

Aug. 8, 2002

14



FILED

2002 OCT 22 AM 10: 57

FOURTH JUDICIAL
DISTRICT

1

ENTERED

2

3    NOV - 5 2002

4    IN REGISTER BY

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

6    GEORGE W. MEAD and VICTORIA MEAD,    )    No. 0107-07136
parents and guardians ad litem for WILLIAM P. )
7    MEAD, a minor child,    )
    )    ORDER ALLOWING
8    Plaintiffs,    )    DEFENDANTS' MOTION FOR
    )    SUMMARY JUDGMENT
9    v.    )
    )
10    AVENTIS PASTEUR, INC., et al.,    )
    )
11    Defendants.    )

12    On September 23, 2002 at 10:00 a.m., the Honorable Nely Johnson heard the motion for

13    summary judgment of defendants Aventis Pasteur Inc. (incorrectly sued herein as Aventis

14    Pasteur, Inc., individually and as successor in interest to Connaught Laboratories, Inc., Pasteur

15    Merieux, and Pasteur Merieux Connaught), formerly known as Connaught Laboratories Inc. and

16    formerly doing business as Pasteur Merieux Connaught; SmithKline Beecham Corporation doing

17    business as GlaxoSmithKline (sued herein as GlaxoSmithKline, individually and as successor in

18    interest to SmithKline Beecham Corp.); Beverly Wittkop, M.D.; and The Children's Clinic. The

19    motion was brought on behalf of all defendants except Eli Lilly and Company, Inc. and John Doe

20    Defendants 1-20. The parties were represented by their attorneys at the hearing and given the

21    opportunity for oral argument. The court, having considered the briefing and oral argument of

22    the parties, hereby **FINDS** as a matter of law that thimerosal is not a contaminant or adulterant

23    and plaintiffs must first seek relief through the National Vaccine Injury Compensation Program.

24    The court hereby **ORDERS**:

25    * * *

26    * * *

Page 1    **ORDER ALLOWING DEFENDANTS' MOTION FOR
    SUMMARY JUDGMENT**

TOOZE DUDEN CREAMER FRANK & HUTCHISON
ATTORNEYS AT LAW
333 S.W. TAYLOR STREET
PORTLAND, OREGON 97204-2498
TELEPHONE (503) 223-5101    FAX (503) 223-5550

1    1. Moving defendants' motion for summary judgment is **ALLOWED**.

2    2. There is no just reason for delay, and moving defendants shall submit a judgment

3    pursuant to ORCP 67B.

4    Dated this 22nd day of October 2002.

5

6

7

8    JUDGE NELY L. JOHNSON

9    Submitted by:
     George S. Pitcher, OSB #96398
10   Of Attorneys for Aventis Pasteur Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 2   **ORDER ALLOWING DEFENDANTS' MOTION FOR
         SUMMARY JUDGMENT**

TOOZE DUDEN CREAMER FRANK & HUTCHISON
ATTORNEYS AT LAW
333 S.W. TAYLOR STREET
PORTLAND, OREGON 97204-2496
TELEPHONE (503) 223-5181 · FAX (503) 223-5550

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
CIVIL TRIAL DIVISION

ALAN J. CHESKIEWICZ, ET AL.            :        MAY TERM, 2002
                                                NO. 0952

VS.                                    :

AVENTIS PASTEUR, INC., ET AL.          :        CONTROL NO. 100957

## MEMORANDUM OF LAW

BY: HON. VICTOR J. DiNUBILE, JR.

The issue presented in this case is whether plaintiffs' cause of action must be discontinued because of failure to exhaust remedies provided to the plaintiff under the National Childhood Vaccine Injury Act, 42 U.S.C. Secs. 300 aa-1 to 300 aa-34 (1994 & Supp. V 1999) (hereinafter referred to as the "Vaccine Act" or "Act"). This Court agrees with the defendants. Consequently, this case is Dismissed and Discontinued.

The parents of minor plaintiff primarily assert products liability claims against various drug companies for injuries arising from mercury poisoning from certain vaccines administered to him during the first 18 months of his life (May, 1994 - December, 1995). Plaintiffs' Complaint maintains that the substance Thimerosal, used as a preservative in these vaccines, contained mercury which caused an adverse reaction and injury to their son. It is not in dispute that the vaccines used by the minor child in this case come within the purview of the Vaccine Act. The Vaccine Act, enacted by Congress, provides that all such causes of action resulting in harm from the use of certain enumerated vaccines must initially be brought before a specially constituted court of the United States Court of Federal Claims (hereinafter referred to as Vaccine Court).

The Act unequivocally provides that parties must first exhaust their remedies under this Act before commencing suit in either state or federal court. The Act further directs the state or federal courts to dismiss actions not first pursued under the Vaccine Act. The Act, however, provides an exception to the exhaustion requirement where the vaccine(s) in question contained a "contaminant" or "adulterant".

Plaintiffs maintain suit is proper here under the exception because the preservative Thimerosal constitutes a contaminant or adulterant. This Court disagrees. All the case law contradicts the plaintiffs' position. This Court adopts the well-reasoned opinions of the Vaccine Court and federal district courts that the preservative Thimerosal, contained in the vaccines, is not a contaminant or an adulterant. Leroy v. Secretary of Department of Health and Human Services, No. 02-392V, 2002 WL 31730680 (Fed. Cl. Spec. Mstr. October 11, 2002); Blackmon v. American Home Products Corp., No. 6-02-179, slip op. (S.D. Tex. May 8, 2002); Owens v. American Home Products Corp., 203 F.Supp. 2d 748 (S.D. Tex. May 7, 2002); O'Connell v. American Home Products Corp., No. 6-02-184, slip op. (S.D. Tex. May 7, 2002). The purpose of the Act is to provide a uniform federal no-fault system with consistent venue to adjudicate claims of persons seeking redress for injuries stemming from adverse reactions from the use of the enumerated vaccines. The contaminant/adulteration exception would apply if some foreign substance, not ordinarily contained in the vaccine, found its way into the drug causing harm. But where the harm arises from an allergic reaction to non-foreign substances contained in the vaccine itself, the claim should first be heard in Vaccine Court. The above cited federal authorities, after an analysis of the purpose of the Act coupled with a medical/general dictionary review of the words "contaminant" and "adulterant", concluded that the Thimerosal preservative is not

encompassed in the exception since it is a component of the vaccine. This Court agrees with their rationale.

The plaintiffs also contend that in any event, even if the Court should agree with the federal authorities that the exception does not apply, plaintiff still can maintain the suit in state court because they do not "qualify" as litigants under the Act. The Act requires that all actions must be commenced by litigants within 36 months of the time in which adverse symptoms first occur. The symptoms first manifested themselves in the minor plaintiff in December of 1995. Since no action was ever brought in Vaccine Court, plaintiffs argue the Act does not apply to them and therefore can maintain the within suit in state court. This Court respectfully disagrees. One cannot simply wait out the three year limitations provision and then file a civil tort action free from all substantive and procedural limitations under the Vaccine Act. It is clear that plaintiffs' attempts to commence this suit in district court and subsequently this Court are to circumvent the requirements of the Act. If the instant suit were permitted, then every litigant who did not want to first assert claims in Vaccine Court simply could wait out the 36 month requirement if the tort actions were not barred by the statute of limitations and then commence their actions in federal or state courts. Such an approach is counter to the intent of Congress. See McDonald v. Lederle Labs, 775 A.2d 528, 532 (N.J. Super. Ct. App. Div. 2001) (affirming the lower court's dismissal of the suit under circumstances similar to the instant case).

Plaintiffs also maintain that the requirement of first having to commence an action in the Vaccine Court is unconstitutional. No authority is cited in support of this proposition. The Vaccine Act does not preclude the bringing of a suit in federal or state Courts. It merely provides that suit must first be maintained in the special Court. If the litigant exhausts remedies there and

3

is dissatisfied with the results, then the Act does not preclude subsequent tort actions being brought in federal or state Courts[1]. Weighing the purpose of the Act to have claims quickly, expeditiously and consistently resolved on a no-fault basis by first requiring litigants to proceed in Vaccine Court, certainly does not constitute such an onerous burden as to render the Act unconstitutional.

> The preclusive application of the Act, which prevents plaintiff in her representative capacity from pursing a civil action does not represent an "absurd or unjust result," that would permit us from disregarding its plain language. *United States v. Shriver*, 989 F.2d 898, 901 (7th Cir. 1993). It is, instead, consistent with the stated purpose of avoiding the public harm that would result from either a loss or decline in the production of necessary vaccines. Simply put, Congress wants victims to first try the Program with the expectation that its results will be accepted. Unless a petitioner is required to fully adjudicate a claim, pursuant to the Program's expedited procedures, Congress's objectives will not be realized. McDonald v. Lederle Labs, supra., 775 A.2d 528, 534-535.

Consequently, this case is dismissed/discontinued pursuant to the provisions of the Vaccine Act.[2]

BY THE COURT:

DATED: December 16, 2002

_____
DiNUBILE, JR., J.

---

[1] The Act provides the tolling of the statute of limitations during the pendency of the action before the Vaccine Court.

[2] Plaintiffs also argue that they as parents do not qualify under the Act since they seek medical expenses on their own behalf. They assert that this action for medical bills is not covered under the Vaccine Act. To the contrary, the Act permits reimbursement for medical bills incurred by or on behalf of a minor.

4

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
CIVIL TRIAL DIVISION

ALAN J. CHESKIEWICZ, ET AL.      :     MAY TERM, 2002
                                   NO. 0952

        VS.                :

AVENTIS PASTEUR, INC., ET AL.     :     CONTROL NO. 100957

**O R D E R**

AND NOW, this 16th day of December, 2002, the Defendants' Preliminary Objections are

Sustained. This case is Discontinued pursuant to the dictates of the National Childhood Vaccine

Injury Act.

                        BY THE COURT:

                        _____
                        DiNUBILE, JR., J.

16

Received 01/15/2003 09:58 in 07:14 on line [10] for BM00340 Printed 01/15/2003  10:06 * Pg 2/19
09:59 JAN 15, 2003                                    TEL NO: 5901015                    #16527  PAGE: 2/19

ESD
1-15-03

**IN THE UNITED STATES DISTRICT COURT**

FILED - CLERK
U.S. DISTRICT COURT

**FOR THE EASTERN DISTRICT OF TEXAS**

2003 JAN 15  AM 8: 04

TX EASTERN - LUFKIN

**LUFKIN DIVISION**

BY_____ DH

| | |
|---|---|
| KIRK BOTTER and DARLA BOTTER § <br> Individually and as Next Friend of <br> CODY WYATT BOTTER §  | |
| VS. | § CIVIL ACTION NO. 9:02 CV 181 |
| AVENTIS PASTEUR, INC., § <br> Individually and as Successor-in-Interest <br> to CONNAUGHT LABORATORIES, § <br> INC., et. al. | |

## ORDER

Plaintiffs Kirk Botter and Darla Botter bring this suit, individually and as legal

representative of their minor child, Cody Wyatt Botter, pursuant to Texas state law,

against Defendants Aventis Pasteur, Inc. ("Aventis") f/k/a Connaught Laboratories

f/d/b/a Pasteur Merieux Connaught; Sigma Aldrich, Inc. and Sigma Aldrich

Corporation ("Sigma Inc."); the Dow Chemical Company ("Dow"); Eli Lilly and

Company ("Eli Lilly"); GDL International, Inc. ("GDL"); GlaxoSmithKline,

Individually and as Successor-in-Interest to  Smith Kline Beecham Corporation

("Smith Kline"); Merck and Company, Inc. ("Merck");  EM Industries, Inc. ("EM");[1]

Taylor Medical;  and Wyeth ("Wyeth") d/b/a Wyeth, Inc., Wyeth Laboratories,

---

[1] Plaintiffs have dismissed their claims against EM Industries, Inc.



1

Received 01/15/2003 09:58 in 07:14 on line [10] for BM00340 Printed 01/15/2003  10:06 * Pg 3/19
10:00 JAN 15, 2003                        TEL NO: 5901015              #10527  PAGE: 3/19

Wyeth-Ayerst, Wyeth-Ayerst Laboratories, Wyeth Lederle, Wyeth Lederle Vaccines, and Lederle Laboratories, and f/k/a American Home Products, Corp. Plaintiffs' complaint alleges the following causes of action: strict liability, negligence, gross negligence, fraud & conspiracy, and negligence in marketing. In their prayer for relief, the parents seek damages for loss of consortium of their child, Cody Wyatt.

Before the Court are the Vaccine Manufacturer Defendants' Rule 12(b) and 12(c) Motion to Dismiss (doc. # 12) brought by Aventis Pasteur, Merck, Wyeth, and Smith Kline; Eli Lilly and Co.'s Motion to Dismiss or Stay Proceedings (doc. # 4) and its Amended Motion to Dismiss (doc. # 31); Sigma-Aldrich Inc.'s Motion to Dismiss (doc. # 6), its Alternative Motion to Stay Proceedings (doc. #33), its Supplemental Motion to Dismiss (doc. # 34), and its second Supplemental Motion to Dismiss (doc. # 60); Aventis Pasteur Inc.'s Motion to Dismiss (doc. # 12); and Dow Chemical's Motion to Dismiss or Stay Proceedings and for Summary Judgment (docs. # 38 and # 39). After due consideration of the briefing and oral arguments of the parties and the relevant law, the Court finds that the motions are well taken in part and should be GRANTED IN PART.

## BACKGROUND

Plaintiffs claim their son, Cody Wyatt, was exposed to harmful levels of mercury received through injections of routine childhood vaccinations administered

2

Received 01/15/2003 09:58 in 07:14 on line [10] for BW00340 Printed 01/15/2003  10:06 * Pg 4/19
10:00 JAN 15, 2003                                    TEL NO: 5901015                                #10527  PAGE: 4/19

to him by his pediatrician during the first eighteen months of his life, from April 16, 1998 through December 10, 1999.  Plaintiffs allege that Cody now suffers, and in the future will continue to suffer, the toxic neurological effects of mercury poisoning as a result of certain Defendants'[2] negligent use of thimerosal preservative, containing mercury, in their vaccines. The Complaint, filed originally in the District Court of Angelina County, Texas, states that in the 1980's, the FDA proposed a regulation requiring the removal of thimerosal from all over-the-counter products and that in July of 1999 the American Academy of Pediatrics advised its members to use thimerosal-free vaccines due to concern regarding mercury poisoning.

Defendants removed the case from Angelina County claiming this Court has diversity and federal question jurisdiction under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-1, *et seq.*

Defendants assert the affirmative defense that the National Childhood Vaccine Injury Act ("The Act") prohibits a civil suit against a vaccine manufacturer or administrator for damages greater than $1,000 if the damages arise from a vaccine related injury or death and urge the Court to dismiss the case because Plaintiffs have not filed first with the U.S. Court of Federal Claims ("Vaccine Court") as required by the Act. In the alternative, Defendants request that we stay proceedings pending the

---

[2]The Complaint does not specify which of the Defendants to which it refers.

3

Received 01/15/2003 09:58 in 07:14 on line [10] for BH00340 Printed 01/15/2003 10:06 * Pg 5/19
10:00 JAN 15, 2003                                    TEL NO: 5901015                    #10527  PAGE: 5/19

outcome of the suit before the Vaccine Court.[3]

## DISCUSSION

<u>Claims Against Vaccine Manufacturers</u>:

The National Childhood Vaccine Injury Act of 1986 sets forth a scheme for compensation for vaccine-related injuries or death. 42 U.S.C. § 300aa-11 (1988 ed., as amended 2002) . Congress recognized that the "[v]accination of children against deadly, disabling, but preventable infectious diseases has been one of the most spectacularly effective public health initiatives this country has ever undertaken. Use of vaccines has prevented thousands of children's deaths each year and has substantially reduced the effects resulting from disease." H.R. Rep. No. 99-908, at 4 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6345. However, while most children enjoy measurable benefit from immunization programs, "a small but significant number of have been gravely injured." *Knudsen v. Secretary of HHS*, 35 F.3d 543, 549 (Fed. Cir. 1994) (quoting H.R.Rep. No. 99-908, at 3, *reprinted in* 1986 U.S.C.C.A.N. 6344).

Congress, therefore, enacted the Act to streamline the process of seeking compensation for vaccine-related injuries and to avoid the inconsistency, expense, and unpredictability of the tort system. *Shalala v. Whitecotton,* 514 U.S. 268, 269,

---

[3]While some Defendants state additional grounds for their motions to dismiss, pending motions use the Vaccine Act provisions as a main basis for their motions to dismiss or to stay.

4

Received 01/15/2003 09:30 in 07:14 on line [10] for BM00340 Printed 01/15/2003  10:06 * Pg 6/19
10:01 JAN 15, 2003                              TEL NO: 5901015              #10527  PAGE: 6/19

115 S.Ct. 1477, 1478, 131 L.Ed.2d 374 (1995). The program established by the

Act is designed to "ensure that all children who are injured by vaccines have access

to sufficient compensation for their injuries," H.R. Rep. No. 99-908 at 6345- 6346,

and "free[s] manufacturers from the specter of large, uncertain tort liability, and

thereby ... keep[s] manufacturers in the market." *Schafer v. Am. Cyanamid Co.*, 20

F.3d 1, 4 (1st Cir. 1994).

The Program, set forth in the Vaccine Act, requires vaccine-related claims

to be initially heard by special masters in the United States Court of Federal Claims

("Vaccine Court"), adjudicated informally and then accorded expeditious review.

*See Whitecotton*, 514 U.S. at 270, 115 S.Ct. at 1478. This system streamlines the

claims process by establishing standards of proof, under which individuals who

suffer injuries within specified intervals after being administered a vaccine, benefit

from a presumption that a vaccine caused those injuries. *See* 42 U.S.C. §§

300aa-11(c)(1)(C)(i), 300aa-13(a)(1), 300aa-14; *Haggerty v. Wyeth Ayerst Pharm.*,

79 F.Supp.2d 182, 184 (E.D.N.Y. 2000). A Program claimant may not file a civil

action against a vaccine manufacturer or administrator unless the claimant initially

files a timely petition in accordance with the Program's guidelines.[4]  *See* 42 U.S.C.

---

[4]A proper claimant, or "petitioner," under the Vaccine Act is "any person who has
sustained a vaccine-related injury," or the legal representative of such person. 42 U.S.C. §
300aa-11(b)(1)(A).

5

Received 01/15/2003 09:58 in 07:14 on line [10] for BN00340 Printed 01/15/2003  10:06 * Pg 7/19
10:01 JAN 15, 2003                              TEL NO: 5901015                    #10527  PAGE: 7/19

§ 300aa-11(2)(A); *Whitecotton*, 514 U.S. at 270, 115 S.Ct. at 1478 (explaining that

a claimant alleging an injury after the Vaccine Act's effective date "must exhaust

the Act's procedures ...before filing any de novo civil action in state or federal

court."). If a claimant seeks compensation in a state or federal court for

vaccine-related injuries prior to exhausting his or her remedies under the Vaccine

Act, the Court must dismiss the action. *See* 42 U.S.C. § 300aa-11(a)(2)(B). Simply

put, individuals who qualify as Program claimants must file petitions in the

Vaccine Court in order to pursue any vaccine-related claims at all.[5] If an individual

who prevails in the Vaccine Court is ultimately dissatisfied with his or her Program

award, that individual may reject the award and pursue a traditional tort action in

any forum[6]. *See* 42 U.S.C. § 300aa-21(a).

---

[5] De minimis claims for less than $1,000, however,  may be brought in state or federal courts without prior filing under the Vaccine Program. See 42 U.S.C. § 300aa-11(a)(2)(A). The Vaccine Act requires that any vaccine-related action seeking an unspecified amount of damages be filed under the Program. *Id.*

[6] Under the Program, the compensation awarded to a petitioner for a vaccine-related injury may include actual and un-reimbursable expenses and projected expenses for medical or other remedial care determined to be reasonably necessary; actual and anticipated lost earnings; and actual and projected pain and suffering subject to a statutory cap of $250,000. See 42 U.S.C. § 300aa-15(a). Punitive and exemplary damages are prohibited. See 42 U.S.C. § 300aa-15(d). Reasonable attorneys' fees and costs are awarded even if the petition is denied, so long as the special master determines that the petition was brought in good faith and that a reasonable basis for asserting the claim existed. See 42 U.S.C. § 300aa-15(e). In the event that a petitioner chooses to reject a Program award, the Vaccine Act limits the tort remedies that become available. For instance, the Vaccine Act establishes compliance with Food and Drug Administration ("FDA") requirements as a partial defense for manufacturers, see 42 U.S.C. § 300aa-22(b)(2), and requires tort suits to be tried in three phases (liability, general damages and punitive damages). See 42 U.S.C. § 300aa-23(a). Moreover, a manufacturer's compliance with FDA guidelines generally precludes an award of punitive damages. See 42 U.S.C. § 300aa-23(d).

Received 01/15/2003 09:58 in 07:14 on line [10] for BH00340 Printed 01/15/2003  10:06 * Pg 8/19
10:02 JAN 15, 2003                          TEL NO: 5901015                    #10527  PAGE: 8/19

At the time of institution of this lawsuit the Plaintiffs had not filed a petition in the Court of Federal Claims.  Plaintiffs' initial position was that they were not required to file originally in the Vaccine Court because the Vaccine Act does not require such a filing when the injury involved is not "vaccine-related." Plaintiffs have since informed the Court that they have filed a claim before the Vaccine Court in mid-December, 2002.

The term vaccine-related injury "does not include an illness, injury, condition or death associated with an adulterant or contaminant intentionally added to a vaccine." 42 U.S.C. § 300aa-33(5). Plaintiffs asserted that Cody's injuries were cause by thimerosal, which they claim is  an "adulterant or contaminant" intentionally added to a vaccine and that, therefore, this lawsuit does not involve a "vaccine- related" injury as defined by the Vaccine Act. The Defendants, however, contend that thimerosal is not an "adulterant or contaminant," but rather, a "constituent material" of vaccines.  In the face of overwhelming authority holding that thimerosal is a constituent material of the vaccines in question and is not an

7

Received 01/15/2003 09:58 in 07:14 on line [10] for BN00340 Printed 01/15/2003  10:06 * Pg 9/19
10:02 JAN 15, 2003                                    TEL NO: 5901015                    #10527  PAGE: 9/19

adulterant or contaminant, Plaintiffs have all but abandoned their position.[7] The following cases have found  injuries from thimerosal are "vaccine-related" under the Vaccine Act: *Liu v. Aventis Pasteur*, 219 F.Supp.2d 762 (W.D.Tex. 2002); *Owens v. Am. Home Prods. Corp.*, 203 F.Supp.2d 748 (S.D.Tex. 2002); *McDonald v. Abbott Labs*, 02-77 (S.D.Miss. Aug. 1, 2002); *Collins v. Am. Home Prods. Corp.*, 01-979 (S.D.Miss. Aug. 1, 2002); *Stewart v. Am. Home Prods. Corp.*, 02-427 (S.D.Miss. Aug. 1, 2002); *Strauss v. American Home Prod. Corp.*, 208 F.Supp.2d 711 (S.D.Tex. 2002); *Blackmon v. American Home Prod. Corp.*, Cause No. G-02- 179 (S.D.Tex. May 8, 2002); *O'Connell v. American Home Products Corp.*, 2002 WL 31455729 (S.D. Tex. May 7, 2002); *Wax v. Aventis Pasteur Inc.*, __ F. Supp.2d. __, 2002 WL 31444878 (E.D.N.Y. Oct. 30, 2002); *Bertrand v. Aventis Pasteur Laboratories, Inc.*, 226 F.Supp.2d 1206 (D. Ariz. 2002); *Leroy v. Secretary of Dept. of Health and Human Services*, 2002 WL 31730680 (Fed. Cl. Oct. 11, 2002).

Additionally, the Department of Health and Human Services has taken the position that thimerosal is not an adulterant or contaminant of vaccines.  See "Statement of Interest" in *King ex rel King v. Aventis Pasteur, Inc.*, 210 F. Supp.2d 1201 (D. Or. 2002).

---

[7]See statement of Plaintiffs' counsel at the October 28, 2002 hearing held on motions, transcript of hearing at page 24.

Received 01/15/2003 07:06 in 07:14 on line [10] for BM00340 Printed 01/15/2003  10:06 * Pg 10/19
10:02 JAN 15, 2003                              TEL NO: 5901015                    #10527  PAGE: 10/19

Since the institution of this lawsuit and the filing of the motions under

consideration here, Congress passed the Homeland Security Act of 2002 ("HSA"),

which was enacted on November 25, 2002. The Homeland Security Act contains

certain clarifying amendments to the Vaccine Act.  According to § 1717 of the its

provisions, the clarifying provisions became effective on the date of enactment and

govern this case.[8]

The first amendment which directly affects this case is the clarification of

the term "vaccine." This term is amended to include "all components and

ingredients listed in the vaccine's product license application and product label."

42 U.S.C. §300aa-33(7) as clarified by § 1716 of the HSA.[9]  It is clear that this

definition would include thimerosal, if it was a component or ingredient listed in

the vaccine's product application and product label. While the Court has no

---

[8]"The amendments made by sections 1714, 1715, and 1716 shall apply to all actions or proceedings pending on or after the date of enactment of this Act, unless a court of competent jurisdiction has entered judgment (regardless of whether the time for appeal has expired) in such action or proceeding disposing of the entire action or proceeding."

[9]§ 1716. CLARIFICATION OF DEFINITION OF VACCINE.

Section 2133 of the Public Health Service Act (42 U.S.C.§ 300aa-33) is amended by adding at the end the following:
"(7) The term 'vaccine' means any preparation or suspension, including but not limited to a preparation or suspension containing an attenuated or inactive microorganism or subunit thereof or toxin, developed or administered to produce or enhance the body's immune response to a disease or diseases and includes all components and ingredients listed in the vaccines's product license application and product label."

9

Received 01/15/2003 09:36 in 07:14 on Line [10] for BM00340 Printed 01/15/2003 10:06 * Pg 11/19
10:03 JAN 15, 2003                    TEL NO: 5901015                    #10527  PAGE: 11/19

evidence of what was listed on the product application or label, given the fact that the FDA had apparently widely approved the use of thimerosal as a vaccine preservative since the 1930's, and required that preservatives be added to vaccines distributed in multi-use vials,[10] it seems logical to assume that thimerosal was listed on either the product application or label of the vaccines used in this case.

Even if this is not the case, in light of the overwhelming case law and the HHS's interpretation holding that thimerosal is not an "adulterant or contaminant," but rather, a "constituent material" of vaccines, the Court finds that the claims of Cody Wyatt Botter against the Vaccine Manufacturers[11] concern a "vaccine related injury" and are covered by the provisions of the Vaccine Act.

Claims Against Non-Manufacturers:

Because of the recent enactment of the Homeland Security Act of 2002, Defendants Sigma-Aldrich and Eli Lilly join in the motion of the Vaccine Manufacturers. They do so based upon the second amendment to the Vaccine Act

---

[10] See C.F.R. § 610.15(a) and C.F.R. § 610.15.

[11] While Plaintiffs' Complaint does not specify which of the Defendants are "Vaccine Manufacturers," the following Defendants have identified themselves as such by their motion "Vaccine Manufacturer Defendants' Rule 12(b) and 12(c) Motion to Dismiss (doc. 12)":Merck and Company, Inc. ("Merck"); Wyeth ("Wyeth") f/k/a American Home Products, Corp.;Aventis Pasteur, Inc. ("Aventis"); Smith Kline Beecham Corporation ("Smith Kline").

10

Received 01/15/2003 09:56 in 07:14 on line [10] for BH00340 Printed 01/15/2003 10:06 * Pg 12/19
10:03 JAN 15, 2003                    TEL NO: 5901015              #10527  PAGE: 12/19

which clarifies the term "manufacturer."[12] This amendment shows that it is Congress' intention that the protections of the Vaccine Act cover distributors of components of vaccines. Section 1714 amends 42 U.S.C. §300aa-33(3) to define "manufacturer" to include any corporation, organization, or institution which manufactures, imports, processes, or distributes any vaccine set forth in the Vaccine Injury table, including any component or ingredient of any such vaccine.... The term "manufacture" means to manufacture, import, process or distribute a vaccine, including any component or ingredient of any such vaccine.

In addition Eli Lilly and Dow move to dismiss the Plaintiffs' claims against them, or in the alternative, for stay of the proceedings until the termination of the action before the Vaccine Court.[13] Dow also moves for summary Judgment. Both Lilly and Dow claim they did not manufacture or distribute the thimerosal or vaccines that allegedly caused Cody Botter's injuries. Eli Lilly contends it stopped distributing childhood vaccines prior to 1980, and all vaccines in 1985, and

---

[12]SEC. 1714. CLARIFICATION OF DEFINITION OF MANUFACTURER.
Section 2133(3) of the Public Health Service Act (42 U.S.C. 300aa-33(3)) is amended—
(1) in the first sentence, by striking "under its label any vaccine set forth in the Vaccine Injury Table" and inserting "any vaccine set forth in the Vaccine Injury table, including any component or ingredient of any such vaccine"; and
(2) in the second sentence, by inserting "including any component or ingredient of any such vaccine" before the period.

[13]While Lilly's motion is titled a Motion to Dismiss, it is converted to a motion for summary judgment under Rule 56 by the addition of evidence beyond the pleadings. Fed. R. Civ. P. 12(c).

11

Received 01/15/2003 09:58 in 07:14 on line [10] for BM00340 Printed 01/15/2003  10:06 * Pg 13/19
10:04 JAN 15, 2003                    TEL NO: 5901015                    #10527  PAGE: 13/19

stopped distributing thimerosal by 1992. *See* Affidavit of Scott Fishman, Exhibit "A" to Lilly's motion. Dow states it has not manufactured vaccines or been licensed to do so since 1978. See Dow's Motion to Dismiss, at page 3.

Sigma-Aldrich Corporation and Sigma-Aldrich, Inc. also move to dismiss or, in the alternative, to stay, claiming they did not manufacture the vaccines or thimerosal at issue in this case.

These Defendants ask this Court to enter a no-liability judgment in their favor despite the Court's need to dismiss or stay the Plaintiffs' claims against the vaccine manufacturers until the Plaintiffs follow the exhaustion requirements of the Vaccine Act.  In the alternative, these Defendants seek a dismissal of the claims against them or a stay of proceedings under the same posture as the vaccine manufacturers. Plaintiffs raise many of the same claims against these Defendants as against the vaccine manufacturer Defendants, including strict liability, negligence in the manufacture, marketing and/or sale of mercury contained in vaccine products, gross negligence, and fraud and conspiracy, and loss of consortium. To rule on the merits of some Defendants' substantive defenses would require a period of discovery allowing the Plaintiffs to investigate the Defendants' contentions. To allow the Plaintiffs to conduct discovery on some Defendants during the pendency of the minor's claims under the Vaccine Act against other

12

Received 01/15/2003 09:__ in 07:14 on line [10] for BM00340 Printed 01/15/2003  10:06 * Pg 14/19
10:04 JAN 15, 2003                              TEL NO: 5901015                        #10527  PAGE: 14/19

Defendants is inconsistent with Congress's goal of minimizing litigation costs.

Therefore, the Court will stay any discovery until the termination of Plaintiffs'

action before the Vaccine Court rather than allow discovery on some Defendants.

<u>Kirk and Darla Botters' Individual Claims:</u>

Kirk and Darla Botter bring claims individually and as next friend of their

son. Individually, they seek recovery for all past and future costs associated with

Cody's injuries, lost wages and income, emotional distress, loss of consortium and

loss of services. *See* First Amended Petition, at 17. Under the Vaccine Act, "any

person who has sustained a vaccine-related injury" or "the legal representative of

such person if such person is a minor or is disabled," may file a petition for

compensation in the Court of Federal Claims. 42 U.S.C. § 300aa-11(b)(1)(A). An

individual may only file a petition on his own behalf if he received a vaccine and

alleges a resulting injury. 42 U.S.C. §§ 300aa-11(b)(1)(A) & 300aa-11(c)(1)(A).

Thus, Kirk and Darla Botter can only bring their claims as next friend of Cody, not

their individual claims, in the Court of Federal Claims.

The Defendants move to dismiss the Botter's individual claims for damages

because they are derivative of Cody's claims, are duplicative of damages available

under the Vaccine Act, or are not cognizable under Texas law. However, if the

Court dismissed the parents' claims, their statutes of limitations could expire while

13

10:04 JAN 15, 2003    Received 01/15/2003 09:56 in 07:14 on line [10] for BM00340 Printed 01/15/2003  10:06 * Pg 15/19
                                              TEL NO: 5901015                        #10527   PAGE: 15/19

the parents are representing Cody's' claims in the Court of Federal Claims.[14]

The Plaintiffs seek to proceed upon their individual claims during the pendency of their case before the Vaccine Court. It is clear that all of the individual claims of Kirk and Darla Botter, including the loss of consortium claim, are derivative of the claim of Cody Wyatt Botter. *Reagan v. Vaughn*, 804 S.W.2d 463, 466 (Tex. 1990); *Whittlesey v. Miller*, 572 S.W.2d 665, 667 (Tex. 1978); *Harris County v. White*, 823 S.W.2d 385, 388 (Tex.App.--Texarkana 1992, *no writ*); *Nash v. Selinko*, 14 S.W.3d 315, 317 (Tex.App.--Houston [14th Dist.] 1999, *pet. denied*). Since the underlying claim must proceed first in the Vaccine Court, judicial economy and concern for consistent results suggests the prudent course of action would be to allow the underlying cause before the Vaccine Court to terminate before proceeding with these individual claims.

The Court has discretion to stay proceedings. *Black Sea Inv., Ltd. v. United Heritage Corp.*, 204 F.3d 647, 649 (5th Cir. 2000). Courts often stay proceedings to avoid interference with related proceedings in another forum and to avoid the waste of duplication. *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751

---

[14]Tex. Civ. Prac. & Rem. Code § 16.003 (two-year statute of limitations in personal injury cases). The Vaccine Act does not toll the statute of limitations for the parents' claims while they are representing their child in the Court of Federal Claims. The Vaccine Act does, however, toll the statute of limitations for the minor's state law claims while his petition is pending before the court. 42 U.S.C. § 300aa-16(c). For the child's claims against the Defendants who do not manufacture vaccines, the statute of limitations will not begin to run until he reaches the age of majority. Tex. Civ. Prac. & Rem. Code § 16.001.

14

10:05 JAN 15, 2003   Received 01/15/2003 09:58 in 07:14 on line [10] for BM00340 Printed 01/15/2003  10:06 * Pg 16/19
TEL NO: 5901015                                        #10527  PAGE: 16/19

F.2d 721, 728-29 (5th Cir. 1985) ("The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result."). The parents' claims brought on behalf of their minor son must first be heard in the Court of Federal Claims. Dismissing the parents' individual claims during the pendency of that court's jurisdiction might preclude the parents from bringing their claims in any forum. Accordingly, the Court will stay all proceedings in Kirk and Darla Botters' individual causes of action against all Defendants until Cody Wyatt Botter's claims have been administered in the Court of Federal Claims under the Vaccine Act.

CONCLUSION

For the foregoing reasons, IT IS ORDERED that

the Vaccine Manufacturer Defendants' Rule 12(b) and 12(c) Motion to Dismiss (doc. # 12) brought by Aventis Pasteur, Merck, Wyeth, and Smith Kline is GRANTED IN PART as to the claims of Cody Wyatt Botter to be presented in the Court of Federal Claims, and their Alternative Motion to Stay is GRANTED IN PART as to Kirk and Darla Botter's individual causes of action;

Eli Lilly and Co.'s Motion to Dismiss (doc. # 4) and its Amended Motion to Dismiss (doc. # 31) are GRANTED IN PART as to the claims of Cody Wyatt

15

Received 01/15/2003 09:58 in 07:14 on line [10] for BW00340 Printed 01/15/2003 10:06 * Pg 17/19
10:05 JAN 15, 2003                               TEL NO: 5901015                #10527  PAGE: 17/19

Botter to be presented in the Court of Federal Claims, and their Alternative Motion

to Stay Proceedings is GRANTED IN PART as to Kirk and Darla Botter's

individual causes of action;

Sigma-Aldrich Inc.'s Motion to Dismiss (doc. # 6), its Supplemental Motion

to Dismiss (doc. # 34), and its second Supplemental Motion to Dismiss (doc. # 60)

are GRANTED IN PART as to the claims of Cody Wyatt Botter to be presented in

the Court of Federal Claims, and its Alternative Motion to Stay Proceedings (doc.

#33) is GRANTED IN PART as to Kirk and Darla Botter's individual causes of

action;

Dow Chemical's Motion to Dismiss or Stay Proceedings (docs. # 38) is

GRANTED IN PART as to the claims of Cody Wyatt Botter to be presented in the

Court of Federal Claims, and their Alternative Motion to Stay is GRANTED IN

PART as to Kirk and Darla Botter's individual causes of action. Dow's Motion for

Summary Judgment (doc. # 39) is DENIED without prejudice to refiling upon a

change of status of the case.

IT IS FURTHER ORDERED that Cody Wyatt Botter's claims against all

Defendants are DISMISSED without prejudice to refiling;

IT IS FURTHER ORDERED that Plaintiffs' claims brought in their

individual capacities are STAYED pending further order of this Court;

16

Received 01/15/2003 09:58 in 07:14 on line [10] for BM00340 Printed 01/15/2003  10:06 * Pg 18/19
10:05 JAN 15, 2003                          TEL NO: 5901015                    #10527  PAGE: 18/19

IT IS FURTHER ORDERED that the Plaintiffs shall file a status report with this Court every six months from the date of this Order, informing the Court of the status of their petition filed on behalf of Cody Wyatt Botter in the Court of Federal Claims.

IT IS FURTHER ORDERED that this case be administratively closed pending the outcome of the Vaccine Court proceedings.

IT IS FINALLY ORDERED that any party may move for a lifting of the stay or other relief upon a change of circumstances.

SIGNED this ___13th___ day of January, 2003.

JOHN HANNAH, JR.
UNITED STATES DISTRICT JUDGE

17

Received 01/15/2003 09:58 in 07:14 on line [10] for BM00340 Printed 01/15/2003  10:06 * Pg 19/19
10:06 JAN 15, 2003                          TEL NO: 5901015                    #10527  PAGE: 19/19

January 15, 2003

Re:  9:02-cv-00181

Notice sent to:

      Reich O Chandler  
      George Edmond Chandler  
      Charles S Siegel  
      Charles Andrew Waters  
      Rebecca Jo Reser  
      John Ralph Gilbert  
      Sandra L Phillips  
      Erik Verne Larson  
      Diana Lynn Panian  
      Barclay A Manley  
      Stephanie Ann Smith  
      Claude Edward Welch  
      Richard L Josephson  
      Paul Reichert Elliott  
      David Michael Macdonald  
      Sudie Thompson  
      Jennifer Dawn Liebhauser  
      John Anthony Scully  
      Marcos A Adrogue  
      Michael R Klatt  
      Susan E Burnett  
      Daniel J Thomasch  
      Lauren J Elliott  
      Richard W Mark  

JH-M

17

IN THE CIRCUIT COURT FOR THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, STATE OF FLORIDA
GENERAL CIVIL DIVISION

DRAGAN RADULOVIC AND TATJANA
RADULOVIC, Individually and as Next Friend of
Minor, MARK RADULOVIC,                                    CASE NO. 02-05033

     Plaintiffs,                                               DIVISION J

vs.

AMERICAN HOME PRODUCTS d/b/a WYETH CO.,
WYETH-AYERST LABORATORIES and LEDERLE
LABORATORIES, INC.; AVENTIS PASTEUR, INC.,
Individually and as Successor-in-Interest to CONNAUGHT
LABORATORIES, INC.; BAXTER PHARMACEUTICAL
PRODUCTS, INC.; ELI LILLY AND COMPANY; GDL
INTERNATIONAL, INC.; GLAXOSMITHKLINE,
Individually and as Successor-in-Interest to SMITHKLINE
BEECHAM CORP.; GLAXOSMITHKLINE BELGIUM;
MERCK & CO., INC.; PARKE-DAVIS, through its parent
companies, WARNER-LAMBERT CO. and PFIZER INC.;
SIGMA-ALDRICH, INC.; SPECTRUM LABORATORY
PRODUCTS; GRUPO URIACH, Individually and as
Successor-in-Interest to URQUIMA, FLORIDA INFUSION
SERVICES, a Florida Corporation
JOHN DOE CORPORATE DEFENDANTS 1-10;
EDWARD T. WILLIAMS, III, M.D.; FLORIDA
POWER AND LIGHT COMPANY; TAMPA ELECTRIC
COMPANY; and FLORIDA POWER CORPORATION,

     Defendants.

_____/

**ORDER ON
AMENDED MOTION TO DISMISS
BY VACCINE-MANUFACTURER DEFENDANTS:
WYETH; LEDERLE; AVENTIS PASTEUR, INC.; MERCK & CO.;
SMITHKLINE BEECHAM; BAXTER HEALTHCARE CORP.;
AND FLORIDA INFUSION SERVICES
AND
MOTIONS TO DISMISS BY SPECTRUM LABORATORY PRODUCTS;
SIGMA-ALDRICH, INC; AND ELI LILLY AND COMPANY**

-1-

This matter having come before the Court for hearing on November 5, 2002 at 1:30 p.m., on (1) the Vaccine-Manufacturer Defendants: Wyeth; Lederle; Aventis Pasteur, Inc.; Merck & Co.; SmithKline Beecham; Baxter Healthcare Corp.; and Florida Infusion Services' Amended Motion to Dismiss, (2) Defendant Spectrum's Motion to Dismiss, (3) Defendant, Sigma-Aldrich, Inc.'s Motion to Dismiss, and (4) Defendant Eli Lilly and Company's Motion to Dismiss Plaintiffs' Complaint, and the Court having heard argument of counsel and being otherwise fully advised in the premises,

THE COURT FINDS THAT:

The attached order by Chief Special Master Golkiewicz in *Leroy vs. Secretary of the Department of Health and Human Services*, filed October 11, 2002 in the United States Court of Federal Claims, Office of Special Masters, Case No. 02-392V, is persuasive authority and its findings and conclusions as they pertain to the initial jurisdiction of the U.S. Court of Federal Claims over claims like those made in the above-styled action and, by application, the lack of initial jurisdiction of this Court over such claims, are adopted and incorporated fully herein; and

Plaintiffs have notified this Court that they voluntarily dismiss without prejudice all claims against GlaxoSmithKline Belgium; it is therefore:

ORDERED and ADJUDGED as follows:

All claims against alleged Vaccine-Manufacturer Defendants: Wyeth; Lederle; Aventis Pasteur, Inc.; Merck & Co.; SmithKline Beecham; Baxter Healthcare Corp.; Florida Infusion Services; and, alleged Thimerosal-Manufacturer Defendants: Spectrum Laboratory Products; Sigma-Aldrich, Inc.; and Eli Lilly and Company are dismissed without prejudice.

All claims against GlaxoSmithKline Belgium are dismissed without prejudice.

The plaintiffs shall have 60 days from the date of this order to serve an amended complaint to bring separate and distinct claims arising outside the administration of vaccines against alleged Thimerosal-Manufacturer Defendants: Spectrum Laboratory Products, Sigma-Aldrich, Inc., and Eli Lilly and Company.

DONE and ORDERED in Chambers in Hillsborough County, Florida this _____ day of November, 2002.

ORIGINAL SIGNED

NOV 19 2002

GREGORY P. HOLDER
CIRCUIT JUDGE

Gregory P. Holder
Circuit Court Judge

Copies furnished to counsel on attached service list

-3-

<u>SERVICE LIST</u>

| | |
|---|---|
| Lauren J. Elliot, Esq.<br>Daniel J. Thomasch, Esq.<br>Richard Mark, Esq.<br>Orrick, Herrington & Sutcliffe LLP<br>666 Fifth Avenue<br>New York, NY 10103<br>**National Counsel for American Home Products d/b/a**<br>**Wyeth and Lederle** | Hugh Smith, Esq.<br>David Nelson, Esq.<br>Smith & Fuller<br>Bank of America Plaza, Suite 1800<br>101 E. Kennedy Blvd.<br>Tampa, FL 33602<br>**Local Counsel for Wyeth and Lederle** |
| Marsha Piccone, Esq.<br>Faegre & Benson<br>2500 Republic Plaza<br>370 Seventeenth Street<br>Denver, CO 80202-4004<br>**National Counsel for Aventis Pasteur, Inc.** | James P. Murray, Esq.<br>Fowler White Burnett P.A.<br>Bank of America Tower<br>Seventeenth Floor<br>100 S.E. Second Street<br>Miami, FL 33131<br>**Local Counsel for Aventis Pasteur, Inc.,** |
| Barclay A. Manley, Esq.<br>Fulbright & Jaworski LLP<br>Suite 5100<br>1301 McKinney<br>Houston, TX 77010<br>**National Counsel for SmithKline Beecham Corp.** | Stephanie Smith, Esq.<br>Fulbright & Jaworski LLP<br>Suite 2400<br>600 Congress Avenue<br>Austin, TX 78702-3271<br>**National Counsel for SmithKline Beecham Corp.** |
| G. Calvin Hayes, Esq.<br>Barbara Ehrich Locke, Esq.<br>Holland & Knight LLP<br>Suite 3000<br>701 Brickell Avenue<br>Miami, FL 33131<br>**Local Counsel for SmithKlineBeecham Corp.** | Mark Hicks, Esq.<br>Jennifer Kerr, Esq.<br>Hicks, Anderson & Kneale, P.A.<br>Suite 900<br>799 Brickell Plaza<br>Miami, FL 33131<br>**Counsel for Florida Infusion Services, Inc.** |
| Chris Bayuk, Esq.<br>Bayuk & Associates, P.A.<br>Suite 1550<br>402 West Broadway<br>San Diego, CA 92101<br>**National Counsel for Spectrum Laboratory** | Lawrence D. Smith Jr., Esq.<br>Natasha K. Talib, Esq.<br>Walton Lantaff Schroeder & Carson<br>9350 South Dixie Highway<br>Miami, FL 33131<br>**Local Counsel for Spectrum Laboratory** |
| Raymond G. Kolts, Esq.<br>Dean & Kolts<br>2020 Lakewood Drive<br>Coeur d' Alene, ID 83834<br>**National Counsel for Sigma-Aldrich, Inc.** | Hugh J. Turner, Jr., Esq.<br>Pamela M. Holcombe, Esq.<br>Redgrave & Turner, LLP<br>Suite 450<br>120 East Palmetto Park Road<br>Boca Raton, FL 33432-9944<br>**Local Counsel for Sigma-Aldrich Inc.** |

| | |
|---|---|
| Richard L. Josephson, Esq.<br>Doug Roberson, Esq.<br>Baker Botts; LLP<br>One Shell Plaza<br>910 Louisiana<br>Houston, TX 77002-4995<br>**Counsel for Merck & Co.** | Brett J. Preston, Esq.<br>Hill, Ward & Henderson P.A.<br>Suite 3700<br>101 E. Kennedy Blvd.<br>Tampa, FL 33602<br>**Local Counsel for Merck & Co, Inc.** |
| Eric L. Lundt, Esq.<br>Heinrich Gordon Hargrove Weihe & James, P.A.<br>Suite 1000<br>500 East Broward Boulevard<br>Fort Lauderdale, FL 33394<br>**Counsel for Parke-Davis** | Richard J. McCrory, Esq.<br>Law Offices of Richard McCrory<br>540 Fourth Street North<br>St. Petersburg, FL 33701<br>**Counsel for Florida Power Corporation** |
| Deborah A. Moeller, Esq.<br>Shook, Hardy & Bacon, L.L.P.<br>One Kansas City Place<br>1200 Main Street<br>Kansas City, MO 64105-2118<br>**National Counsel for Eli Lilly** | David C. Banker, Esq.<br>Toby J. Bonar, Esq.<br>Shook Hardy & Bacon LLP<br>Suite 2900<br>100 North Tampa Street<br>Tampa, FL 33602-5810<br>**Counsel for Eli Lilly** |
| Benjamin Reid, Esq.<br>Carlton Fields, P.A.<br>Suite 4000 at International Place<br>100 S.E. 2nd Street<br>Miami, FL 33131<br>**Local Counsel for Baxter Pharmaceutical** | Lee Davis Thames, Esq.<br>Butler Snow O'Mara Stevens & Cannada<br>AmSouth Plaza, 17th Floor<br>210 East Capitol Street<br>Jackson, MS 39201<br>**National Counsel for Baxter Pharmaceutical** |
| L.H. Steven Savola, Esq.<br>Ferraro & Associates<br>Suite 3800<br>200 S. Biscayne Boulevard<br>Miami, FL 33131<br>**Counsel for Plaintiffs** | C. Lawrence Stagg, Esq.<br>Margaret D. Mathews, Esq.<br>Akerman, Senterfitt & Eidson P.A.<br>Suite 1500<br>100 S. Ashley Drive<br>Tampa, FL 33602<br>**Counsel for Tampa Electric Company** |

TPA1 #1256546 v2

-5-

18

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2003 MAR 10  AM 9: 48

U. S. ...

DARON SWAFFORD AND TINA SWAFFORD,
Individually and as Next Friend of JOEY
SWAFFORD,

Plaintiffs,

-vs-                                                           Case No.  A-03-CA-055-SS

AVENTIS PASTEUR, INC., et al.,
Defendants.

## ORDER

BE IT REMEMBERED on the __7__ day of March 2003 the Court reviewed the file in the

above-styled cause, specifically Sigma-Aldrich Corporation and Sigma-Aldrich, Inc.'s Motion to

Dismiss [#4] and alternative Motion to Stay [#5], the response [#21] and reply [#30]; the Vaccine

Defendants' Motion to Dismiss or Alternatively to Stay [#6] (to which no response has been filed);

Spectrum Laboratory Products, Inc.'s Motion to Dismiss [#7] and the response thereto [#22]; and

Eli Lilly and Company's Motion to Dismiss and/or to Stay [#23] and supplemental memorandum

thereto [#24] and Plaintiffs' response [#26].  Having considered the motions, responses, case file as

a whole and the applicable law, the Court enters the following opinion and orders.

### Factual and Procedural Background

The plaintiffs, Daron and Tina Swafford, are Texas residents and the parents of Joey

Swafford, who is approximately three years old.  *See* Petition, at ¶¶ 5, 23.  They appear in this

lawsuit as individuals and as next friend of Joey Swafford.  *Id.* at ¶ 5.  The plaintiffs contend their

son suffered and continues to suffer neurological damage because he was poisoned by mercury

contained in thimerosal, a preservative used in vaccines administered to him. *Id.* at ¶¶ 23-25. Joey received the vaccines between September 1, 1999 and approximately January 5, 2001. *Id.* at ¶ 5.

On December 31, 2002, the plaintiffs filed this lawsuit in the 345th Judicial District Court of Travis County, Texas, Cause No. GN204657. The plaintiffs raise causes of actions for strict liability; negligence in the manufacture, marketing and/or sale of mercury contained in vaccine products; gross negligence; fraud and conspiracy; and negligence in the marketing, licensing, and design of thimerosal. *Id.* at ¶¶ 29-69. The plaintiffs seek compensatory damages for expenditures necessitated by Joey Swafford's injuries, Joey Swafford's pain and suffering, all plaintiffs' lost wages and income, all plaintiffs' emotional distress and loss of consortium, and the lost services the plaintiffs could have provided to each other. *Id.* at 16. The plaintiffs also seek punitive damages for certain causes of action. *Id.* at 17. Defendant Wyeth, formerly known as American Home Products Corporation, removed the case to this Court on January 30, 2003 after having obtained consent of all other defendants. *See* Notice of Removal [#1].

Defendants Aventis Pasteur Inc. ("Aventis"), Wyeth, SmithKline Beecham Corporation ("SmithKline"), and Merck & Co., Inc. ("Merck") (collectively, "the Vaccine Manufacturers") move to dismiss or, in the alternative, to stay because the plaintiffs did not first file an administrative claim in the Court of Federal Claims as required by the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-11(a)(2)(A). Defendants Sigma-Aldrich Corporation, Sigma-Aldrich, Inc., Spectrum Laboratory Products, Inc. ("Spectrum") and Eli Lilly and Company ("Eli Lilly") move to dismiss or alternatively to stay on the same basis.

-2-

## Analysis

### I.    The Vaccine Act's Requirements

The defendants move to dismiss or, in the alternative, to stay the case because the plaintiffs did not first file a petition in the United States Court of Federal Claims. The National Childhood Vaccine Injury Act of 1986 ("the Vaccine Act") sets forth a scheme for compensation for vaccine-related injuries or death. 42 U.S.C. § 300aa-11. Congress enacted the Vaccine Act to streamline the process of seeking compensation for vaccine-related injuries and to avoid the inconsistency, expense and unpredictability of the tort system. *Shalala v. Whitecotton*, 514 U.S. 268, 270, 115 S.Ct. 1477, 1478 (1995) ("For injuries and death traceable to vaccinations, the Act establishes a scheme of recovery designed to work faster and with greater ease than the civil tort system."); H.R. Rep. No. 99-908 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6347 (noting for those injured by vaccines, "the opportunities for redress and restitution are limited, time-consuming, expensive, and often unanswered."). The Vaccine Act prevents plaintiffs from initiating lawsuits against vaccine administrators or manufacturers in state or federal court for unspecified amounts of damages resulting from vaccine-related injuries unless they first file a timely petition in the Court of Federal Claims for compensation under the Vaccine Act. 42 U.S.C. § 300aa-11(a)(2)(A); *see also Shalala*, 514 U.S. at 270, 115 S.Ct. at 1478. Petitions filed in the Court of Federal Claims are assigned to a special master familiar with Vaccine Act claims. 42 U.S.C. §§ 300aa-11(a)(1) & 300aa-12(d). The statute directs courts to dismiss such causes of action that were not first filed in the Court of Federal Claims. 42 U.S.C. § 300aa-11(a)(2)(B).

The plaintiffs have not filed a petition in the Court of Federal Claims. They contend the Vaccine Act does not require them to do so, because Joey Swafford's injuries are not vaccine-related.

-3-

The Vaccine Act defines a "vaccine-related injury" as "an illness, injury, condition, or death associated with one or more of the vaccines set forth in the Vaccine Injury Table, except that the term does not include an illness, injury, condition, or death associated with an adulterant or contaminant intentionally added to such vaccine." 42 U.S.C. § 300aa-33(5). The plaintiffs contend Joey's injuries are not "vaccine-related" because they were caused not by the vaccines themselves but by the thimerosal added to the vaccines as a preservative to deter microbial and fungal growth– an "adulterant . . . intentionally added to such vaccine." 42 U.S.C. § 300aa-33(5). The terms "adulterant" and "contaminant" are not defined in the Vaccine Act. Similarly, the plaintiffs argue their claims are not against "vaccine administrators" or "vaccine manufacturers" as defined under the Vaccine Act, because the defendants are manufacturers, distributors, designers and/or promoters of thimerosal itself, not a vaccine. 42 U.S.C. § 300aa-11(a)(2)(A).

The plaintiffs are unable to provide the Court any legal authority for their interpretation of the Vaccine Act as applied to thimerosal. On the contrary, it appears every federal court to have ruled on the issue, including this one, has held injuries resulting from thimerosal contained in vaccines are vaccine-related under the meaning of the Vaccine Act. *E.g., Strauss v. American Home Prod. Corp., et al,* Cause No. G-02-226 (S.D. Tex. June 11, 2002) (finding injuries from thimerosal are "vaccine-related" under the Vaccine Act); *Blackmon, et al v. American Home Prod. Corp.,* Cause No. G-02-179 (S.D. Tex. May 8, 2002) (same); *Owens v. American Home Prod. Corp.,* 203 F.Supp.2d 748 (S.D. Tex. 2002) (same). Additionally, the Department of Health and Human Services ("HHS") has taken the position that thimerosal is not an adulterant or contaminant of

-4-

vaccines.[1] Indeed, the HHS's determination that thimerosal is a component of vaccines,[2] not an adulterant, comports with common sense, since at the time Joey Swafford received the vaccines it was impossible to get the vaccines without thimerosal.

Moreover, the special masters in the Court of Federal Claims are experienced in Vaccine Act claims and are better equipped to handle thimerosal cases. The Court of Federal Claims has been inundated with cases alleging the thimerosal contained in vaccines caused neurodevelopmental disorders such as autism. *See* Vaccine Manufacturers' Motion to Dismiss, Ex. 3 ("Autism General Order #1"), at 1-2; Ex. 1 ("Ruling on Jurisdiction"). The plaintiffs' claims are identical to hundreds of those already before the Court of Federal Claims. The Office of Special Masters within that court recently established procedures to accommodate the thousands of thimerosal cases it expects to receive. *See* Autism General Order #1. While the Court of Federal Claims' acceptance of jurisdiction and creation of procedures is not binding on this Court, it indicates the entity with the most experience applying the Vaccine Act finds thimerosal cases within the statute's definition of a "vaccine-related injury" and is prepared and willing to handle such cases. *See also Collins vs. American Home Prod. Corp.*, Cause No. 3:01-CV-979LN (S.D. Miss. Aug. 1, 2002) (dismissing thimerosal claims because Autism Order #1 "foreclose[d] any reasonable possibility that the plaintiffs have stated a currently cognizable claim against the resident defendants."). The Court

---

[1] While the HHS's position is official, in that it is posted on the HHS web site and HHS has taken the position in court papers, it is not a regulation or other agency action entitled to judicial deference under the *Chevron* doctrine. *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984). However, the HHS's official position holds persuasive authority.

[2] The HHS regulation for general biological products standards includes "preservatives" in the category of "constituent materials," indicating the agency's view that preservatives are components of vaccines, not adulterants. 21 C.F.R. § 610.15.

holds thimerosal is not an adulterant or contaminant under the Vaccine Act and, thus, Joey Swafford's alleged injuries are vaccine-related. Accordingly, the Vaccine Act requires the Court to dismiss the parents' claims brought on behalf of Joey Swafford without prejudice to refiling after they have exhausted the requirements of the Vaccine Act.[3]

**II.    Daron Swafford and Tina Swafford's Individual Claims**

Daron and Tina Swafford bring claims individually and as next friend of their son, Joey Swafford. Individually, they seek recovery for all past and future costs associated with their son's injuries, lost wages and income, emotional distress, loss of consortium and loss of services. *See* Petition, at 16. Under the Vaccine Act, "any person who has sustained a vaccine-related injury" or "the legal representative of such person if such person is a minor or is disabled" may file a petition for compensation in the Court of Federal Claims. 42 U.S.C. § 300aa-11(b)(1)(A). An individual may only file a petition on his own behalf if he received a vaccine and alleges a resulting injury. 42 U.S.C. §§ 300aa-11(b)(1)(A) & 300aa-11(c)(1)(A). Thus, Daron and Tina Swafford can only bring their claims as next friend of Joey, not their individual claims, in the Court of Federal Claims.

The defendants move to dismiss Daron and Tina Swafford's individual claims for damages because they are derivative of Joey's claims, are duplicative of damages available under the Vaccine Act, or are not cognizable under Texas law. However, if the Court dismissed the parents' claims, their statutes of limitations could expire while they are representing their son's claims in the Court

_____

[3] To the extent the plaintiffs sued defendants that allegedly did not manufacture the thimerosal at issue in this case, the Court dismisses their claims on behalf of Joey Swafford against those defendants as well in the interest of judicial economy.

of Federal Claims.[4] Tex. Civ. Prac. & Rem. Code § 16.003 (two-year statute of limitations in personal injury cases). The Court has discretion to stay proceedings. *Black Sea Inv., Ltd. v. United Heritage Corp.*, 204 F.3d 647, 649 (5th Cir. 2000). Courts often stay proceedings to avoid interference with related proceedings in another forum and to avoid the waste of duplication. *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728-29 (5th Cir. 1985) ("The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result."). The parents' claims brought on behalf of their minor son must first be heard in the Court of Federal Claims. Dismissing the parents' individual claims during the pendency of that court's jurisdiction might preclude the parents from bringing their claims in any forum. Accordingly, the Court will stay all proceedings in Daron and Tina Swafford's individual causes of action against all defendants until their son's claims have been administered in the Court of Federal Claims under the Vaccine Act.

In accordance with the foregoing:

IT IS ORDERED that the Vaccine Manufacturers' Motion to Dismiss [#6] is GRANTED IN PART as to the claims of Joey Swafford to be presented in the Court of Federal Claims, and their Alternative Motion to Stay [#6] is GRANTED IN PART as to Daron and Tina Swafford's individual causes of action;

---

[4] The Vaccine Act does not toll the statute of limitations for the parents' claims while they are representing their child in the Court of Federal Claims. The Vaccine Act does, however, toll the statute of limitations for the minor's state law claims while his petition is pending before the court. 42 U.S.C. § 300aa-16(c). For the child's claims against the defendants who do not manufacture vaccines, the statute of limitations will not begin to run until he reaches the age of majority. *See* Tex. Civ. Prac. & Rem. Code § 16.001.

IT IS FURTHER ORDERED that Sigma-Aldrich Corporation and Sigma Aldrich, Inc.'s Motion to Dismiss [#4] is GRANTED IN PART as to the claims of Joey Swafford to be presented in the Court of Federal Claims, and their Alternative Motion to Stay Proceedings [#5] is GRANTED IN PART as to Daron and Tina Swafford's individual causes of action;

IT IS FURTHER ORDERED that Eli Lilly and Company's Motion to Dismiss [#23] is GRANTED IN PART as to the claims of Joey Swafford to be presented in the Court of Federal Claims, and its Alternative Motion to Stay [#23] is GRANTED IN PART as to Daron and Tina Swafford's individual causes of action;

IT IS FURTHER ORDERED that Spectrum Laboratory Products, Inc.'s Motion to Dismiss [#7] is GRANTED IN PART as to the claims of Joey Swafford to be presented in the Court of Federal Claims, and DENIED IN PART as to Daron and Tina Swafford's individual causes of action;

IT IS FURTHER ORDERED that plaintiffs' claims brought as next friend of Joey Swafford against all defendants are DISMISSED without prejudice to refiling;

IT IS FURTHER ORDERED that plaintiffs' claims brought in their individual capacities are STAYED pending further order of this Court;

IT IS FINALLY ORDERED that the plaintiffs SHALL FILE a status report with this Court on **November 7, 2003** informing the Court of the status of their petition, if any, filed on behalf of Joey Swafford in the Court of Federal Claims.

SIGNED this the ___7___ day of March 2003.

SAM SPARKS
UNITED STATES DISTRICT JUDGE

-8-



FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

FEB 2 5 2003

LUTHER D. THOMAS, Cle
By: _____
Deputy Cle

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

NATALIE MELECK MURPHY, as Next
Friend of JOSHUA MURPHY,

        Plaintiff,

    v.

AVENTIS PASTEUR, INC.,
Individually and as Successor-
in-Interest to Connaught
Laboratories, Inc., Pasteur
Merieux, and Pasteur Merieux
Connaught; WYETH (f/k/a
American Home Products
Corporation); SMITHKLINE
BEECHAM CORPORATION, d/b/a
GlaxoSmithKline; ELI LILLY AND
COMPANY; MERCK & CO., INC.;
GEORGIA POWER COMPANY[1];
SAVANNAH ELECTRIC AND POWER
COMPANY; AMERICAN DENTAL
ASSOCIATION; and GEORGIA
DENTAL ASSOCIATION,

        Defendants.

CIVIL ACTION

NO. 1:02-CV-2257-CAP

O R D E R

This matter is currently before this court on the plaintiff's

motion for remand as well as several motions to dismiss.

The plaintiff brought this civil suit on behalf of herself and

her minor child, alleging that her child suffers from the effects

of heavy metal poisoning, specifically mercury poisoning, due to

---

[1]By an order dated November 15, 2002, the allegations against
the Georgia Power Company were dismissed without prejudice.

the conduct of the defendants. This action was originally filed in state court. The defendants removed the action to this court invoking both the diversity of citizenship jurisdiction and the federal question jurisdiction of this court. The plaintiff has challenged the defendants' assertions of jurisdiction with a motion to remand. Since a court may not hear or decide a case when it lacks subject matter jurisdiction, this court must first address the question of whether the action was properly removed to federal court. For reasons stated below, the court finds that this action was improperly removed, but remand is not available because the action is within the subject matter jurisdiction of this court and the defect in the removal was not challenged within thirty (30) days of the notice of removal.

Many of the plaintiff's allegations and claims relate to injuries allegedly sustained as a result of receiving a vaccine. She sues several "vaccine manufacturer defendants".[2] Federal law requires such claims to be brought before the United States Court of Federal Claims before any civil action can be maintained in any state or other federal court with respect to any injuries sustained. The plaintiff here has not complied with that

---

[2]Aventis Pasteur, Inc.; Wyeth; SmithKline Beecham Corporation; and Merck & Co. are collectively referred to as the vaccine manufacturer defendants. The plaintiff's allegations make significant distinctions between these defendants.

requirement. Thus, the vaccine manufacturer defendants' motion to dismiss is due to be granted.

The plaintiff has attempted to articulate a cause of action against Eli Lilly and Co. ("Lilly") that is not cognizable under Georgia law. The plaintiff asserts that Lilly developed and patented thimerosal. The plaintiff alleges that Lilly was thus required to warn all consumers of the alleged danger of using thimerosal, even when there is no allegation that Lilly manufactured, packaged, or sold the thimerosal in question. Georgia law does not impose a general duty on inventors, developers, or patent holders to warn the public of potential hazards related to their creation. The duty to warn arises only when a special relationship is formed between the plaintiff and the defendant. The allegations of the complaint reveal no such special relationship. Accordingly, Lilly's motion to dismiss is due to be granted.

The plaintiff has also made allegations against the American Dental Association ("ADA"). The ADA challenges this court's exercise of personal jurisdiction and the sufficiency of the allegations contained in the plaintiff's complaint. Because this court finds that it lacks personal jurisdiction over the ADA, the ADA's motion to dismiss is due to be granted.

3

Thus, for the reasons set forth below, the plaintiff's motion to remand [Doc. No. 30-1] is **DENIED**; the vaccine manufacturers' motion to dismiss [Doc. No. 4-1] is **GRANTED**; the motion to dismiss by Eli Lilly and Co. [Doc. No. 5-1] is **GRANTED**; and the ADA's motion to dismiss [Doc. No. 6-1] is **GRANTED**.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The plaintiff, a citizen[3] of South Carolina, brought this civil suit on behalf of herself and her minor child, alleging that her child suffers from the effects of heavy metal poisoning, specifically mercury poisoning, due to the conduct of the defendants. The plaintiff alleges that her son was exposed to mercury from three different sources: (1) from vaccination; (2) from his mother's dental amalgams; and (3) from power plant emissions.

The plaintiff's theory of this case is linked to her allegations that exposure to mercury caused her son a neurological injury. The plaintiff alleges that her son was exposed to mercury

---

[3]The complaint alleges that the plaintiff and her son are both residents of the State of South Carolina. The notice of removal alleges that the plaintiff and her son are citizens of the State of South Carolina. The plaintiff has not refuted or otherwise controverted the allegation that she and her son are citizens of the State of South Carolina.

4

in three ways.  First, she alleges that he was exposed to mercury *in utero* as a result of mercury entering her blood stream from the mercury containing dental amalgams which a dentist installed in her mouth.[4]  Dental amalgams, which are often referred to as "silver" or fillings, do contain mercury which is released, over time.  This released mercury can enter the blood stream of the patient.  Second, the plaintiff alleges that her son was exposed to mercury via vaccine injections which contained a preservative called thimerosal.  Lilly holds an expired patent over the chemical compound known generically as thimerosal.  Thimerosal contains mercury.  The Food and Drug Administration approved the presence of thimerosal in the vaccines administered to the plaintiff's son.  Third, the plaintiff alleges that her son was exposed to mercury from emissions from power plants that burn fossil fuels.  She contends that these airborne emissions contain heavy metals.

This action was originally filed in state court.  The defendants removed the action, invoking both the diversity of citizenship jurisdiction and the federal question jurisdiction of this court.  The plaintiff has challenged the defendants' assertions of jurisdiction with a motion to remand.  In many

---

[4]The plaintiff has not sued the unnamed dentist.  Nor has she alleged that the dentist was or is a member of either the Georgia Dental Association or the ADA.

5

respects this case is similar to several related cases this court previously remanded to state court. Those related cases were remanded because this court held that it lacked both diversity based and federal question jurisdiction.

## II.   LEGAL ANALYSIS

### A.   Motion To Remand

Civil actions brought in state courts may be removed by defendants to an appropriate district court of the United States when such actions fall within the original jurisdiction of the federal courts. 28 U.S.C. § 1441(a). Generally, there are two categories of cases within the original jurisdiction of this court which defendants may remove from state court.[5] Cases are properly removed based on either the satisfaction of the requirements of 28 U.S.C. § 1332 (diversity jurisdiction) or the presence of a federal cause of action (federal question jurisdiction). The defendants

---

[5]The subject matter jurisdiction of this court is defined by the Constitution and by federal statutes. Article III of the United States Constitution confers subject matter jurisdiction on this court for cases which fall in the following categories: cases arising under the Constitution or the laws of the United States and its treaties; diversity cases; cases involving ambassadors, other public ministers and consuls; admiralty and maritime cases; cases in which the United States is a Party; controversies between states or between a state and a citizen of another state; and controversies between a foreign state or citizen and a U.S. state or citizen.

6

here invoke both the diversity jurisdiction and the federal question jurisdiction of this court in support of their removal of this action.

The court must look to the plaintiff's complaint to determine whether removal was appropriate. See Burns v. Windsor Ins. Co., 31 F.3d 1092, 1095 (11th Cir. 1994). Further, because this case was originally filed in state court and removed to federal court by the defendants, the defendants bear the burden of proving that federal jurisdiction exists. See Williams v. Best Buy Company, Inc., 369 F.3d 1316, 1319 (11th Cir. 2001); and see Kirkland v. Midland Mortgage Co., 243 F.3d 1277, 1281 n.5 (11th Cir. 2001).

Here, the defendants have invoked the diversity jurisdiction of this court as a basis for removal. Diversity jurisdiction exists where a suit is between citizens of different states and the amount in controversy exceeds the statutorily prescribed amount, in this case $75,000. See 28 U.S.C. § 1332(a). Here, the amount in controversy is in excess of $75,000. Further, complete diversity[6] between the parties exists. The plaintiff and her son are citizens of South Carolina. No defendant is a citizen of South Carolina. Thus, this court has subject matter jurisdiction over this case

---

[6]See Owen Equipment & Erection Co. v. Kroger, 437 U.S. 365, 373, 98 S.Ct. 2396, 2402 (1978) ("Diversity jurisdiction does not exist unless each defendant is a citizen of a different State from each plaintiff").

7

pursuant to Article III of the United States Constitution and 28 U.S.C. § 1332(a). The remand analysis, however, does not end here. Even when the court has subject matter jurisdiction, defects in the removal process can result in the remand of an improperly removed case.

An action invoking this court's diversity jurisdiction may be removed to this court "only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b). This requirement is commonly referred to as the forum defendant rule. Here, properly joined[7] and served defendants are citizens of Georgia. Thus, it appears that removal was improper. Nevertheless, "a motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a)." 28 U.S.C. § 1447(c). The plaintiff strongly, and correctly, insists that she challenged the subject matter jurisdiction of this court almost from the moment of removal. She

---

[7]By previous order in a number of related cases, the court ruled that the defendants' assertions of fraudulent joinder with respect to the Georgia defendants were incorrect. The same analysis controls in this action. The court notes that Georgia Power Company was dismissed from this suit. The same analysis that applied to Georgia Power Company applies to Savannah Electric and Power Company.

did not, however, move for remand within 30 days of the filing of the notice of removal. The question, therefore, is whether the provisions of § 1441(b) affect the subject matter jurisdiction of this court. If the forum defendant rule is jurisdictional, then no district court may adjudicate an action removed by a resident defendant on the basis of diversity jurisdiction. If the forum defendant rule is not jurisdictional, then plaintiffs may waive the forum defendant rule and district courts may hear cases removed by resident defendants on the basis of diversity jurisdiction.

The question of whether the forum defendant rule is jurisdictional is an unsettled one. Though the circuits are split, the court notes the great weight of authority favoring the conclusion that a removal in violation of § 1441(b) is subject to the 30-day time limit established by § 1447(c).[8] There does not

---

[8]See also Hurley v. Motor Coach Industries, Inc., 222 F.3d 377, 379-80 (7th Cir. 2000) (noting circuit split and holding forum defendant rule to be nonjurisdictional); Handelsman v. Bedford Village Associates, Ltd., 213 F.3d 48, 50 n.2 (2d Cir. 2000) (citing Hamilton v. Aetna Life & Cas. Co., 5 F.3d 642, 643 (2d Cir. 1993)); Korea Exch. Bank v. Trackwise Sales Corp., 66 F.3d 46, 50 (3d Cir. 1995) (forum defendant rule nonjurisdictional); In re Shell Oil Co., 932 F.2d 1518, 1521-23 (5th Cir. 1991) (holding that the presence of defendants who are citizens of the forum state is a procedural defect); Farm Constr. Serv. v. Fudge, 831 F.2d 18, 21-22 (1st Cir. 1987); Handley-Mack Co. v. Godchaux Sugar Co., 2 F.2d 435, 437 (6th Cir. 1924) (forum defendant rule nonjurisdictional); Taylor v. St. Louis S.W. Ry., 128 F.R.D. 118, 120 (D. Kan. 1989) (although case improperly removed to federal court in violation of § 1441(b), plaintiffs' motion to remand denied because made after the 30-day time limit of § 1447(c)). But see Hurt v. Dow Chem.

9

appear to be any controlling authority on this question before this court.  See Snapper, Inc. v. Redan, 171 F.3d 1249, 1258 (11th Cir. 1999) (mentioning the § 1441(b) issue in performing a thorough analysis of the significance of the 1996 amendment to § 1447(c)). Snapper strongly suggests that this circuit follows the majority rule.  This strong suggestion in dicta, however, does not represent controlling authority on this point of law.

This court hereby adopts the majority rule and joins the courts holding the forum defendant rule of § 1441(b) to be a "defect other than lack of subject matter jurisdiction" as contemplated by § 1447(c).  The forum defendant rule prohibits a forum defendant from removing to federal court an action which is within the subject matter jurisdiction of the federal court. It is not a limitation on the subject matter jurisdiction of the court. When a forum defendant files a notice of removal invoking the diversity jurisdiction of the district court, the removal is defective because it does not comply with § 1441(b).  Accordingly, a plaintiff's motion to remand based on the defect must be filed within the 30-day time limit set forth in § 1447(c).  Here, there is no dispute that the plaintiff's motion to remand was filed

---

Co., 963 F.2d 1142, 1145-46 (8th Cir. 1992) (holding that the presence of a resident defendant is a jurisdictional defect).

outside the 30-day window.    Therefore, the plaintiff's motion to remand is due to be denied.

B.  **Motions To Dismiss**

There are currently three separate motions to dismiss before the court.  The vaccine manufacturer defendants have filed a motion to dismiss all claims against them.  Lilly has filed a motion to dismiss the claims against it.  Likewise, the ADA has moved for dismissal of the claims against it.  Taken as a whole, all of the defendants, save the Georgia Dental Association and the Savannah Electric and Power Company, have moved this court to dismiss the plaintiff's complaint.

1.  *Claims Against The Vaccine Manufacturer Defendants*

The National Childhood Vaccine Injury Act ("Vaccine Act"), 42 U.S.C. § 300aa-1, *et seq.*, states in relevant part:

> No person may bring a civil action for damages in an amount greater than $1,000 or in an unspecified amount against a vaccine administrator or manufacturer in a State or Federal court for damages arising from a vaccine-related injury or death . . . unless a petition has been filed in accordance with section 300aa-16 of this title, for compensation under the Program for such injury or death . . .

42 U.S.C. § 300aa-11(a)(2)(A).  Whenever a civil action is brought in violation of the above provision, the presiding court "shall dismiss the action."  42 U.S.C. § 300aa-11(2)(B).  Here, the plaintiff has not filed a petition in accordance with § 300aa-16.

11

Therefore, if her claims arise from a "vaccine-related" injury, this court must dismiss those claims.

The plaintiff forcefully argues that her claims do not arise from a vaccine-related injury as contemplated by the Vaccine Act. Instead, she insists, her claims arise from injuries sustained due to exposure to the mercury containing preservative thimerosal. The plaintiff contends that thimerosal is not part of the vaccine. Thimerosal, she contends, is an "adulterant or contaminant." Injuries sustained from exposure to adulterants or contaminants are not covered by the Vaccine Act. 42 U.S.C. § 300aa-33(5).

After careful review of the statute, the authorities cited by the parties, and the arguments presented by counsel, the court is compelled to dismiss the plaintiff's claims against the vaccine manufacturer defendants. Thimerosal is not an adulterant or contaminant as those terms are used in the statute. The language of the statute is clear and unambiguous. Adulterant and contaminant, as used in the statute, refer to something which makes the vaccine corrupt, infected, impure, unfit for its intended use, or otherwise altered from its original form. Thimerosal cannot be viewed as an adulterant or contaminant because it was an intended and approved component of the vaccines themselves. To read the statute in the manner suggested by the plaintiff would dramatically undermine the purpose of the act. See Schafer v. American

12

Cyanamide Co., 20 F.3d 1, 2 (1st Cir. 1994) (The Vaccine Act is intended "to provide compensation to those harmed by childhood vaccines outside the framework of traditional tort law.").

In the instant case, thimerosal was an intended component of the vaccine. The presence of thimerosal in the vaccine was intended to ensure the efficacy of the vaccine. Without thimerosal, the medical purpose of the vaccines would have been compromised. When choosing a preservative, the manufacturers likely had other options. They chose thimerosal and the FDA approved the choice. If thimerosal, or some other preservative, had not been used, the vaccines would have been less effective or even useless. Thus, the presence of the preservative did not serve to contaminate or adulterate the vaccines. To the contrary, thimerosal was a constituent component of the vaccines. Asserting a thimerosal-related claim is the equivalent of asserting a vaccine-related claim. Accordingly, the court finds that the plaintiff's claims alleging injuries arising from exposure to thimerosal are "vaccine-related" injuries. Thus, the plaintiff's claims against the vaccine manufacturer defendants are due to be dismissed. Accordingly, the vaccine manufacturer defendants' motion to dismiss is due to be granted.[9]

---

[9]The dismissal of the claims against the vaccine manufacturer defendants is without prejudice. The claims were simply brought in the wrong court.

13

2.  *Claims Against Lilly*

With respect to the instant case, Lilly is not a vaccine administrator or manufacturer. There has been no suggestion that Lilly produced the thimerosal in the vaccines given to the plaintiff's son. If Lilly were a manufacturer, the claims against Lilly would be dismissed in accordance with the provisions of the Vaccine Act. Thus, Lilly's motion to dismiss should be granted only if the complaint fails to state a claim upon which relief can be granted against Lilly.

A Rule 12(b)(6) motion questions the legal sufficiency of a complaint; therefore, in assessing the merits of a Rule 12(b)(6) motion, the court must assume that all the factual allegations set forth in the complaint are true. See United States v. Gaubert, 499 U.S. 315, 327, 111 S. Ct. 1267 (1991); Powell v. Lennon, 914 F.2d 1459, 1463 (11th Cir. 1990). Moreover, in determining whether to grant a Rule 12(b)(6) motion, the court only considers the allegations in the complaint, which it liberally construes in the light most favorable to the plaintiffs. See Brower v. County of Inyo, 489 U.S. 593, 598, 109 S. Ct. 1378 (1989).

Generally, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." In re Johannessen, 76 F.3d 347, 349 (11th Cir. 1996) (quoting Conley v. Gibson, 355 U.S. 41, 45-6, 78 S. Ct. 99

14

(1957)).  Thus, a motion to dismiss will be denied unless it
appears beyond all doubt that the plaintiff can prove no set of
facts in support of his claims that would entitle him to relief.
See Luckey v. Harris, 860 F.2d 1012, 1016 (11th Cir. 1988); see
also Hishon v. King & Spaulding, 467 U.S. 69, 104 S. Ct. 2229
(1984).  In the latter instance, the court is authorized to dismiss
the complaint "on the basis of a dispositive issue of law."
Neitzke v. Williams, 490 U.S. 319, 326, 109 S.Ct. 1827, 1832
(1989).

Accordingly, this court applies the traditional pleading
requirement of Fed.R.Civ.P. 8(a) to the instant motion to dismiss,
requiring only "'a short and plaint statement of the claim' that
will give the defendant fair notice of what the plaintiff's claim
is and the grounds upon which it rests."  Conley, 355 U.S. at 47,
78 S. Ct. 99.

The plaintiff's primary allegations against Lilly sound in
negligence.  Specifically, the plaintiff contends that Lilly failed
to warn consumers of the alleged dangers of thimerosal.  Georgia
law controls this analysis.  Pursuant to Georgia law, in order to
recover for negligence, a plaintiff must show "(1) a legal duty to
conform to a standard of conduct raised by the law for the
protection of others against unreasonable risk of harm; (2) a
breach of this standard; (3) a legally attributable causal
connection between the conduct and the resulting injury; and (4)

15

some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty." Bradley Ctr., Inc. v. Wessner, 250 Ga. 199, 200, 296 S.E.2d 693, 695 (1982). Lilly focuses its argument on the first element of the plaintiff's purported negligence claim.

Georgia law occasionally imposes an affirmative duty to warn on potential defendants. With respect to the allegations of the instant complaint, the court finds a basis in Georgia law for a duty to warn of a dangerous product.

> While a manufacturer has a duty to exercise reasonable care in manufacturing its products so as to make products that are reasonably safe for intended or foreseeable uses, the manufacturer of a product which, to its actual or constructive knowledge, involves danger to users, has a duty to give warning of such danger. Breach of these different duties hence gives rise to separate and distinct claims. Thus, a duty to warn can arise even if a product is not defective.

Moore v. ECI Management, 246 Ga.App. 601, 606, 542 S.E.2d 115, 120 (2000) (internal citations and punctuation omitted). Thus, manufacturers have a duty to warn consumers of potential dangers associated with the use of their product. The plaintiff has not directed the court to any authority expanding this duty beyond the manufacturer of the product in question. The chain of commerce that begins with the manufacturer and ends with the final consumer involves a series of special relationships. These special relationships provide a basis for the affirmative duty to warn.

16

The duty proposed by the plaintiff does not arise from any special relationship. Instead, the plaintiff alleges the existence of an affirmative duty to warn which arises merely from being the developer, inventor, or patent holder of a product or design. The plaintiff reasons that Lilly, as the holder of the patent on thimerosal, knew that other companies would copy thimerosal when the patent expired. The plaintiff further reasons that such knowledge on the part of Lilly gave rise to an ongoing duty to warn the purchasers and recipients of such copied products manufactured by other companies. The plaintiff has not cited and the court has not found any authority supporting the existence of such a duty. Accordingly, the court concludes that no such duty exists under Georgia law. Thus, the plaintiff's negligence claim against Lilly is not cognizable under Georgia law and, as such, is due to be dismissed.

The plaintiff's emotional distress claim against Lilly is likewise flawed. "In a claim concerning negligent conduct, a recovery for emotional distress is allowed only where there is some impact on the plaintiff, and that impact must be a physical injury." Lee v. State Farm Mut. Ins. Co., 272 Ga. 583, 584, 533 S.E.2d 82, 84 (2000) (quoting Ryckeley v. Callaway, 261 Ga. 828, 412 S.E.2d 826 (1992)). A careful review of the above standard reveals that the plaintiff's claim is flawed in two respects.

17

First, as set forth above, the plaintiff has failed to adequately allege negligent conduct. Second, the plaintiff has failed to allege any impact that can reasonably be attributed to the conduct of Lilly. Thus, the allegations of the complaint do not support a cause of action against Lilly for emotional distress. Accordingly, Lilly's motion to dismiss is due to be dismissed.[10]

### 3. *ADA's Motion To Dismiss*

The ADA challenges this court's exercise of personal jurisdiction. In general, this court must engage in a two step inquiry to determine whether the exercise of personal jurisdiction is appropriate. First, the court must examine the Georgia long-arm statute to determine whether that statute confers jurisdiction over the defendant. If the Georgia statute confers jurisdiction, the court proceeds to the second step. The second step requires the court to determine whether the exercise of personal jurisdiction comports with the Due Process requirements of the federal Constitution. See Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc., 148 F.3d 1355 (Fed. Cir. 1998). The Georgia long-arm statute is construed to confer personal jurisdiction to

---

[10]The plaintiff's claims against Lilly are dismissed without prejudice. As Lilly pointed out, the plaintiff's allegations against Lilly are broad and conclusory. If the plaintiff has more specific facts showing a direct link between the harm alleged and Lilly, she should be able to articulate such a claim in a subsequent action.

18

the greatest extent permitted by federal law.  See First United Bank of Mississippi v. First National Bank of Atlanta, 255 Ga. 505, 340 S.E.2d 597 (1986).  Accordingly, this court's inquiry is reduced to an analysis of whether the assertion of personal jurisdiction comports with the Due Process requirements of federal law.

The exercise of personal jurisdiction must comport with "traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158 (1945).  As a starting point, the issue turns on whether the ADA had sufficient minimum contacts with the State of Georgia "such that it would reasonably anticipate being haled into court" here.  World-Wide Volkswagon Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 567 (1980).  Contacts are relevant to the analysis only when they are "purposefully directed at the forum or its residents." Red Wing, 148 F.3d at 1359.  Nevertheless, a single act can be sufficient to confer specific jurisdiction over a defendant where the cause of action arises out of or relates to the specific contact in question.  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174 (1985).

A defendant may be subject to general jurisdiction in a given forum where its activities in the forum are "continuous and systematic." International Shoe, 326 U.S. at 320, 66 S.Ct. at 160.

19

The actions of third parties directed at the defendant are not appropriate for inclusion in this analysis. See Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239 (1958). Thus, only actions by the defendant which are "purposefully directed at the forum or its residents" may be considered. Red Wing, 148 F.3d at 1359.

In light of the above standards, the court finds that the ADA is not subject to the personal jurisdiction of this court. The plaintiff does not sufficiently allege[11] that the ADA either manufactured or sold the dental amalgams she allegedly received. Neither has she alleged that her treating dentist was a member of the ADA or was in any manner influenced by the ADA at the time the amalgams were installed. Upon careful review, it does not appear that the ADA is alleged to have directly participated in any manner in the chain of events that led to the dental amalgams being installed in the plaintiff. Accordingly, the court finds that the ADA is not subject to specific jurisdiction.

---

[11]The plaintiff's broad allegations that, *inter alia*, the "dental defendants" manufactured, inspected, marketed, and sold "the amalgams" are conclusory and unsupported by sufficient factual allegations. The allegations fail to identify which of the "dental defendants" performed which alleged task. Moreover, the allegations do not provide sufficient factual allegations to support the allegation that the ADA manufactured the amalgams in question. As noted, the complaint does not identify the dentist who installed her amalgams nor does it allege where the unnamed dentist acquired the amalgams. The court cannot indulge such unsupported allegations.

20

The ADA does not have sufficient continuous and systematic contacts with Georgia to support a finding that the ADA is subject to general jurisdiction in this forum.  The ADA is a voluntary association whose activities are centered around Chicago, Illinois. The ADA's contacts with Georgia are generally initiated by member citizens of Georgia.  The ADA is not licenced to transact business in Georgia and does not have a designated agent for service of process in Georgia.  It appears that the ADA has taken careful steps not to subject itself to the jurisdiction of foreign jurisdictions.  The tri-partite dental association structure allows the ADA to avoid employing citizens of Georgia while deriving significant financial benefit from citizens of Georgia. Nevertheless, the contacts revealed by the record do not support a finding that the ADA is subject to general jurisdiction in Georgia. Accordingly, because it has properly objected to the jurisdiction of this court and this court has found that it lacks jurisdiction, the ADA's motion to dismiss is due to be granted.[12]

_____

[12]Because the court has determined that it lacks jurisdiction over the person of the ADA, the court does not address the sufficiency of the plaintiff's allegations against the ADA.  Thus, there has been no adjudication on the merits and this action is dismissed without prejudice as to the ADA.

III.   <u>CONCLUSION</u>

For the above and foregoing reasons, the plaintiff's motion to remand [Doc. No. 30-1] is **DENIED**; the vaccine manufacturers' motion to dismiss [Doc. No. 4-1] is **GRANTED**; the motion to dismiss by Eli Lilly and Co. [Doc. No. 5-1] is **GRANTED**; and the ADA's motion to dismiss [Doc. No. 6-1] is **GRANTED**.   Except for the Georgia Dental Association and the Savannah Electric and Power Company, this action is dismissed against all other defendants without prejudice.

SO ORDERED, this ___ day of February, 2003.

CHARLES A. PANNELL, JR.
United States District Judge

22

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

FEB 2 5 2003

LUTHER D.
By:                    Dep. of

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

NATALIE MELECK MURPHY,

        Plaintiff,

    v.

AVENTIS PASTEUR, INC.,
Individually and as Successor-
in-Interest to Connaught
Laboratories, Inc., Pasteur
Merieux, and Pasteur Merieux
Connaught; WYETH (f/k/a
American Home Products
Corporation); SMITHKLINE
BEECHAM CORPORATION, d/b/a
GlaxoSmithKline; ARMOUR
PHARMACEUTICAL COMPANY;
JOHNSON & JOHNSON; ELI LILLY
AND COMPANY; MERCK & CO.,
INC.; GEORGIA POWER COMPANY[1];
SAVANNAH ELECTRIC AND POWER
COMPANY; AMERICAN DENTAL
ASSOCIATION; and GEORGIA
DENTAL ASSOCIATION,

        Defendants.

CIVIL ACTION
NO. 1:02-CV-2258-CAP

## O R D E R

    This matter is currently before this court on the plaintiff's

motion for remand as well as several motions to dismiss.

    The plaintiff brought this civil suit on behalf of herself,

alleging that her child suffers from the effects of heavy metal

_____

    [1] By an order dated November 15, 2002, the allegations against
the Georgia Power Company were dismissed without prejudice.

poisoning, specifically mercury poisoning, due to the conduct of
the defendants.  The plaintiff seeks recovery for "injuries" she
has sustained as a result of the alleged injuries of her son.  This
action was originally filed in state court.  The defendants removed
the action to this court invoking both the diversity of citizenship
jurisdiction and the federal question jurisdiction of this court.
The plaintiff has challenged the defendants' assertions of
jurisdiction with a motion to remand.  Since a court may not hear
or decide a case when it lacks subject matter jurisdiction, this
court must first address the question of whether the action was
properly removed to federal court.  Though the court finds that
this action was improperly removed, the court finds that remand is
not available because the action is within the subject matter
jurisdiction of this court and the defect in the removal was not
challenged within thirty (30) days of the notice of removal.

Many of the plaintiff's allegations and claims relate to
injuries allegedly sustained as a result of receiving a vaccine.
She sues several "vaccine manufacturer defendants".[2]  Federal law
requires such claims to be brought before the United States Court
of Federal Claims before any civil action can be maintained in any

_____

[2]Aventis Pasteur, Inc.; Wyeth; SmithKline Beecham Corporation;
and Merck & Co. are collectively referred to as the vaccine
manufacturer defendants.  The plaintiff's allegations make no
significant distinctions between these defendants.

2

state or other federal court with respect to any injuries sustained. The plaintiff here has not complied with that requirement. Thus, the vaccine manufacturer defendants' motion to dismiss is due to be granted.

The plaintiff has attempted to articulate a cause of action against Eli Lilly and Co. ("Lilly") that is not cognizable under Georgia law. The plaintiff asserts that Lilly developed and patented thimerosal. The plaintiff alleges that Lilly was thus required to warn all consumers of the alleged danger of using thimerosal, even when there is no allegation that Lilly manufactured, packaged, or sold the thimerosal in question. Georgia law does not impose a general duty on inventors, developers, or patent holders to warn the public of potential hazzards related to their creation. The duty to warn arises only when a special relationship is formed between the plaintiff and the defendant. The allegations of the complaint reveal no such special relationship. Accordingly, Lilly's motion to dismiss is due to be granted.

The plaintiff has also made allegations against the American Dental Association ("ADA"). The ADA challenges this court's exercise of personal jurisdiction and the sufficiency of the allegations contained in the plaintiff's complaint. Because this

court lacks personal jurisdiction, the ADA's motion to dismiss is due to be granted.

Thus, for the reasons set forth below, the plaintiff's motion to remand [Doc. No. 28-1] is **DENIED**; the vaccine manufacturers' motion to dismiss [Doc. No. 4-1] is **GRANTED**; the motion to dismiss by Eli Lilly and Co. [Doc. No. 6-1] is **GRANTED**; and the ADA's motion to dismiss [Doc. No. 5-1] is **GRANTED**.  This action is dismissed as against all defendants, except the Georgia Dental Association, the Savannah Electric and Power Company, the Armour Pharmaceutical Company, and Johnson & Johnson, without prejudice. Additionally, based on the forgoing, the ADA's motion to disqualify [Doc. No. 18-1] is **DENIED AS MOOT**; the ADA's motion to strike or disregard [Doc. No. 19-1 and 19-2] is **DENIED AS MOOT**; the plaintiff's motion for leave to file [Doc. No. 20-1] is **DENIED AS MOOT**; and the plaintiff's motion to strike [Doc. No. 42-1] is **DENIED AS MOOT**.

4

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The plaintiff, a citizen[3] of South Carolina, brought this civil suit on behalf of herself, alleging that her child suffers from the effects of heavy metal poisoning, specifically mercury poisoning, due to the conduct of the defendants.  The plaintiff alleges that her son was exposed to mercury in three different ways: (1) from vaccination; (2) from his mother's dental amalgams; and (3) from power plant emissions.  The plaintiff contends that the injuries to her son give rise to her claims.

The plaintiff's theory of this case is linked to her allegations that exposure to mercury caused her son a neurological injury.  The plaintiff alleges that her son was exposed to mercury in three ways.  First, she alleges that he was exposed to mercury *in utero* as a result of mercury entering her blood stream from the mercury containing dental amalgams which a dentist installed in her mouth.[4]  Dental amalgams, which are often referred to as "silver" or fillings, do contain mercury which is released, over time.  This

_____

[3]The complaint alleges that the plaintiff is a resident of the State of South Carolina.  The notice of removal alleges that the plaintiff is a citizen of the State of South Carolina.  The plaintiff has not refuted or otherwise controverted the allegation that she is a citizen of the State of South Carolina.

[4]The plaintiff has not sued the unnamed dentist.  Nor has she alleged that the dentist was or is a member of either the Georgia Dental Association or the ADA.

5

released mercury can enter the blood stream of the patient. Second, the plaintiff alleges that her son was exposed to mercury via vaccine injections which contained a preservative called thimerosal. Lilly holds an expired patent over the chemical compound known generically as thimerosal. Thimerosal contains mercury. The Food and Drug Administration approved the presence of thimerosal in the vaccines administered to the plaintiff's son. Third, the plaintiff alleges that her son was exposed to mercury from emissions from power plants that burn fossil fuels. She contends that these airborne emissions contain heavy metals.

This action was originally filed in state court. The defendants removed the action, invoking both the diversity of citizenship jurisdiction and the federal question jurisdiction of this court. The plaintiff has challenged the defendants' assertions of jurisdiction with a motion to remand. In many respects this case is similar to several related cases this court previously remanded to state court. Those related cases were remanded because this court held that it lacked both diversity based and federal question jurisdiction.

6

II.  **LEGAL ANALYSIS**

A.  **Motion To Remand**

Civil actions brought in state courts may be removed by defendants to an appropriate district court of the United States when such actions fall within the original jurisdiction of the federal courts.  28 U.S.C. § 1441(a).  Generally, there are two types of cases within the original jurisdiction of this court which defendants may remove from state court.  Cases are properly removed based on either the satisfaction of the requirements of 28 U.S.C. § 1332 (diversity jurisdiction) or the presence of a federal cause of action (federal question jurisdiction).  The defendants here invoke both the diversity jurisdiction and the federal question jurisdiction of this court in support of their removal of this action.

The court must look to the plaintiff's complaint to determine whether removal was appropriate.  See Burns v. Windsor Ins. Co., 31 F.3d 1092, 1095 (11th Cir. 1994).  Further, because this case was originally filed in state court and removed to federal court by the defendants, the defendants bear the burden of proving that federal jurisdiction exists.  See Williams v. Best Buy Company, Inc., 369 F.3d 1316, 1319 (11th Cir. 2001); and see Kirkland v. Midland Mortgage Co., 243 F.3d 1277, 1281 n.5 (11th Cir. 2001).

7

The subject matter jurisdiction of this court is defined by the Constitution and by federal statutes.[5]  Here, the defendants have invoked the diversity jurisdiction of this court as a basis for removal.  Diversity jurisdiction exists where a suit is between citizens of different states and the amount in controversy exceeds the statutorily prescribed amount, in this case $75,000.  See 28 U.S.C. § 1332(a).  Here, the amount in controversy is in excess of $75,000.  Further, complete diversity[6] between the parties exists. The plaintiff and her son are citizens of South Carolina.  No defendant is a citizen of South Carolina.  Thus, this court has subject matter jurisdiction over this case pursuant to Article III of the United States Constitution and 28 U.S.C. § 1332(a).  In short, this court has subject matter jurisdiction over this action based on diversity jurisdiction.  The remand analysis, however, does not end here.  Even when the court has subject matter

---

[5]Article III of the United States Constitution confers subject matter jurisdiction on this court for cases which fall in the following categories: cases arising under the Constitution or the laws of the United States and its treaties; diversity cases; cases involving ambassadors, other public ministers and consuls; admiralty and maritime cases; cases in which the United States is a Party; controversies between states or between a state and a citizen of another state; and controversies between a foreign state or citizen and a U.S. state or citizen.

[6]See Owen Equipment & Erection Co. v. Kroger, 437 U.S. 365, 373, 98 S.Ct. 2396, 2402 (1978) ("Diversity jurisdiction does not exist unless each defendant is a citizen of a different State from each plaintiff").

jurisdiction, defects in the removal process can result in the remand of an improperly removed case.

An action invoking this court's diversity jurisdiction may be removed to this court "only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b). This requirement is commonly referred to as the forum defendant rule. Here, properly joined[7] and served defendants are citizens of Georgia. Thus, it appears that removal was improper. Nevertheless, "a motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a)." 28 U.S.C. § 1447(c). The plaintiff strongly, and correctly, insists that she challenged the subject matter jurisdiction almost from the moment of removal. She did not, however, move for remand within 30 days of the filing of the notice of removal. The question, therefore, is whether the provisions of § 1441(b) affect the subject matter jurisdiction of this court. If

---

[7]By previous order in a number of related cases, the court ruled that the defendants' assertions of fraudulent joinder with respect to the Georgia defendants were incorrect. The same analysis controls in this action. The court notes that Georgia Power Company was dismissed from this suit. The same analysis that applied to Georgia Power Company applies to Savannah Electric and Power Company.

9

the forum defendant rule is jurisdictional, then no district court may adjudicate an action removed by a resident defendant on the basis of diversity jurisdiction.  If the forum defendant rule is not jurisdictional, then plaintiffs may waive the forum defendant rule and district courts may hear cases removed by resident defendants on the basis of diversity jurisdiction.

The question of whether the forum defendant rule is jurisdictional is an unsettled one.  Though the circuits are split, the court notes the great weight of authority favoring the conclusion that a removal in violation of § 1441(b) is subject to the 30-day time limit established by § 1447(c).[8]  There does not appear to be any controlling authority on this question before this court.  See Snapper, Inc. v. Redan, 171 F.3d 1249, 1258 (11th Cir.

---

[8]See also Hurley v. Motor Coach Industries, Inc., 222 F.3d 377, 379-80 (7th Cir. 2000) (noting circuit split and holding forum defendant rule to be nonjurisdictional); Handelsman v. Bedford Village Associates, Ltd., 213 F.3d 48, 50 n.2 (2d Cir. 2000) (citing Hamilton v. Aetna Life & Cas. Co., 5 F.3d 642, 643 (2d Cir. 1993)); Korea Exch. Bank v. Trackwise Sales Corp., 66 F.3d 46, 50 (3d Cir. 1995) (forum defendant rule nonjurisdictional); In re Shell Oil Co., 932 F.2d 1518, 1521-23 (5th Cir. 1991) (holding that the presence of defendants who are citizens of the forum state is a procedural defect); Farm Constr. Serv. v. Fudge, 831 F.2d 18, 21-22 (1st Cir. 1987); Handley-Mack Co. v. Godchaux Sugar Co., 2 F.2d 435, 437 (6th Cir. 1924) (forum defendant rule nonjurisdictional); Taylor v. St. Louis S.W. Ry., 128 F.R.D. 118, 120 (D. Kan. 1989) (although case improperly removed to federal court in violation of § 1441(b), plaintiffs' motion to remand denied because made after the 30-day time limit of § 1447(c)).  But see Hurt v. Dow Chem. Co., 963 F.2d 1142, 1145-46 (8th Cir. 1992) (holding that the presence of a resident defendant is a jurisdictional defect).

1999) (mentioning the § 1441(b) issue in performing a thorough analysis of the significance of the 1996 amendment to § 1447(c)). _Snapper_ strongly suggests that this circuit follows the majority rule. This strong suggestion in _dicta_, however, does not represent controlling authority on this point of law.

This court hereby adopts the majority rule and joins the courts holding the forum defendant rule of § 1441(b) to be a "defect other than lack of subject matter jurisdiction" as contemplated by § 1447(c). The forum defendant rule prohibits a forum defendant from removing to federal court an action which is within the subject matter jurisdiction of the federal court. It is not a limitation on the subject matter jurisdiction of the court. When a forum defendant files a notice of removal invoking the diversity jurisdiction of the district court, the removal is defective because it does not comply with § 1441(b). Accordingly, a plaintiff's motion to remand based on the defect must be filed within the 30-day time limit set forth in § 1447(c). Here, there is no dispute that the plaintiff's motion to remand was filed outside the 30-day window. Therefore, the plaintiff's motion to remand is due to be denied.

B.  **Motions To Dismiss**

There are currently three separate motions to dismiss before the court. The vaccine manufacturer defendants have filed a motion

11

to dismiss all claims against them.  Lilly has filed a motion to dismiss the claims against it.  Likewise, the ADA has moved for dismissal of the claims against it.  Taken as a whole, all of the defendants, save the Georgia Dental Association, the Savannah Electric and Power Company, the Armour Pharmaceutical Company, and Johnson & Johnson, have moved this court to dismiss the plaintiff's complaint.

1.  *Claims Against The Vaccine Manufacturer Defendants*

The National Childhood Vaccine Injury Act ("Vaccine Act"), 42 U.S.C. § 300aa-1, *et seq.*, states:

> No person may bring a civil action for damages in an amount greater than $1,000 or in an unspecified amount against a vaccine administrator or manufacturer in a State or Federal court for damages arising from a vaccine-related injury or death . . . unless a petition has been filed in accordance with section 300aa-16 of this title, for compensation under the Program for such injury or death and . . .

42 U.S.C. § 300aa-11(a)(2)(A).  Whenever a civil action is brought in violation of the above provision, the presiding court "shall dismiss the action."  42 U.S.C. § 300aa-11(2)(B).  Here, the plaintiff has not filed a petition in accordance with § 300aa-16. Therefore, if her claims arise from a "vaccine-related" injury, this court must dismiss those claims.[9]

---

[9]To the extent the plaintiff has argued that her personal claims are distinct from claims she brought in a related action as next friend of her child, such a distinction has no consequence. Legal representatives may petition the Court of Federal Claims and

12

The plaintiff forcefully argues that her claims do not arise from a vaccine-related injury as contemplated by the Vaccine Act. Instead, she insists, her claims arise from injuries sustained due to exposure to the mercury containing preservative thimerosal. The plaintiff contends that thimerosal is not part of the vaccine. Thimerosal, she contends, is an "adulterant or contaminant." Injuries sustained from exposure to adulterants or contaminants are not covered by the Vaccine Act. 42 U.S.C. § 300aa-33(5).

After careful review of the statute, the authorities cited by the parties, and the arguments presented by counsel, the court is compelled to dismiss the plaintiff's claims against the vaccine manufacturer defendants. Thimerosal is not an adulterant or contaminant as those terms are used in the statute. To read the statute in the manner suggested by the plaintiff would dramatically undermine the purpose of the act. In the instant case, thimerosal was a constituent component of the vaccine. The presence of thimerosal in the vaccine was intended to ensure the efficacy of the vaccine. The court finds that the plaintiff's claims alleging injuries arising from exposure to thimerosal are "vaccine-related" injuries. Thus, the plaintiff's claims against the vaccine manufacturer defendants are due to be dismissed. Accordingly, the

---

may recover for expenses incurred on behalf of the injured person. See 42 U.S.C. §§ 300aa-11(b)1)(A) and 300aa-15(a).

13

vaccine manufacturer defendants' motion to dismiss is due to be granted.[10]

## 2. Claims Against Lilly

With respect to the instant case, Lilly is not a vaccine administrator or manufacturer. Thus, Lilly's motion to dismiss should be granted only if the complaint fails to state a claim upon which relief can be granted against Lilly.

A Rule 12(b)(6) motion questions the legal sufficiency of a complaint; therefore, in assessing the merits of a Rule 12(b)(6) motion, the court must assume that all the factual allegations set forth in the complaint are true. See United States v. Gaubert, 499 U.S. 315, 327, 111 S. Ct. 1267 (1991); Powell v. Lennon, 914 F.2d 1459, 1463 (11th Cir. 1990). Moreover, in determining whether to grant a Rule 12(b)(6) motion, the court only considers the allegations in the complaint, which it liberally construes in the light most favorable to the plaintiffs. See Brower v. County of Inyo, 489 U.S. 593, 598, 109 S. Ct. 1378 (1989).

Generally, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle

---

[10]The dismissal of the claims against the vaccine manufacturer defendants is without prejudice. The claims were brought in the wrong court. The plaintiff is urged to consider bringing her claims before the United States Court of Federal Claims.

him to relief." In re Johannessen, 76 F.3d 347, 349 (11th Cir. 1996) (quoting Conley v. Gibson, 355 U.S. 41, 45-6, 78 S. Ct. 99 (1957)). Thus, a motion to dismiss will be denied unless it appears beyond all doubt that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief. See Luckey v. Harris, 860 F.2d 1012, 1016 (11th Cir. 1988); see also Hishon v. King & Spaulding, 467 U.S. 69, 104 S. Ct. 2229 (1984). In the latter instance, the court is authorized to dismiss the complaint "on the basis of a dispositive issue of law." Neitzke v. Williams, 490 U.S. 319, 326, 109 S.Ct. 1827, 1832 (1989).

Accordingly, this court applies the traditional pleading requirement of Fed.R.Civ.P. 8(a) to the instant motion to dismiss, requiring only "'a short and plaint statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley, 355 U.S. at 47, 78 S. Ct. 99.

The plaintiff's primary allegations against Lilly sound in negligence. Specifically, the plaintiff contends that Lilly failed to warn consumers of the alleged dangers of thimerosal. Georgia law controls this analysis. Pursuant to Georgia law, in order to recover for negligence, a plaintiff must show "(1) a legal duty to conform to a standard of conduct raised by the law for the

15

protection of others against unreasonable risk of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty." Bradley Ctr., Inc. v. Wessner, 250 Ga. 199, 200, 296 S.E.2d 693, 695 (1982). Lilly focuses its argument on the first element of the plaintiff's purported negligence claim.

Georgia law occasionally imposes an affirmative duty to warn on potential defendants. With respect to the allegations of the instant complaint, the court finds a basis in Georgia law for a duty to warn of a dangerous product.

> While a manufacturer has a duty to exercise reasonable care in manufacturing its products so as to make products that are reasonably safe for intended or foreseeable uses, the manufacturer of a product which, to its actual or constructive knowledge, involves danger to users, has a duty to give warning of such danger. Breach of these different duties hence gives rise to separate and distinct claims. Thus, a duty to warn can arise even if a product is not defective.

Moore v. ECI Management, 246 Ga.App. 601, 606, 542 S.E.2d 115, 120 (2000) (internal citations and punctuation omitted). Thus, manufacturers have a duty to warn consumers of potential dangers associated with the use of their product. The plaintiff has not directed the court to any authority expanding this duty beyond the manufacturer of the product in question. The chain of commerce

16

that begins with the manufacturer and ends with the final consumer involves a series of special relationships. These special relationships provide a basis for the affirmative duty to warn.

The duty proposed by the plaintiff does not arise from any special relationship. Instead, the plaintiff alleges the existence of an affirmative duty to warn which arises merely from being the developer, inventor, or patent holder of a product or design. The plaintiff reasons that Lilly, as the holder of the patent on thimerosal, knew that other companies would copy thimerosal when the patent expired. The plaintiff further reasons that such knowledge on the part of Lilly gave rise to an ongoing duty to warn the purchasers and recipients of such copied products manufactured by other companies. The plaintiff has not cited and the court has not found any authority supporting the existence of such a duty. Accordingly, the court concludes that no such duty exists under Georgia law. Thus, the plaintiff's negligence claim against Lilly is not cognizable under Georgia law and, as such, is due to be dismissed.

The plaintiff's emotional distress claim against Lilly is likewise flawed. "In a claim concerning negligent conduct, a recovery for emotional distress is allowed only where there is some impact on the plaintiff, and that impact must be a physical injury." Lee v. State Farm Mut. Ins. Co., 272 Ga. 583, 584, 533

17

S.E.2d 82, 84 (2000) (quoting <u>Ryckeley v. Callaway</u>, 261 Ga. 828, 412 S.E.2d 826 (1992)).  A careful review of the above standard reveals that the plaintiff's claim is flawed in two respects. First, as set forth above, the plaintiff has failed to adequately allege negligent conduct.  Second, the plaintiff has failed to allege any impact that can reasonably be attributed to the conduct of Lilly.  Thus, the allegations of the complaint do not support a cause of action against Lilly for emotional distress.  Accordingly, Lilly's motion to dismiss is due to be dismissed.[11]

### 3.   *ADA's Motion To Dismiss*

The ADA challenges this court's exercise of personal jurisdiction.  In general, this court must engage in a two step inquiry to determine whether the exercise of personal jurisdiction is appropriate.  First, the court must examine the Georgia long-arm statute to determine whether that statute confers jurisdiction over the defendant.  If the Georgia statute confers jurisdiction, the court proceeds to the second step.  The second step requires the court to determine whether the exercise of personal jurisdiction comports with the Due Process requirements of the federal

---

[11]The plaintiff's claims against Lilly are dismissed without prejudice.  As Lilly pointed out, the plaintiff's allegations against Lilly are broad and conclusory.  If the plaintiff has more specific facts showing a direct link between the harm alleged and Lilly, she should be able to articulate such a claim in a subsequent action.

Constitution.    See    Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc., 148 F.3d 1355 (Fed. Cir. 1998).    The Georgia long-arm statute is construed to confer personal jurisdiction to the greatest extent permitted by federal law.    See First United Bank of Mississippi v. First National Bank of Atlanta, 255 Ga. 505, 340 S.E.2d 597 (1986).    Accordingly, this court's inquiry is reduced to an analysis of whether the assertion of personal jurisdiction comports with the Due Process requirements of federal law.

The exercise of personal jurisdiction must comport with "traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158 (1945).    As a starting point, the issue turns on whether the ADA had sufficient minimum contacts with the State of Georgia "such that it would reasonably anticipate being haled into court" here.    World-Wide Volkswagon Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 567 (1980).    Contacts are relevant to the analysis only when they are "purposefully directed at the forum or its residents."    Red Wing, 148 F.3d at 1359.    Nevertheless, a single act can be sufficient to confer specific jurisdiction over a defendant where the cause of action arises out of or relates to the specific contact in question.    Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174 (1985).

19

A defendant may be subject to general jurisdiction in a given forum where its activities in the forum are "continuous and systematic." International Shoe, 326 U.S. at 320, 66 S.Ct. at 160. The actions of third parties directed at the defendant are not appropriate for inclusion in this analysis. See Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239 (1958). Thus, only actions by the defendant which are "purposefully directed at the forum or its residents" may be considered. Red Wing, 148 F.3d at 1359.

In light of the above standards, the court finds that the ADA is not subject to the personal jurisdiction of this court. The plaintiff does not sufficiently allege[12] that the ADA either manufactured or sold the dental amalgams she allegedly received. Neither has she alleged that her treating dentist was a member of the ADA or was in any manner influenced by the ADA at the time the amalgams were installed. Upon careful review, it does not appear that the ADA is alleged to have directly participated in any manner in the chain of events that led to the dental amalgams being

_____

[12]The plaintiff's broad allegations that, inter alia, the "dental defendants" manufactured, inspected, marketed, and sold "the amalgams" are, simply, conclusory and unsupported by specific factual allegations. The allegations fail to identify which of the "dental defendants" performed which alleged task. Moreover, the allegations do not provide sufficient factual allegations to support the allegation that the ADA manufactured the amalgams in question. As noted, the complaint does not identify the dentist who installed her amalgams nor does it allege where the unnamed dentist acquired the amalgams. The court cannot indulge such unsupported allegations.

installed in the plaintiff.  Accordingly, the court finds that the ADA is not subject to specific jurisdiction.

The ADA does not have sufficient continuous and systematic contacts with Georgia to support a finding that the ADA is subject to general jurisdiction in this forum.  The ADA is a voluntary association whose activities are centered around Chicago, Illinois. The ADA's contacts with Georgia are generally initiated by member citizens of Georgia.  The ADA is not licenced to transact business in Georgia and does not have a designated agent for service of process in Georgia.  It appears that the ADA has taken careful steps not to subject itself to the jurisdiction of foreign jurisdictions. The tri-partite dental association structure allows the ADA to avoid employing citizens of Georgia while deriving significant financial benefit from citizens of Georgia. Nevertheless, the contacts revealed by the record do not support a finding that the ADA is subject to general jurisdiction in Georgia. Accordingly, because it has properly objected to the jurisdiction of this court and this court has found that it lacks jurisdiction, the ADA's motion to dismiss is due to be granted.[13]

---

[13]Because the court has determined that it lacks jurisdiction over the person of the ADA, the court does not address the sufficiency of the plaintiff's allegations against the ADA.  Thus, there has been no adjudication on the merits and this action is dismissed without prejudice as to the ADA.

21

## III.  CONCLUSION

For the above and foregoing reasons, the plaintiff's motion to remand [Doc. No. 28-1] is **DENIED**; the vaccine manufacturers' motion to dismiss [Doc. No. 4-1] is **GRANTED**; the motion to dismiss by Eli Lilly and Co. [Doc. No. 6-1] is **GRANTED**; and the ADA's motion to dismiss [Doc. No. 5-1] is **GRANTED**.  Except for the Georgia Dental Association, the Savannah Electric and Power Company, the Armour Pharmaceutical Company, and Johnson & Johnson, this action is dismissed against all other defendants without prejudice. Additionally, based on the forgoing, the ADA's motion to disqualify [Doc. No. 18-1] is **DENIED AS MOOT**; the ADA's motion to strike or disregard [Doc. No. 19-1 and 19-2] is **DENIED AS MOOT**; the plaintiff's motion for leave to file [Doc. No. 20-1] is **DENIED AS MOOT**; and the plaintiff's motion to strike [Doc. No. 42-1] is **DENIED AS MOOT**.

SO ORDERED, this _24_ day of February, 2003.

CHARLES A. PANNELL, JR.
United States District Judge

22

21

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2001-019657                                    02/20/2003


                                          CLERK OF THE COURT
THE HONORABLE MICHAEL A. YARNELL                 K. Winchell
                                                  Deputy

                                          FILED: 03/07/2003

ADAM BERTRAND, et al.                     MICHAEL E MEDINA JR

v.

AMERICAN HOME PRODUCTS, et al.            CRAIG W PHILLIPS


                                          JAMES R BROENING
                                          JEFFREY J CAMPBELL
                                          PAUL F ECKSTEIN
                                          STEPHANIE VITHOULKAS HACKETT
                                          CHARLES S HOVER III
                                          ROGER N MORRIS
                                          DARWIN J NELSON
                                          GINA ROSSANO


                           RULING


        Various Motions To Dismiss, or in the alternative To Stay, have been under advisement
since Oral Argument on January 17, 2003. This minute entry contains the ruling on those
motions:

        This action was filed November 13, 2001, removed to Federal court on or about
December 13, 2001, and remanded to State court by order of September 27, 2002. Plaintiff
Adam and Catherine Bertrand bring this action on their behalf and that of their son Benjamin
Cole Bertrand for personal injury under theories of negligence, consumer fraud, battery, breach
of warranty and strict liability all related to Thimerosal, a mercury based preservative contained
in childhood vaccines administered to Benjamin. Toxic metal screening tests show that Benjamin
suffers from mercury toxicity.

        Defendants include the vaccine manufactures (Wyeth, Aventis, Merck and
Glaxsosmithkline) (hereinafter the "Vaccine Defendants"), the Thimerosal
Manufacture/supplier/distributors (Eli Lilly and Sigma Aldrich) (hereinafter the "Thimerosal

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2001-019657                                          02/20/2003

Defendants"), and the healthcare providers (Arrowhead Pediatrics, Ruiz, Cigna and Houfek) (hereinafter the "Healthcare Defendants").

As an initial procedural matter, on the Court's own motion,

IT IS ORDERED granting Plaintiff's Motion To File First Amended Complaint, which complaint is hereby deemed filed and served. All current answers may stand to the amended complaint, provided however, any Defendant may file a new answer at the Defendant's option.

FURTHER ORDERED all pending Motions To Dismiss shall and do apply to the First Amended Complaint.

All appearing Defendants have either moved to dismiss or joined in other defendants pending motions to dismiss. Some common and some different grounds are asserted by each group of Defendants.

### The Vaccine Defendants

One common ground asserted by all Defendants for dismissal of this action is the affect of the National Childhood Vaccine Injury Act of 1986, as amended, 42 U.S.C. § 300aa-11 (the "Vaccine Act"). The Vaccine Act specifically directs courts to dismiss causes of action that were not first filed in the Court of Federal Claims. 42 U.S.C. §300aa-11a(2)(B). After proceeding through the Court of Federal Claims, a claimant may pursue a civil tort action in either state or federal court. The parties here dispute which of the claims and/or parties in this action are subject to the mandates of the Vaccine Act. It is undisputed that Plaintiff Benjamin has filed an action under the Vaccine Act that has not been concluded.  ·

The United States District Court for The District Of Arizona in CV-01-2431-PHX-PGR ,in its order of September 27, 2002 remanding this case (the "Remand Order"), has ruled the Vaccine Act supplements and does not entirely preempt state tort remedies "with the requirement that claims first be exhausted in the Court of Claims." Remand Order at p. 6. According to the district court's order, ". . . the state court is the appropriate body to address exhaustion and assess the merits of Plaintiff's claims." Id., at 7.

Plaintiff's argue, in the alternative, that the alleged injury is from the "adulterant or contaminant" Thimerosal, not an integral vaccine component, and that the injuries are not "vaccine-related", thus the injuries are not covered by the Vaccine Act.

### The Thimerosal Defendants

Plaintiffs' argue the Thimerosal Defendants, as manufactures, suppliers or distributors of a licensed and known chemical component of a vaccine are not "vaccine manufacturer or

Docket Code 078                      Form V000A                           Page 2

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2001-019657                                    02/20/2003

administrator" under the Vaccine Act. *See Owens v. American Home Products*, [United States District Court For The Southern District Of Texas, Civil Action No. G-02-185, Order dated May 8, 2002, Tab 5, Vaccine Manufacture's Motion To Dismiss] and 203 F.Supp.2nd 748 (S.D. Tex. 2002). Plaintiffs' assert that if a claim can not be made against the Thimerosal Defendants under the Vaccine Act, then dismissal here is not required. Plaintiffs point out the government has taken such a position in the Vaccine Act proceedings.

The Thimerosal Defendants contend that *Owens* is incorrectly decided pointing out the Vaccine Act's definition of "vaccine related injury" includes injury from a component. The Thimerosal Defendants argue, indeed they judicially concede and admit, they are within the term "manufacture or administrator" of a Vaccine Act because they were a manufacture and distributor of the approved and licensed component Thimerosal. The Thimerosal Defendants contend that unless the claims in this action against them are dismissed, Plaintiffs in fact can not maintain a claim under the Vaccine Act. 42 U.S.C. § 300aa-11a(5)(B).

The Thimerosal Defendants also point to recent rulings by in the Vaccine Court that death or injury from the Thimerosal component of a vaccine is encompassed within the Vaccine Act and the recent amendment by the Homeland Security Act of 2002 to 42 U.S.C. §300aa-33(3) specifically expanding the definition of manufacture to include vaccine component manufactures such as the Thimerosal Defendants.

As to Defendant Eli Lilly, Plaintiff additional alleges liability not from just the manufacture and distribution of Thimerosal, but from activities "in manipulating the medical literature and concealing the dangers of Thimerosal." Plaintiff currently concedes that no claim lies against Eli Lilly on a strict liability theory because "Eli Lilly did not manufacture or distribute the specific Thimerosal that was injected into Benjamin." Response, p 13, ln.18-20.

The Thimerosal Defendants also contend the Vaccine Defendants are necessary parties under Rule 19(b), Rules of Civil Procedure and this action should thus be dismissed against the Thimerosal Defendants on that ground. Plaintiffs respond that the Thimerosal Defendants have not met their burden of showing necessary party.

**The Healthcare Defendants**

The Healthcare Defendants contend that claims of strict liability and breach of warranty as to childhood vaccines are not cognizable under Arizona law by reason of A.R.S. 12-561 et. al. Alternatively, the Healthcare Defendants contend they are not "manufacturers or sellers" of the vaccines in question and thus can not be liable on a products liability claim under A.R.S. 12-681. The Healthcare Defendants contend the only possible viable claim against them is medical negligence.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2001-019657                                      02/20/2003

### The Parents Claims

Plaintiff parents assert claims for medical expenses for Benjamin and loss of consortium claims. Some of the issues present here were present in the remand proceedings, briefed, argued and ruled upon by the District Court Judge. For instance, the Remand Order concludes that "the claims of Adam and Catherine Bertrand for their own injuries, as parents of the injured child, are not covered by the Vaccine Act." Remand Order, p. 13. The district court ruling does not address, however, the derivative nature of those claims under state law. Without a final verdict on the claim of Benjamin, it is likely under Arizona law there can be a final verdict on the claims of Benjamin's parents as a result of alleged injury to Benjamin. *See Quadrone v. Pasco Petroleum Co., Inc.*, 156 Ariz. 415 (1987).

### The Stay Issues

Plaintiff wishes to proceed to the greatest extent possible in two forums, the Vaccine Court and this Court. Defendants wish to proceed not at all in this Court, either by way of dismissal or stay. All parties assert the alternative position of a stay, artfully arguing separate sides of the same "stay" coin.

Plaintiff may be exposed to statute of limitations problems if claims not otherwise cognizable in the Vaccine Court are dismissed. Defendants contend that the Vaccine Act requires the dismissal of not only claims cognizable in the Vaccine Court, but all claims in this action.

Based on the entire record in this case and the authorities cited by the parties,

IT IS ORDERED finding as a matter of law that Thimerosal is not an "adulterant or contaminant" as those terms are used in the Vaccine Act.

FURTHER ORDERED finding as a matter of law the Thimerosal Defendants, as manufacture/supplier/distributors of a licensed component of a listed childhood vaccine subject to a Vaccine Act claim based on that component, are "vaccine manufacturer[s] or administrator[s]" under the Vaccine Act, particularly as amended by the Homeland Security Act of 2002.

FURTHER ORDERED finding the alleged fraud and direct negligence claims as to Defendant Elli Lilly are not as a practical matter severable and should not proceed to discovery and adjudication without an adjudication of the strict liability and implied warranty claims.

FURTHER ORDERED alternatively finding the Vaccine Defendants are necessary parties under Rule 19(b) Rules of Civil Procedure to any adjudication in this Court of the liability of the Thimerosal Defendants on the strict liability and implied warranty claims.

Docket Code 078                    Form V000A                         Page 4

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2001-019657                                    02/20/2003

FURTHER ORDERED finding the parent's claims in this action are derivative, are not as a practical matter severable, and should not proceed to judgment under Arizona law without an adjudication of the child's claims.

FURTHER ORDERED finding as a matter of law that no claim lies under Arizona Law against the Healthcare Providers for strict liability or breach of warranty in the context of the alleged childhood vaccine administration.

FURTHER ORDERED finding as a matter of law the Healthcare Provider Defendants are not "manufacturers or sellers" as those terms are used in A.R.S. 12-681 of either the vaccine or its Thimerosal component.

Accordingly,

IT IS ORDERED ADJUDGED AND DECREED,

IT IS ORDERED dismissing all claims in this action, without prejudice, against the Vaccine Defendants Wyeth, Aventis, Merck and Glaxsosmithkline, except as to any loss of consortium claims by the Plaintiff Parents.

FURTHER ORDERED dismissing all claims in this action, without prejudice, against the Thimerosal Defendants Eli Lilly and Sigma Aldrich, except as to any fraud and/or direct negligence claims not included within any strict liability or implied warranty claims and except as to any loss of consortium claims by the Plaintiff Parents.

FURTHER ORDERED dismissing, **with prejudice,** the strict liability and implied warranty claims only against the Healthcare Defendants Arrowhead Pediatrics, Ruiz, Cigna and Houfek. Any medical negligence claim remains as to these Defendants.

FURTHER ORDERED staying all discovery and adjudication of any and all remaining claims in this action pending further order of this Court or the conclusion of Plaintiff's Vaccine Court proceeding, which ever shall first occur.

FURTHER ORDERED finding no just reason for delay in the entry of final judgment on these issues and directing that final judgment be so entered.

FURTHER ORDERED each party shall currently bear their own costs and attorney's fees that relate to any dismissed claims, subject to later assertion should all or any portion of this or any related litigation proceed.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2001-019657                                    02/20/2003

FURTHER ORDERED Defendants' counsel shall forthwith meet, confer and jointly lodge a single form of judgment, including Rule 54(b) language, provided however, that judgment shall included **only** the orders of dismissal and stay.

FURTHER ORDERED placing this matter on the Inactive Calendar until **December 1, 2003** for dismissal without prejudice, without further notice to the parties, unless the stay has been lifted or the Inactive Calendar date has been extended.


/S/  THE HONORABLE MICHAEL A. YARNELL
_____
JUDICIAL OFFICER OF THE SUPERIOR COURT

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 02-CV-11664-RGS


ALLISON DAIGLE, et al.

v.

AVENTIS PASTEUR, INC. f/k/a
CONNAUGHT LABORATORIES, INC., et al.

MEMORANDUM AND ORDER ON
MOTION TO REMAND AND MOTIONS TO DISMISS

June 13, 2003


STEARNS, D.J.

On May 31, 2002, plaintiff parents filed this Complaint in the Massachusetts Superior

Court alleging that their minor children had been injured by exposure to vaccines containing

the preservative thimerosal. The defendants consist of most of the vaccine manufacturers

in the United States, the New England Medical Center, and two doctors who administered

the vaccines. The Complaint asserts claims for breach of warranty, failure to warn, fraud,

product defect, violations of Chapter 93A, medical malpractice, "medical monitoring," and

loss of consortium. On August 20, 2002, defendants removed the case to the federal district

court. On August 27, 2002, defendants Aventis Pasteur, Inc., Wyeth Pharmaceuticals, Inc.,

Merck & Co., Inc., SmithKline Beecham Corporation, Ayerst Pharmaceuticals, Inc., Baxter

International, Inc., and Abbott Laboratories, Inc., (the vaccine manufacturers) moved to

dismiss the Complaint on grounds that plaintiffs had failed to comply with the requirement

of the National Vaccination Program (the Vaccination Act), 42 U.S.C. §§ 300aa-1 et seq.,

that vaccine-related injury claims be filed in the first instance in the Court of Federal Claims, the court designated to oversee the National Vaccine Injury Compensation Program (NVICP).[1] On September 11, 2002, the plaintiffs moved to remand the case for want of federal jurisdiction.[2] On December 30, 2002, the New England Medical Center joined the vaccine manufacturers' argument that plaintiffs had failed to exhaust their remedies under the NVICP. On January 8, 2003, the two defendant doctors moved for dismissal on the same grounds.

The court will first address (as the plaintiffs urge) the motion to remand. Plaintiffs argue that because their claims are framed exclusively on state law, no substantial federal question is implicated by the Complaint. Moreover, plaintiffs maintain that diversity jurisdiction is lacking because the two defendant doctors are (like plaintiffs) citizens of Massachusetts. While conceding the lack of facial diversity, defendants maintain that the doctors were named as defendants solely for the purpose of defeating diversity, and should therefore be considered as fraudulently joined.[3]

> When speaking of jurisdiction, "fraudulent" is a term of art. 14A Charles A. Wright, et al., Federal Practice and Procedure § 3723 at 354 (2d ed. 1985). Although false allegations of jurisdictional fact may make joinder fraudulent, B., Inc. v. Miller Brewing Co., 663 F.2d 545, 549 (5th Cir.1981), in most cases fraudulent joinder involves a claim against an in-state defendant that simply has no chance of success, whatever the plaintiff's motives. Chicago, R.I. & P.R. Co. v. Whiteaker, 239 U.S. 421, 424, 36 S.Ct. 152, 153, 60 L.Ed. 360

---

[1]On October 28, 2002, Eli Lilly & Co., filed a separate motion to dismiss on the same grounds.

[2]Plaintiffs also moved to stay the proceedings pending a decision on the motion to remand.

[3]It is undisputed that the damages alleged in the Complaint exceed $75,000, and that, if the doctors are disregarded as defendants, diversity jurisdiction exists.

(1915); Insinga, 845 F.2d at 254; Dodd v. Fawcett Publications, Inc., 329 F.2d 82, 85 (10th Cir.1964); Chilton Private Bank v. Norsec-Cook, Inc., 99 B.R. 402, 403 (N.D. Ill.1989); Kocot v. Alliance Machine Co., 651 F. Supp. 226, 227 (S.D. Ill.1986).

Poulos v. Naas Foods, Inc., 959 F.2d 69, 73 (7th Cir. 1992). Plaintiffs argue (in the most general terms) that because a state court might theoretically find the doctors liable under one or more of the various state claims, they are not "fraudulent" defendants, and therefore, diversity jurisdiction does not exist. The difficulty with the argument is that while a state court might find liability, to do so, it would have to disregard the clear command of the Vaccination Act, which bars the prosecution of any vaccine-related injury claim, whether state or federal, and regardless of its merits, unless a plaintiff first files a petition under the NVICP. The Vaccination Act provides, in relevant part, that:

> [n]o person may bring a civil action for damages in an amount greater than $1,000 or in an unspecified amount against a vaccine administrator or manufacturer in a State or Federal court for damages arising from a vaccine-related injury or death associated with the administration of a vaccine after October 1, 1988, and no such court may award damages in an amount greater than $1,000 in a civil action for damages for such a vaccine-related injury or death, unless a petition has been filed, in accordance with section 300aa-16 of this title, for compensation under the [NVIC] Program for such injury or death. . . .

42 U.S.C. § 300aa-11(a)(2)(A). Under § 300aa-11(a)(2)(B), "[i]f a civil action which is barred under subparagraph (A) is filed in a State or Federal court, the court shall dismiss the action." (Emphasis added). Defendants argue (correctly) that the claims against the doctors "simply ha[ve] no chance of success" because plaintiffs undisputedly did not file under the NVICP, and that a state court that nonetheless entertained their claims would be acting ultra vires.

Perhaps recognizing that a finding of fraudulent joinder is virtually compelled in this

3

case, plaintiffs argue in the alternative that the children's claims derive from their exposure to thimerosal, which is a vaccine preservative, and not a vaccine. The logic of the argument is that if thimerosal is not a vaccine, the children's alleged injuries cannot be considered "vaccine-related," and the claims are therefore not subject to the exhaustion requirements of the Vaccination Act.

Under § 300aa-33(5), a "vaccine-related injury" is defined as "an illness, injury, condition, or death associated with one or more of the vaccines set forth in the Vaccine Injury Table, except that the term does not include an illness, injury, condition, or death associated with an adulterant or contaminant intentionally added to such a vaccine." Despite overwhelming authority to the contrary,[4] plaintiffs argue that thimerosal falls within the "adulterant or contaminant" exception of the Vaccination Act. Not only have most courts rejected this argument, but so has Congress. In enacting the Homeland Security Act of 2002, Congress amended the definition of a "vaccine-related injury" under § 300aa-33(5), to state that "[f]or purposes of the preceding sentence, an adulterant or contaminant shall not include any component or ingredient listed in a vaccine's product license application or product label." Because it is undisputed that thimerosal is an ingredient listed in the vaccine product license applications at issue, it is clear that Congress' intention is, and was, that all thimerosal-based claims be channeled in the first instance through the NVICP.

Plaintiffs' final argument is that their consortium claims against the doctors have an

---

[4]The case most often cited is Leroy v. Secretary of Dep't. of Health & Human Services, 2002 WL 31730680 (Fed. Cl. Spec. Mstr., October 11, 2002). In that case, the Special Master, after an exhaustive analysis, held that thimerosal is a not a contaminant or adulterant within the meaning of § 300aa-33(5), and that thimerosal-related claims were therefore within the primary jurisdiction of the Court of Federal Claims.

4

existence independent of the claims of the children, and therefore cannot be said to be

"vaccine-related." While loss of consortium in the abstract is an independent legal claim, the

law is clear that where the child has no viable cause of action, neither does the parent.

> As a general rule, a claim for loss of consortium requires proof of a tortious act that caused the claimant's spouse personal injury. See Agis, supra at 146-147; Diaz v. Eli Lilly & Co., 364 Mass. 153, 161-168 (1973); Mouradian v. General Elec. Co., 23 Mass. App. Ct. 538, 543-544 (1987). See also W.P. Prosser & R.E. Keeton, Torts § 125, at 931-934 (5th ed. 1984). Although we have determined that a claim for loss of consortium is independent of the spouse's cause of action, see, e.g., Feltch v. General Rental Co., 383 Mass. 603, 607-608, (1981), we have not repudiated the implicit prerequisite that the injured spouse have a viable claim.

Sena v. Commonwealth, 417 Mass. 250, 264 (1994). In sum, the court has jurisdiction to

hear the case, and in so doing, is bound by the Vaccination Act to dismiss plaintiffs' claims

pursuant to § 300aa-11(a)(2)(B).

## ORDER

For the foregoing reasons, plaintiffs' motion to remand is <u>DENIED</u>. The vaccine

defendants' motion to dismiss is <u>ALLOWED</u>. Eli Lilly & Co.'s motion to dismiss is

<u>ALLOWED</u>. New England Medical Center's motion to dismiss is <u>ALLOWED</u>. Dr. Eileen

Homcy and Dr. Mark Blumenthal's motion to dismiss is <u>ALLOWED</u>. Plaintiffs' motion to stay

proceedings is <u>DENIED</u>.

SO ORDERED.

_Richard X Stearns_

UNITED STATES DISTRICT JUDGE

May-26-2003  04:14pm   From-REED SMI,                        215-851-1420        T-356  P 002   F-257

CHARLES R. ASHTON, III and PENNY            :    COURT OF COMMON PLEAS
STARR-ASHTON, parents and natural           :    PHILADELPHIA COUNTY
guardians of MADIGAN ASHTON and             :
LUCINDA ASHTON, et al.                      :    COMMERCE PROGRAM
                                            :
              vs.                           :
                                            :
AVENTIS PASTEUR, INC., individually and     :    JULY TERM, 2002
as successor in interest to CONNAUGHT       :
LABORATORIES, INC., PASTEUR MERIEUX,        :    NO.  04026
and PASTEUR MERIEUX CONNAUGHT, et al.       :

                                                 Control #011926, #011965,
                                                 #011982, #012004, #012017,
                                                 #012035, #012036, #012044,
                                                 #012045, #020310

## ORDER and MEMORANDUM

AND NOW, to wit, this 22ⁿᵈ day of _____, 2003, upon consideration of the

Preliminary Objections of the defendants and the plaintiffs' response thereto, it is hereby

ORDERED and DECREED said Preliminary Objections are SUSTAINED.  The plaintiffs'

Complaint is DISMISSED WITH PREJUDICE.


                                        BY THE COURT:



                                        _____
                                        GENE D. COHEN,              J.




                                        COPIES SENT
                                        PURSUANT TO Pa. R.C.P. 236(b)

                                        MAY 2 2 2003

                                        First Judicial District of Pa.
                                        User I.D.:  JCY

| | |
|---|---|
| CHARLES R. ASHTON, III and PENNY STARR-ASHTON, parents and natural guardians of MADIGAN ASHTON and LUCINDA ASHTON, et al. | : COURT OF COMMON PLEAS<br>: PHILADELPHIA COUNTY<br>:<br>: COMMERCE PROGRAM |
| vs. | : |
| AVENTIS PASTEUR, INC., individually and as successor in interest to CONNAUGHT LABORATORIES, INC., PASTEUR MERIEUX, and PASTEUR MERIEUX CONNAUGHT, et al. | : JULY TERM, 2002<br>:<br>: NO. 04026 |

Control #011926, #011965,
#011982, #012004, #012017,
#012035, #012036, #012044,
#012045, #020310

## MEMORANDUM

*COHEN, GENE D., J.*

### INTRODUCTION:

The instant action is a class action complaint brought by class representatives who seek actual damages and damages in the form of "medical monitoring" based upon injuries they and class members either currently have or may develop. The plaintiffs allege that vaccinations containing the chemical thimerosal were the source of their current and would-be injuries. The Court now has before it preliminary objections filed by all defendants — manufacturers of the vaccines and thimerosal — urging this Court to dismiss the plaintiffs' complaint and hold that for several reasons the plaintiffs have no cause of action. The Court hereby sustains said preliminary objections and dismisses the plaintiffs' complaint.

### BACKGROUND:

The plaintiffs seek damages and "medical monitoring" alleging they were poisoned by the presence of the ingredient Thimerosal in childhood vaccinations they received.

Within a few years after birth most American children receive a series of vaccinations. The vaccines administered control the virulent consequences of such childhood diseases as measles, pertussis, rubella, polio, whooping cough, hepatitis, diphtheria and tetanus. These vaccines often contain either a killed bacteria or live but weakened viruses and, hence, can cause serious adverse affects. *See* O'Connell v. Shalala, 79 Fed. 3d 170, 172 (1st Cir. 1996) (citing Committee to Review the Adverse Consequences of Pertussis and Rubella Vaccines, Institute of Medicine, Adverse Affects of Pertussis and Rubella Vaccines 1 (1991)). In 1996, responding to the possibility of a socio-medical catastrophe that might arise if the victims of the adverse consequences of childhood vaccinations made use of the tort liability system, Congress enacted the National Childhood Vaccine Injury Act of 1996, Pub. L. No. 99-660, 1986 U.S.C.C.N. (100 Stat.) 3755 (Codified as amended at 42 U.S.C. §§300aa-1 to 34) (1994). The purpose of the Vaccine Act was to establish a vaccine injury compensation program that would allow claimants to petition to receive compensation for vaccine-related injuries or death. Congress in its wisdom believed that to subject such injuries and deaths to the marketplace of the tort liability system would drive up the prices of vaccines and discourage vaccine manufacturers from remaining in the marketplace as well as leaving many sufferers of vaccine-caused injuries uncompensated. To receive compensation the claimant must petition the Court of Federal Claims and demonstrate by a preponderance of the evidence that (1) the vaccinated child suffered an injury listed on a table or a complication or "sequela" thereof, or (2) that the vaccine caused or significantly aggravated the child's injury or condition. *See* §§300aa-11 to 13 and 14. *See also* 42 C.F.R. §100.3 (1996). The Act in pertinent part requires that a person injured directly by a vaccine first bring a Vaccine Court proceeding. Id. §300aa-11(a)(2)(A). Then the statute gives that person the choice either to accept the court's award and abandon his tort rights (which the Act transfers to the federal

- 2 -

government, Id. §§300aa-17), or to reject the judgment and retain his tort rights. Id. §§300aa-21(a); 300aa-11(a)(2)(A)(i).  A claimant can also keep his tort rights by withdrawing the Vaccine Court petition if the court moves too slowly. Id. §§300aa-21(b); 300aa-11(a)(2)(A)(ii).)

This new remedial system further interacts with traditional tort law suits by limiting punitive damage awards and bifurcating trials. The Act establishes a presumption of compliance with Food and Drug Administration requirements meaning the manufacturer provided proper directions and warnings and freeing the manufacturer from liability for not providing direct warnings to an injured person or his representatives. Id. §§300aa-23(a), 23(d), 22(c), 22(b)(1). See Schaeffer v. American Cyanimide Co., 20 Fed. 3d 1, 9 to 12 (1st Cir. 1994).

Further provisions of the Vaccine Act address the real issue of concern in these cases and that is whether the vaccine in question caused injury or death. There are two ways to prove causation under the Act. The Vaccine Injury Table lists certain injuries and conditions which if found to occur within a prescribed period of time following vaccination, create a rebuttable presumption of causation. In such "on table" cases petitioners do not need to show proof of actual causation. For instance, if a petitioner proves that her child received a DPT vaccine on July 20, 1998 and that she suffered an encephalopathy within three days thereafter or anaphylactic shock within 24 hours thereafter, causation is presumed. The Act's Qualifications and Aids to Interpretation further define the compensable conditions. A petitioner is no longer burdened with the onerous task of proving that the vaccine actually caused the condition in question. In the vast majority of cases the presumption of causation does not, however, obviate expert medical testimony. A qualified witness must still attest that the victim suffered the particular medical condition for which the compensation is being sought.

- 3 -

Where the symptoms fall outside the statutory time frames the petitioner must present evidence of causation and fact. The legislative history instructs that "simple similarity to conditions or time periods listed in the table is not sufficient evidence of causation; evidence in the form of scientific studies or expert medical testimony is necessary to demonstrate causation for such a petitioner. Petitioner need not, however, prove causation to a scientific certainty. Rather the petitioner must show a "logical sequence of cause and affect".

Once the petitioner establishes a *prima facie* case, the burden then shifts to the respondent who must prove by a preponderance of the evidence that the claimed injury is attributable to some factor unrelated to the vaccine. Such factors may not include "any idiopathic, unexplained, unknown, hypothetical or undocumentable cause, factor, injury, illness, or condition". In part because of belated participation by the respondent, the precise scope of the alternate cause injury has yet to be defined. Although the alternate cause determination is usually fact specific, the claims court has held as a matter of fact that proof of Sudden Infant Death Syndrome is insufficient to dispel the Act's presumption of causation. *See e.g.,* Daniel Green and Sandra Green, as legal representatives of the Estate of Chad Green v. Secretary of the Department of Health and Human Services, 19 Cl. Ct. 57 (1989).

The system thus establishes standards of proof under which individuals who suffer injuries within specified intervals after being administered a vaccine benefit from a presumption that a vaccine caused those injuries. *See* 42 U.S.C. §300aa-11(c)(1)(C)(i). *See also,* Haggerty v. Wyeth Averst Pharmceutical Co., 79 F.Supp. 2d 182, 184 (E.D.N.Y. 2000).

A program claimant may not file a civil action against a vaccine manufacturer or administrator (i.e., the person or organization on behalf of whom the person administered the

- 4 -

vaccination) unless the claimant initially files a timely petition in accordance with the program's guidelines. *See* Shalala v. Whitecotton, 514 U.S. 268, 270 (1995) and 42 U.S.C. §300aa-11(2)(A), explaining that a claimant alleging an injury after the Vaccine Act's effective date must exhaust the Act's procedures . . . before filing any *de novo* civil action in state or federal court. If a claimant seeks compensation in a state or federal court for vaccine-related injuries prior to exhausting his or her remedies under the Vaccine Act, the court must dismiss the action. *See* 42 U.S.C. §300aa-11(a)(2)(B). Simply put, individuals who qualify as program claimants must file petitions in the Vaccine Court in order to pursue any vaccine-related claims at all. If an individual who prevails in the Vaccine Court is ultimately dissatisfied with his or her program award, that individual may reject the award and pursue a traditional tort action in any forum. *See* 42 U.S.C. §300aa-21(a).

Under the Vaccine Act, then, a person may not sue in state or federal court for more than $1,000 for a vaccine-related injury unless that person has first filed a petition in Vaccine Court within thirty-six months of the injury. The plaintiffs herein seek to circumvent this bar by claiming (a) they need not file petitions under the Act because the statute of limitations under the Act has expired, and (b) they are not injured. To quote from the plaintiffs' surreply memorandum of law:

> "Without question, the Vaccine Act does not provide relief to the children for whom plaintiffs request medical monitoring relief. As set forth in plaintiffs' Memorandum in Opposition, this case presents a textbook example of the circumstances where medical monitoring should be awarded: *asymptomatic* children who need testing as a result of defendants' tortious conduct in order to determine the extent, if any, of damage caused by direct injection of mercury into their bodies, so early diagnosis or mitigation can occur. These children are *asymptomatic* and therefore unable to obtain relief from the Act. No amount of verbal calisthenics can change that fact."

Initially, and making reference to the amended complaint which is the subject matter of these proceedings, in conjunction with the foregoing assertion that "these children" are not injured and the plaintiffs'·duties under the Vaccine Act, the Court's attention is inevitably drawn to the allegations in the complaint. Pages 6 and 7 of the complaint – a class action -- name three representatives of the class. One is Madigan Ashton. She is described as "diagnosed with an Autism Spectrum Disorder (ASD); Pervasive Developmental Disorder, Not Otherwise Specified (PDD/NOS)." The next class representative plaintiff is Samuel Kaplan, a minor child who "has been diagnosed with an Autism Spectrum Disorder (ASD); Pervasive Developmental Disorder, Not Otherwise Specified (PDD/NOS)." Another plaintiff, Robbie Powell, a minor, according to the complaint "has been diagnosed with an Autism Spectrum Disorder (ASD); Pervasive Developmental Disorder, Not Otherwise Specified (PDD/NOS)." And the fourth plaintiff, Lucinda Ashton, is described as having "achieved the neurological, social and developmental milestones anticipated for a child of her age." From pages 12 through 21 the complaint relates in detail the medical histories of each child, including their exposure to the vaccines in question. Each account of each child concludes with the statement, "In all [plaintiff] was poisoned with 237.5 micrograms of toxic mercury from the vaccines containing thimerosal." Overall, then, the Court has before it four plaintiffs, all "poisoned", three with injuries that the complaint alleges, inferentially if not directly, were caused by their thimerosal-containing vaccinations.

## DISCUSSION:

### Preliminary Objections pursuant to Pa.R.C.P. 1028(a)(1) and Pa.R.C.P. 1028(a)(4)

(a) *This Court lacks jurisdiction under the Vaccine Act – Plaintiffs are Qualified Claimants under the Act.*

Without reiterating the foregoing discussion, it should be plain that this Court has

- 6 -

no jurisdiction to entertain the vaccine-related claims of the plaintiffs for the following reasons. This Court holds that the plaintiffs are persons who would qualify to file original actions under the Vaccine Act because they do allege damages for vaccine-related injuries. Each plaintiff alleges that he or she was "poisoned" by the substance thimerosal added to a series of vaccines. No amount of verbal calisthenics can conceal the fact that plaintiffs do allege injuries, even if they are incubating injuries that may manifest themselves later in time. The plaintiffs Ashton, Kaplan and Powell definitely assert injuries in the form of learning disorders. And, as stated, all four plaintiffs unequivocally state they were poisoned. Being poisoned is being injured. Being injured involves the plenary jurisdiction of the Vaccine Act. Plaintiffs claims are precluded for this reason.

      (b)    *This Court lacks jurisdiction under the Vaccine Act — Thimerosal-related Injuries are "Vaccine-related".*

Every court that has had the opportunity to rule on this issue has held that thimerosal is not an "adulterant or contaminant" of the vaccines at issue, but a preservative inherent to the production of a vaccine. *See* <u>McDonell v. Abbott Laboratories</u>, C.A. No. 3:02 CV 437 LN slip opinion at pp. 2-3 (S.D.Miss. August 1, 2002); and <u>Liu v. Aventis Pasteur, Inc.</u>, 219 F.Supp. 2d 7622 (W.D.Tex. 2002). What is more, an opinion by a fellow judge of this Court, <u>Cheskiewicz et al. v. Aventis Pasteur, Inc., et al.</u>, May Term, 2002 #0952 (DiNubile, J. December 16, 2002) analyzes the very same contention — that thimerosal is an ingredient outside of the content of the vaccines thus enabling a separate state-related tort action to be brought against the manufacturers who use thimerosal — and holds that thimerosal does not fall within an exception or foreign substances added to vaccines. As the defendant vaccine manufacturers correctly point it is the unanimous position of the Secretary of United States Department of

- 7 -

Health and Human Services, the Vaccine Court and the Federal District and state trial courts that

confronted the issue that thimerosal claims are covered by the Vaccine Act.

- (c) *This Court lacks jurisdiction under the Vaccine Act -- Plaintiffs were Qualified Claimants even though untimely.*

The plaintiffs through their lawyers support their identities as state tort plaintiffs

by claiming that they failed to file their claims "within three years from the onset of a vaccine-

related injury" and it is the latent nature of their purported injuries that caused them to do so.

For this contorted reason the plaintiffs believe they are exempted from filing a petition in the

Vaccine Court. This argument was rejected by the court in Cheskiewicz, *supra*. This Court

will re-emphasize the rejection. The Court can simply re-recite the language of Cheskiewicz to

dismiss the complaint on these grounds:

> "One cannot simply wait out the three-year limitations period and then
> file a civil tort action free from all substantive and procedural limitations
> under the Vaccine Act. It is clear that plaintiffs' attempts to commence
> this suit in District Court and subsequently this Court are to circumvent
> the requirements of the Act. If the instant suit were permitted, then
> every litigant who did not want to first assert claims in Vaccine Court
> simply could wait out the 36 month requirement if the tort actions were
> not barred by the statute of limitations and then commence their actions
> in federal or state courts. Such an approach is counter to the intent of
> Congress." *See* McDonald v. Lederle Labs, 775 A.2d 528, 532
> (N.J.Super.Ct.App.Div. 2001) (affirming the lower court's dismissal of
> the suit under circumstances similar to the instant case).

The Vaccine Act by its terms unambiguously bars civil actions for damages for alleged

vaccine-related injury "unless a petition has been filed in accordance with §300aa-16 of this

title." That section provides that "no petition for compensation shall be filed for [a vaccine-

related] injury after the expiration of 36 months from the date of the occurrence of the first

symptom or manifestation of onset or of the significant aggravation of such injury." 42

- 8 -

May-28-2003  04:17pm  From-REED SM....                215-851-1420          T-356   P.011/013   F-257

U.S.C. 300aa-16(a)(2). Plaintiffs have admittedly missed filing under the foregoing provision within the acceptable period of time. Because this Court holds that only the Vaccine Court has jurisdiction over their claims, their claims must be dismissed with prejudice.

(d)    *Plaintiffs Fail to State a Claim Upon Which Relief Can Be Granted.*

In what this Court views as largely a rhetorical instrument aimed at circumventing the requirements of the Vaccine Act, the plaintiffs base their state tort claim on a right to "medical monitoring" for injuries yet to be ascertained. The Court agrees with the defendants in holding that without an underlying tort no relief for medical monitoring can be asserted. *See* Redland Soccer Club, Inc. v. Department of the Army, 696 A.2d 137 (Pa. 1997). The Supreme Court in Redland held that proof of a defendant's negligence is a required element of a cause of action for medical monitoring. The complaint by its terms suggests no proof of the defendants' negligence. The substance at issue is a prescription drug. As the defendants point out, manufacturers of prescription drugs can be held negligent only on a failure to warn formulation. Were the manufacturers' alleged failures to warn issued to doctors insufficient then the manufacturers may be negligent. *See* Demmler v. SmithKlineBeecham, 671 A.2d 1151, 1155 (Pa. Super. 1995) allocatur denied 684 A.2d 557 (Pa. 1996). The plaintiffs are not suing the doctors who administered the vaccinations, so there is no proof that the prescribing doctors were independently aware of the risks at issue. Therefore, proximate cause is not pleaded and thus absent.

The Court further holds that none of the attempted tort formulations the plaintiffs raise in their complaint have a basis under Pennsylvania law. For example, the plaintiffs allege the vaccine defendants negligently failed to test their vaccines and negligently designed,

- 9 -

manufactured and packaged them by using multi-dose vials which require thimerosal as a preservative. *See* Paragraphs 163, 165 and 195(a) and (e) of the Amended Complaint. Again, a brother jurist in this Court has held that negligent failure to test is not an independent tort under Pennsylvania law. *See* In re: Phenylpropanolamine Litigation #0001, September Term, 2001 (Tereshko, J.).

(e)    *Remaining Counts.*

1.    Fraud

While it may not be necessary for this Court to address the specific counts of the complaint, having held that the Vaccine Act applies exclusively to the plaintiffs' claims, the Court will specifically dismiss all remaining claims as having no basis under the law. What is more, plaintiffs' claim for fraud is not specifically pleaded as required by Rule 1019(b) of the Pennsylvania Rules of Civil Procedure. *See* Bash v. Bell Telephone Co., 601 A.2d 825, 831 (Pa.Super. 1992). Plaintiffs' claim for loss of consortium is not actionable not only because there is some ambiguity whether or not the plaintiffs are alleging loss of filial consortium due to injury or some other cause, but because this is not a recognized cause of action in Pennsylvania. *See* Quinn v. City of Pittsburgh, A. 353 (Pa. 1914); McCaskill v. Philadelphia Housing Authority, 615 A.2d 382, 384 (Pa.Super. 1992); Jackson v. Tastykake, 648 A.2d 1214, 1217 (Pa.Super. 1994).

2.    Preliminary Objections as applied to the Vaccine suppliers

This Court specifically rejects as without authority the plaintiffs' claim that the suppliers of thimerosal occupy a separate class apart from that of the vaccine manufacturers and, therefore, regardless of the Court's ruling on the motion of the vaccine manufacturers,

- 10 -

May-28-2003  04:17pm    From-REED SH                215-851-1420              T-356   P 013/013   F-257

should remain as defendants in this matter. The law contradicts this position. The Vaccine Court in <u>Leroy v. Secretary of HHS</u> No. 02-392V at 12 (Ct. Fed. Cl. Office of Special Masters, October 11, 2002) held that the term "vaccine" included the constituents of the vaccine and this takes in thimerosal as well. The Court agrees with the defendants thimerosal suppliers and distributors that the ingredient is interchangeable with the vaccine for the purposes of the defendants' jurisdictional defense. Thus the exclusive jurisdiction of the Vaccine Act should, this Court holds, apply to the manufacturers, suppliers and distributors of thimerosal as well.

## CONCLUSION:

Because the class plaintiffs have not stated a cause of action cognizable under Pennsylvania law, and principally because their claims are cognizable under the exclusive jurisdiction of the federal Vaccine Act, all defendants' preliminary objections will be sustained and the plaintiffs' complaint is dismissed with prejudice.

BY THE COURT:

_GENE D. COHEN,_     J.

- 11 -

24

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

| | | |
|---|---|---|
| MATT NESTLEN & KELLEY NESTLEN, individually and as guardians of DANIEL NESTLEN, a minor child, | ) ) ) ) | Case No. 0201-00126 |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | OPINION and ORDER |
| WYETH, fka AMERICAN HOME PRODUCTS CORP, dba LEDERLE, LEDERLE LABORATORIES, WYETH, WYETH LABORATORIES, WYETH-AYERST, and WYETH VACCINES; MERCK & COMPANY, INC., dba MERCK SHARP & DHOME; ELI LILLY & COMPANY, INC.; JOHN DOE CORPORATE DEFENDANTS 1-20; VIRGINIA FELDMAN, MD; KAISER FOUNDATION HEALTH PLAN, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

| | | |
|---|---|---|
| FREDERICK and MyLINDA KING, et. al., | ) ) | Case No. 0106-05780 |
| Plaintiffs, | ) ) | |
| On behalf of themselves and all others similarly situated, | ) ) ) ) | |
| v. | ) ) | |
| AVENTIS PASTEUR, INC., et. al. | ) ) | |
| Defendants. | ) ) | |

1

03/21/2003 11:30 FAX 503 223 3300          DUDEN NEIMAN LLP                          @003

This matter came on for a hearing December 19, 2002, on the defendants' motions to dismiss and for summary judgment. Michael Williams and Thomas Powers represented the plaintiffs on both cases. Daniel Thomasch was admitted pro hac vice, represented American Home Products, dba Wyeth, and spoke on behalf of all defendants, Margaret Hoffman also represented Wyeth, William Crow represented GlaxoSmithKline, and Paul Duden represented Aventis Pasteur. Based on the evidence presented, memorandum, and arguments of counsel, the Court issues the following opinion.

Plaintiffs Matt and Kelly Nestlen are the parents of Daniel Nestlen, who was born on September 13, 1995. They filed a complaint in Multnomah County Circuit Court on January 7, 2002, alleging that their son suffered permanent neurological injuries, including autism, after receiving three Recombivax HB vaccinations and four Tetramune vaccinations containing thimerosal between September 13, 1995, through January 18, 1997. The plaintiffs allege that Daniel Nestlen's symptoms first occurred or became manifest in January of 1997.

Plaintiffs Jordan King, Sophia Wigney, August Fagelman, Lorenzo Lindsey, Josie Stierna, and Jerry Stafford, III, filed a national class action on behalf of 30 million children in the United States born on or after January 1, 1990, alleging negligence, common law fraud, and strict product liability and seeking damages, declarative and equitable relief.

This Court held a hearing September 23, 2002 on the defendants' motions for summary judgement, motions to abate and Rule 21 motions. The plaintiffs argued they were not required to first file in the Court of Federal Claims ("Vaccine Court") because thimerosal is an adulterant or contaminant and therefore the claims were not subject to the Vaccine Court's jurisdiction. This Court ruled at that time and for the reasons stated on the record that as a matter of law,

thimerosal fits within the definition of a preservative as opposed to an adulterant or contaminant and granted the defendants' motions.

Plaintiffs' counsel raised an additional argument that those plaintiffs whose claims had expired under the National Vaccine Injury Compensation Act's (the "Act") statute of limitations should be allowed to bring civil actions in state court. The Court allowed counsel time to brief this issue and scheduled a hearing on December 19, 2002.

At the December 19, 2002 hearing, plaintiffs argued that because they did not file a petition in Vaccine Court within 36 months of the of the occurrence of the first symptom or manifestation of onset of the vaccine-related injury they are not "qualified" petitioners and therefore need not first file in Vaccine Court.[1]  In the alternative, plaintiffs argued that the Act's time limitation provision violates the Fifth Amendment (equal protection), Fourteenth Amendment (due process), and Seventh Amendment (jury trial guarantee) to the United States Constitution.

The defendants responded that the Act is clear in its requirement that plaintiffs must file first in Vaccine Court and that it is constitutional, requiring this Court to dismiss the law suit. This opinion is intended to address these issues.

### The National Vaccine Injury Compensation Act

The National Vaccine Injury Compensation Act of 1986 was intended as "a Federal 'no-

---

[1]Specifically, in Nestlen et.al v. Wyeth. et.al., plaintiffs allege that their son's symptoms first occurred or became manifest in January of 1997, more than 36 months before the lawsuit was filed in state court.  In King et.al. v. Adventis. et.al., class representatives Jordan King, Sophia Wigney, August Fagelman, Lorenzo Lindsey, Josie Stierna, and Jerry Stafford, III, alleges that their symptoms appeared or may have appeared more than 36 months before the class action was filed.

3

fault' compensation program under which awards can be made to vaccine-injured persons quickly, easily, and with certainty and generosity." H.R. Rep. No. 99-908, 3, *reprinted in* 1986 U.S.C.C.A.N. 6344, 6344.  This program was " designed to work faster and with greater ease than the civil tort system." *Shalala v. Whitecotton*, 544 U.S. 268, 269, 115 S.Ct. 1477, 1478 (1995).

The Act established a claims procedure in which Special Masters determine if a petitioner is entitled to compensation. 42 USC § 300aa-12. A petitioner is defined as "any person who has sustained a vaccine-related injury, the legal representative of such person if such person is a minor or disabled, or the legal representative of any person who died as the result of the administration of a vaccine set forth in the Vaccine Injury Table..." 42 USC § 300aa-11(b)(1)(A).  If the vaccine is administered after October 1, 1988, a petitioner must file for compensation under the program within 36 months after the date of the occurrence of the first symptom or manifestation of onset of injury. 42 USC § 300aa-16.

. The Act requires that a person with a vaccine-related injury file a petition in Vaccine Court before proceeding in either state or federal court. 42 USC §§ 300aa-11(a)(2)(A) & (B). After a judgment has been entered by a Special Master in Vaccine Court, the petitioner may elect to either accept the judgment or to file a civil action for damages in state or federal court. 42 USC § 300aa-21(a).

The first issue presented by these cases raises a question of statutory interpretation: whether the plaintiffs are exempt from filing petitions in Vaccine Court, because their claims were not filed within 36 months after the first symptom or manifestation of onset of the vaccine-related injury.  In interpreting statutes, the Court starts by examining the plain language of the

4

statute. *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992).[2] As long as the language of the statute is clear, the function of the court is to enforce it according to its terms. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242 (1989).

The plaintiffs contend that 42 USC § 300aa-11(a)(9) creates an exception to the general rule that potential state court litigants first proceed through Vaccine Court. They argue that sections 11(a)(2), the general rule, 11(a)(9), the qualifications provision, and 16(a)(2), the limitations of actions provision, when read together, mean that claimants who have not filed petitions within 36 months of the first manifestation of onset or of the significant aggravation of injury are not "qualified" and therefore not required to first file a petition in Vaccine Court.

Section 300aa-11 mandates that a petition must be filed in Vaccine Court before the filing of civil action in either state or federal court in accordance with section 300aa-16, the limitations of actions provision:

> "No person may bring a civil action for damages in an amount greater that $1,000 or in an unspecified amount against a vaccine administrator or manufacturer in a State or Federal court for damages arising from a vaccine-related injury or death associated

---

[2]Oregon law requires that the legislative history be examined when interpreting a statute: Legislative intent; general and particular provisions; consideration of legislative history.   (1)(a) In the construction of a statute, a court shall pursue the intention of the legislature if possible.

(b) To assist a court in its construction of a statute, a party may offer the legislative history of the statute.

(2) When a general and particular provision are inconsistent, the latter is paramount to the former so that a particular intent controls a general intent that is inconsistent with the particular intent.

(3) A court may limit its consideration of legislative history to the information that the parties provide to the court. A court shall give the weight to the legislative history that the court considers to be appropriate. ORS 174.020

03/21/2003 11:31 FAX 503 223 .50          DUDEN NEIMAN LLP                                    ☑007

with the administration of a vaccine after October 1, 1988, and no
such court may award damages in an amount greater than $1,000 in
a civil action for damages for such a vaccine-related injury or
death, unless a petition has been filed, in accordance with section
300aa-16 of this title..." 42 USC § 300aa-11(a)(2)(A).

Section 300aa-11(a)(9) states that section 300aa-11 applies "only to a person who has

sustained a vaccine-related injury or death and who is *qualified* to file a petition for

compensation under the program" (emphasis added).

Section 300aa-16 states that no petition for a vaccine related injury may be filed 36

months after the occurrence or manifestation of onset of the vaccine-related injury:

"In the case of...a vaccine set forth in the Vaccine Injury Table
which is administered after October 1, 1988, if a vaccine-related
injury occurred as a result of the administration of such vaccine, *no
petition may be filed* for compensation under the Program for such
injury after the expiration of 36 months after the date of the
occurrence of the first symptom or manifestation of onset or of the
significant aggravation of such injury" (emphasis added).

In other words, no person may file in state or federal court for damages for a vaccine-

related injury or death for an amount greater than $1,000 unless a petition was filed in Vaccine

Court within 36 months of the occurrence of the first symptom or manifestation of the vaccine-

related injury.

By looking at these provisions, plaintiffs argue that an element of "qualification" is the

limitations of actions provisions. The defendants, however, point to sections 300aa-11(b)(1)(A)

and 300aa-11(c)(1) and argue that a "qualified" petitioner is one who meets the requirements of

these sections. To decide otherwise would be to ignore the text and context as well as the

legislative intent.

The plain language of the Act is that a person may not sue in state or federal court for

more than $1,000 for a vaccine-related injury unless they have first filed a petition in Vaccine

Court within 36 months.

Section 300aa-11 defines a petitioner (11(b)(1)(A)) and the petition content (11(c)(1)).

Subsection 11(b)(1)(A) provides that only a person who has sustained a vaccine-related injury

and who "meets the requirements of subsection (c)(1) of this section" may file a petition.

Subsection 11(c)(1) provides that a petition for compensation must contain an affidavit and

supporting documentation demonstrating five requirements:

1) the petitioner who suffered injury received a vaccine set forth in the
   Vaccine Injury Table (42 USC § 300aa-11(c)(1)(A));

2) the petitioner received the vaccine in the United States or in its trust
   territories (*id.* § 300aa-11(c)(1)(D));

3) the petitioner sustained, or had significantly aggravated, any illness,
   disability, injury, or condition set forth in the Vaccine Injury Table in
   association with the vaccine (*id.* § 300aa-11(c)(1)(C));

4) the petitioner suffered the residual effects or complications of such illness,
   disability, injury, or condition for more than six months after the
   administration of the vaccine (*id.* § 300aa-11(c)(1)(D)); and

5) the petitioner has not previously collected an award or settlement of a civil
   action for damages for the vaccine-related injury (*id.* § 300aa-11(c)(1)(E)).

The 36 months limitations of actions provision is not listed as a requirement.

Plaintiffs' proposed interpretation is not supported by legislative history. In 1986,

problems with vaccine-related injuries were becoming evident:

03/21/2003 11:31 FAX 503 223 5950          DUDEN NEIMAN LLP                    @009

> "Injured persons (potential tort plaintiffs) complained about the tort
> law system's uncertain recoveries, the high cost of litigation, and
> delays in obtaining compensation. They argued that government
> had, for all practical purposes, made vaccination obligatory, and
> thus it had a responsibility to ensure that those injured by vaccines
> were compensated. Vaccine manufacturers (potential tort
> defendants) complained about litigation expenses and occasional
> large recoveries, which caused insurance premiums and vaccine
> prices to rise, and which ultimately threatened the stability of the
> vaccine supply." *Shafer v. American Cyanamid Co.* 20 F.3d 1, 2-3
> (1st Cir. 1994).

When Congress passed the Vaccine Act in 1986, its goals were to provide compensation for

children injured by vaccines, while reducing liability exposure and litigation costs that might

prevent vaccine manufacturers from participating in the vaccine market.    H.R. Rep. No. 99-908,

5-7, *reprinted in* 1986 U.S.C.C.A.N. 6344, 6346-6348.    By creating the Vaccine Courts,

Congress hoped to meet these goals by establishing a system that was "fair, simple, and easy to

administer," and one that would give manufacturers a better sense of their potential litigation

obligations, thereby ensuring a more stable childhood vaccine market. *Id.* at 6348. Congress

therefore mandated that "all individuals injured by a vaccine administered after the date of

enactment of the legislation are required to go through the compensation program." *Id.* at 6344.

In *McDonald v. Lederle Labs,* 775 A.2d 528 (N.J. Super. Ct. App. Div. 2001), the court

reiterated the congressional objective of sending petitioners to Vaccine Court first:

> "The preclusive application of the Act, which prevents plaintiff in
> her representative capacity from pursuing a civil action does not
> represent an "absurd or unjust result," that would permit us from
> disregarding its plain language. *United States v. Shriver,* 989 F.2d
> 898, 901 (7th Cir. 1993). It is, instead, consistent with the stated
> purpose of avoiding the public harm that would result from either a
> loss or decline in the production of necessary vaccines. Simply
> put, Congress wants victims to first try the Program with the
> expectation that its results will be accepted. Unless a petitioner is

8

required to fully adjudicate a claim, pursuant to the Program's
expedited procedures, Congress's objectives will not be realized."
*Id.* at 534-535.

To interpret the statutes as plaintiffs argue would allow individuals who qualify under the

Act to wait 36 months and file directly in state or federal court, thus defeating the stated purpose

of the Act.

42 USC § 300aa-11(a)(2)(B) directs this Court to dismiss this action:

> "If a civil action which is barred under subparagraph (A)[3] is filed in
> a State or Federal court, the court shall dismiss the action.  If a
> petition is filed under this section with respect to the injury or
> death for which such civil action was brought, the date such
> dismissed action was filed shall, for purposes of the limitations of
> actions prescribed by section 300aa-16 of this title, be considered
> the date the petition was filed if the petition was filed within one
> year of the date of the dismissal of the civil action."

Plaintiffs may raise all issues of statutory construction and constitutional objections in Vaccine

Court.  They may be entitled after obtaining a Master's decision to pursue their state claims.[4]

---

[3]42 USC § 300aa-11(a)(2)(A) is the rule stating that actions must be filed in Vaccine
Court before being filed in state or federal court.

[4]*See Carlson v. Secretary of the Department of Health and Human Services*, 23 Cl. Ct.
788, 790, where the Court of Federal Claims states:

> "The statute of limitations expired for petitioner's claim under the
> Act on January 31, 1991.  *See* 42 U.S.C. §300aa-16(a)(2).
> Consequently, the Special Master's order prevents petitioner from
> recovering damages under the Act, as she may not re-file her action
> in the Claims Court.  However, petitioner still may pursue civil
> damages in district court subject, of course, to any deficiencies
> properly raised there."

9

03/20/2003 11:31 FAX 503 223 ____0          DUDEN NEIMAN LLP                          ☑ 011

For the reasons stated, pursuant to the requirements of 42 USC § 300aa-11(a)(2)(B), the defendants' motions to dismiss are granted.

Dated this 20th day of March, 2003.

Nely L. Johnson, Circuit Court Judge

28

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, FLORIDA
GENERAL JURISDICTION DIVISION

JOHN F. SHANAUGHY AND CANDACE
SHANAUGHY, Individually and as Next Friend of
Minor, TYLER SHANAUGHY,                            CASE NO. 02-1517 CAWS

      Plaintiffs,                                 DIVISION G

vs.

WYETH CO., WYETH, WYETH-AYERST
LABORATORIES and LEDERLE
LABORATORIES, INC. f/k/a AMERICAN HOME
PRODUCTS; AVENTIS PASTEUR, INC.,
Individually and as Successor-in-Interest to CONNAUGHT
LABORATORIES, INC.; BAXTER PHARMACEUTICAL
PRODUCTS, INC.; ELI LILLY AND COMPANY; GDL
INTERNATIONAL, INC.; GLAXOSMITHKLINE, INC.;
GLAXOSMITHKLINE BELGIUM;
MERCK & CO., INC.; PARKE-DAVIS, through its parent
companies, WARNER-LAMBERT CO. and PFIZER INC.;
SIGMA-ALDRICH, INC.; SPECTRUM LABORATORY
PRODUCTS; GRUPO URIACH, Individually and as
Successor-in-Interest to URQUIMA, FLORIDA INFUSION
SERVICES, a Florida Corporation
JOHN DOE CORPORATE DEFENDANTS 1-10;
ANTHONY R. MORELLI, M.D.; TAMPA ELECTRIC
COMPANY; and FLORIDA POWER CORPORATION,

      Defendants.

_____/

**ORDER ON
MOTION TO DISMISS
BY VACCINE DEFENDANTS:
WYETH; LEDERLE; AVENTIS PASTEUR, INC.; MERCK & CO.;
SMITHKLINE BEECHAM; BAXTER HEALTHCARE CORP.;
AND FLORIDA INFUSION SERVICES
AND
MOTIONS TO DISMISS BY TAMPA ELECTRIC COMPANY,
FLORIDA POWER CORPORATION, ANTHONY R. MORELLI, M.D.,
SPECTRUM LABORATORY PRODUCTS; SIGMA-ALDRICH, INC;
AND ELI LILLY AND COMPANY**

-1-

This matter having come before the Court for hearing on December 5, 2002 at 2:00 p.m., on motions to dismiss by (1) the Vaccine Defendants: Wyeth; Lederle; Aventis Pasteur, Inc.; Merck & Co.; SmithKline Beecham; Baxter Healthcare Corp.; and Florida Infusion Services, (2) Defendant Tampa Electric Company, (3) Defendant Florida Power Corporation, (4) Defendant Anthony R. Morelli, (5) Defendant Spectrum Laboratory Products, (6) Defendant Sigma-Aldrich, Inc., and (7) Defendant Eli Lilly and Company, and the Court having heard argument of counsel and being otherwise fully advised in the premises,

IT IS ORDERED AND ADJUDGED THAT:

1.    The motions to dismiss by Tampa Electric Company and Florida Power Corporation are granted without prejudice.

2.    The motions to dismiss by Vaccine Defendants: Wyeth; Lederle; Aventis Pasteur, Inc.; Merck & Co.; SmithKline Beecham; Baxter Healthcare Corp.; and Florida Infusion Service; and Spectrum, Sigma, and Eli Lilly are (a) granted without prejudice as to the plaintiff children's claims based on this Court's lack of initial jurisdiction over such claims. *See* order by Chief Special Master Golkiewicz in *Leroy vs. Secretary of the Department of Health and Human Services*, filed October 11, 2002 in the United States Court of Federal Claims, Office of Special Masters, Case No. 02-392V; (b) granted without prejudice as to the claims of negligent infliction of emotional distress and intentional infliction of emotional distress; (c) granted with prejudice as to the claims of breach of implied warranty; (d) granted without prejudice as to the plaintiff parents' claims for medical expenses; and (e) granted without prejudice as to the plaintiffs' failure to properly plead a market-share theory.

3.    The motions to dismiss by Vaccine Defendants: Wyeth; Lederle; Aventis Pasteur, Inc.; Merck & Co.; SmithKline Beecham; Baxter Healthcare Corp.; and Florida Infusion Service;

and Spectrum, Sigma, and Eli Lilly concerning the plaintiff parents' derivative claims are denied. However, their motions to stay the plaintiff parents' derivative claims are granted consistent with this Court's ruling in paragraph 6 below.

4.      The motion to dismiss by Dr. Morelli is granted without prejudice based on this Court's lack of initial jurisdiction. *See* order by Chief Special Master Golkiewicz in *Leroy vs. Secretary of the Department of Health and Human Services*, filed October 11, 2002 in the United States Court of Federal Claims, Office of Special Masters, Case No. 02-392V.

5.      The motions to dismiss by defendants based on plaintiffs' incorporation in each count of all the previous allegations of the complaint are granted without prejudice.

6.      This case is stayed effective as of December 5, 2002, and shall remain stayed until 30 days after the Vaccine Court relinquishes jurisdiction over claims that could be brought before it in this matter.  Plaintiffs may file amended pleadings consistent with this order at the conclusion of the stay of this case.

**DONE AND ORDERED** in Chambers in Pasco County, Florida this _____ day of _____, 2003.

ORIGINAL SIGNED

JAN 1 7 2003

STANLEY R. MILLS
CIRCUIT JUDGE

ORIGINAL SIGNED

JAN 1 6 2003

STANLEY R. MILLS
CIRCUIT JUDGE

Stanley R. Mills
Circuit Court Judge

Copies furnished to counsel on Service List



```
AMBROSE AGBEBAKU and MARY        *      IN THE
 GILBERT, Individually, and
 as Parents and Next Friends of  *      CIRCUIT COURT
 ALLEN AGBEBAKU, a Minor
                                 *      FOR
      Plaintiffs
                                 *      BALTIMORE CITY
v.
                                 *      Case No: 24-C-02-004243*
SIGMA ALDRICH, INC., et al.
                                 *
      Defendants
 *     *     *     *     *     *     *     *     *     *     *     *     *
```

## ORDER

*RELATED THIMEROSAL CASE NUMBERS:

| | | |
|---|---|---|
| 24-C-02-004175 | 24-C-02-004238 | 24-C-02-004321 |
| 24-C-02-004176 | 24-C-02-004239 | 24-C-02-004322 |
| 24-C-02-004178 | 24-C-02-004240 | 24-C-02-004323 |
| 24-C-02-004179 | 24-C-02-004241 | 24-C-02-004324 |
| 24-C-02-004180 | 24-C-02-004242 | 24-C-02-004328 |
| 24-C-02-004181 | 24-C-02-004245 | 24-C-02-004935 |
| 24-C-02-004182 | 24-C-02-004246 | 24-C-02-005122 |
| 24-C-02-004183 | 24-C-02-004247 | 24-C-02-005868 |
| 24-C-02-004184 | 24-C-02-004249 | 24-C-02-005869 |
| 24-C-02-004185 | 24-C-02-004251 | 24-C-02-005870 |
| 24-C-02-004186 | 24-C-02-004252 | 24-C-02-005871 |
| 24-C-02-004188 | 24-C-02-004253 | 24-C-02-005872 |
| 24-C-02-004189 | 24-C-02-004254 | 24-C-02-005873 |
| 24-C-02-004190 | 24-C-02-004255 | 24-C-02-005936 |
| 24-C-02-004191 | 24-C-02-004256 | 24-C-02-007224 |
| 24-C-02-004192 | 24-C-02-004257 | 24-C-02-007231 |
| 24-C-02-004194 | 24-C-02-004320 | 24-C-02-007234 |
| | | 24-C-02-007235 |

Upon consideration of the preliminary motions filed on behalf of all Defendants, as well as the Plaintiffs' Oppositions filed thereto, and the reply memoranda submitted on behalf of the Defendants, and after oral argument having been held on April 21 - 22, 2003, it is this 19TH day of June 2003, by the Circuit Court for Baltimore City hereby ORDERED that, for the reasons stated in this Court's Memorandum Opinion:

1.  All claims brought by or on behalf of the minor plaintiffs and all claims brought by the parents of the minors for costs and expenses arising from the minors' alleged vaccine-related injuries against Aventis Pasteur, Inc., Baxter Healthcare Corporation, Merck & Co., Inc., SmithKline Beecham Corporation d/b/a GlaxoSmithKline and Wyeth f/k/a American Home Products Corporation (collectively the "Vaccine Defendants") and Sigma-Aldrich, Inc., American International Chemical, Inc. Spectrum Laboratory Products, Inc. and Eli Lilly and Company (collectively the "Thimerosal Defendants") and Ortho-Clinical Diagnostics, Inc. and Johnson & Johnson (collectively the "Other Defendants") be, and the same is, hereby **DISMISSED without prejudice** for lack of subject matter jurisdiction pursuant to the National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300 aa-10 et seq.; and it is further ORDERED that:

2.  Defendants' Motion to Dismiss Count 11 (Fraud) be, and the same is, hereby **DENIED**; and it is further ORDERED that:

3.  Defendants' Motion to Dismiss Count 13 (Fraud on the Marketplace - Fraudulent Misrepresentation/Fraudulent

2

Concealment) be, and the same is, hereby **GRANTED**; and it is further ORDERED that:

4. Defendants' Motion to Dismiss Count 14 (Maryland Consumer Protection Act) be, and the same is, hereby **GRANTED**; and it is further ORDERED that:

5. Defendant Constellation Energy Group's Motion to Dismiss be, and the same, is hereby **GRANTED**; and it is further ORDERED that:

6. Plaintiffs' Amended Complaint be, and the same is, hereby **DISMISSED with PREJUDICE** as to Defendant Constellation Energy Group; and it is further ORDERED that:

7. Defendant Baltimore Gas & Electric Company's Motion to Dismiss be, and the same is, hereby **GRANTED**; and it is further ORDERED that:

8. Plaintiffs' Amended Complaint be, and the same is, hereby **DISMISSED with PREJUDICE**; and it is further ORDERED that:

9. The Clerk shall forward a copy of this Order to all Counsel of Record in this proceeding.

**The Honorable Stuart R. Berger**
The Judge's Signature Appears
on the Original Document Only

:y

cc: All Counsel of Record

3

SERVICE LIST

Thomas F. Yost, Jr., Esq.
Michael A. Pulver, Esq.
341 North Calvert Street, Suite 100
Baltimore, MD 21202

D'Ana E. Johnson, Esq.
Keith M. Bonner, Esq.
Carolyn Israel Stein, Esquire
Bonner, Kiernan, Trebach & Crociata
1250 Eye Street, N.W., Suite 600
Washington, DC 20005

M. Diane Owens, Esq.
Bradley S. Wolff, Esq.
Swift, Currie, McGee & Hiers, LLP
The Peachtree
1355 Peachtree Street, N.E., Suite 300
Atlanta, GA 30309-3231

Kenneth Scott, Esq.
Wilson, Elser, Moskowitz, Edleman & Dicker, LLP
The Curtis Center, Suite 1130 East
Independence Square Est
Sixth & Walnut Streets
Philadelphia, PA 19106

Warren Lutz, Esq.
Jennifer R. Kantor, Esq.
Jackson & Campbell, P.C.
1120 20th Street, N.W.
Suite 300 South
Washington, DC 20036

Paul F. Strain, Esq.
Dino S. Sangiamo, Esq.
Stephen E. Marshall, Esq.
Venable, Baetjer and Howard, LLP
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, MD 21201

Deborah M. Russell, Esq.
Janet Selph Moyers, Esq.
McGuireWoods, LLP
One James Center, 901 East Cary Street
Richmond, VA 23219-4030

Jonathan T. Blank, Esq.
Maguire Woods, LLP
7 St. Paul Street, Suite 1000
Baltimore, MD 21202-1671

Winston D. Carter, Jr., Esq.
Charles Jason Rother, Esq.
Fulbright & Jaworski, LLP
1301 McKinney, Suite 5100
Houston, TX 77010-3095

Stephanie A. Smith, Esq.
Stacey A. Martinez, Esq.
Fulbright & Jaworski, LLP
600 Congress Avenue, Suite 2400
Austin, TX 78701

Raymond G. Mullady, Jr., Esq.
Kenneth Y. Turnbull, Esq.
Orrick, Herrington & Sutcliffe, LLP
Washington Harbour
3050 K Street, N.W.
Washington, DC 20007

Daniel J. Thomasch, Esq.
Lauren J. Elliot, Esq.
Orrick, Herrington & Sutcliffe, LLP
665 Fifth Avenue
New York, NY 10103-0001

Paul J. Maloney, Esq.
William J. Carter, Esq.
Carr Maloney, PC
1667 K Street, N.W.
Suite 1100
Washington, DC 20006-1605

Brian S. Goodman, Esq.
Fedder and Garten, P.A.
2300 Charles Center South
36 S. Charles Street
Baltimore, MD 21201

Thomas J. Cullen, Jr., Esq.
Ericka L. Kleiman, Esq.
Goodell, Devries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, MD 21202

Michelle R. Mangrum, Esq.
John H. Hsu, Esq.
Shook, Hardy & Bacon, LLP
Hamilton Square
600 14th Street, N.W.
Washington, DC 20005-2004

Deborah A. Moeller, Esq.
David W. Smith, Esq.
Chris Murphy, Esq.
Marie Woodbury, Esq.
Shook, Hardy & Bacon, LLP
One Kansas City Place
1200 Main Street
Kansas City, MO 64104-2118

Deborah E. Jennings, Esq.
Damon L. Krieger, Esq.
Piper Rudnick LLP
6225 Smith Avenue
Baltimore, MD 21209-3600

Jonathan D. Smith, Esq.
Jennifer Wright Burke, Esq.
Piper Rudnick LLP
6225 Smith Avenue
Baltimore, MD 21209-3600

Richard M. Barnes, Esq.
Bonnie J. Beavan, Esq.
Goodell, Devries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, MD 21202

Robert C. Tucker, Esq.
Arter & Hadden, LLP
1100 Huntington Building
925 Euclid Avenue
Cleveland, OH 44115

AMBROSE AGBEBAKU and MARY          *          IN THE
  GILBERT, Individually, and
  as Parents and Next Friends of  *          CIRCUIT COURT
  ALLEN AGBEBAKU, a Minor
                                   *          FOR

      Plaintiffs                                *          BALTIMORE CITY

v.                                              *          Case No: 24-C-02-004243*

SIGMA ALDRICH, INC., et al.        *

      Defendants                                *

*      *      *      *      *      *      *      *      *      *      *      *      *      *

### MEMORANDUM OPINION

*RELATED THIMEROSAL CASE NUMBERS:

| | | |
|---|---|---|
| 24-C-02-004175 | 24-C-02-004238 | 24-C-02-004321 |
| 24-C-02-004176 | 24-C-02-004239 | 24-C-02-004322 |
| 24-C-02-004178 | 24-C-02-004240 | 24-C-02-004323 |
| 24-C-02-004179 | 24-C-02-004241 | 24-C-02-004324 |
| 24-C-02-004180 | 24-C-02-004242 | 24-C-02-004328 |
| 24-C-02-004181 | 24-C-02-004245 | 24-C-02-004935 |
| 24-C-02-004182 | 24-C-02-004246 | 24-C-02-005122 |
| 24-C-02-004183 | 24-C-02-004247 | 24-C-02-005868 |
| 24-C-02-004184 | 24-C-02-004249 | 24-C-02-005869 |
| 24-C-02-004185 | 24-C-02-004251 | 24-C-02-005870 |
| 24-C-02-004186 | 24-C-02-004252 | 24-C-02-005871 |
| 24-C-02-004188 | 24-C-02-004253 | 24-C-02-005872 |
| 24-C-02-004189 | 24-C-02-004254 | 24-C-02-005873 |
| 24-C-02-004190 | 24-C-02-004255 | 24-C-02-005936 |
| 24-C-02-004191 | 24-C-02-004256 | 24-C-02-007224 |
| 24-C-02-004192 | 24-C-02-004257 | 24-C-02-007231 |
| 24-C-02-004194 | 24-C-02-004320 | 24-C-02-007234 |
| | | 24-C-02-007235 |

## INTRODUCTION

Plaintiffs allege that their minor children suffered an increase risk of developmental harm and specifically, autism, which were proximately caused by the administration of various childhood vaccines containing the preservative thimerosal, the composition of which contains mercury. The Plaintiffs allege that their children suffered injuries resulting from repeated exposure to thimerosal, a mercury containing preservative added to some vaccines and other pharmaceutical products. Plaintiffs further allege that their children's injuries were exacerbated by coal burning power plants owned and operated by Baltimore Gas & Electric Company and Constellation Energy Group. Plaintiffs seek relief, including compensatory and punitive damages on numerous statutory and common law theories.

## PROCEDURAL HISTORY

On January 30, 2003, Judge Carol E. Smith (Judge-in-Charge of the Civil Docket for the Circuit Court for Baltimore City) issued "Maryland Thimerosal Litigation"[1] Order Number 1 in the above-captioned cases. These cases include 49 cases that were remanded to this Court from the United States District Court for the District of Maryland by Order of Judge Andre M. Davis dated December 18, 2002. Judge Smith's Order dated January 30, 2003

---

[1] For ease of reference, these cases will be described as the Maryland Thimerosal Litigation.

established a briefing schedule for the filing of "Master Briefs" as well as other preliminary motions, oppositions and replies supporting or opposing the Master Briefs.

Thereafter, four (4) additional cases were filed in the Circuit Court for Baltimore City (case numbers: 24-C-02-007224, 24-C-02-007231, 24-C-02-007234, and 24-C-02-002735). On March 21, 2003, Judge Smith executed an Order scheduling those cases along with the 49 other cases remanded from the United States District Court before this Court for a hearing on all preliminary motions on April 21 - 22, 2003.

Several preliminary motions were filed including:

1.    Vaccine Defendants'[2] Motion to Dismiss and Request for Stay (filed January 31, 2003);

2.    Thimerosal Defendants'[3] Motion to Dismiss (filed January 31, 2003);

---

[2] There are several categories of Defendants who, for ease of reference, are described as the "Vaccine Defendants," the "Thimerosal Defendants", the "Power Plant Defendants", and "Other Defendants". The Vaccine Defendants include: (1) Aventis Pasteur, Inc. (hereinafter "Aventis"); (2) Baxter Healthcare Corporation (hereinafter "Baxter"); (3) Merck & Co., Inc. (hereinafter "Merck"); (4) SmithKline Beecham Corporation d/b/a GlaxoSmithKline (hereinafter "GSK"); (5) Wyeth (formerly known a0XAmerican Home Products Corporation); and (6) Antex Biologics. On April 16, 2003, this Court granted a Stay as to Defendant Antex Biologics, Inc., and the proceedings against Antex Biologics were deferred to the Bankruptcy Court in accordance with Section 362 of Title 11 of the United States Code.

[3] The "Thimerosal Defendants" include: (1) Sigma-Aldrich, Inc.; (2) American International Chemical, Inc.; (3) Spectrum Laboratory Products, Inc. and (4) Eli Lilly and Company. For reasons unrelated to the merits of these Motions, Eli Lilly and Company filed its Motion to Dismiss separate and distinct from the Thimerosal Defendants' Motion. Nevertheless, Eli Lilly and Company will be considered with the "Thimerosal Defendants" for the purpose of the determination of all preliminary motions.

3.   Power Plant Defendants'[4] Motion to Dismiss (filed January 31, 2003);

4.   Other Defendants'[5] Motion to Dismiss and/or for Stay of All Claims and Proceedings.

The Plaintiff filed its Opposition to all preliminary Motions on February 20, 2003 and requested a hearing on the preliminary Motions.   On April 21 and 22, 2003, this Court (Berger, J.) conducted a hearing on the extant Motions and held its decision on all motions <u>sub curia</u>.   This Memorandum Opinion addresses all of the outstanding Motions that were ripe at the time of the hearing on April 21, 2003.[6]

### STANDARD OF REVIEW

In considering a motion to dismiss for failure to state a cause of action pursuant to Md. R. 322 (b)(2), a trial court must assume the truth of all well-pleaded relevant material facts in the

---

[4] The "Power Plant Defendants" include: (1) Baltimore Gas & Electric, Co. (hereinafter "BG&E"); and (2) Constellation Energy Group, Inc. (hereinafter "CEG").

[5] The "Other Defendants" include: (1) Ortho-Clinical Diagnostics, Inc. (hereinafter "OCD"); (2) Johnson and Johnson; and (3) Human Genome Sciences, Inc. (hereinafter "HGS").   Prior to the hearing on April 21, 2003, counsel for the Plaintiff and Human Genome Sciences, Inc. agreed to dismiss this action against HGS without prejudice.   This Court granted the dismissal of HGS without prejudice by Order dated April 25, 2003.

[6] On the first day of the hearing, Plaintiffs' counsel presented the Court with an additional pleading captioned as "Supplemental Memorandum of Law in support of Maryland Thimerosal Plaintiffs' Opposition to Thimerosal-Laden Product Defendants (aka Vaccine Defendants) Motion to Dismiss and Request for Stay."   Inasmuch as said filing was not authorized by the Scheduling Orders signed by Judge Smith, this Court neither considered the filing nor allowed oral argument on the contents of this filing at the hearing on April 21 - 22, 2003.

-4-

Complaint and all inferences reasonably drawn therefrom. <u>Bobo v. State</u>, 346 Md. 706, 708 (1997); <u>Bd. of Education of Montgomery County v. Browning</u>, 333 Md. 281, 286 (1994)("[the court] must accept as true all well-pleaded facts and allegations in the complaint"); <u>Stone v. Chicago Title Ins. Co.</u>, 330 Md. 329, 333 (1993); <u>Bennett Heating & Air Conditioning v. Nations Bank</u>, 103 Md. App. 749, 757 (1995), <u>rev'd on other grounds</u>, 342 Md. 169 (1996). Additionally, in the context of a motion to dismiss, it would be improper to ask a judge to make any findings of fact. <u>Morris v. Osmore</u>, 99 Md. App. 646, 658 (1994).

It is well settled that the facts comprising the cause of action must be pleaded with sufficient specificity. <u>Bobo v. State</u>, <u>supra</u>, 346 Md. at 708. Indeed, the Maryland Rules expressly provide that "a pleading that sets forth a claim for relief ... shall contain a clear statement of the facts necessary to constitute a cause of action and a demand for judgment for relief sought ..." Md. Rule 2-305. "Bald assertions and conclusory statements by the pleader will not suffice." <u>Id.</u>; <u>Professional Staff Nurses Assoc. v. Dimensions Health Corp.</u>, 110 Md. App. 270, 285 (1996). Thus, the "grant of a motion to dismiss is proper if the complaint does not disclose on its face a legally sufficient cause of action." <u>Lubore v. RPM Assoc.</u>, 109 Md. App. 312, 322 (1996), <u>cert. denied</u>, 343 Md. 565 (1996).

Alternatively, the motion to dismiss must be denied when the

facts, if proven, would entitle Plaintiff to relief.  Morris v. Osmose Wood Preserving, 99 Md. App. 646, 653 (1991)(citing Stone v. Chicago Title Ins. Co. of Md., 330 Md. 329 (1993)).  When moving to dismiss, a Defendant is asserting that even if the allegations of the Complaint are true, Plaintiff is not entitled to relief as a matter of law.  Lubore, supra, 109 Md. App. at 322.

### SUBJECT MATTER JURISDICTION

A.   Vaccine Defendants

Defendants argue that the Plaintiff's injuries are governed by what is commonly referred to as the Vaccine Act.  Specifically, 42 U.S.C.S. § 300aa-11(a)(2)(A), provides that:

> No person may bring a civil action for damages in an amount greater than $1,000 or in an unspecified amount against a vaccine administrator or manufacturer in a State or Federal court for damages arising from a vaccine-related injury or death associated with the administration of a vaccine after the effective date of this part, and no such court may award damages in an amount greater than $1,000 in a civil action for damages for such a vaccine-related injury or death, unless a petition has been filed, in accordance with 42 U.S.C.S. § 300aa-16, for compensation under the Program for such injury or death.

Further, Defendants contend that Plaintiff's Complaint must be dismissed because Plaintiffs failed to exhaust any and all remedies provided by the Vaccine Act's no-fault compensation program before they filed a civil Complaint.  Defendants maintain that before filing a Complaint against manufacturers and distributors of a vaccine, Plaintiffs must first file a petition for compensation in a specially constituted court of special masters that is part of

-6-

the United States Court of Federal Claims (hereinafter the "Vaccine Court").

Plaintiffs argue that they are exempt from filing a Vaccine Act claim in the Vaccine Court for several reasons, including but not limited to: (1) there is no federal preemption of vaccine-related injury claims; (2) the Homeland Security Act makes it clear that thimerosal claims should not have been and will not in the future be handled by the Vaccine Act; (3) Defendants have not established that Plaintiffs' claims 'qualify' under the Vaccine Act; and (4) Plaintiffs have no outstanding administrative remedy within the Vaccine Act, and therefore, they are not required to exhaust it.

Initially, this Court must determine whether the thimerosal preservative in vaccines is an 'adulterant' or 'contaminant' as defined in the Vaccine Act.  If the thimerosal preservative is an 'adulterant' or 'contaminant,' the Plaintiffs are exempt from filing a claim in the Vaccine Court.  The Vaccine Act defines broadly the term 'vaccine related injury' as "an illness, injury, condition, or death associated with" vaccines listed in the Act, but not a condition "associated with an adulterant or contaminant intentionally added to such a vaccine."  42 U.S.C. § 300aa-33(5).

Numerous courts have ruled on this issue and have held, as a matter of law, that thimerosal is not an adulterant or contaminant and have dismissed claims, identical to those brought here by

Plaintiff, for lack of subject-matter jurisdiction.[7] Significantly, a Texas court held recently that the "language of the Vaccine Act unambiguously and specifically indicates that injuries caused by vaccine preservatives (i.e., thimerosal) are within its scope...it is clear that Congress has spoken to the precise question at issue." Owens v. Am. Home Prods. Corp., 203 F. Supp. 2d 748, 756 n. 11 (S.D. Tex. 2002).

Clearly, case law issued after the Vaccine Act and rules of statutory interpretation support the conclusion that injuries allegedly caused by the thimerosal preservative constitute vaccine-related injuries. Accordingly, this Court finds that the Plaintiffs' injuries caused by the thimerosal preservative indeed constitute vaccine-related injuries.[8]

---

[7] See Liu v. Aventis Pasteur, Inc. 219 F. Supp. 2d 762 (W.D. Tex. 2002); Owens v. Am. Home Prods. Corp., 203 F. Supp. 2d 748 (S.D. Tex. 2002); O'Connell v. Am. Home Prods. Corp., No. G-02-184 (S.D. Tex. May 7, 2002); Blackmon v. Am. Home Prods. Corp., No. G-02-179 (S.D. Tex. May 8, 2002); Collins v. Am. Home Prods. Corp., No. 3:01CV979LN (S.D. Miss. Aug. 2, 2002); McDonald v. Abbott Labs, Inc., 3:02CV77LN (S.D. Miss. Aug. 2, 2002); Stewart v. Am. Home Prods. Corp., No. 3:02CV427LN (S.D. Miss. Aug. 2, 2002); Greene v. Aventis Pasteur, Inc., No. L-1228-012 (N.J. Super. Ct. Aug. 8, 2002); Colson v. Aventis Pasteur, Inc., No. L-1351-02 (N.J. Super. Ct. Aug. 8, 2002); Russak v. Aventis Pasteur, Inc., No. A-02-CA-480-SS (W.D. Tex. Sept. 9, 2002); Carabine v. Aventis Pasteur, Inc., No. A-02-CA-501-SS (W.D. Tex. Oct. 8, 2002); Holder v. Abbott Labs., No. 4:02-CV-148LN (S.D. Miss. Oct. 15, 2002); Wax v. Aventis Pasteur, Inc., No. CV 02-2018 (JBW)(E.D.N.Y. Oct. 28, 2002); Mead v. Aventis Pasteur, Inc., No. 0107-07136 (Or. Cir. Ct. Nov. 6, 2002); Radulovic v. Am. Home Prods. Corp., No. 02-05033 (Fl. Cir. Ct. Nov. 19, 2002); Cheskiewicz v. Aventis Pasteur, Inc., No. 0952 (Pa. C. Dec. 16, 2002); Young v. Aventis Pasteur, Inc., No. A-02-CA-734-SS (W.D. Tex. Jan. 6, 2003); Botter v. Aventis Pasteur, Inc., No. 9:02-CV-181 (E.D. Tex. Jan. 13, 2003); Shanaughy v. Wyeth, No. 02-1517 CAWS (Fl. Cir. Ct. Jan. 17, 2003); Murphy v. Aventis Pasteur, Inc., No. 1:02-CV-2257-CAP (N.D. Ga. Feb. 25, 2003).

[8] Plaintiffs argue that the Act does not apply to their claims because of the adulterant/contaminant exception of 42 U.S.C. § 300aa-33(5). Although the terms 'adulterant' and 'contaminant' are not defined in the Act, established principles of statutory construction mandate the conclusion thimerosal, when used as a preservative in licensed vaccines, is a constituent

-8-

The Vaccine Act provides that:

> No person may bring a civil action for damages in an amount greater than $1,000...against a vaccine administrator or manufacturer in a State or Federal court for damages arising from a vaccine-related injury...unless a petition has been filed, in accordance with section 300aa-16 of this title, for compensation under the Program for such injury...

42 U.S.C. § 300aa-11(a)(2)(A). It is well settled that the Court must look at the plain language of the statute when determining its meaning. Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 475 (1992). As long as the language of the statute is clear, the function of the court is to enforce it according to its terms. United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 242 (1989).

However, if the plain language is ambiguous, the Court must look to the legislative history of the statute. The Vaccine Act expressly provides that: "[n]o person may bring a civil action for damages in an amount greater than $1,000" for damages incurred from a vaccine-related injury unless a petition has been filed in the Vaccine Court. 42 U.S.C. § 300aa-11(a)(2)(A). As virtually all of the Courts interpreting the Vaccine Act have held, this Court finds that the language in the Vaccine Act is clear and unambiguous. See, e.g., Owens v. An. Home. Prods. Corp., supra, 203 F. Supp. at

---

ingredient of the vaccines and not an adulterant or contaminant. In addition, both the Vaccine Court and the Secretary of the Health and Human Services have determined that thimerosal-related claims are included within the statutory definition of "vaccine related injury" because thimerosal is not an 'adulterant' or 'contaminant.' Amendola v. Secretary of HHS, 989 F.2d 1180, 1186 (Fed. Cir. 1993); Leroy v. Secretary of HHS, No. 02-392V (Fed. Cl. Oct. 11, 2002).

756; <u>O'Connell v. Am. Home Prods. Corp.</u>, No. G-02-184 (S.D. Tex. May 7, 2002); <u>Blackmon v. Am. Home Prods. Corp.</u>, No. G-02-179 (S.D. Tex. May 8, 2002).

Although this Court need not look to the legislative history in interpreting the Act, a review of the legislative history solidifies the Act's plain meaning: "All individuals injured by a vaccine administered after the date of enactment of the legislation are required to go through the compensation program ... before other remedies may be pursued." H.R. Rep. No. 99-908, at 3, <u>reprinted in</u> 1986 U.S.C.C.A.N. at 6344.[9] It is only <u>after</u> a claimant has exhausted the no-fault compensation system that the claimant may elect to refuse any award or compensation and file a civil action. 42 U.S.C. § 300aa-21(a). This Court finds that Plaintiffs' injuries from the thimerosal preservative constitute vaccine-related injuries within the contemplation of the Vaccine Act. Accordingly, Plaintiffs failed to exhaust their remedies in the Vaccine Court before filing their action in this Court.

Further, the express terms of the Act are instructive. Section 42 U.S.C. § 300aa-11(a)(2)(B) expressly provides that: "If a civil action which is barred under [§ 300aa-11(a)(2)] is filed in

_____

[9] The effective date of the Vaccine Act is November 15, 1988. In their oral argument, Plaintiffs stated that two to three minors of the 53 minor Plaintiffs included in the Complaint were exposed to thimerosal before October 1, 1988. However, Defendants maintain that according to Plaintiffs' Complaint, only one minor plaintiff was born before Congress enacted the Act (one minor plaintiff was born November 8, 1988). However, at oral argument on April 21, 2003, the Court was advised that the one minor plaintiff did not receive any vaccinations until six weeks after his birth, thereby making the plaintiff's exposure to thimerosal a post Vaccine Act case.

a State or Federal court, the court shall dismiss the action." Furthermore, state and federal courts have dismissed such cases for lack of subject-matter jurisdiction to decide the merits of vaccine-related injury claims. See Brown v. Secretary of HHS, 874 F. Supp. 238, 241 (S.D. Ind. 1994)(granting motion to dismiss for lack of subject-matter jurisdiction on this basis), aff'd mem., 61 F.3d 905 (7th Cir. 1995), 1995 WL 395753; Greene v. Aventis Pasteur & Colson v. Aventis Pasteur, Nos. L-1288-02, L-1351-02, slip op. at 5 (N.J. Super. Ct. Aug. 8, 2002)(dismissing thimerosal-related claims because "Plaintiffs' alleged injuries are vaccine-related and this Court lacks jurisdiction in these matters"). Accordingly, inasmuch as Plaintiffs' filed their claim in State court without first exhausting their remedies in the Vaccine Court, this Court must dismiss the vaccine-related injury claims for lack of subject-matter jurisdiction.

Moreover, Plaintiffs contend that the repeal of the Homeland Security Act amendments[10] to the Vaccine Act demonstrate that Congress did not intend to include thimerosal claims within the Vaccine Act. However, the mere fact that Congress clarified specific sections of the Vaccine Act and subsequently repealed

---

[10] Before its repeal, sections the Homeland Security Act ("HSA") clarified the definition of a vaccine-related injury by adding that "an adulterant or contaminant shall not include any component or ingredient listed in a vaccine's product license application or product label." Homeland Security Act of 2002, Pub. L. No. 107-296, § 1715. Section 1716 of the HSA clarified the definition of a vaccine to include "all components and ingredients listed in the vaccine's product license application and product label."

those clarifications does not indicate any intention of Congress to exclude thimerosal-related claims from vaccine-related injuries. On the contrary, the clarifications confirm the holdings of courts that had addressed whether thimerosal-related injuries are covered under the Vaccine Act _before_ Congress enacted the HSA amendments.[11] See, e.g., Owens v. Am. Home Prods. Corp., 203 F. Supp. 2d, 748, 755 (S.D. Tex. 2002)(holding that "because the children's injuries are allegedly linked to a vaccine ingredient, their injuries are definitely 'vaccine-related'").

This Court is not persuaded by Plaintiffs' assertion that the HSA amendments "for _the first time_ include Thimerosal claims within the Vaccine Act." State and federal courts have included thimerosal claims within the Vaccine Act for at least three months before the effective date of the HSA in November, 2002.[12] Indeed, state and federal courts continue to reach the same conclusion that thimerosal claims are within the Vaccine Act _after_ Congress enacted the HSA amendments without regard to those amendments.[13]

_____

[11] Prior to the effective date of the HSA (November 15, 2002), numerous courts decided that vaccines include all constituent materials identified in the biological license such as preservatives (i.e. thimerosal), and injuries attributed to any such constituent are "vaccine-related" claims covered by the Vaccine Act and its administrative filing requirement. See supra note 7.

[12] See supra note 7.

[13] See Wax v. Aventis Pasteur, Inc., No. CV 02-2018 (JBW), slip op. at 4 (E.D.N.Y. Dec. 16, 2002)(declining to consider wehther the HSA amendments apply and dismissing complaint "based on the law prior to the effective date of the amendment"); Young v. Aventis Pasteur, Inc., No. A-02-CA-734-SS (W.D. Tex. Jan. 6, 2003), slip op. at 6 n.3 ("Because these amendments are quite new and the Court has relied in its previous thimerosal rulings on more established authorities, the Court need not interpret these amendments in this Order.").

The repeal of the HSA amendments is identified as "non-prejudicial." Because the amendments merely clarified existing law, the repeal changes nothing. Significantly, in its repeal, Congress included the following language:

> (a) Repeal. - In accordance with subsection (c), sections 1714-1717 of the [HSA] are repealed.
>
> (b) Application of the Public health Service Act. - The Public Health Service Act (42 U.S.C. 201 et seq.) shall be applied and administered as if the sections repealed by subsection (a) had never been enacted.
>
> (c) Rule of construction. - <u>No inference shall be drawn from the enactment of sections 1714 through 1717 of the [HSA], or from this repeal, regarding the law prior to the enactment of sections 1714 through 1717 of the [HSA]. Further, no inference shall be drawn that subsection (a) or (b) affects any change in that prior law, or that Leroy v. Secretary of Health and Human Sevs., Office of Special Master, No. 02-392V (October 11, 2002)[14] was incorrectly decided.</u>  (Emphasis added).

H.J. Res. 2, 108th Cong. § 102(a-c). In sum, this Court finds -- as a matter of law -- that injuries related to the preservative thimerosal are encompassed within the definition of "vaccine-related injuries" in the Vaccine Act. This conclusion is based on several independent sources, including: (1) the decisions of state and federal courts before and after Congress enacted the HSA amendments; (2) the plain language of the repeal; (3) the repeal's express language reaffirming the <u>Leroy</u> decision; and (4) the

---

[14] The Vaccine Court in <u>Leroy</u> held that the "thimerosal preservative in vaccines is not an 'adulterant' or 'contaminant' under § 33(5) of the Vaccine Act" and that "petitioners alleging an injury ... from the thimerosal preservative in vaccines are statutorily obligated to file their claims against a manufacturer ... in the Court of Federal Claims, *in the first instance*." Slip op. at 26 (emphasis in original).

-13-

legislative history of the Act.  As a result, Plaintiffs must first file their claim with the Vaccine Court.  Inasmuch as this Court lacks subject-matter jurisdiction to preside over Plaintiffs' primary claims for vaccine-related injuries against the Vaccine Defendants, it must dismiss such claims for vaccine-related injuries.[15]

## B.   Thimerosal Defendants[16]

The Thimerosal Defendants have adopted and incorporated the Vaccine Defendants' arguments regarding this Court's lack of subject-matter jurisdiction.  For reasons stated previously (see discussion at pp. 6 -15), this Court finds that the causes of action arising out of vaccines containing thimerosal are vaccine-related.  Further, this Court holds, as the Vaccine Court held in Leroy v. Secretary of the Dept. of Health & Human Servs., No. 02-382V (Fed. Cl. Oct. 11, 2002), that the preservative thimerosal is not an adulterant or contaminant because a "preservative is not an intentionally added ingredient of the vaccine meant to make impure, inferior, or contaminate the vaccine end product." Id. at 7.

---

[15] Plaintiffs also allege that they are exempt from filing their claim in Vaccine Court because they are not qualified to do so, as they are beyond the 36-month statute of limitation time period to file a claim.  This Court finds such reasoning illogical.  Plaintiffs' argument, if considered valid, would allow all future vaccine-related injured plaintiffs to simply "sit on their hands" and wait for the 36-month statute of limitations to pass in order to bypass the no-fault compensation program in the Vaccine Court and go straight to state or federal court.  Such an approach is "counter to the intent of Congress." See McDonald v. Lederle Labs , 775 A.2d 528, 532 (N.J. Super. Ct. App. Div. 2001).

[16] In their Complaint, Plaintiffs have alleged that the Thimerosal Defendants manufactured and marketed thimerosal.

-14-

Rather, as a vaccine preservative, thimerosal is a constituent part or component part of the vaccine, thereby further buttressing this Court's decision that thimerosal-related injuries fall within the ambit of vaccine-related injuries. Accordingly, Plaintiffs must first exhaust all administrative remedies in Vaccine Court before filing a civil action in this Court. Because Plaintiffs failed to file their claims in the Vaccine Court "in the first instance", this Court must dismiss the action against the Thimerosal Defendants for lack of subject-matter jurisdiction.

### STATE CAUSES OF ACTION – THIMEROSAL AND VACCINE DEFENDANTS

**A.  Intentional Infliction of Emotional Distress – Count 16**

In order to establish a prima facie case for intentional infliction of emotion distress ("IIED"), Plaintiffs must allege and prove facts showing that: 1) the conduct in question was intentional or reckless; 2) the conduct was extreme and outrageous; 3) a causal connection exists between the conduct and the emotional distress; and 4) the emotional distress was severe. Alcalde v. Deaton Specialty Hospital, Inc., 133 F. Supp. 2d 702, 712 (D. Md. 2001). A complaint that fails to allege sufficient facts in support of each element of IIED must be dismissed. Id.

Defendants assert that the Court must dismiss Plaintiffs' claims because Plaintiffs can not establish the intent or extreme and outrageous conduct elements of the tort of IIED. In that context, Defendants maintain that they manufactured and distributed

-15-

FDA-approved vaccines.  Defendants further argue that Plaintiffs failed to plead the intent, severe, and extreme and outrageous conduct elements of severe emotional distress with the specificity required by Maryland law.  Specifically, Defendants contend that Plaintiffs failed to allege that Defendants either desired to inflict severe emotional distress, knew that such distress was certain or substantially certain to result from Defendants' conduct, or acted recklessly in deliberate disregard of a high degree of probability that the emotional distress would follow.

Plaintiffs reply that Defendant's failure to include proper warnings with the vaccine about the known adverse side effects of thimerosal, coupled with the fact that the Defendants had actual knowledge at all relevant times that thimerosal is classified as a hazardous material, constitute intentional, extreme and outrageous conduct.  Plaintiffs further maintain that by alleging in their Complaint that Defendants intentionally added thimerosal to the vaccine, and widely marketed and distributed the vaccine to the public, they have satisfied the intentional conduct element of the IIED tort.

Further, Defendants assert that Plaintiffs have failed to allege the requisite evidentiary particulars necessary to sustain a claim of IIED.  Specifically, Defendants allege that Plaintiffs have not stated any facts describing with specificity the nature and extent of any severe emotional distress the Plaintiffs suffered

-16-

or whether any medical or psychological treatment was needed.

Moreover, Plaintiffs argue that Defendants failure to test the cumulative effects of persons repeated exposure to thimerosal demonstrate a causal connection between the Defendants' conduct and the Plaintiffs' injuries. Plaintiffs further allege that Defendants knowingly or intentionally exposed Plaintiffs to thimerosal, a mercury poison, which resulted in brain damage. As a result, Plaintiffs contend that they have satisfied the specificity requirement of pleading the severity element of IIED. Plaintiffs maintain that all that is necessary for them to sustain this cause of action is for them to allege that the parent Plaintiffs must care for their children, the minor Plaintiffs, who now suffer from brain damage due to Defendants' intentional and reckless conduct.

To meet the "intentional or reckless" criterion of the first element, Plaintiffs must allege and show with particularity that Defendants "either *desired* to inflict severe emotional distress, *knew* that such distress was *certain* or *substantially certain* to result from [their] conduct, or acted recklessly in deliberate disregard *of a high degree of probability* that the emotional distress will follow." Foor v. Juvenile Servs. Admin., 78 Md. App. 151, 175 (1989)(emphasis in original). This Court finds -- as a matter of law -- that Plaintiffs have failed to demonstrate that Defendants desired to inflict severe emotional distress, or knew that such distress was certain or substantially certain to result

from their conduct.  Further, Plaintiffs have failed to show that Defendants' conduct generated a "high degree of probability" that emotional distress would result.

In their Complaint, Plaintiffs allege that Defendants manufactured, distributed, supplied, promoted, labeled, packaged, licensed, designed, sold and/or profited from the sale of thimerosal-laden products.  Plaintiffs also allege that Defendants had actual knowledge of the toxicity of thimerosal.  However, Plaintiffs' Complaint is devoid of any allegation that Defendants intended to harm Plaintiffs.

In <u>Walser v. Resthaven Memorial Gardens, Inc.</u>, 98 Md. App. 371 (1993), the Court of Special Appeals considered whether, in an IIED cause of action, a Complaint which merely asserted Defendant's conduct but failed to assert any motivation behind that conduct could survive a motion to dismiss.  The Court held that although an act may be intentional, the consequence of inflicting emotional distress may not be intentional.  In such a case, the infliction of emotional distress may be the result of conduct undertaken for a wholly different purpose.  <u>Id.</u> at 395.  Simply stated, "An actor is not liable where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress."  <u>Id.</u> (internal citations omitted).

Here, Defendants undisputably intended to add thimerosal into

the vaccine; without the preservative, the vaccine could not maintain its effectiveness.   Further, the Defendants clearly intended to expose minor Plaintiffs to the vaccine.   Plaintiffs have not demonstrated that Defendants ever intended to cause severe emotional distress or to cause brain damage.   The intent here was to add thimerosal into a vaccine to maintain the effectiveness of the vaccine, a motivation and act clearly "within its legal rights".

As pointed out in <u>Alcade v. Deaton Specialty Hospital Home, Inc.</u>, <u>supra</u>, 133 F. Supp. 2d at 712, a significant issue is whether Defendants desired Plaintiffs to suffer severe emotional distress or acted with the appropriate degree of recklessness.   Based on the Complaint and the written submission by the parties, Plaintiffs have failed to satisfy that Defendants' conduct was intentional or reckless.   Because Plaintiffs failed to set forth sufficient facts establishing the first element of the tort as identified in <u>Alcade</u>, <u>supra</u>, 133 F. Supp. 2d at 712, this Court need not consider whether the remaining allegations are sufficient to support a cause of action for IIED.   For the foregoing reasons, this Court grants Defendants' Motion to Dismiss Count 16 of the Amended Complaint.

**B.   Fraud - Counts 11 and 13**

**1.   Fraud**

Defendants assert that Plaintiffs Amended Complaint is grossly deficient in alleging the facts necessary to sustain a cause of

action for fraud.   Defendants maintain that the Complaint merely
contains "broad, general, and conclusory allegations that have been
deemed insufficient to sustain a claim of fraud."   Defendants'
Initial Memorandum at p. 44.   Specifically, Defendants contend that
Plaintiffs failed to plead facts establishing that Defendants made
representations or withheld information with the intent to deceive
Plaintiffs.

Plaintiffs assert that although there must be sufficient facts
and circumstances pled to sustain a claim of fraud, they need not
specifically detail the transaction in which the fraud was
predicated.

In a cause of action for fraud, the Plaintiffs must set forth
the facts constituting fraud with certainty and particularity.   It
is well settled that "a general allegation of fraud, however strong
in expression, is not sufficient unless there is an allegation of
the facts and circumstances relied on as constituting the alleged
fraud."   Sims v. Ryland Group, Inc., 37 Md. App. 470, 473
(1977)(internal citations omitted).   Merely because a plaintiff
uses the word "fraudulent" does not mean that the facts are
sufficiently pled.   Brack v. Evans, 230 Md. 548, 553 (1963).
Charges of fraud, without allegations of facts and circumstances
which constitute the fraud, does not sustain a sufficient pleading
of the fraud.   Id.   There are no strict guidelines for the Court to
determine how well facts and circumstances must be pled.   As long
as the allegations of fraud are supported by specific facts and
circumstances, the Court must deny a motion to dismiss for failure

to state a claim for the relief granted.

To establish a claim for fraud, Plaintiffs must allege that: 1) Defendants made a false representation to Plaintiffs; 2) Defendants knew of the falsity or made representations with reckless indifference to its truth; 3) Defendants made the misrepresentation for the purpose of defrauding Plaintiffs; 4) Plaintiffs relied on the misrepresentation and had the right to rely on it; and 5) Plaintiffs suffered compensable injury resulting from the misrepresentation. <u>Environmental Trust v. Graynor</u>, 370 Md. 89, 97 (2002); <u>McGraw v. Loyola Ford, Inc.</u>, 124 Md. App. 560, 584-85 (1999). Plaintiffs' Amended Complaint is very detailed; indeed its length is forty pages. In their Amended Complaint, Plaintiffs allege that Defendants made a false representation about the vaccines because they failed to:

> properly label, brand and warn about the toxic mercury contained in the [vaccine]. They specifically failed to identify the quantity of mercury in their products. Their products were in violation of the Maryland Food, Drug and Cosmetic Act, Md. Code Ann., Health-General II § 21-218 (2000).

Plaintiffs' Amended Complaint, ¶ 42.

Plaintiffs also allege that Defendants knowingly concealed material facts that Defendants had a duty to disclose, such as the presence of toxic mercury in the vaccines, the risks of mercury exposure, and the amount of mercury in each dose. Plaintiffs' Amended Complaint, ¶ 124. Plaintiffs allege that Defendants concealed such information with the intent to deceive Plaintiffs and that Plaintiffs relied and had a right to rely upon the

assumption that the concealed and undisclosed facts did not exist or were not harmful. Plaintiffs' Amended Complaint, ¶¶ 125-128. Finally, Plaintiffs allege that the acts or omissions of Defendants were a proximate cause of Plaintiffs' injuries and damages. Plaintiffs' Amended Complaint, ¶ 129.

This Court finds that Plaintiffs' allegations in their Amended Complaint are sufficient to support a claim of fraud. Plaintiffs specifically allege that Defendants failed to properly label, brand or warn about the toxicity of thimerosal in the vaccines. Plaintiffs allege facts and circumstances which -- if proven -- may constitute common law fraud. Accordingly, this Court denies Defendants' motion to dismiss Count 11 for failure to state a claim upon which relief can be granted.

> ### 2. Fraud on the Marketplace (Fraudulent Misrepresentation/Fraudulent Concealment)

Count 13 of Plaintiffs' Complaint alleges fraudulent misrepresentation under Section 310 of the Restatement (Second) of Torts, otherwise known as fraud on the marketplace. Section 310 provides:

> An actor who makes a misrepresentation is subject to liability to another for physical harm which results from an act done by the other or third person in reliance upon the truth of the representation, if the actor
>
> (a) intends his statement to induce or should realize that it is likely to induce action by the other, or a third person, which involves an unreasonable risk of physical harm to the other, and
>
> (b) knows
>
>> (i) that the statement is false, or

> (ii) that he has not the knowledge which he
> professes.

The Restatement provides examples of third party liability to illustrate how Section 310 should be interpreted. One such example is as follows:

> A seller of an automobile who paints over a defective wheel or axle and so conceals its dangerously defective character is liable not only to his immediate buyer who is harmed by the collapse of the wheel or axle, but also to any person to whom the immediate buyer by sale, lease, or license transfers the use of the car, and to other travelers who sustain bodily harm or whose cars are damaged when the defective car gets out of control through the collapse of the wheel or axle.

Simply stated, a plaintiff claiming fraud on the marketplace is relieved of the burden of demonstrating their personal reliance on any alleged misrepresentations. The theory of fraud on the marketplace presumes reliance, while common law fraud requires proof of actual reliance. In re Medimmune, Inc. Sec. Litig., 873 F. Supp. 953, 968 (D. Md. 1995). Maryland courts have consistently held that "under Maryland law, there is no fraudulent misrepresentation cause of action for statements made to third parties." Estate of White v. R.J. Reynolds Tobacco Co., 109 F. Supp. 2d 424, 430 (D. Md. 2000)(citing Parlette v. Parlette, 88 Md. App. 628, 635 (1991)); see also Strange v. Sofamor Danek Group, Inc., 1999 U.S. Dist. 19717, at *2 (D. Md. 1999); In re Medimmune, supra, 873 F. Supp. at 968; Cofield v. Lead Indus. Assoc., No. MJG-99-3277 (D. Md. Aug. 17, 2000).

-23-

This Court finds that Plaintiffs' claim for fraudulent misrepresentation of third parties must fail as a matter of law because such a cause of action is inconsistent with venerable Maryland case law regarding fraud.[17] A claim for fraudulent misrepresentation of third parties does not require the injured party to have relied upon the alleged misrepresentation. Maryland law requires the injured person to <u>actually rely</u> on the alleged misrepresentation. Accordingly, Defendants' motion to dismiss Count 13 is granted.[18]

## C.    Maryland Consumer Protection Act – Count 14

The Consumer Protection Act ("CPA") prohibits a person from engaging in any unfair or deceptive trade practice in connection with certain enumerated activities. MD. CODE ANN., COMM. LAW § 13-101 <u>et seq.</u> (2000 Repl. Vol). Among the activities subject to the CPA are the "sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services. MD. CODE ANN., COMM. LAW § 13-303. The General Assembly enacted the CPA and set minimum standards for the protection of consumers in response to

---

[17] <u>See supra</u> Part B, section 1 for common law fraud under Maryland law.

[18] Further, this Court finds that no confidential or fiduciary relationship existed between the parties which would have incurred a duty on Defendants to disclose to Plaintiffs any potential risks of its product. Plaintiffs argue that such a relationship exists because Defendants, not the physicians and other practitioners, had superior knowledge of the alleged defect in its product. However, in their Memorandum, Plaintiffs note that FDA panels have conducted studies that have proven the toxic effect of thimerosal. Plaintiffs' Opposition Motion at pp. 57-58. These studies serve as notice to physicians and other practitioners that indeed, thimerosal may have harmful effects.

-24-

concerns of the lack of "public confidence in merchants offering goods, services, realty, and credit." MD. CODE ANN., COMM. LAW § 13-102(b).

In their Complaint, Plaintiffs assert that the thimerosal-laden vaccine is a consumer good. A consumer good is defined as goods sold "which are primarily for personal, household, family, or agricultural purposes." MD. CODE ANN., COMM. LAW § 13-101(d). Plaintiffs support their argument with reference to the case of T-Up Inc. v. Consumer Protection Division, 145 Md. App. 27 (2002). In the T-Up case, defendants were alleged to have marketed deceptively to the general public an aloe vera extract that would cure diseases from cancer to AIDS.

Contrary to Plaintiffs' argument, the T-Up, Inc. case is wholly distinguishable from the issues present in this case. The defendants in T-Up used the following tactics to deceive potential victims: 1)Defendants falsely claimed they had Ph.D. degrees and even carried counterfeit diplomas from Germany; 2) Defendants mailed audio tapes entitled "There is Hope" to thousands of potential victims by using a purchase list; 3) the audio tape was a staged lecture with the Defendant acting as the speaker who held a question-answer session at the end of the tape; 4) Defendants gave false hope to the recipients of the audio tapes by including at the end of the recording "You and you alone can avoid becoming another statistic;" and 5) Defendants operated their corporation by

-25-

having telephone salespersons answer questions about the aloe vera extract using a desk reference manual. _Id._, at 39-41. In the present case, Plaintiffs have not alleged that Defendants engaged in any such tactics for the purpose of profiting from the vaccine. Further, in _T-Up_, the defendants were directly dealing with the consumers and victims. Here, Defendants were never in contact with Plaintiffs, nor did they directly market its products to the Plaintiffs. Defendants are bona fide manufacturers and distributors producing and providing an FDA-approved vaccine to knowledgeable physicians who professionally administer the vaccine. This Court finds that such a claim is not actionable under the Consumer Protection Act.

In addition, section 13-104 of the CPA exempt certain professional services from the Act, including "medical or dental practitioners." MD. CODE ANN., COMM. LAW § 13-104. Vaccines are part of the medical services that physicians and other medical personnel recommend and administer to patients. Under the CPA, the physicians and other medical personnel who actually select, recommend, and administer the vaccine are exempt from liability should any injuries result. Accordingly, the manufacturer or distributor of the vaccine, an entity even more attenuated from the injured person than the medical practitioner who selected, recommended, and administered the vaccine, must also be exempt from liability under the CPA.

For the above-mentioned reasons, even if vaccines were consumer goods as defined by the CPA, any manufacturer or distributer of the vaccines would be exempt from liability under section 13-104. Accordingly, this Court grants Defendants' motion to dismiss Count 14 of Plaintiffs' Complaint.

### ORTHO-CLINICAL DIAGNOSTICS, INC. and JOHNSON & JOHNSON

During the relevant time periods, Ortho-Clinical Diagnostics, Inc. ("OCD") manufactured and distributed RhoGAM, a hemoglobin product that contains mercury-based Thimerosal. RhoGAM was injected into Rh negative mothers immediately before they gave birth, exposing their fetuses in utero to the thimerosal. RhoGAM is not considered a vaccine under the Vaccine Act.

Plaintiffs argue that they need not file any claims against OCD and Johnson & Johnson (hereinafter "J&J")in the Vaccine Court because OCD and J&J are not vaccine manufacturers within the Vaccine Act and its products are not vaccines. Therefore, according to Plaintiffs, the injuries caused by OCD's and J&J's products are not vaccine-related injures. Defendants argue that the fact that RhoGAM is not listed as a vaccine under the Vaccine Act does not relieve Plaintiffs from first exhausting all remedies against all Defendants in the Vaccine Court. Defendants maintain that all of Plaintiffs' claims are for vaccine-related injuries and expenses that must first be adjudicated in the Vaccine Court.

Plaintiffs contend that their injuries resulted from

-27-

accumulated exposure of RhoGAM and thimerosal. This Court has already established that any thimerosal-related injury must first be addressed in the Vaccine Court. Plaintiffs' Complaint is devoid of any allegation that maternal exposure to RhoGAM caused any minor plaintiff's injury. On the contrary, of the three minor Plaintiffs exposed to RhoGAM, all three were born "perfectly normal and healthy." Plaintiffs' Complaint at ¶¶ 36, 72). Consequently, any injury could only occur from an accumulation of exposure to RhoGAM and thimerosal, thereby making injuries from exposure to RhoGAM vaccine-related injuries. All vaccine-related injuries must first be adjudicated in Vaccine Court before being tried in state or federal court.[19] Further, should this Court entertain Plaintiffs' cause of action against OCD and J&J for their vaccine-related injuries, the Vaccine Act would prohibit Plaintiffs from seeking compensation through the Vaccine Court.[20]

This Court has already held that Plaintiffs must first exhaust their administrative remedies in Vaccine Court before filing any claims in state court. Recently, in Liu v. Aventis Pasteur, Inc., 219 F. Supp. 2d 762 (W.D. Texas 2002), a Texas court dismissed the plaintiff's thimerosal-related injury claims against non-vaccine manufacturers, in addition to vaccine manufacturers, until

---

[19] See supra, pp. 6- 15.

[20] The Vaccine Act states: "If a plaintiff has pending a civil action for damages for a vaccine-related injury or death, such a person may not file a petition under subsection (b) for such injury or death." 42 U.S.C. § 300aa-11(a)(5)(B).

-28-

Plaintiff first exhausted all remedies in the Vaccine Court. The Texas court stated that entertaining the non-vaccine related injuries "would be wholly inconsistent with Congress' goal of minimizing litigation costs..." Id. at 767-68. Here, Plaintiffs' claim against OCD and J&J is clearly related to their claims against the Thimerosal Defendants and Vaccine Defendants. Therefore, Plaintiffs must first exhaust their remedies against OCD and J&J in the Vaccine Court. Accordingly, this Court grants Defendant OCD's and J&J's motion to dismiss.

## POWER PLANT DEFENDANTS

**A.   Constellation Energy Group**

Plaintiffs maintain that Constellation Energy Group ("CEG") owns, operates, maintains and markets energy created in part by fossil-fuel/coal-burning power plants. To the contrary, CEG is a holding company which "holds" the stock of its various subsidies, one of which is Baltimore Gas and Electric ("BGE"). As a holding company for various subsidies, including BGE, CEG's primary function is to hold their stock.

CEG can only be an appropriate party if Plaintiff convinces this Court that they should be permitted to pierce the corporate veil. A party may pierce the corporate veil when the corporation or company has committed fraud. Plaintiffs fail to set forth any allegations in its Complaint that would necessitate piercing the corporate veil. Further, contrary to Plaintiffs' pursuit of this

litigation against CEG, this Court cannot - - and will not  - - allow Plaintiffs to "discover" whether they have a viable claim against CEG _after_ filing suit CEG.  Plaintiffs must have a good faith basis for filing suit in the first instance.  <u>Southern Leasing Partners, Ltd. v. McMcullan</u>, 801 F. 2d 783, 788 (5th Cir. 1986) ("Appellants sued Phillips without knowing how he fit into the picture, apparently hoping that later discovery would uncover something").  Accordingly, this Court finds that CEG is an inappropriate party to this litigation and grants CEG's motion to dismiss for failure to state a claim against CEG.

B.    BGE

       **1. Public Nuisance - Count 19**

       Public nuisance is defined as "an unreasonable interference with a right common to the general public." <u>Tadjer v. Montgomery County</u>, 300 Md. 539, 552 (1984), citing Restatement (Second) of Torts § 821B.  Examples of an unreasonable interference with a public right include conduct that significantly interferes with the public health, public safety, public peace, or public convenience. <u>Id.</u> The individual must suffer "some special or particular damage, different not merely in degree, but different in kind from that experienced in common with other citizens." <u>Hoffman v. United Iron & Metal Co.</u>, 108 Md. App. 117, 135 (1996), citing, <u>Baltimore & O.R. Co. v. Gilmore</u>, 125 Md. 610, 617 (1915). Further, conduct that is prohibited by statute, ordinance, or administrative regulation also

support a finding of public nuisance.   Id.

Defendants are authorized to manufacture, sell, and furnish electric power in any municipal corporation or county of the State in accordance with directives and licensing proceedings implemented by the Public Service Commission.  Defendants maintain that because it operates its power plants in accordance with authorizations from several sources including the Public Service Commission, the Maryland Department of the Environment, and the United States Environmental Agency, Plaintiffs' claim for public nuisance must fail as a matter of law.  Defendants assert that the cases Plaintiffs have supplied to support their public nuisance claim are distinguishable in that all of the cited cases involve claims seeking recovery for private nuisance rather than public nuisance. Defendants further argue Plaintiffs' suffered harm different in degree, but not in kind, than the general public. This allegation, Defendants contend, is insufficient, as a matter of law, for a claim against Defendants for public nuisance.

Plaintiffs contend that "[v]irtually any conduct may amount to a nuisance so long as it would be offensive or inconvenient to the normal person."  Plaintiffs' Response to Power Plant Defendants' Motion to Dismiss, p. 20.  Plaintiffs maintain that neither the legislature nor the Maryland Code would authorize Defendants to poison the public with mercury and then cloak them with immunity for causing or contributing to mercury poisoning.  In their oral

-31-

argument, Plaintiffs contended that absent a clause exempting Defendants from liability where they complied with the statute but harm nevertheless results, Defendants remain liable for injuries incurred by the manufacturing of its products. Plaintiffs further allege that their claim of "debilitating brain damage" satisfies the public nuisance requirement that the Plaintiffs' injury is different in kind <u>and</u> degree from that experienced by the general public.

This Court finds, for the reasons that follow, that Plaintiffs' claim for public nuisance fails, as a matter of law. It is uncontradicted that Maryland has authorized Defendants to produce electricity by power plants that emit mercury. The Plaintiffs do not contend that Defendants have operated its power plants in contravention of such authorization and in derogation with directives and licensing proceedings implemented by the Public Service Commission. Pursuant to the Restatement (Second) of Torts § 821(B), "[a]lthough it would be a nuisance at common law, conduct that is fully authorized by statute, ordinance or administrative regulation does not subject the actor to tort liability." Restatement (Second) of Torts § 821(B) at Note F (1979). Moreover, "if there has been established a comprehensive set of legislative acts or administrative regulations governing the details of a particular kind of conduct, the courts are slow to declare an activity to be a public nuisance if it complies with the regulations." <u>Id.</u>    Further, although this Court is cognizant of

-32-

§ 821(B) of the Restatement (Second), it does not root its decision solely on the Restatement.[21]

This Court is persuaded by Defendants' argument that Plaintiffs suffered injuries different in degree, but not in kind. In a public nuisance action, a plaintiff must allege that he or she has suffered a harm that is different in kind from that shared by the general public; to allege that any harm is different in degree is insufficient to support a public nuisance cause of action. See, e.g., Venuto v. Owens-Corning Fiberglas Corp., 22 Cal. App. 3d 116, 125 (1971)(Court considered an allegation that the public was suffering from a general irritation to the respiratory tract but plaintiffs were suffering a more severe irritation solely indicated that plaintiffs and the public were suffering from the same kind of harm but plaintiffs suffered to a greater degree). In Venuto, the California Appellate Court found that such an allegation did not support an action for public nuisance. See also, Page v. Niagra Chem. Div. of Food Mach. & Chem. Corp. 68 So.2d 382, 384 (Fla. 1953)(holding that plaintiffs failed to allege that their injuries were different in kind, not merely in degree, from the injury to the public and therefore such allegations were insufficient to sustain a public nuisance claim).

Here, Plaintiffs allege that while BGE's emissions affected all people by exposing them to mercury emissions, Plaintiffs'

---

[21] The Court notes that as of the date this Opinion is issued, Maryland has not enacted any specific regulations regarding the emission of mercury.

children suffered greater harm than the general public because of their "heightened vulnerability." Complaint at ¶ 63. According to case law, if an individual who has an ailment, allergies for example, and files a public nuisance cause of action against a manufacturing plant alleging that pollution emitted aggravates their allergies and injures the health of the public, then the Court must dismiss the action for failing allege a harm different in kind and not degree.[22] This hypothetical is analogous to the case at bar. The same mercury omissions that Plaintiffs allege caused injury to them, allegedly caused injury to the general public in that area. Merely because Plaintiffs might be affected to a greater degree would not, under the case law, support a claim for public nuisance.

Accordingly, for all the reasons set forth, this Court grants Defendants motion to dismiss Count 19 of Plaintiffs' Complaint.[23]

**2.    Negligence - Count 20**

Defendants contend that Plaintiffs' negligence claim should be dismissed as a matter of law because it owed no duty to Plaintiffs. Specifically, Defendants argue that the United States Environmental

---

[22] On the other hand, if an ordinary person with ordinary sensibilities brings a public nuisance claim against the same manufacturing plant and alleges that pollution emitted has injured his or her respiratory tract and the health of the public, then a cause of action for public nuisance exists.

[23] In their response to Defendants' motion to dismiss, Plaintiffs cite and discuss several cases to support their public nuisance claim. However, the cases cited by the Plaintiffs involve causes of action for private nuisance, not public nuisance. Therefore, this authority is distinguishable from Plaintiffs' public nuisance claim.

Protection Agency studies the emissions of metals and other substances from power plants, regulating the power plants to the extent deemed appropriate. Further, the Maryland Department of the Environment, the Maryland Public Service Commission, and the federal Clean Air Act coexist for many purposes, including to "control the type and level of emissions that Power Plant Defendants may emit from their power generating facilities." Defendants' Motion to Dismiss at p. 14. Defendants maintain that it operated its coal-fired power plant in compliance with all regulations and that it had no duty to self-impose further obligations to avoid a suit for negligence. Further, by complying with the statute and regulations, Defendant maintain that they have satisfied any duty owed to Plaintiffs.

Plaintiffs argue that the duty Defendants owe to them arises from the responsibility each person or entity has to exercise due care to avoid unreasonable risks of harm to others. Plaintiffs' Response at 17. Plaintiffs further argue that an unreasonable risk, such that would give rise to a duty, can be determined by whether a reasonable person would or should know the harm is foreseeable. Id. at 17-18. Plaintiffs maintain the Defendants knew it was emitting dangerous levels of mercury, that Defendants knew of the potential harmful effects of its conduct, and still, Defendants failed to cease such emission or reduce it to safe levels.

To sustain a cause of action for negligence, Plaintiffs must show that: 1) Defendants owed a duty to Plaintiffs; 2) Defendants breached that duty; 3) Plaintiffs suffered injury; and 4) Plaintiffs' injury was proximately caused by Defendants' breach of its duty. Valentine v. On Target, 353 Md. 544, 549 (1999). Thus, there can be no negligence when no duty is due. In negligence actions, 'duty' is defined as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." Grimes v. Kennedy Krieger Institute, Inc., 366 Md. 29, 86 (2001), citing Prosser and Keeton [on Torts] §§ 53 [(W. Keeton 5th ed. 1984)]. In order to determine whether a duty exists, a Court must consider several factors; foreseeability being arguably the most important factor. Grimes, supra, 366 Md. at 82. Whether harm is foreseeable is generally determined by asking if a reasonable person knew or should have known that the alleged conduct would constitute an unreasonable risk of harm to another. B.N. v. K.K., 312 Md. 135, 141 (1988).

The issue of foreseeability is typically a question of fact for the trier of fact to determine. Yonce v. SmithKline Beecham Clinical Lab., 111 Md. App. 124, 141 (1996). However, merely because a result could be or should be foreseeable does not necessitate a finding that a duty exists. Grimes, supra, 366 Md. at 86. A duty is created when policy considerations lead the law to say that a particular plaintiff is entitled to protection. Ashburn v. Anne Arundel County, 306 Md. 617, 627-28 (1986). Such

policy considerations include "convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, [and] the moral blame attached to the wrongdoer." Id. (internal citations omitted). When determining whether a duty exists, the Court must also look to the seriousness of the potential harm along with the probability that harm will result. Faya v. Almaraz, 329 Md. 435, 449 (1993)(holding that a surgeon with AIDS had a duty to inform his patients he was infected because it was foreseeable that the surgeon would transmit the virus to his patients during surgery). Additionally, the Court must also consider the relationship that exists between the parties. Bobo v. State, 346 Md. 706, 715 (1997). Such a relationship can arise in a number of ways: "(1) by statute or rule; (2) by contractual or other private relationship; or (3) indirectly or impliedly by virtue of the relationship between the tortfeasor and the third party." Id. (internal citations omitted).

There is no relationship between Plaintiffs and Defendants that arises from statute or rule or by a contractual or other private relationship. Consequently, the only relationship that could exist between Plaintiffs and Defendants is one of an indirect or implied nature. Certain parties have an implied or indirect relationship: a lifeguard and swimmers on the lifeguard's shift, parents and children, researchers and human subjects, doctors and patients, common carriers and passengers, employers and employees, owners of land and licensees or invitees, innkeepers and their

guests, and custodians and their wards.  Restatement (Second) of Torts, §§ 314A-314B (1965).  There is no such relationship between a coal-fired power plant and the general public, including Plaintiffs.[24]  Absent some special relationship, Defendants do not have a duty to act affirmatively for the benefit of Plaintiffs. See Diane E. Hoffmann & Karen H. Rothenberg, Whose Duty is it Anyway?: The Kennedy Krieger Opinion and its Implications for Public Health Research, 6 J. Health Care L. & Pol'y 109, 112 (2002), quoting Dan B. Dobbs, The Law of Torts, § 227, at 579 (2000).

Neurological injury is most certainly a serious harm; however, this Court finds that it is not probable that such an injury would result from Defendants' ordinary operation of coal-fired power plants.  The facts in Faya v. Almaraz, supra, provide an example of the "seriousness of harm/high probability of resulting harm" element of a duty.  In Faya, a surgeon infected with the AIDS virus operated on numerous patients but failed to inform his patients that he had the virus.  Faya, supra.  Medical literature indicates the seriousness of potential harm, should one contract AIDS. Further, it is foreseeable that a surgeon might transmit the AIDS virus to his patients during invasive surgery.  The seriousness of the potential harm, coupled with its probability, creates a duty to prevent it.

---

[24] Moreover, Plaintiffs have never alleged that a special relationship exists between Defendant Power Plant and Plaintiffs or the general public.

Here, there is no indication that the emission of mercury caused or was a substantial factor in causing the minor Plaintiffs' neurological disorders. If, in fact, emission of mercury was a cause or a substantial factor in causing the disorders, it woulXd indeed be considered a severe harm. Further, Plaintiffs have failed to allege that there is a high probability that the emission of mercury caused the neurological disorders in the minor Plaintiffs. Accordingly, Plaintiffs have not satisfied the "seriousness of harm/high probability of resulting harm" element of determining whether a duty exists on behalf of Defendants.

Maryland Courts must look to see whether the legislature has proffered various policy considerations that would dictate whether a duty exists. Grimes, supra, 366 Md. at 100. Absent any voice from the legislature, courts must look to case law. Id. Here the legislature has spoken by assigning the United States Environmental Protection Agency the responsibility of regulating and studying mercury emissions from power plants. 42 U.S.C. § 7412.[25] When determining whether a duty exists, policy considerations are taken into account in order to compensate injured parties and deter the alleged wrongdoer from undesirable or risky behavior. Hoffman & Rothenberg, supra, at 113.

These objectives arise from broader societal goals including

---

[25] Section 7412(n) provides for various studies and regulations pertaining to mercury emissions from "electric utility steam generating units, municipal waste combustion units, and other sources, including area sources." 42 U.S.C. § 7412(n).

"moral responsibility and corrective justice between parties and societal welfare." Hoffman & Rothenberg, at 113. The corrective justice goal stems from the desire to instill "personal and institutional responsibility [within persons and entities] for their harmful actions and to correct wrongs through some form of redress or compensation." Id. at 114. Because the corrective justice goal can sometimes conflict with the goal of societal welfare, courts use a cost-benefit analysis to "take into account the social utility of a particular outcome." Questions arise including whether the result is so beneficial to society as to warrant the alleged tortfeasor to continue its conduct? Id. Further, are the plaintiff's interests entitled to legal protection against the conduct of the defendant? The production of power is patently essential to our everyday lives. The legislature has taken steps to ensure Defendants operation of its power plants complies with regulations. There is no claim that Defendants have not operated their power plants in the manner authorized by the various agencies that supervise them.

Inasmuch as Plaintiffs have failed to successfully allege factors this Court must consider when determining whether a duty exists, this Court finds that the issue of foreseeability is instructive in determining whether a duty exists. Was it foreseeable that Defendants' conduct, which resulted in mercury emissions, would create an unreasonable risk of harm to others?

-40-

*The concept of duty* and *the idea of foreseeability* create a conundrum: to be charged with a duty, one must look to the foreseeable harm, yet foreseeability is an issue for the trier of fact and duty is a question of law for the Court to decide. Nonetheless, when determining whether a duty exists, Courts have consistently applied the "foreseeability of harm" test. Rosenblatt v. Exxon Co., 335 Md. 58, 77 (1994); Henley v. Prince George's County, 305 Md. 320, 333 (1986). This test is based on the concept that no duty exists for unreasonably remote consequences. The key word here is "unreasonable."

In evaluating whether harm is foreseeable, this Court must again look to the relationship between the parties. There exists no relationship or privity between Plaintiffs and Defendants which would have made it reasonably foreseeable that Defendants' acts or failure to act would result in harm to Plaintiffs.[26]   The relationship between the parties here is too attenuated to charge Defendants with foreseeability and duty. To do so would hold Defendants liable to the entire general public. Plaintiffs provide no indication that the majority of the general public suffer from the wholly unfortunate disorders that afflict minor Plaintiffs. As such, minor Plaintiffs' injuries are unreasonably remote

---

[26] The Court of Appeals in Rosenblatt, supra, deferred to the foreseeability test and lack of relationship between the parties when it found that Exxon, a former occupant of land, owed no duty to Rosenblatt, a subsequent occupant of same land, when it was found that the land was contaminated.

consequences from any alleged harm that Defendants may have caused. Defendants cannot be held liable for unreasonably remote consequences.

For the foregoing reasons this Court finds that no duty exists upon Defendants for unreasonably remote consequences. Absent any finding of a duty due to Plaintiffs, Defendants could not have breached a duty to Plaintiffs. Therefore, no cause of action for negligence exists. Accordingly, Defendants' motion to dismiss Count 20 is granted.[27]

### 3.   Punitive Damages - Count 21

Inasmuch as this Court has granted Defendants' motion to dismiss the public nuisance claim, the punitive damages claim of Count 21 is dismissed as it relates to Plaintiffs' claim for public nuisance.

Plaintiffs' claim for punitive damages for Defendants' alleged negligence is also dismissed. This Court has granted Defendants' motion to dismiss Count 20, which in effect eliminates any claim for punitive damages based upon negligence. As a result, Count 21 is dismissed in its entirety.

### 4.   Battery - Count 22

On December 30, 2002, Plaintiffs amended their Complaint, and

---

[27] This Court is cognizant of Judge Andre M. Davis' Remand Order wherein Judge Davis outlined the possibility of a viable negligence claim under Maryland Law. However, after studying the plethora of filings and being fully briefed oral argument, this Court finds that Plaintiffs have failed to successfully allege a claim for negligence against Baltimore Gas & Electric Company.

thereafter, added four more Plaintiffs for a total of 53 Plaintiffs. The Plaintiffs allege that Defendant Power Plant committed a battery through its emission of mercury during the production of energy.

A battery is the intentional touching of a person without that person's consent. McQuiggan v. Boy Scouts of America, 73 Md. App. 705, 714 (1988). Touching includes the intentional putting into motion of anything which touches another person. Id. To establish a claim for battery, Plaintiffs must show that the unwanted touching is harmful or offensive. Ghassemieh v. Schafer, 52 Md. App. 31, 42-43 (1982).

Defendants argue that Plaintiffs cannot infer the requisite general intent. Defendants further argue that there was no offensive touching. Defendants liken Plaintiffs' argument to the average person emitting pollution while driving his car. It would be unreasonable, according to Defendants, to hold each driver liable for battery merely because the pollution emitted from the car 'touches' the general public.

Plaintiffs argue that Defendants need not intend to have harmed them, only that Defendants violated the legally protected interest of another. Plaintiffs further argue that Defendants intended to produce energy, thereby intending to emit mercury, resulting in harm that did not involve the Plaintiffs' consent.

This Court finds that no cause of action for battery exists

-43-

for the activities alleged in the Amended Complaint. Plaintiffs are correct in arguing that it is immaterial whether Defendants intended to do harm.[28] However, Plaintiffs have not inferred the requisite general intent required to sustain a cause of action for battery against the Defendants. Specifically, Defendants must have intended to unlawfully invade Plaintiffs' physical well-being through the emission of mercury from its power plants. See, e.g., Nelson v. Carroll, 355 Md. 593, 602 (1999). This Court finds that Defendants, through its ordinary conduct of producing energy, did not commit a battery on the minor Plaintiffs. As a result, Defendants are not liable to Plaintiffs for battery. See, e.g., Nelson, supra 355 Md. at 603 (recognizing that a defendant would be liable to a plaintiff for harmful contact if the contact resulted from a volitional act where the defendant intended to invade the plaintiff's legally protected interests). Accordingly, this Court grants Defendants' motion to dismiss Count 22 of the Amended Complaint.

### PLAINTIFFS' SUPPLEMENTAL MEMORANDUM

On April 21, 2003, the morning of the first day of oral argument, Plaintiffs introduced a supplemental memorandum alleging the unconstitutionality of the Vaccine Act. This Court refused to accept or consider the supplemental memorandum at the hearing, as it was introduced clearly at the eleventh hour. At the hearing on

---

[28] For example, horseplay or a prank can be a battery. Ghassemeiah v. Schafer, 52 Md. App. 31 (1982).

-44-

April 21, 2003, this Court stated that it will not entertain Plaintiffs' supplemental memorandum as it plainly does not comply with Judge Smith's Order which set forth a briefing schedule with deadlines for Defendants' Motion to Dismiss, Plaintiffs' Opposition, and Defendants' Reply.  Plaintiffs had ample opportunity in their thorough Opposition to expand on any unconstitutionality argument. Additionally, Plaintiffs' attempt to introduce the supplemental memorandum does not comply with the Maryland Rules.

Further, the unconstitutionality issues Plaintiffs raise in the supplemental memorandum are not based on new precedent that was unavailable when Plaintiffs filed their Opposition.  Neither case law nor statutory law has changed since the filing of Plaintiffs' Complaint or Opposition that would precipitate raising these issues.

In light of this Court's decision, it is unnecessary to reach the Plaintiffs' argument that the Vaccine Act is unconstitutional. Accordingly, this Court grants Defendants motion to strike Plaintiffs' supplemental memorandum.

### STAY OF REMAINING CLAIMS

The state law claim that survives this Court's ruling on the preliminary motions is Count 11, Plaintiffs' claim of fraud.  For the reasons set forth previously, this Court finds that Count 11 is viable under applicable state law.

-45-

Clearly, it is within this Court's discretion whether to grant or deny a stay. Bancroft Info. Group v. Comptroller of the Treas., 91 Md. App. 100, 107 (1992), quoting Dodson v. Temple Hill Baptist Church, Inc., 254 Md. 541, 546 (1969). A court may "stay proceedings before it pending the determination of another proceeding that may affect the issues raised," especially if "many of the factual and legal issues in [one] action are identical to or are interrelated with and dependent on factual and legal issues in the [other] action." Vaughn v. Vaughn, 146 Md. App. 264, 279-81 (2002).

Courts in other thimerosal actions have consistently stayed remaining claims. In Liu v. Aventis Pasteur, Inc., 219 F. Supp. 2d 762 (W.D. Tex. 2002), the court noted that "[c]ourts often stay proceedings to avoid interference with related proceedings in another forum and to avoid the waste of duplication." Id. at 768 (citations omitted). The court stayed all proceedings in the parents' individual causes of action against all defendants until their child's claims were heard in the Vaccine Court. Id.; see also, Carabine v. Aventis Pasteur, Inc., No. A-02-CA-501-SS (W.D. Tex. Oct. 8, 2002); Russak v. Aventis Pasteur, Inc., No. A-02-CA-480-SS (S.D. Tex. Sept. 7, 2002).

Based on this authority, this Court will stay all remaining non-vaccine related claims against Defendants pending resolution of minor Plaintiffs' primary claims in the Vaccine Court. As a

-46-

result, Count 11 will be stayed.  To allow Plaintiffs to conduct discovery on some Defendants during the pendency of Plaintiffs' other claims in the Vaccine Court would be "wholly inconsistent with Congress's goal of minimizing litigation costs." Liu, supra, 219 F. Supp. 2d at 767-68.  Accordingly, this Court will stay Count 11 and not permit discovery until Plaintiffs have satisfied all mandatory requirements of the Vaccine Act.

### Conclusion

Accordingly, all claims brought by or on behalf of the minor plaintiffs, and all claims brought by the parents of the minor plaintiffs for costs and expenses arising from the minors' alleged vaccine-related injuries are dismissed without prejudice for lack of subject matter jurisdiction pursuant to the National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300 aa - 10 et seq.  Further, Defendants' Motion to Dismiss Count 11 is denied.  Moreover, for the reasons stated in this Opinion, this Court grants Defendants' Motion to Dismiss Counts 13, 14, 19, 20, 21 and 22 with prejudice. The remaining non-vaccine related claim against Defendants will be stayed pending a resolution of the minor Plaintiffs' primary claims in the Vaccine Court.

**The Honorable Stuart R. Berger**
The Judge's Signature Appears
on the Original Document Only

cc:  All Counsel of Record

-47-

27

Not Reported in F.Supp.2d
Prod.Liab.Rep. (CCH) P 16,589
(Cite as: 2003 WL 145427 (E.D.La.))

Page 1

**H**

United States District Court, E.D. Louisiana.

Jacqueline CASE and Mark Redding
v.
MERCK & CO., Aventis Pasteur, Inc., American
Home Products Corp., Smithkline
Beecham Corp., Spectrum Chemical Mfg. Corp.,
Sigma-Aldrich, Corp., Eli Lilly
Corp., Tenet Healthsystem Memorial Medical
Center, Inc., and Children's
Hospital

No. Civ.A. 02-1779.

Jan. 17, 2003.

*ORDER AND REASONS*

VANCE, J.

*1 Before the Court are defendants SmithKline Beecham, Wyeth (formerly known as American Home Products), Sigma-Aldrich, Merck and Aventis Pasteur (the "Vaccine Manufacturers"), which move the Court to reconsider its denial of their previous motion to stay. Defendant Eli Lilly also seeks a stay, invoking the protection recently bestowed upon it by the Homeland Security Act. [FN1] The relevant provision of the Act was expressly made retroactive and it defines Eli Lilly, for purposes of this lawsuit, as a "vaccine manufacturer" under the National Childhood Vaccine Injury Act (the "Vaccine Act"). 42 U.S.C. § 300aa (2002). [FN2] For the following reasons, the Court grants defendants' motion to stay.

> FN1. *See* Homeland Security Act of 2002, H.R. 5005 as amended by S. Amdt. 4901, 107th Cong., 2nd Sess. § § 1714-1717 (Nov. 19, 2002); H.R. 5710, 107th Cong., 2nd Sess. § § 1714-1717 (Nov. 13, 2002).

> FN2. Section 1714 of the Homeland Security Act of 2002 redefines the term "manufacturer" to include a corporation that manufactures any component or ingredient of a vaccine. *See* 42 U.S.C. § 300aa-33(3).

I. Background

Plaintiffs Jacqueline Case and Mark Redding bring

this action to recover damages for loss of consortium and lost wages as a result of the injuries allegedly caused by defendants to their child, Case Redding. Case Redding took childhood vaccines containing thimerosal, a chemical compound containing mercury that is used as a preservative in vaccines, which allegedly caused him to develop an autism-like disorder. Preservatives like thimerosal enable manufacturers to cut costs by distributing vaccines in multi-dose packages.

In an Order and Reasons entered on November 5, 2002, this Court determined that the Vaccine Act does not require plaintiffs' to assert claims for loss of consortium and their own lost wages in the court established by the Vaccine Act (the "Vaccine Court") before bringing them in a lawsuit in federal district court. The Court denied defendants' request to stay this lawsuit, primarily because Case Redding did not have a petition pending in the Vaccine Court. It has since come to the attention of the Court that Case Redding has, in fact, filed a petition in the Vaccine Court. In light of this development, defendants re-urge their request that the lawsuit be stayed.

II. Discussion

A. The Vaccine Act

The Vaccine Act is a federal statute that provides a no-fault compensation system for injuries caused by the administration of childhood vaccines. 42 U.S.C. § 300aa. The Act enables individuals who sustain vaccine-related injuries to bring their claims before special masters appointed by the United States Court of Federal Claims. Petitioners need only prove causation--and not negligence--to obtain a recovery that is paid out from the federal purse. Petitioners may reject the recovery that is offered in the Vaccine Court and then file a civil lawsuit against the vaccine manufacturer. The purpose of the Act was to encourage vaccine development by sparing vaccine manufacturers certain litigation expenses, as well as the insurance premiums that are associated with such costs. *See Schafer v. American Cyanamid Co.*, 20 F.3d 1, 2 (1st Cir.1994).

Specifically, the Act provides that before an individual who sustains vaccine- related injuries (or the legal representatives of such an individual) files a civil lawsuit against a vaccine manufacturer for damages greater than $1,000, he or she must first file a petition in the Vaccine Court for the alleged injury. 42 U.S.C. § 300aa-11(a)(2)(A); *see Shalala v. Whitecotton*, 514 U.S. 268, 269, 115 S.Ct. 1477,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
Prod.Liab.Rep. (CCH) P 16,589
(Cite as: 2003 WL 145427 (E.D.La.))

1478 (1995). If a plaintiff fails to file a petition under the Act before the plaintiff sues in state or federal court, the court is required to dismiss the action. 42 U.S.C. § 300aa-11(a)(2)(B). The Vaccine Act provides that "no person may bring a civil action ... for damages arising from a vaccine-related injury ... unless a petition has been filed in accordance with [the Vaccine Act]." 42 U.S.C. § 300aa-11a(2)(A). This bar, however, applies only to individuals who have sustained vaccine-related injuries or the legal representatives of such individuals. 42 U.S.C. § § 300aa-11a(9) and 11b(1)(A).

*2 Courts have long held that the Vaccine Act does not bar civil suits brought by parents, on their own behalf, for damages arising from the vaccine- related injuries of their children. Schafer, 20 F.3d at 6 (noting that the Vaccine Act "has held that a parent *can* obtain a loss of consortium 'award' from a state court ... and also obtain compensation for her vaccinated (and injured) child from the Vaccine Court"); Owens v. American Home Products, 203 F.Supp. 748, 756 (S.D.Tex.2002); see also Cook v. Children's Medical Group, 756 So.2d 734, 741 (Miss.1999); McDonald v. Lederle Laboratories, 775 A.2d 528, 535 (N.J.Sup.Ct.2001). As this Court noted in its Order and Reasons of November 5, 2002, Congress could have swept loss of consortium claims and lost wages claims within the purview of the Act, but it did not do so.

B. The Court's Inherent Power to Stay

The Court begins, as it must, by recognizing its "virtually unflagging obligation" to exercise the jurisdiction that it is given. Black Sea Investment, Ltd. v. United Heritage Corporation, 204 F.3d 647, 650 (5th Cir.2000). As Judge Rubin succinctly stated, "[f]ederal courts exist to decide controversy." Itel Corporation v. M/S Victoria U, 710 F.2d 199, 202 (5th Cir.1983). A court nevertheless possesses the inherent power to control the disposition of the cases on its docket "with economy of time and effort for itself, for counsel, and for litigants." Landis v. North American Co. Same, 299 U.S. 248, 254, 57 S.Ct. 163, 166 (1936). Use of the Court's inherent power to stay must not be abused. Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co., Inc., 761 F.2d 198, 303 n. 6 (5th Cir.1985). Absent statutory authorization, the moving party bears a heavy burden to show why a stay should be granted. Id. Further, the Court "should tailor its stay so as not to prejudice other litigants unduly." Id. A stay may be granted to avoid hardship or inequity, but courts should "prevent the ossification of rights which attends inordinate delay."

Itel, 710 F.2d at 203 (internal citations omitted).

A number of factors persuade the Court that a stay would economize the time of the Court, the counsel and the litigants. An essential portion of plaintiffs' case is now currently pending before an adjudicative tribunal investigating the causal link between thimerosal and injuries like those sustained by Case Redding. In order to recover for loss of consortium, plaintiffs must establish that defendants caused and are liable for the injuries allegedly sustained by Case Redding. Keener v. Mid-Continent Casualty, 817 So.2d 347, 363 (La.Ct.App.2002); Junot v. Morgan, 818 So.2d 152, 158 n. 5 (La.Ct.App.2002); Gilbert v. Laborde, 632 So.2d 1162, 1169 (La.Ct.App.1994). The issue of whether thimerosal caused Redding's injuries is now before the Vaccine Court, which is handling, in addition to Redding's petition, hundreds of similar claims. (See Autism General Order # 1, United States Court of Federal Claims, Office of Special Masters, July 3, 2002, Attached to Def.'s Mot. to Reconsider, Ex. 2.) The Chief Special Master has set forth a two-step procedure whereby, first, the general issue of whether thimerosal causes autism and similar disorders will be resolved, and, second, if it does, whether this conclusion can be applied to each of the individual cases, including Case Redding's. (Id. at 3.) Undoubtedly, a number of experts, independent or otherwise, will be retained. Requiring the parties to conduct a parallel inquiry, on a different timetable, to determine plaintiffs' right to recover for loss of consortium is duplicative, expensive, and wasteful.

*3 Finally, the Court notes that a stay of limited duration does not cause undue prejudice to plaintiffs. A stay reduces litigation expenses for plaintiffs as well. Further, plaintiffs' interest in the Vaccine Court's proceedings is not attenuated, as their child's petition is pending there.

In light of these considerations, the Court concludes that stay is in the interest of justice. The Court is not aware of any other court that has denied a stay of parental claims for loss of consortium when their child has a claim pending in the Vaccine Court. To the contrary, on facts nearly identical to those involved in this lawsuit, other courts have ordered stays. See Russak v. Aventis Pasteur, No. A-02-CA-480-SS, at 8 (W.D.Tex. Sept. 9, 2002); Owens v. American Home Products Corporation, No. G-02-185, at 1 (S.D.Tex. July 12, 2002). In Owens, Judge Kent stayed a lawsuit involving parental claims arising out of thimerosal-related injuries for a limited time pending developments in the Vaccine Court.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
Prod.Liab.Rep. (CCH) P 16,589
**(Cite as: 2003 WL 145427 (E.D.La.))**

Page 3

Given that a stay must not give rise to a lengthy delay, the Court agrees that a stay of limited duration is appropriate. *See Saybolt,* 761 F.2d at 203 n. 6 (citing *Landis,* 299 U.S. at 257, 57 S.Ct. at 167). The Court grants defendants' motion to stay and hereby stays this lawsuit until August 1, 2003.

III. Conclusion

For the foregoing reasons, the Court grants defendants' motion to stay. This lawsuit is hereby STAYED until August 1, 2003.

2003 WL 145427 (E.D.La.), Prod.Liab.Rep. (CCH) P 16,589

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

28

06/24/03  09:33 FAX 504 596 2867    HS INFO- Fax Received: 06/24/2003 11:35AM * Pg 2,
McCLINCHEY STAFFORD    ☑002/013

FILED
USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK
DATE 6 17 2003
BY _____

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE/OPELOUSAS DIVISION

SCOTT MOSS, INDIVIDUALLY AND          CIVIL ACTION NUMBER: 03-0334
ON BEHALF OF AMBER MOSS, AND
JANICE MOSS                           JUDGE DOHERTY

VERSUS                                MAGISTRATE JUDGE HILL          ,

MERCK & CO., ET AL

<u>MEMORANDUM RULING</u>

     This matter comes before the Court on a Motion to Dismiss
filed on behalf of  Merck & Co., Aventis Pasteur, Inc. and Wyeth
(formerly known as American Home Products), (the "Vaccine
Defendants"), and Eli Lilly & Co. ("Lilly"), (the "Thimerosal
Defendant") seeking to dismiss the parent plaintiffs, Scott and
Janice Moss ("Parent Plaintiffs") vaccine related claims on the
basis all vaccine related claims must first be brought pursuant
to the National Childhood Vaccine Injury Act ("Vaccine Act"),
which requires the claims for injuries and expenses associated
with thimerosal containing vaccines to first be adjudicated in
the Court of Federal Claims (the "Vaccine Court").  42 U.S.C.
§ 300aa-1, et seq.

     The Vaccine Defendants, also, seek dismissal of the Parent
Plaintiffs' claims for "specific damages" flowing from the
Louisiana Products Liability Act as follows: (1) hedonic damages,
on the basis that said damages under Louisiana law are part of
the general damage award available to the minor daughter, Amber

VP13439          4|7

06/24/03  09:34 FAX 504 596 2867    JHS INFO- Fax Received: 06/24/2003 11:35AM * Pg 3,
                                   McCLINCHEY STAFFORD                    ☒003/013

Moss; (2) punitive damages, on the basis such damages are not
allowed under Louisiana law without a statutory basis, and the
Louisiana Products Liability Act does not allow the award of
punitive damages.

Lilly, also, seeks dismissal of the Parent Plaintiffs'
claims for both hedonic and punitive damages on the same basis as
argued by the Vaccine Defendants; however, plaintiffs' Complaint
reads: "**THIRD CAUSE OF ACTION AS THE THIMEROSAL MANUFACTURER.**"
Thus, the Third Cause of Action alleged by plaintiffs as against
Lilly, is couched against a manufacturer; however, alleges
"negligent and/or fraudulent misrepresentation of the safety of
thimerosal which caused plaintiffs' injuries." Plaintiffs'
Complaint. Thus, plaintiffs claims against Lilly have not been
couched under the Louisiana Products Liability Act; however,
plaintiffs' petition identified Lilly as a manufacturer.
Consequently, this Court has confusion as to whether the
Louisiana Products Liability Act would govern plaintiffs' claim
made against Lilly as the "Thimerosal Manufacturer." However,
plaintiffs have couched their claim against Lilly under La. Civ.
Code art. 2315. Nonetheless, this is of no moment at this
juncture, as the same threshold analysis would apply for either
basis under the law. Thus, Lilly has adopted the arguments of
the Vaccine Defendants as to Lilly's Motion to Dismiss
plaintiffs' claims. This Court notes, however, plaintiffs have

2

pled the application of La. Civ. Code art. 2315 as to Lilly,
couched in negligence.

All plaintiffs have dismissed all state law claims based
upon conspiracy as originally pled against the Vaccine
Defendants.  All plaintiffs have dismissed all claims "for
damages for emotional distress" as against all defendants.

Additionally, both the Vaccine Defendants and Lilly seek
dismissal and/or stay of the Parent Plaintiff's loss of
consortium claim as pled.[1]  Both the Vaccine Defendants and
Lilly, argue in support of dismissal/stay of the Parent
Plaintiffs' loss of consortium claim arguing the loss of
consortium claim is a derivative of the claim now filed in the
Vaccine Court on behalf of the minor child, Amber Moss, and,
therefore, is not subject to determination before this Court.

### Procedural History

Plaintiffs' Memorandum at page 2 states plaintiffs initially
filed the instant lawsuit on October 18, 2002, against three
classes of defendants:  (1) the "Vaccine Defendants," Merck &
Co., Aventis Pasteur, Inc. and Wyeth, which manufactured various
vaccines; (2) the "Thimerosal Defendant," Eli Lilly & Co., which
developed and marketed thimerosal, a preservative for vaccines;
and (3) the Medical Defendant, which administered the vaccines.

---

[1]A claim for loss of consortium is incorporated into the
Louisiana Products Liability Act by way of incorporation of La.
Civ. Code art. 2315, et seq.

3

Plaintiffs have since voluntarily dismissed the Medical Defendant from this litigation.

Plaintiffs have withdrawn their claim for civil conspiracy against the Vaccine Defendants, as well as their claim for damages for emotional distress against both the Vaccine Defendants and Lilly.

Further, plaintiffs have filed no opposition to the Motion to Dismiss filed on behalf of both the Vaccine Defendants and Lilly, plaintiffs' claim for punitive damages. Therefore, this Court DISMISSES plaintiffs' claim for punitive damages as against all defendants, finding no basis for same under applicable Louisiana law.

Additionally, counsel for plaintiff has advised the Court that all claims asserted on behalf of the minor child, Amber Moss by the Parent Plaintiffs, against both Vaccine Defendants and Lilly, will be pursued by the parents on behalf of Amber Moss by way of the recent filing of the claim by the Parent Plaintiffs on behalf of their minor daughter in the "Vaccine Court."

By way of the pending motions, this Court has been asked to determine, considering the suit filed with the "Vaccine Court," whether or not the Parent Plaintiffs' claim for loss of consortium flowing as a defined "damage" from the Louisiana Products Liability Act, as to the Vaccine Defendants, and as to plaintiffs' claim for loss of consortium pursuant to La. Civ.

4

Code art. 2315, based on "negligent and/or fraudulent
misrepresentation of the safety of Thimerosal," as against Lilly,
can stand.  Defendants suggest the Parent Plaintiffs' claim
either should be dismissed or stayed pending resolution of the
vaccine related claims of their daughter, Amber Moss, now filed
before the Vaccine Court.

Both the Vaccine Defendants and Lilly, argue the source of
the Parent Plaintiffs' claim for loss of consortium and the
damages sought thereby, is merely a derivative claim flowing from
the injury of their minor daughter and the claims pled on her
behalf.  Thus, the defendants make several arguments urging
dismissal of the Parent Plaintiffs' claims, or in the
alternative, stay of the Parent Plaintiffs' claims pending
resolution of the minor's claim presently pending before the
"Vaccine Court."  In support of their argument for dismissal, or
in the alternative, stay of the Parent Plaintiffs' claims, the
Vaccine Defendants argue:

> A stay of the derivative proceedings in this Court pending
> the outcome of the minor's petition in Vaccine Court is both
> necessary and appropriate because:
>
> 1.  The parents' derivative claims are dependent upon
> the minor plaintiff's primary-injury claims and, these
> claims should not be tried until the Vaccine-Court
> remedies have been exhausted;
>
> 2.  Neither discovery nor any sort of pre-trial
> procedures can go forward against the vaccine
> manufacturers until the Vaccine-Court proceedings are
> completed; and

      3.  The Vaccine Act's mandatory substantive and procedural limitations on a vaccine related lawsuit will govern any trial and pre-trial preparation.

After a reading of the Vaccine Act, as cited below, this Court finds the Vaccine Act, itself, mandates the dismissal of the Parent Plaintiffs' claims, until the claim now filed in the Vaccine Court on behalf of the minor child, Amber Moss, has been resolved.

The Vaccine Act, more particularly 42 § 300aa-11(2)(A) states (emphasis added):

**(a) General rule**

(2)(A)  **No person** may bring a civil action for damages in an amount greater than $1,000 or in an unspecified amount **against a vaccine administrator or manufacturer in a State or Federal court for damages arising from a vaccine-related injury or death associated with the administration of a vaccine** after October 1, 1988, **and** no such court may award damages in an amount greater than $1,000 in a civil action for damages for such a vaccine-related injury or death, **unless a petition has been filed,** in accordance with section 300aa-16 of this title, for compensation under the Program for such injury or death **and -**

    (i)(I) the **United States Court of Federal Claims has issued a judgment** under section 300aa-12 of this title on such petition, **and**

    (II) such person elects under section 300aa-21(a) of this title to file such an action, or

    (ii) such person elects to withdraw such petition under section 300aa-21(b) of this title or such petition is considered withdrawn under such section.

**(b) Petitioners**

. . . **any** person who has sustained a vaccine-related injury, the legal representative of such person if such person is a

6

06/24/03  09:36 FAX 504 596 2867    OHS INFO- Fax Received: 06/24/2003 11:35AM • Pg 8/
McCLINCHEY STAFFORD                                                @008/013

minor or is disabled, or the legal representative of any person who dies as the result of the administration of a vaccine set forth in the Vaccine Injury Table may, if the person meets the requirements of subsection (c)(1) of this section, file a petition for compensation under the Program.

Additionally, the statue provides in 42 § 300aa-16(c):

**(c) State limitations of actions**

If a petition is filed under section 300aa-11 of this title for a vaccine-related injury or death, limitations of actions under State law shall be stayed with respect to a civil action brought for such injury or death for the period beginning on the date the petition is filed and ending on the date (1) an election is made under section 300aa-21(a) of this title to file the civil action or (2) an election is made under section 300aa-21(b) of this title to withdraw the petition.

Therefore, all state statutes of limitations are stayed until, as stated under 42 § 300aa-21(a)(1) and (2):

**(a) Election**

After judgment has been entered by the United States Court of Federal Claims or, if an appeal is taken under § 300aa-12(f) of this title, after the appellate court's mandate is issued, the petitioner who filed the petition under section 300aa-11 of this title shall file with the clerk of the United States Court of Federal Claims -

(1) if the judgment awarded compensation, an election in writing to receive the compensation or to file a civil action for damages for such injury or death, or

(2) if the judgment did not award compensation, an election in writing to accept the judgment or to file a civil action for damages for such injury or death.

The Act also allows a petitioner to file a civil action for damages for such injury or death, if the petition is withdrawn as per 42 § 300aa-21(b) due to the failure of the Special Master to rule on petitioner's claims within 240 days, 42 300aa-21(b)(1) or

7

OHS INFO- Fax Received: 06/24/2003 11:35AM * Pg 9/
06/24/03  09:36 FAX 504 596 2887    McCLINCHEY STAFFORD                    ☑009/013

if the Court fails to enter a judgment on petitioner's claims
within 420 days, 42 § 300aa-21(b)(2).

Additionally, this Court notes that § 300aa-15,
"**Compensation**," lists the basis for compensation should the
Vaccine Court find compensation due and said compensation
includes expenses which will be incurred by or on behalf of the
person who suffered such injury.  § 300aa-15(a)(1)(A)(ii).
Therefore, compensation is available to Parent Plaintiffs for
expenses which "have been or will be incurred by or on behalf of
the person," in this case, Amber Moss, who allegedly suffered
such injury.

The statute further provides for loss of earning capacity
and in § (4), for actual and projected pain and suffering and
emotional distress from the vaccine-related injury, an award not
to exceed $250,000.00.  Accordingly, the Vaccine Act defines
damages which may be recovered under the Act.

Therefore, the Vaccine Statute addresses the rights of a
petitioner to recover on behalf of the minor child expenses
incurred by the parents on behalf of the minor child.  The Parent
Plaintiffs may chose either to accept compensation or a decision
awarding no compensation, from the Vaccine Court and not to
proceed further or thereafter, to file a civil action for damages
under 42 § 300aa-16(c).  Additionally, the petitioner is, also,
allowed to withdraw his petition, as stated above, for failure of

8

the Special Master or the Court to rule within a specific amount
of time.  Accordingly, the petitioner may then seek to file a
civil action for claimed injury and damages.  Regardless of
whether judgment is given or the petition is withdrawn, the
statute of limitations for any state law claim, in this case, the
urged claim of the parents of the minor child, Amber Moss, under
the Louisiana Product Liability Act against the Vaccine
Defendants, and negligence claim under La. Civ. Code art. 2315
against Lilly, are tolled.

Parent Plaintiffs admit that proof of their claims under the
Louisiana Products Liability Act and "negligent
misrepresentation" would involve proof of the same facts and
involve the same legal issues as their child's claims for alleged
injury caused by the vaccine.  Plaintiffs' Opp., p. 6.  Thus,
defendants argue the Parent Plaintiffs' claims are merely
derivative claims flowing from the minor child's claim.  However,
the Parent Plaintiffs have made claims against the two
defendants, which the Parent Plaintiffs argue are sufficiently
separate and independent as to allow them to exist in tandem with
or separately from the claims made on behalf of the minor child
before the "Vaccine Court."  Whether the claims made by the
Parent Plaintiffs are merely claims for damages which are solely
derivative of the minor child's cause of action, and thus, must
be addressed within the minor child's cause of action or are

causes of action owned by the parents themselves, and thus, can
stand alone, is a question this Court need not address at this
time.  Rather, the language of the statute is clear, either such
type of claim should be dismissed at this juncture; the
prescription period will be tolled until resolution of the claim
now before the "Vaccine Court."  Thus, this Court GRANTS
defendants', Lilly, Merck & Co., Aventis Pasteur and Wyeth,
Motion to Dismiss without prejudice the Parent Plaintiffs' claims
as against Lilly, Merck & Co., Aventis Pasteur and Wyeth pending
resolution of the minor child's claim in a fashion as
contemplated by the statute.

THUS DONE AND SIGNED this  17  day of  June , 2003.

COPY SENT:
DATE: 6-23-03
BY: JW
TO: Bachford
Miyagi
Clausen
Owens
Chassaignac
Krause
Manning

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

10

**FILED**

USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK
DATE 6/17/2003
BY _____

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OP LOUISIANA

LAFAYETTE/OPELOUSAS DIVISION

SCOTT MOSS, INDIVIDUALLY AND      CIVIL ACTION NUMBER: 03-0334
ON BEHALF OF AMBER MOSS, AND
JANICE MOSS      JUDGE DOHERTY

VERSUS      MAGISTRATE JUDGE HILL

MERCK & CO., ET AL

## O R D E R

    Considering the foregoing Memorandum Ruling;

    IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Motion
to Dismiss [doc. #21] filed on behalf of Eli Lilly and the Motion
to Dismiss [doc. #24] filed on behalf of Merck & Co., Aventis
Pasteur, Inc. and Wyeth, is GRANTED.  This Court GRANTS
defendants' Motion to Dismiss the Parent Plaintiffs', Scott and
Janice Moss's, cause of action under the Louisiana Products
Liability Act as against the Vaccine Defendants and "negligent
and/or fraudulent misrepresentation" against Lilly, the
Thimerosal Defendant, pending ruling by the Vaccine Court.  All
other relief sought in the Motions to Dismiss by Lilly and Merck,
Aventis Pasteur and Wyeth, has been rendered MOOT by actions of



11

06/24/03  09:37 FAX 504 596 2867    MCCLINCHEY STAFFORD    UHS INFO- Fax Received: 06/24/2003 11:35AM * Pg 13,    ☒013/013

the parties.

Lafayette, Louisiana this 17 day of June, 2003.

REBECCA F DOHERTY
UNITED STATES DISTRICT JUDGE

COPY SENT:
DATE: 6-23-03
BY:
TO: Bickford
Miyagi
Cloutier
Owens
Chassaignac
Kruse
Mouning

12

29

# In the United States Court of Federal Claims

### OFFICE OF SPECIAL MASTERS

No  02-392V

Filed  October 11, 2002

```
FILED

OCT 1 1 2002

U.S. COURT OF
FEDERAL CLAIMS
```

• • • • • • • • • • • • • • • • • • • • • • • •

DIANE and NICHOLAS LEROY,
Individually and as Next Friends of
NICHOLAS ARTHUR LEROY, a minor,

    Petitioners,

       v

SECRETARY OF THE DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

    Respondent.

• • • • • • • • • • • • • • • • • • • • • • • •

To Be Published

Michael T. Gallagher, Houston, Texas, for petitioners.
Vincent J. Matanoski, Washington, D C., for respondent.

### RULING ON JURISDICTION

**COLKIEWICZ, Chief Special Master.**

Petitioners filed for compensation under the National Vaccine Injury Compensation Program ("the Program") on April 24, 2002.[1] Petitioners claim that "a series of mercury-containing vaccines" caused Nicholas, their otherwise healthy child, to suffer developmental problems. Petitioners contest

---

[1]    The National Vaccine Injury Compensation Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended, 42 U S.C. §§300aa-10 et seq. (2000).  Hereinafter, individual section (§) references will be to 42 U S C. §300aa of the National Childhood Vaccine Injury Act of 1986 ("the Act" or "the Vaccine Act").

the court's jurisdiction over their claim. Petitioners do not challenge that Nicholas received vaccines covered by the Program or that their damages claim exceeds $1,000.[2] See Complaint at 3-5, filed April 24, 2002; 42 C.F.R. §100.3(a) (1997), §11(a)(2)(A)  However, petitioners argue adamantly that their claim is beyond the scope of the Vaccine Act because their son suffers from "mercury poisoning [from the thimerosal preservative contained in the vaccines he received] and not from any condition associated with any therapeutic component in any of the vaccines" administered  Complaint at 5  Given the Leroys' stated position, the undersigned ordered the parties to brief whether jurisdiction over the subject matter of this claim is properly in this court  After considering the parties' arguments, the court finds that jurisdiction lies properly with the U S. Court of Federal Claims.[3]  The court's reasons follow.

## PROCEDURAL HISTORY

Petitioners filed a petition for compensation on April 24, 2002, but argue that their claim is not covered by the Vaccine Act.  Petitioners' injury claim is similar to over 875 other cases filed under the Program; the claims allege that a vaccine or series of vaccines caused the vaccinee to develop developmental problems which may fall within the diagnosis of autism spectrum disorder.[4]  Like this case, the other claims state that thimerosal, a vaccine preservative, is responsible for the vaccinee's injury and is the basis for his or her claim for Program compensation.  Working with a

---

[2]    Vaccines covered by the Program are outlined in the Vaccine Injury Table.  §14(a), as amended, 42 C.F.R. §100.3(a) (1997).  Petitioners must file their vaccine-related claim within the Act's statute of limitations period.  §16(a).  Filing an untimely petition is fatal to a claim; equitable tolling is not available to Program petitioners.  See Brice v  Secretary of HHS, 240 F.3d 1367 (Fed. Cir. 2001), cert. denied sub nom., Brice v  Thompson, 122 S Ct. 614 (2001).  Petitions for Program compensation must be filed in this court within 36 months of the first symptom or manifestation of onset of the alleged vaccine-related injury  §16(a)(2)  If the vaccinee died, claims on the decedent's behalf must be filed within 24 months of the death, and no later than 48 months after the first symptom or manifestation of onset of the injury from which the death resulted.  §16(a)(3).

[3]    The court's ruling is limited to a finding of subject matter jurisdiction over this claim.  The undersigned makes no determination as to whether petitioners' claim falls outside the court's jurisdiction due to some other legal defect, such as it was filed beyond the Act's statute of limitations period.  Petitioners provide no evidence, but only assertions, as to the timeliness of their petition, see Complaint at 3, and any such issue will be resolved at a later time.

[4]    See Autism General Order #1 at 1, n. 2, Office of Special Masters, Chief Special Master Gary J. Golkiewicz (Fed. Cl. Spec. Mstr. July 3, 2002) (describing the symptoms of autism spectrum disorder to include "avoidance of eye contact, seeming 'deafness,' abrupt loss of language, unawareness of environment, physical abusiveness, inaccessibility, fixation, bizarre behavior, 'flapping,' repetitive and/or obsessive behavior, insensitivity to pain, social withdrawal, and extreme sensitivity to sounds, textures, tastes, smells, and light") (citing National Institute of Mental Health, Publication 97-4023)

2

committee of petitioners' and respondent's lawyers, the court has implemented an efficient litigation procedure for resolving the autism cases. see Autism General Order #1 Counsel and the court are diligently preparing the cases pursuant to that agreed upon procedure Thus, resolving this jurisdictional issue is obviously critical.[3] Consequently, the undersigned ordered petitioners to brief the court on the jurisdictional issue raised by their petition and to state with particularity whether jurisdiction lies with the Court of Federal Claims Petitioners filed their brief on June 18, 2002. See Petitioners' Brief in Support of the Jurisdictional Issues Raised in Their Petition ("Pet Brief") The government filed its response on July 19, 2002 See Response to Petitioners' Brief in Support of the Jurisdictional Issues Raised in Their Petition ("Resp Brief"). Petitioners filed their reply on August 9 2002. See Petitioners' Reply to Respondent's Response Concerning the Jurisdictional Issues Raised in the Petitioners' Brief ("Pet Reply")

In sum, petitioners allege that the vaccine preservative, thimerosal, caused Nicholas's neurologic injury; that thimerosal is not a "constituent material" of the vaccines that he received, "nor does it have any therapeutic effect which would make it a necessary or essential part of any vaccine"; that the Act explicitly excludes thimerosal from coverage because it is an "adulterant" or "contaminant" of the vaccine, that, further, the Vaccine Act never contemplated thimerosal or autism claims, and finally, that thimerosal, because of its toxicity, is not a "constituent material" as defined by the Code of Federal Regulations setting forth regulations for preservatives used in licensed vaccines. Pet. Brief at 3-15 For the above reasons, petitioners argue that any claims alleging injuries arising from thimerosal are beyond this court's jurisdiction

Respondent contends that petitioners' arguments are "without merit" for the following reasons: compensation has been granted to vaccinees for injuries sustained from a vaccine preservative, citing Grant v. Secretary of HHS, 956 F.2d 1144 (Fed. Cir. 1992); "thimerosal is neither an adulterant or contaminant within the plain meaning of the Act"; thimerosal is not an adulterant or contaminant when used "within [the] prescribed limits of a valid biologics license"; and, the legislative history supports the proposition that "injuries allegedly related to thimerosal [must] be brought under

---

[3]     The issue of whether this court has jurisdiction over claims alleging injuries arising from the thimerosal component of a vaccine (or vaccines) has been the subject of litigation in other courts. See, e.g., Bertrand v. Aventis Pasteur Laboratories, Inc., 2002 WL 31194226 (D. Ariz. Sept. 23, 2002); Liu v. Aventis Pasteur, Inc., 2002 WL 31007709 (W.D. Tex. Aug. 23, 2002); Collins v. American Home Products Corporation, No. 01-979, slip op. (S.D. Miss. Aug. 1, 2002); Stewart v. American Home Products Corporation, No. 02-427, slip op. (S.D. Miss. Aug. 1, 2002); King v. Aventis Pasteur, Inc., 210 F. Supp. 2d 1201 (D. Or. June 7, 2002); Blackmon v. American Home Products Corporation, No. G-02-179, slip op. (S.D. Tex. May 8, 2002); Owens v. American Home Products Corporation, 203 F. Supp. 2d 748 (S.D. Tex. May 7, 2002); O'Connell v. American Home Products Corporation, No. G-02-184, slip op. (S.D Tex. May 7, 2002). In most cases filed with the Court of Federal Claims, petitioners have accepted this court's jurisdiction over claims alleging a causal relationship between vaccination and autism disorders. To this court's knowledge, petitioners' counsel is the only practitioner at this time contesting jurisdiction. Mr. Gallagher currently has nearly 300 autism-related cases pending before this court

the Program." Resp. Brief at 2, 4-12  Respondent argues further that thimerosal is a constituent of vaccines and the statute makes no distinction between the vaccine antigens and the vaccine's constituent parts. Id. at 12-14  Finally, respondent contends that petitioners' legal position would lead to a "multiplicity of litigation," which is at odds with the Program's legislative purpose. Id. at 14-15.

In their reply, petitioners allege that their claim is not covered under the Program because thimerosal is not a vaccine, but a preservative that "poses a neurotoxic threat to its recipients", thus, injuries attributable to the ethyl-mercury in thimerosal are not covered. Pet. Reply at 1, 9. Petitioners also restate that thimerosal is an adulterant and has no therapeutic effect. In this regard, they rely heavily on Special Master Edwards's Order in Geppert v. Secretary of HHS, No. 00-286V (Fed. Cl. Spec. Mstr. Mar. 21, 2001) (unpublished Order raising the issue whether thimerosal is an adulterant or contaminant and directing respondent to file a brief on the jurisdictional issue), for the proposition that injuries from mercury do not fall under the Vaccine Act  Id. at 2.  They also rely on Magistrate Judge Ashmanskas's recommendation to the federal district court judge in King v  Aventis Pasteur, Inc., that a state court could find thimerosal-related injuries are not covered by the Program. Id. at 2-3.  See also King v  Aventis Pasteur, Inc., No. 01-1305-AS, Findings and Recommendation, slip op. at 7-8 (D. Or  June 7, 2002).  Petitioners further contest respondent's reliance on Grant v. Secretary of HHS, 956 F.2d 1144 (Fed. Cir 1992).  They aver that the Federal Circuit in that case did not find that the preservative caused the injury, and that Grant is distinguishable because the Leroys' son's injuries were caused by the toxin thimerosal and not by an antigen of the vaccines received, as was the case in Grant  Pet. Reply at 3-5.  Finally, petitioners contend that irrespective of the Food and Drug Administration's ("FDA") licensing of thimerosal-containing vaccines, thimerosal could not be considered a "constituent material," or component part of a vaccine because it is toxic to the recipient, as evidenced by various agencies' actions  Id. at 5-8

After considering the parties' arguments, the undersigned finds that subject matter jurisdiction lies properly with this court.

## DISCUSSION

To maintain an action against the government for Program compensation, petitioners must show that their claim meets the filing prerequisites of the Vaccine Act.  Section 11(a) is the gate-keeping provision of the statute which sets forth the general rules describing when a vaccinee may petition for compensation.  See Amendola v. Secretary of HHS, 989 F.2d 1180, 1182-83 (Fed. Cir. 1993); see also Klahn v. Secretary of HHS, 31 Fed. Cl. 382, 385 (1994) ("The court's jurisdiction involves compliance with [these] gate-keeping provisions . . . .").  Among its various requirements, §11(a)(1) provides for "[a] proceeding for compensation under the Program for a vaccine-related injury or death."  Section 33(5) of the Act defines "vaccine-related injury or death" as "an illness, injury, condition, or death associated with one or more of the vaccines set forth in the Vaccine Injury Table."  §33(5).  However, injuries associated with "an adulterant or contaminant intentionally added" to a Table vaccine are specifically excluded by the Act's definition of a "vaccine-related injury or death."  Id.  The jurisdictional issue raised in this case is whether an injury allegedly caused by the thimerosal preservative within a Table vaccine is a "vaccine-related injury" under §11(a)(1), as

4

defined by §33(5) of the Vaccine Act. Petitioners' counsel advances a plethora of unsuccessful arguments to contest this court's jurisdiction over the Leroys' case. In short, petitioners ignore time-honored legal principles, common definitions of relevant statutory language, congressionally-stated Program goals, relevant scientific evidence, and case law. The undersigned finds petitioners' numerous arguments, contending that Nicholas's injuries are not "vaccine-related," legally flawed and unsupported by the record.

## I.    The Scope of the Vaccine Act and the Doctrine of Sovereign Immunity

The Vaccine Act established a no-fault compensation Program, designed to curb the time and expense of traditional tort litigation.[6] Congress envisioned a system where awards to an injured vaccinee or a person suing on the vaccinee's behalf were to be made "'quickly, easily, and with certainty and generosity.'" Knudsen v. Secretary of HHS, 35 F.3d 543, 549 (Fed. Cir. 1994)

-----

[6]    The Program's structure fosters expedited review of a vaccine claim alleging that a Table vaccine caused the vaccinee's injury. §14; 42 C.F.R. §100.3. Congress created the Vaccine Injury Table, 42 U.S.C. §300aa-14(a), as amended, 42 C.F.R. §100.3(a), which affords petitioners a statutory presumption that the Table vaccine in question caused an injury, provided that a particular injury listed on the Vaccine Injury Table occurs within the specified time frame following the vaccine. Alternatively, the vaccinee may prove an off-Table claim, in other words, that the vaccine did in-fact cause the injury even though the injury itself or the onset period falls outside the Table's parameters. §11(c)(1)(C)(ii)(I) and (II).    Both theories assume that the evidence fails to show by a preponderance that a factor unrelated to the vaccine caused the injury. §13(a)(1)(B).

In off-Table claims, petitioners must establish causation utilizing traditional tort litigation standards. See, e.g., Grant v. Secretary of HHS, 956 F.2d 1144, 1147-48 (Fed. Cir. 1992); Shyface v. Secretary of HHS, 165 F.3d 1344, 1351 (Fed. Cir. 1999); Terran v. Secretary of HHS, No. 95-451V, 1998 WL 55290, at *6 (Fed. Cl. Spec. Mstr. Jan 23, 1998), aff'd, 41 Fed. Cl. 330 (1998), aff'd, 195 F.3d 1302 (Fed. Cir. 1999). In other words, petitioners must demonstrate by a preponderance of the evidence that the vaccine caused the alleged injury. §§11(c)(1)(C)(ii)(I) and (II); §13(a)(1)(A). For a detailed discussion of the appropriate analytical framework for resolving off-Table cases, see Stevens v. Secretary of HHS, No. 99-594V, 2001 WL 387418 (Fed. Cl. Spec. Mstr. Mar. 30, 2001). Any sequela of the vaccine-related injury is compensable. §14(a), as amended, 42 C.F.R. §100.3(a).

Once filed, the Program petition is assigned to a special master who has 240 days to render a decision on the merits or otherwise resolve the case, excluding any periods of suspension allowed by the Act. §12(d)(3)(A). Although the Program's scheme is adversarial, there is no right to discovery and often little need for formal discovery; petitions are either filed complete with all the evidence attached as exhibits or the parties work cooperatively to gather information to complete the record. See the special masters' Guidelines for Practice Under the National Vaccine Injury Compensation Program for a complete description of the Program and the implementing procedures.

(quoting H.R. Rep. No 99-908, at 3, reprinted in 1986 U.S.C.C.A.N. 6344, 6344)  See also Shalala v. Whitecotton, 514 U.S. 268, 270 (1995) (stating that "the [Act's] streamlining does not stop with the mechanics of litigation, but goes even to substantive standards of proof")  The Act directs an individual who is injured by a vaccine to file a Program petition with this court against the United States government, namely the Secretary for the Department of Health and Human Services, rather than vaccine manufacturers who provide the vaccines to doctors and hospitals or the doctors who administer the vaccines.[7]  As the Federal Circuit recognized, the Vaccine Program "stems from Congress's recognition that '[w]hile most of the Nation's children enjoy great benefit from immunization programs, a small but significant number have been gravely injured.'"  Knudsen, 35 F.3d at 549 (quoting H.R. Rep. No. 99-908, at 4, reprinted in 1986 U.S.C.C.A.N. at 6345).  All persons alleging a vaccine-related injury are entitled to take advantage of the Program's "streamlined" process.  Significantly, if the vaccinee misinterprets or ignores the Court of Federal Claims's jurisdiction over claims brought pursuant to the Vaccine Act, and instead, for whatever reason, files a civil action in state or federal court, the state or federal court must dismiss the claim until the vaccinee exhausts her remedies under the Program. §11(a)(2)(B).  See also §11(a)(3)

The Vaccine Act constitutes the federal government's waiver of sovereign immunity which must be strictly construed "'in favor of the sovereign.'"  United States v. Nordic Village, Inc., 503 U.S. 30, 34 (1992) (quoting McMahon v. United States, 342 U.S. 25, 27 (1951)).  See also Holihan v. Secretary of HHS, 45 Fed. Cl. 201, 207 (1999); Childers v. Secretary of HHS, No. 96-194V, 1999 WL 218893, at *2 (Fed. Cl. Spec. Mstr. Mar. 26, 1999); Hoffman v. Secretary of HHS, No. 90-3151V, 1995 WL 103334, at *2 (Fed. Cl. Spec. Mstr. Feb 21, 1995)  "As a limited waiver of sovereign immunity, [the Vaccine Act] must be given a strict and narrow construction."[8]  Holihan, 45 Fed. Cl. at 207.  The Federal Circuit recently cautioned that "courts should be 'careful not to interpret [a waiver of sovereign immunity] in a manner that would extend the waiver beyond that

---

[7]     The Program allows vaccine manufacturers to produce vaccines necessary to maintain the public health, without fear of constant litigation when injuries occur, and at the same time ensures those individuals who are injured by vaccines receive compensation. See H.R. Rep. No 99-908, at 3-5 (1986), reprinted in 1986 U.S.C.C.A.N. at 6345-46.  The Act prevents the vaccinee from filing a civil action without first obtaining a judgment from this court and electing to file a civil action, or alternatively, withdrawing her petition pursuant to the Act's provisions.  §11(a)(2)(A).  See also Shalala v. Whitecotton, 514 U.S. 268, 270 (1995) (examining and explaining §11(a) provisions).

[8]     In a thoughtful analysis of sovereign immunity as it applies to the Vaccine Act, Special Master Hastings recognized that the Supreme Court has said, "in construing a statute that waives sovereign immunity, a court must be careful not to 'assume the authority to narrow the waiver that Congress intended,'" and "a federal court should not 'as a self-constituted guardian of the Treasury, import immunity back into a statute designed to limit it.'"  Childers v. Secretary of HHS, No. 96-194V, 1999 WL 218893, at *3 (Fed. Cl. Spec. Mstr. Mar 26, 1999) (quoting, respectively, United States v. Kubrick, 444 U.S. 111, 118 (1979) and Indian Towing Co. v. United States, 350 U.S. 61, 69 (1955)).  But, Special Master Hastings also concluded that Supreme Court precedent reinforces the notion that statutes waiving sovereign immunity must be construed strictly.  Id. at *4.

which Congress intended.'" Brice v. Secretary of HHS, 240 F.3d 1367, 1370 (Fed. Cir. 2001) (citing Block v. North Dakota, 461 U.S. 273, 287 (1983), as quoted in Stone Container Corp. v. United States, 229 F.3d 1345, 1352 (Fed. Cir. 2000))   Questions of jurisdiction and statutory interpretation must be analyzed and answered in light of these underlying principles.

## II.     Accepted Canons of Statutory Interpretation Support Subject Matter Jurisdiction

It is well settled that when interpreting statutory language, "[a] statute's words must be given their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import."  Williams v. Taylor, 529 U.S. 420, 421 (2000).  See also Smith v. United States, 508 U.S. 223, 228 (1993) (stating "[w]hen a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning");  Old Colony Railroad Co. v. Commissioner of Internal Revenue, 284 U.S. 552, 560 (1932) (stating "'[t]he legislature must be presumed to use words in their known and ordinary signification'") (quoting Levy's Lessee v. M'Cartee, 31 U.S. 102, 6 Pet. 102, 110 (1832)); City of Lincoln, Nebraska v. Ricketts, 297 U.S. 373, 376 (1936) (stating "[w]e give to the words their natural significance unless that leads to an unreasonable result plainly at variance with the evident purpose of the legislation"); Asgrow Seed Company v. Winterboer, 513 U.S. 179, 187 (1995) (stating "[w]hen terms used in a statute are undefined, we give them their ordinary meaning"), Terran v. Secretary of HHS, 195 F.3d 1302, 1310 (Fed. Cir. 1999) (stating "[t]he first and most important step when interpreting a statute is, of course, analyzing its text").  Thus, "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as *conclusive*." Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980) (emphasis added).  Moreover, "'where Congress has clearly stated its intent in the language of a statute, a court should not inquire further.'" Hellebrand v. Secretary of HHS, 999 F.2d 1565, 1569 (Fed. Cir. 1993) (quoting Brookside Veneers, Ltd. v. United States, 847 F.2d 786, 788 (Fed. Cir. 1988), cert. denied, 488 U.S. 943 (1988) (citations omitted)).

Relevant to the jurisdictional issue before this court, the Vaccine Act defines "vaccine-related injury or death" as "an illness, injury, condition, or death associated with one or more of the vaccines set forth in the Vaccine Injury Table, *except that the term does not include an illness, injury, condition, or death associated with an adulterant or contaminant intentionally added to such a vaccine*." §33(5) (emphasis added).  Neither the statute nor the legislative history expressly defines "adulterant," "contaminant," or "vaccine."  Petitioners allege that the thimerosal preservative is an adulterant or contaminant within the meaning of the Act, and thus, any injury allegedly caused by the thimerosal is excluded specifically by the Act's definition of "vaccine-related injury."  See Pet. Brief at 4-5, 9-12.  Petitioners contend further that because definitions of "vaccine" do not mention thimerosal specifically or preservatives generally, thimerosal cannot be a component of the vaccine itself.  Id. at 8-9.  To determine whether Congress intended to exclude from the Act's statutory scheme those injuries allegedly associated with thimerosal, the undersigned must first and foremost examine the *plain and ordinary meaning* of these three statutory terms.

Applying accepted canons of statutory interpretation and following a review of common dictionary definitions of the terms "adulterant" and "contaminant," the court finds that a preservative

7

is not an intentionally added ingredient of the vaccine meant to make impure, inferior, or contaminated the vaccine end product. Rather, a preservative is the antithesis of these descriptions, as it actually prevents corruption of the vaccine. Upon further exploration of dictionary references, the court also finds that the plain meaning of the term "vaccine" allows for the composition of different ingredients in the vaccine product, including a preservative such as thimerosal; therefore, a vaccine preservative is a constituent part or a component of the vaccine. Consequently, based upon the plain meaning of the statutory terms, any injury arising from the thimerosal preservative in vaccines is encompassed within the statutory definition of "vaccine-related injury," thereby granting jurisdiction over such claims to this court. To that end, the court's findings are well-supported by recent federal case law addressing the identical issue. The court's analysis follows.

A.    The Preservative Thimerosal Is Neither an "Adulterant" Nor a "Contaminant" as Ordinarily Defined

Using accepted principles of statutory interpretation, several federal courts have decided that thimerosal is not an "adulterant" or "contaminant" within the meaning of the Vaccine Act and, therefore, excluded under the Program by the Act's definition of "vaccine-related injury." See, e.g., Liu v. Aventis Pasteur, Inc., 2002 WL 31007709 (W.D Tex. Aug. 23, 2002); Owens v. American Home Products Corporation, 203 F. Supp. 2d 748 (S.D. Tex. May 7, 2002); O'Connell v. American Home Products Corporation, No G-02-184, slip op. (S.D. Tex. May 7, 2002). See also Bertrand v. Aventis Pasteur, Labs., Inc., 2002 WL 31194226, at *5-*6 (D. Ariz. Sept. 23, 2002) (declining to resolve whether thimerosal is an adulterant or contaminant, but noting that "every federal court to have ruled on the issue has held that injuries resulting from Thimerosal contained in vaccines are vaccine-related under the meaning of the Act"); Liu, 2002 WL 31007709, at *2-*3 (citing Blackmon v. American Home Products Corporation, No. G-02-179, slip op (S.D. Tex. May 8, 2002), as holding that thimerosal cases are vaccine-related cases under the meaning of the Vaccine Act, and citing Collins v. American Home Products Corporation, No 01-979, slip op (S.D. Miss. Aug. 1, 2002), as "dismissing thimerosal claims because Autism Order #1 'foreclose[d] any reasonable possibility that the plaintiffs have stated a currently cognizable claim against the resident defendants'"). In Owens and O'Connell,[9] Judge Kent concluded that plaintiffs' claims fell squarely

---

[9]    While petitioners cite to Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss in Owens v. American Home Products Corporation, they fail to cite directly to the decision in that case which is contrary to their position in this matter. See Owens v. American Home Products Corporation, 203 F. Supp. 2d 748 (S.D Tex. 2002). ABA Model Rule of Professional Conduct 3.3 states that "[a] lawyer shall not knowingly: (1) make a false statement of material fact or law to a tribunal; . . . [or] (3) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client." Model Rules of Prof'l Conduct R. 3.3 (1983) Comment 3 to Model Rule 3.3 likewise states that "[a] lawyer is not required to make a disinterested exposition of the law, but must recognize the existence of pertinent legal authorities." Model Rules of Prof'l Conduct R. 3.3 cmt (1983). Most states adopt the Model Rules or have similar variations in pertinent part. In this case, the Texas federal district court is not a controlling
(continued...)

within the scope of the Act and should be decided by the Court of Federal Claims [10] Relying on an accepted canon of statutory interpretation, the Owens court first looked to the plain meaning of the Vaccine Act's language. Since the statute explicitly precludes compensation for injuries arising from an "adulterant" or "contaminant," Judge Kent sought to define these terms. Recognizing that "adulterant" and "contaminant" are not defined by the Vaccine Act, the Owens court turned to dictionary definitions for guidance. It found that "[t]himerosal, when used in vaccines, fails to correspond with any of th[e] definitions [of adulterant and contaminant]."[11] Owens, 203 F. Supp. 2d at 755; O'Connell, slip op at *7. He thus concluded that "[c]learly, the plain language of the Vaccine Act indicates that the [vaccinee's] injuries cannot be 'thimerosal-related' without being 'vaccine-related' as well." Owens, 203 F. Supp. 2d at 756 (emphasis added); O'Connell, slip op. at *9. Judge Kent further opined that "because the [vaccinee's] injuries are allegedly linked to a vaccine ingredient, their injuries are definitely 'vaccine-related.'" Owens, 203 F. Supp. 2d at 755; O'Connell, slip op. at *8 (citations omitted)  The undersigned agrees completely with Judge Kent's well-reasoned analysis of this issue

---

[9](...continued)
jurisdiction; however, petitioners' counsel was ethically obligated to reference Judge Kent's contrary findings given that the decision is directly on point to the jurisdictional issue raised in the case sub judice.

[10]     Other federal district courts have followed Judge Kent's line of reasoning in Owens and O'Connell. See, e.g., Liu v. Aventis Pasteur, Inc., 2002 WL 31007709, at *2 (W.D. Tex. Aug. 21, 2002) (stating "it appears every federal court to have ruled on the issue has held injuries resulting from thimerosal contained in vaccines are vaccine-related under the meaning of the Vaccine Act") (citing Blackmon v. American Home Products Corporation, No. G-02-179, slip op. (S.D. Tex. May 8 2002); Owens v. American Home Products Corporation, 203 F. Supp. 2d 748 (S.D. Tex. May 7, 2002)). See also Cheskiewicz v. Aventis Pasteur, Inc., 2002 WL 1880524, at *2 (E.D. Pa. Aug. 15, 2002) (discussing defendant's reliance on McDonald v. Abbott Labs., No. 02-77, slip op. (S.D. Miss. Aug. 1, 2002); Collins v. American Home Products Corporation, No. 01-979, slip op. (S.D. Miss. Aug. 1, 2002); and Stewart v. American Home Products Corporation, No. 02-427, slip op. (S.D. Miss. Aug. 1, 2002), for the proposition that claims arising from thimerosal are covered by the Vaccine Act). Like Owens and O'Connell, all three of the cases discussed in Cheskiewicz were cited as dismissing claims that were covered under the Vaccine Act. See Cheskiewicz, 2002 WL 1880524, at *2.

[11]     Quoting The American Heritage Dictionary 58 (2d ed. 1992) and Stedman's Medical Dictionary 30 (27th ed. 2000) respectively, Judge Kent found "adulterant" defined as "a substance which makes an item impure, spurious, or inferior by adding extraneous or improper ingredients" and "[a]n impurity; an additive that is considered to have undesirable effect on or to dilute the active material so as to reduce its therapeutic or monetary value." Owens, 203 F. Supp. 2d at 754-55. A contaminant was defined as "[s]omething that makes impure or corrupt by contact or mixture." Id. at 755 (quoting Webster's 9th New Collegiate Dictionary 283 (9th ed. 1991)).

9

In support of their respective positions, petitioners and respondent cite the same, or slight variations of, definitions relied on by the Owens court [12] For instance, Dorland's Illustrated Medical Dictionary 33 (27th ed. 1988) defines "adulterant" as "a substance used as an addition to another substance for sophistication or adulteration " "Adulteration" is defined as the "addition of an impure, cheap, or unnecessary ingredient to cheat, cheapen, or falsify a preparation, in legal terminology, incorrect labeling, including dosage not in accordance with the label." Id. A "contaminant" is defined as "something that causes contamination " · Id. at 376. "Contamination" is "the presence of any substance or organism that makes a preparation impure." Id. Petitioners provide no persuasive evidence advancing a substantively different definition for "adulterant" or "contaminant." Nor do they provide any persuasive evidence in the record that Congress intended "adulterant" or "contaminant" to mean anything other than their plain meaning. Further, relevant to this discussion, a "preservative" is "a substance or preparation added to a product for the purpose of destroying or inhibiting the multiplication of microorganisms." Id at 1353 Therefore, following Judge Kent's analysis, thimerosal is not an "adulterant" or "contaminant" as ordinarily defined. That is, by any ordinary meaning, a preservative is the antithesis of contaminant because a preserving agent actually prevents the impurity or corruption of the vaccine [13] The same conclusion was reached in Owens.

Thimerosal, when used in vaccines, fails to correspond with any of these definitions. Vaccine manufacturers intentionally add thimerosal to vaccine formulas because it

---

[12]   Petitioners and respondent cite numerous dictionaries defining "adulterant," "adulteration," and "contaminant," including The American Heritage College Dictionary 58 (2d ed. 1992); Webster's New World College Dictionary (3d ed. 1997), Webster's 9th New Collegiate Dictionary 283 (9th ed. 1991); Dorland's Illustrated Medical Dictionary (29th ed 2000), Barron's Medical Guides· Dictionary of Medical Terms (4th ed 2000); Taber's Encyclopedic Medical Dictionary (19th ed. 2001); Mosby's Medical, Nursing & Allied Health Dictionary (5th ed. 1998); Stedman's Concise Medical Dictionary for the Health Professions (4th ed. 2001), Stedman's Medical Dictionary 30 (27th ed. 2000); and Merriam-Webster's Medical Desk Dictionary (1996). Some definitions are duplicative of those quoted herein, but no definition differs significantly from the next.

[13]   The Institute of Medicine ("IOM") has explained:

Thimerosal, an organic mercury compound that is metabolized to ethylmercury and thiosalicylate, has been used since the 1930s as a preservative in some vaccines. Food and Drug Administration (FDA) regulations require that preservatives be used in multidose vials of vaccines, except live viral vaccines, to prevent bacterial and fungal contamination (General Biologics Product Standards, 2000), which can lead to serious illness and death in recipients (Wilson, 1967). . . . Uses other than as a preservative contribute little to the final concentration of thimerosal in vaccines (Ball et al., 2001).

Immunization Safety Review, Institute of Medicine, Thimerosal-Containing Vaccines and Neurodevelopmental Disorders 13 (Kathleen Stratton et al. eds., 2001) ("IOM Thimerosal Report").

10

deters microbial and fungal growth, thereby maintaining the safety, purity, and potency of vaccines . . . [T]himerosal cannot be said to "make impure or corrupt" a vaccine or to reduce a vaccine's therapeutic value  Furthermore, thimerosal cannot be characterized as having an undesirable effect or diluting the active material found within a vaccine. In fact, the opposite is true. As a preservative, thimerosal *prevents* a vaccine's corruption.  Hence, neither the plain meaning of "adulterant" nor "contaminant" applies to thimerosal when, as here, it is purposefully used as an ingredient in the approved formulation of a vaccine

<u>Owens</u>, 203 F. Supp 2d at 755.  The undersigned finds no persuasive or logical reason to deviate from this cogent analysis of this issue

> ### B.   The Preservative Thimerosal Is a Component or a Constituent of the "Vaccine" as Ordinarily Defined

The meaning of "vaccine-related injury or death," which is defined by the Act as "an illness, injury, condition, or death associated with *one or more of the [Table] vaccines*," includes *injuries allegedly* caused by the thimerosal component of a vaccine. §33(5)  Relying on the ordinary meaning of "vaccine," Judge Kent found in <u>Owens</u> that the vaccinee's claim was covered under the Program:

> A "vaccine" is defined as a "suspension of attenuated or killed microorganisms," <u>Dorland's Medical Dictionary</u> 1799 (27th ed. 1988), and "a preparation of killed microorganisms, living attenuated organisms, or living fully virulent organisms." <u>Webster's 9th New Collegiate Dictionary</u> 1301 (9th ed. 1991).  Neither of these definitions indicate that a vaccine is comprised of microorganisms alone  On the contrary, they indicate that a vaccine is a "suspension" or "preparation" composed of both microorganisms and additional ingredients. And, as explained above, manufacturers of vaccines add thimerosal to the "preparation" or "suspension" of vaccines.

<u>Owens</u>, 203 F. Supp. 2d at 755 (footnotes omitted).

Here, petitioners offer definitions of the word "vaccine," all of which similarly define vaccine as a "suspension" or "preparation."  <u>See</u> Pet. Brief at 8-9 (<u>Mosby's Medical Dictionary</u> (5th ed. 1998) ("[a] suspension of attenuated or killed microorganisms"); <u>Stedman's Medical Dictionary</u> (27th ed. 2000) ("a preparation"); <u>Taber's Encyclopedic Medical Dictionary</u> (19th ed. 1997) ("[a]ny suspension *containing antigenic molecules*"); <u>Dorland's Illustrated Medical Dictionary</u> (29th ed. 2000) ("[a] suspension of attenuated or killed microorganisms"); <u>The Bantam Medical Dictionary</u> (3d ed. 2000) ("a special preparation of antigenic material"); <u>Compact American Medical Dictionary</u> (3d ed. 1998) ("[a] preparation of a weakened or killed pathogen"); <u>Webster's New World Medical Dictionary</u> (2000) ("preparations of killed or modified microorganisms"); <u>Merriam-Webster's Medical Desk Dictionary</u> (1996) ("a preparation of killed microorganisms")).  A "suspension" is "a preparation of a finely divided drug intended to be incorporated (suspended) in some suitable liquid vehicle before it is used, or already incorporated in such a vehicle."  <u>Dorland's Illustrated Medical</u>

Dictionary 1617 (27th ed. 1988). A "preparation" is "a medicine made ready for use." *Id.* at 1351. Petitioners argue that none of the definitions of "vaccine" mention thimerosal, specifically, or a preservative, generally, leading one to conclude that a preservative is a non-component or non-constituent of the vaccine. Pet. Brief at 8. *Petitioners' argument is unreasonably strained.*

Once again, Judge Kent's analysis in *Owens* is persuasive. It is reasonable to construe the plain meaning of "vaccine" to encompass the thimerosal *component* because, within its ordinary usage, the term "vaccine" strongly implies the inclusion of bacterium and additional ingredients. *See Owens,* 203 F. Supp. 2d at 755. It is also clear from the FDA regulations cited in petitioners' brief, at 13-14 and Appendix 3, that those vaccines sold in multiple-dose vials indeed must contain such an additional ingredient, a preservative.[14] *See* 21 C.F.R. §610.15 (West 2002). Section 610.15 states in relevant part:

> Products in multiple-dose containers shall contain a preservative, except that a preservative need not be added to Yellow Fever Vaccine, Poliovirus Vaccine Live Oral; viral vaccines labeled for use with the jet injector; dried vaccines when the accompanying diluent contains a preservative, or to an Allergenic Product in 50 percent or more volume in volume (v/v) glycerin.

21 C.F.R. §610.15(a). *See also Owens,* 203 F. Supp 2d at 755, n. 10 (stating "[t]he FDA has long recognized that preservatives (i.e. thimerosal) are 'constituent materials' of vaccines. *See* 21 C.F.R. §610.15 (indicating that constituents of biological materials include ingredients, preservatives, diluents and adjuvants)"). That thimerosal is not mentioned by name in the regulation does not necessarily exclude it as an acceptable additive or as a component of the vaccine preparation. Moreover, nothing in the legislative history suggests that Congress intended the word "vaccine" to adopt a meaning different from its common usage. Indeed, throughout the House Report, the word "vaccine" is used in its ordinary sense. *See generally* H.R. Rep. 99-908, *reprinted in* 1986 U.S.C.C.A.N. 6344. The plain language of the statute is conclusive, in the absence of clear legislative intent to the contrary. *See Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108 (1980). Hence, as Judge Kent recognized and as this court agrees, injuries allegedly arising from the thimerosal component (a vaccine ingredient) are reasonably construed as "definitely 'vaccine-related'" within the plain meaning of the language of the Vaccine Act. *Owens,* 203 F. Supp. 2d at 755; *O'Connell,* slip op. at *8.

### III.   The Legislative History Supports the Court's Analysis

It is a time-honored principle that "[t]he court will defer to the clear meaning of a statute when the language is sufficiently clear, and the plain meaning of the statute is supported by the legislative history." *Klahn v. Secretary of HHS,* 31 Fed. Cl. 382, 386 (1994). "The statutory language should be conclusive '*except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.*'" *Warner Cable v.*

---

[14]   For a more detailed discussion of the FDA regulations, *see* Part V of this decision.

Doyle, 66 F 3d 867, 876 (7th Cir 1995). cert denied, 516 U S 1141 (1996) (citations omitted) (emphasis added), as quoted in DeRoche v Secretary of HHS, No. 97-643V, 2002 WL 603087, at *28 (Fed. Cl. Spec. Mstr. Mar 28, 2002) The Secretary argues that the legislative history supports "the finding that Congress intended that injuries allegedly related to thimerosal be brought under the Program." Resp. Brief at 10-11  The Secretary contends that "[g]iven the congressional purpose of channeling liability for vaccine injuries to the Program and the fact the vaccines chosen for coverage contained thimerosal, it is incongruous to argue that at the same time Congress extended coverage to these vaccines, it intended to define away that coverage for any injury related to thimerosal." Id. at 11. Additionally, the Secretary submits that not only is petitioners' argument legally in error, but it would undermine the Program's legislative purpose by leading to a "multiplicity of litigation." Id. at 14. Although the government cannot provide direct evidence in the legislative history relevant to the interpretation of "adulterant" or "contaminant," the respondent notes that Congress created a Table injury in response to a concern over possible hypersensitivity reactions to the inactivated polio vaccine *because it contained trace amounts of antibiotics*. Id. at 11  *The government emphasizes this is an indication that Congress intended the Act to compensate vaccinees injured by any component of the vaccine*. Id  The court finds the Secretary's arguments persuasive.[15]

The court's own review of the legislative history supports fully respondent's interpretation of the Act. The statute's purpose is to ensure vaccine safety and supply and reduce civil litigation while still providing compensation to injured vaccinees. See H.R Rep 99-908, at 3-5, reprinted in 1986 U.S.C.C.A N. at 6344-46  The court may not read limitations into the definition of "vaccine-related injury" that are clearly at odds with the Program's congressionally-stated purpose. Distinguishing thimerosal-related injuries from vaccine-related injuries, as petitioners advocate, would likely result in a "multiplicity of litigation " See Resp. Brief at 14  That is, Program petitioners alleging injury resulting from both the vaccine antigen and its component parts would be required to maintain actions in two different courts: a Program claim in the Court of Federal Claims based upon the antigen-causing-injury theory, and a second action in state or federal civil court based upon a theory that injury resulted from the non-antigen component part of a vaccine. Id  This litigative scheme would clearly defeat the stated legislative purpose of the Act and expose manufacturers and administrators to the same litigation the Act was designed to reduce or eliminate.  To be sure, the value by which Congress held these goals is unequivocally evident in the Act's express statutory scheme at §11(a).  As the Federal Circuit has determined, the statute prevents petitioners from maintaining actions in two fora.  See Flowers v. Secretary of HHS, 49 F.3d 1558 (Fed. Cir. 1995) (affirming the dismissal of a Program petition for lack of jurisdiction pursuant to §11(a)(5)(B), when a civil suit was still pending at the time petitioner filed her petition).  The Act also does not allow a petitioner to continue under the Program if the vaccinee has previously collected a civil action award or settlement for his injury.  See §11(a)(7) and §11(c)(1)(E).  Thus, petitioners' interpretation of the statutory text violates the statutory scheme by promoting dual actions for compensation.

---

[15]    Although the courts are the final arbiters on issues of statutory interpretation, an administrative agency's interpretations of the statutory scheme they are entrusted to administer have been given considerable deference  See Chevron, USA, Inc v Natural Resources Defense Council, Inc., 467 U.S. 837, 844-45 (1984).

Compliance with the legislative purpose and the statutory scheme was discussed at length by the Federal Circuit in Amendola v. Secretary of HHS, 989 F 2d 1180 (Fed. Cir 1993). As in the case sub judice, Amendola involved the interpretation of §11(a) of the Act (specifically §§11(a)(4) and (a)(5)), which encompasses "the gate-keeping provisions" of the Vaccine Act.[16] Amendola, 989 F 2d a 1182  See also Klahn v. Secretary of HHS, 31 Fed. Cl. 382, 385 (1994)  Judge Plager, writing for the panel in Amendola, cautioned that statutory interpretation is an art "constrained by the fundamental obligation of the judicial branch to implement, not rethink, the purpose of the legislative branch."[17]  Amendola, 989 F.2d at 1182  Judge Plager wrote: "When the legislative purpose is incorporated in a complex piece of legislation, such as those establishing a major regulatory or entitlement program, the meaning of any particular phrase or provision cannot be securely known simply by taking the words out of context and treating them as self-evident."[18]  Id. In the case of the Vaccine Act, Judge Plager determined that "Congress'[s] purpose is both clear and clearly evidenced by the statutory framework.  The statute provides a strong bias in favor of bypassing the civil litigation route in favor of compensation claims under the Act." Id. at 1184.  Judge Plager noted

---

[16]     The gate-keeping provisions are as follows. Section 11(a)(1) requires that a petitioner allege a vaccine-related injury or death and serve a petition for compensation on the Secretary of the Department of Health and Human Services. Section 11(a)(2) describes when an injured vaccinee can sue civilly, specifically only if his or her claim is less than $1,000, or the vaccinee stays in the Program for a required period of time after which the vaccinee chooses to withdraw from the Program, or the vaccinee rejects the judgment in this court. De minimis claims can be filed in either state or federal court. §11(a)(2)(A). Section 11(a)(3) limits suits against vaccine administrators and manufacturers, unless the vaccinee complies with §11(a)(2). Sections 11(a)(4) permits the filing of Program petitions where pre-Act civil suits resulted in a denial of damages or dismissal with prejudice  Section 11(a)(5) limits when a vaccinee with a pending civil action may bring an action here.  Similarly, §§11(a)(6) through (a)(8) lay ground rules for whether a vaccinee may bring a petition under the Program.

[17]     The Amendolas filed a Program petition after they had already brought a state civil action against the administrating physician for their son's injuries which resulted in an unfavorable judgment in 1989.  Amendola, 989 F.2d at 1181.  The government moved to dismiss under §11(a)(5)(A) of the statute, which allowed vaccinees with civil suits pending when the Act became effective to dismiss the civil suit without prejudice prior to judgment or by October 1, 1990 (whichever occurred first), and file a petition in this court.  The special master granted the government's motion, reasoning that the Amendolas' civil case had already gone to judgment in 1989, precluding them from filing a claim in this court under the Vaccine Act. Amendola v. Secretary of HHS, No. 90-766V, 1991 WL 43027 (Cl. Ct. Spec. Mstr. Mar. 14, 1991). The Federal Circuit ultimately affirmed the dismissal. Amendola v. Secretary of HHS, 989 F.2d 1180 (Fed. Cir. 1993).

[18]     Judge Plager relied upon the "rather straightforward homily . . . captured in the more pretentious proposition that parts of a statute in pari materia must be construed together." Amendola, 989 F.2d at 1182.  In interpreting the interplay between subsections (a)(4) and (a)(5) of §11, Judge Plager construed subsection (a)(4) as prohibiting a plaintiff who had a civil suit pending on the effective date of the Act from taking the suit to judgment, then after receiving an unfavorable judgment, bringing a petition under the Act.  Id. at 1184

further that "[c]learly, the motivating factor behind enactment of the legislation was the desire to protect the vaccine supply by shielding manufacturers from exposure to liability resulting from the small but nevertheless statistically significant incidence of unavoidable injury or death from widespread use of the vaccine." Id. at 1186.

Although Judge Plager analyzed a different subsection of §11(a) than is at issue here, he interpreted a gate-keeping provision consistent with the statutory scheme which evinced Congress's strong preference for an alternative forum for resolving vaccine claims. Following the Federal Circuit's direction, the undersigned will not improperly "rethink" the purpose for the Vaccine Act. As Judge Plager correctly implied, that is a job for Congress. Amendola, 989 F.2d at 1182. Notably, there is legislation addressing provisions of the Vaccine Act currently pending before Congress. See, e.g., Vaccine Injury Compensation Reform Act, H.R. 2056, 107th Cong. (2001); National Vaccine Injury Compensation Program Improvement Act of 2002, H.R. 3741, 107th Cong. (2002). If Congress desires to exclude from the Vaccine Act injuries that allegedly result from a component of a vaccine, such as the thimerosal preservative, thus enabling vaccinees to seek initial relief in civil court, Congress has the power to do so. This court does not. In its final analysis, the court's interpretation of "vaccine-related injury" under §11(a)(1) and §33(5) is fully consistent with the legislative history and the statutory scheme.[19]

---

[19]     Incidentally, the Amendolas also argued that their negligence and malpractice suit against the physician was not a "'civil action for damages' as contemplated by the Act." Amendola, 939 F.2d at 1181, 1185-86. From their perspective, the Vaccine Act was only meant to protect manufacturers and administrators from strict liability claims. Id. at 1186. Judge Plager analyzed their argument in the context of §33(5). Id. Recognizing that the only exclusion to the definition of "vaccine-related injury" is an injury associated with a "foreign substance" or an "extraneous material," Judge Plager dismissed the Amendolas' argument that their civil court claim was not one contemplated by the Act. Id. In further rejecting petitioners' position that the injury was not "vaccine-related," he wrote: "If this were a situation in which the direct cause of the injury was a contaminated needle, or the doctor's negligent dropping of an infant patient, or other negligence facially *unrelated to the vaccine's effects*, then [petitioners' arguments] might require further examination." Id. at 1186-87. Petitioners in the instant case cite Amendola for the proposition that adulterant or contaminant "extends to the addition of 'foreign' substances or 'extraneous' materials." Pet. Brief at 11. However, the scenarios that Judge Plager suggest, *in dicta*, require "further examination" are not similar to the case we have here, where Nicholas's alleged injury arises directly from a required vaccine component added to some of the vaccines on his immunization schedule. To the contrary, Nicholas's case is similar to the situation in Amendola where the child allegedly suffered an adverse reaction to *a series* of DPT shots.

15

IV.   **Petitioners' Supplemental Legal Arguments Disputing Jurisdiction Are Unpersuasive**

Petitioners present other legal arguments in support of their claim, all of which the court finds unpersuasive

First, petitioners rely on language from Special Master Edwards's Order in Geppert v. Secretary of HHS, No. 00-286V (Fed. Cl. Spec. Mstr. Mar. 21, 2001) (unpublished order raising the issue whether thimerosal is an adulterant or contaminant and directing respondent to file a brief on the jurisdictional issue), as further proof that claims based on thimerosal are not within this court's jurisdiction. Pet. Brief at 5-6; P Reply at 2  The language referenced by petitioners reads

> A simple, lay reading of the plain language of § 300aa-33(5) suggests that the Act does not encompass injuries related to "mercury, aluminum and other materials" in vaccines.  A cursory review of the legislative history does not yield support for a contrary interpretation.

Order at 2.  A closer examination of the entire Order reveals that this passage simply expresses the special master's tentative analysis of the jurisdictional issue raised by the statute, rather than his final legal "conclusion," as petitioners contend. Indeed, in the Order, Special Master Edwards directed respondent to brief the issue of whether an injury allegedly arising from the thimerosal component of a vaccine is a "vaccine-related injury" within the meaning of the Vaccine Act  In response to that Order, the Secretary filed a brief in support of the special master's jurisdiction over the claim. Based on respondent's position and petitioners' apparent acquiescence to jurisdiction by this court,[20] Special Master Edwards determined that "he [did] not have to render an interpretation of 42 U.S.C. § 300aa-3 1(5)" and directed further proceedings in the case. See Geppert v. Secretary of HHS, No. 00-286V, Order at 1 (Fed. Cl. Spec. Mstr. Oct. 12, 2001) (unpublished).  Clearly, Geppert provides no persuasive support for petitioners' contention that this court is an improper forum for their case.

Second, petitioners rely on the federal magistrate's conclusion in King v. Aventis Pasteur, Inc., No. 01-1305-AS, Findings and Recommendation, slip op. (D. Or. June 7, 2002) Pet. Brief at 7-8.  Following the defendant manufacturer's removal of the case to federal court, the federal magistrate declined to find federal question jurisdiction over claims by plaintiffs alleging that thimerosal caused the vaccinee to sustain injury. King, slip op. at 3-5; see also Pet. Brief at Appendix 2   The magistrate recommended the case's remand on the belief that the state court was the appropriate forum for plaintiffs' claim even though the defendants' defense involved the interpretation of §11(a) and §33(5) of the Vaccine Act. King, slip op. at 3-5  The magistrate determined that

_____

[20]     Special Master Edwards wrote: "Indeed, in the special master's view, petitioners have acquiesced to the special master's jurisdiction – first, by filing a Program petition, and second, by electing to have their petition remain pending before the special master after the expiration of 420 days from the filing of the petition." Geppert v. Secretary of HHS, No. 00-286V, Order at 1, n 1 (Fed. Cl. Spec. Mstr. Oct. 12, 2001) (unpublished).

16

Congress did not "craft an exclusive federal remedy for all vaccine-related injuries," but allowed the state courts to retain jurisdiction over certain vaccine claims. Id. at 4-5. For diversity jurisdiction purposes, in further determining whether plaintiffs had viable claims against the doctors administering the vaccinations, Magistrate Judge Ashmanskas ruled that although the doctors were covered by the Act as "vaccine administrators," "a state court could find the injuries were not 'vaccine-related.'" Id. at 6-7. He stated

> [I]t is entirely possible that the state court would find that Plaintiffs' injuries, which are attributed solely to the toxic mercury found in Thimerosal, do not qualify as "an illness, injury, condition or death associated with one or more of the vaccines set forth in the Vaccine Injury Table" and are not covered by the Act.

Id. at 7-8. The federal district court judge ultimately adopted the federal magistrate's findings and recommendations. See King v. Aventis Pasteur, Inc., 210 F. Supp. 2d 1201 (D. Or. June 7, 2002).[21]

---

[21]     Other federal district courts have declined to find federal question jurisdiction over tort claims alleging injury from the thimerosal component of a vaccine. See, e.g., Doherty v. Pasteur, 2002 WL 1034044 (N.D. Cal. May 17, 2002); Garcia v. Aventis Pasteur, Inc., 2002 U.S. Dist. LEXIS 15122 (W.D. Wash. Apr 23, 2002); Demos v. Aventis Pasteur, No. 01-04504-CIV-GRAHAM, slip op. (S.D. Fla. Mar. 21, 2002). The district courts have based their analyses on the "well-pleaded complaint rule," which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." Doherty, 2002 WL 1034044, at *1, see also Garcia, 2002 U.S. Dist LEXIS 15122, at *5-*6, Demos, slip op. at 15-16 Defendants have argued, in support of removal, that the Vaccine Act created and/or preempted plaintiffs' causes of action or state law and that the claims involve substantial federal questions in the interpretation of the scope of the Vaccine Act. Doherty, 2002 WL 1034044, at *1-*3, Garcia, 2002 U.S. Dist. LEXIS 15122, at *4-*10; Demos, slip op. at 15. The federal district courts rejected these arguments, concluding that the Vaccine Act neither created nor preempted the state claims or law because the statute explicitly contemplated the state courts as alternative fora for the tort claims. Doherty, 2002 WL 1034044, at *2 ("It is axiomatic that a federal remedy that leaves intact alternative civil fora cannot be the basis for 'creation' of claims that may be brought in those fora.") (citation and footnote omitted); Demos, slip op. at 15-17. That is, the Act simply postponed, rather than eliminated, the pursuit of civil suits in state or federal court. Doherty, 2002 WL 1034044, at *3. The courts have also determined that the federal issues were not substantial enough to confer federal question jurisdiction. Doherty, 2002 WL 1034044, at *3; Demos, slip op. at 16. See also Bertrand v. Aventis Pasteur Laboratories, Inc., 2002 WL 31194226 (D. Ariz. Sept. 23, 2002). But see Cheskiewicz v. Aventis Pasteur, Inc., 2002 WL 1880524, at *1 (E.D. Pa. Aug. 15, 2002) (finding that the complaint did not raise a federal question and noting that defendants, at oral argument, "expressly disclaimed any argument that [the Vaccine Act] create[d] a federal question"). Conversely, more recently in Liu v. Aventis Pasteur, Inc., 2002 WL 31007709, at *1-*3 (W.D. Tex. Aug. 23, 2002), the federal district court dismissed plaintiffs' claim brought before it on federal question jurisdiction, finding that the plaintiffs must exhaust their remedies first under the Vaccine

(continued...)

The undersigned finds little persuasive value in the magistrate's findings and recommendation. As respondent notes, the federal district court never reached the issue of whether thimerosal is an adulterant for purposes of the Vaccine Act, nor, as of this time, has the state court on remand. Moreover, Magistrate Judge Ashmanskas's suggestive words focus not on whether plaintiffs' injuries are vaccine-related because thimerosal is an adulterant or contaminant, but focus instead on whether thimerosal-related injuries flow from *vaccines set forth in the Vaccine Injury Table*. See King, slip op. at 7-8. Whether the injury was caused by thimerosal in the vaccine or by some other component in the vaccine begs the question as to the proper fora for addressing that issue. As discussed infra, this court finds no basis for distinguishing between the component parts of the vaccine and, thus, finds the King analysis inapposite.

Furthermore, the magistrate's analysis depends on cases with fact scenarios that are dissimilar to the factual allegations made in this case. Magistrate Judge Ashmanskas wrote: "Thimerosal is not listed as a vaccine in the Vaccine Injury Table, which courts have tended to construe in an extremely narrow and strict manner." King, slip op. at 7. See also Pet. Brief at 7. In support of this statement, he relied on two cases where the special master or judge found the vaccinee did not "receive" a vaccine within the meaning of §11(c)(1)(A) and §14(a) of the Act. In Brausewetter v. Secretary of HHS, petitioner received an injection of Hyper-Tet which was "created from the blood plasma of people whom ha[d] been immunized with the tetanus toxoid." Brausewetter v. Secretary of HHS, No. 99-278V, 1999 WL 562700, at *1 (Fed. Cl. Spec. Mstr. July 16, 1999). The special master rejected the claimant's arguments that he had directly or indirectly "received" a tetanus toxoid-containing vaccine as set forth in the Vaccine Injury Table.[22] Id. at *2. Because the Hyper-Tet inoculation did not actually contain tetanus toxoid, petitioner did not "personally" receive a Table vaccine. Id. Mr. Brausewetter also did not "indirectly" receive a tetanus toxoid-containing vaccine under §11(c)(1)(A), he actually received injections of tetanus antibodies produced by third parties whom were administered directly the vaccine components. Id. at *3. The magistrate also cites Staples v. Secretary of HHS, 30 Fed. Cl. 348 (1994). In that case, tried and decided by the undersigned, petitioner was denied compensation under the Program when she contracted paralytic polio from her children who received the inactivated polio vaccine ("IPV"). The Vaccine Act limits

―――――――――――――

[21] (...continued)
Program.

[22]    See also Melton v. Secretary of HHS, No. 01-105V, 2002 WL 229781 (Fed. Cl. Spec. Mstr. Jan. 25, 2002) (ruling that an *in utero* unborn child had not "received" the vaccine as required under §11(c)(1)(A) when the vaccine was administered to a mother while she was pregnant); Burch v. Secretary of HHS, No. 99-946V, 2001 WL 180129 (Fed. Cl. Spec. Mstr. Feb. 8, 2001) (ruling that as a matter of law the *in utero* unborn child had not "received" the vaccine as required under §11(c)(1)(A)). But see Rooks v. Secretary of HHS, 35 Fed. Cl. 1 (1996) (holding that an *in utero* child "received" a vaccine within the meaning of §11(c)(1)(A) when the vaccine was administered to a mother while she was pregnant).

18

compensation for injuries from *community contact-related* incidences to those sustained from contact with a live virus oral polio vaccine ("OPV") recipient. Staples, 30 Fed. Cl. 348, 350-51, 354-60 (1994). Thus, petitioner in that case neither "received" a Table vaccine directly nor contracted her illness from a person administered OPV. Id. at 359. Both Staples and Brausewetter involved factual scenarios wholly different from the one here. Without a doubt, Nicholas personally received a series of Table vaccines covered under the Program; he further sustained, allegedly, developmental problems arising from a component of some of those vaccines. The magistrate judge's reliance on these cases again reveals the focus of his analysis: whether thimerosal-related injuries flow from vaccines set forth in the Vaccine Injury Table, rather than whether thimerosal is an adulterant or contaminant. See King, slip op at 7-8. See also Pet. Brief at 7 (stating incorrectly that "Federal Magistrate Ashmansks [sic]   recently concluded that it was 'entirely possible' that a state court would find Thimerosal to be an 'adulterant'") Thus, the cases cited by Magistrate Judge Ashmanskas are not "directly in line" with the factual or jurisdictional issues raised in this case, as petitioners aver, and his finding based on these decisions is unpersuasive. See Pet Brief at 8

Moreover, as respondent argues, "the Vaccine Act has broad scope over claims related to vaccinations[,] . . . related not only to the vaccine itself, but also to those related to misadventures from the act of administering the vaccine." Resp Brief at 4 (citing Pociask v. Secretary of HHS, No. 95-569V, 1999 WL 199053 (Fed. Cl Spec. Mstr Mar 24, 1999) (compensating petitioner for her arm abscess after she experienced a reaction to the tetanus vaccine); Amorella Moore v. Secretary of HHS, No. 91-1558V, 1992 WL 182194 (Fed. Cl. Spec. Mstr July 13, 1992) (awarding damages for sterile arm abscess resulting from the DPT vaccine). Petitioners' claim is more in line with these two cases involving vaccinees who sustained an injury from the administration of a Table vaccine even though the specific injury is not designated as a Table injury. In sum, petitioners' reliance on King does little to support their interpretation of §11(a)(1) or §33(5)

## V.    Relevant Evidence from the Scientific Community Is Persuasive

While there is an absence of legislative history that directly addresses this vaccine-preservative issue, pertinent evidence from the scientific community tends to refute petitioners' claims that thimerosal is a separate entity of a vaccine or that it is an "adulterant" or "contaminant" within the meaning of the Vaccine Act. An examination of the research and directives of the Food and Drug Administration and the Institute of Medicine ("IOM") reveals strong support for the proposition that the thimerosal preservative is, indeed, a component or constituent of its parent vaccine. The same information also tends to support the proposition that a substance must be improperly added to a vaccine before it can be considered an "adulterant" or "contaminant" under §33(5) of the Vaccine Act.

19

A.    *FDA Regulations and the Federal Food, Drug and Cosmetic Act Support the Court's Interpretation of the Disputed Statutory Language*

1.    *The Preservative Thimerosal Is a Component or a Constituent of the Vaccine*

Petitioners argue that thimerosal is toxic to the recipient, "has no therapeutic effect," and thus, cannot be a component of any vaccine, even though they concede thimerosal is an approved preservative in childhood vaccines See, e.g., Pet. Brief at 3-5; Pet. Reply at 5-7. They further allege that "[o]nly the vaccine and its component parts, the parts designed and intended to prevent the targeted disease, are part of the vaccine." Pet. Brief at 4. They note that thimerosal has been removed from "numerous vaccines" and, in its absence, the vaccines are "carrying out their intended purpose of preventing targeted diseases." Id. Thus, if thimerosal is indeed a "component," its removal should render the vaccine ineffective.[23] Id.

Petitioners offer, other than argument, no support for their proposition that to be a component part of a vaccine, thimerosal must be "intended to prevent the targeted disease." As shown supra in Part II (subpart B), the accepted definition of "vaccine" is vastly broader. Thimerosal has an accepted, FDA-approved role as a preservative. Petitioners concede that point. Pet. Reply at 6-7 ("[T]he thimerosal might actually be fulfilling the purpose for its intentional inclusion . . . ."). Petitioners' creative argument that thimerosal's limited role as an FDA-approved preservative nonetheless renders it not part of the vaccine is just that, creative. As with much of petitioners' arguments, no support is given and none can be found.

With respect to the FDA guidelines, petitioners repeatedly discount the fact that thimerosal remains an FDA-approved component of the vaccines at issue. Pet. Brief at 13-14; Pet. Reply at 5-8. Respondent argues persuasively that FDA regulations treat preservatives as a constituent part of vaccines, and thus are "part and parcel" of vaccines. Resp. Brief at 11. Furthermore, respondent points out that all vaccines must be manufactured in accordance with FDA-approved specifications as set forth in an effective biologics license. Id. at 9. To obtain approval for a biologics license, the applicant must show that "the biological product that is the subject of the application is safe, pure, and potent." 42 U.S.C.A. §262(a) (West 2002). Further, to maintain a biologics license, the licensee must comply with FDA regulations. Resp. Brief at 9. In the case at bar, all vaccines are licensed as such. The FDA requires a preservative, like thimerosal, to be added to licensed vaccines sold in multiple dose vials. See 21 C.F.R. §610.15 (stating "[p]roducts in multiple dose containers shall contain a preservative"). See also IOM Thimerosal Report at 13. As emphasized in Owens, thimerosal was an FDA-approved preservative in many drugs since the 1930s. See Owens, 203 F.

---

[23]    Respondent counters that a component part of a vaccine (like thimerosal) can be removed without altering the effectiveness of the vaccine (as, indeed, is the case with thimerosal). Resp. Brief at 13. Respondent illustrates this rebuttal by submitting that the cell wall (arguably a "component") of the whole-cell bordatella pertussis was removed without reducing the vaccine's effectiveness. Id.

20

Supp. 2d at 755 (citing the Statement by William Egan, Ph D, FDA, before the Committee on Government Reform, U S. House of Representatives, July 18, 2002). See also IOM Thimerosal Report at 19. The vaccines in question were approved through this comprehensive licensing process. In fact, only recently has thimerosal's utility been questioned[24] Nonetheless, respondent persuasively notes that the "FDA has found no ground upon which to order a recall of vaccines containing thimerosal as a preservative or to revoke or suspend the approved licenses for such vaccines." Resp Brief at 9. Petitioners' argument is devoid of legal and scientific support

2.    *The Preservative Thimerosal Is Neither an "Adulterant" Nor a "Contaminant"*

Petitioners further contend that because thimerosal is toxic and not a necessary vaccine component, it is an "adulterant" or "contaminant" within the meaning of the Vaccine Act Pet. Brief a. 10, 14-15; Pet. Reply at 6-8. Today, this court finds that the preservative thimerosal is not an "adulterant" or "contaminant" within the meaning of §33(5) Even if it is ultimately found that thimerosal is harmful to the recipient, this legal finding remains valid because thimerosal's intended purpose, *at the time it was intentionally added,* was to preserve vaccines, not corrupt them.[25] Petitioners' inflammatory statements that thimerosal was added to vaccines only for profit and without regard to the public health are unsupported and irrelevant to the jurisdictional issue.[26]

---

[24]    In October 2001, the IOM issued a report after it examined "whether or not the use of vaccines containing the preservative thimerosal can cause neurodevelopmental disorder in vaccinees." IOM Thimerosal Report at 13. The IOM did not have sufficient evidence "to accept or reject" a causal relationship between thimerosal and neurodevelopmental disorders Id at 57 Nevertheless, the report recommends additional research in order to assess the risk of exposure to thimerosal. Id. The concern over the use of thimerosal in vaccines arose when the FDA discovered that children were being exposed to doses of ethyl mercury, an organic mercury, that exceeded the federal safety standards for another form of organic mercury, their exposure to ethyl mercury was attributed to the thimerosal preservative. Id. at 13. The American Academy of Pediatrics and the U.S. Public Health Service issued a joint statement recommending the removal of thimerosal from childhood vaccines in 1999 based upon this information. Id. All vaccines in the recommended childhood immunization schedule that are given to children six years of age and younger are now available thimerosal-free. Id. at 13-14.

[25]    Of course, this court's rejection of petitioners' toxicity arguments for jurisdictional purposes does not prevent them from later demonstrating, in the general and specific causation phases of the case, that the thimerosal component of the vaccines administered to their son was in-fact toxic and injurious.

[26]    In an attempt to muster some support for their allegations that the thimerosal preservative is toxic, petitioners append various exhibits to their Reply Brief, none of which support their plea that jurisdiction more properly lies with another court

21

While finding superficially attractive petitioners' theory that if a preservative is toxic, it should not be considered a part of the vaccine pursuant to 21 C.F.R. §610 15 (providing that preservatives serving as a constituent material should be "sufficiently nontoxic"), public health officials have not determined that licenses for vaccines containing thimerosal should be revoked because their toxicity reached levels incompatible with FDA regulations. See Pet Brief at 14, Resp Brief at 9 Respondent aptly points out that adopting petitioners' interpretation of adulterant or contaminant presupposes that an FDA-approved preservative is harmful Resp Brief at 5 For example, petitioners conclude prematurely that "[t]he undisputed reality of its inclusion has been nothing short of neurologic poisoning to thousands of unsuspecting recipients." Pet. Reply at 5 Evidence supporting such a medical conclusion has yet to be presented. The only relevant medical evidence at the court's disposal is from the IOM publication (below at subpart B), which supports the opposite finding.

Respondent also refers to the Federal Food, Drug and Cosmetic Act ("FDCA"), enacted prior to the Vaccine Act and referenced by the Act itself, for a definition of "adulterant." Further insisting that the court adopt this definition, respondent cites Lorillard v Pons, 434 U.S. 575, 580-81 (1978), and American Federation of Government Employees v United States, 46 Fed Cl. 586, 599-600 (2000), for the proposition that "Congress normally can be presumed to have had the knowledge of the interpretation given to the incorporated law, at least in so far as it affects a new statute." Resp Brief at 10 Respondent states that the FDCA defines "adulterated" as "putrid, unsanitary or, 'if it is a drug its manufacture, processing, packing, or holding, do not conform to or are not operated or administered in conformity with current good manufacturing practice "' Id. (quoting 21 U.S.C. §351(a)(2)(B)). Respondent argues that "[i]t would be incongruous to find that a vaccine component added in compliance with current good manufacturing practices referenced by the FDCA is also an adulterant under that same Act." Id.

This court agrees with respondent's position. "Adulterated" is clearly defined by the FDCA and its meaning is consistent with those ordinary definitions outlined and accepted earlier in the court's discussion. It seems illogical to interpret "adulterant" under the Vaccine Act to encompass an approved ingredient in a vaccine, which is mandated by and in full compliance with FDA regulations.[27] Petitioners have not produced a scintilla of evidence or any persuasive argument to suggest otherwise.

### B. The Institute of Medicine's Report Does Not Support Petitioners' Toxicity Argument

The only other available evidence addressing thimerosal's potential toxicity is a recent publication by the Institute of Medicine. In 2001, the IOM Immunization Safety Review Committee, comprised of a fifteen member panel, all of whom possess expertise in various fields, such as pediatrics, neurology, immunology, internal medicine, infectious diseases, genetics, epidemiology,

---

[27]    Judge Kent found likewise in Owens: "[N]either the plain meaning of 'adulterant' nor 'contaminant' applies to thimerosal when, as here, it is *purposefully used as an ingredient in the approved formulation of a vaccine* " Owens, 203 F. Supp. 2d at 755 (emphasis added)

tiostatistics, and public health, explored the medical issue. The IOM committee assessed the scientific plausibility of whether thimerosal can be associated with neurodevelopmental injury. Reviewing both published and unpublished reports and data, the committee examined biologic plausibility, causality, the health risks associated with vaccine-preventable diseases, and the specific adverse event in question. IOM Thimerosal Report, Executive Summary at 2. Due to insufficient evidence "to accept or reject" a causal relationship between thimerosal and neurodevelopmental disorders, the IOM's report was ultimately inconclusive. IOM Thimerosal Report at 57. Rather, the IOM merely recommended a response by public health officials in the areas of policy review and analysis, public health and biomedical research and communications. Id.

Despite the IOM's inconclusive findings, petitioners nonetheless proffer the argument that "a preservative [thimerosal] which is toxic to the recipient becomes an adulterant."[28] Petitioners cite an FDA regulation which provides that all preservatives introduced into a drug "shall be sufficiently non-toxic so that the amount present in the recommend [sic] dose of the product will not be toxic to the recipient." Pet. Brief at 14. Further, petitioners contend that public health officials agree that "thimerosal is dangerous, it poses a neurotoxic threat to recipients." Pet. Reply at 1. They base this on their belief that "[thimerosal] was removed from vaccines due to its toxicity and contaminating effect." Id. Again, petitioners rely upon unsupported extrapolations from scientific reviews for their baseless conclusions. The scientific community has not reached the consensus petitioners advance. For the reasons discussed supra, thimerosal, as an FDA-approved preservative, is in all respects part of the vaccine as "vaccine" is defined in scientific parlance. In light of the aforementioned pronouncement from the IOM, the undersigned finds petitioners' argument inconsistent with the scientific community's current posture.[29]

---

[28]    Incidentally, petitioners offer only one definition, for "adulteration," which includes the word "toxic." See P. Brief at 10 ("The addition or substitution of an impure, weaker, cheaper, or possibly toxic substance in a formulation or product ") (quoting Taber's Encyclopedic Medical Dictionary (19th ed. 2001)). In light of the evidence from the FDA, FDCA, and the IOM, this court cannot accept petitioners' unreasonably strained application of this definition.

[29]    The law establishing the Vaccine Program, P.L. 99-660, charged the Institute of Medicine of the National Academy of Sciences to review the medical and scientific literature regarding risks associated with the various vaccines covered under the Program. In light of the IOM's statutory charge, the scope of its review, and the cross-section of experts making up the reviewing committees, the court has given considerable weight to the IOM's findings. See Stevens v. Secretary of HHS, No. 99-594V, 2001 WL 387418, at *2 (Fed. Cl Spec. Mstr Mar. 30, 2001). See also Salmond v. Secretary of HHS, No 91-123V, 1999 WL 778528, at *5 (Fed. Cl. Spec. Mstr. Sept. 16, 2000) (recognizing that the special masters have consistently afforded deference to the IOM's conclusions in vaccine cases largely because of "its mandate and independent role in reviewing existing literature relating to the adverse consequences of vaccines").

## VI.     The Court of Federal Claims Has Exercised Jurisdiction Over Similar Claims

As respondent notes, the Court of Federal Claims has previously exercised jurisdiction over a case involving a preservative that allegedly worsened or triggered injury  Resp Brief at 4. In Grant v Secretary of HHS, No 88-70V, 1990 WL 293410 (Cl. Ct Spec. Mstr July 13, 1990), the undersigned awarded compensation to a vaccinee who was administered a Quadrigen vaccine  The court was persuaded by the government's medical studies but distinguished them from the facts before him because of the uniqueness of the Quadrigen vaccine  The court found persuasive petitioners' evidence "that pertussis as part of the Quadrigen vaccine has a heightened potential to cause serious harm "  Grant, 1990 WL 293410, at *7  The undersigned explained that

> Quadrigen was developed by Parke-Davis as a quadruple antigen product combining pertussis vaccine with diphtheria and tetanus toxoids and with the Salk polio vaccine. All vaccines require a *preservative to keep them sterile and one problem encountered by Parke-Davis with the development of Quadrigen was the selection of an appropriate preservative.* Ultimately, benezethonium chloride (trade name Phemerol) was selected .  Later research indicated that the use of Phemerol caused certain endotoxins in the pertussis vaccine to leak out from the bacterial cell into the fluid which was injected causing fever leading to convulsions and brain damage.

Id . (emphasis added)  This phenomenon was referred to by experts as the leakage theory. Id. at *8 (citing Ezagui v. Dow Chemical Corp , 598 F 2d 727 (2d Cir 1979) (discussing the "Phemerol [preservative] causes leakage" theory which was found to proximately cause personal injury to the vaccinee). The court treated the injury as vaccine-related even though it was caused by a "combination of the pertussis vaccine with *other in [sic] Quadrigen chemicals,*" a preservative to be exact, that materially increased the risk of injury. Id. at *10 (emphasis added)

Throughout the court's consideration of whether the vaccinee suffered a Table injury, whether petitioners established a prima facie case of causation-in-fact. and whether a factor unrelated to the vaccine caused the injury, the court never questioned that the vaccinee's injury was a "vaccine-related injury" within the meaning of the Act. In fact, the undersigned stated that "overwhelming evidence supports a finding that Quadrigen is capable of causing exactly the symptoms that occurred to Scott and no other apparent cause of these symptoms was ever brought to light." Id. at *10. The Secretary appealed the court's findings arguing that the undersigned improperly weighed the evidence to reach a final conclusion that the vaccinee was entitled to an award. See Grant v. Secretary of HHS, 956 F 2d 1144, 1148 (Fed. Cir. 1992). Neither the Secretary nor the petitioners ever questioned the undersigned's jurisdiction to decide the ultimate causation issue – nor did the Court of Federal Claims or the Federal Circuit, sua sponte. Instead, on *de novo* review of the Court of Federal Claims's decision, the Federal Circuit affirmed the undersigned's award, finding the court "relied on a preponderance of relevant scientific and medical evidence about the *particular nature* of the Quadrigen." Id. at 1149 (emphasis added). The Circuit "discern[ed] nothing arbitrary, capricious, or unlawful in that reliance." Id  The Federal Circuit quoted the undersigned's findings about the Quadrigen vaccine: "'[M]ost persuasive, however, was the evidence that pertussis as part of the Quadrigen vaccine has a heightened potential to cause serious harm .. '" Id. at 1148. Further, the

24

undersigned "gave great weight to testimony about the uniqueness of Quadrigen," which revealed that "Quadrigen uses preservative agents" which when combined with pertussis bacteria can cause neurological damage. Id. at 1149. Thus, clearly the key to both the special master's decision in Grant and the Federal Circuit's affirmance of that decision was the *preservative's* role as a trigger for injury, without which petitioners would not have prevailed on causation.

Petitioners in the instant case attempt to distinguish their case by alleging it is *solely* the thimerosal's *toxicity* which "neurologically poisoned" their son, not the preservative's combination with any other part of or antigen in the vaccine, as was the case in Grant.[10] Pet. Brief at 1-2. Petitioners argue the Federal Circuit "found the preservative(s)      did not cause the damage, [but that] the cellular [sic] structure of the pertussis caused the harm. For the Respondents to claim the preservative(s) used in Quadrigen were injurious is simply inaccurate." Pet. Reply at 4. Petitioners draw too fine a distinction here between their case and Grant. The Federal Circuit affirmed the undersigned's findings which were based largely on evidence that the addition of the preservative Phemerol to the Quadrigen vaccine made its administration harmful to the recipient. But for the role of Phemerol, the Federal Circuit found persuasive respondent's epidemiologic evidence against causation. Grant, 956 F.2d at 1148-49. Thus, the triggering role of Phemerol, was the evidentiary difference in Grant. Given that the preservative's role is key to the causation theory in the case sub judice, just as it was in Grant, again a case over which the Court of Federal Claims and the Federal Circuit exercised jurisdiction, the court sees no compelling reason why petitioners' claim is not likewise covered by the Vaccine Act.

---

[10]    As a related argument, petitioners contend that it is the toxicity of thimerosal which makes the preservative an "adulterant" or "contaminant" under the Act. This argument was fully addressed in Part V of this decision.

## CONCLUSION

Based on the aforesaid discussion, the court finds that the thimerosal preservative in vaccines is not an "adulterant" or "contaminant" under §33(5) of the Vaccine Act. Consequently, any injury or death arising from the thimerosal component is encompassed within the statutory definition of "vaccine-related injury or death," thereby granting jurisdiction over such claims to this court. Therefore, petitioners alleging an injury or death from the thimerosal preservative in vaccines are statutorily obligated to file their claim against a manufacturer or administrator of the vaccine in the Court of Federal Claims, *in the first instance* Thus, petitioners' claim is properly before this court.

While petitioners have the right to pursue this case in civil court, they are first obligated to either submit to this court's jurisdiction for 240 days (excluding suspension periods) or until a judgment is rendered, whichever occurs first Petitioners shall contact the undersigned's law clerk, Chris Hartley, at (202) 504-2183, by <u>October 25, 2002</u>, to schedule a status conference in order to discuss how they intend to proceed in this case

**IT IS SO ORDERED.**

Gary J Golkiewicz
Chief Special Master

A TRUE COPY:
TEST:

MARGARET M. EARNEST
Clerk, U.S. Court of Federal Claims

By _____
Deputy Clerk

26



In the United States Court of Federal Claims

ORIGINAL

OFFICE OF SPECIAL MASTERS

(Filed: July 3, 2002)

FILED

JUL  3 2002

U.S. COURT OF
FEDERAL CLAIMS

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

IN RE: CLAIMS FOR VACCINE INJURIES
RESULTING IN AUTISM SPECTRUM
DISORDER OR A SIMILAR
NEURODEVELOPMENTAL DISORDER

VARIOUS PETITIONERS,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

Respondent.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

AUTISM MASTER FILE
To be published

---

## AUTISM GENERAL ORDER #1

### A. Background

This Autism General Order #1 is being issued by the Office of Special Masters ("OSM"), to address an unusual situation facing the National Vaccine Injury Compensation Program ("Program.")[1] This situation arises out of concern in recent years that certain childhood vaccinations might be causing or contributing to an apparent increase in the diagnosis of a type of serious neurodevelopmental disorder known as "autism spectrum disorder," or "autism" for short.[2]

---

[1] The applicable statutory provisions defining the Program are found at 42 U.S.C. § 300aa-10 *et seq.* (2000). Hereinafter, for ease of citation, all "§" references will be to 42 U.S.C. § 300aa (2000).

[2] An autism spectrum disorder is a brain disorder affecting a person's ability to communicate, form relationships, and/or respond appropriately to the environment. Such disorders sometimes result in death. The "spectrum" of such disorders includes relatively high-functioning persons with speech and language intact, as well as persons who are mentally retarded, mute, or with serious language delays. Symptoms may include, but are not limited to, avoidance of eye contact, seeming "deafness," abrupt loss of language, unawareness of environment, physical abusiveness,

Specifically, it has been alleged that cases of autism, or neurodevelopmental disorders similar to autism, may be caused by Measles-Mumps-Rubella ("MMR") vaccinations; by the "thimerosal" ingredient contained in certain Diphtheria-Tetanus-Pertussis ("DTP"), Diphtheria-Tetanus-acellar Pertussis ("DTaP"), Hepatitis B, and Hemophilus Influenza Type B ("HIB") vaccinations; or by some combination of the two.

To date, over 400 cases alleging a causal relationship between such vaccinations and autism disorders have been filed in this court; more than 300 of those cases have been filed in the past six months. Moreover, numerous civil lawsuits against vaccine manufacturers, alleging that the thimerosal ingredient caused autism, have been filed in courts around the country. One recent ruling in such a suit determined as a matter of law that such claims of vaccinees against vaccine manufacturers must be dismissed and brought to this court as Program claims. See *Owens v American Home Products Corp*, 2002 WL 992094 (S.D. Tex. May 7, 2002).

As a result of the influx of Program claims and the potential for many more such claims, the OSM has held a series of meetings with an informal advisory committee to address the task of dealing with these claims. This committee consisted of petitioners' counsel who represent many such current and potential Program claimants, along with legal and medical representatives of the Secretary of Health and Human Services. (*See* Ex. C for a list of the participants in that advisory committee.) The participating petitioners' counsel, who are in contact with many other petitioners' counsel, have estimated that due to the *Owens* decision, approximately 3,000 to 5,000 such Program petitions (or possibly even more) are likely to be filed with this court during the next several months.

Processing such a large number of cases will stretch thinly the resources of both the court and the bar. It is in the interests of all that the court aggressively, but fairly, manage this docket to ensure a timely presentation and resolution of the difficult medical and legal issues raised in these cases. This Autism General Order #1 and the procedure detailed herein resulted from extensive discussions with the parties' representatives, and from the special masters' experience in handling other groups of cases presenting common issues. The court is confident that this procedure, coupled with the cooperative efforts and quality advocacy of counsel, will provide the necessary information for resolving these cases, within a reasonable time frame.

During the advisory committee meetings, petitioners' representatives proposed a timetable for resolving the general causation issues involved in these cases which extended well over two years. In response, the OSM established one overriding principle governing all suggestions, proposals, and requests--the OSM's decision on the causation issues shall be rendered within two years after the filing of this General Order. The OSM's subsequently adopted procedure and schedule contained herein are designed to meet that two-year time frame.

---

inaccessibility, fixation, bizarre behavior, "flapping," repetitive and/or obsessive behavior, insensitivity to pain, social withdrawal, and extreme sensitivity to sounds, textures, tastes, smells, and light. National Institute of Mental Health, Publication 97-4023.

2

### B. Proposal of petitioners' representatives

Autism cases are not new to the court; a number have been pending for several years. However, in those pending cases, petitioners' counsel continue to request more time for the science to crystalize, to obtain experts, and in general to prepare their proof concerning the difficult medical and legal causation issues. Similarly, in the advisory committee discussions described above, petitioners' representatives have stated that they are not prepared to present their causation case at this time. Rather, petitioners request extensive discovery--documents, studies, and raw data from government agencies and possibly vaccine manufacturers--information relevant to the general causation issues, through this court's discovery process.

Accordingly, petitioners' representatives in the advisory committee meetings have proposed a general procedure by which the OSM could process the claims described above, both those already filed and those about to be filed. They propose that the OSM utilize a two-step procedure: first, conduct an inquiry into the *general causation issues* involved in these cases-- *i.e.*, whether the vaccinations in question can cause autism and/or similar disorders, and if so in what circumstances; and then, second, apply the conclusions reached in that general inquiry to the individual cases. They propose that the OSM establish an "Autism Master File" with respect to the general causation issues, which would be open to inspection by any interested persons, and which would constitute an evidentiary record with respect to the general causation issues. They propose that a team of petitioners' lawyers be selected to represent the interests of all petitioners in these autism cases during the course of this general causation inquiry. They propose that the proceeding begin with a lengthy period of discovery concerning the general causation issues, followed by a designation of experts for each side, an evidentiary hearing, and a ruling on the general causation issues. Finally, the special master's determination on the general causation issues would be applied to the individual cases.

During the meetings of the informal advisory group, respondent's representatives did not oppose petitioners' general plan, as set forth above, that the OSM conduct a general inquiry into the causation question, then apply the conclusions reached in that inquiry to the individual cases.

### C. Procedure adopted by the OSM

After considering carefully the practical and thoughtful advice from petitioners' and respondent's representatives presented during the meetings of the advisory committee, the OSM responds to the challenge presented by this influx of cases with the following procedures.

First, the OSM adopts the general approach to these cases suggested by the participants in the informal advisory committee. That is, the OSM will utilize a two-step procedure: First, the OSM will inquire into the *general causation issues* involved in these cases--whether the vaccinations in question can cause autism and/or similar disorders, and if so in what circumstances; and then, second, the conclusions reached in that general inquiry will be applied to the individual cases. As proposed, the OSM will authorize a team of attorneys to represent the interests of all

3

petitioners in these autism cases during the course of this general causation inquiry, which is officially entitled the "Omnibus Autism Proceeding." The inquiry will proceed as generally proposed by petitioners' attorneys--*i.e.*, a period for any court-approved discovery concerning the general causation issues, followed by a designation of experts for each side, an evidentiary hearing, and finally a special master's ruling on the general causation issues. Subsequently, the general causation conclusions will be applied to the individual cases.

The court will, as proposed, establish an "Autism Master File" with respect to the general causation issues involved in these cases. That file will be open to inspection by any interested persons, and will constitute an evidentiary record with respect to the general causation issues. All evidence relevant to the general causation issues, including transcripts of any evidentiary hearings, will be placed into that file. The first documents placed into that master file will be this Autism General Order #1 and the attachments hereto.

In accordance with § 300aa-12(d)(1), the Chief Special Master hereby designates Special Master George Hastings to preside over the Omnibus Autism Proceeding, and to make any necessary rulings on the general causation issues.

Representing the interests of petitioners in the Omnibus Autism Proceeding will be a Petitioners' Steering Committee. This committee will be comprised of counsel who are representing Program petitioners in autism cases. Currently, the vast majority of pending Program autism cases have been filed by a small number of law firms. The OSM invited attorneys from those firms to participate in the informal advisory committee described above. Those counsel have organized the initial Petitioners' Steering Committee, whose members are set forth at Ex. D to this Order. Other counsel who are interested in serving on the Steering Committee may contact the members of that committee to express their interest. The OSM believes that membership on the Steering Committee should be determined by petitioners' counsel, interacting among themselves. The Committee shall keep the presiding special master apprised, however, of changes in its membership. The Committee shall designate two attorneys as "lead counsel," authorized to sign and file documents on behalf of the Committee into the Autism Master File, and to represent the Committee at status conferences. In the unlikely event that disputes arise as to the Committee membership, the presiding special master shall be informed immediately and will resolve any issues.

Similarly, respondent shall designate two "lead counsel" for respondent in the Omnibus Autism Proceeding, who will be authorized to file documents on behalf of respondent into the Autism Master File, and to represent respondent at status conferences.

When either "party" to the Omnibus Autism Proceeding--*i.e.*, the Petitioners' Steering Committee or respondent--files documents into the Autism Master File, if the document is less than 20 pages, the party shall file an original and two copies. For documents of 20 or more pages, an original and one copy will suffice. By rule, the Clerk of the Court will file the original in the Autism Master File and send the copy or copies to the presiding special master. Unless requested, separate mailings to the presiding special master are unnecessary. The Steering Committee will serve a copy

4

of each filed document on each of the two designated lead counsel for respondent. The respondent will serve a copy of each filed document on each member of the Steering Committee.

Attached to this General Order as Exhibit A is the "Master Autism Petition for Vaccine Compensation" ("Master Petition"). This document was drafted and presented to the OSM by the Petitioners' Steering Committee. It sets forth the general allegation that a vaccinee's autistic disorder or similar disorder was caused by one or more of the MMR and thimerosal-containing vaccinations. It provides that any Program petitioner filing a "Short-Form Autism Petition for Vaccinee Compensation," in a form similar to that set forth as Exhibit B to this General Order, represents that such petitioner's claim meets the criteria set forth in the Master Petition. As will be detailed below, by filing such a short-form petition, a petitioner will elect into the Omnibus Autism Proceeding, and simultaneously opt to stay case-specific proceedings on his own petition until the conclusion of the Omnibus Autism Proceeding.

## D. The Autism Master Schedule

To meet the court's self-imposed two-year timetable for decision, the Omnibus Autism Proceeding will be conducted according to an Autism Master Schedule, appended to this General Order as Exhibit E. This schedule has been determined through cooperative discussions at the advisory committee meetings. Petitioners' representatives proposed the first draft of the schedule. They proposed a schedule covering two years, from issuance of an initial General Order (i.e., this Order) until the date of an evidentiary hearing on the general causation issues, with an additional unspecified period of time obviously needed for the presiding special master to analyze the evidence introduced at the hearing and produce a written opinion. In that proposed schedule, essentially 470 of the 730 days in the two-year period were devoted to the discovery process. The first proposal extended beyond two years, and thus was rejected by the OSM. After discussion, petitioners submitted a revised schedule which shortened the discovery period to 410 days, moved the hearing date up, and built in sufficient time to decide the causation issues within the two-year period. This second proposal is adopted, with slight modifications and three observations.

First, and foremost, the OSM expects that the parties will act promptly and vigorously to *adhere* to this schedule, if not move more quickly. Because the interests of thousands of petitioners are affected, the presiding special master will be disinclined to allow the Omnibus Autism Proceeding to slip behind schedule. In fact, the OSM and the presiding special master will strictly manage these proceedings in an effort to resolve the causation issues in less than the allotted two-year time period.

Second, the OSM recognizes that two years is a relatively long time to ask petitioners to wait for a ruling on the general causation issues. Congress clearly envisioned rulings on Program petitions rendered in a much shorter time frame. However, the short decision-making time periods provided in the Program statute were obviously based upon the assumption that most Program claims would present far different issues than those presented in these autism cases. The assumption clearly was that in most Program cases the question for the special master would simply be whether

petitioner's case fit within one of the "Table Injury" categories set forth at § 300aa-14(a). It was also assumed that even in those relatively few cases where no Table Injury was alleged and a petitioner attempted to prove that the vaccine "actually caused" an injury, the petitioner would file *along with his petition* all of his proof concerning the causation issue, including a report from an expert supporting the claim. In contrast, in these autism claims petitioners have requested a period of 500 days from now--almost a year-and-one-half--before filing expert reports explaining and supporting their theory of causation. These reports will follow a lengthy discovery period of a type clearly never envisioned by Congress. However, it is clear to the OSM that the reality of the difficult medical issues involved and the stringent legal standards applied to causation cases justifies petitioners' request for a reasonable discovery opportunity and the extended time for filing expert reports. Unfortunately, resolution of the general causation inquiry must await longer than Congress envisioned and the OSM would ideally wish; but it is clear to all involved that without the requested extended time frames, petitioners would be unable to prosecute their claims. In this instance, quick justice would mean no justice.

Third, the above pages have referenced the "general causation issues." The OSM recognizes that the Omnibus Autism Proceeding is in its earliest phase. While petitioners' representatives have mentioned multiple potential theories of causation, until discovery is completed and expert reports are filed it will not be known whether one or more causation theories are at issue. As noted above, there have been suggestions that autistic disorders can be caused by (1) MMR vaccinations; (2) the thimerosal component of the DTP, DTaP, Hepatitis B, and HIB vaccinations; and/or (3) a combination of (1) and (2). Accordingly, the presiding special master, working with the parties' representatives, will decide at a later date the most efficient procedure for resolving the causation issues, depending upon the development of the causation theories put forth by Petitioners' Steering Committee.

**E. Opting into, or out of, the Omnibus Autism Proceeding**

All persons with pending petitions or potential Program claims involving an autistic or autistic-like disorder should assess their own cases in light of the Omnibus Autism Proceeding. Many petitioners with pending claims have already requested and have been granted stays in their own cases until the conclusion of the Omnibus Proceeding.[3] The presiding special master will conduct no case-specific proceedings in those "stayed" cases until the conclusion of the Omnibus Proceeding, unless otherwise requested by a party. The OSM will keep all petitioners or their counsel updated as to the progress of the Omnibus Proceeding. After the Omnibus Proceeding is concluded by the special master's ruling concerning the general causation issues, the individual cases will then be addressed. If the ruling on the general causation issues appears favorable to an individual petitioner's case, the petitioner will be ordered to demonstrate that his or her case qualifies for compensation under the general ruling, and proceed to a damages determination. If the general

---

[3]Such cases will be officially transferred from the docket of the originally-assigned special master to the docket of Special Master Hastings, the special master presiding over the Omnibus Autism Proceeding.

6

ruling, on the other hand, appears unfavorable to an individual petitioner's case, then the petitioner will be given the opportunity to introduce additional supportive case-specific evidence, including expert reports, or to dismiss the case for want of proof. The court will determine how to process individual cases, following the resolution of the general causation issues, only after ample time and opportunity is granted to each petitioner to review the evidence from the Omnibus Proceeding, to consult with counsel and medical experts, and then to make a reasoned choice.

Any petitioner with a *pending* autism-related claim, who has not yet requested to have proceedings in his own case stayed for the duration of the Omnibus Autism Proceeding, may do so simply by filing a Notice to Stay Proceedings, similar to that contained at Ex. F to this General Order. Once that is done, no case-specific proceedings will be held in that case until further notice, and that case will be treated as described in the previous paragraph.

Persons who have autism-related claims for which they have *not yet filed* Program petitions, and who wish to have their cases stayed during the Omnibus Autism Proceeding, may file their petitions by filing a "Short-Form Autism Petition for Vaccine Compensation" in a form similar to the one set forth as Ex. B to this General Order.[4] No medical records need be filed with such a short-form petition, though each petitioner or his counsel is encouraged to assemble, organize, and keep all relevant medical records so that they will be available for filing if, and when, the petitioner is directed to do so by the special master. Once such a short-form petition is filed, no case-specific proceedings will be held in the case during the course of the Omnibus Autism Proceeding, and the case will be treated as described above.

*One important caveat, however, is drawn to the attention of all petitioners and their counsel!* There may be cases involving autistic-like disorders which manifested following an injury defined in the Vaccine Injur     . That is, a vaccinee may have suffered an episode involving a severe acute encephalopathy    in 72 hours after a pertussis vaccination (DTP or DTaP), or 5 to 15 days after an MMR vaccination. If so, such an acute encephalopathy and any residual effects thereof would be *presumed* to be vaccine-caused pursuant to the Vaccine Injury Table. *See* 42 C.F.R. § 100.3(a) (10-1-97 version of CFR).[5] However, this would apply only to cases falling within the current Vaccine Injury Table's definition of "acute encephalopathy," in which the vaccinee suffered a sudden, dramatic, and severe change in level of consciousness lasting at least 24 hours: 42 C.F.R. § 100.3(b)(2)(i)(A) and (D). The incident must have been "sufficiently severe so as to require hospitalization," though actual hospitalization at the time need not have occurred. 42 C.F.R. § 100.3(b)(2)(i). Autism cases involving Table Injuries have been compensated under the Program. If in a particular case there exist medical records demonstrating that such a qualifying

---

[4]The OSM acknowledges that respondent opposes the use of a short-form petition. The court's reasoning on this topic will be set forth in a separate document.

[5]Note that the Vaccine Injury Table contained in the statute at § 300aa-14(a) is *not* applicable to Program petitions filed since March 10, 1995. For any petition filed on or after March 24, 1997, the applicable Vaccine Inju      is found at 42 C.F.R. § 100.3 (1997).

"acute encephalopathy" occurred within the appropriate time frame, petitioner or counsel should bring that to the assigned special master's attention so that, if appropriate, the case can be processed without delay as a Table Injury.

Finally, petitioners should note that even after electing to have their case stayed pending the conclusion of the Omnibus Autism Proceeding, such election is not irrevocable. That is, if at a future time a petitioner determines that his own case should be separated from the Omnibus Autism Proceeding and processed separately, with the petitioner introducing case-specific proof of causation, such petitioner may request that a special master analyze his case. A special master will be assigned and the case will be processed as expeditiously as possible.

**F. Obtaining Information About the Progress of the Omnibus Autism Proceeding**

As noted above, during the course of the Omnibus Autism Proceeding, the individual autism cases will be stayed, with no case-specific proceedings conducted. During that time, however, the OSM will keep the petitioners in such cases well informed as to the progress of the Omnibus Autism Proceeding, by two devices.

First, the OSM from time-to-time will issue additional Autism General Orders detailing the progress of the Omnibus Autism Proceeding. Such general orders will be sent to all counsel, or petitioners appearing *pro se*, in autism cases.

Secondly, a specific page on this court's internet website will be devoted to the Omnibus Autism Proceeding. Relevant filed documents and periodic updates regarding the proceedings will be posted on that site. This page may be accessed by logging onto this court's website at www.uscfc.uscourts.gov, then clicking on the "Special Masters" icon.

**G. Conclusion**

The Office of Special Masters is determined to process these autism petitions as swiftly and efficiently as possible, while giving all interested parties a fair opportunity to present their claims and evidence. We appreciate the assistance of all petitioners, petitioners' counsel, and respondent's representatives in this challenging endeavor.

Gary J. Golkiewicz
Chief Special Master
For the Office of Special Masters

8

EXHIBIT A

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## OFFICE OF SPECIAL MASTERS

```
• • • • • • • • • • • • • • • • • • • • • • • • •
IN RE: CLAIMS FOR VACCINE INJURIES    •
RESULTING IN AUTISM SPECTRUM           •
DISORDER OR A SIMILAR                   •
NEURODEVELOPMENTAL DISORDER             •    AUTISM MASTER FILE

VARIOUS PETITIONERS,                    •

            v.                          •

SECRETARY OF HEALTH AND                 •
HUMAN SERVICES,                         •

            Respondent.                 •

• • • • • • • • • • • • • • • • • • • • • • • • •
```

### MASTER AUTISM PETITION FOR VACCINE COMPENSATION

Pursuant to the Autism General Order #1 issued by the Office of Special Masters of this Court on July 3, 2002, this Master Autism Petition for Vaccine Compensation is hereby placed into the Omnibus Autism Master File created in the Office of the Clerk of this Court. As detailed in that Autism General Order #1, any petitioner desiring that his or her Vaccine Act claim be processed along with the other "Omnibus Autism" cases may file a "Short-Form Autism Petition for Vaccine Compensation" similar to that contained at Ex. B to the Autism General Order #1. Any petitioner who files such a short-form petition will be deemed to be representing that such petitioner's own particular claim meets the following criteria:

1.   The petitioner alleges a vaccine-related injury and/or death, and requests compensation under the National Vaccine Injury Compensation Program, codified at 42 U.S.C. §§ 300aa-10 *et seq.* (Supp. 1996).

2.   No civil action against a vaccine manufacturer or administrator for the vaccine-related injury or death alleged by the petitioner is pending. No person has previously collected an award or settlement of a civil action for damages for the vaccine-related injury or death being claimed.

3.   As a direct result of one or more vaccinations covered under the National Vaccine Injury Compensation Program, the vaccinee in question has developed a neurodevelopmental disorder, consisting of an Autism Spectrum Disorder* or a similar disorder. This disorder was caused by a measles-mumps-rubella (MMR) vaccination; by the "thimerosal" ingredient in certain Diphtheria-Tetanus-Pertussis (DTP), Diphtheria-Tetanus-acellular Pertussis (DTaP), Hepatitis B, and Hemophilus Influenza Type B (HIB) vaccinations; or by some combination of the two.

4    The vaccinee received the vaccination or vaccinations in question in the United States, or otherwise in compliance with 42 U.S.C. § 300aa-11(c)(1)(B).

5.   The petition is being filed within three years after the first symptom of the disorder, or within three years after the first symptom of a vaccine-caused significant aggravation of the disorder. (If the vaccine-related death is alleged, the petition is being filed within two years after the date of death and no later than 48 months after onset of the injury from which death resulted.)

6.   The vaccine-related injury either has persisted for more than six months or resulted in death.

Therefore, by filing a "Short-Form Autism Petition for Vaccine Compensation," a petitioner will be deemed to be seeking an award under the National Vaccine Injury Compensation Program. Such a petitioner will be deemed to have deferred specific compensation demands, pursuant to 42 U.S.C. § 300aa-11(e), until the issue of entitlement to compensation is determined.

---

*An autism spectrum disorder is a brain disorder affecting the petitioner's ability to communicate, form relationships, and/or respond appropriately to the environment. Such disorders sometimes result in death. The "spectrum" of such disorders includes relatively high-functioning persons with speech and language intact, as well as persons who are mentally retarded, mute, or with serious language delays. Symptoms may include, but are not limited to, avoidance of eye contact, seeming "deafness," abrupt loss of language, unawareness of environment, physical abusiveness, inaccessibility, fixation, bizarre behavior, "flapping," repetitive and/or obsessive behavior, insensitivity to pain, social withdrawal, and extreme sensitivity to sounds, textures, tastes, smells, and light. National Institute of Mental Health, Publication 97-4023.

2

**EXHIBIT B**

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### OFFICE OF SPECIAL MASTERS

```
• • • • • • • • • • • • • • • • • • • • • • • •
_____ ,        •
_____          •
    parent(s) of                         •
_____ , a minor,  •
                                          •   No. [leave blank        ]
                                          •   Special Master [leave blank   ]
            Petitioners,                  •
                                          •
        v.                                •
                                          •
SECRETARY OF HEALTH AND                   •
HUMAN SERVICES,                           •
                                          •
            Respondent.                   •
                                          •
• • • • • • •.• • • • • • • • • • • • • • • • •
```

### SHORT-FORM AUTISM PETITION FOR VACCINE COMPENSATION

The petitioners, on behalf of their minor child, hereby petition for compensation under the National Vaccine Injury Compensation Program, and adopt the MASTER AUTISM PETITION FOR VACCINE COMPENSATION.

| | |
|---|---|
| _____ | Sign:_____ |
| Date | Print Name:_____ |
| | Address:_____ |
| Check One: | City, State, Zip:_____ |
|     Attorney ☐ | Phone Number:_____ |
|     Pro Se ☐ | Fax Number:_____ |

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the attached Autism Petition for Vaccine Compensation was sent by First Class or Certified Mail on _____, to:

Secretary of Health and Human Services
c/o Director, Bureau of Health Professions
5600 Fishers Lane, Suite 8-05
Rockville, MD 20857

_____
Signature of person mailing Petition

EXHIBIT C

## AUTISM ADVISORY COMMITTEE PARTICIPANTS

### Participants from the Office of Special Masters

Chief Special Master Gary Golkiewicz
Special Master George Hastings
Special Master John Edwards

### Petitioners' Counsel Participants

Clifford Shoemaker
Ghada A. Anis
SHOEMAKER & ASSOCIATES
Vienna, VA

Jeff Thompson
WILLIAMS BAILEY, L.L.P.
Houston, TX

John Kim
GALLAGHER, LEWIS, DOWNEY & KIM
Houston, TX

Ben C. Martin
LAW OFFICES OF BEN C. MARTIN
Dallas, TX

Ronald Homer
Kevin Conway
CONWAY, HOMER & CHIN-CAPLAN, P.C.
Boston, MA

### Participants Representing Respondent

Mark Raby
Vince Matanoski
U.S. Department of Justice

Vito Caserta, M.D., Chief Medical Officer
National Vaccine Injury Compensation Program
Medical Analysis Branch
U.S. Department of Health & Human Services

Deborah Harris
Office of General Counsel, Public Health Division
U.S. Department of Health & Human Services

Vernessa Pollard, Assistant Chief Counsel
Office of the Chief Counsel
Food and Drug Administration

EXHIBIT D

## AUTISM PETITIONERS' STEERING COMMITTEE

Clifford Shoemaker
   cliff@attorneyaccess.net

Ghada A. Anis
   ghada@attorneyaccess.net

SHOEMAKER & ASSOCIATES
Attorneys and Counselors of Law
9711 Meadowlark Road
Vienna, VA 22182
Telephone: (703) 281-6395
Fax: (703) 281-5807

_____

Jeff Thompson
   jthompson@williamsbailey.com

WILLIAMS BAILEY, L.L.P.
8441 Gulf Freeway, Suite 600
Houston TX 77017-5001
Telephone: (713) 230-2207
Fax: (713) 643-6226

_____

John Kim
   jhkkimlaw@aol.com

GALLAGHER, LEWIS, DOWNEY & KIM
Bank of America Center
700 Louisiana Street, 40th Floor
Houston TX 77002
Telephone: (713) 238-7787
Fax: (713) 222-0066

_____

Ronald Homer
   rhomer@ccandh.com

Kevin Conway
   kconway@ccandh.com

CONWAY, HOMER & CHIN-CAPLAN, P.C.
16 Shawmut Street
Boston, MA 02116
Telephone: (617) 695-1990
Fax: (617) 695-0880

**EXHIBIT E**

OMNIBUS AUTISM PROCEEDING

**MASTER SCHEDULING ORDER**

| | |
|---|---|
| July 3, 2002 | Autism General Order #1 |
| August 2, 2002 | Petitioners file discovery requests, setting forth the discovery sought from any party or entity subject to the control of respondent agency |
| September 3, 2002 | Respondent files response and any objections to petitioners' discovery requests |
| September 17, 2002 | Conference on discovery requests |
| October 8, 2002 | Hearing on discovery requests |
| February 3, 2003 | Petitioners file supplemental discovery requests setting forth any additional and/or third-party discovery sought |
| March 3, 2003 | Respondent and/or third parties file response and any objections to supplemental discovery requests |
| March 17, 2003 | Conference on supplemental discovery requests |
| April 3, 2003 | Hearing on supplemental discovery requests |
| August 22, 2003 | Discovery completed |
| August 22, 2003 | Petitioners designate experts for Omnibus Hearing |
| October 21, 2003 | Respondent designate experts for Omnibus Hearing |
| November 21, 2003 | Petitioners file expert reports with supporting authorities |
| January 21, 2004 | Respondent file expert reports with supporting authorities |
| February 20, 2004 | Any additional motions, objections, statements of interest, etc., must be filed |
| March 22, 2004 | Omnibus evidentiary hearing |
| May 3, 2004 | Post-hearing briefs due |
| July 3, 2004 | Decision on causation issues |

EXHIBIT F

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

## OFFICE OF SPECIAL MASTERS

```
• • • • • • • • • • • • • • • • • • • • • • • • •
--- and ---,                              •
parents of                                •
---------------                           •
                Petitioner[s],            •
                                          •
        v.                                •
                                          •
SECRETARY OF HEALTH AND                   •
HUMAN SERVICES,                           •
                                          •
                Respondent.               •
                                          •
• • • • • • • • • • • • • • • • • • • • • • • • •
```

### NOTICE TO DEFER PROCEEDINGS IN AUTISM CASE

The petitioner[s] in this case believe[s] that the causation question in the case may be related to the general causation issues to be addressed in the Omnibus Autism Proceeding, and request[s] that case-specific proceedings in this case be deferred pending completion of the Omnibus Autism Proceeding.

_____

Counsel for Petitioner[s]

[or Petitioner appearing pro se]

3)

# ORIGINAL

## In the United States Court of Federal Claims

### OFFICE OF SPECIAL MASTERS
02-208V

Filed: June 5, 2002

**FILED**
JUN 5 2002
U.S. COURT OF
FEDERAL CLAIMS

DOROTHY VERDON,
Parent of ROBERT VERDON,

　　　　　　　Petitioner,

　　v.

SECRETARY OF THE DEPARTMENT OF HEALTH
AND HUMAN SERVICES,

　　　　　　　Respondent.

## ORDER

　　This case appears to fall into a growing group of Vaccine Act cases in which it is alleged that a vaccinee's autism or autistic-like disorder was caused by a measles-mumps-rubella vaccination, by the "thimerosal" ingredient in certain other vaccinations, or by some combination of the two. A committee of petitioners' counsel, respondent's representatives, and special masters has been formed to determine how to most efficiently process these cases. The Office of Special Masters will used the ideas exchanged in the committee meetings to set forth a meaningful time schedule for resolving these cases. I understand that Petitioner's counsel in this particular case desires that this case be processed along with this group of cases. Accordingly, pursuant to a policy adopted by the Office of Special Masters after discussion in the above-described committee, the petitioners in this particular case may delay indefinitely the filing of the medical records relating to this case, until the committee determines a procedure for resolving the general "causation" issue involved in these related cases. Likewise, the due date for respondent's "Rule 4 Report" in this case is hereby suspended until such procedure is determined. No status reports need to be filed unless I indicate otherwise.

　　If, however, either party believes that this particular case should be processed separately from the group of cases described above, such party should promptly contact my law clerk, Sofia Luiña, at (202) 504-2381.

IT IS SO ORDERED.

E. LaVon French
Special Master

32

**ROBERT D. McCALLUM, JR.**
Assistant Attorney General
**PAUL C. HARRIS**
Deputy Assistant Attorney General
**VINCENT J. MATANOSKI**
Acting Assistant Director
United States Department of Justice
1425 New York Avenue, N.W., Rm. 3100
Washington, D.C. 20005
Telephone:    (202) 616-4124
Facsimile:    (202) 616-4310
vincent.matanoski@usdoj.gov

**MICHAEL W. MOSMAN**, OSB #87111
United States Attorney
**HERBERT C. SUNDBY**, OSB #72257
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone:    (503) 727-1026
Facsimile:    (503) 727-1117
herb.sundby@usdoj.gov

Attorneys for the Secretary of Health and Human Services

RECVD '02 MAR 04 16:00 USTC-ORP

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| FREDERICK and MyLINDA KING, parents and guardians ad litem for JORDAN KING, a minor child; BETTY STAFFORD, parent and guardian ad litem for JERRY N. STAFFORD III, a minor child; BONNIE STIERNA and STEVE STIERNA, parents and guardians ad litem for JOSIE STIERNA, a minor child; MARK LINDSEY and LIEN VU, parents and guardians ad litem for LORENZO QUOC ANH LINDSEY, a minor child; and DIANE DOGGETT and GARY FAGELMAN, parents and guardians ad litem for AUGUST FAGELMAN, <br><br>          Plaintiffs, <br><br> On behalf of themselves and all others | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )    CV 01-1305-AS <br><br> STATEMENT OF INTEREST SUBMITTED BY THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES |

STATEMENT OF INTEREST BY HHS
Page 1 of 2

similarly situated,                    )
                                       )
         vs.                           )
                                       )
AVENTIS PASTEUR, INC., individually    )
and as successor in interest to Connaught )
Laboratories, Inc.; PASTEUR MERIEUX;   )
PASTEUR MERIEUX CONNAUGHT;             )
GLAXOSMITHKLINE, individually and as   )
successor in interest to Smithkline Beecham )
Corp.; MERCK & COMPANY, INC.;          )
ABBOTT LABORATORIES; AMERICAN          )
HOME PRODUCTS, dba WYETH               )
LABORATORIES, INC., dba WYETH, dba     )
WYETH-AYERST, dba WYETH-AYERST         )
LABORATOARIES, dba WYETH               )
LEDERLE, dba WYETH LEDERLE             )
VACCINES, aka LEDERLE                  )
LABORATORIES; and BAXTER              )
INTERNATIONAL, INC., individually and  )
as successor in interest to North American )
Vaccine, Inc., and ELI LILLY &         )
COMPANY, INC.; and BEVERLY             )
WITTKOPP, and LORI GILMARTIN, and      )
WALTER BUHL,                           )
                                       )
         Defendants.                   )
                                       )

STATEMENT OF INTEREST BY HHS
Page 2 of 2

## TABLE OF CONTENTS

I.   STATEMENT OF INTEREST OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  AUTHORITY TO FILE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III. SUMMARY OF THE ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

IV.  EXPLANATION OF PROGRAM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     A.   Program Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     B.   Statutory framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

V.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     A.   Thimerosal is neither an Adulterant or Contaminant within the Plain Meaning of the Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          1.   The plain meaning of "adulterant" and "contaminant" does not encompass thimerosal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

          2.   Thimerosal used within prescribed limits of a valid biologics license is not an adulterant or contaminant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          3.   The legislative history supports the finding that Congress intended that injuries allegedly related to thimerosal be brought under the Program.  . 12

     B.   Interpreting Thimerosal as an "Adulterant or Contaminant" Undercuts the Comprehensive Regulatory Scheme Established by Congress to Both Promote the Public Health by Ensuring the Vaccine Supply and Compensate Vaccine-Related Injuries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     C.   This Court Should Defer to the Agency's Interpretation Excluding Thimerosal from the Meaning of Adulterant or Contaminant, or at Least Defer Determination of the Issue until the Court of Federal Claims Resolves this Technical Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

VI.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

STATEMENT OF INTEREST BY HHS
Page 1 of 4

## TABLE OF AUTHORITIES

### FEDERAL CASES

Amendola v. Secretary of HHS,
989 F.2d 1180 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14, 15

Auer v. Robbins,
519 U.S. 452 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Brice v. Secretary of HHS,
240 F.3d 1367 (Fed. Cir. 2001),
cert. denied sub nom. Brice v. Thompson,
__ U.S. __, 122 S. Ct. 614 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Carson Harbor Village v. Unocal Corp.,
270 F.3d 863 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Cf. Geier v. American Honda,
529 U.S. 861, 120 S. Ct. 1913 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

City of Kenosha v. Bruno,
412 U.S. 507 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Connecticut National Bank v. Germain,
503 U.S. 249 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Davis v. Michigan Department of Treasury,
489 U.S. 803 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Fincke v. United States,
675 F.2d 289 (Fed. Cl. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Food and Drug Admin. v. Brown & Williamson Tobacco Corp.,
529 U.S. 120 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Naveillier v. Sletten,
262 F.3d 923 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

O'Connell v. Shalala,
79 F.3d 170 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Reiter v. Cooper,
507 U.S. 258 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Ricci v. Chicago Mercantile Exchange,
409 U.S. 289 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Schafer v. American Cyanamid Co.,
20 F.3d 1 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Schafer v. American Cyanamid Co.,
20 F.3d 1 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 16

Shalala v. Whitecotton,
514 U.S. 268 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

United States v. Mead Corp.,
533 U.S. 218, 121 S. Ct. 2164 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## FEDERAL STATUTES

21 C.F.R. § 601.4(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

21 C.F.R. § 601.5(b)(1)(vi) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

21 C.F.R. § 601.6(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

21 C.F.R. § 610.15(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

21 C.F.R. § 615 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

26 U.S.C. § 9510 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

28 U.S.C. § 517 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 C.F.R. § 100.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

42 U.S.C. § 262(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

42 U.S.C. §§ 300aa-10 - 300aa-34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## LEGISLATIVE HISTORY

STATEMENT OF INTEREST BY HHS
Page 3 of 4

H.R. Rep. No. 99-908, 99th Cong., 2d Sess. 7 (1986),
reprinted in 1986 U.S.C.C.A.N. 6344 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 6, 15

House Comm. on Energy and Commerce, 99th Cong., 2d Sess., Childhood Immunizations,
(Comm. Print 99LL 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## MISCELLANEOUS

Daniel Ridgway, "No-Fault Vaccine Insurance: Lessons from the National Vaccine Injury
Compensation Program," 24 Journ. of Health Politics, Policy and Law 59  (1999) . . . . . . . . . 16

Dorland's Medical Dictionary (29th ed. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

1 K. Davis and R. Pierce, Administrative Law Treatise § 14.1 (3rd ed. 1994) . . . . . . . . . . . . . 19

Stedman's Medical Dictionary (27th ed. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

The American Heritage College Dictionary (2d ed. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S. Court of Federal Claims Office of Special Masters, Guidelines for Practice under the
National Vaccine Injury Compensation Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Webster's 9th New Collegiate Dictionary (9th ed. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**L.    STATEMENT OF INTEREST OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES**

The interest of the United States, through the Department of Health and Human Services (HHS), in this matter is to ensure the proper administration of the National Vaccine Injury Compensation Program ("Program"), the responsibility for which resides with the Secretary of HHS. See 42 U.S.C. §§ 300aa-10 to 300aa-34 (the "Act" or "Vaccine Act"). HHS must assert its views in this case for two compelling reasons. First, Plaintiffs have filed a declaration purporting to state that HHS has refused to contest the jurisdiction of this Court to resolve claims alleging thimerosal is an "adulterant" or "contaminent" and, therefore, outside the scope of the Program and the exclusive jurisdiction of the U.S. Court of Federal Claims. This is emphatically not the case as HHS sets forth in this Statement of Interest. Second, the resolution of the jurisdictional issues presented will directly impact the Secretary's ability to exercise his responsibilities in administering the Program. Specifically, should Plaintiffs prevail in forcing the finding they urge, the U.S. Court of Federal Claims would be deprived of its exclusive original jurisdiction over many claims required to be filed in that forum and adjudicated under the Program. Such a finding would undermine not only the words, but also the purpose, of the Act.

**II.    AUTHORITY TO FILE**

This brief is filed pursuant to 28 U.S.C. § 517, which authorizes the Department of Justice to attend to the interests of the United States in any suit pending in a court of the United States, or of any State.

**III.    SUMMARY OF THE ARGUMENTS**

Under the National Vaccine Injury Compensation Program, 42 U.S.C. §§ 300aa-10 -

STATEMENT OF INTEREST BY HHS
Page 1 of 22

300aa-34; the U.S. Court of Federal Claims has exclusive original jurisdiction over claims of

"vaccine-related injuries"; however, the Court of Federal Claims is not given exclusive

jurisdiction where an "adulterant" or a "contaminant" is intentionally added to a vaccine. The

linchpin of Plaintiffs' argument is their erroneous assertion that thimerosal, used as a

preservative in vaccines, is an "adulterant" or "contaminant." Plaintiffs' argument is merely an

attempt to evade the statutory bar on civil actions against manufacturers and administrators of

vaccines for vaccine-related injuries unless a claimant has first filed a timely petition in the Court

of Federal Claims.[1]

Plaintiffs' argument, if successful, would contravene the purpose of the Act and would

substantially undermine its goals. First, Plaintiffs' position is inconsistent with the plain meaning

of "adulterant" and "contaminant." Second, the Secretary has determined that the preservative

thimerosal is not an adulterant or contaminant within the meaning of the Vaccine Act, a

determination that should be accorded deference under statutory scheme by which vaccine safety

and compensation is administered. See Attachment A (Secretary of Health and Human Service's

Brief, Geppert v. Secretary of HHS, Court of Federal Claims No. 00-286V (42 U.S.C. § 300aa-

---

[1] As a practical matter, not all potential claimants included in the broadly defined putative class may come within the Program. Because Plaintiffs have not defined any subclasses, it is difficult to discern those individuals whose claims are not barred. As stated in the Act, however, the Program's bar on civil actions does not apply to putative class members seeking damages for injuries related to vaccines that are not listed as vaccines covered by the Program. In addition, the Act does not require claims against a defendant "chemical manufacturer" of a component of a vaccine to be filed first in the Court of Federal Claims. The Act further excludes claimants who seek individual damages totaling less than $1,000, or any claim for injunctive relief or other non-monetary damages. Nonetheless, as set forth in this Statement of Interest, the Act undeniably prohibits claims against vaccine manufacturers or administrators by putative class members for injuries resulting from vaccines covered by the Program, and those claims should be dismissed.

33(5) was not meant to exclude claims of injury caused by individual components which comprise the vaccine)). As the Secretary is charged with administering the statute and has the delegated authority to regulate presumptively vaccine-related injuries, this Court should defer to the Secretary's interpretation. Should this Court not find the Secretary's interpretation controlling, the doctrine of primary jurisdiction counsels this Court to allow resolution of this technical issue by the Court of Federal Claims -- which is already exercising jurisdiction over more than 60 cases alleging injury from thimerosal -- before ruling on the issue.

## IV.  EXPLANATION OF PROGRAM

### A.    Program Overview

The Vaccine Program was created in response to two primary concerns:  first, the inconsistency, expense, delay, and unpredictability of the tort system in processing and compensating claims of vaccine-injured persons; second, the instability and uncertainty of the childhood vaccine market created by the risks of tort litigation. H.R. Rep. No. 99-908, 99th Cong., 2d Sess. 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6348. Recognizing that "vaccination of children against deadly, disabling, but preventable infectious diseases has been one of the most spectacularly effective public health initiatives this country has ever undertaken," the Congress acknowledged a responsibility "to ensure that all children who are injured by vaccines have access to sufficient compensation for their injuries." Id. at 6345-6346. Moreover, "[a]n important federal purpose of the Act is to free manufacturers from the specter of large, uncertain tort liability, and thereby . . . keep manufacturers in the market." Schafer v. American Cyanamid Co., 20 F.3d 1, 4 (1st Cir. 1994).

STATEMENT OF INTEREST BY HHS
Page 3 of 22

Congress identified several shortcomings in the traditional tort process. For the claimants, "opportunities for redress and restitution are limited, time-consuming, expensive, and often unanswered." H.R. Rep. No. 99-908, 99th Cong., 2d Sess. 4-5 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6347. For the manufacturers, litigation meant increasing expenses and decreasing insurance liability coverage. Id. Congress's solution was to create a "new system for vaccine injury compensation." Id. at 6348. With truncated discovery, presumed injuries, informal procedures, and attorney fee-shifting, this system offered claimants a quicker, and generally more certain, recovery. In turn, by initially diverting litigation to this system, manufacturers were guaranteed a measure of security and could get "a better sense of their potential litigation obligations." Id

B.    **Statutory framework**

Effective October 1, 1988, the Program established procedures through which claimants, or "petitioners," may seek compensation for certain vaccine-related injuries.[2] 42 U.S.C. §§ 300aa-10 to 300aa-34. It established a specialized tribunal of special masters in the U.S. Court of Federal Claims through which vaccine-related injury claims must initially be submitted.[3] 42

---

[2] As of January 31, 2002, 6,192 petitions had been filed since the Act's inception; 5,444 of these petitions have been adjudicated. National Vaccine Injury Compensation Program, Monthly Statistics Report, *available at* http://www.hrsa.gov/osp/vicp/monthly.htm. More than $1.3 billion has been paid to approximately 1,700 families and individuals. Id.

[3] *De minimis* claims for less than $1,000 may be brought in civil courts without prior filing under the Vaccine Program. 42 U.S.C.§ 300aa-11(a)(2)(A). The Act mandates, however, that any action seeking an unspecified amount of damages be filed under the Program. Id. Courts have also allowed limited claims for loss of consortium. See Schafer v. American Cyanamid Co., 20 F.3d 1, 7 (1st Cir. 1994). It does not appear from Plaintiffs' allegations that they seek on behalf of themselves and the putative class individual recovery of less than $1,000.

U.S.C. § 300aa-11(a)(1). A key provision at issue in this litigation is the proscription against filing any civil action against a vaccine manufacturer or administrator unless a timely petition is first filed under the Program. 42 U.S.C. § 300aa-11(a)(2)(A); Shalala v. Whitecotton, 514 U.S. 268, 270 (1995)(claimant alleging injury after Act's effective date "must exhaust the Act's procedures" before filing "any *de novo* civil action in state or federal court"). In fact, if potential claimants first seek compensation in state or federal courts, the Act requires that those cases be dismissed regardless of venue. 42 U.S.C. § 300aa-11(a)(2)(B)("If a civil action which is barred under subsection (A) is filed in a State or Federal court, the court shall dismiss the action."). To pursue these claims, individuals must file petitions in the U.S. Court of Federal Claims.

Individual claims[4] are filed by way of a "petition," which must be accompanied by all relevant medical records. Importantly for claimants, the Program is no-fault. 42 U.S.C. § 300aa-11(c). Special masters adjudicate claims according to less adversarial rules that simplify burdens on petitioners. 42 U.S.C. § 300aa-12(d). For instance, the special masters are not bound by common law or statutory rules of evidence. Rules of the Court of Federal Claims (RCFC), Vaccine Rule 8(c). The informal and cooperative exchange of information is the ordinary and preferred practice, and there is no discovery as a matter of right. RCFC, Vaccine Rule 7. Rather,

---

[4] A proper petitioner is "any person who has sustained a vaccine-related injury," or the legal representative of such person. 42 U.S.C. § 300aa-11(b)(1)(A). Claims must be filed by individuals, and neither the Vaccine Act nor Court of Federal Claims Vaccine Rules authorize filing petitions that, as Plaintiffs attempt to do here, describe a class, group, or category of claimants. Indeed, proceedings that merely define a class or category of claimant, rather than specify a particular individual with an alleged vaccine injury, would frustrate one of Congress's purposes in creating the Act: to allow vaccine manufacturers to get "a better sense of their potential litigation obligations." H.R. Rep. No. 99-908, 99th Cong., 2d Sess. 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6348.

STATEMENT OF INTEREST BY HHS
Page 5 of 22

the Program is premised on the notion that the process is "front-loaded" in that all medical records will be filed with the petition. U.S. Court of Federal Claims Office of Special Masters, *Guidelines for Practice under the National Vaccine Injury Compensation Program*, p. 1 ("compensation program is based on the premise that the initial submission -- the petition and accompanying documents -- will essentially contain petitioner's case in chief").

Congress intended the system to be expeditious. H.R. Rep. No. 99-908, 99th Cong., 2d Sess. 12 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6353. Petitions must be filed in the Court of Federal Claims within 36 months after "the date of the occurrence of the first symptom or manifestation of onset" of the alleged vaccine-related injury.[5] 42 U.S.C. § 300aa-16(a)(2). In cases alleging a vaccine-related death, the claim must be filed within 24 months of the death so long as the first symptom of the injury that caused the death occurred not more than 48 months earlier. 42 U.S.C. § 300aa-16(a)(3). Equitable tolling is not available to toll or extend these limitation periods. Brice v. Secretary of HHS, 240 F.3d 1367, 1373-1374 (Fed. Cir. 2001), cert. denied sub nom. Brice v. Thompson, __ U.S. __, 122 S.Ct. 614 (2001).[6]

---

[5] Limitations of actions under state law are stayed upon the filing of a petition. 42 U.S.C. § 300aa-16(c).

[6] However, if a claimant improperly files a civil action for a vaccine-related injury in state or federal court rather than in the Court of Federal Claims, the date that action is filed effectively becomes the date the petition is filed . 42 U.S.C. § 300aa-11(a)(2)(B). In that situation, the state or federal court is directed to dismiss the action, but the "date such dismissed action was filed shall . . . be considered the date the petition was filed" in the Court of Federal Claims provided that "the petition was filed within one year of the date of the dismissal of the civil action." Id. Although Plaintiffs purport to include in their putative class all persons receiving vaccines containing thimerosal from 1990 through 2000, some of these claims may be barred by the Vaccine Act's statute of limitations. That determination, however, is required to be made in the first instance by the Court of Federal Claims pursuant to its grant of exclusive jurisdiction under

- Currently, the vaccines covered under the Program are diphtheria, tetanus, pertussis, measles, mumps, rubella, polio, hepatitis B, Haemophilis influenzae type b, varicella, rotavirus, and streptococcus pneumoniae. 42 C.F.R. § 100.3 (2001)(Vaccine Injury Table).[7] The Act defines vaccine-related injuries as follows:

> The term "vaccine-related injury or death" means an illness, injury, condition, or death associated with one or more of the vaccines set forth in the Vaccine Injury Table, except that the term does not include an illness, injury, condition or death associated with an adulterant or contaminant intentionally added to such a vaccine.

42 U.S.C. § 300aa-33(5).

Claimants who suffer injuries according to criteria outlined in the Vaccine Injury Table make out a prima facie case for compensation that the Secretary may rebut only by proving the injury was caused by factors unrelated to the vaccine. 42 U.S.C. §§ 300aa-11(c)(1)(C)(i) and 13(a)(1)(B). Those not suffering a "Table Injury" may still obtain compensation by showing by a preponderance of evidence that the injury was caused in fact by the vaccine.[8] Id.

Compensation awarded to a petitioner for a vaccine-related injury may include actual unreimbursable expenses and projected expenses for medical or other remedial care determined to be reasonably necessary; actual and anticipated lost earnings; and actual and projected pain

---

the Act, even if those claims are ultimately determined to be time-barred.

[7] Not all vaccines administered to children are covered under the Program. For example, influenza vaccine, which may contain thimerosal, is not a covered vaccine.

[8] The Vaccine Injury Table currently contains nine injuries presumptively related to certain listed vaccines. 42 C.F.R. § 100.3. The Table does not list any injury presumptively linked to thimerosal, and so proof of causation by members of the putative class will be required in the Program, just as in any tort case.

STATEMENT OF INTEREST BY HHS
Page 7 of 22

and suffering subject to a statutory cap of $250,000. 42 U.S.C. § 300aa-15(a). Punitive or

exemplary damages are prohibited. 42 U.S.C. § 300aa-15(d). In the event of a vaccine-related

death, an award of $250,000 is paid to the estate of the deceased. 42 U.S.C. § 300aa-15(a)(2).

Reasonable attorneys' fees and other costs are awarded even if the petition is denied, so long as

the special master determines that the petition was brought in good faith and there was a

reasonable basis for asserting the claim. 42 U.S.C. § 300aa-15(e). Judgments are paid from the

Vaccine Injury Compensation Trust Fund, financed by an excise tax on vaccines. 42 U.S.C.

§ 300aa-15(i)(2); 26 U.S.C. § 9510. Limited review of a decision of the special master is

available before a judge in the Court of Federal Claims, and appeals may be taken to the Court of

Appeals for the Federal Circuit. 42 U.S.C. § 300aa-12(e), (f).

    The Program affords substantial protections to claimants against inordinate delay or

awards deemed by the claimant to be inadequate. After first proceeding through the Program, a

claimant may reject the special master's judgment for any reason and pursue a traditional tort

action in any forum. 42 U.S.C. § 300aa-21(a). Moreover, if the special master fails to issue a

decision within the Program's specified time frame of 240 days, exclusive of certain periods of

suspension, the petitioner may at that time withdraw from the Program and pursue his or her civil

action.[9] 42 U.S.C. § 300aa-21(b).

---

    [9] Even if petitioners do not have their claims resolved within 240 days (and they can, and, in experience, often do, consent to an extension of this time period) and elect to leave the Program, they may still benefit from participation. For claims filed within the statute of limitations, claimants may begin assembling documents and information necessary to prosecute their claim and may petition the Federal Court of Claims for attorneys' fees and expenses associated with those activities. Although Plaintiffs may argue that this statutorily mandated proceeding merely delays the ultimate filing of the tort case, reimbursed expenses offset any such

- In the event a petitioner elects to reject a Program award, the Act places several limitations on subsequent tort remedies. For example, it establishes compliance with Food and Drug Administration ("FDA") requirements as a partial defense for the manufacturer (42 U.S.C. § 300aa-22(b)(2)), and requires tort suits to be tried in three phases (i.e., liability, general damages, and punitive damages). 42 U.S.C. § 300aa-23(a). Generally, compliance with FDA requirements also precludes punitive damages. 42 U.S.C. § 300aa-23(d).

## V.   ARGUMENT

### A.   Thimerosal is neither an Adulterant or Contaminant within the Plain Meaning of the Act.

The gravamen of the Plaintiffs' case is that thimerosal when used within prescribed limits as a preservative in a licensed vaccine is an "adulterant" or "contaminant" under 42 U.S.C. § 300aa-33(5), and, therefore, injury claims based on this component of the vaccine are beyond the exclusive original jurisdiction of the U. S. Court of Federal Claims. Such an assertion must be denied for at least two compelling reasons. First, the plain meaning of the words "adulterant" and "contaminant" does not apply to thimerosal when, as here, it is used as an ingredient in the approved formulation of a licensed vaccine. Plaintiffs do not allege that the introduction of thimerosal into the specified vaccines was done contrary to an approved and licensed vaccine

---

burden from delay.

    If thousands of claims are refiled in the Court of Federal Claims as vaccine petitions following dismissal of those claimants from this lawsuit, current administrative resources may be inadequate and other resources may need to be dedicated to resolving these claims in a timely manner. Nevertheless, this potential in no way affects resolution of the jurisdictional issue before this Court.

STATEMENT OF INTEREST BY HHS
Page 9 of 22

formulation: Nor can they. Second, based on the available scientific data, FDA has not made any finding to date that even suggests that thimerosal, used as a preservative within the prescribed limits of a licensed vaccine, is an adulterant or a contaminant. By contrast, when asked to do so, FDA declined to order a recall of vaccines containing thimerosal because it found insufficient scientific data to show that the use of thimerosal as a preservative in accordance with approved license formulations renders the drug unsafe or hazardous to the public health.

1.   The plain meaning of "adulterant" and "contaminant" does not encompass thimerosal.

The cardinal rule of statutory construction is that the court must first look to the plain meaning of the words of a statute to discern the statute's meaning. If that meaning is unambiguous, then the court looks no further. Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992). Although the words "adulterant" and "contaminant" are not defined in the statute, the plain English definition of an adulterant is "a substance which makes an item impure, spurious, or inferior by adding extraneous or improper ingredients." *The American Heritage College Dictionary* 58 (2d ed. 1992). An "adulterant" is also defined as "[a]n impurity; an additive that is considered to have an undesirable effect or to dilute the active material so as to reduce its therapeutic or monetary value." *Stedman's Medical Dictionary* 30 (27th ed. 2000).

Similarly, a contaminant is "[s]omething that makes impure or corrupt by contact or mixture" (*Webster's 9th New Collegiate Dictionary* 283 (9th ed. 1991)), or "something that causes contamination." *Dorland's Medical Dictionary* 397 (29th ed. 2000). Thimerosal, when used as prescribed in a licensed vaccine formulation, does not fit within any of these definitions. Rather, when used as a preservative, thimerosal acts in precisely the opposite fashion of an

STATEMENT OF INTEREST BY HHS
Page 10 of 22

adulterant or contaminant. As a preservative, it deters microbial and fungal growth in order to maintain the safety, purity, and potency of a vaccine.

2.    **Thimerosal used within prescribed limits of a valid biologics license is not an adulterant or contaminant.**

Under the Program, an exclusion based on the addition of an adulterant or contaminant extends only to the addition of "foreign" substances or "extraneous" materials. See generally Amendola v. Secretary of HHS, 989 F.2d 1180, 1186 (Fed. Cir. 1993) (stating in dicta that "the only exclusion [from the program] is exposure to a foreign substance introduced into the vaccine itself . . . [T]he exclusion refers only to . . . extraneous material."). When thimerosal is part of a vaccine formulation and added in accordance with the specifications set forth in a valid and effective biologics license, it is neither foreign nor extraneous.

That thimerosal is neither an adulterant or contaminant is further supported by an FDA requirement to use preservatives in products distributed in multi-dose containers, with certain exceptions not relevant here. 21 C.F.R. § 610.15(a). The purpose of adding a preservative is to safeguard against microbial contamination, and thimerosal is effective in that role . *U.S. Pharmacopeia*, (USP 24) 1644 (1999). Thimerosal has been a widely used preservative in vaccines since the 1930s. Statement by William Egan, Ph.D., FDA, before the Committee on Government Reform, U.S. House of Representatives, July 18, 2000.

Plaintiffs contention that thimerosal is an adulterant or contaminant as used vaccines is incongruous with the federal requirement that a vaccine be manufactured according to approved specifications set forth in an effective biologics license. So long as a biologics license is in effect and FDA has not found that thimerosal is unsafe as used in such licensed products, thimerosal used as prescribed cannot, and should not, be considered an adulterant or contaminant under the

STATEMENT OF INTEREST BY HHS
Page 11 of 22

Vaccine Act.

FDA has found no grounds upon which to order a recall of vaccines containing thimerosal as a preservative or to revoke or suspend the approved licenses for such vaccines. A biologics license is valid until revoked or suspended. 21 C.F.R. § 601.4(a). A biologics license may be revoked if FDA finds, among other things, that the product is not safe and effective for all of its intended uses. 21 C.F.R. § 601.5(b)(1)(vi). A biologics license may be suspended if FDA finds that there is ground for revocation and there is a danger to public health. 21 C.F.R. § 601.6(a). FDA has not revoked or suspended any vaccine license on the ground that it contains the preservative thimerosal in accordance with an approved biologics licensing agreement. FDA may also order the recall of a vaccine upon a determination that the product presents an imminent or substantial hazard to the public health. 42 U.S.C. § 262(d)(1). FDA was asked to recall vaccines containing thimerosal, and, in response, FDA stated that these vaccines did not violate FDA law and that there was insufficient information to support a recall. FDA letter to Safe Minds, November 13, 2001 (Attachment B).

3.    **The legislative history supports the finding that Congress intended that injuries allegedly related to thimerosal be brought under the Program.**

The use of preservatives in vaccines is not new. In fact, thimerosal has been added to vaccines since the 1930s. Accordingly, when Congress created the Program it chose to cover many vaccines that already contained thimerosal. Given the congressional purpose of channeling liability for vaccine injuries to the Program and the fact that vaccines chosen for coverage contained thimerosal, it is incongruous to argue that at the same time Congress extended coverage to these vaccines, it intended to define away that coverage for any injury related to thimerosal. The reasonable conclusion, bolstered by FDA treatment of preservatives as

STATEMENT OF INTEREST BY HHS
Page 12 of 22

"constituents" of vaccines, is that preservatives were considered part and parcel of the vaccines

covered under the Program. See 21 C.F.R. § 615 (providing that constituents include

preservatives).

Indeed, while there is no legislative history directly bearing on the proper interpretation

of "adulterant" or "contaminant," there is legislative history revealing a general congressional

intent to cover injuries related to vaccine components such as preservatives. In this regard, one

vaccine covered by the Program, inactivated polio vaccine, contains trace amounts of antibiotics

left over from the production process. Congress was aware that these materials were in this

vaccine.

> No serious side effects of currently available IPV [inactivated polio vaccine] have
> been documented. The preparation contains trace amounts of streptomycin and
> neomycin and should not be given to individuals who have a hypersensitivity
> reaction to these antibiotics.

House Comm. on Energy and Commerce, 99th Cong., 2d Sess., *Childhood Immunizations*, p. 32

(Comm. Print 99LL 1986). Rather than excluding injuries related to the antibiotics, Congress

made those injuries presumptively vaccine-related. The Vaccine Injury Table Congress created

lists anaphylaxis and anaphylactic shock -- hypersensitivity reactions -- as injuries

presumptively related to receipt of inactivated polio vaccine. 42 U.S.C. § 300aa-14(a)IV.

**B.    Interpreting Thimerosal as an "Adulterant or Contaminant" Undercuts the
Comprehensive Regulatory Scheme Established by Congress to Both
Promote the Public Health by Ensuring the Vaccine Supply and Compensate
Vaccine -Related Injuries.**

Even if the phrases "adulterant" and "contaminant" were ambiguous in isolation, that

ambiguity quickly vanishes upon examining the words as part of "a symmetrical and coherent

regulatory regime." Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S.

120, 133 (2000). "It is a fundamental canon of statutory construction that the words of a statute

STATEMENT OF INTEREST BY HHS
Page 13 of 22

must be read in their context and with a view to their place in the overall statutory scheme."

Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 809 (1989).

Courts have, in fact, found this interpretive approach essential to construe provisions of the Act. "When the legislative purpose is incorporated in a complex piece of legislation, such as those establishing a major regulatory or entitlement program, the meaning of any particular phrase or provision cannot be securely known simply by taking the words out of context and treating them as self-evident." Amendola, 989 F.2d at 1182. Examining the words "adulterant" and "contaminant" as part of a comprehensive regulatory scheme designed to filter injury claims associated with certain vaccines through the Program compels the conclusion that these words were not meant to include thimerosal used as a licensed vaccine preservative.

First, the Act unambiguously discourages state law-based tort actions by raising hurdles to the pursuit of such claims for those who elect to reject the Program-derived result. For example, in such situations covered vaccine manufacturers generally have a complete defense to liability based on "failure to warn" if they have "complied in all material respects with all requirements under the Food, Drug, and Cosmetic Act and Section 351 of the Public Health Service Act." 42 U.S.C. § 300aa-22(b). To overcome this defense, a plaintiff must demonstrate by "clear and convincing evidence that the manufacturer failed to exercise due care" or otherwise engaged in fraudulent or criminal activity. 42 U.S.C. § 300aa-22(b)(2). This careful reshaping of state tort law evinces the statutory purpose of keeping the vast majority of injury claims associated with vaccines in the Court of Federal Claims. "Congress' purpose is both clear and clearly evidenced by the statutory framework. The statute provides a strong bias in favor of bypassing the civil litigation route in favor of compensation claims under the Act." Amendola, 989 F.2d at 1184.

STATEMENT OF INTEREST BY HHS
Page 14 of 22

- The availability of the regulatory compliance defense lends further support for the finding that thimerosal is not an "adulterant or contaminant." FDA regulations require the use of a preservative in certain vaccines to inhibit microbial contamination, and the agency licensed vaccines using thimerosal in that role. It does not follow that Congress would provide a regulatory compliance defense -- based on compliance with regulations designed to ensure the safety of vaccines -- to manufacturers who achieve compliance, in part, by intentionally adding a purported "adulterant" or "contaminant" to otherwise safe vaccines. See Amendola, 989 F.2d at 1182 (stating that in interpreting the Vaccine Injury Compensation Act, "provisions *in pari materia* must be construed together.").

Congress chose not to preempt all state tort actions.[10] Still, its detailed establishment of a specialized tribunal to hear vaccine-related claims and its deliberate reshaping of state tort law demonstrate an overriding purpose that vaccine-related injury claims "associated with one or more of the vaccines set forth in the Vaccine Injury Table" be first brought under its Vaccine Program where statutorily prescribed benefits and burdens are divided between claimants and defendants. 42 U.S.C. § 300aa-33(5). Both substantive and procedural provisions of the legislation underscore carefully crafted legislative compromises on many fronts. Substantively, the Act dispenses with any requirement of proving negligence. 42 U.S.C. § 300aa-11. Procedurally, proceedings before the special masters are more flexible in admissibility of evidence and encourage a less adversarial procedure. 42 U.S.C. § 300aa-12(d)(2). These and the

---

[10] In fact, a provision of the Act proscribes states from passing laws that prohibit suits against vaccine manufacturers not otherwise barred by the Act. 42 U.S.C. § 300aa-22(e).

Act's many other detailed provisions[11] leave little doubt that the statute was deliberately designed to balance the goals of protecting the viability of the vaccine supply and compensating individuals for injuries arising from routine vaccinations. *See* H.R. No. 99-908, 99th Cong., 2d Sess. 6, *reprinted in* 1986 U.S.C.C.A.N. at 6347 (stating that, "but for the relatively few who are injured by vaccine -- through no fault of their own -- the opportunities for redress and restitution are limited, time-consuming, expensive, and often unanswered.").

Introducing uncertainty into the delicate balance reached by Congress by allowing state tort liability, absent the filter of the Act, could have dramatic effects that substantially undermine Congress's objectives and have deleterious effects on the public health. Such exposure may prompt increases in vaccine prices, or otherwise adversely effect vaccine supply and use. American Cyanamid, 20 F.3d at 4. Because of the overriding importance to the public health, Congress established a successful, comprehensive procedure which facilitates compensation to those injured while protecting the nation's vaccine supply. This Court should uphold that procedure by denying Plaintiffs' Motion to Remand and dismissing those claims falling within the purview of the Vaccine Program.[12]

**C.  This Court Should Defer to the Agency's Interpretation Excluding Thimerosal from the Meaning of Adulterant or Contaminant, or at Least**

---

[11] Also among the Act's provisions are detailed rules as to the weight of evidence (42 U.S.C. §300aa-13), types and amounts of compensation (42 U.S.C. § 300aa-15), attorney's fees (42 U.S.C. § 300aa-15(e)), and timelines for both the issuance and the rejection of special masters' judgments (42 U.S.C. §§ 300aa-12(g), 300aa-21(a)).

[12] *See* Daniel Ridgway, "No-Fault Vaccine Insurance: Lessons from the National Vaccine Injury Compensation Program," 24 *Journ. of Health Politics, Policy and Law* 59, 76 (1999) (discussing the relative success of the program in keeping vaccine prices low, supplies at optimums, and manufacturers in the market and innovating, as well as the increase in vaccination coverage since the passage of the Act).

**Defer Determination of the Issue until the Court of Federal Claims Resolves this Technical Issue.**

In this Circuit, agency constructions of their own statutes are controlling unless plainly erroneous. Naveillier v. Sletten, 262 F.3d 923, 945 (9th Cir. 2001)(citing Auer v. Robbins, 519 U.S. 452, 461-63 (1997 )).[13] Although no specific authority has been granted to regulate what constitutes an "adulterant" or "contaminant" under section 33(5), the broad delegation of authority to the Secretary to administer the Program counsels that deference be given to the Secretary's interpretation of Program terms. Indeed, the delegation concerns the very topic defined by section 33(5), "vaccine-related injuries or death." Thus, the Secretary's consistent interpretation that any injury claims allegedly caused by thimerosal in covered vaccines are "vaccine related" and should therefore be adjudicated through the Court of Federal Claims is entitled to deference.[14]

Indeed, the statutory scheme embodied in the Program also dictates deference. Congress delegated the broad power to add, delete, or, in essence, redefine injuries on the Vaccine Injury Table to the Secretary. 42 U.S.C. § 300aa-14(c)(3); see O'Connell v. Shalala, 79 F.3d 170, 177 (1st Cir. 1996) ("[T]he brute power to subtract listed medical conditions from the Table

---

[13] See also Carson Harbor Village v. Unocal Corp., 270 F.3d 863, 877 n.5 (9th Cir. 2001) ("Although we would normally address the agency's interpretation of the statute . . . here there is no EPA determination as a point of reference or deference.")(citation omitted).

[14] See Attachment A at 2: Respondent's Brief interpreting 42 U.S.C. § 300aa-33(5), Geppert v. Secretary of HHS, No. 00-286V (the adulterant and contaminant exception "was not meant to exclude claims of injury caused by individual components which comprise the vaccine itself."). See also National Vaccine Injury Compensation Program web-page, available at <http://www.hrsa.gov/osp/vicp/qanda.htm> ("Because thimerosal is not an adulterant or contaminant, individuals who have claims relating to thimerosal in vaccines covered under the VICP . . . must first file the claim with the VICP before pursuing any other civil litigation."). The Secretary did not agree in Geppert that the injury alleged resulted from thimerosal.

STATEMENT OF INTEREST BY HHS
Page 17 of 22

encompasses the more modest power to trim the definitions associated with listed medical

conditions."). This manifests congressional recognition of the Secretary's expertise in assessing

harms potentially related to vaccines. Though the Secretary's interpretation is proffered to this

Court in the form of this Statement of Interest, it should be no less controlling since it represents

"the agency's fair and considered judgement on the matter in question." Auer v. Robbins, 519

U.S. 452, 462 (1997).[15] Cf. Geier v. American Honda, 529 U.S. 861, ___, 120 S.Ct. 1913, 1926-

27 (2000)(In construing federal preemption of state tort law under National Traffic and Motor

Vehicle Safety Act, Court placing "some weight" on Department of Transportation's amicus

brief due to: the delegated authority to implement the statute, the technical nature of the subject

matter, the consistency of the agency's interpretation, and the extensive and complex history of

the issue. "In these circumstances, the agency's own views should make a difference.")(citing

Auer)(other citations omitted).

 The Court of Federal Claims, charged with resolving petitions under the Program, has

effectively endorsed the Secretary's position on how "vaccine-related injury or death" must be

defined. Order, Geppert v. Secretary of HHS, No. 00-286V (Fed. Cl. Sp. Mstr. Oct. 12, 2001).

The special master's order did not explicitly resolve the definition of "adulterant" or

"contaminant"; rather, noting the petitioner's "acquiesce[nce]" and the lack of "contest" by the

---

[15] See United States v. Mead Corp., 533 U.S. 218, ___, 121 S. Ct. 2164, 2172-3 (2001)
("We have recognized a very good indicator of delegation meriting *Chevron* treatment in express
congressional authorizations to engage in the process of rulemaking . . . . *The want of procedure
here does not decide the case, for we have sometimes found reasons for Chevron deference even
when no such administrative formality was required and none was afforded.*")(italics added).
This Statement of Interest is certainly sufficient to rebut Plaintiffs' unsupported claim that the
Secretary has refused to challenge the Court's jurisdiction to adjudicate their claims either on an
individual or class-wide basis.

STATEMENT OF INTEREST BY HHS
Page 18 of 22

Government,[16] the special master continued proceedings in the case. However, it is the duty of the court to determine jurisdiction over proceedings. Fincke v. United States, 675 F.2d 289, 297 (Fed. Cl. 1982). It cannot be gained merely by the consent of the parties. City of Kenosha v. Bruno, 412 U.S. 507, 511 (1973). In allowing the suit to continue in the Court of Federal Claims, the special master implicitly construed "adulterant" and "contaminant" to exclude thimerosal-related vaccine injury claims. Cf., id. at 511-513 (on its own motion, the Court interpreted a statutory term as to reject the assertion of jurisdiction).

Even if this Court were hesitant to accord the Secretary's interpretation controlling weight, it should first allow full consideration of the issue in the Court of Federal Claims where jurisdiction has already been assumed. In this regard, the principles underlying the doctrine of primary jurisdiction are instructive and counsel that the question of whether thimerosal is an adulterant or contaminant under the Act be resolved in the first instance by the body created by the Act specifically to decide legal questions arising from its provisions. Invocation of primary jurisdiction is appropriate when the subject of court litigation "is . . . at least *arguably* protected or prohibited by . . . [a] regulatory statute." Ricci v. Chicago Mercantile Exchange, 409 U.S. 289, 299-300 (1973) (emphasis added); see Reiter v. Cooper, 507 U.S. 258, 268 (1993) (explaining primary jurisdiction and reaffirming Ricci). The Act requires that all litigation subject to its jurisdiction be initially brought at the Court of Federal Claims, making that entity analogous to an agency with primary decisionmaking authority over matters "arguably" regulated by the Act. Although subject to "no fixed formula," a court should defer to the primary

---

[16] The Government's position was more than the lack of "contest" to the special master's jurisdiction. The brief affirmatively asserted that "the components added to the microorganisms to create vaccines cannot be considered adulterants or contaminants." Attachment A at 3-4.

STATEMENT OF INTEREST BY HHS
Page 19 of 22

jurisdiction of an agency when: (1) the agency's specialized expertise makes it a preferable

forum for resolving the issue; (2) there exists a strong need for uniform resolution of the issue;

and, (3) there is a potential that judicial resolution of the issue will have an adverse impact on the

agency's performance of its regulatory responsibilities. 1 K. Davis and R. Pierce,

*Administrative Law Treatise* § 14.1 (3rd ed. 1994).

All of these considerations arise here. First, the Court of Federal Claims has specialized

expertise regarding legal and technical issues arising under the Act as it is the adjudicatory entity

specifically tapped by Congress to resolve them. 42 U.S.C. § 300aa-12(c), (d). Second, uniform

resolution is demanded. By the Act's express terms, federal law admits of no concurrent

jurisdiction over these thimerosal claims; they either must, or cannot, be pursued under the Act,

depending on whether the exception under section 33(5) is operative. By resolving this issue

initially in the Court of Federal Claims, legally conflicting decisions among the federal and state

courts may be avoided. Finally, the adverse impact is substantial in that a vast number of claims

that must otherwise be brought in the Court of Federal Claims would evade its jurisdiction.

Indeed, Congress established the Program to overcome precisely the problems associated with

multiple, potentially conflicting judicial rulings that might adversely affect the willingness of

manufacturers or administrators to produce or provide needed vaccines or impede the reasonably

expeditious and consistent review of claims by those individuals injured through the receipt of

mandatory vaccinations.

## VI.    CONCLUSION

For the reasons set forth in this Statement of Interest, Plaintiffs' Motion to Remand

should be denied and their complaint should be dismissed against the defendant vaccine

manufacturers and administrators to the extent that the putative class members seek damages for

STATEMENT OF INTEREST BY HHS
Page 20 of 22

** TOTAL PAGE.29 **

injuries resulting from vaccines covered by the Program. Plaintiffs cannot avoid the exclusive

jurisdiction of the Court of Federal Claims and the procedures of the Program by erroneously

arguing that thimerosal is an adulterant or contaminant. The plain language of the statute and the

determinations that have been made by the Secretary demonstrate that their argument is

fundamentally incorrect and without merit.



Dated: March 4, 2002

                                           Respectfully submitted,


MICHAEL W. MOSMAN                          ROBERT D. McCALLUM, Jr.
United States Attorney                     Assistant Attorney General


HERBERT C. SUNDBY                          PAUL C. HARRIS
Assistant United States Attorney           Deputy Assistant Attorney General
Chief, Civil Division
                                           VINCENT J. MATANOSKI
HERBERT C. SUNDBY                          Acting Assistant Director
Assistant United States Attorney           United States Department of Justice
Oregon State Bar No. 72257                 1425 New York Ave., N.W., Rm 3100
1000 S.W. Third Avenue, Suite 600          Washington, D.C. 20005
Portland, Oregon 97204-2902                Telephone: (202) 616-4124
Telephone: (503) 727-1026



STATEMENT OF INTEREST BY HHS
Page 21 of 22

A

33

United States Courts
Southern District of Texas
ENTERED

JUL 1 2 2002

Michael N. Milby, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| JESSICA OWENS *et al.* | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-02-185 |
| | § | |
| AMERICAN HOME PRODUCTS | § | |
| CORPORATION, *et al.* | § | |
| Defendants. | § | |

### ORDER GRANTING PLAINTIFFS' MOTION FOR CLARIFICATION AND DENYING THE MOTIONS TO STAY FILED BY DEFENDANTS SIGMA, ELI LILY AND SMITH KLINE AS MOOT

Several Motions are now before the Court: (1) a Motion to Stay Proceedings filed by Defendants Sigma Aldrich Corporation and Sigma Aldrich, Inc. and joined by Defendant Eli Lilly and Company; (3) a Motion to Stay Proceedings filed by the Vaccine Manufacturer Defendants;[1] and (4) Plaintiffs' Motion for Clarification.

#### Motions to Stay

At a Rule 16 Conference held in this matter on June 5, 2002, the Court stayed this action until February 6, 2003. Accordingly, the two pending Motions to Stay are hereby DENIED AS MOOT.

#### Motion for Clarification

Plaintiffs' Motion for Clarification points out that in its May 7, 2002 Order regarding various Defendants' Motions to Dismiss, the Court failed to directly address the viability of Plaintiffs' individual claims for reasonable and necessary medical expenses incurred on behalf of their minor children. The Court concludes that Plaintiffs Motion for Clarification is meritorious and therefore, Plaintiffs' Motion is hereby GRANTED. The requested clarification is provided below.

_____

[1] The Vaccine Manufacturers are Defendants Wyeth, Aventis Pasteur, Inc., Merck and Company, Inc. and Smith Kline Beecham Corporation.

*Plaintiffs' Individual Claims Against the Vaccine Manufacturers for Medical Expenses*

The Court acknowledges that in Texas, "[i]t is well settled law that because the parent is primarily liable for a minor's medical expenses incurred during minority, any cause of action for medical expenses incurred up to the age of 18 belongs to such parent." Roth v. Law, 579 S.W.2d 949, 956 (Tex. App.–Corpus Christi 1979, writ ref'd n.r.e.). Nevertheless, although Plaintiffs are not barred outright by the Vaccine Act from seeking individual damages (i.e. loss of consortium) from the Vaccine Manufacturers, they cannot recover from the Vaccine Manufacturers for such medical expenses at this time. As explained in the Court's previous Order, the Vaccine Act provides compensation for actual and un-reimbursable expenses and projected expenses (incurred by the victim or on the victim's behalf) for medical or other remedial care determined to be reasonably necessary, actual and anticipated lost earnings, actual and projected pain and suffering of the victim and reasonable attorneys' fees and costs. The covered expenses include those costs which "have been or will be incurred by or on behalf of the [victim]. . . for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and services expenses, and facilities determined to be reasonably necessary." 42 U.S.C. § 300aa-15(a)(1). Plaintiffs are therefore required to seek reimbursement for these expenses in the Vaccine Court, rather then attempting to recover damages via an action wherein they assert individual claims against the Vaccine Manufacturers. Allowing them to do so would clearly undermine the stated objectives of the Vaccine Act. This result is not in contravention of Texas law, because the Court is in no way holding that Plaintiffs' do not possess a valid claim for the medical expenses at issue. The Court is simply stating that Plaintiffs cannot seek to recover such expenses from the Vaccine Manufacturers until after they have filed a

2

Vaccine Act Petition in accordance with the Vaccine Act. Plaintiffs' claims for medical expenses incurred on behalf of their minor children are therefore DISMISSED WITHOUT PREJUDICE and Plaintiffs are urged to re-file such claims in the Vaccine Court if they so desire.

*Plaintiffs' Individual Claims Against the Chemical Manufacturers for Medical Expenses*

As explained in the Court's May 7, 2002 Order, the Vaccine Act does not bar Plaintiffs from bringing any individual claims against the Chemical Manufacturers[2] at this time, as long as those causes of action are otherwise viable under Texas law. Accordingly, Plaintiffs' individual causes of action against the Chemical Manufacturers for medical expenses incurred on behalf of their minor children remain pending before the Court.

IT IS SO ORDERED.

DONE this 12th day of July, 2002, at Galveston, Texas.

SAMUEL B. KENT
UNITED STATES DISTRICT JUDGE

---

[2] The Chemical Manufacturer Defendants include Sigma, Eli Lily The Dow Chemical Company, EM Industries, Inc., Spectrum Laboratory Products, Inc. and GDL International, Inc..

3

34

111 S.W.3d 113
46 Tex. Sup. Ct. J. 944
(Cite as: 111 S.W.3d 113)

Page 1

**H**
Briefs and Other Related Documents

Supreme Court of Texas.

Dr. Karen ROBERTS, Petitioner,
v.
Lainie and Casey WILLIAMSON, individually and
as next friends of Courtnie
Williamson, Respondents.
Dr. Karen Roberts, Petitioner,
v.
Lainie and Casey Williamson, individually and as
next friend of Courtnie
Williamson, Respondents.

**Nos. 01-0765, 01-0766.**

Argued April 17, 2002.
Decided July 3, 2003.

Parents sued two physicians for medical malpractice in connection with neurological injuries sustained by newborn child. Following jury verdict finding one physician 15 percent liable, the 124th Judicial District Court, Gregg County, Bennie C. Boles, J., entered judgment that included award for loss of filial consortium, ordered physician to pay 15 percent of jury award, and ordered that parents and physician split payment of fee for court-appointed guardian ad litem. Physician and parents appealed. On physician's appeal, the Court of Appeals affirmed the award of damages, 52 S.W.3d 343. On parents' appeal, the Court of Appeals, 52 S.W.3d 354, ordered that physician pay the full amount of guardian ad litem's fee. Granting physician's petitions for review and consolidating appeals, the Supreme Court, Phillips, C.J., held that: (1) as matter of first impression, Supreme Court would decline to extend a claim for loss of consortium to parents of children who have been seriously injured; disapproving *Schindler Elevator Corp. v. Anderson, 78 S.W.3d 392; Enochs v. Brown, 872 S.W.2d 312; Parkway Hosp., Inc. v. Lee, 946 S.W.2d 580;* (2) though not a neurologist, board-certified pediatrician was qualified to render expert opinion about causes and effects of child's neurological injuries; (3) trial court was not required to reduce damages award by the amount of a pretrial settlement before determining physician's proportionate responsibility; and (4) trial court's perception that it would be fair that fees for guardian ad litem be split equally between parents and physician did not, without additional findings on the

record, constitute good cause for taxing part of court costs against parents.

Judgments of Court of Appeals affirmed in part and reversed in part.

Jefferson, J., filed an opinion dissenting as to Part II only in which O'Neill and Schneider, JJ., joined.

West Headnotes

**[1] Action** ☜2
13k2

When recognizing a new cause of action and the accompanying expansion of duty, court must perform something akin to a cost-benefit analysis to assure that this expansion of liability is justified.

**[2] Torts** ☜1
379k1

Fundamental purposes of tort system are to deter wrongful conduct, shift losses to responsible parties, and fairly compensate deserving victims.

**[3] Parent and Child** ☜7(1)
285k7(1)

State Supreme Court would decline to extend a claim for loss of consortium to parents of children who have been seriously injured; disapproving *Schindler Elevator Corp. v. Anderson, 78 S.W.3d 392; Enochs v. Brown, 872 S.W.2d 312; Parkway Hosp., Inc. v. Lee, 946 S.W.2d 580.*

**[4] Damages** ☜51
115k51

**[4] Death** ☜88
117k88

**[4] Death** ☜89
117k89

All statutory beneficiaries under the Wrongful Death Act are entitled to recover intangible damages not only for loss of companionship but also mental anguish; same parties, however, have a much more circumscribed right to recover mental anguish damages when the family member survives. V.T.C.A., Civil Practice & Remedies Code § 71.004(a).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

111 S.W.3d 113
46 Tex. Sup. Ct. J. 944
(Cite as: 111 S.W.3d 113)

**[5] Evidence** 🔑544
157k544

Though not a neurologist, board-certified pediatrician was qualified based on his experience and expertise to render expert opinion in medical malpractice action as to causes and effects of neurological injures sustained by newborn child as alleged result of malfunctioning ventilator, delay in administering sodium bicarbonate, and failure to immediately transfer child to a better- equipped hospital. Rules of Evid., Rule 702.

**[6] Damages** 🔑63
115k63

Under governing statutes, trial court was not required, in medical malpractice action in which jury found nonsettling defendant, who was not jointly and severally liable, to be 15 percent at fault and found settling parties to be 85 percent at fault, to reduce damages award by amount of settlement before determining nonsettling defendant's proportionate responsibility, where 15 percent of jury award did not exceed the difference between jury award and settlement amount.  V.T.C.A., Civil Practice & Remedies Code § § 33.012(a), (b)(1), 33.013(a).

**[7] Infants** 🔑77
211k77

A guardian ad litem does not serve for the benefit of all parties, but is appointed to protect the child's interests.

**[8] Infants** 🔑116
211k116

Trial court's perception that it would be fair to split payment of fees for court-appointed guardian ad litem between parents and physician in medical malpractice action involving neurological injuries to child, even though parents were prevailing parties, was insufficient by itself to constitute good cause for taxing part of court costs against parents; trial court was required to state on the record how parents benefited from guardian ad litem's services. Vernon's Ann.Texas Rules Civ.Proc., Rules 131, 141.

*114 Robert Lee Galloway, Mary Olga Ferguson and Richard W. Bass, Thompson & Knight, Houston, for Petitioner.

Rex A. Nichols, Jr., Rex A. Nichols, Nichols &

Nichols, Longview, Karen Debiasse Bishop, Bishop & Bishop, P.C., Gilmer, for Respondent.

Chief Justice PHILLIPS delivered the opinion of the Court, joined by Justice HECHT, Justice ENOCH, Justice OWEN, Justice SMITH and Justice WAINWRIGHT, and joined by Justice O'NEILL, Justice JEFFERSON, and Justice SCHNEIDER in all Parts except Part II.

In these consolidated cases involving two separate appeals in a medical malpractice action, we must decide an issue of first impression:  whether Texas recognizes a common law cause of action for a parent's loss of consortium resulting from a non-fatal injury to a child.  In addition, we consider whether the court of appeals erred in affirming the trial court's decision to admit certain expert testimony or in failing to apply prior settlements to reduce the damages award.  We also consider whether the court of appeals erred in reversing *115 the trial court's allocation of the ad litem's fee between the parties.  In one opinion, the court of appeals concluded that the common law recognizes a parent's claim for loss of filial consortium and that the trial court had not erred in admitting that expert testimony or in refusing to apply a settlement credit when calculating the defendant physician's percentage of responsibility. 52 S.W.3d 343.  In a separate opinion, the court of appeals concluded that the trial court had erred in taxing the guardian ad litem's fee as costs evenly between the parents and the defendant physician, holding that the physician should pay all these costs. 52 S.W.3d 354.  Both judgments have been consolidated in this appeal.  While we disagree that parents may recover for the loss of filial consortium, we agree with the remainder of the court of appeals' judgments.  We therefore render judgment, affirming in part and reversing in part.

I

The day after her birth, Courtnie Williamson began suffering from severe acidosis, a condition with a number of serious complications, including damage to the heart and brain.  Dr. Roger Fowler, the attending physician, called Dr. Karen Roberts, the only consulting pediatrician at Laird Memorial Hospital in Kilgore, Texas, and advised her that Courtnie was in respiratory distress.  Dr. Roberts arrived from Longview approximately forty-five minutes later and began treating Courtnie.  Shortly thereafter, Dr. Roberts and Dr. Fowler placed

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

111 S.W.3d 113                                                                                      Page 3
46 Tex. Sup. Ct. J. 944
(Cite as: 111 S.W.3d 113)

Courtnie on a pediatric ventilator. The ventilator was not functioning properly, however, and Courtnie did not receive needed oxygen for several minutes.

About one hour after Dr. Roberts' arrival, a colleague suggested that sodium bicarbonate should be administered to counteract Courtnie's worsening acidosis. Two hours later, after consulting with a neonatologist in Shreveport, Dr. Roberts followed this advice, and Courtnie began to improve. Not long thereafter, Courtnie was transported to Schumpert Medical Center in Shreveport. Courtnie now has a permanent shunt implanted in her skull to drain fluids to her abdomen. She suffers from a weakened left side, requires braces to walk, has significant scarring, and is developmentally delayed.

Courtnie's parents, Lainie and Casey Williamson, individually and on behalf of their daughter, sued Dr. Roberts, Laird Memorial Hospital, Dr. Mark Miller (the on-call physician), and Dr. Fowler. They contend that the malfunctioning ventilator, the delay in administering sodium bicarbonate, and the failure to immediately transfer Courtnie to a better-equipped hospital, combined to proximately cause Courtnie's injuries. The trial judge appointed a guardian ad litem to represent Courtnie's interests.

The Williamsons' claims against the hospital, Dr. Fowler, and a treating physician who was not named as a defendant were settled for $468,750. The claims against Dr. Roberts and Dr. Miller proceeded to trial. At trial, Dr. Frank McGehee, a board-certified pediatrician, testified that Dr. Roberts was negligent in delaying Courtnie's transfer to a hospital equipped to treat her condition and in failing to administer sodium bicarbonate sooner. Dr. McGehee testified that Dr. Roberts' negligence proximately caused Courtnie to suffer from mental retardation, anti-social behavior, and hemiplegia, a partial paralysis of one side of body caused by an injury to the brain.

The jury apportioned responsibility for Courtnie's injuries as follows: 85 percent to the settling parties, 15 percent to Dr. Roberts, and zero percent to Dr. Miller. The jury awarded $3,010,001 in damages, *116 including $75,000 to the parents for past loss of filial consortium and one dollar for future loss thereof. The trial court rendered judgment on the verdict, ordering Dr. Roberts to pay $451,500.15, or 15 percent of the entire award, with no deduction for the settlements. The trial court also awarded the ad litem [FN1] a fee of $21,405.69, which it divided equally between Dr. Roberts and the Williamsons.

FN1. Although the trial court and parties refer to the ad litem as an attorney ad litem, the court of appeals concluded that she was in fact a guardian ad litem appointed under Texas Rule of Civil Procedure 173. 52 S.W.3d 354, 355 n. 1. Rule 173 provides that when a minor is a party to a suit and is represented by a next friend whose interests may be adverse to the minor, "the court shall appoint a guardian ad litem for [the minor] and shall allow [her] a reasonable fee for [her] services to be taxed as a part of the costs." Tex.R. Civ. P. 173.

Dr. Roberts and the Williamsons filed separate appeals. Dr. Roberts urged that (1) Texas law does not permit a parent to recover for loss of consortium for non-fatal injuries to a child, (2) Dr. McGehee was not qualified to testify as an expert on the cause and effect of Courtnie's neurological injuries, (3) no evidence supported the jury's award of past and future medical expenses, and (4) the trial court erred in not applying a settlement credit before apportioning damages. The Williamsons complained only about having been taxed with one-half of the ad litem's fee. The court of appeals rejected Dr. Roberts' appeal and affirmed the trial court's award of damages against her. 52 S.W.3d at 354. However, the court of appeals agreed with the Williamsons' separate appeal, reversing the trial court and rendering judgment that Dr. Roberts pay the full amount of the ad litem's fee. Id. at 357.

In this Court, Dr. Roberts has filed two separate appeals, complaining about both judgments. We granted both petitions for review and consolidated the two appeals to decide four issues: (1) whether Texas common law recognizes a parent's claim for loss of consortium when a child is seriously, but not fatally, injured; (2) whether a medical expert, who is not a neurologist, is nevertheless qualified to testify about the cause and effect of a child's neurological injuries; (3) whether a defendant, who is not jointly and severally liable, is entitled to a settlement credit before the application of her percentage of responsibility; and (4) whether there is evidence of good cause sufficient to tax the prevailing party with part of the ad litem's fee as costs.

II

In Reagan v. Vaughn, 804 S.W.2d 463, 468 (Tex.1990), we held that a child is entitled to seek

111 S.W.3d 113
46 Tex. Sup. Ct. J. 944
(Cite as: 111 S.W.3d 113)

Page 4

damages for loss of consortium when a parent suffers a serious, permanent, and disabling injury. We equated the child's relationship to the parent to that of one spouse to another, a relationship for which we had previously recognized consortium rights. *Id.* at 465-66 (citing *Whittlesey v. Miller,* 572 S.W.2d 665, 667-68 (Tex.1978)). We further noted the vulnerable and dependent role of the child in this relationship and the profound harm that might befall a child who has been deprived of a parent's love, care, companionship, and guidance. *Id.* at 466 (citing *Villareal v. State,* 160 Ariz. 474, 774 P.2d 213, 217 (1989)).

The court of appeals concluded that because of our emphasis in *Reagan* that the parent-child relationship deserved special protection, we must have intended for parents to have consortium rights in the relationship as well. 52 S.W.3d at 352. The court suggests that the parent-child relationship is a reciprocal one, like husband and wife, and that all parties deserve the *117 same protection. 52 S.W.3d at 352. Dr. Roberts counters that *Reagan* does not extend so far, and that the loss to a child caused by a serious injury to the parent is uniquely different from that to a parent of a seriously injured child.

We have not previously considered whether parents have a claim for loss of consortium in non-fatal injury cases, but some courts of appeals have assumed that such a claim is viable. *See Schindler Elevator Corp. v. Anderson,* 78 S.W.3d 392, 414 (Tex.App.-Houston [14th Dist.] 2001, pet. filed); *Enochs v. Brown,* 872 S.W.2d 312, 322 (Tex.App.-Austin 1994, no writ); *see also Parkway Hosp., Inc. v. Lee,* 946 S.W.2d 580, 590 (Tex.App.-Houston [14th Dist.] 1997, writ denied). We recognize the sympathetic and, on the surface, logical appeal to extending consortium rights to parents as well as children. But several states that have recognized a child's right to loss of consortium have denied the parents any reciprocal right, including two of the first states in the nation to recognize the child's right. *See Norman v. Mass. Bay Transp. Auth.,* 403 Mass. 303, 529 N.E.2d 139, 141-42 (1988); [FN2] *Sizemore v. Smock,* 430 Mich. 283, 422 N.W.2d 666, 667-74 (1988). [FN3] These courts have concluded that the child's interest deserves greater protection because of the child's singular emotional dependency on the parents. The Massachusetts Supreme Court explained this distinction in *Norman* as follows:

FN2. *Ferriter v. Daniel O'Connell's Sons, Inc.,* 381 Mass. 507, 413 N.E.2d 690 (1980)

(child's consortium right recognized). A parent in Massachusetts presently has a statutory claim for loss of consortium. *See* Mass. Gen. Laws ch. 231, § 85X; *Monahan v. Town of Methuen,* 408 Mass. 381, 558 N.E.2d 951, 956 (1990).

FN3. *Berger v. Weber,* 411 Mich. 1, 303 N.W.2d 424 (1981) (child's consortium right recognized).

In the ordinary course of things the dependence of spouses on one another for love and support is found to the same degree in no other relationship except, perhaps, in the relationship of a minor child to his or her parents.

* * *

Although parents customarily *enjoy* the consortium of their children, in the ordinary course of events a parent does not *depend* on a child's companionship, love, support, guidance, and nurture in the same way and to the same degree that a husband depends on his wife, a wife depends on her husband, or a minor or disabled adult child depends on his or her parent. Of course, it is true that such dependency may exist in a particular situation, but it is not intrinsic to the parent-child relationship as is a minor child's dependency on his or her parents and as is each spouse's dependency on the other spouse. *Norman,* 529 N.E.2d at 140-41.

The Wyoming Supreme Court has also rejected a parent's right to consortium damages while recognizing the child's right. Some years after rejecting a parent's claim for consortium in *Gates v. Richardson,* 719 P.2d 193, 201 (Wyo.1986), the Wyoming Supreme Court concluded that the child's interest in the relationship was so different that it did deserve protection:

In our society the minor child requires his or her parent's nurturing, guidance, and supervision. The child is uniquely dependent upon the parent for his or her socialization, that maturation process which turns a helpless infant into an independent, productive, responsible human being who has an opportunity to *118 be a valuable, contributing member of our society. Without question, the child's relational interest with the parent is characterized by dependence. In contrast, the parent's relational interest with the child is not. In a real sense, the child is "becoming" and the parent "has become." Thus, the parent's loss of an injured child's consortium is different in kind from the

111 S.W.3d 113
46 Tex. Sup. Ct. J. 944
(Cite as: 111 S.W.3d 113)

child's loss of an injured parent's consortium. Viewed in this light, our refusal in *Gates* to recognize the parent's claim is inapposite to the legal problem whether we recognize the child's claim.

*Nulle v. Gillette-Campbell County Joint Powers Fire Bd.*, 797 P.2d 1171, 1175 (Wyo.1990). The Vermont Supreme Court has similarly recognized that the "child is in a uniquely difficult position to make up for the loss of a parent." *Hay v. Med. Ctr. Hosp. of Vt.*, 145 Vt. 533, 496 A.2d 939, 942 (1985). It explained:

> While "an adult is capable of seeking out new relationships in an attempt to fill in the void of his or her loss, a child may be virtually helpless in seeking out a new adult companion. Therefore, compensation through the courts may be the child's only method of reducing his or her deprivation of the parent's society and companionship."

*Id.* (quoting *Theama v. City of Kenosha*, 117 Wis.2d 508, 344 N.W.2d 513, 516 (1984)).

We agree with these courts that the parent-child relationship is not reciprocal like husband and wife and that the child is the party to the relationship who needs special protection. We concede that serious injury to a child will have emotional consequences for the parents. Tort law, however, cannot remedy every wrong. Sound public policy requires an end at some point to the consequential damages that flow from a single negligent act. As the New York Court of Appeals has explained: "Every injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit the legal consequences of wrongs to a controllable degree." *Tobin v. Grossman*, 24 N.Y.2d 609, 301 N.Y.S.2d 554, 249 N.E.2d 419, 424 (1969). Consequently, the law ordinarily denies recourse to those not directly injured by a negligent act, but whose injury is caused indirectly by the harm to another. There are exceptions to this general rule, including claims for loss of consortium. But all these exceptions have been narrowly cabined. Thus, while we have recognized that spouses and children can recover loss of consortium, we have concluded that siblings and step-parents cannot. *Compare Whittlesey*, 572 S.W.2d at 667-68 (spousal consortium), *and Reagan*, 804 S.W.2d at 466 (parental consortium) *with Ford Motor Co. v. Miles*, 967 S.W.2d 377, 383-84 (Tex.1998) (rejecting consortium claim for siblings and step- parent).

[1][2] When recognizing a new cause of action and the accompanying expansion of duty, we must perform something akin to a cost-benefit analysis to assure that this expansion of liability is justified. *See, e.g., Bird v. W.C.W.*, 868 S.W.2d 767, 769 (Tex.1994). The fundamental purposes of our tort system are to deter wrongful conduct, shift losses to responsible parties, and fairly compensate deserving victims. While the recognition of an additional layer of liability to the parent clearly shifts the loss, it is not at all clear that this additional layer of liability will produce corresponding benefits of deterrence or fair compensation. It is clear, however, that it will foster further uncertainty and widen the divergence in recoveries among similarly situated victims. Courts have generally been willing to tolerate more uncertainty in the calculation of damages when *119 necessary to compensate the primary tort victim. That pain and mental anguish defy objective valuation or that money damages are a poor palliative for catastrophic injury do not justify the denial of a monetary remedy to a victim who has been severely injured. But once courts have fairly compensated the primary victim, they should be more troubled about the difficulties in measuring intangible losses to secondary victims.

The case before us demonstrates the challenges presented to a fact-finder when awarding consortium damages. The Williamsons assert that the defendant's negligence caused their daughter to sustain massive brain damage, particularly to the right side of her brain, resulting in permanent and in all likelihood progressive neurological and behavioral problems. They submit that their daughter has and will continue to have difficulty controlling her emotions and will likely suffer from some degree of retardation. Her injuries, however, have not shortened her life expectancy. At the time of trial, the child was three years old. On this evidence, the jury concluded that the value of the "harm to the parent-child relationship" [FN4] during the first three years of the relationship was $75,000, while future harm to the relationship over several score years was only a dollar. As for the child's personal injury claim, the jury awarded, among other damages, $100,000 for past pain and mental anguish, $35,000 for past physical impairment, $750,000 for future pain and mental anguish, and $300,000 for future physical impairment. The jury apparently concluded that while the child's intangible losses would grow with time, her continuing impairment would have no substantial effect on the parent- child relationship in the future. Another jury after hearing the same evidence might well have reached a very different conclusion.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

FN4. The jury question asked what sum of money would fairly and reasonably compensate the parents "for the harm, if any, to the parent- child relationship as a result of the occurrences in question?" The jury was further instructed "that 'harm to the parent-child relationship' means *damage to the right of both parents and their child to* the affection, comfort, companionship, society, assistance, emotional support, and love necessary to a parent-child relationship." (emphasis added). The defendant did not object to the instruction's apparent erroneous inclusion of the child's parental consortium claim, although the defendant did object to the issue on other grounds, i.e., its failure to include a predicate that the injury to the child must be serious, permanent, and disabling before a parent may recover filial consortium.

[3] In *Reagan,* we were willing to let the system sort through these difficulties because of the perceived social importance in protecting the child's interests. Moreover, we concluded that " 'limiting the plaintiffs in the consortium action to the victim's children' " was a rational way to ensure the validity of these intangible losses. *Miles,* 967 S.W.2d at 384 (quoting *Reagan,* 804 S.W.2d at 466). That rationale, however, breaks down when we extend such rights to parents. Because the parent has a less dependent role than that of the child in the relationship, extending consortium rights here could logically lead to the recognition of such rights in other non-dependent relatives or even in close friends, given appropriate facts. *See Norman,* 529 N.E.2d at 141. But, like every other jurisdiction, we have already concluded that consortium should not be expanded to this extent. *See Miles,* 967 S.W.2d at 383-84. We therefore decline to extend a claim for loss of consortium to parents of children who have been seriously injured.

Some may argue that our refusal to extend consortium rights to parents creates *120 a paradox because we permit parents to recover consortium damages in wrongful death cases. *See Sanchez v. Schindler,* 651 S.W.2d 249, 251 (Tex.1983) (abolishing pecuniary loss rule). But there are reasons for distinction. Before abolition of the pecuniary loss rule, the wrongful death of a child did not ordinarily create pecuniary consequences for the negligent tortfeasor because the child was of little monetary value to the family. Abolishing this rule

and permitting the "[r]ecovery for loss of affection and society in a wrongful death action thus fulfills a deeply felt social belief that a tortfeasor who negligently kills someone should not escape liability completely, no matter how unproductive his victim." *Borer v. Am. Airlines, Inc.,* 19 Cal.3d 441, 138 Cal.Rptr. 302, 563 P.2d 858, 865 (1977). But when the child survives, as here, so does the child's own cause of action against the tortfeasor. And if the primary victim of the accident may bring an action, there is no need to recognize actions by other family members to prevent the tortfeasor from escaping liability. Thus, our law is not inconsistent in recognizing certain intangible damages for secondary victims in death actions but not in personal injury actions.

[4] But even if it were an anomaly to do so, we could not unify the rules for recovery of intangible damages in wrongful death and personal injury actions by any decision in this case. All statutory beneficiaries [FN5] under the Wrongful Death Act are entitled to recover intangible damages not only for loss of companionship but also mental anguish. *See Estate of Clifton v. S. Pac. Transp. Co.,* 709 S.W.2d 636, 639 (Tex.1986); *Moore v. Lillebo,* 722 S.W.2d 683, 685 (Tex.1986). These same parties, however, have a much more circumscribed right to recover mental anguish damages when the family member survives. *See United Servs. Auto. Ass'n v. Keith,* 970 S.W.2d 540, 541-42 (Tex.1998) (per curiam) (bystander recovery). Thus, whether or not we were to recognize a right to filial consortium in this case, differences in the award of intangible damages for wrongful death and personal injury would persist. *See Reagan,* 804 S.W.2d 463, 489-90 (op. on rehearing) (Doggett, J., concurring and dissenting) (urging that close family members of a seriously injured person should also recover for mental anguish).

FN5. "An action to recover damages [for wrongful death] is for the exclusive benefit of the surviving spouse, children, and parents of the deceased." Tex. Civ. Prac. & Rem.Code § 71.004(a).

We conclude that no compelling social policy impels us to recognize a parent's right to damages for the loss of filial consortium. And, on balance, we believe that the common law is best served by the result we reach here. Accordingly, we disapprove of those cases holding or suggesting to the contrary.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

111 S.W.3d 113
46 Tex. Sup. Ct. J. 944
(Cite as: 111 S.W.3d 113)

*See Schindler Elevator Corp., 78 S.W.3d at 414* (approving award of filial consortium); *Enochs, 872 S.W.2d at 322* (recognizing parent's right to filial consortium); *see also Parkway Hosp., Inc., 946 S.W.2d at 590* (allowing filial consortium damages because error not preserved).

### III

Dr. Roberts next complains about the court of appeals' approval of the trial court's decision to allow Dr. McGehee, a board-certified pediatrician, to testify as an expert about matters beyond his expertise. Texas Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto **\*121** in the form of an opinion or otherwise." Tex.R. Evid. 702. While Dr. Roberts does not question Dr. McGehee's qualifications to testify about the appropriate standard of care, she argues that he was not qualified to render an opinion about the nature and effect of Courtnie's neurological injuries. Relying on our decision in *Broders v. Heise, 924 S.W.2d 148 (Tex.1996)*, Dr. Roberts contends that the trial court abused its discretion when it admitted this neurological testimony. We disagree.

In *Broders,* the trial court excluded expert testimony from an emergency-room physician who was prepared to testify about the cause of death in a medical malpractice action. The patient had suffered a head injury during an assault and was thereafter admitted to a hospital for observation and treatment. The patient was released the next day by her attending physician but returned to the hospital a few hours later, complaining of an intense headache, nausea, and sensitivity to light. A neurosurgeon examined her this time and determined that she had a fractured skull, with bleeding and swelling in the brain. The swelling could not be controlled, and the patient died the next day.

The decedent's parents brought a wrongful death action against the hospital and three doctors. The defendants argued that the assault had caused an irreversible, untreatable, and fatal brain injury. No treatment, they said, whether negligent or not, could have been a cause in fact of the patient's death. The defendants presented expert testimony from two neurosurgeons to support their position. The plaintiff's expert would have testified that had the patient's head trauma been promptly diagnosed and

treated during her first hospitalization, the patient would, in all medical probability, have survived. The court of appeals reversed and remanded, concluding that the trial court had erred in excluding this testimony. *Id.* at 148-51.

We held that the trial court had correctly excluded this testimony because the emergency-room physician was not qualified as an expert under Rule 702 "on the issue of cause in fact." *Id.* at 153. While the emergency-room physician "knew both that neurosurgeons should be called to treat head injuries and what treatments they could provide, he never testified that he knew, from either experience or study, the effectiveness of those treatments in general, let alone in this case." *Id.* We further observed that a medical license does not automatically qualify the holder "to testify as an expert on every medical question." *Id.* at 152; *see also Christophersen v. Allied-Signal Corp., 939 F.2d 1106, 1112-1113 (5th Cir.1991)* (inquiry is not simply whether expert has an M.D. degree, but also actual qualifications). But we likewise rejected the notion "that only a neurosurgeon can testify about the cause-in-fact of death from an injury to the brain, or even that a an emergency room physician could never so testify." *Broders, 924 S.W.2d at 153.* Rather, we stated the test to be whether "the offering party [has] establish[ed] that the expert has 'knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Id.*

[5] Unlike *Broders,* where the record failed to establish the emergency-room doctor's qualifications, the record here does establish Dr. McGehee's. He is a board-certified pediatrician, holds certifications in pediatric advanced life support and advanced trauma life support, and has served as the Chief of Medical Staff at Denton Regional Medical Center and the Chief of Pediatrics at Flow Medical Hospital in Denton. Additionally, Dr. McGehee **\*122** has studied the effects of pediatric neurological injuries and has extensive experience advising parents about the effects of those injuries. According to his testimony, Dr. McGehee based his opinions about the cause and extent of Courtnie's injuries on his experience, his medical training and education, a review of Courtnie's diagnostic test results from the University of Arkansas at Little Rock, and the diagnostic results from a Gregg County Early Childhood Development specialist. He also relied upon Courtnie's MRIs and CT scans, and the interpretation of these tests by Dr. Mark Laney, a

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

111 S.W.3d 113
46 Tex. Sup. Ct. J. 944
(Cite as: 111 S.W.3d 113)

pediatric neurologist whose qualifications Dr. Roberts did not challenge. Finally, Dr. McGehee consulted several peer-reviewed medical-journal articles and textbooks on pediatric neurology.

Although Dr. McGehee is not a neurologist, the record reflects that he had experience and expertise regarding the specific causes and effects of Courtnie's injuries. Therefore, we agree with the court of appeals that the trial court did not abuse its discretion in admitting his testimony on matters pertaining to Courtnie's neurological injuries.

IV

[6] Dr. Roberts next asserts that, in calculating the damages against her, the trial court failed properly to apply the $468,750 settlement credit. She maintains that the trial court should have reduced the jury's damage award ___[FN6] with this credit before multiplying that number by her proportionate responsibility as found by the jury. In other words, Dr. Roberts contends that the judgment against her should be $369,937.50 (15% x $2,466,250) rather than $440,250. This reduction, she asserts, is required when a defendant timely elects to have a dollar-for-dollar credit. _See_ Tex. Civ. Prac. & Rem.Code § 33.012(b)(1). We disagree.

> FN6. The jury awarded damages totaling $3,010,001, which included $75,001 for loss of filial consortium. In keeping with our conclusion that the common law does not recognize a claim for loss of filial consortium, we have deducted $75,001 from the jury's verdict, yielding the sum of $2,935,000.

The rules of proportionate responsibility and settlement credits are found in Chapter 33 of the Civil Practices and Remedies Code. Pertinent here are sections 33.012 and 33.013, which provide in relevant part:

§ 33.012. Amount of Recovery
(a) ... the court shall reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a percentage equal to the claimant's percentage of responsibility.
(b) If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a credit equal to one of the following ...

(1) the sum of the dollar amounts of all settlements ...

§ 33.013. Amount of Liability
(a) Except [when a defendant is jointly and severally liable], a liable defendant is liable to a claimant only for the percentage of damages found by the trier of fact equal to that defendant's percentage of responsibility with respect to the personal injury, property damage, death, or other harm for which the damages are allowed.
Tex. Civ. Prac. & Rem.Code § § 33.012(a), (b)(1), 33.013(a). Section 33.012 refers to "the amount of damages to be recovered by the claimant", while section 33.013 refers to the "damages found by the trier of *123 fact." _Id._ The "amount of damages to be recovered by the claimant" under section 33.012 must be reduced by the claimant's proportionate responsibility and by settlements. No corresponding reduction is prescribed under section 33.013 because the "damages found by the trier of fact" are not affected by settlement or the claimant's shared responsibility. Thus, damages under these two sections are the same only when the claimant has not settled and shares no responsibility. And although related, the two sections pose separate inquiries. Section 33.012 controls the claimant's total recovery, while section 33.013 governs the defendant's separate liability.

Under section 33.012, the Williamsons' total recovery, including amounts received in settlement, is limited to $2,935,000, so they can receive no more than $2,466,250 ($2,935,000--$468,750) in satisfaction of this judgment. This limit, however, is independent of section 33.013's limitation on a particular defendant's percentage of responsibility. And section 33.013(a) specifically pertains to defendants who, like Dr. Roberts here, are not jointly and severally liable. That section provides that a severally-liable defendant's monetary liability is calculated by multiplying the damages found by the trier of fact by the defendant's percentage of responsibility. _See_ _C & H Nationwide, Inc. v. Thompson,_ 903 S.W.2d 315, 321 (Tex.1994) ( "Section 33.013(a) sets the liability to the claimant of each [severally liable] defendant at an amount equal to that defendant's percentage of responsibility multiplied by the damages found by the trier of fact."). The trial court did this when it multiplied the jury's damage award by the 15 per cent of proportionate responsibility it assigned to Dr. Roberts. Because Dr. Roberts' liability for $440,250, does not exceed the limit placed on the amount of damages the Williamsons may recover under section 33.012, no further credit is required. [FN7]

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

111 S.W.3d 113
46 Tex. Sup. Ct. J. 944
(Cite as: 111 S.W.3d 113)

Page 9

FN7. Had the Williamsons negotiated a more favorable settlement, reducing section 33.012's limit on damages below Dr. Roberts proportionate share under section 33.013, a further credit would have been required. Thus, a defendant may incidentally benefit from a claimant's favorable settlement with others.

V

Finally, Dr. Roberts challenges the court of appeals' judgment assessing all guardian ad litem costs against her. She contends that, because the Williamsons were both a successful party (against Dr. Roberts) and a losing party (against Dr. Miller), the trial court properly apportioned the ad litem costs between them.

The court approved an ad litem fee of $21,405.69 and divided it equally between Dr. Roberts and the Williamsons. At the hearing for rendition of judgment, the court stated:

I think that an attorney ad litem is there for the benefit of all the parties that are there. I would like to, for this to be assessed as court costs, and I would like for it to be split between the Plaintiffs and between the Defendant in that particular regard. And I think, that way, it would be a little bit more fair to all parties that are concerned. And I don't think simply because there was a verdict returned against an individual, that he pays it all. We're looking at a situation where the Court feels that it would be in the best interest of the child for this individual to be appointed. And, therefore, as a result of that, it should be assessed as a court cost, and to be borne one half by [Dr. Roberts], and one half by [the Williamsons].

The court of appeals reversed the trial court's judgment, holding that, because the *124 Williamsons were the successful parties, "the trial court was required by Rule 141 to state good cause on the record for assessing costs against them." 52 S.W.3d at 356. Finding no good cause, the court of appeals concluded that the trial court had abused its discretion. Id. We agree.

Texas Rule of Civil Procedure 131 provides that "[t]he successful party to a suit shall recover of his adversary all costs incurred therein, except where otherwise provided." Tex.R. Civ. P. 131. Rule 141

permits a trial court, for good cause stated on the record, to "adjudge the costs otherwise than as provided by law or [the Rules of Civil Procedure]." Tex.R. Civ. P. 141. Thus, it was the trial court's responsibility to state on the record good cause for taxing a part of the court costs against the Williamsons, the successful party. Id.

[7] The trial court did explain its reasons for splitting costs. It observed that because an ad litem is there for the benefit of all parties, it is "fair" to split costs between the losing and prevailing parties. A guardian ad litem, however, does not serve for the benefit of all parties; the guardian is appointed to protect the child's interests. See Am. Gen. Fire & Cas. Co. v. Vandewater, 907 S.W.2d 491, 493 n. 2 (Tex.1995). Certainly, fairness can be good cause, but the record must substantiate the connection.

[8] For example, we concluded in Rogers v. Walmart Stores, Inc., 686 S.W.2d 599, 601 (Tex.1985), that the trial court had demonstrated good cause when assessing part of the ad litem costs against the prevailing party because the conduct of that party had unnecessarily prolonged and obstructed the trial. In Furr's Supermarkets, Inc. v. Bethune, 53 S.W.3d 375, 378 (Tex.2001), however, we reversed the lower courts' determination that the prevailing party should bear its own costs because the losing party was too emotionally fragile to bear them. We concluded that emotional distress at paying costs was not good cause under Rule 141. Id. Here, the trial court's finding of good cause is premised on the perception that the prevailing party incidentally benefitted from the guardian ad litem's services. Assuming that such an incidental benefit might in a particular case provide good cause, Rule 141 still requires that the trial court state its reasons "on the record" and with more specificity than the court's general notion of fairness here. Tex.R. Civ. P. 141. Grounds of perceived fairness, without more, are insufficient to constitute good cause. See Furr's Supermarkets, Inc., 53 S.W.3d at 377-78.

* * * * * *

We reverse that part of the court of appeals' judgment affirming the award of damages for loss of filial consortium and render judgment that the Williamsons take nothing as to this claim. The judgments of the court of appeals are otherwise affirmed.

Justice JEFFERSON, joined by Justice O'NEILL and

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Justice SCHNEIDER, filed a dissent to Part II of the Court's Opinion.


Justice JEFFERSON, joined by Justice O'NEILL and Justice SCHNEIDER, dissenting as to Part II only.

In *Sanchez v. Schindler*, this Court concluded that the common law is best served by permitting a parent "to recover damages for loss of companionship and society ... for the death of his or her child." 651 S.W.2d 249, 251 (Tex.1983). In *Reagan v. Vaughn*, this Court held that the common law supports a child's recovery of damages for loss of consortium when a parent is injured but not killed by the tortious act of a third party. 804 S.W.2d 463, 466 (Tex.1990). These cases, and others outlined *125 below, explain why the Court today grudgingly acknowledges that a "surface logic" to extending consortium rights to parents whose children are severely injured. 111 S.W.3d at 119. I am at a loss, then, to understand why the Court today concludes that the common law is best served by holding that parents have no such rights. *Id.* at 120. The Court's conclusion is contrary to our longstanding precedent, counter to the majority of jurisdictions that have considered this issue, and unduly tolerant of the anomaly it creates in the law. And the theme underlying the Court's decision--that a parent's loss of consortium claim must be rejected because adults require less protection than children--makes little sense in light of our repeated declarations that *parents* may recover consortium damages for the death of their children, and *adult children* are entitled to consortium damages for the death of, or serious injury to, their parents. Because the Court's opinion creates, but does not adequately justify, a prominent paradox in Texas law, I respectfully dissent.

I
THE EVOLUTION OF TEXAS CONSORTIUM LAW
**A. Extending Common Law to Permit Wife's Separate Consortium Claim**

Texas, like most other jurisdictions, initially limited consortium damages to a husband's claim arising out of injury to the marital relationship. *See Garrett v. Reno Oil Co.*, 271 S.W.2d 764, 768 (Tex.Civ.App.-Fort Worth 1954, writ ref'd n.r.e.) (refusing to recognize wife's reciprocal claim for consortium damages); *see also Reagan*, 804 S.W.2d at 473-75 (Hecht, J., dissenting) (chronicling history of consortium claims). Although the *Garrett* court

acknowledged that recognizing a wife's reciprocal cause of action was "in accord with the broad principle of justice motivating" a change in the common-law rule, it nevertheless declined to adopt such a change, opting instead to "follow the majority rule until such time as legislation might effect a change." *Garrett*, 271 S.W.2d at 766-67.

This Court criticized the *Garrett* court's decision for refusing to recognize a wife's claim for loss of consortium, calling it "an abdication of judicial responsibility":
> Providing either spouse with a cause of action for loss of consortium would allow us to keep pace with modern society by recognizing that the emotional interests of the marriage relationship are as worthy of protection from negligent invasion as are other legally protected interests.

*Whittlesey v. Miller*, 572 S.W.2d 665, 668 (Tex.1978). Based on this reasoning, we held that "either spouse has a cause of action for loss of consortium that might arise as a result of an injury caused to the other spouse by a third party tortfeasor's negligence." *Id.* Our decision, we noted, brought Texas in line with the majority of jurisdictions and corrected "a paradox in the law." *Id.*

**B. Extending Common Law to Permit Parent's Consortium Claim for Child's Death**

Five years after *Whittlesey*, we were asked to decide whether Texas should revise its position on the traditional common-law principle limiting a surviving parent's damages for a child's death "to the pecuniary value of the child's services and financial contributions, minus the cost of his care, support and education." *Sanchez*, 651 S.W.2d at 251. Describing the pecuniary-loss rule as "antiquated and inequitable," we rejected the common-law concept which viewed the child as an economic asset. *Id.* We reasoned that
> [t]he real loss sustained by a parent is not the loss of any financial benefit to be gained from the child, but is the loss of *126 love, advice, comfort, companionship and society. We, therefore, reject the pecuniary loss limitation and allow a plaintiff to recover damages for loss of companionship and society and damages for mental anguish for the death of his or her child.

*Id.* Relying primarily on *Whittlesey*, we concluded that "injuries to the familial relationship are significant injuries and are worthy of compensation" and that "[such injuries] were real, direct, and personal losses ... not too intangible or conjectural to be measured in pecuniary terms." *Id.* at 252 (citing

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

111 S.W.3d 113
46 Tex. Sup. Ct. J. 944
(Cite as: 111 S.W.3d 113)

Page 11

*Whittlesey, 572 S.W.2d at 667, 668).* Further, in abrogating the common-law pecuniary-loss rule, we found persuasive the argument that a parent's claim for damages for the loss of companionship of a child was closely analogous to a spouse's loss of consortium cause of action. *Id.; see also Reagan, 804 S.W.2d at 468* (opinion on reh'g) ("The purpose of [recognizing a parental-consortium claim] is to allow children the same protection allowed spouses when a third party causes serious, permanent, and disabling injuries to their parent.").

**C. Extending Common Law to Recognize Child's Consortium Claim for Parent's Death**

Two years after *Sanchez,* we again extended the common law, this time to permit children to recover damages for the mental anguish and loss of companionship resulting from their parents' death. *Cavnar v. Quality Control Parking, Inc., 696 S.W.2d 549, 551 (Tex.1985).* In *Cavnar,* we reiterated that injuries to the familial relationship are compensable. *Id.* (citing *Sanchez, 651 S.W.2d at 252).* Then, in recognizing the Cavnar children's right to recover for their mother's death, we said: "There is no logical reason to treat an injury to the familial relationship resulting from the wrongful death of *any family member* enumerated [in the wrongful death statute]" differently depending on whether it is the spouse, parent or child that dies. *Id.* (emphasis added)

**D. Extending Common Law to Recognize Child's Consortium Claim for Parent's Serious, Permanent Injury**

Finally, almost thirteen years ago, we decided that a child may recover damages for loss of consortium and mental anguish when a parent is severely injured by the tortious conduct of a third party. *Reagan, 804 S.W.2d at 466.* We found that consortium damages were recoverable in that context because "a serious, permanent and disabling injury to a parent" potentially visits upon the child deprivations as serious as those we recognized in *Cavnar, Sanchez,* and *Whittlesey. Id.* at 465-66 (discussing *Cavnar, 696 S.W.2d at 551, Sanchez, 651 S.W.2d at 251,* and *Whittlesey, 572 S.W.2d at 667).* We reaffirmed our commitment to preserving the parent- child relationship:

> While all family members enjoy a mutual interest in consortium, the parent- child relationship is undeniably unique and the wellspring from which other family relationships derive. It is the parent- child relationship which most deserves protection and which, in fact, has received judicial protection

in the past.
> The loss of a parent's love, care, companionship, and guidance can severely impact a child's development and have a major influence on a child's welfare and personality throughout life.

*Id.* at 466 (quoting *Villareal v. State, 160 Ariz. 474, 774 P.2d 213, 217 (1989)).* Finding "no principled reason to accord the parent-child relationship second class status[,]" we held that the unquestionable significance of that relationship compelled our recognition of a cause of action for a child's loss of consortium resulting from a *127 parent's non- fatal injury. [FN1] Id.* We also declined to limit the right of recovery to minor children:

> FN1. When we decided *Reagan,* fewer than ten states recognized a child's claim for loss of consortium. *See Reagan v. Vaughn, 804 S.W.2d 463, 465 n. 3 (Tex.1990).* Now, twenty-one states recognize, either judicially or by statute, a child's loss of parental consortium claim. *See Hibpshman v. Prudhoe Bay Supply, 734 P.2d 991 (Alaska 1987); Villareal v. Dep't of Transp., 160 Ariz. 474, 774 P.2d 213 (1989); Audubon- Exira Ready Mix, Inc. v. Illinois C.G.R. Co., 335 N.W.2d 148 (Iowa 1983); Giuliani v. Guiler, 951 S.W.2d 318 (Ky.1997); Ferriter v. Daniel O'Connell's Sons, Inc., 381 Mass. 507, 413 N.E.2d 690 (1980); Berger v. Weber, 411 Mich. 1, 303 N.W.2d 424 (1981); Pence v. Fox, 248 Mont. 521, 813 P.2d 429 (1991); Rolf v. Tri State Motor Transit Co., 91 Ohio St.3d 380, 745 N.E.2d 424 (2001); Williams v. Hook, 804 P.2d 1131 (Okla.1990); Hancock v. Chattanooga Hamilton County Hosp. Auth., 54 S.W.3d 234 (Tenn.2001); Hay v. Med. Ctr. Hosp., 145 Vt. 533, 496 A.2d 939 (1985); Belcher v. Goins, 184 W.Va. 395, 400 S.E.2d 830 (1990); Theama v. Kenosha, 117 Wis.2d 508, 344 N.W.2d 513 (1984); Nulle v. Gillette-Campbell County Joint Powers Fire Bd., 797 P.2d 1171 (Wyo.1990); see also* Fla. Stat. Ann § 768.0414; Haw.Rev.Stat. Ann. § 663-3; Idaho code § 5-310; La. Civ.Code Ann. art. 2315; Me.Rev.Stat. Ann. § 18-A, § 2-804(b); R.I. Gen. Laws § 9-1- 41; Wash. Rev.Code § 4.24.010.

Consistent with our prior recognition that adult children may recover for the wrongful death of a parent, [see *Yowell v. Piper Aircraft Corp., 703 S.W.2d 630, 635 (Tex.1986)*], we decline to limit

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

111 S.W.3d 113
46 Tex. Sup. Ct. J. 944
**(Cite as: 111 S.W.3d 113)**

Page 12

the right of recovery under this cause of action to minor children. "Although minors are the group most likely to suffer real harm due to a disruption of the parent-child relationship, we leave this to the jury to consider in fixing damages." *Ueland [v. Reynolds Metals Co.,]* 103 Wash.2d 131, 691 P.2d [190,] 195 [(Wash.1984)]; *see also Audubon-Exira Ready Mix, Inc. v. Illinois Cent. Gulf Co.,* 335 N.W.2d 148, 152 (Iowa 1983) ("even adult and married children have the right to expect the benefit of good parental advice and guidance") (citing *Schmitt v. Jenkins Truck Lines, Inc.,* 170 N.W.2d 632, 665 (Iowa 1969)). *Id.* at 466.

**E. Refusing to Extend Common Law to Recognize Parent's Consortium Claim for Child's Serious, Permanent Injury**

In the case now before us, the Court confronts the mirror-image of the question presented in *Reagan*-- whether *parents* may recover damages for loss of consortium and mental anguish when their *child* is severely, but not fatally, injured by a third party's tortious conduct. The Court says "No," and offers as justification many of the same rationales the Court flatly rejected in *Whittlesey, Sanchez* and *Reagan:* (i) tort law cannot remedy every wrong; (ii) awarding damages in this context presents special challenges to a factfinder; (iii) recognizing filial consortium claims would not eliminate differences in the award of intangible damages for wrongful death and personal injury cases; (iv) there are insufficient benefits to justify changing the common law in Texas; and (v) several states that have recognized the child's right to loss of consortium have denied parents any reciprocal rights.

None of these proffered explanations--when weighed against our prior decisions and the growing body of law and commentary that recognize the symbiotic nature of the parent-child relationship--provide a satisfactory justification for creating an anomaly in Texas law. Moreover, noticeably absent from the Court's analysis is any meaningful examination of Texas's consortium precedent, the importance that Texas has historically placed on the parent-child relationship, or this Court's decisions analogizing that relationship to the **\*128** reciprocal nature of the husband-wife relationship.

II
DECONSTRUCTING THE COURT'S OPINION
**A. Tort Law Cannot Remedy Every Wrong**

It is, of course, preferable that the law be consistent and predictable. *See, e.g., Sanchez,* 651 S.W.2d at 254 (determining that retroactive application of the Court's decision turned "primarily on the extent of public reliance on the former rule and the ability to foresee a coming change in the law"); *Whittlesey,* 572 S.W.2d at 669. Today's decision, however, will come as a great surprise to the bench and bar of Texas. As the Court points out, many of our lower courts and at least one Texas commentator have predicted that this Court, based on its precedent, would recognize a parent's claim for loss of consortium in this context. *See, e.g., Schindler Elevator Corp. v. Anderson,* 78 S.W.3d 392, 414 (Tex.App.-Houston [14th Dist.] 2001, pet. dism'd by agreement); *Parkway Hosp. v. Lee,* 946 S.W.2d 580, 590 (Tex.App.-Houston [14th Dist.] 1997, writ denied); *Enochs v. Brown,* 872 S.W.2d 312, 322 (Tex.App.-Austin 1994, no writ); *Hall v. Birchfield,* 718 S.W.2d 313, 337- 38 (Tex.App.-Texarkana 1986), *rev'd on other grounds,* 747 S.W.2d 361 (Tex.1987); Benny Agosto, Jr. & Mario A. Rodriguez, *What About the Parents?* 66 TEX. B.J. 396, 396 (2003). And our decisions have, before now, justified that assumption. *See Krishnan v. Sepulveda,* 916 S.W.2d 478, 482 (Tex.1995) ("Assuming that a cause of action exists for loss of a child's consortium which is derivative of the child's claim for personal injury ... there is no negligence cause of action arising out of the treatment or injury of a fetus."); *Reagan,* 804 S.W.2d at 489 (Doggett, J., concurring and dissenting) ("I concur in that portion of the court's opinion expressly recognizing a cause of action for loss of parental consortium, and implicitly a consortium action by a parent upon injury of a child...."). But today, incanting that tort law cannot remedy every wrong, the Court announces that Texas does not recognize filial consortium claims for non-fatal injuries.

This [mantra], of course, is the hue and cry in many tort cases and in essence is no more than the fear that some cases will be decided badly. Undoubtedly, the system will not decide each case correctly in this field, just as it does not in any field, but here, as in other areas of tort law, [ ] it [is] better to adopt a rule which will enable courts to strive for justice in all cases rather than to rely upon one which will ensure injustice to many. *Reben v. Ely,* 146 Ariz. 309, 705 P.2d 1360, 1364 (App.1985) (recognizing filial consortium claim) (quoting *Univ. of Ariz. Health Sciences Ctr. v. Superior Court,* 136 Ariz. 579, 667 P.2d 1294, 1298 (1983)). The rule the Court adopts, rather than providing parents of seriously injured children the same protections the Court has given to spouses and children, ensures that Texas parents will be denied

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

111 S.W.3d 113
46 Tex. Sup. Ct. J. 944
**(Cite as: 111 S.W.3d 113)**

Page 13

recovery for a loss the Court has already concluded is real, significant, and worthy of compensation. *See Reagan, 804 S.W.2d at 466* (recognizing parental consortium claim for non-fatal injuries). The error of this rule is compounded by the detour the Court must take from our precedent to arrive at its conclusion.

The Court asserts that tort law generally denies recourse to those who are harmed only indirectly by another's negligence. 111 S.W.3d at 118. Acknowledging that the consortium claims this Court has recognized are an exception to this rule, the Court then attempts to distinguish *129 the filial consortium claim at issue here. To do this, the Court asserts that claims for filial consortium are more akin to consortium claims by siblings and step-parents than spouses and children. *See id.* at 118 ("[W]hile we have recognized that spouses and children can recover loss of consortium, we have concluded that siblings and step-parents cannot.") (citations omitted). By determining that filial consortium claims are analogous to sibling and step- parent consortium claims, the Court concludes that such claims are not actionable in Texas. *See id.* at 118; *see also Ford Motor Co. v. Miles, 967 S.W.2d 377, 383 (Tex.1998)* (denying siblings and step-parents consortium damages by adhering to the boundaries for loss of consortium established in *Reagan* ). But we are not dealing with a sibling or step-parent here; Courtnie Williamson is the six-year-old daughter of Lainie and Casey Williamson. We have accorded special treatment to the "obvious and unquestionable" parent-child relationship for years, and for years have consistently rejected arguments that friends, step-parents, and siblings must, in principle, receive equivalent recognition. The Court's regurgitation of that old issue only diverts attention from its assault on the principles underlying *Reagan, 804 S.W.2d 463, Cavnar, 696 S.W.2d 549, Yowell, 703 S.W.2d 630, Sanchez, 651 S.W.2d 249,* and *Whittlesey, 572 S.W.2d 665.*

In defiance of our clear holdings in this area, the Court adopts the position that "the parent-child relationship is not reciprocal" and that "the child's interest deserves greater protection because of the child's singular emotional dependency on the parents." 111 S.W.3d at 117. Not only does this constrained view of reciprocity contradict our previous writings, it is unpersuasive in light of the fact that mutual dependency has never been a basis for rejecting consortium claims in any of our prior cases brought by a member of the husband-wife or parent-child relationship.

In the past, we have explained that no logical reason exists for treating injuries to family members identified by the wrongful death statute differently depending on whether the injured party is the spouse, parent or child. This is true regardless of whether the resulting harm is serious, permanent bodily injury or death. [FN2] *Cf. Cavnar, 696 S.W.2d at 551.* Applying this principle in *Reagan,* we remarked that even adult children should be entitled to recover consortium damages when their parents suffer non-fatal injuries. 804 S.W.2d at 466. Because we expressly rejected the notion that consortium damages are available only if the plaintiff is dependent on the injured party, I am unpersuaded that the real reason for rejecting filial consortium claims is the lack of reciprocity in the parent-child relationship.

FN2. As the Arizona Supreme Court has recognized, death is often "separated from severe injury by mere fortuity; and it would be anomalous to distinguish between the two when the quality of consortium is negatively affected by both." *Frank v. Superior Court of Ariz., 150 Ariz. 228, 722 P.2d 955, 957 (1986).* The court further explained:
Perhaps the loss of companionship and society experienced by the parents of a child permanently and severely injured ... is in some ways even greater than that suffered by parents of a deceased child. Not only has the normal family relationship been destroyed, as when a child dies, but the parent also is confronted with his loss each time he is with his child and experiences again the child's diminished capacity to give comfort, society, and companionship.
*Id.* at 958 (quoting Simpson, *The Parental Claim for Loss of Society and Companionship Resulting From the Negligent Injury of a Child: A Proposal for Arizona,* 1980 ARIZ. ST. L.J. 909, 923 (1980)).

The Court's conclusion pertaining to reciprocity is all the more surprising considering that our jurisprudence has settled on *130 the proposition that "[t]he real loss sustained by a parent is not the loss of any financial benefit to be gained from the child, but is the loss of love, advice, comfort, companionship and society." *Sanchez, 651 S.W.2d at 251.* We have unequivocally held that these losses are "real, direct, and personal losses" and "worthy of compensation."

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

111 S.W.3d 113
46 Tex. Sup. Ct, J. 944
(Cite as: 111 S.W.3d 113)

Page 14

*Id.* at 252. We have never conditioned recovery on dependency.

Even assuming for purposes of argument that this Court has now adopted the view that a parent can "fill in the void of his or her loss" by "seeking out new relationships," consideration of this factor, as in *Reagan,* is but one of many facets of the relationship that juries weigh when making damage assessments. 111 S.W.3d at 118 (quoting *Hay v. Med. Ctr. Hosp. of Vt.,* 145 Vt. 533, 496 A.2d 939, 942 (1985)); *see also Reagan,* 804 S.W.2d at 466. In light of our prior holdings pertaining to the parent-child relationship, more persuasive authority is required to deny parents the right to recover filial consortium damages but continue to allow children, including adult children, to recover for the same injuries.

**B. Damages Present Special Challenges to Factfinder**

Similarly unpersuasive is the Court's contention that we must reject filial consortium claims because the damage assessment is difficult. Loss of consortium is a common-law doctrine that we have consistently modified to adapt to changes in societal norms and values. Unlike other intangible values compensated by tort, consortium does not focus directly on a plaintiff's internal feelings. *See, e.g., Reagan,* 804 S.W.2d at 467. Instead, recovery for consortium attaches value to a plaintiff's lost opportunity to derive benefit from another person. *Id.* Stated another way, consortium damages reflect the intangible, non-economic benefits inherent in the interaction associated with certain relationship, *i.e.,* spouses and parents and children. *See Whittlesey,* 572 S.W.2d at 666.

This Court, and almost every court in the nation, recognizes that consortium damages are neither "too intangible [n]or conjectural to be measured in pecuniary terms by a jury." *Whittlesey,* 572 S.W.2d at 667; *Sanchez,* 651 S.W.2d at 253 (dismissing argument that consortium damages are "too speculative to be given a monetary value"); *see also* cases cited *supra* note 1 and *infra* note 4. The Court speculates that "[t]he jury apparently concluded that while the child's intangible losses would grow with time, her continuing impairment would have no substantial effect on the parent-child relationship in the future." 111 S.W.3d at 119. The Court also notes that "[a]nother jury after hearing the same evidence might well have reached a very different conclusion." *Id.* But is that not true in every jury case? And is that not an issue of factual or legal sufficiency--an inquiry

wholly distinct from whether we should recognize the cause of action in the first instance?

It is true that consortium damages are difficult to assess. *See, e.g., Sanchez,* 651 S.W.2d at 253; *Whittlesey,* 572 S.W.2d at 667. They are intangible and therefore resist mathematical computation. Because the damages are ethereal, different juries may well award different (and sometimes excessive) amounts based on similar facts. But we have not, until today, let those difficulties overcome our larger interest in the fair adjudication of a valid claim, nor our confidence in our judiciary to fulfill their duty to review awards:

> The fear of excessive verdicts is not a sufficient justification for denying recovery for loss of companionship. The judicial system has adequate safeguards to *131 prevent recovery of damages based on sympathy or prejudice rather than fair and just compensation for the plaintiff's injuries.
> *Sanchez,* 651 S.W.2d at 253; *see also Whittlesey,* 572 S.W.2d at 667. Thus, I do not understand how the Court can now, in good faith, contend that the difficulties of calculating damages in filial consortium cases warrant denying such claims altogether.

**C. Filial Consortium Claims and Wrongful Death**

As another justification for denying filial consortium claims, the Court maintains that when the child survives, there is no need to recognize a parent's action to prevent the tortfeasor from escaping liability. 111 S.W.3d at 120. Thus, concludes the Court, it is not anomalous to recognize a parent's intangible damages in death but not personal injury actions. *Id. But see Miles,* 967 S.W.2d at 383 ("it would be anomalous to recognize a cause of action for loss of consortium for a severe injury to a loved one when there is no recovery for the death of that same family member"). Applying this rationale consistently, however, would preclude consortium damages in all personal injury cases. But, as previously discussed, this Court has already recognized that both spouses and children may recover consortium damages in personal injury actions. Thus, I do not understand how denying the parents' filial consortium claims here, while permitting recovery in other personal injury cases, does not create an aberration in Texas law. [FN3]

FN3. To the extent that the Court is persuaded by reasoning from other courts, there is ample precedent to demonstrate that

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

111 S.W.3d 113
46 Tex. Sup. Ct. J. 944
(Cite as: 111 S.W.3d 113)

today's opinion, in fact, bucks the national trend. *See, e.g., Reben v. Ely,* 146 Ariz. 309, 705 P.2d 1360, 1364-65 (App.1985) ("The public policy governing a parent's claim for a child's death is analogous to the policy controlling the parent's derivative claim for a child's injury.") (quoting *Norvell v. Cuyahoga County Hosp.,* 11 Ohio App.3d 70, 463 N.E.2d 111, 115 (1983)); *Giuliani,* 951 S.W.2d at 321 ("there is no legal distinction between the claim of a parent for loss of a child's consortium from the claim of a child for the loss of a parent's consortium"); *Berger,* 303 N.W.2d at 426 ("the real anomaly is to allow a child's recovery for the loss of a parent's society and companionship when the loss attends to the parent's death but to deny such recovery when the loss attends the parent's injury"); *Pence,* 813 P.2d at 433 ("The claim for loss of parental consortium ... is not sufficiently distinguishable from either spousal consortium claims in injury cases or children's consortium claims in death cases to warrant non-recognition.") (quoting *Hibpshman,* 734 P.2d at 994); *Gallimore v. Children's Hosp. Med. Ctr.,* 67 Ohio St.3d 244, 617 N.E.2d 1052, 1057 (1993) ("[I]n the present day, it would be incongruous to deny parents recovery for loss of the society and companionship of a seriously injured child while recognizing that such losses are compensable in cases involving death."); *Hook,* 804 P.2d at 1137 ("When a parent dies in Oklahoma, it would be an anomaly indeed if a child were allowed recovery for the loss of a parent's society and companionship when the loss attends the parent's death, but denied recovery when the equivalent loss attends the parent's permanent injury.").

By focusing on the differences between wrongful death and personal injury cases, the Court attempts to make more palatable the fact that some plaintiffs may recover consortium damages while others in a similar position may not. While this conclusion itself is problematic, the Court misapprehends the true nature of the inconsistency created by its opinion: two of the three plaintiff groups identified in the wrongful death statute can recover consortium damages in personal injury actions but the third is walled off. *See* Tex. Civ. Prac. & Rem.Code § 71.004(b) (identifying persons who may recover under wrongful death statutes). The Court's decision today also relegates parents to second-class status and reneges on the Court's earlier *132 promise to protect the familial relationship as a whole. *See, e.g., Reagan,* 804 S.W.2d at 466; *Sanchez,* 651 S.W.2d at 252.

**D. Cost-Benefit Analysis**

The Court correctly notes that, "[w]hen recognizing a new cause of action and the accompanying expansion of duty, we must perform something akin to a cost-benefit analysis to assure that this expansion of liability is justified." 111 S.W.3d at 118. In performing its analysis, however, the Court proceeds as if we have never before considered the relative advantages and disadvantages of permitting consortium claims for injuries to the parent- child relationship. Ultimately, the Court concludes that we should reject filial consortium claims associated with a child's injury because permitting parents a separate cause of action will further uncertainty in the law and widen the divergence in recoveries among similarly situated victims. *Id.* And, asserts the Court, "it is not at all clear that this additional layer of liability will produce corresponding benefits of deterrence or fair compensation." *Id.* But we have already given due consideration to these principles and concluded that consortium damages should be available for injuries to the parent-child relationship. *See Reagan,* 804 S.W.2d at 464- 66; *Cavnar,* 696 S.W.2d at 551; *Sanchez,* 651 S.W.2d at 253-54.

In balancing parents' interests in compensation for the lost society and companionship of their injured children against tortfeasors' interests in freedom from additional liability--giving appropriate consideration to the social consequences of each alternative--there are, of course, numerous influencing factors, included but not limited to: (i) whether recognizing filial consortium claims will yield a significant social benefit; (ii) the relative costs born by parents versus those born by the general public; (iii) the nature of the asserted loss; (iv) the connection between the plaintiff and defendant; and (v) the ability to fairly assess damages. In *Reagan, Cavnar,* and *Sanchez,* we considered similar factors and concluded that, on balance, they weigh in favor of permitting parents to recover consortium damages related to their children's injuries, there is no need to analyze them again here. It should suffice to say that, as a matter of *stare decisis,* our conclusions in those cases govern today.

**E. States Recognizing Child's Rights Have**

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

111 S.W.3d 113
46 Tex. Sup. Ct. J. 944
(Cite as: 111 S.W.3d 113)

Page 16

**Rejected Parent's**

Finally, the Court suggests that, because some courts that have recognized parental consortium claims have rejected filial consortium claims, so too should Texas. 111 S.W.3d at 120. But most courts recognize the inconsistency in permitting parental consortium claims but denying those for filial consortium. *See, e.g., Gillispie v. Beta Constr. Co.,* 842 P.2d 1272, 1274 (Alaska 1992) ("We have already held that a wife has the right to sue for loss of 'care, comfort, companionship and solace' resulting from an injury to her husband, and that a child is entitled to loss of consortium damages when his parent is tortiously injured. To now hold that a parent is not entitled to recover loss of society for the death of his or her child would run counter to this line of precedent."); *Giuliani v. Guiler,* 951 S.W.2d 318, 321 (Ky.1997); *Berger v. Weber,* 411 Mich. 1, 303 N.W.2d 424, 434 (1981) (Levin, J., dissenting); *Pence v. Fox,* 248 Mont. 521, 813 P.2d 429, 433 (1991); *Gallimore v. Children's Hosp. Med. Ctr.,* 67 Ohio St.3d 244, 617 N.E.2d 1052, 1057 (1993). More specifically, courts across the country widely acknowledge that, within each category of parental or filial consortium, permitting recovery for death but not serious injury creates a legal anomaly. *See, e.g., *133*Audubon-Exira Ready Mix, Inc.,* 335 N.W.2d at 149; *Giuliani,* 951 S.W.2d at 321; *Berger,* 303 N.W.2d at 426; *Gallimore,* 617 N.E.2d at 1057; *Williams v. Hook,* 804 P.2d 1131, 1136 (Okla.1990). Unsurprisingly, then, most of the states that recognize the child's consortium claim also recognize parents' reciprocal right to recover consortium damages. [FN4] Underlying each of these decisions is the notion that the parent-child relationship is reciprocal, despite the fact that each party to the relationship receives different benefits from the other.

FN4. Currently, nineteen states recognize a parent's right to recover, either judicially or by statute, for loss of a child's consortium. *See Gillispie v. Beta Constr. Co.,* 842 P.2d 1272 (Alaska 1992); *Howard Frank, M.D., P.C. v. Superior Court,* 150 Ariz. 228, 722 P.2d 955 (1986); *United States v. Dempsey,* 635 So.2d 961 (Fla.1994); *Masaki v. Gen. Motors Corp.,* 71 Haw. 1, 780 P.2d 566 (1989); *Dep't of Educ. v. Blevins,* 707 S.W.2d 782 (Ky.1986); *Vincent v. Morgan's L. & T.R. & S.S. Co.,* 140 La. 1027, 74 So. 541 (1917); *Larson v. Dunn,* 460 N.W.2d 39 (Minn.1990); *Pence,* 248 Mont. 521, 813 P.2d 429; *First Trust Co. v. Scheels*

*Hardware & Sports Shop,* 429 N.W.2d 5 (N.D.1988); *Gallimore,* 67 Ohio St.3d 244, 617 N.E.2d 1052; *Gaither v. City of Tulsa,* 664 P.2d 1026 (Okla.1983); *Hancock,* 54 S.W.3d 234; *Belcher,* 184 W.Va. 395, 400 S.E.2d 830; *Shockley v. Prier,* 66 Wis.2d 394, 225 N.W.2d 495 (1975); *see also* Haw.Rev.Stat. Ann. § 663-3; Idaho code § 5-310; Iowa R. Civ. P. 1.206; La. Civ.Code Ann. art. 2315; Mass. Gen. Laws. ch. 231, § 85X; R.I. Gen. Laws § 9-1-41; Wash. Rev.Code § 4.24.010. Illinois, Minnesota, and North Dakota recognize the parent's claim but not the child's. *See supra,* note 4. Conversely, Michigan, Vermont, West Virginia, and Wyoming recognize the child's claim but not the parent's. *See supra,* note 1.

III
CONCLUSION

In the past, this Court has recognized consortium claims for the injury or death of a spouse, the injury or death of a parent, and the death of a child. We have consistently limited consortium claims--as has the Wrongful Death Act--to the husband-wife and parent-child relationships. Today, however, the Court concludes that "no compelling social policy impels us to recognize a parent's right to damages for the loss of filial consortium" associated with a child's injury. 111 S.W.3d at 120. By failing to recognize parents' right to recover damages for injuries tortiously inflicted upon their children, the Court creates an incongruence between its stated policy of protecting the parent-child relationship and the law.

When we decided *Reagan v. Vaughn* in 1990, we crossed a Rubicon. We committed ourselves to the proposition that the parent-child relationship--not just the child-parent relationship--is one deserving of "special protection." Because the Court cannot show that *Reagan* has become unworkable or that the law has changed so significantly that the consortium doctrine has somehow become antiquated or obsolete, it should be constrained by principles of *stare decisis* from reversing course and disturbing the settled expectations it has promoted. The Court evades *Reagan* only by resort to immaterial distinctions between a parent's loss of companionship resulting from death and a similar loss of companionship resulting from a severe, permanent, and disabling injury.

The Court's decision marks a significant departure

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

111 S.W.3d 113
46 Tex. Sup. Ct. J. 944
**(Cite as: 111 S.W.3d 113)**

Page 17

from our consortium precedent, for which the Court provides no adequate justification. I would affirm the court of appeals' judgment in all respects. Because the Court does otherwise, I respectfully dissent from Part II of the Court's opinion.

111 S.W.3d 113, 46 Tex. Sup. Ct. J. 944

Briefs and Other Related Documents (Back to top)

• 2002 WL 32133217 (Appellate Brief) Respondents' Brief on the Merits (Mar. 2002)

• 2001 WL 34115249 (Appellate Brief) Petitioner's Reply Brief (Dec. 21, 2001)

• 2001 WL 34115247 (Appellate Brief) Respondents' Brief on the Merits (Dec. 2001)

• 2001 WL 34115248 (Appellate Brief) Petitioner's Brief on the Merits (Nov. 16, 2001)

**END OF DOCUMENT**

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works