United States District Court
Southern District of Texas
FILED

OCT 0 6 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| VERONICA RAMIREZ, Individually, and as Next Friend of JEREMIAH S. RAMIREZ, a minor, | § § § § | |
| *Plaintiff,* | § § | Civil Action No. M-03-155 |
| VS. | § § | JURY DEMAND |
| AMERICAN HOME PRODUCTS CORPORATION d/b/a WYETH, ET AL, | § § § § | |
| *Defendants.* | § | |

## DEFENDANTS' OPPOSITION TO REMAND

Defendants Abbott Laboratories, SmithKline Beecham Corporation d/b/a GlaxoSmithKline, Aventis Pasteur Inc., Merck & Co., Inc., Wyeth and Eli Lilly and Company (hereinafter "Defendants") submit this Opposition to Plaintiff's Motion to Remand and would show the Court as follows:

### I. INTRODUCTION

This is a products liability action in which Plaintiff Veronica Ramirez allege that her minor child, Jeremiah S. Ramirez, has sustained neurological injuries from exposure to FDA-approved vaccines containing the preservative thimerosal. *See* Plaintiff's Original Petition (hereinafter "Petition") at ¶¶ 4.01-4.06, 4.09. Defendant Merck & Company, Inc. timely removed this action to this Court because complete diversity exists between Plaintiffs and their daughter—who are alleged to be citizens of Texas—and those defendants that are properly joined.[1] Complete diversity exists because Plaintiff's Petition fails to adequately allege any viable cause of action against any of the in-state defendants—Dr. Oralia T. Wells, M.D., Dr.

Eloisa T. Gonzalez, M.D. (hereinafter "Healthcare Defendants").[2]  Consequently, the Texas citizenship of these defendants must be disregarded for purposes of determining the existence of diversity jurisdiction.

 Plaintiff has filed a Motion to Remand, arguing that this Court cannot apply the federal Vaccine Act's tort-suit bar to find the Healthcare Defendants fraudulently joined because, according to Plaintiff, the tort-suit bar is applicable to the diverse defendants as well.[3]  Alternatively, Plaintiff argues that the Vaccine Act is not applicable to any of her claims, essentially reiterating the arguments of her response to Defendants' motions to dismiss.  Finally, Plaintiffs' Motion to Remand makes a half-hearted—but ultimately inadequate—attempt to address the Notice of Removal's primary argument for finding fraudulent joinder, *i.e.*, the Petition fails to allege any conduct by the Healthcare Defendants that could possibly form the basis of a viable claim against them under Texas law.

## II. FRAUDULENT JOINDER STANDARD

 Though Plaintiff's Motion for Remand repeatedly claims that this Court is required to remand unless Defendants establish that there is "no possibility" that a state court would find that her Petition states a cause of action against the in-state defendants (Motion for Remand at 4-5, 9), the Fifth Circuit has made it unmistakably clear that remand is required only

---

[1] Plaintiff's Motion to Remand does not dispute the removing defendant's contention that the allegations in the Petition place the amount in controversy in excess of $75,000.  *See* Notice of Removal at ¶ 26.

[2] *See* Notice of Removal at ¶ 8 ("The Petition fails to adequately allege any cognizable cause of action against either of the Healthcare Defendants.  Moreover, the Petition is completely devoid of any factual allegations which could form the basis of a cognizable claim against the Healthcare Defendants."). *See also Hinojosa v. Perez*, 214 F. Supp. 2d 703, 707 (S.D. Tex. 2002)("A notice of removal is analogous to a pleading, which under the pleading regime of the Federal Rules of Civil Procedure 'shall be so construed as to do substantial justice.'") (quoting Fed. R. Civ. P. 8(f)).

[3] In her response to Defendants motions to dismiss, however, Plaintiff contends that the Vaccine Act is not applicable to all of the out-of-state defendants.  *See* Plaintiff's Combined Memorandum Response to the Motions to Dismiss Filed by Vaccine Defendants and by Eli Lilly and Company ("Response") at 6-11.

if there is "'*a reasonable basis* for predicting that the state law might impose liability'" on the in-state defendant. *Travis v. Irby*, 326 F.3d 644, 648 (5th Cir. 2003) (quoting *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002)) (emphasis in original). "This *possibility, however, must be reasonable*, not merely theoretical." *Great Plains*, 313 F.3d at 312 (emphasis added). According to the Fifth Circuit,

> [t]his standard necessarily requires an evaluation of the allegations of the state court complaint, because it is by referring to this pleading that a court assesses whether a reasonable theory, or merely a theoretical one, has been asserted.

*Id.* at 328-29 (footnote omitted).

More importantly for the case *sub judice*, the Fifth Circuit and the U.S. District Courts of Texas have repeatedly held that there can be no reasonable possibility of recovery against in-state defendants where the plaintiff's complaint contains only conclusory allegations as to those defendants. *See, e.g., Griggs v. State Farm Lloyds*, 181 F.3d 694, 699 (5th Cir. 1999) (affirming finding of fraudulent joinder where plaintiff's petition "fail[ed] to state any specific actionable conduct on [in-state defendant's] part"); *Cavallini v. State Farm Mut. Auto. Ins. Co.*, 44 F.3d 256, 260-61 (5th Cir. 1995) (same); *McIntire v. Rollins, Inc.*, 888 F. Supp. 68, 69 (S.D. Tex. 1995) ("Where no specific acts of negligence are pled against the [in-state] defendant, this Court has consistently held that the [in-state defendant] has been fraudulently joined, and has dismissed [that defendant].")

Thus, a "[f]ailure to specify *a factual basis* for recovery against a non-diverse party constitutes a failure to state a claim and fraudulent joinder of that party." *Waters v. State Farm Mut. Auto. Ins. Co.*, 158 F.R.D. 107, 108 (S.D. Tex. 1994) (emphasis added). *See also Ghoman v. New Hampshire Ins. Co.*, 2001 WL 376460, *2 (N.D. Tex. April 11, 2001) ("The mere pleading of a cause of action against [the in-state defendant] is not sufficient to defeat removal jurisdiction. Rather, 'whether the plaintiff has stated a valid state law cause of action

depends upon and is tied to the factual fit between the plaintiffs' allegations and the pleaded theory of recovery.'") (quoting *Griggs*, 181 F.3d at 701). As explained below, the wholly conclusory allegations leveled against the Healthcare Defendants in Plaintiff's Petition are unsupported by any factual allegations and are, therefore, insufficient to deprive the diverse Defendants of a federal forum.

### III. ARGUMENT

Plaintiff's Petition is devoid of any allegations that could form the basis of a claim against the Healthcare Defendants under Texas law. As a threshold matter, Plaintiff's Petition fails to even mention the Texas Medical Liability and Insurance Improvement Act ("MLIIA"), the statute providing the sole cause of action against a healthcare provider for injuries related to the rendition of healthcare services. Under the MLIIA, the *only* claim a plaintiff may bring against a healthcare provider is one for medical malpractice and *only after* providing written notice 60 days before filing suit. Plaintiff's Petition, however, alleges neither a malpractice claim nor the requisite notice to the Healthcare Defendants. Moreover, the MLIIA and the Texas Family Code prohibit all claims against a healthcare provider for injuries allegedly related to childhood immunizations except for a claim based on the healthcare provider's own negligent acts. Plaintiff's Petition, however, fails to allege any negligent conduct on the part of the Healthcare Defendants. As a result, there is no reasonable possibility that a Texas state court would find that a claim has been stated against the Healthcare Defendants.

Tellingly, Plaintiff does not point to *any factual allegations of negligent conduct* on the part of the Healthcare Defendants included in her Petition. Instead, Plaintiff's Motion to Remand simply states that the sole allegation that the Healthcare Defendants "engaged in the business of marketing, distributing, and/or selling vaccines and/or products containing Thimerosal"—though mentioning neither negligent conduct nor assault—was meant to

encompass claims for medical negligence and assault. *See* Motion to Remand at 13. Signaling the weakness of this argument, Plaintiff focuses the vast majority of her Motion to Remand on the question of whether the federal Vaccine Act can be applied to bar these premature tort claims against the Healthcare Defendants. Though that question is rendered academic by Plaintiff's deficient pleading, Defendants demonstrate below that the Vaccine Act both bars Plaintiff's purported claims against the Healthcare Defendants and serves as a proper basis for finding fraudulent joinder in this case.

**A.    Plaintiff's Allegations Do Not State a Cognizable Claim Against the Healthcare Defendants Under Texas Law.**

**1.    Plaintiff's claims against the Healthcare Defendants are governed by the MLIIA and the Texas Family Code.**

Under Texas law, the MLIIA provides the exclusive cause of action against healthcare providers for alleged personal injuries resulting from the rendition of healthcare services. The MLIIA covers:

> [any] cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety which proximately results in injury to or death of the patient, *whether the patient's claim or cause of action sounds in tort or contract.*

TEX. REV. STAT. ANN. ART. 4590i § 1.03(a)(4) (emphasis added). *See Walden v. Jeffery*, 907 S.W.2d 446, 448 (Tex. 1995) (MLIIA governs claims where challenged conduct "was an inseparable part of [the physician's] rendition of medical services").

The sole cause of action provided by the MLIIA is essentially one for professional negligence, requiring the plaintiff "to prove that the mode of treatment undertaken by the treating physician would not have been undertaken under the same or similar circumstances by a reasonable and prudent member of the medical community." *Pack v. Crossroads, Inc.*, 53 S.W.3d 492, 508 (Tex. App.—Fort Worth 2001, pet. denied). Accordingly, Texas courts have

refused to recognize any other theory of recovery against healthcare providers where the claim is

based on the rendition of healthcare services—such as the administration of childhood vaccines.

*See Gomez v. Matey*, 55 S.W.3d 732, 735 (Tex. App.—Corpus Christi 2001, no pet.) (*no fraud*

*claim* where allegations related to medical treatment); *Williams v. Walker*, 995 S.W.2d 740, 742

(Tex. App.—Eastland 1999, n.p.h.) (*no assault and battery* claim where allegations related to

medical treatment); *MacGregor Medical Assoc. v. Campbell*, 985 S.W.2d 38, 39, 41 (Tex. 1998)

(*no DTPA*, *breach of warranty*, or *contract* claim for a healthcare providers' alleged departure

from the accepted standard of care); *Gormley v. Stover*, 907 S.W.2d 448, 450 (Tex. 1995) (*no*

*independent negligence or DTPA claims* against dentist based on the dentist's performance of

dental surgery); *Ruiz v. Walgreen, Inc.*, 79 S.W.3d 235, 239 (Tex. App.—Houston [14th Dist.]

2002, n.p.h.) (*no breach of warranty or DTPA claims* against pharmacy where claim was based

on the alleged improper filling of a prescription); *Easterly v. HSP of Texas*, 772 S.W.2d 211

(Tex. App.—Dallas 1989, no writ) (*no strict liability, breach of warranty, or DTPA claims*

where defective product was inextricably related to provision of healthcare services).

Moreover, the MLIIA provides that where a lawsuit based on the healthcare

provider's alleged failure to warn the plaintiff of the hazards involved in a medical procedure,

*"the only theory on which recovery may be obtained is that of negligence* in failing to disclose

the risks or hazards that could have influenced a reasonable person in making a decision to give

or withhold consent." TEX. REV. STAT. ANN. ART. 4590i § 6.02 (emphasis added). Likewise,

the provision of the Texas Family Code governing childhood vaccinations—Section 32.103—

permits *only a claim for negligence* against the physician or medical facility responsible for

administering immunizations to children:

> A person consenting to immunization of a child, a physician, nurse
> or other health care provider, or a public health clinic, hospital, or
> other medical facility *is not liable for damages arising from an*
> *immunization administered to a child* authorized under this

> subchapter *except for injuries resulting from the person's or facility's own acts of negligence.*

TEX. FAM. CODE § 32.103(b) (emphasis added).  Thus, because Plaintiff alleges that her son was injured as a result of receiving routine child immunizations (Petition at ¶ 4.09), any claim against the Healthcare Defendants must be brought as a MLIIA claim alleging negligent conduct by the Healthcare Defendants—and only after 60 days written notice.[4]

    **2.  Plaintiff's Petition fails to allege any negligent conduct by the Healthcare Defendants.**

    Even ignoring Plaintiff's failure to expressly plead a claim under the MLIIA, Plaintiff has no reasonable possibility of recovery against the Healthcare Defendants because the Petition fails to specify *any facts* which support a potentially viable claim against them.  Instead, the section of the Petition entitled "Liability of Healthcare Defendants" makes two vague allegations in regard to the Healthcare Defendants:

> The Healthcare Defendants are liable for their own distinct tortious conduct, separate and apart from the conduct of the Manufacturer Defendants, although they acted in concert with them.
>
> The conduct of the Healthcare Defendants forms an independent basis for imposing liability on them for commission of the acts referenced above.

Petition at ¶¶ 11.02-11.03.  Such conclusory statements do not come close to alleging *facts* supporting a claim for negligence by the Healthcare Defendants necessary to support the sole claim allowed by the MLIIA and Texas Family Code.  Rather Plaintiff must accompany her legal theory of recovery against the Healthcare Defendants (had she specified one) with factual allegations of conduct specifically attributable to the Healthcare Defendants.  *See, e.g., Griggs v.*

---

[4]    The MLIIA requires that a plaintiff (i) provide written notice of a claim against a healthcare providers "at least 60 days before the filing of a suit in any court of this state" *and* (ii) *plead that the required notice was provided.*  TEX. REV. STAT. ANN. ART. 4590i § 4.01(a)-(b).("[i]n such pleadings as are subsequently filed in any court, each party shall state that it has fully complied with the provisions of this section ").

*State Farm Lloyds*, 181 F.3d 694, 699 (affirming fraudulent joinder finding where plaintiff's petition "allege[d] no *actionable facts* specific to [the in-state defendant]") (emphasis added); *McIntire v. Rollins, Inc.*, 888 F. Supp. at 69 ("Where no specific *acts of negligence* are pled against the [in-state] defendant, this Court has consistently held that the [in-state defendant] has been fraudulently joined, and has dismissed [that defendant].") (emphasis added). *See also Addison v. Allstate Ins. Co.*, 58 F. Supp. 2d 729, 732 (S.D. Miss. 1999) ("[F]ailure to specify *a factual basis for recovery* against a nondiverse party constitutes fraudulent joinder of that party.") (emphasis added).

The only other allegations specifically directed toward the Healthcare Defendants are found in the "Parties" section of the Petition and state only that each Healthcare Defendant "was engaged in the business of marketing, distributing and/or selling vaccines and/or products containing Thimerosal to the Plaintiff herein." Petition at ¶¶ 3.13-3.15. Again, however, there is no allegation of any *negligent conduct* attributable to either of the Healthcare Defendants. Absent allegations of defendant-specific, actionable conduct, the Healthcare Defendants must be deemed fraudulently joined. *See Griggs*, 181 F.3d at 699 (plaintiff's "petition, which mentions [the in-state defendant] once in passing, then fails to state any specific actionable conduct on her part" is insufficient to require remand).[5]

---

[5]    Though Plaintiff's Motion to Remand argues that they can pursue a claim for assault and battery against the Healthcare Defendants under Texas law, Plaintiff makes no attempt to distinguish the only Texas authority addressing this question, *Williams v. Walker*, 995 S.W.2d 740 (Tex. App.—Eastland 1999, not pet.). In *Williams*, the court of appeals held that where—as here—the alleged assault and battery is "an inseparable part of the rendition of medical services," the claim is covered by the MLIIA. *Id.* at 742. As such, "*the only theory on which recovery may be obtained is that of negligence* in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent." TEX. REV. STAT. ANN. ART. 4590i § 6.02 (emphasis added). The Motion to Remand also ignores the provision of the Texas Family Code governing childhood vaccinations—Section 32.103—which permits *only a claim for negligence* against the physician or medical facility responsible for administering immunizations to children.

**3.    The Fifth Circuit's *Griggs* Fraudulent Joinder Analysis Is Controlling.**

Because Plaintiff's Petition fails to allege any negligent conduct on the part of the Healthcare Defendants—the only non-diverse defendants in this case—the Fifth Circuit's fraudulent joinder analysis in *Griggs v. State Farm Lloyds*, 181 F.3d 694, 699 (5th Cir. 1999) requires that Plaintiff's Motion to Remand be denied. Indeed, each of the pleading deficiencies requiring denial of remand in *Griggs* is present in the instant case:

- The non-diverse defendant in *Griggs* was alleged to be a conduit (an insurance agent) for the diverse defendant's product (an insurance policy).

  Likewise here, the non-diverse Healthcare Defendants are alleged to be conduits for the diverse defendants' allegedly defective products (childhood vaccines).

- The plaintiff's petition in *Griggs* alleged only facts demonstrating this relationship. *See Griggs*, 181 F.3d at 699 ("'Defendant[], through its local agent, [non-diverse defendant,] issued an insurance policy.'") (quoting plaintiff's petition).

  Likewise here, Plaintiff's Petition alleges only that the Healthcare Defendants "w[ere] engaged in the business of marketing, distributing and/or selling vaccines and/or products containing Thimerosal to [Plaintiffs and her child] herein." Petition at ¶¶ 3.13-3.15.

- The *Griggs* plaintiff's petition "fail[ed] to state *any specific actionable conduct* on [the non-diverse defendant's] part whatsoever." *Id.* (emphasis added).

  Likewise here, Plaintiff's Petition fails to state any specific actionable conduct— *i.e.*, any negligent act or omission—on the part of the Healthcare Defendants.

- Finally, the Fifth Circuit found that "[t]he remainder of Griggs' pleadings refer[ed] to conduct by the 'Defendants' that can in no way be attributed to [the non-diverse defendant]." *Id.* (emphasis added).

  Likewise here, the only *actionable* conduct alleged in Plaintiff's Petition can in no way be attributed to the Healthcare Defendants. *See* Petition at ¶ 4.06 (alleging that Manufacturer Defendants "*fail[ed], in all instances, to advise doctors*" of the alleged dangers of thimerosal-containing vaccines) (emphasis added).

Aware of the controlling *Griggs* decision, Plaintiff cites the Fifth Circuit's decision in *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000) and argues that *Hart*

allows this Court to grant her "repeated opportunities" to amend her Petition until she has alleged facts sufficient to state a cognizable claim against the Healthcare Defendants. *See* Motion to Remand at 16 (quoting *Hart*, 199 F.3d at 248 n.6). This argument misrepresents the holding of *Hart*, and it directly contradicts the well-settled law of the Fifth Circuit (and of this Court). For it is axiomatic that removal jurisdiction is based on the allegations "in the state court petition as they existed at the time of removal." *See Manguno v. Prudential Property & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002). And "a complaint amended post-removal cannot divest a federal court of jurisdiction." *Cavallini v. State Farm Mutual Auto Ins. Co.*., 44 F.3d 256, 264 (5th Cir. 1995 (citing *Pullman Co. v. Jenkins*, 305 U.S. 534, 537 (1939)); *Gebbia v. Wal-Mart Stores, Inc.*, 233 F.3d 880, 883 (5th Cir. 2000) (same). *See also Madden v. Able Supply Co.*, 205 F. Supp. 2d 695, 699 (S.D. Tex. 2002) ("When considering the propriety of subject matter jurisdiction in the context of a motion to remand, a district court must consider the claims in the plaintiff's state court petition as they existed at the time of removal."); *Castellanos v. Bridgestone Corp.*, 215 F. Supp. 2d 862, 867 (S.D. Tex. 2002) (same).

As the Fifth Circuit explained in its opinion in *Cavallini*,

> The rationale for determining removal jurisdiction on the basis of claims in the state court complaint as it exists at the time of removal is obvious.[] Without such a rule, disposition of the issue would never be final, but would instead have to be revisited every time the plaintiff sought to amend the complaint to assert a new cause of action against the nondiverse defendant, all at considerable expense and delay to the parties and the state and federal courts involved. Limiting the removal jurisdiction question to the claims in the state court complaint avoids that unacceptable result, and permits early resolution of which court has jurisdiction, so that the parties and the court can proceed with, and expeditiously conclude, the litigation.

*Cavallini*, 44 F.3d at 256 (footnote omitted). Of course, Plaintiff's characterization of the *Hart* decision cannot be reconciled with the unambiguous holding of *Cavallini*.[6]

The *Hart* decision is also a red herring because the Fifth Circuit specifically found that ***the plaintiffs in that case had pled actionable facts*** sufficient to state a cause of action for misrepresentation against the in-state defendants. *See Hart*, 199 F.3d at 247 ("[The non-diverse defendant] breached his duty by continuing to represent that [the diverse defendant]'s products would effectively control budworms *when he knew or should have known* that the chemicals were failing to control the budworms as represented.") (emphasis in original) (quoting plaintiff's complaint). Again, however, Plaintiff's Petition contains ***no pleading of any actionable facts*** against the Healthcare Defendants.

### 4. Plaintiff's allegations against the "Manufacturer Defendants" refute any negligence claim against the Healthcare Defendants.

Finally, the allegations of Plaintiff's Petition *affirmatively negate* any negligence claim against the Healthcare Defendants for failure to warn Plaintiff of any dangers related to thimerosal. According to the Petition, the Healthcare Defendants themselves could not have known of any such dangers because the "Manufacturer Defendants" allegedly concealed these dangers from the public, consumers, *and prescribing physicians*:

> [T]he Manufacturer Defendants deliberately or negligently misrepresented to the public the efficacy and safety of these products that contained Thimerosal. Because of ***their failure, in all instances, to advise doctors*** or consumers that the usage of Thimerosal containing products could result in mercury poisoning, the result is that the Plaintiff's child has experienced severe bodily injury.

---

[6]    To the extent that the *Hart* decision conflicts with the fraudulent joinder analysis of *Cavallini*, the latter decision constitutes the controlling precedent. *See, e.g., United States v. Castillo*, 179 F.3d 321, 328 (5th Cir. 1999) (stating that decisions of subsequent panels cannot overrule those of prior panels absent en banc review or a superseding change in the law); *Teague v. City of Flower Mound*, 179 F.3d 377, 383 (5th Cir. 1999) (characterizing principle as "rule of orderliness"); *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997) (same).

> ***The Manufacturer Defendants purposely downplayed and understated the health hazards and risks associated with Thimerosal*** . . .   The Manufacturer Defendants falsely and fraudulently kept relevant information from potential users . . . .
>
> ***The Manufacturer Defendants falsely and fraudulently misrepresented*** . . . ***the presence of adequate testing of Thimerosal*** and the presence of adequate testing of any combination of Thimerosal-containing products.

Petition at ¶¶ 4.06-4.08 (emphasis added).   According to the Petition, then, the Healthcare Defendants could not have known, or have had reason to know, of the alleged hazards associated with thimerosal-containing vaccines, and Plaintiff cannot possibly succeed on a negligence claim against them.

In fact, several recent district court decisions have denied remand in suits against pharmaceutical manufacturers where the plaintiff's complaint included only conclusory allegations of the healthcare provider's knowledge of the alleged dangers of the product at issue and abundant specific allegations of the pharmaceutical manufacturer's active concealment or misrepresentation of such dangers from the public at large, including physicians.  *See, e.g., Baisden v. Bayer Corp.*, ---F. Supp. 2d---, 2003 WL 21910701, *3 (S.D.W.Va. Aug. 11, 2003) (non-diverse physician fraudulently joined); *In re Baycol Products Litig.*, No. MDL 1431(MJD), 02-4835, 2003 WL 21223842 (D. Minn. May 27, 2003) (non-diverse physician fraudulently joined); *In re Rezulin Prods. Liab. Litig.*, 00 Civ. 2843, 2003 WL 43356 (S.D.N.Y. Jan. 6, 2003) ("*Rezulin II*") (non-diverse Texas physician fraudulently joined); *Brown v. Bristol Myers Squibb Co.*, Civ. A. No. 4:02CV301LN, slip op. at 11 (S.D. Miss. Dec. 2, 2002) (in-state physician fraudulently joined); *In re Diet Drugs Prods. Liab. Litig.*, 220 F. Supp. 2d 414, 424 (E.D. Pa. 2002); *In re Rezulin Prods. Liab. Litig.*, 133 F. Supp. 2d 272, 295 (S.D.N.Y. 2001) ("*Rezulin I*") (non-diverse Mississippi physician fraudulently joined); *Louis v. Wyeth-Ayerst Pharm., Inc.*, Civ.

A. No. 5:COCV102LN, slip op. at 5 (S.D. Miss. Sept. 25, 2000) (in-state pharmacy fraudulently joined).[7]

U.S. District Judge Lee's decision denying remand in *Louis* is instructive on this point. In *Louis*, the plaintiffs brought suit against the manufacturers of certain drugs (*i.e.*, Pondimin, Redux, and/or Phentermine), as well as in-state healthcare providers (*i.e.*, pharmacies). *See id.* at 2. Observing that while the *Louis* complaint—like that here—made only general allegations that "defendants" had knowledge of the dangerous condition of the diet drugs, Judge Lee determined that the plaintiffs had failed to adequately allege a factual basis for the in-state defendants' knowledge of the alleged dangerous condition of the drugs. More particularly, the Court determined that the plaintiffs' allegations that the manufacturing defendants had concealed information concerning risks precluded a claim that the healthcare providers could have known of those risks:

> Yet, and notwithstanding the fact that the complaint in places may allege or allude generally to knowledge possessed by the "defendants," it is plain that the complaint on the whole cannot reasonably and legitimately be construed as alleging any factual basis for the conclusion that any of the pharmacy defendants had any knowledge or reason to know of any of the dangers associated with the product(s) of which plaintiffs contend they were aware. *Quite to the contrary, the complaint, the major theme of which is the manufacturers' intentional concealment of the true risks of the drug(s), coupled with dissemination through various media of false and misleading information of the safety of the drug(s) at issue, belies any suggestion of knowledge or reason to know by these resident defendants.*

*Id.* at 4-5 (emphasis added) (footnote omitted). Likewise, the courts in *Baisden*, *In re Baycol*, *Brown*, *In re Diet Drugs*, and *Rezulin I* and *II* held that generalized allegations of knowledge attributed to "defendants" could not preclude a finding of fraudulent joinder of the in-state

---

[7]    Copies of the unpublished decisions in *Baisden*, *In re Baycol*, *Brown*, *Louis*, and *Rezulin* II are attached hereto as Exhibits A through E respectively.

healthcare providers where—as here—the plaintiff's complaint also alleges that "defendants" concealed material facts from "prescribing physicians." *Compare Baisden,* at *2-*3; *In re Baycol,* at *1-*2; *Rezulin I,* 133 F. Supp. 2d at 295; *Rezulin II,* at *1; *Brown,* slip op. at 11; *In re Diet Drugs,* 220 F. Supp. 2d at 424; *and* Petition at ¶ 6.01(a), (f) ("Defendants failed to warn or adequately warn prescribers . . . [and] . . . Defendants did not give warning or adequate warning to healthcare providers regarding the dangers of Thimerosal").

5.    **The United States District Court for the Northern District of Texas Has Rejected Plaintiff's Arguments for Remand.**

Considering allegations identical to those made by Plaintiff here against the non-diverse Healthcare Defendants, United States District Judge John McBryde recently rejected the very same arguments for remand offered by Plaintiff in this case. *See Chiles v. American Home Products,* No. 4:03-CV-802-A (N.D. Tex. Sept. 26, 2003) (attached hereto as Exhibit F)[8]. Reiterating the Fifth Circuit's admonition that "pleadings matter" when addressing claims of fraudulent joinder, Judge McBryde denied the *Chiles* plaintiffs' motion to remand because the plaintiffs' allegations "do[] not set forth any facts that would support a claim against the [in-state] physicians." *Id.* at 2-3 (quoting *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 328 (5th Cir. 2002)).

In addition to finding that the *Chiles* plaintiffs had failed to allege any negligent conduct on the part of the in-state healthcare defendants, Judge McBryde reasoned that the plaintiffs' allegations that the "Manufacturing Defendants" had deliberately or negligently deceived everyone else—including doctors—regarding the safety of products containing thimerosal precluded any claim of negligence on the part of the healthcare defendant. *See id.* at

---

[8]    Counsel for Plaintiffs in the instant case is also counsel for the plaintiffs in the *Chiles* case.

4. "Thus, [the plaintiffs] have affirmatively pleaded facts that negate any possible liability of the physicians." *Id.*

The *Chiles* analysis applies here. Like *Chiles*, Plaintiff's Petition contains no allegations whatsoever of negligent conduct on the part of the Healthcare Defendants and, instead, specifically alleges that the Healthcare Defendants could not have had any reason to know of the alleged dangers of thimerosal-containing childhood vaccines. Defendants respectfully request that this Court adopt Judge McBryde's astute reasoning and deny Plaintiff's Motion to Remand.

**B. The Common-Defense Rule of *Smallwood v. Illinois Central Railroad Company* Does Not Require Remand.**

Plaintiff's Motion to Remand should be denied pursuant to the authorities discussed above. On this basis, the Fifth Circuit's recent decisions in *Smallwood v Illinois Central Railroad Co.*, 2003 WL 21805636 (5th Cir. Aug. 7, 2003) and *Collins v. American Home Products Corp.*, 2003 WL 21998574 (5th Cir. Aug. 29, 2003) have no application to the case *sub judice* because the fraudulent joinder of the Healthcare Defendants is found in defenses (or deficiencies in Plaintiff's pleading) that are unique to them and not "common" to both diverse and non-diverse defendants alike. This was exactly what Judge McBryde recently held in the *Chiles* case on this point. *See Chiles*, slip op. at 7. Accordingly, the Court need never take up the issues raised in Plaintiff's motion to remand concerning *Smallwood* and *Collins* for they have no application here.

But even if the Court were to find that the fraudulent joinder of the Healthcare Defendants was premised upon a common defense, remand is not required. Defendants respectfully submit that, for the reasons explained below, the Fifth Circuit's recent decision in *Collins* incorrectly applied the so-called "common defense" rule of *Smallwood*. The Defendants also respectfully submit that the appellees in both *Smallwood* and *Collins* have sought an *en banc*

rehearings of those appeals. Consequently, both *Collins* and *Smallwood* are neither final nor binding on this Court.[9] Considering the importance of the issues raised and their broad implications, it is highly likely that review by the United States Supreme Court will be sought in one or both of these cases, regardless of the outcome at the Fifth Circuit.

1.    **The Vaccine Act's tort-suit bar is a procedural bar that does not go to the merits of Plaintiff's claims.**

Following the reasoning of *Chesapeake & Ohio Railway Co. v. Cockrell*, 232 U.S. 146 (1914), and *Boyer v. Snap-On Tools Corp.*, 913 F.2d 108 (3d Cir. 1990), the Fifth Circuit recently held that a district court deciding whether a non-diverse defendant has been fraudulently joined may not resolve a merits-based defense in favor of the non-diverse defendants where that defense in equally applicable to all of the defendants. *See Smallwood v Illinois Central Railroad Co.*, ---F.3d---, 2003 WL 21805636, *5 (5th Cir. Aug. 7, 2003). In doing so, the Fifth Circuit acknowledged with apparent approval Professor Wright's explanation of the policy behind the rule:

> "*[T]he defendant may not use removal proceedings as an occasion to adjudicate the substantive issues of a case*. Thus, a nondiverse codefendant may not remove a case to federal court on the theory that because it was not liable to the plaintiff, it should be disregarded for removal jurisdiction purposes. In such a situation, the question of the defendant's liability should be adjudicated in the state forum and not, de facto, in the context of procedures such as removal."

*Id.* at *3 n.34 (quoting 14B Charles Alan Wright, et al., Federal Practice and Procedure § 3721 (3d ed. Supp. 2003)) (emphasis added). The Fifth Circuit additionally quoted from *Boyer* in characterizing the rule as applying to merits-based fraudulent joinder

---

[9]    *See* 5th Cir. Loc. R. 41(d)(1) ("The timely filing of a . . . petition for rehearing en banc . . . stays the mandate until the disposition of the petition . . . unless the court orders otherwise."); *see also* 5th Cir. Loc. R. 41.3 ("Unless otherwise expressly provided, the granting of rehearing en banc vacates the panel opinion and judgment of the court and stays the mandate."); *see also Bliss v. Lockhart*, No. 90-2144, 1990

decisions: "'in the guise of deciding whether the joinder was fraudulent,' the district court 'stepped from the threshold jurisdictional issue into a decision on the merits.'" *Id.* at *3 (quoting *Boyer*, 913 F.2d at 112); *see id.* ("'[W]here there are colorable claims or defenses asserted against or by diverse and non-diverse defendants alike, the court may not find that the non-diverse parties were fraudulently joined *based on its view of the merits of those claims or defenses.*'") (quoting *Boyer*, 913 F.2d at 113) (emphasis added).

Thus, this "common-defense" rule, rightly construed, depends upon the existence of a defense that *both* (i) *goes to the merits* of the plaintiff's claims *and* (ii) would be dispositive of the plaintiff's entire action if successfully raised by all defendants.[10] Such a determination would allow a district court to essentially convert the threshold jurisdictional question of fraudulent joinder into a final dispositive decision on the merits of the plaintiff's action as whole.

In stark contrast to merits-based defenses, however, a district court *can* apply a procedural bar to find a defendant fraudulently joined—even though that procedural bar is equally applicable to the claims against all defendants. *See, e.g., Ross v. Citifinancial, Inc.*; ---F.3d.---, 2003 WL 22026346 (5th Cir. Aug. 29, 2003) (affirming fraudulent joinder finding based on statute of limitations defense equally applicable to claims against diverse and nondiverse defendants);[11] *LeBlang Motors, Ltd. v. Subaru of Am., Inc.*, 148 F.3d 680, 691-92 (7th Cir. 1998) (same); *Ritchey v. Upjohn Drug Company*, 139 F.3d 1313 (9th Cir. 1998) (same). In *Ritchey*, the Ninth Circuit explained why the "common-defense" rule of *Cockrell* (and *Boyer* and *Smallwood*), had no application where the defense common to diverse and nondiverse

---

U.S. App. LEXIS 23152 (8th Cir. Dec. 13, 1990) ("Until the mandate issues, a party may petition for rehearing, and the court of appeals may modify or revoke its judgment.").

[10]    The *Smallwood* court expressly declined to address the question—presented here—of whether this rule would apply where the defense was not common to all defendants. *See Smallwood*, at *4 n.35.

[11]    The Fifth Circuit's opinion in *Ross* is attached hereto as Exhibit G, and the underlying district court order denying remand is attached as Exhibit H.

defendants is a purely procedural bar.[12]   Despite the obvious applicability of the statute of

limitations defense to all defendants in that case, the Ninth Circuit affirmed the denial of remand

because the limitations defense was "a kind of *procedural bar, and not one which relates to the*

*merits of the case*." *Id.* at 1319 (emphasis added).

Distinguishing the *Cockrell* decision, the Ninth Circuit emphasized the procedural

nature of the statute of limitations bar under state law and explained that the defense:

> is one that does not truly go to the merits of the plaintiff's claim in
> any sense.  It does not assert some excuse or justification for what
> the defendant is alleged to have done, nor does it assert any release
> or waiver of any right of action against the defendant.  It does not
> even deny the wrong or claim contributory fault or set off.

*Id.* at 1319.

The *Ritchey* court's reasoning is equally applicable to the jurisdictional bar at

issue here.  Like the statute of limitations defense in *Ritchey* (and that in *Ross* and *LeBlang*,

*supra*), the Vaccine Act's tort-suit bar does not challenge Plaintiff's factual allegations

concerning alleged wrongful conduct of the nondiverse defendants.  It did not require the district

court to "'step[] from the threshold jurisdictional issue into a decision on the merits,'"[13] but

rather to stay in the realm of subject matter jurisdiction.  As explained in the Vaccine

Defendants' Motion to Dismiss, § 300aa-11(a)(2)(A) bars *any* civil action for vaccine-related

injuries—whether meritorious or not—brought against a vaccine administrator or manufacturer

until the plaintiff has first complied with the procedures of the Vaccine Act.  *See* 42 U.S.C. §

300aa-11(a)(2)(A)-(B).  The failure to satisfy this federal precondition to filing suit means that

any other court lacks subject matter jurisdiction over the claim.  This lack of subject matter

---

[12]   The Court in *Smallwood* recognized *Ritchey* as having applied a universal limitations defense to
find fraudulent joinder of the nondiverse defendants.  *See Smallwood*, at *4 n.49.  As explained above,
*Smallwood, Ross, LeBlang,* and *Ritchey* are both consistent with the Supreme Court's decision in *Cockrell*
because the former involved a merits-based defense, while the latter involved only a procedural one.

[13]   *Smallwood*, at *3 (quoting *Boyer*, 913 F.3d at 112).

jurisdiction is not a merits-based defense because it bars only the prosecution of the action in the forum where it is currently pending and does not ultimately resolve the plaintiff's claims.[14]

Moreover, the Vaccine Act goes directly to the question of joinder—not the merits of the underlying claim. *See Smallwood*, at *5 (following the "Supreme Court's century-old command in *Cockrell* that the fraudulent joinder allegations be directed toward the joinder, not to the merits of the action as an entirety") (internal quotations omitted) (emphasis added). Under the Act, a vaccine administrator or manufacturer cannot be joined to any action in which claims for vaccine-related injury are asserted unless and until the Vaccine Act's mandate has been satisfied. *See* 42 U.S.C. § 300aa-11(a)(3). The issue is clearly one of joinder, not merits.

**C.    Plaintiff's Authorities Remanding "Thimerosal" Cases Have Been Superceded by the Vaccine Court's *Leroy* Decision.**

Plaintiff's Motion to Remand cites several federal district court decisions remanding claims for alleged thimerosal-related injuries to state court. *See* Motion to Remand at 8. Each of those courts[15] reasoned that because the question of whether thimerosal-related claims fell within the Act's "adulterant or contaminant" exception was an unsettled point of law, the removing defendants could not show that the plaintiffs had "no possibility" of recovery against the in-state healthcare providers. Since those decisions were handed down, however, the Vaccine Court has resolved the "adulterant and contaminant" question *as a matter of law* in its

---

[14]    *See also Ruhrgas v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999) (discussed *infra*). In the *Ruhrgas* case, the district court dismissed the removing defendant for lack of personal jurisdiction prior to (and instead of) deciding the plaintiff's motion to remand. The Supreme Court affirmed that dismissal, noting that "[a] court [may] dismiss[] *on . . . non-merits grounds* . . . before finding subject matter jurisdiction," because "a federal court [may] choose among threshold grounds for denying audience to a case on the merits." *Id.* at 584-85 (emphasis added) (citations and internal quotation marks omitted). Likewise, here, the Vaccine Act presents an overarching "non-merits" barrier to the courthouse for claims against the Healthcare Defendants. And like the trial court in *Ruhrgas*, this Court can take notice of that jurisdictional bar and dismiss the case on this ground.

[15]    The remand decision in *Cheskiewicz v. Aventis Pasteur, Inc.*, 2002 WL 1880524 (E.D. Pa. 2002) was based on an application of the "common-defense" rule addressed in Section B, *supra*. For the reasons stated therein, Defendants respectfully submit that the *Cheskiewicz* court erred in doing so.

decision in *Leroy v. Sec'y, Dep't of Health & Human Servs.*, 2002 WL 31730680 (Fed. Cl. Spec. Mstr. Oct. 11, 2002). In light of that decision, there is no reasonably possibility that Plaintiff can proceed with a claim for a thimerosal-related injury against the Healthcare Defendants until she has complied with the requirements of the Vaccine Act.

Contrary to Plaintiff's argument that Texas state courts are not bound by the Vaccine Court's determination that thimerosal-related claims do not fall within the Act's "adulterant or contaminant" exception, the Vaccine Court's *Leroy* decision is entitled to the highest level of judicial deference. This is so because the Special Masters of the Vaccine Court are charged with adjudicating claims under the Act (42 U.S.C. § 300aa-12), and they are empowered to issue decisions on petitions for compensation which include "findings of fact and conclusions of law." *Id.* § 300aa-12(d)(3)(A)(1). When, as in *Leroy*, an agency reaches a generally applicable interpretation of the statute it is charged to apply in the context of a formal adjudication, that interpretation carries the force and effect of law and is owed the highest deference by all courts. *See Chevron U.S.A., Inc., v. Natural Resources Defense Counsel, Inc.*, 467 U.S. 837 (1984); *see also United States v. Mead Corp.*, 533 U.S. 218, 230-31 (2001) ("the overwhelming number of our cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking *or formal adjudication*") (emphasis added)); *see e.g., INS. v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (holding that the Board of Immigration Appeals' construction of its statute "should be accorded *Chevron* deference as it gives ambiguous statutory terms 'concrete meaning through a process of case-by-case adjudication'" (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 448-49 (1987)).

## D.   Plaintiff Has No Cognizable Individual Claims Under Texas Law.

Plaintiff's remaining arguments for remand are merely reiterations of her arguments in response to the Vaccine Defendants' Motion to Dismiss. Defendants hereby

incorporate for all purposes the arguments and authorities contained in their Motion to Dismiss, supporting brief, and Reply Brief. As explained therein, the Vaccine Act governs all claims brought on behalf of Plaintiff's child and all claims for costs and expenses related to the medical, remedial, and custodial care of her child. Consequently, any claim for those damages sought against the Healthcare Defendants is barred until the Plaintiffs and her child either file a formal election to withdraw from the Vaccine Injury Compensation Program or a written rejection of any judgment rendered by the Vaccine Court. *See* 42 U.S.C. § 300aa-11(a)(2).

Furthermore, and as explained in the Vaccine Defendants' brief in support of their Motion to Dismiss and Reply Brief, Plaintiff has no cognizable claims under Texas law for lost wages, mental anguish, or loss of consortium. Thus, any claim for such damages against the Healthcare Defendants would be insufficient to defeat the removal jurisdiction of this Court.

Finally, and as explained in the Vaccine Defendants' briefing on the Motion to Dismiss, Plaintiff's Petition fails to state a viable claim for fraud against any defendant. Indeed, the allegations of Plaintiff's Petition refute any contention that the Healthcare Defendants had any knowledge, or reason to know, of any dangers allegedly associated with thimerosal-containing vaccines. *See* Petition at ¶ 6.01(a), (f) ("Defendants failed to warn or adequately warn prescribers . . . [and] . . . Defendants did not give warning or adequate warning to healthcare providers regarding the dangers of Thimerosal").

**E.     The Court Need Not Decide Questions of Subject Matter Jurisdiction In Any Particular Order.**

Plaintiff contends that, if the Court agrees that it lacks diversity jurisdiction over their lawsuit at this time, the Court's only option would be to remand the case back to state court. *See* Plaintiff's Combined Response to Motions to Dismiss at 3-4. However, the United States Supreme Court has recognized that "there is no unyielding jurisdictional hierarchy" prohibiting a federal court from entertaining a motion to dismiss based upon a jurisdictional defect before

deciding whether to remand. *See Ruhrgas v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999). In the *Ruhrgas* case, the district court had addressed issues of personal jurisdiction and dismissed the case on that basis before determining its removal jurisdiction. The Supreme Court, accepting this practice, noted that "[a] court that dismisses *on . . . non-merits grounds* . . . before finding subject matter jurisdiction makes no assumption of law-declaring power that violates . . . separation of powers principles . . . [and] [i]t is hardly novel for a federal court to choose among threshold grounds for denying audience to a case on the merits." *Id.* at 584-85 (emphasis added) (citations and internal quotation marks omitted). Thus, because the application of the Vaccine Act is a threshold question of subject matter jurisdiction, this Court has the authority to grant the Defendants' motions to dismiss before addressing Plaintiff's Motion to Remand.[16]

In the typical removal situation, the federal and state courts have concurrent jurisdiction over the claims, and the jurisdictional question is strictly construed against the removing defendant, which is effectively defeating the plaintiff's choice of forum. If any aspect of diversity or federal question jurisdiction is lacking, the federal court has no power but to remand. But, in deciding to remand, the federal court makes an implicit assumption that the state court has its own subject matter jurisdiction over the claims asserted—or at least the power and authority to make its own decision as to subject matter jurisdiction. Indeed, the very purpose of narrowly construing removal jurisdiction is to prevent an affront to "the dignity of the state courts":

> Most essentially, federal and state courts are *complementary systems for administering justice in our Nation.* Cooperation and comity, not competition and conflict, are essential

---

[16]   While *Ruhrgas* involved the determination of personal jurisdiction prior to subject-matter jurisdiction, and the present case poses two issues of subject-matter jurisdiction—namely, removal jurisdiction and the jurisdictional effect of the Vaccine Act—the same principle should apply: there is no "jurisdictional hierarchy" that a court must follow in deciding among such threshold issues. *See Ruhrgas*, 526 U.S. at 578.

> to the federal design.  A state dignitary interest bears consideration
> when a district court exercises discretion in a case of this order [by
> deciding issues other than subject-matter jurisdiction first].  . . .
> Our Federalism "does not mean blind deference to 'States' Rights'
> any more than it means centralization of control over every
> important issue in our National Government and its courts.  The
> Framers rejected both these courses.  ***What the concept does
> represent is a system in which there is sensitivity to the legitimate
> interests of both State and National Governments.***"

*Ruhrgas*, 526 U.S. at 586 (quoting *Younger v. Harris*, 401 U.S. 37, 44 (1971)) (emphasis added).

Here, by contrast, the state court has no legitimate interest in hearing claims against those defendants covered by the Vaccine Act.  By law, state courts lack jurisdiction to do anything but dismiss those claims.  Congress—which has the sole authority to define the subject matter jurisdiction of the federal courts—has specifically decreed that *no court* except the Court of Federal Claims can entertain claims, like the ones alleged by Plaintiff, for vaccine-related injuries.  Until the Vaccine Court compensation process has been completed, *no other federal or state court* can exercise jurisdiction of those claims.  Put another way, the federal court has precisely the same jurisdictional problem—and the same attendant duty to dismiss—as a state court would have.  *See Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*, 529 U.S. 765 (2002) ("'Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'") (quoting *Ex parte McCardle*, 74 U.S. 506, 7 Wall. 506, 514 (1869)).

At least one federal district court has expressly held that it could, and should address the question of dismissal for lack of subject-matter jurisdiction under the Vaccine Act before reaching the issues raised by a motion to remand:

> Generally, a court may not hear or decide a case when it lacks
> subject matter jurisdiction.  Accordingly, federal courts usually
> address the question of whether the action was properly removed
> before assessing other matters.  Where, however, dismissal would
> be inevitable, a district court may pass directly to a procedurally
> dispositive issue without addressing the merits of the underlying

action or a motion to remand. *See generally Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 119 S.Ct. 1563 (1999).

The court's decision to dismiss this action without addressing the plaintiffs' motion to remand is the result of the careful consideration by this court of the legal standards and principles involved. The court bases the decision on the relatively straightforward subject matter jurisdictional question which would apply with equal force in the state court. Further, such a disposition obviates a more complex fraudulent joinder analysis. Moreover, the court finds the interests of judicial economy and the expedition of the resolution of this matter to weigh in favor of addressing the motion to dismiss.

*Mann v. Glaxo SmithKline Beecham Corp.*, Civ. A. No. 1:02-CV-2660-CAP (N.D. Gal. July 8, 2003) (dismissing action for vaccine-related injuries without prejudice) (attached as Exhibit I).

In dismissing the claims covered by the Vaccine Act, the Court will fulfill its Congressionally mandated duty and confirm that the Vaccine Court alone has exclusive jurisdiction over Plaintiff's compensation claims at present. Under these circumstances, remand would be futile. Because the state court to which this action might be remanded would also lack subject matter jurisdiction, dismissal—and not remand—is the appropriate action. *See, e.g., Asarco, Inc. v. Glenara Ltd.*, 912 F.2d 784, 787 (5th Cir. 1990) ("Were the state action remanded, the [state] courts would be bound by our ruling that defendants had insufficient contacts with [the state] to satisfy the federal due process clause requisites for personal jurisdiction. A remand thus would be a futile gesture, wasteful of scarce judicial resources, an exercise in which we decline to engage."); *Bell v. City of Kellogg*, 922 F.2d 1418, 1424-25 (9th Cir. 1991) ("Where . . . remand to state court would be futile . . . the desire to have state courts resolve state law issues is lacking. We do not believe Congress intended to ignore the interest of efficient use of judicial resources. . . . The district court correctly resolved the whole case by dismissing it because a remand to state court would have been futile.").

## IV. CONCLUSION

For all of these reasons, Plaintiff's Petition fails to state any viable claim against the in-state Healthcare Defendants under Texas law, and the Texas citizenship of those defendants must be disregarded. Consequently, this Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1441, and Plaintiff's Motion for Remand must be denied.

Respectfully submitted,

BAKER BOTTS L.L.P.

By _Richard L. Josephson /by permission_

Richard L. Josephson
Attorney-in-Charge
Federal I.D. No. 04614
State Bar No. 11031500
One Shell Plaza
910 Louisiana
Houston, TX 77002
(713) 229-1460
(713) 229-1522 (fax)
richard.josephson@bakerbotts.com

COUNSEL FOR DEFENDANT MERCK & CO., INC. AND
ABBOTT LABORATORIES

OF COUNSEL:

BAKER BOTTS L.L.P.

Paul R. Elliott
State Bar No. 06547500
Douglas B. Roberson
State Bar No. 24013409
One Shell Plaza
910 Louisiana
Houston, TX 77002
(713) 229-1460
(713) 229-1522 (fax)

CLARK, THOMAS & WINTERS

By: _Michael R. Klatt / by permission DK_
    Michael R. Klatt
    State Bar No. 11554200
    Susan E. Burnett
    P. O. Box 1148
    Austin, TX  78767
    (512) 472-8800

Counsel for Wyeth f/k/a American Home
Products


FULBRIGHT & JAWORSKI L.L.P.

By: _Jeffrey S. Wolff / by permission DK_
    Jeffrey S. Wolff
    State Bar No. 21865900
    1301 McKinney, Suite 5100
    Houston, TX  77010-3095
    (713) 651-5151
    (512) 651-5246 (fax)

Counsel for SmithKline Beecham
Corporation d/b/a GlaxoSmithKline


By: _R. Jo Reser / by permission JW_
    R. Jo Reser
    State Bar No. 16789500
    Davidson & Troilo
    7550 W. IH 10, Suite 800
    San Antonio, Texas 78229
    210.349.6484
    210.349.0041 (Fax)

Counsel for Aventis Pasteur Inc.

By: _____

M. Scott Michelman
State Bar No. 00797075
Federal I.D. No. 20802
Shook, Hardy & Bacon, L.L.P.
Chase Tower
600 Travis Street, Suite 1600
Houston, TX 77002-2911

Counsel for Defendant Eli Lilly and Company

## Certificate of Service

I certify that on this ___3___ day of October 2003, I served the above pleading on all counsel of record via facsimile, First Class U.S. mail, or certified mail, return receipt requested.

_____
Richard L. Josephson

2003 WL 21910701
--- F.Supp.2d ---
(Cite as: 2003 WL 21910701 (S.D.W.Va.))

Page 1

Only the Westlaw citation is currently available.

United States District Court, S.D. West Virginia.

Comella BAISDEN, Plaintiff,
v.
BAYER CORPORATION and James W. Endicott,
M.D., Defendants.

No. CIV.A. 2:03-0526.

Aug. 11, 2003.

Patient brought state court suit against non-resident drug manufacturer and resident physician, alleging that manufacturer knew of dangers of drug and hid dangers from physicians and public, and that physician, in failing to inform patient of dangers, was liable for malpractice. Action was removed. On patient's motion to remand, the District Court, Haden, J., held that physician was fraudulently joined in patient's action in order to defeat removal based on diversity.

Motion denied.

West Headnotes

[1] Removal of Cases ⚷2
334k2

Removal statutes must be construed strictly against removal.

[2] Removal of Cases ⚷107(7)
334k107(7)

The burden of establishing the propriety of removal falls upon the removing party.

[3] Removal of Cases ⚷29
334k29

District court may assert subject matter jurisdiction, under diversity jurisdiction statute, in removed cases only if complete diversity of citizenship between the parties on either side of the dispute existed at time of removal. 28 U.S.C.A. § 1332.

[4] Removal of Cases ⚷36
334k36

[4] Removal of Cases ⚷107(7)
334k107(7)

To show that in-state defendant was fraudulently joined in state action to defeat removal based on diversity, the removing party must demonstrate either outright fraud in plaintiff's pleading of jurisdictional facts or that there is no possibility that plaintiff would be able to establish cause of action against in-state defendant in state court. 28 U.S.C.A. § 1332.

[5] Removal of Cases ⚷36
334k36

Non-diverse physician was fraudulently joined in patient's negligent and fraud based action against non-resident drug manufacturer, arising from damages she sustained due to alleged undisclosed dangers of drug, in order to defeat removal based on diversity; premise of medical malpractice claim against physician was that physician had knowledge of drug's dangers, and failed to inform patient, but such premise was incompatible with claims that manufacturer withheld knowledge of drug's dangers from physicians and public. 28 U.S.C.A. § 1332.

[6] Removal of Cases ⚷36
334k36

[6] Removal of Cases ⚷107(7)
334k107(7)

The party alleging that in-state defendant was fraudulently joined to state action to defeat removal based on diversity bears heavy burden, and must show that plaintiff cannot establish claim even after resolving all issues of law and fact in plaintiff's favor. 28 U.S.C.A. § 1332

[7] Removal of Cases ⚷36
334k36

When considering whether in-state defendant was fraudulently joined in state action to defeat removal based on diversity, claim against in-state defendant need not succeed to defeat removal; only a possibility of a right to relief need be asserted. 28 U.S.C.A. § 1332

[8] Health ⚷623
198Hk623

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 21910701                                                    Page 2
--- F.Supp.2d ---
(Cite as: 2003 WL 21910701 (S.D.W.Va.))

[8] Health ☞631
198Hk631

To establish legally cognizable medical malpractice claim under West Virginia law, plaintiff must prove: (1) health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances, and (2) such failure was a proximate cause of the injury or death. West's Ann. W.Va.Code, 55-7B-3.
Marvin W. Masters, Esq, Charles M. Love, IV, Esq., Masters & Taylor, Charleston, for Plaintiff.

D.C. Offutt, Jr., Esq., Cheryl A. Simpson, Esq., Offutt, Fisher & Nord, Charleston, for Defendant James Endicott, M.D.

Michael J. Farrell, Esq., Tamela J. White, Esq., Erik W. Legg, Esq., Farrell Farrell & Farrell, Huntington, Gene C. Schaerr, Esq., Sidley Austin Brown & Wood, LLP, Washington, DC, for Defendant Bayer Corporation.

### MEMORANDUM OPINION AND ORDER

HADEN, District Judge.

*1 Pending is Plaintiff's motion to remand this action to the Circuit Court of Kanawha County, West Virginia, which the Court DENIES.

Comella Baisden, a citizen of West Virginia, brought this action in state court against the Bayer Corporation, a resident of Indiana with its principal place of business in Pennsylvania. Also named as Defendant is Baisden's personal physician, James W. Endicott, M.D., a West Virginia resident. Bayer Corporation timely removed to this Court, claiming federal diversity jurisdiction under 28 U.S.C. § 1332 is satisfied because Dr. Endicott was fraudulently joined. Plaintiff responds her Amended Complaint states a cause of action against Dr. Endicott for medical malpractice.

[1][2][3] Removal statutes must be construed strictly against removal. See Mulcahey v. Columbia Organic Chem. Co., 29 F.3d 148, 151 (4th Cir.1994); accord Murray v. State Farm Fire & Cas. Co., 870 F.Supp. 123, 124 (S.D.W.Va.1994). The burden of establishing the propriety of removal falls upon the removing party. Mulcahey, 29 F.3d at 151. If federal jurisdiction is doubtful, remand is necessary. Id.; see

also 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."). The district court may assert subject matter jurisdiction under Section 1332 in removed cases only if complete diversity of citizenship between the parties on either side of the dispute existed at the time of removal. Rowland v. Patterson, 882 F.2d 97, 99 (4th Cir.1989) (en banc).

[4][5] To show fraudulent joinder, the removing party must demonstrate either "outright fraud in the plaintiff's pleading of jurisdictional facts" or that "there is no possibility that the plaintiff would be able to establish a cause of action against the in-state defendant in state court." Marshall v. Manville Sales Corp., 6 F.3d 229, 232 (4th Cir.1993) (internal quotation marks omitted). Bayer does not allege any bad faith in pleading, so the only inquiry is whether Baisden has any possibility of recovery against Dr. Endicott.

[6][7] The party alleging fraudulent joinder bears a heavy burden: it must show that the plaintiff cannot establish a claim even after resolving all issues of law and fact in the plaintiff's favor. Id. at 232-33. This standard is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss under Rule 12(b)(6), Federal Rules of Civil Procedure. See, e.g., Batoff v. State Farm Ins. Co., 977 F.2d 848, 852 (3d Cir.1992) (inquiry into validity of complaint is more searching under Rule 12(b)(6) than when party claims fraudulent joinder). "A claim need not succeed to defeat removal; only a possibility of a right to relief need be asserted." Marshall, 6 F.3d at 233 (citing 14A Charles A. Wright et al., Federal Practice & Procedure § 3723, at 353-54 (1985)).

Baisden's Amended Complaint alleges that Bayer manufactured, marketed and distributed Cerivastatin/Baycol ("the drug"), which had deleterious effects on human health including rhabdomyolysis, myopathy and kidney damage. Baisden's claims are based in strict liability, negligence, intentional tort, misrepresentation, fraud, breach of warranties, and unfair and deceptive trade practices. In support of these claims, Baisden alleges Bayer knew or should have known of the dangers of the drug, but failed to advise and warn clinics, physicians, the public or others of those dangers. (Am.Compl.¶¶ 15, 16, 19.) Instead, Baisden alleges Bayer withheld information from the public, physicians, pharmacies, clinics, and the medical community that would have prevented exposure to these dangers while encouraging the drug's use,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 21910701                                                        Page 3
--- F.Supp.2d ---
(Cite as: 2003 WL 21910701 (S.D.W.Va.))

solely to make a profit. (*Id.* ¶¶ 20, 21 22, 24.)
Further, she alleges Bayer provided false and
misleading information by providing only partial
information concerning the drug's ill effects, thus
misleading Baisden and others into believing the drug
was safe and effective. (*Id.* ¶¶ 25, 26.)

*2 Baisden's claim against Dr. Endicott alleges he
"purchased, advertised, marketed, prescribed,
distributed and/or sold the drug" to Baisden. (*Id.* ¶
7.) She further alleges Dr. Endicott failed to
recognize her symptoms, monitor her medical
condition, and appropriately evaluate and treat her
with respect to her medication, Baycol and Lopid.
(*Id.* ¶ 69.) As a direct and proximate result of Dr.
Endicott's negligence, Baisden sustained damages of
pain, expense, loss of enjoyment, and so forth. Lopid,
not mentioned elsewhere in the Complaint, is
described in a Screening Certificate of Merit, an
affidavit appended as an exhibit to Plaintiff's motion
to remand, as the brand name of gemfibrozil.
Plaintiff's memorandum asserts without citation that
combined drug treatment with Baycol and Lopid is
contraindicated on Bayer's package inserts because
the drug interaction can cause rhabdomyolysis.

The question, then, is whether Baisden's Amended
Complaint states a claim against Dr. Endicott when
all inferences and questions of law and fact are
resolved in her favor. Under Fed.R.Civ.P. 8(a), a
pleading must contain: (1) a short, plain statement of
the grounds for jurisdiction; (2) a short, plain
statement of the claim, showing plaintiff is entitled to
relief; and (3) "a demand for judgment for the relief
the pleader seeks." Fed.R.Civ.P. 8(a). Under notice
pleading, it is not necessary that she provide the
factual basis for that claim. *See Swierkiewicz v.
Sorema N.A.*, 534 U.S. 506, 510-11, 122 S.Ct. 992,
152 L.Ed.2d 1 (2002)(complaint in an employment
discrimination lawsuit need not allege specific facts
establishing a *prima facie* case of discrimination).
Our Court of Appeals, however, has not interpreted
*Sorema* to alter the "basic pleading requirement that a
plaintiff set forth facts sufficient to allege each
element of his claim." *Dickson v. Microsoft Corp.*,
309 F.3d 193, 213 (4th Cir.2002).

[8] To establish a legally cognizable medical
malpractice claim under West Virginia law, Plaintiff
must prove:

(a) The health care provider failed to exercise that
degree of care, skill and learning required or
expected of a reasonable, prudent health care
provider in the profession or class to which the
health care provider belongs acting in the same or

similar circumstances; and
(b) Such failure was a proximate cause of the
injury or death.
W.Va.Code § 55-7B-3. Baisden alleges Endicott
deviated from applicable standards of care in a series
of listed acts, which failures proximately caused her
injury. Two of the acts, as noted previously, also
mention the medication Lopid.

Defendants have provided numerous cases, which
they argue are similar to this one, on which courts
have denied remand based on fraudulent joinder
because a premise of the claim asserted against the
non-diverse defendant is knowledge of the dangers
posed by the drug at issue--a knowledge withheld
from them by the co-defendant drug company, as the
remainder of the complaint alleges. *See e.g., In re
Baycol Products Litigation (Spier v. Bayer Corp.)*,
Case No. 02- 4835, 2003 WL 21223842 (D.Minn.
May 27, 2003)(conclusory allegation doctor knew or
should have known of Baycol's risks absent
supporting factual assertions will not defeat
fraudulent joinder); *Rezulin Products Liability
Litigation*, MDL No. 1348, Case No. 02-Civ. 3583,
2003 WL 43356 (S.D.N.Y. Jan. 6, 2003) (claims
doctor failed to warn about Rezulin, failed to test and
monitor liver functions, cannot possibly be proven
because premised on knowledge allegedly withheld);
*Louis v. Wyeth-Ayerst Pharm.*, Civil Action No.
5:00CV102LN (S.D.Miss. Sept. 25, 2000)(non-
diverse pharmacists fraudulently joined where, given
allegations against manufacturers, no reasonable
basis supports claim they knew or should have
known of drug dangers).

*3 In the Baycol and Rezulin cases that find
fraudulent joinder, the impossibility of the claim
against the non-diverse defendant(s) is implicit in the
contradictory allegations: 1) defendant manufacturer
hid the information that 2) non-diverse doctor or
pharmacist knew or should have known. In each of
these cases, the premise of the case against the non-
diverse defendant(s) that they knew or should have
known of the dangers is undercut, defeated, and made
impossible by the claims of fraud and
misrepresentation against the manufacturers, who
allegedly prevented anyone from knowing the
dangers. That contradiction, apparent on the face of
the complaint, is also present here.

Aside from *Count* XI against Dr. Endicott, the other
ten counts of the Amended Complaint lie against the
defendant drug manufacturer for Baycol-related
injuries. The gravamen of the malpractice case
against Dr. Endicott is his failure to know what

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 21910701
--- F.Supp.2d ---
**(Cite as: 2003 WL 21910701 (S.D.W.Va.))**

allegedly was deliberately hidden: his failure to recognize, diagnose, monitor, supervise and treat Baisden for the effects of Baycol treatment. As well there are two references, not further illuminated, to the drug Lopid. According to Plaintiff's briefs, an interaction between Baycol and Lopid ostensibly was stated [FN1] in the literature provided with the drug.

Defendants correctly point out that jurisdiction is determined at the time of removal. The documents and claims supporting the interaction between Baycol and Lopid were not attached to the Amended Complaint or provided to Defendants at that time. The Court must consider the complainant's well-pleaded allegations as true and view the *complaint* in the light most favorable to the non-moving party. *Mylan, 7 F.3d at 1134.* Even under that lenient standard, the Amended Complaint does not state a claim against Dr. Endicott based on knowledge he should have known about a Baycol/Lopid drug interaction. That claim is nowhere presented on the face of the complaint, which does not assert either that there was such a drug interaction or that information about the interaction was available to Endicott. The insertion of "Lopid" twice in the malpractice count is insufficient to state a claim on this basis under *Rule 8(a)* or *Dickson, supra, 309 F.3d at 213.*

For these reasons, the Court **FINDS** and **CONCLUDES** the claims against the manufacturer and the claims against the doctor, as stated in the Amended Complaint, cannot both be true. Dr. Endicott must be **DISMISSED** as fraudulently joined. Thus, complete diversity is present and Plaintiff's motion to remand is **DENIED.**

The Clerk is directed to send a copy of this Order to counsel of record. The opinion is published on the Court's website at http://www.wvsd.uscourts.gov.

FN1. The only basis provided is a conclusory statement, without citation or attribution, contained in Plaintiff's memorandum of law.

2003 WL 21910701, 2003 WL 21910701 (S.D.W.Va.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                                  Page 1
(Cite as: 2003 WL 21223842 (D.Minn.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.

In re: BAYCOL PRODUCTS LITIGATION

**No. MDL 1431(MJD), 02-4835.**

May 27, 2003.

Akim A. Anastopoulo and Samuel K. Allen,
Anastopoulo Law Firm for and on behalf of
Plaintiffs.

Celeste T. Jones and Andrew G. Melling, McNair
Law Firm, N.A. and Gene S. Schaerr, Sidley Austin
Brown & Wood LLP for and on behalf of Bayer
Corporation.

DAVIS, J.

**\*1** This Document also relates to: Genevieve Spier
v. Bayer Corporation et al.,

This matter is before the Court upon Plaintiff's
motion for remand. Bayer Corporation ("Bayer")
opposes the motions, arguing that this Court has
diversity jurisdiction over Plaintiff's claims.

*Background*

Plaintiff Genevieve Spier is a citizen of the state of
South Carolina. She was prescribed Baycol by
Defendant Dr. Terrell Stone in February 1999; which
she took until August 2001. Complaint ¶ 6. She
alleges that she was injured as a result of ingesting
Baycol.

Plaintiff has asserted claims against the
pharmaceutical manufacturers, as well as her
personal physician, Dr. Stone. Because Dr. Stone is
also a citizen of the state of South Carolina, this
action was originally filed in state court. Bayer
Corporation timely removed this action to the United
States District Court, District of South Carolina
asserting subject matter jurisdiction based on
diversity of citizenship under 28 U.S.C. § 1332(a). In
its removal petition, Bayer asserts that the only non-
diverse defendant, Dr. Stone, was fraudulently joined
as Plaintiff failed to state a cause of action against

him.

*Standard*

Remand to state court is proper if the district court
lacks subject matter jurisdiction over the asserted
claims. 28 U.S.C. § 1447(c). In reviewing a motion
to remand, the court must resolve all doubts in favor
of remand to state court, and the party opposing
remand has the burden of establishing federal
jurisdiction by a preponderance of the evidence. *In re
Business Men's Assurance Co. of America,* 992 F.2d
181, 183 (8th Cir.1983) (citing *Steel Valley Auth. v.
Union Switch & Signal Div.,* 809 F.2d 1006, 1010
(3rd Cir.1987) *cert. dismissed* 484 U.S. 1021 (1988)).

Joinder is fraudulent and removal is proper when
there exists no reasonable basis in fact and law
supporting a claim against the resident defendant."
*Wiles v. Capitol Indemnity Corporation,* 280 F.3d
868, 870 (8th Cir.2001). The burden is on the
removing party to show that there is no possibility
that the plaintiff will be able to state a cause of action
against the resident defendant or that there has been
outright fraud in the pleading of jurisdictional facts.
*Parnas v. General Motors Corporation,* 879 F.Supp.
91, 92 (E.D.Mo.1995). In deciding this issue, the
Court may consider the pleadings and supporting
affidavits. *Id.*

Plaintiff has asserted a number of claims against
Bayer Corporation and SmithKlineBeecham (the
"Baycol Defendants") based in strict liability,
negligence, misrepresentation and fraud, and breach
of warranty. In support of these claims. Plaintiff
alleges that Baycol was unaccompanied by proper
warnings, and that the Baycol Defendants failed to
perform adequate testing. *Id.* ¶ 20. Plaintiff further
alleges that after the Baycol Defendants knew or
should have known of Baycol's risks of serious
injury, they failed to provide adequate warnings to
Plaintiff and/or her physicians ..." *Id.* ¶ 22. "Further,
Defendants failed to warn the Plaintiff, her
physicians, her insurance company or the public that
such product was not safe." *Id.* ¶ 25. In support of
her misrepresentation/fraud claim, she alleges that the
"Baycol Defendants, through advertising, labeling,
and other communications, made misrepresentations
to physicians and the public, including the Plaintiff
and Plaintiff's insurance company ... about the safety
and efficacy of Baycol ..." *Id.* ¶ 27. "Physicians and
their patients, including the Plaintiff and the
insurance company, relied on these Defendants
fraudulent misrepresentations, and the Plaintiff was
harmed as a result." *Id.* ¶ 30.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

*2 In her Complaint, she also asserts a claim of negligence against Dr. Stone. Specifically, she alleges that Dr. Stone "knew, or should have known, that Baycol was a dangerously defective drug which posed unacceptable risks of serious injury which were unknown and unknowable by Plaintiff." *Id.* ¶ 18. She also alleges that Dr. Stone negligently failed to warn Plaintiff of the risks associated with Baycol and that such negligence was the cause of her injuries. *Id.* ¶ 26. She further alleges that Dr. Stone could have used a safer statin, but instead prescribed Baycol. *Id.*

It is Bayer's position that given the allegations in Plaintiff's complaint, that the Baycol Defendants misrepresented the safety of Baycol, and failed to warn physicians of the serious risks associated with Baycol, Plaintiff has failed to show that Dr. Stone knew or should have known of the serious risks associated with Baycol.

Plaintiff responds that she anticipates that Bayer will assert the "learned intermediary doctrine" as a defense to Plaintiff's claims. Assuming such doctrine will apply in this case, liability will be assumed by her physician, making the physician an indispensable party. Bayer responds, however, that the learned intermediary doctrine has no bearing on whether a cause of action exists against a doctor for failure to warn of unknown risks. The Court agrees.

In determining whether a party has been fraudulently joined, the Court looks to Plaintiff's Complaint. Reading the Complaint as a whole, it is clear that the main thrust of this action is that the Baycol Defendants misrepresented Baycol's risks and failed to adequately warn of such risks. Plaintiff has not included any factual assertions in her Complaint to support the conclusory allegation that Dr. Stone "knew or should have known" of Baycol's risks. Her conclusory allegations, however, will not defeat a finding of fraudulent joinder. *See eg. In re: Rezulin Products Liability Litigation,* 2003 WL 43356 at *1 (S.D.N.Y. Jan. 6, 2003) (citing *Strickland v. Brown Morris Pharmacy Inc.,* 1996 WL 537736 at *2 (E.D.La. Sept. 20, 1996); *In re: Rezulin Products Liability Litigation,* 133 F.Supp.2d 272, 295 (S.D.N.Y.2001). *See also, Silver v. H & R Block, Inc.,* 105 F.3d 394 (8th Cir.1997) (conclusory allegations not sufficient to withstand motion to dismiss). Based on the allegations contained in the Complaint, the Court finds that there is no reasonable basis in fact and law supporting a claim against Dr. Stone.

Accordingly, IT IS HEREBY ORDERED that

Plaintiff's Motion for remand is DENIED.

2003 WL 21223842 (D.Minn.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

NICOLE M. BROWN, SANDRA KEELY,
MIRIAM M. LONG, KAREN RODERICK AND
MISTY STALCUP                                            PLAINTIFFS

VS.                                         CIVIL ACTION NO. 4:02CV301LR

BRISTOL-MYERS SQUIBB COMPANY;
APOTHECON, INC.; CEPHALON, INC.;
AND TERRY FRENCH, M.D., AND
FICTITIOUS PERSONS A, B, C AND D                        DEFENDANTS

### MEMORANDUM OPINION AND ORDER

There are currently pending in this case the following
motions:

    1. The motion of plaintiffs, Nicole M. Brown, Sandra
Keely, Miriam M. Long, Karen Roderick and Misty Stalcup
to remand and abstain;

    2. The motion of defendant Cephalon to vacate or set
aside entry of default and putative default judgment;

    3. The motion of defendant Apothecon to set aside entry
of default; and

    4. Bristol-Myers' motion to strike plaintiffs' rebuttal
affidavits.

Each of these motions has been fully briefed by the parties,
and are addressed herein.

Plaintiffs, four of whom are Mississippi residents and one of
whom is a citizen of Utah, filed this case on June 9, 2002 in the
Circuit Court of Kemper County, alleging personal injury from
their use of the prescription drug Stadol[1]. All the plaintiffs
asserted claims against the non resident defendants, Bristol-

Myers, Apothecon and Cephalon, and one, Sandra Neely, one of the Mississippi plaintiffs, asserted claims against her prescribing physician, Terry French.

On August 5, 2002, defendants Bristol-Myers, Apothecon and Cephalon removed the case to this court pursuant to 28 U.S.C. § 1441 and § 1452, asserting both diversity jurisdiction under 28 U.S.C. § 1332 and bankruptcy jurisdiction under 28 U.S.C. § 1334. Defendants contend that complete diversity exists in this case because plaintiffs "have improperly and fraudulently joined together and have improperly and fraudulently joined Dr. Terry French, the one resident defendant." Finally, defendants contend that the court has removal jurisdiction on the basis that the claims of two of the plaintiffs, Karen Roderick and Sandra Neely, are the property of their bankruptcy estates.

In their motion, plaintiffs argue this case is due to be remanded on the basis that defendants' removal was untimely. They further assert that Terry French is a proper defendant, that fraudulent misjoinder is no basis for remand and that although the claims of Karen Roderick do relate to her pending Chapter 13 bankruptcy proceeding, abstention and remand are mandated, or at least warranted. The court addresses each of these arguments in turn.

Timeliness of Removal:

Defendants Bristol-Myers, Apothecon and Cephalon filed their notice of removal on August 5, 2002. Plaintiffs maintain that the notice of removal was not filed within thirty days of June 28,

2

2002, the date on which the first defendant was properly served with process, and that consequently, the notice of removal was untimely. They contend alternatively that even if the court were to conclude that their attempted service on Apothecon was ineffective, removal was still untimely, since the case was not removed within thirty days of their July 3, 2002 service on Cephalon. In the court's opinion, neither defendant was properly served, and therefore, the notice of removal was timely.

The general removal statute, 28 U.S.C. § 1446(b), provides as follows:

> The notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within thirty days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter.

In Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344, 119 S. Ct. 1322, 143 L. Ed. 2d 448 (1999), the Supreme Court, applying the "bedrock principle" that "[a]n individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process," concluded that "a named defendant's time to remove is triggered by simultaneous service of the summons and complaint, or receipt of the complaint, 'through service or otherwise,' after and apart from service of the summons, but not by mere receipt of the complaint unattended by any formal service." Id. at 347-48, 119 S. Ct. 1322. Following Murphy

3

Brothers, numerous courts have recognized that the relevant date for gauging timeliness of removal is the date on which proper service was effected or, if there has been no proper service, the date on which objections to the sufficiency of process or service of process are waived.[1]

Mississippi Rule of Civil Procedure Rule 4(d)(4) requires that service upon a "domestic or foreign corporation or upon a partnership or other unincorporated association" be made by

---

[1] See, e.g., Liberty Mut. Ins. Co. v. Bayer Corp., No. 02-343-GMS, 2002 WL 1487331, *2 (D. Del. 2002) (stating that "only after a plaintiff has rendered proper service is a defending party obligated to take action"); Mauldin v. Blackwell Area Credit Union, No. 01 C 56221, 2002 WL 31840, *1 (N.D. Ill. January 2002)(holding that "the thirty-day removal technically never really began" since the defendant was not properly served with process, "meaning [the defendant's] notice of removal was timely"); Paradis v. Trahan, S.A.E., Inc., 101 F. Supp. 2d 158, 160 (S.D.N.Y. 2000) ("[W]hen a defendant receives a copy of the initial pleading--in this case, the summons and complaint--the thirty-day period for filing notice of removal is triggered, provided that service of the initial pleading is proper."); Tubbert v. Kahn, Kurnath, Webble, F.H. v. Engas, 94 F. Supp. 2d 1030, 1012 (N.D. Ind. 2000) (Administrative issue was whether plaintiff's attempt at service was proper, for if it was, "then the thirty-day removal clock began to run at that time and the [defendants'] Notice of Removal [more than thirty days later] would be untimely . . . [but] if [the] attempt at service [were] ineffective, then the removal clock would still not have begun (because there ha[d] been no other attempts at service) and the Notice of Removal would be timely"); Big 4 Autokptive Warehouse Distributors, Inc. v. Cooperative Computing, Inc., No. SC 00-2402, 2000 WL 1677348, *1-2 (N.D. Cal. Nov. 2000) (stating that under Murphy Bros., "it is not enough for Plaintiffs to show that Defendant . . . actually received a copy of the complaint by a particular date; Plaintiffs must demonstrate compliance with the requirements of service."); Ward v. Aetna Life Ins. Co., No. 98 Civ. 5428, 1999 U.S. Dist. LEXIS 5133, *2 (W.D.N.Y. 1999) (stating that "the Court's reasoning [in Murphy Bros.] supports the conclusion that the time for removal commences when service is completed' and jurisdiction over the defendant has been obtained."); see also infra p. 9.

4

"delivering a copy of the summons and of the complaint to an

officer, a managing or general agent, or to any other agent

authorized by appointment or by law to receive process." Rule

4(c)(5), which governs service on non-resident defendants,

provides for service by certified mail:

> In addition to service by any other method provided by
> this rule, a summons may be served on a person outside
> this state by sending a copy of the summons and of the
> complaint to the person to be served by certified mail,
> return receipt requested. Where the defendant is a
> natural person, the envelope containing the summons and
> complaint shall be marked by "restricted delivery."
> Service by this method shall be deemed complete as of
> the date of delivery as evidenced by the receipt or by
> the returned envelope marked "Refused." 4(d)(4) requires
> that service upon a "domestic or foreign corporation" be
> made by "delivering a copy of the summons and of the
> complaint to an officer, a managing or general agent, or
> to any other agent authorized by appointment or by law
> to receive process."

Here, the record reflects that plaintiffs sent the summons and

complaint to Apothecon via certified mail, return receipt

requested, but did not address it to any particular person.

Rather, though they purported to send it "restricted delivery,"

plaintiffs failed to designate any person to whom delivery was to

be restricted, and mailed it instead to "Apothecon, Inc., Route 3,

Province Line Road, Princeton, New Jersey." The papers were

signed for by an employee of Bristol-Myers named John Kozak; but

evidence submitted by Apothecon establishes that Kozak was not an

officer, managing or general agent or any other agent authorized

by appointment or by law to receive process for Apothecon. In

fact, the evidence establishes that on July 2, the summons and

complaint were returned to the sender, via United States Postal

5

Service, on July 2, 2002 and received by the sender on July 17,

2002, "because it could not be delivered as addressed."

In Rogers v. Hartford Life and Accident Insurance Company,

167 F.3d 933, 940 (5th Cir. 1999), the court considered the

interrelationship between Rule 4(c)(5) and 4(d) with respect

to service on nonresident unincorporated associations, and

interpreted these rules as follows:

> We begin by examining the plain language of Rule
> 4(c)(5).  The first sentence of the Rule states that "a
> summons may be served on a person outside this state by
> sending a copy of the summons and of the complaint to
> the person to be served by certified mail, return
> receipt requested." Miss. R. Civ. P. 4(c)(5) (emphasis
> added). The Rule thus states that "[w]here the defendant
> is a natural person, the envelope containing the summons
> and complaint shall be marked 'restricted delivery.'"
> Miss R. Civ. P. 4(c)(5) (emphasis added).  The Rule,
> therefore, distinguishes between the "person" that
> physically receives service, and the actual "defendant."
> The two terms are not synonymous.

> Interpreting Rule 4(c)(5) in this way is appropriate,
> because this interpretation makes Rule 4(c)(5)
> consistent with Rule 4(d).  Rule 4(d), which is entitled
> "Summons and Complaint: Person to be Served,"
> specifically identifies the "person" the plaintiff must
> serve with process based on the type of defendant
> involved in the case.  If the defendant is an
> "unincorporated association which is subject to suit
> under a common name," like the Klan, then the plaintiff
> must deliver "a copy of the summons and of the complaint
> to an officer, a managing or general agent, or to any
> other agent authorized by appointment or by law to
> receive service of process." Miss. R. Civ. P. 4(d)(4).
> Thus, when the defendant is an unincorporated
> association the "person" referred to in Rule 4(c)(5) is
> not the defendant itself, but the agent authorized to
> receive service on the defendant's behalf.

6

Eugene, 157 F.3d at 941.[1]  Plaintiffs did not properly serve Apothecon.

Turning, then, to Cephalon, it appears from the record that plaintiffs did correctly address and request restricted delivery of their certified mail with the summons and complaint to John Osborn, Cephalon's general counsel and corporate secretary, all in accordance with Rule 4(c)(5).  However, the Postal Service erroneously allowed the certified mail to be signed for by and delivered to John Kolb.  Kolb, who is described as a mail clerk and maintenance man for Cephalon, is not an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive process on behalf of Cephalon, and he was not authorized to sign for restricted delivery letters on behalf of Osborn.

It does appear in the case of Cephalon, as contrasted with the situation with Apothecon, the certified mail did make its way to John Osborn, the person to whom it was addressed, and hence the summons and complaint were actually received by a proper person to receive process on this defendant's behalf.  In the court's opinion, however, where process, though properly directed by the plaintiff in accordance with the rules governing service of process, is not delivered in accordance with the plaintiff's directions and in accordance with the rules, it cannot be said

_____

[1]  See also 1 Mississippi Civil Procedure § 2.12 (2001) (stating that "[i]t the plaintiff is in possession of the name and address of the officer or managing agent of a foreign corporation, service may be made by mail pursuant to Rule 4(b)(3)).

7

that proper service has been effected. Simply stated, process was not "served" on a person authorized to receive service of process. See Collins v. Collins, 821 So. 2d 874, 878 [Miss. 2002) ["The rules on service of process are to be strictly construed. If they have not been complied with, the court is without jurisdiction unless the defendant appears on his own volition."). Accordingly, the court concludes Cephalon was not effectively served with process on July 3, 2002, as claimed by plaintiffs, and the thirty-day removal clock thus did not commence to run at that time.

There remains the question of when the time period for removal started to run. In this regard, the court recognizes that Cephalon filed an answer in this court on August 5, 2002, following removal, and in its answer, did not raise any objection to the sufficiency of service of process; Cephalon thereby waived any objections to the sufficiency of service. However, in the court's opinion, the thirty-day period for removal could not have begun to run on the basis of service of process on Cephalon until Cephalon actually waived its objections to the sufficiency of service. See Thomas v. Klinkhamer, No. 00 C 3654, 2000 WL 967984, *1-2 (N.D. Ill. 2000) (holding that 30-day period for removal began when defendants waived objections to sufficiency of process by appearing before the court without contesting service of process); Prescott v. Memorial Med. Center-Livingston, No. 5:00CV-00025, 2000 WL 532035, 3 (E.D. Tex. 2000) (observing that the Supreme Court in Murphy Brothers indicated that time limits run from the date of service of citation or from the time

8

of waiver of that service). By the time that occurred in this
case, Bristol-Myers had been served with process and, within
thirty days of being served on July 9, Bristol-Myers, with the
consent of Apothecon and Cephalon, had removed this case. The
removal was thus timely.

### Fraudulent Joinder/Misjoinder

The five plaintiffs in this case have all sued Bristol-Myers,
Apotheon and Cephalon (the manufacturing defendants), alleging
vaguely that as a result of their having taken the prescription
drug Stadol for unspecified conditions, each became addicted and
suffered injury as a result of their prolonged use of Stadol. In
addition to suing the manufacturers, one of the Mississippi
plaintiffs, Sandra Neely, has also sued Terry French, the
Mississippi doctor who prescribed Stadol for her.

In their notice of removal, defendants asserted that Dr.
French had been fraudulently joined and claimed alternatively that
Neely's co-plaintiffs had "fraudulently misjoined" their claims
with those of Neely in order to defeat diversity jurisdiction over
their claims against the diverse manufacturer defendants. Having
reviewed plaintiffs' complaint, the court concludes that Dr.
French has been fraudulently joined, for reasons that follow.

The first amended complaint filed by plaintiffs in the
Circuit Court of Kemper County contains sixteen paragraphs of
"factual allegations," followed by twelve counts, the first eleven
of which are primarily products liability claims directed against
the manufacturer defendants, Bristol-Myers, Apotheon and

9

Cephalon.  The final count encompasses Nealy's putative negligence claim against Dr. French.

The "facts" set forth by plaintiff in their complaint are these:  In 1992, Bristol-Myers obtained FDA approval for its nasal spray form of Stadol as an uncontrolled substance by falsely representing to the FDA and to the DEA that Stadol had few addictive qualities, and by further representing that it would be used in the same manner as prior forms of Stadol, namely, for temporary, postoperative pain relief, and not for prolonged and repetitive use.  Plaintiffs allege that because the manufacturer defendants misled the FDA and DEA about the addictive nature of Stadol, it was not initially classified as a controlled substance, as a result of which it was more readily prescribed and more abundantly purchased.  Plaintiffs charge that after the manufacturer defendants misled the FDA and DEA into not classifying Stadol as a controlled substance, they then began aggressively marketing Stadol, not for temporary, non-recurring pain, the use which had been identified to the FDA and DEA, but instead for chronic pain, with an emphasis on migraine headaches.  They allege that "[u]pon government approval and at the urging of the corporate Defendants' marketing campaign, physicians in the State of Mississippi and elsewhere within the United States started prescribing Stadol for their patients."  Plaintiffs allege that they justifiably relied on "the corporate Defendants' marketing and assurances of the safety and non-addictiveness of its product," including defendants' literature and information

10

contained in the Physician's Desk Reference, which described
Stadol as a very mild drug with very little chance of abuse or
addiction yet which provided patients with immediate and
remarkable relief.

No facts are set forth in the complaint with respect to Dr.
French, other than that he undertook to diagnose and treat Sandra
Neely's "specific medical condition," and that he "failed to
disclose to her the specific risks associated with the use of
Stadol, to fully monitor and evaluate her progress and to do all
things otherwise necessary and proper for her treatment." She
charges that Dr. French therefore failed to obtain her informed
consent to the use of Stadol, the lack of which proximately caused
her injuries and damages.

The premise of Neely's negligence claim against Dr. French is
that he was fully knowledgeable about the challenged propensities
of Stadol. However, plaintiffs consistently and repeatedly allege
throughout the complaint that in the manufacturing defendants'
aggressive marketing of Stadol, they failed to disclose all
possible side effects associated with the use of Stadol,
including, in particular, addiction, and specifically
misrepresented the safety and effectiveness of Stadol. Thus, in
terms of Dr. French's potential liability, Neely's allegation that
he "did not fully disclose to her the specific risks associated
with Stadol" is essentially meaningless, since there is no
allegation or hint of an allegation in the complaint that Dr.
French knew or should or could have known of the information that

11

plaintiffs pointedly allege was withheld by the manufacturer
defendants.[3]  The court thus concludes that based on the
allegations of her complaint, Nealy has no reasonable possibility
of recovery against Dr. French and that he should be dismissed as
fraudulently joined.[4]  See Hart v. Bayer Corp., 199 F.3d 239, 246
(5th Cir. 2000) ("To prove their allegation of fraudulent joinder
[removing parties] must demonstrate that there is no possibility

---

[3]    Nealy does allege that Dr. French had a duty to "be
fully informed . . . of the dangers and risks inherent in the use
of Stadol," but there is nothing to indicate how Dr. French was to
have become "fully informed" of this information that plaintiffs
contend the manufacturer defendants failed to disclose.  That is,
plaintiffs allege that the information disseminated by the
manufacturer defendants, including that contained in the package
inserts and in the Physician's Desk Reference, did not contain
information about the risks of which plaintiffs complain, and they
do not allege that Dr. French did or could have obtained the
subject information.  Cf. Thompson v. Carter, 518 So. 2d 609, 620
(Miss. 1987) (observing that at the point a physician diagnoses
his patient and undertakes treatment with medication, "he may
consult a Physician's Desk Reference, drug inserts, or a
pharmacologist to determine the best drug to be given to this
patient for this ailment").

[4]    In a similar case decided by this court before the
Mississippi Supreme Court finally laid to rest the question of
applicability of the learned intermediary doctrine in the case of
pharmacists, see Moore v. Memorial Hosp. of Gulfport, 825 So. 2d
658, 666 (Miss. 2002) (extending learned intermediary doctrine to
pharmacists), this court found fraudulent joinder of resident
pharmacist defendants who had dispensed the allegedly unsafe drugs
to the plaintiffs.  Lois v. Wyeth-Ayerst Pharmaceuticals, Inc.,
Civ. Action No. 5:00CV192LN (Sept. 25, 2000).  The court concluded
that plaintiffs' conclusory allegation that the pharmacist
defendants "knew or should have known" that the subject drugs were
unsafe did not suffice to render them potentially liable since the
plaintiffs' complaint, "the major thrust of which is the
manufacturers' intentional concealment of the true risks of the
drug(s), coupled with dissemination through various media of false
and misleading information of the safety of the drug(s) at issue,
belie[d] any suggestion of knowledge, or reason to know by these
resident defendants."  Id. slip op. at 5.

13



that [plaintiff] would be able to establish a cause of action
against them in state court.'") [citations omitted]; Griggs v.
State Farm Lloyds, 181 F.3d 694 (5th Cir. 1999) [affirming
dismissal of resident, nondiverse defendant as fraudulently
joined).[5]

### Bankruptcy Jurisdiction[6]

In view of the court's conclusion that it has diversity
jurisdiction, the court finds it unnecessary to determine whether

---

[5]    Having concluded that Neely has failed to allege a
cognizable claim against Dr. French, the court need not address
whether her claims have been fraudulently misjoined with the
claims of her co-plaintiffs, though it could well be that this
case does present an instance of fraudulent misjoinder sufficient
to warrant relief. In this vein, the court recognizes that the
Fifth Circuit recently approved the concept of fraudulent
misjoinder of plaintiffs in In re Benjamin Moore & Co., 309 F.3d
296 (5th Cir. 2002). There, although the court denied the
multiple defendants' petition for writ of mandamus in the wake of
the district court's order granting remand, the court suggested
that the case might be one of fraudulent misjoinder and observed
that the district court should have considered the defendants'
arguments on that point. See id. [stating, "[T]he point cannot be
ignored, since it goes to the court's jurisdiction and to the
defendants' rights to establish federal jurisdiction following
removal," and describing this as "a feature critical to
jurisdictional analysis"]. Though the complaint in the case at
bar is entirely lacking in factual allegations as to the
individual plaintiffs' circumstances, it does not appear from the
complaint that the plaintiffs have anything in common other than
having taken Gravol. The court questions whether this is a
sufficient tie to bind the claims of these plaintiffs. Cf. In re
Rezulin Prods. Liability Litigation, 168 F. Supp. 2d 136 (S.D.N.Y.
2001) [severing claims of five plaintiffs with claims against
their nondiverse physicians from those other six plaintiffs who
asserted no such claims in order to preserve the defendants' right
to removal in the remaining motions," and observing that the costs
and efficiency benefits to joined plaintiffs "simply do not carry
the same weight when balanced against the defendant's right to
removal."]    But this court need not decide the issue.

13

it might also properly have and exercise jurisdiction based on the bankruptcy filing of two of the plaintiffs.[6]

**Apotheon's Motion to Set Aside Default and Cephalon's Motion to Set Aside Entry of Default and Putative Default Judgment.**

Prior to removal, plaintiffs obtained a clerk's entry of default as to Apotheon and an entry of default and default judgment as to Cephalon. These defendants have moved for relief from entry of default and default judgment on the basis that they were not properly served with process. This court, which has now determined that it has subject matter jurisdiction, has concluded that service of process was not effective as to either of these defendants. It thus follows that the entries of default and of the default judgment are void, having been entered without jurisdiction over those parties.[7] See McCain v. Dauzat, 791 So. 2d 839, 842 (Miss. 2001) (stating, "A court must have jurisdiction, [sic] proper service of process, in order to enter a default judgment against a party. Otherwise, the default judgment is void. If a default judgment is void, the trial court has no discretion and must set the judgment aside."). Defendants' motions will be granted.

---

[6] Bristol-Mayers has moved to strike exhibits submitted by plaintiffs with their rebuttal on the motion to remand and abstain. These affidavits are devoted to the issue of bankruptcy jurisdiction, and since the court has concluded that this issue need not be addressed, the motion to strike is now moot and will be denied as such.

[7] "The proper procedure respecting the opening vel non of a removed default judgment is to file a motion to set aside . . . in federal court . . . ." Pennsylvania Nat'l Bank & Trust v. American Home Assurance Co., 87 F.R.D. 152, 154 (E.D. Pa. 1980).

14

## Conclusion

Based on the foregoing, it is ordered that plaintiffs' motion to remand is denied and defendant Terry French is dismissed as fraudulently joined; Apothecon's motion to set aside entry of default is granted; Cephalon's motion to set aside entry of default and putative default judgment is granted; and Bristol-Meyer's motion to strike is denied as moot.

SO ORDERED this 30th day of November, 2003.

UNITED STATES DISTRICT JUDGE

15

08/06/2003 12:31 FAX     WATKINS & EAGER PLLC     Ø026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
FILED

SEP 25 2000

J.T. NOBLIN, CLERK
BY_____ D.C.

MARGIE LOUIS, PEARLIE COX, MARY
DOTTOREY, OTIS ABRON, GLORIA LOTT,
EARL PIGG, MARION WEATHERS AND KATHY
ROBERTS                                          PLAINTIFFS

VS.                              CIVIL ACTION NO. 5:00CV102LN

WYETH-AYERST PHARMACEUTICALS, INC. F/K/A
WYETH-AYERST LABORATORIES, A DIVISION OF
AMERICAN HOME PRODUCTS, INC.; WYETH
LABORATORIES, INC., A.H. ROBBINS COMPANY,
INC., AMERICAN HOME PRODUCTS, INC.
POLK'S DISCOUNT DRUGS, INC.; ECONOMY DRUG
STORE, INC.; BRANDON DISCOUNT DRUGS, INC.;
KING'S DISCOUNT DRUGS, INC.; FORREST BRATLEY,
JR.; SUSAN BODNE; CHRIS L. LUCKETT; LESTER A.
LALA; CHARLES CARTER, JR.; GINA SABBATINI;
SCOTT M. BOONE; VICTOR E. RUSSELL; JIMMY ROBINSON,
JR.; JEWELL E. NORMAN; MCR PHARMACEUTICALS INC.,
A/K/A AMERICAN PHARMACEUTICALS, INC, A/K/A
MCR/AMERICAN PHARMACEUTICALS, INC.; JONES
MEDICAL INDUSTRIES, A/K/A ABANA PHARMACEUTICALS,
INC.; QUALITEST PRODUCTS, INC.; SEATRACE
PHARMACEUTICALS, INC.; EON LABS MANUFACTURING,
INC.; FISONS CORPORATION; GATE PHARMACEUTICALS;
INTERNEURON PHARMACEUTICALS, INC.; MEDEVA
PHARMACEUTICALS, INC.; RUGBY LABORATORIES,
INC.; SMITHKLINE BEECHAM CORPORATION;
AND ECKERD CORPORATION                           DEFENDANTS

## ORDER

This cause is before the court on the motion of plaintiffs to

remand this case to the Circuit Court of Claiborne County,

Mississippi. Defendants have responded in opposition to the motion

and the court, having considered the memoranda of authorities

submitted by the parties in the light of plaintiffs' complaint in

this cause, concludes for reasons to follow that plaintiffs' motion

should be denied.

Plaintiffs, like many others throughout this country, brought

this action to recover damages for injuries they claim to have

suffered as a result of their taking the diet drugs Pondimin, Redux
(also known by fenfluramine and dexfenfluramine, respectively)
and/or Phentermine.  The plaintiffs herein, Mississippi residents,
filed their suit in Mississippi state court, and in addition to
suing the manufacturers of these drugs, all of which are of diverse
citizenship from plaintiffs, and another diverse company, Eckerd
Corporation, which is alleged to have distributed, marketed and
promoted these drugs, plaintiffs sued a number of Mississippi
pharmacies (Polk's Discount Drugs, Inc., Economy Drugs of
Greenwood, Inc., Liberty Drug Store, Brandon Discount Drugs, Inc.
and King's Discount Drugs) and a multitude of other Mississippi
residents (Forest Bratley, Jr., Susan Bodne, Chris L. Luckett,
Lester A. Lala, Charles Charter, Jr., Gina Savatini, Scott M.
Boone, Victor E. Russell, Jimmy L. Robinson, Jr. and Jewell E.
Norman) who were employed as sales representatives for one or
another of the defendant drug companies.  Defendants, contending
that all of the Mississippi defendants were fraudulently joined,
removed the case to this court on the basis of diversity of
citizenship, following which plaintiffs filed their present motion
to remand.

The standard for evaluating claims of fraudulent joinder is,
of course, well known by all of the parties, as well as by the
court; and the court, having given due consideration to that
standard on the basis of the complaint filed by plaintiffs in this
cause, concludes that plaintiffs have no possibility of recovery
against any of the nondiverse defendants.

2

WATKINS & EAGER PLLC

06/06/2003 12:32 FAX

The complaint filed by plaintiffs in this cause includes, so far as the court can tell, ten counts, numbered and headed as follows:

    Count I:    Strict Product Liability
    Count II:   Failure to Warn
    Count IV:   Negligence
    Count I:    Strict Product Liability (Defective Design) Against
                  the AHP Defendants
    Count II:   Strict Product Liability (Failure to Warn) Against
                  All Defendants
    Count III:  Negligence Against All Defendants
    Count IV:   Fraud and Misrepresentation Against All Defendants
    Count V:    Wantoness
    Count VI:   Fraud, Misrepresentation and Suppression
    Count VI:   Conspiracy[1]

A premise of each count that can reasonably be construed as having been asserted against the resident pharmacy defendants[2] is knowledge on the part of these defendants of the dangers posed by

_____

[1]    It appears that plaintiffs may have taken two complaints from other cases and attempted to combine them into a single complaint, amending the content as needed for this case. That would explain why they have asserted their causes of action in this duplicate fashion, and why the complaint begins on page one, continues through page 19 (skipping page 18), and then picks up on a new and different page 2 and continues on through page 64, and contains two sections (each somewhat different) for each of the headings; "Parties", "Jurisdiction" and "General Allegations"/"Fectual Allegations."

[2]    Plaintiffs' claims of wantoness and conspiracy, while nominally asserted against "defendants", is clearly not directed toward the pharmacy defendants, as the substance of these counts utterly belies any conclusion that these defendants are a target of these counts.  See Badon v. RJR Nabisco Inc., No. 98-30942, 2000 WL 115424, at *7 (5th Cir. Aug. 16, 2000) (noting that "[w]hile the amended complaint does often use the word `defendants,' frequently it is evident that such usage could not be referring to the `Tobacco Wholesalers.'").

3

72A
rv. 8/82)

WATKINS & EAGER PLLC

the subject drugs.[3] Yet, and notwithstanding the fact that the complaint in places may allege or allude generally to knowledge possessed by the "defendants,"[4] it is plain that the complaint on the whole cannot reasonably and legitimately be construed as alleging any factual basis for the conclusion that any of the

---

[3]   Generally speaking, under Mississippi's Products Liability Act, Miss. Code Ann. § 11-1-63, liability of a product seller may be based on a theory of defective design or inadequacy of warning/failure to warn. Either theory requires proof of knowledge on the part of the seller. See Miss. Code Ann. § 11-1-63(f) ("In any action alleging that a product is defective because of its design . . . the manufacturer or product seller shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller; (i) [t]he manufacturer or seller knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the danger for which recovery is sought. . . ."); Miss. Code Ann. § 11-1-63(c)(i) ("In any action alleging that a product is defective because it failed to contain adequate warnings or instructions . . . the manufacturer or seller shall not be liable if the claimant does not prove by a preponderance of the evidence that at the time the product left the control of the manufacturer or seller, the manufacturer or seller knew or in light of reasonably available knowledge should have known about the danger that caused the damage for which recovery is sought. . . ."). Thus, even if the "learned intermediary" doctrine, which is incorporated into the statute, see Miss. Code Ann. § 11-1-63(c)(ii), were not an impediment to recovery, the absence of an allegation that a defendant knew, or had reason to know, of the product defect dooms any claim for defective design or lack of adequate warning. Likewise, knowledge, or a reason to know, is also a necessary requisite for any claim of failure to warn or negligence that a plaintiff might undertake to assert extraneous to a claim under the Products Liability Act itself (assuming solely for the sake of argument that such a claim could exist). An essential element of a claim of fraud is knowledge of the falsity of the representation; and regarding any claim of omission of facts, a person obviously cannot disclose what he does not and cannot know.

[4]   They allege, for example, that the drugs "were marketed to be used in combination which was known to the Defendants to cause harmful side effects which outweighed any potential utility."

4

WATKINS & EAGER PLLC

pharmacy defendants had any knowledge or reason to know of any of
the dangers associated with the product(s) of which plaintiffs
contend they were unaware.  Quite to the contrary, the complaint,
the major theme of which is the manufacturexs' intentional
concealment of the true risks of the drug(s), coupled with
dissemination through various media of false and misleading
information of the safety of the drug(s) at issue, belies any
suggestion of knowledge, or reason to know by these resident
defendants.  According to the lengthy and extremely detailed
factual allegations of the complaint, the product manufacturers had
knowledge from numerous sources that the drug(s) at issue was
unsafe, yet they, in the face of this knowledge, not only concealed
this information, but affirmatively misrepresented to the FDA, to
the public, to consumers, to the plaintiffs, to pharmacists, to
dispensing entities, and even to AHP's own business partner, that
the product(s) was safe.³  In the face of plaintiffs'

---

³    By way of example only, plaintiffs allege variously that:
"Plaintiffs and/or their prescribing physicians and other
dispensing entities justifiably relied on and/or were
induced by the misrepresentations and/or active
concealment of Defendants to her detriment."

"These defendants, having undertaken the manufacturing,
marketing, prescription dispensing, distributing and
promotion of the diet drugs described herein owe a duty
to provide the Plaintiffs, and physicians, regulators and
others upon whom it was known by Defendants that the
plaintiffs would rely, accurate and complete information
regarding its products."

"AHP was put on notice . . . that the . . . labeling was
probably inadequate and needed to be revised. . . .
[D]espite this warning. . . no changes were made to the
labeling between 1990 and mid-1996. . . . [AHP was

5

172A
rv.8/82)

06/06/2003 12:33 FAX

WATKINS & EAGER PLLC

@031

motivated] to conceal the safety hazards of [its products]. . . . [A]lthough an FDA official warned that there were too many adverse reaction reports . . . and that he wanted AHP DEFENDANTS to discourage combination use, the Defendants did not actively discourage the use of Fen-Phen.

[AHP knew as early as 1991 that the warning on the Pondimin labeling [from 1987 through 1996] was false and misleading . . [y]et . . . AHP did nothing to strengthen the warning language about PPH. . . . AHP deliberately chose not to make any change to the labeling in the summer or Fall of 1994, but chose to provide false and misleading information in its product labeling for Pondimin.

By [February of 1995], APH was already concerned the FDA might require to have a black box warning about PPH in the Redux labeling and it had conducted market research which showed that with a black box warning, Redux sales could only be a fraction of what AHP hoped for. [AHP] was fully aware that its warning about PPH in the Pondimin labeling was inadequate.

AHP DEFENDANTS believed it was in their best interest to have consumers uninformed about the deadly risk of PPH. . . . The PHENTERMINE DEFENDANTS also sought to keep consumers and prescribing physicians uninformed about the true risk of PPH. . . . Although [the risks of PFH] were known to phentermine manufacturers around the world, these manufacturers actively concealed this fact from prescribing physicians and consumers, including the Plaintiffs and their prescribing physicians, and misrepresented the risk of PPH by failing to place any such warning in the package insert. . . . [B]y failing to disclose [the facts], the package insert for fenfluramine implicitly and falsely stated to the Plaintiffs' prescribing physicians that it could be prescribed in combination with phentermine.

[From 1993 through 1995] [the] AHP defendants received further information [about risks of valvular heart disease] - yet chose to ignore it. . . . [T]he PHENTERMINE DEFENDANTS [also] began to receive reports [of] VHD. Defendants failed to obtain any more information about these reports. . . . AHP DEFENDANTS did not even report many of these cases to FDA. AHP DEFENDANTS should have regarded the 1994-1995 reports of VHD as an early warning signal of what was likely to

6

happen in the U.S.  However, because of its desire to
conceal safety problems and not derail the exponential
growth of Pondimin or the pending approval of Redux . .
.APH DEFENDANTS chose . . . not to report the VHD problem
[to FDA]. . . . AHP DEFENDANTS mischaracterized many of
the reports as "non-serious" and did not report them to
FDA, to the Plaintiffs, or to the Plaintiffs' prescribing
physicians.
AHP DEFENDANTS did not change the Pondimin labeling
regarding PPH because to do so would have threatened its
diet drug business.

[AHP marketing programs] contained false and misleading
information and/or material ommissions about the true
risks . . .and the supposed benefits. . . .  The text of
one AHP document . . . falsely states "Redux is a safe
and effective product." [AHP, through its sales force]
fed false and misleading information and/or material
omissions about the true risks . . . [to doctor
advocates, whose job it was to promote AHP's products to
other physicians].

The "best case" for the company's sales was if consumers
were unaware of the risk of PPH and physicians chose not
to enlighten them.

AHP DEFENDANTS [knew of problems] but decided to say
nothing of those problems to physicians, patients or the
FDA. . . . AHP DEFENDANTS withheld critical information
from the FDA Advisory Committee, the Plaintiffs, and the
Plaintiffs' physicians, about the risks of VHD.

AHP DEFENDANTS, knowing that its market research
demonstrated that [a black box] warning would destroy
sales, adamantly resisted the black box warning requested
by FDA and any other restrictions on the use of Redux.

[An internal memo authored by an AHP executive stated]
"[E]very attempt will be made to ensure that no `Black
Box' warnings, restrictions of use or negative statements
find their way into the Redux labeling."
[After a leading researcher in the field of PPH appeared on
the Today Show expressing concerns, he was threatened by
AHP's medical director and] never again spoke to the
media about his concerns about the safety of Redux.

AHP made matters worse by having its paid consultants
write an editorial minimizing the risk of PPH with diet
drugs which was published in the New England Journal of

7

772A

Medicine without the authors disclosing that they were paid consultants for the company. In addition, AHP DEFENDANTS sent out a misleading press release regarding the IPPHS study, which also tended to downplay the risk of PPH.

AHP did everything in its power to obscure the true scope of the problem from the Mayo Clinic, Interneuron, FDA and the public as long as it could.
. . . [R]ather than coming clean about the knowledge in its possession for about two years, AHP continued to withhold that information and feigned total surprise [when a Mayo Clinic physician reported to AHP that she had discovered VHD in a number of patients who had been using Fen-Phen].

Worried about a leak of information to the general public and prescribing physicians, AHP DEFENDANTS tried to keep IPI (its business partner) in the dark about the Mayo Clinic findings. . . .AHP [attempted] to conceal information about the VHD problem from even its own business partner for as long as possible.

AHP DEFENDANTS continued their policy of hiding information about the risk of VHD even up to the day that FDA told the company that it should take Pondimin and Redux off the market.

[Pursuant to a conspiracy between] AHP DEFENDANTS and ECKERD, false and fraudulent information was provided to pharmacists, consumers, and prescribing physicians about the risks and supposed benefits of these drugs. Upon information and belief, and in furtherance of the conspiracy, AHP Defendants and Eckerd supplied false and misleading marketing and promotional material and programs to unsuspecting pharmacists and prescribing physicians. . . . Eckerd [agreed that it would] take "no action, including but not limited to telephone calls or written communication to physician providers or Pharmacies regarding specific prescriptions, that [would] adversely affect utilization" [of AHP's products]. . . . Upon information and belief, [certain "patient education programs" and "provider education programs" worked on by Eckerd and Wyeth-Ayerst jointly] provided false and misleading information about [the drugs].
Eon agreed and conspired with various pharmacies and/or AHP Defendants to ensure that the off-label combination use of these drugs could be timely provided to consumers, pharmacists, and prescribing physicians who were deliberately misled as to the safety and efficacy of these drugs

8

·72A

06/06/2003 12:35 FAX
WATKINS & EAGER PLLC
☑034

specific allegations of concerted, unabated fraud and concealment by the manufacturer defendants from virtually everyone, including pharmacists, no factual basis can be drawn from plaintiffs' complaint for their entirely general and conclusory charge that these "defendants" knew or had reason to know of the risks. Even assuming, then, for the sake of argument, that under Mississippi law, there exists the possibility that a viable cause of action could be maintained against a pharmacist who had knowledge of risks associated with a particular drug or drugs which he failed to disclose to his customer, the plaintiffs herein have failed to properly plead such a claim.[6] Accordingly, the court concludes that the pharmacy defendants have indeed been fraudulently joined.

The court also concludes, for the reasons assigned by Judge William H. Barbour in <u>Beatrice Johnson et al. v. Parke-Davis, A</u>

---

Eon agreed and conspired with other manufacturers to ensure that an adequate supply of phentermine could be delivered to consumers, pharmacists, and prescribing physicians who were deliberately misled as to the safety and efficacy of these drugs, and to the dangers of prescribing phentermine in combination with fenfluramine. . . . In furtherance of this conspiracy, prescribing physicians, consumers, and pharmacists were fed false and misleading information about fen-phen and Redux. . . .

[6]   See <u>Badon v. RJR Nabisco Inc.</u>, 2000 WL 1159424, No. 98-30942, at *7 (5th Cir. Aug. 16, 2000) (noting that plaintiffs' conspiracy allegations were "entirely general" and did not allege "any particular or specific activity, agreement, or state of mind on the part of either the in-state distributor defendants. . . . while as to the other defendants the amended complaint is replete with innumerable specific allegations of particular, identified activities, . . . .").

72A

<u>Division of The Warner-Lambert Co., et al.</u>, No. 3:00CV315BN (S.D.

Miss. July 21, 2000) (involving the drug Rezulin), that the sales

representative defendants have also been fraudulently joined.

Accordingly, for the foregoing reasons, it is ordered that

plaintiffs' motion to remand is denied.

SO ORDERED this 25th day of September, 2000.

UNITED STATES DISTRICT JUDGE

10

Not Reported in F.Supp.2d                                                    Page 1
(Cite as: 2003 WL 43356 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

In re: REZULIN PRODUCTS LIABILITY
LITIGATION (MDL No. 1348).

No. 00 Civ. 2843(LAK).

Jan. 6, 2003.

Patient filed state court action against manufacturer and his treating physician to recover for personal injuries allegedly caused by use of prescription diabetes medication. After removal to federal court, patient moved to remand to state court. The District Court, Kaplan, J., held that physician had no duty to warn patient of need for body system monitoring.

Motion denied.

**Health** ☞706

198Hk706

Treating physician did not have duty to warn patient for whom he had prescribed diabetes medication of need for liver function and other body system monitoring, and thus physician's treatment was not negligent, absent allegation of basis for supposing that physician should have conducted liver testing or what information concerning need for testing was available to medical professionals at relevant time.

PRETRIAL ORDER NO. 122

KAPLAN, J.

**\*1** This Document Relates to: 02 Civ. 3583

(Motion to Remand in *Martin* )

Plaintiff has moved to remand this action based on his contention that the presence of a nondiverse defendant--plaintiff's treating physician, Garth C. Denyer, M.D.--defeats complete diversity. Defendants object to the Report and Recommendation of Magistrate Judge Katz, which recommended that plaintiff's motion to remand be granted because "defendants have failed to

demonstrate that there is no reasonable possibility that plaintiff's negligence claim against the non-diverse physician would be successful." Report & Recommendation at 6. Defendants argue that Dr. Denyer was joined fraudulently, or, alternatively, that he was misjoined with the Manufacturing Defendants.

Plaintiff asserts three theories of negligence against the physician. First, plaintiff asserts that the defendant-physician negligently failed to warn him of the risks linked to Rezulin. Petition ¶ IV(7). As this Court recently found in PTO No. 121, in light of plaintiff's myriad allegations that the defendants withheld information concerning the risks of Rezulin from physicians and others, [FN1] an entirely conclusory allegation that the physician failed to warn of risks of Rezulin is insufficient to provide the defendant sufficient notice of the claim against him. [FN2]

> FN1. *See, e.g.,* Petition ¶ IV(4) ("Defendants failed to provide adequate warnings of dangers and instruction for safe use of the drug."); Petition ¶ VI(2)(f) ("The Pharmaceutical Defendants failed to timely and adequately warn the medical community and/or Plaintiff regarding the risks associated with Rezulin as they became known."); Petition ¶ X(1)(c) ("The Pharmaceutical Defendants were grossly negligent in failing to timely and adequately warn consumers of the known adverse effects of Rezulin....").

> FN2. PTO No. 121 at n. 11 (citing *Rodriguez v. Beechmont Bus Svce., Inc.,* 173 F.Supp.2d 139, 145 (S.D.N.Y.2001) ("Allegations that are so conclusory that they fail to give notice of the basic events and circumstances of which the plaintiff complains are insufficient as a matter of law."); *Strickland v. Brown Morris Pharmacy Inc.,* Civ. A. No. 96-815, 1996 WL 537736, at \*2 (E.D.La. Sept.20, 1996) (conclusory allegations that defendant knew or should have known that drug was dangerous do not warrant remand)).

Plaintiff next alleges that the physician negligently "fail[ed] to test and monitor her [sic] liver functions." Petition ¶ IV(7). Once again, in light of plaintiff's other allegations that the defendants failed to timely

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 43356 (S.D.N.Y.))

warn of the need for liver function and other body system monitoring, [FN3] plaintiff's conclusory allegation is insufficient. Plaintiff has failed to allege any basis for supposing that his physician should have conducted liver testing or even what information concerning the need for testing was available to medical professionals at the relevant time. [FN4]

> FN3. *See, e.g.,* Petition ¶ X(1)(c) ("The Pharmaceutical Defendants were grossly negligent in failing to timely and adequately warn consumers of the known adverse effects of Rezulin, the need for liver function and other body system monitoring."); Petition ¶ IV(4) ("Defendants failed to provide adequate warnings of danger and instruction for safe use of the drug."); Petition ¶ VI(2)(c)(ii) ("The Pharmaceutical Defendants failed ... to give adequate warnings regarding the dangers associated with the use of Rezulin and adequate instructions to avoid such dangers.").

> FN4. This Court need not consider the "Dear Health Care Professional" letters, FDA Talk Paper, letter from Glaxo Wellcome to the President of Sankyo Company Limited, and Rezulin product labels plaintiff appended to his motion to remand. *See* Motion Exs. C-- H. As this Court previously has noted, the propriety of joinder "is to be determined based on the pleadings." *In re Rezulin Prods. Liab. Litig.,* 133 F.Supp.2d 272, 284 (S.D.N.Y.2001) *("Rezulin I"* ) (internal quotation marks and citation omitted). Moreover, this Court has observed that "[f]ederal courts across the nation have relied upon that standard to deny remand based on inadequate pleadings and to disregard allegations not contained in the original complaint." *Id.* (citing cases).

Plaintiff's third claim of negligence against the physician likewise fails because it does not state on what basis the physician should have known the patient was unable to tolerate Rezulin.

Accordingly, there is no possibility, based on the pleadings, that plaintiff will establish his medical malpractice claim against the nondiverse physician.

The plaintiff's motion to remand is denied.

SO ORDERED.

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**
SEP 2 6 2003

CLERK, U.S. DISTRICT COURT
By _____
        Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

BENNETTA CHILES, ET AL.,           §
                                   §
        Plaintiffs,                §
                                   §
VS.                                §   NO. 4:03-CV-802-A
                                   §
AMERICAN HOME PRODUCTS             §
CORPORATION, ET AL.,               §
                                   §
        Defendants.                §

## ORDER

Came on for consideration the motion of plaintiffs, Bennetta
Chiles, individually and as next friend of Tony Chiles, a minor;
Holly Blackburn and Mark Blackburn, each individually and as next
friends of Mitchell Reed Blackburn, a minor; Lori M. Reed,
individually and as next friend of Ryan Joseph Reed, a minor; and
Krissy Fagan and Carl Fagan, each individually and as next
friends of Bradley Kole Fagan, a minor, to remand.  The court,
having considered the motion, the response of defendants Abbott
Laboratories, SmithKline Beecham Corporation d/b/a
GlaxoSmithKline, Aventis Pasteur, Inc., Merck & Co., Inc., Wyeth,
and Eli Lilly & Company, the reply, the record, and applicable
authorities, finds that the motion should be denied.

On June 30, 2003, plaintiffs filed their original petition
in the 96th Judicial District Court of Tarrant County, Texas.
The action was removed by notice of removal filed July 21, 2003.
Plaintiffs contend that they and their minor children were

injured as a result of the children having received vaccines
containing Thimerosal.  Plaintiffs have sued the manufacturers
and distributors of the vaccines that allegedly injured their
children and have named their children's treating physicians,
Marcia Sampson, M.D., Alfred Santesteban, M.D., John Chapman,
M.D., and Richard Chiarello, M.D. ("physicians"), as defendants.
The removing defendants maintain that the physicians have been
fraudulently joined in order to defeat diversity.

In assessing a claim of fraudulent joinder, the court
determines whether there is any reasonable basis for predicting
that state law might impose liability on the facts involved.
Travis v. Irby, 326 F.3d 644, 647-48 (5th Cir. 2003).  The
possibility that state law might impose liability must be
reasonable, not merely theoretical.  Great Plains Trust Co. v.
Morgan Stanley Dean Witter & Co., 313 F.3d 305, 312 (5th Cir.
2002).  As the Fifth Circuit has noted, "pleadings matter" when
the court addresses fraudulent joinder.  Id. at 328.  The failure
to specify a factual basis for recovery against a non-diverse
party constitutes a failure to state a claim and fraudulent
joinder of that party.  Waters v. State Farm Mut. Auto. Ins. Co.,
158 F.R.D. 107, 109 (S.D. Tex. 1994).  Speculative and conclusory
allegations do not state a cause of action without factual
support.  Id. at 108.  Fraudulent joinder will be found where a
plaintiff has failed to plead any specific acts of negligence

2

against the non-diverse defendant.  See, e.g., Griggs v. State
Farm Lloyds, 181 F.3d 694, 699 (5th Cir. 1999); Cavallini v.
State Farm Mut. Auto. Ins. Co., 44 F.3d 256, 260-61 (5th Cir.
1995); McIntire v. Rollins, Inc., 888 F. Supp. 68, 69 (S.D. Tex.
1995).

In this case, plaintiffs' original petition does not set
forth any facts that would support a claim against the
physicians.  Under the heading "Liability of Healthcare
Defendants," plaintiffs allege:

> 11.02  The [physicians] are liable for their own
> distinct tortious conduct, separate and apart from the
> conduct of the Manufacturer Defendants, although they
> acted in concert with them.

> 11.03  The conduct of the [physicians] forms an
> independent basis for imposing liability on them for
> commission of the acts referenced above.

Pls.' Pet. at 16.  Plaintiffs also plead:

> 4.06  All of the Manufacturer Defendants
> deliberately or negligently misrepresented to the
> public the efficacy and safety of these products that
> contained Thimerosal.  Because of their failure, in all
> instances, to advise doctors or consumers that the
> usage of Thimerosal containing products could result in
> mercury poisoning, the result is that plaintiff's child
> [sic] has experienced severe bodily injury.

> 4.07  The Manufacturer Defendants purposely
> downplayed and understated the health hazards and risks
> associated with Thimerosal.  The Manufacturer
> Defendants through promotional literature, deceived
> potential users of these products by relaying positive
> information and manipulating statistics to suggest
> widespread safety, while downplaying the known adverse
> and serious health effects of ethyl mercury.  The
> Manufacturer Defendants falsely and fraudulently kept
> relevant information from potential users and minimized

3

user concern regarding the safety of the products that
contained Thimerosal.

Id. at 11-12.[1]  Thus, they have affirmatively pleaded facts that
negate any possible liability of the physicians.

Plaintiffs apparently recognize the inadequacy of their
original petition to state claims against the physicians.  They
have attempted to rectify this deficiency through the submission
of affidavits in support of their reply to defendants' opposition
to the motion to remand.  But, the conclusory allegations in the
affidavits that each of the physicians would or should have been
aware of Thimerosal's dangers are simply insufficient to rectify
the pleading deficiency.  Having affirmatively pleaded that the
manufacturer defendants deliberately or negligently deceived
everyone else regarding the safety and efficacy of products
containing Thimerosal, plaintiffs' speculation that the
physicians knew or should have know of any danger is insufficient
to support a cause of action.

Finally, the court notes that it is not relying on a common
defense theory in determining that the physicians have been
fraudulently joined.  Accordingly, Collins v. American Home
Products Corporation, 2003 WL 21998574 (5th Cir. 2003), is not
relevant to the court's decision.  See Pls.' Br. in Supp. of
their Reply at 7.

---

[1] The pages in the original petition that should be numbered
10 and 11 are numbered 1 and 2.

4

The court ORDERS that plaintiffs' motion to remand be, and
is hereby, denied.

SIGNED September 26, 2003.

JOHN McBRYDE
United States District Judge

5

--- F.3d ----                                                        Page 1
2003 WL 22026346 (5th Cir.)
**(Publication page references are not available for this document.)**

(consolidated with 02-60609) SUSIE ROSS;
DENITA JOHNSON; JAMES CURTIS;
LARRY
PICKENS; DORIS KING; KAREN WHITLEY;
RUBY MAGEE; ROY ALLEN, JR.; CHESTER
NEWMAN; SHARON WHITE, Plaintiffs-
Appellants,
v.
CITIFINANCIAL, INC., a Maryland
Corporation, formerly known as First Family
Financial Services, Inc.; CITIFINANCIAL, INC.,
a Maryland Corporation,
formerly known as Commercial Credit of
Mississippi; CITIFINANCIAL, INC., a
Tennessee Corporation, formerly known as
Commercial Credit of Mississippi;
CITIFINANCIAL SERVICES, INC., a Georgia
Corporation; UNION SECURITY LIFE
INSURANCE COMPANY; AMERICAN
SECURITY INSURANCE COMPANY; TRACY
MITCHELL;
DARLA FARMER; JOE SMITH, Defendants-
Appellees. DENISE HOWARD; LENA
CHAMBERS; PRISCILLA CHALMERS;
BETTY WHITLEY; FAYE DENISE LOGAN;
CAROL
BUSECK; KELVIN JOHNSON; PHILLIP
GORDON; DEBBIE GORDON; ALISHA F.
WILSON;
MARGARET HAYMON; WANDA ALLEN;
MONROE HOGGATT; EUGENE HAYMON;
EVA PARKER
HALL, Plaintiffs-Appellants,
v.
CITIFINANCIAL, INC., a Maryland
Corporation, formerly known as First Family
Financial Services, Inc.; CITIFINANCIAL, INC.,
a Maryland Corporation,
formerly known as Commercial Credit of
Mississippi; CITIFINANCIAL, INC., a
Tennessee Corporation, formerly known as
Commercial Credit of Mississippi;
CITIFINANCIAL SERVICES, INC., a Georgia
Corporation; UNION SECURITY LIFE
INSURANCE COMPANY; AMERICAN
SECURITY INSURANCE COMPANY; TRACY
MITCHELL;
DARLA FARMER; JOE SMITH; JOHN DOES
1-50; VALERIE STEVENS, Defendants-
Appellees.

No. 02-60608

United States Court of Appeals, Fifth Circuit.

August 29, 2003

Appeal from the United States District Court for
the Southern District of Mississippi (5:01-CV-185-
BN and 3:01-CV-471-BN)

Before SMITH, WIENER, and BARKSDALE,
Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

For these consolidated 28 U.S.C. § 1292(b)
interlocutory appeals from remand-denials where
diversity-jurisdiction removal was based on
fraudulent joinder, at issue is whether there is
*arguably a reasonable basis* for predicting the non-
diverse defendants could be liable under Mississippi
law and, therefore, *not* fraudulently joined.
**AFFIRMED; REMANDED.**

I.

Plaintiffs, all Mississippi residents, entered into loan
agreements with Citifinancial or its predecessors. In
conjunction with those loans, Plaintiffs purchased
insurance, such as credit life and property, through
Union Security Life Insurance Company and
American Security Insurance Company.

Plaintiffs filed actions in Mississippi state court. In
addition to suing Citifinancial, American Security,
and Union Security (non-resident corporations),
Plaintiffs sued Citifinancial employees, who were
licensed insurance agents and Mississippi residents
(collectively: Individual Defendants).

Plaintiffs alleged: their insurance premiums were
excessive compared to market rates; they were
inflated by commissions; and their loan interest and
principal were increased by including the insurance
polices within the loan amounts or unnecessarily
refinancing the loans. Plaintiffs claimed breach of
fiduciary duty, breach of implied covenants of good
faith and fair dealing, fraudulent and negligent
misrepresentation and omission, civil conspiracy,
negligence, and unconscionability under Mississippi
law.

Along this line, where Defendants submitted
evidence of Plaintiffs' loan documents, they

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

contained signed separate disclosure statements or signed provisions on the note or security agreements, making clear that insurance was *not* required. These statements included: "CREDIT LIFE OR CREDIT DISABILITY INSURANCE IS NOT REQUIRED TO OBTAIN THIS LOAN"; and "Credit Life and Credit Disability Insurance are NOT REQUIRED in connection with this loan and were not a factor in the approval of this extension of credit. If you chose to obtain life insurance through Lender ... the cost thereof is shown ... herein and is included in the Amount Financed". Each of the remaining Plaintiffs has at least a high school education except for one, who has a ninth grade education.

In 2001, Defendants removed the actions to federal court under 28 U.S.C. § 1441, claiming diversity jurisdiction pursuant to 28 U.S.C. § 1332. To that end, Defendants claimed Individual Defendants were fraudulently joined.

The district court denied Plaintiffs' remand motions, reasoning: Individual Defendants were fraudulently joined; therefore, jurisdiction was valid under § 1332. It held most of Plaintiffs' claims time-barred under Mississippi's general three-year statute of limitations, Miss.Code. Ann. § 15-1-49(1). For Plaintiffs' remaining claims, it concluded there was *no reasonable basis* for predicting Individual Defendants could be liable. *Howard v. Citifinancial,* No. 3:01-CV-471BN (S.D. Miss. 13 Mar. 2002); *Ross v. Citifinancial,* No. 5:01-CV-185BN (S.D. Miss. 18 Mar. 2002). (A number of Plaintiffs had been voluntarily dismissed or did not assert claims against Individual Defendants.)

## II.

The interlocutory appeal for each action presents four issues: (1) whether the district court applied the correct standard in holding non-diverse defendants were fraudulently joined; (2) whether, under Mississippi law, an affirmative act is required to toll the statute of limitations for the claims at issue; (3) whether a party may justifiably rely on an oral representation contrary to the terms of a written contract; and (4) whether a fiduciary relationship arises in first party insurance contracts such as those at issue.

## A.

Fraudulent joinder is established by showing: (1) actual fraud in pleading jurisdictional facts; or (2) inability of the plaintiff to establish a cause of action

against the non-diverse plaintiff. *Travis v. Irby,* 326 F.3d 644, 647 (5th Cir.2003) (citing *Griggs v. State Farm Lloyds,* 181 F.3d 694, 699 (5th Cir.1999)). At issue is the standard to be applied for the second of the two means for showing fraudulent joinder.

The district court noted that the removing party has the burden of showing fraudulent joinder, but that Plaintiffs could not rest upon mere allegations in their pleadings. Rather, the court could pierce the pleadings. It concluded: "In the event the court, after resolving all disputed questions of fact and ambiguities of law in favor of the non-removing party, finds that there is '*arguably a reasonable basis* for predicting that the state law *might* impose liability on the facts involved, then there is *no* fraudulent joinder' and hence *no* basis for asserting diversity of citizenship jurisdiction". *Howard,* slip op. at 8 (emphasis added) (citing *Jernigan v. Ashland Oil, Inc.,* 989 F.2d 812, 815 (5th Cir.), *cert. denied,* 510 U.S. 868 (1993)); *Ross,* slip op. at 8 (same).

Later, however, the district court stated: "The issue before the Court is whether there is a *possibility* that liability could be imposed on the non-diverse Defendants/agents based on the facts of the case". *Howard,* slip op. at 10 (emphasis added); *Ross,* slip op. at 9 (same). The court concluded: because Plaintiffs could not prevail on any of their claims against Individual Defendants, they were fraudulently joined. *Howard,* slip op. at 30; *Ross,* slip op. at 35.

Plaintiffs assert that the "reasonable basis" standard is not correct; that, instead, the standard is whether "there is no possibility that plaintiff [could] establish a cause of action". *Burchett v. Cargill, Inc.,* 48 F.3d 173, 176 (5th Cir.1995). Plaintiffs also claim the district court shifted the burden of proof and did not construe all factual disputes in their favor. They contend Defendants only refuted their allegations with allegations, and as such, Plaintiffs were not required to provide evidence to refute them--that it is only after Defendants provide evidence refuting Plaintiffs' allegations that Plaintiffs must provide evidence.

Our opinions have described the fraudulent joinder standard in various ways. Recent opinions, however, have clarified that standard. "Any argument that a gap exists between the 'no possibility' and 'reasonable basis' of recovery language was recently narrowed, if not closed". *Travis,* 326 F.3d at 648. The court must determine whether there is arguably a reasonable basis for predicting that state law might impose liability. *Great Plains Trust Co. v. Morgan Stanley*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

*Dean Witter & Co.,* 313 F.3d 305, 312 (5th Cir.2002). This means that there must be a *reasonable* possibility of recovery, not merely a *theoretical* one. *Id.*; *Badon v. RJR Nabisco, Inc.,* 236 F.3d 282, 286 n.4 (5th Cir.2000) (rejecting contention that theoretical possibility of recovery is enough to support no fraudulent joinder, citing "reasonable basis" standard); *Griggs,* 181 F.3d at 701 ("While the burden of demonstrating fraudulent joinder is a heavy one, we have never held that a particular plaintiff might possibly establish liability by the mere hypothetical possibility that such an action could exist".).

Nonetheless, the burden of persuasion on those claiming fraudulent joinder remains a heavy one. *Travis,* 326 F.3d at 648. Along these lines, our court has recognized the similarity between standards for Federal Rule of Civil Procedure 12(b)(6) (failure to state claim) and fraudulent joinder. *Id. See Great Plains Trust,* 313 F.3d at 312. The scope of the inquiry for fraudulent joinder, however, is broader than that for Rule 12(b)(6).

For fraudulent joinder *vel non,* it is well established that the district court may "pierce the pleadings" and consider summary judgment-type evidence. *Travis,* 326 F.3d at 648-49 (citing *Carriere v. Sears, Roebuck and Co.,* 893 F.2d 98, 100 (5th Cir.), *cert. denied,* 498 U.S. 817 (1990)). In conducting this inquiry, the district court "must also take into account all unchallenged factual allegations, including those alleged in the complaint, in the light most favorable to the plaintiff". *Travis,* 326 F.3d at 649. In addition, the court must resolve all ambiguities of state law in favor of the non-removing party. *Id.*

The district court properly applied these standards. It cited the "reasonable basis" standard; and, although it also discussed the "possibility" of recovery, it never looked for a "mere theoretical possibility of recovery". It also correctly noted that it could "pierce the pleadings", but that it must construe all disputed questions of fact and ambiguities of law in Plaintiffs' favor. Contrary to Plaintiffs' assertion, it did not shift the burden to them upon Defendants' asserting contrary allegations. Finally, it construed all allegations and evidence in Plaintiffs' favor.

B.

The district court ruled that most of Plaintiffs' claims were time-barred; their claims had not been fraudulently concealed; and, had they been, the time for bringing an action would be tolled. In this regard,

the court applied Mississippi's general three-year statute of limitations, Miss.Code Ann. § 15-1-49(1) ("All actions for which no other period of limitation is prescribed shall be commenced within three (3) years next after the cause of such action accrued, and not after"). *E.g., Stephens v. Equitable Life Assurance Society of the United States,* 850 So.2d 78, 2003 WL 1343254 at *3 (Miss. 20 March 2003) (applying statute to claim of fraud and misrepresentation of sale of insurance).

Claims asserted three years after their accrual may be actionable *if* they were fraudulently concealed and Plaintiffs could not discover them with reasonable diligence. In that event, the limitations period begins to run when the claims are discovered.

If a person liable to any personal action shall fraudulently conceal the cause of action from the knowledge of the person entitled thereto, the cause of action shall be deemed to have first accrued at, and not before, the time at which such fraud shall be, or with reasonable diligence might have been, first known or discovered.

Miss.Code. Ann. § 15-1-67. Along this line, *Robinson v. Cobb,* 763 So.2d 883 (Miss.2000), provides that, in order to toll the limitations period, Plaintiffs must prove: "[Defendant] engaged in *affirmative acts of concealment* "; and "though [Plaintiffs] acted with due diligence in attempting to discover [the claim], they were unable to do so". *Id.* at 887 (emphasis added; internal quotation and citation omitted).

Nevertheless, Plaintiffs contend the district court erred by requiring them to prove an affirmative act of concealment and assert that, in cases of fraud, no subsequent act of concealment is necessary. Defendants counter that, although the Mississippi Supreme Court has not ruled on this issue in the context of credit insurance sales, it has established that a subsequent affirmative act of fraudulent concealment is necessary to toll limitations where the underlying claim is for fraud. Otherwise, the limitations begin to run when Plaintiffs receive documents which, if read, would lead to discovery of the claim.

Mississippi law is unambiguous: Plaintiffs must prove a subsequent affirmative act of fraudulent concealment to toll the limitations. *Stephens,* 2003 WL 1343254, held that the fraudulent concealment doctrine applied to a fraud claim. There, plaintiffs alleged defendants misrepresented that a life insurance contract had vanishing premiums. The court stated that fraudulent concealment was required

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

--- F.3d ----
2003 WL 22026346 (5th Cir.)
(Publication page references are not available for this document.)

Page 4

to toll the limitations period; and, because the terms were written in the policies, plaintiffs could not show such concealment.

Further, in *Reich v. Jesco, Inc.*, 526 So.2d 550 (Miss.1988), plaintiff's structure collapsed 12 years after construction. Plaintiff sued the builder for negligence, strict liability, and breach of warranty. He claimed the limitations period was tolled because the faulty construction was not evident until after the collapse. In holding the limitations period was *not* tolled, the Mississippi Supreme Court cited two prior opinions: *Dunn v. Dent*, 153 So. 798 (Miss.1934); and *Lundy v. Hazlett*, 112 So. 591 (Miss.1927).

In each, defendant falsely represented that land conveyed to plaintiff was larger than it was. Limitations were tolled in *Lundy*, but not in *Dunn*. In *Reich*, the court distinguished these cases by noting that, in *Lundy*, defendants made "express, fraudulent representation[s] ... calculated to conceal ... after completion of the sale", *Reich*, 526 So.2d at 552 (internal quotation omitted); in *Dunn*, plaintiffs failed to show defendant "did anything that could be construed as a concealment of the falsity of the representation", *id.* (internal quotation omitted).

As stated, Mississippi law is unambiguous. Pursuant to § 15-1-67, Plaintiffs were required to prove an affirmative act of fraudulent concealment post-completion of the insurance sales in order to toll the statute of limitations.

C.

The district court held that, under Mississippi law, a plaintiff has a duty to read a contract before signing it and cannot reasonably rely on oral misrepresentations regarding its terms. Accordingly, it held both that the statute of limitations was not tolled because Plaintiffs' claim was not fraudulently concealed and that Plaintiffs did not state valid substantive claims of fraudulent or negligent misrepresentation.

Plaintiffs maintain that, under Mississippi law, the rule that a party must read a contract before signing it does not apply if the party was induced by fraud or false representations in entering into that contract. Defendants counter that, as a general rule, Mississippi imputes knowledge of a contract to the signatory, and a contracting party cannot reasonably rely on oral representations that conflict with its written terms. Defendants accept that the Mississippi Supreme Court has created a limited exception for cases of *fraud in factum*, that is, where the character

of the document is misrepresented. Defendants assert that the exception does not apply here, because Plaintiffs claim *fraud in inducement*, that is misrepresentations about the terms of the contract.

"[A] party is under an obligation to read a contract before signing it, and *will not as a general rule be heard to complain of an oral misrepresentation the error of which would have been disclosed by reading the contract* ". *Godfrey, Bassett & Kuykendall Architects, Ltd. v. Huntington Lumber & Supply Co., Inc.*, 584 So.2d 1254, 1257 (Miss.1991) (emphasis added). *See Russell v. Performance Toyota, Inc.*, 826 So.2d 719, 726 (Miss.2002) ("In Mississippi, a person is charged with knowing the contents of any document that he executes".); *Cherry v. Anthony, Gibbs & Sage*, 501 So.2d 416, 419 (Miss.1987) (in the context of an insurance policy, knowledge of contract terms is "imputed to [the contracting party] as a matter of law").

*Stephens*, 2003 WL 1343254, is highly persuasive authority that the Mississippi Supreme Court would bar Plaintiffs' claims. There, plaintiffs sued an insurer and their agent, Bell, claiming Bell had fraudulently represented that the life insurance policies they had purchased had vanishing premiums. They brought their claims after the limitations period, but asserted it was tolled because of fraudulent concealment. Significantly, *Stephens* cited *Godfrey, Basset & Kuykendall* for the following proposition:
> [I]nsureds are bound as a matter of law by the knowledge of the contents of a contract in which they entered notwithstanding whether they actually read the policy. Any alleged oral agreement in this case does not have any effect on the written insurance contract.

2003 WL 1343254 at *4 (internal citation omitted). The court concluded plaintiffs could not show fraudulent concealment because the terms of the insurance contract unambiguously stated that premiums did not vanish. *Stephens* and the actions at hand are indistinguishable.

The Mississippi Supreme Court appears to apply two exceptions to the rule that knowledge of written terms is imputed to contract signatories: fraud in factum and equitable relief. Neither exception applies here.

First, fraud in factum
> is defined as "[m]isrepresentation as to the nature of a writing that a person·signs with neither knowledge nor reasonable opportunity to obtain knowledge of its character or essential terms."

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

--- F.3d ----                                                                Page 5
2003 WL 22026346 (5th Cir.)
**(Publication page references are not available for this document.)**

BLACK'S LAW DICTIONARY 661 (6th ed.1990). Fraud in the inducement, which is broader, is defined as "[f]raud connected with [the] underlying transaction and not with the nature of the contract or document signed. Misrepresentation as to the terms, quality or other aspects of a contractual relation, venture or other transaction that leads a person to agree to enter into the transaction with a false impression or understanding of the risks, duties or obligations she has undertaken." *Id.*

*FDIC v. Fireman's Ins. Co.*, 109 F.3d 1084, 1089 n.1 (5th Cir.1997). Tracking the definition of fraud in factum, the Mississippi Supreme Court has applied an exception to the imputed knowledge rule:

> If a person is ignorant of the contents of a written instrument and signs it under mistaken belief, induced by misrepresentation, that it is an instrument *of a different character,* without negligence on his part, the agreement is void.

*Johnson v. Brewer,* 427 So.2d 118, 123 (Miss.1983) (emphasis added).

Although it used the word "induced", it is clear from this language that the Mississippi Supreme Court is discussing fraud in factum. Here, this exception cannot apply because Plaintiffs do not claim they misapprehended the character of the documents.

Second, *Godfrey, Bassett & Kuykendall* provides an exception for equitable relief: "[F]ailure to read a contract before signing it, although it may constitute negligence, will not bar equitable relief to one who has executed a contract in reliance upon false representations made to him by the other contracting party". 584 So.2d at 1259. *See Turner v. Terry,* 799 So.2d 25, 36 (Miss.2001) (citing *Godfrey* rule, but not applying because plaintiffs failed to prove fraud).

This exception does not apply because Plaintiffs are not seeking equitable relief. They seek damages. In any event, the facts are distinguishable. There, a construction contractor failed to read a contract into which he entered with the construction site owner. The contract was drafted by a third-party architect. Before bidding on the project, the contractor contacted the architect to inquire whether the contract included a $9,000 contingency term that had to be included in the bid. The architect said it did not. Inadvertently, the term was left in the contract the contractor signed, and the owner refused to pay the contractor $9,000. The contractor sued the third-party architect for restitution based on misrepresentation. Here, Plaintiffs are suing the signatories and drafters of the contracts.

### D.

For the final issue, the district court ruled that, as a matter of law, no fiduciary relationship existed between Individual Defendants (insurance agents) and Plaintiffs. Plaintiffs contend the district court erred because, *at least arguably,* a fiduciary relationship could have existed. They primarily claim that Mississippi case law has previously held a fiduciary relationship exists between an insurance agent and an insured, by virtue of their relationship. Further, they claim that, even if that is not the case, the facts indicate Plaintiffs trusted the agents, which brought about such a relationship.

"Under Mississippi law, there is no fiduciary relationship or duty between an insurance company and its insured in a first party insurance contract." *Langston v. Bigelow,* 820 So.2d 752, 756 (Miss.Ct.App.2002) (quoting *Gorman v. Southeastern Fidelity Ins. Co.,* 621 F.Supp. 33, 38 (S.D.Miss.1985)). *See also General Motors Acceptance Corp. v. Baymon,* 732 So.2d 262, 270 (Miss.1999) ("[T]he general rule is that there is no presumption of a fiduciary relationship between a debtor and creditor." (alteration in original; quotation omitted)), *cert. denied,* 534 U.S. 944 (2001). "In Mississippi, the purchase of insurance is deemed to be an arms' length transaction." *Langston,* 820 So.2d at 756.

*Langston* rejected claims like those asserted here:

> [Plaintiff] claims that the trust and dependence with regard to insurance, thus creating the special fiduciary relationship.... We find, though, that [Plaintiff] is mistaken in his belief that this mere contractual obligation on the part of the insurer to pay a claim creates any special trust or fiduciary relationship.

*Id.* at 756-57.

A fiduciary duty may exist to *procure* insurance, if a bank sells credit insurance. *First United Bank of Poplarville v. Reid,* 612 So.2d 1131 (Miss.1992), considered whether a fiduciary duty arose when a bank employee agreed to purchase credit life insurance for a loan applicant. The court concluded that the bank became an insurance agent with a duty to procure insurance. Nonetheless, because the certificate of insurance showed its terms on its face, the bank did not have a duty to disclose any terms, even though the loan applicants had not read the policy.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

--- F.3d ----    Page 6
2003 WL 22026346 (5th Cir.)
**(Publication page references are not available for this document.)**

Although Plaintiffs point to affidavits in which some Plaintiffs state they trusted and relied on Individual Defendants, none of this evidence shows circumstances *justifying* such reliance. Plaintiffs do not claim Defendants failed to procure insurance; moreover, they do not claim Defendants violated the written terms of the insurance contract or created a hidden scheme to defraud them. *Cf.* _American Bankers Ins. Co. of Florida v. Alexander_, 818 So.2d 1073 (Miss.2001) (fiduciary duty between bank, credit insurance company, and lendee arose where claim of "hidden scheme" between bank and insurance company increasing insurance rates); _Lowery v. Guaranty Bank & Trust Co._, 592 So.2d 79 (Miss.1991) (fiduciary duty arose between bank and lendee/insured where long history of dealings with bank aside from the note).

III.

For the foregoing reasons, because there is not arguably a reasonable basis for predicting Individual Defendants could be liable under Mississippi law, the remand-denials are **AFFIRMED** and these cases are **REMANDED** for further proceedings consistent with this opinion.

*AFFIRMED ; REMANDED.*

--- F.3d ----, 2003 WL 22026346 (5th Cir.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 461567 (S.D.Miss.))

Page 1

Only the Westlaw citation is currently available.

United States District Court, S.D. Mississippi,
Western Division.

Susie ROSS, Denita Johnson, James E. Curtis, Larry
Pickens, Doris King, Karen
Whitley, Ruby Magee, Roy Allen, Jr., Chester
Newman and Sharon White Plaintiffs
v.
CITIFINANCIAL, INC., F/K/A First Family
Financial Services, Inc.,
Citifinancial, Inc., F/K/A Commercial Credit of
Mississippi, Inc.,
Citifinancial, Inc., F/K/A First Family Financial
Services, Inc.,
Citifinancial, Inc., F/K/A Commercial Credit of
Mississippi, Inc.,
Citifinancial Services, Inc., Union Security Life
Insurance Company, American
Security Insurance Company, Tracy Mitchell, Darla
Farmer, Joe Smith and John
Does 1-50 Defendants

No. CIV.A.5:01-CV-185BN.

March 18, 2002.

OPINION AND ORDER

BARBOUR, District J.

*1 This cause is before the Court on the Motion of
Plaintiffs for Remand. Having considered the
Motion, Response, Rebuttal, attachments to each and
supporting and opposing authority, the Court finds
that the Motion is not well taken and should be
denied.

I. Background and Procedural History

Plaintiffs all entered loan agreements with either
Defendants CitiFinancial, Inc., f/k/a First Family
Financial Services, Inc., Defendants CitiFinancial,
Inc., f/k/a Commercial Credit of Mississippi, Inc., or
CitiFinancial Services, Inc. (collectively
"CitiFinancial"). [FN1] In conjunction with the loans,
Plaintiffs purchased various insurance policies
through Defendants Union Security Life Insurance
Company ("Union Security") and/or American
Security Insurance Company ("American Security")
(collectively "Insurance Defendants").

FN1. Plaintiffs Cora Edney and Ralph King
voluntarily dismissed their claims against all
Defendants without prejudice on September
20, 2001.

On May 7, 2001, Plaintiffs filed a complaint in the
Circuit Court of Holmes County, Mississippi, against
CitiFinancial, the Insurance Defendants, Tracy
Mitchell ("Mitchell"), Darla Farmer ("Farmer") and
Joe Smith ("Smith") (collectively "individual
Defendants"). [FN2] Plaintiffs allege that, "[c]ontrary
to law, the Defendants required collateral protection
insurance, credit life insurance, credit accident and
health    insurance,    accidental    death    and
dismemberment    insurance,    involuntary
unemployment insurance, property insurance, and/or
other insurance in connection with their loans to
Plaintiffs." Complaint, ¶ 26. Plaintiffs also allege
that the premiums paid for the allegedly required
insurance products were excessive in comparison to
similar products on the market, and that they were
not offered alternative, and presumably less costly,
insurance. Plaintiffs allege that the premiums were
inflated because of undisclosed commissions and
other remuneration received from the Defendant
insurers for selling their policies. Plaintiffs further
allege that Defendants engaged in insurance packing,
padding, flipping, and churning in violation of
Mississippi law. Based on this conduct, Plaintiffs
allege claims of breach of fiduciary duty, breach of
implied covenants of good faith and fair dealing,
fraudulent and negligent misrepresentation and/or
omission,    civil    conspiracy,    negligence,    and
unconscionability under the Uniform Commercial
Code of Mississippi ("UCC").

FN2. Mitchell, Farmer and Smith are or
were    licensed    insurance    agents    of
CitiFinancial.

On June 11, 2001, the CitiFinancial Defendants and
Insurance Defendants removed the lawsuit to this
Court pursuant to 28 U.S.C. § 1441 on the basis of
diversity of citizenship jurisdiction under 28 U.S.C. §
1332. [FN3] For the purpose of diversity analysis,
Plaintiffs are all citizens of Mississippi. Defendant
CitiFinancial, Inc., f/k/a First Family Financial
Services, Inc., and Commercial Credit of Mississippi,
Inc., are Maryland corporations with their principal
places of business in Maryland. Defendant
CitiFinancial, Inc., f/k/a First Family Financial

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Services, Inc., and Commercial Credit of Mississippi, Inc., are Tennessee corporations with their principal places of business in Tennessee. Defendant CitiFinancial Services, Inc., is a Georgia corporation with its principal place of business in Georgia. Defendants Union Security and American Security are Delaware corporations with their principal places of business in Georgia. Defendants Mitchell, Farmer, and Smith are citizens of Mississippi. Defendants contend that Plaintiffs have fraudulently joined the non-diverse Defendants to avoid federal jurisdiction and, therefore, the Court may properly assert federal subject matter jurisdiction over this case. Plaintiffs filed the instant Motion to Remand on July 6, 2001. [FN4]

FN3. In their Notice of Removal, Defendants "reserve[d] the right to supplement [their] Notice of Removal by adding additional Plaintiffs who may be in bankruptcy or whose claims are property of their bankruptcy estates." Notice of Removal ¶ 14. Defendants filed a supplement to their Notice of Removal on September 4, 2001, adding the bankruptcies of Cora Edney and Ralph Harvey King, Sr., Ernestine King. Defendants filed a second supplement to their Notice of Removal on and September 7, 2001, adding the bankruptcy of Ralph W.E. King. As Cora Edney and Ralph King were voluntarily dismissed, the Court need not decide the propriety of such supplementation, nor consider their bankruptcies for jurisdictional purposes. See _Allen v. City Fin. Co._, 224 B.R. 347, 353 (S.D.Miss.1998).

FN4. Plaintiffs amended their Motion to Remand on July 10, 2001, September 7, 2001, and September 17, 2001 to challenge the assertion of Defendants that subject matter jurisdiction existed based on the bankruptcies of Cora Edney and Ralph Edney.

II. Fraudulent Joinder Standard

**\*2** Under 28 U.S.C. § 1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed ... to the district court of the United States for the district and division embracing the place where such action is pending." The removing party

has the burden of proving that the federal court has jurisdiction to hear the case. See _Jernigan v. Ashland Oil, Inc._, 989 F.2d 812, 815 (5th Cir.1993), cert. denied, 510 U.S. 868, 114 S.Ct. 192, 126 L.Ed.2d 150 (1993); _Laughlin v.. Prudential Ins. Co._, 882 F.2d 187, 190 (5th Cir.1989) (holding that the "removing party bears the burden of establishing federal jurisdiction."). In cases in which the removing party alleges diversity of citizenship jurisdiction on the basis of fraudulent joinder, "it has the burden of proving the fraud." _Laughlin_, 882 F.2d at 190; _Carriere v. Sears, Roebuck & Co._, 893 F.2d 98, 100 (5th Cir.1990), cert. denied 498 U.S. 817, 111 S.Ct. 60, 112 L.Ed.2d 35 (1990). To establish fraudulent joinder, the removing party must prove: (1) that there was actual fraud in the plaintiff's pleading of the jurisdictional facts or (2) that the plaintiff has no possibility of establishing a cause of action against the non-diverse defendant in state court. _Griggs v. State Farm Lloyds_, 181 F.3d 694, 699 (5th Cir.1999) (citations omitted); _Burden v. General Dynamics Corp._, 60 F.3d 213, 217 (5th Cir.1995); _Cavallini v. State Farms Mutual Auto Ins. Co._, 44 F.3d 256, 259 (5th Cir.1995).

When considering whether a non-diverse defendant has been fraudulently joined to defeat diversity of citizenship jurisdiction, courts should "pierce the pleadings" and consider "summary judgment-type evidence such as affidavits and deposition testimony." See e.g. _Cavallini_, 44 F.3d at 256. See also _LeJeune v. Shell Oil Co._, 950 F.2d 267, 271 (5th Cir.1992) (holding that "a removing party's claim of fraudulent joinder to destroy diversity is viewed as similar to a motion for summary judgment.... A court is to pierce the pleadings to determine whether, under controlling state law, the non-removing party has a valid claim against the non-diverse parties."). Under this standard, plaintiffs "may not rest upon the mere allegations or denials of [their] pleadings." _Beck v. Texas State Bd. of Dental Examiners_, 204 F.3d 629, 633 (5th Cir.2000). See also _Badon v. RJR Nabisco, Inc._, 236 F.3d 282, 286 n. 4 (5th Cir.2001) (finding that the "mere theoretical possibility of recovery under local law" does not preclude removal. Plaintiffs must show that there exists "a reasonable basis for predicting that state law would allow recovery in order to preclude a finding of fraudulent joinder."). Further, conclusory or generic allegations of wrongdoing on the part of the non-diverse defendant are not sufficient to show that that defendant was not fraudulently joined. See _Badon v. RJR Nabisco, Inc._, 224 F.3d 382, 392-93 (5th Cir.2000); _Peters v. Metropolitan Life Ins. Co._, 164 F.Supp.2d 830, 834 (S.D.Miss.2001) (J. Bramlette) (holding that the allegations against non-diverse defendants "must be

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

factual, not conclusory, because conclusory allegations do not state a claim."). Therefore, when responding to a charge of fraudulent joinder, a plaintiff must allege specific acts of wrongdoing on the part of the non- diverse defendant in the complaint and submit evidence to support those claims. *See Badon,* 224 F.3d at 390 (holding that removal is not precluded merely because the state court complaint, on its face, sets forth a state law claim against a non-diverse defendant. Removal is proper "if the plaintiff's pleading is pierced and it is shown that as a matter of law there is no reasonable basis for predicting that the plaintiff might establish liability on that claim against the instate defendant.").

*3 When conducting a fraudulent joinder analysis, a court must resolve all disputed questions of fact and ambiguities of law in favor of the non-removing party, *see Dodson v. Spiliada Maritime Corp.,* 951 F.2d 40, 42 (5th Cir.1992), but *only* when there exists an actual controversy, i.e. when *both* parties have submitted *evidence* of contradictory facts." *Badon,* 224 F.3d at 394. A court should not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts" to support his claims against the non-diverse defendant. *Id.* (citing *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994)) (alteration in original). In the event the court, after resolving all disputed questions of fact and ambiguities of law in favor of the non-removing party, finds that there is "arguably a reasonable basis for predicting that the state law might impose liability on the facts involved, then there is no fraudulent joinder" and hence no basis for asserting diversity of citizenship jurisdiction. *Jernigan,* 989 F.2d at 816.

### III. Analysis

As a preliminary matter, the Court considers Plaintiffs argument that the removal was untimely. Plaintiffs argue that Defendants were served with process on May 11, 2001 and that the 30 day time limit for removal under section 1446(b) expired on June 10, 2001. Plaintiffs argue that, because Defendants filed their Notice of Removal on June 11, 2001, the removal is untimely and this action must be remanded. The Court does not agree. While the thirtieth day was, indeed, June 10, 2001, Rule 6(a) of the Federal Rules of Civil Procedure provides in pertinent part, "The last day of the [time] period ... shall be included, unless it is a Saturday, a Sunday, or a legal holiday ... in which event the period runs until the end of the next day which is not one of the aforementioned days." As June 10, 2001, was a Sunday, the 30 day removal period ran until the end

of Monday, June 11, 2001. The Court therefore finds that the removal was timely and that the Motion to Remand on this ground is not well taken and should be denied.

Plaintiffs allege that as agents of CitiFinancial, Mitchell, Farmer, and Smith may be held liable on the claims alleged in the Complaint. Under Mississippi law, an agent can incur independent liability if he engages in conduct which rises to the level of gross negligence, malice or reckless disregard for the rights of the plaintiff. *See Bass v. California Life Ins. Co.,* 581 So.2d 1087, 1090 (Miss.1991). The issue before the Court is whether there is a possibility that liability could be imposed on the non-diverse Defendants/agents based on the facts of the case.

### A. Are Plaintiffs' Claims Time Barred?

The record shows that only Plaintiffs Susie Ross ("Ross"), Karen Whitley ("Whitley"), Doris King ("King"), Ruby Magee ("Magee"), Roy Allen, Jr. ("Allen"), Chester Newman ("Newman"), and Sharon White ("White") assert claims against the individual Defendants. [FN5] Defendants argue that Plaintiffs' claims are governed by the general, three year statute of limitations found at MISS. CODE ANN. § 15-1-49(1). Defendants also argue that statute of limitations began to run on Plaintiffs' claims on the date each Plaintiff took out their loans with Defendants. *See* Memorandum of Insurance Defendants in Opposition to Motion to Remand. That is, no general discovery rule tolled the statute as to Plaintiffs' claims.

> FN5. As previously noted, Plaintiffs Cora Edney and Ralph King have been voluntarily dismissed from this action. Plaintiffs James Curtis, Denita Johnson, and Larry Pickens stated in response to Interrogatory 4 propounded by the Insurance Defendants that they have no claims against the individual Defendants. *See* Response, Exhibit "C."

*4 Plaintiffs allege that they "were unaware of the Defendants' wrongful conduct ... and could not have at any time earlier [than the filing of their Complaint] discovered Defendants' wrongful conduct, which included Defendants' affirmative and fraudulent concealment of their wrongful conduct...." Complaint ¶ 28. Thus, Plaintiffs argue that the statute of limitation was tolled by the alleged fraudulent

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

concealment of Defendants of their allegedly wrongful conduct.

The Court finds that, as there are no periods of limitation prescribed by statute for the causes of action asserted by Plaintiffs, the general, three year statute of limitations is applicable to all of Plaintiffs' claims. The Court further finds that the general statute of limitations may be tolled pursuant to MISS. CODE ANN. § 15-1-67 (providing, "If a person liable to any personal action shall fraudulently conceal the cause of action from the knowledge of the person entitled thereto, the cause shall be deemed to have first accrued at, and not before, the time at which such fraud shall be, or with reasonable diligence might have been, first known or discovered"). Accordingly, the Court finds that, unless tolled by section 15-1-67, Plaintiffs' claims that accrued before May 7, 1998, are time barred. In order to determine whether the statute of limitations was tolled as Plaintiffs contend, the Court must consider each of Plaintiffs' loans with CitiFinancial, the insurance policies associated with each loan, the disclosures made by CitiFinancial with regard to each loan, and any affirmative acts whereby Defendants fraudulently concealed Plaintiffs' claims.

1. Plaintiff Allen's Loans with CitiFinancial

Plaintiff Allen took out loans with CitiFinancial on the following dates: February 22, 1995, October 12, 1995, March 21, 1996, April 29, 1998, and July 22, 1999. See Exhibit "A1." None of the Defendants argue that Allen's claims as to his July 22, 1999, loan with CitiFinancial are barred by the statute of limitations. However, with each of his loans with CitiFinancial, including the July 22, 1999, loan with CitiFinancial, Allen signed disclosure statements and/or retail installment contract and security agreements containing one or more of the following clearly marked provisions:
  • "*Insurance:* Credit life insurance is not required to obtain credit and will not be provided unless you sign and agree to pay the additional cost;"
  • "Credit Life and Disability Insurance are NOT REQUIRED ED in connection with this loan and were not a factor in the approval of this extension of credit. If you chose to obtain life insurance through Lender ... the cost thereof is shown ... herein and is included in the Amount Financed;"
  • "CREDIT LIFE OR CREDIT DISABILITY INSURANCE IS NOT REQUIRED TO OBTAIN THIS LOAN;"
  • "I/WE HAVE READ THIS NOTICE AND HAVE MADE THE CHOICE ABOVE BEFORE SIGNING ANY NOTE OR OTHER PAPER

REPRESENTING A LOAN."

*See id.* It is well settled under Mississippi law that a contracting party is under a legal obligation to read a contract before signing it. *See Godfrey, Bassett & Kuykendall Architects, Ltd. v. Huntington Lumber & Supply Co., Inc.,* 584 So.2d 1254, 1257. *See also Koenig v. Calcote,* 199 Miss. 435, 25 So.2d 763 (Miss.1946); *McCubbins v. Morgan,* 199 Miss. 153, 23 So.2d 926 (Miss.1945). Moreover, knowledge of the contents of a contract will be imputed to a contract party even though he did not read the contract before signing it. *See Cherry v. Anthony, Gibbs, Sage,* 501 So.2d 416, 419 (Miss.1987). Where, as here, the terms of a contract are made available to a contracting party, any reliance on alleged misrepresentations of those terms is, as a matter of law, unreasonable. *See Carter v. Union Security Life Ins. Co.,* 148 F.Supp.2d 734 (S.D.Miss.2001) (Lee, J.). The Court finds that no exception to the above stated rules is applicable to the case *sub judice.* Therefore, the Court finds that any claims Allen had as to his February 22, 1995, October 12, 1995, March 21, 1996, and April 29, 1998, loans with CitiFinancial are barred by the statute of limitations.

2. Plaintiff Whitley's Loans with CitiFinancial

**\*5** Plaintiff Whitley took out loans with CitiFinancial on the following dates: August 21, 1996, April 28, 1997, May 30, 1997, November 13, 1997, February 6, 1998, April 24, 1998, September 11, 1998, May 10, 2000, and September 11, 2000. *See* Response, Exhibit "A7." None of the Defendants argue that Whitley's claims as to her September 11, 1998, May 10, 2000, and September 11, 2000, loans with CitiFinancial are barred by the statute of limitations. With regard to the April 24, 1998, loan with CitiFinancial, Whitley did not purchase insurance. It is unclear whether Whitley purchased insurance with the August 21, 1996, November 13, 1997, and May 10, 2000, loans. Whitley purchased insurance with the loans of April 28, 1997, May 30, 1997, February 6, 1998, September 11, 1998, and September 11, 1998, and, as part of the loan transaction, signed disclosure statements or combined note and security agreements containing one or more of the following provisions:
  "Credit Life and Disability Insurance are NOT REQUIRED in connection with this loan and were not a factor in the approval of this extension of credit. If you chose to obtain life insurance through Lender ... the cost thereof is shown ... herein and is included in the Amount Financed;"
  "CREDIT LIFE OR CREDIT DISABILITY INSURANCE IS NOT REQUIRED TO OBTAIN

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

THIS LOAN;"

"I/WE HAVE READ THIS NOTICE AND HAVE MADE THE CHOICE ABOVE BEFORE SIGNING ANY NOTE OR OTHER PAPER REPRESENTING A LOAN;"

"NOTE: NON-COMPULSORY INSURANCE VOLUNTARILY PURCHASED BY BY DEBTOR. I hereby declare that the purchase of the above insurance is entirely voluntary and has not been made compulsory by the creditor and that the creditor has in no way led me to believe that such insurance is a prerequisite to the extending of credit to me. I further declare that the option has been extended to me to purchase this insurance from any insurer or agent of my own choice. I freely choose the insurer and agent to whom the authorization is given."

*See id.* Whitley also initialed the following provisions of the "Customer Satisfaction Checklist," as part of her September 11, 1998, loan:

"During the loan closing, my loan representative explained all of my loan documents and loan terms to my satisfaction."

"I received copies of all of my loan documents. My loan representative answered all of my questions.

The benefits of optional insurance have been explained to my satisfaction.

*See id.* For the reasons stated in section III.A.1. above, the Court finds that any claims Whitley had as to her April 28, 1997, May 30, 1997, and February 6, 1998, loans with CitiFinancial are barred by the statute of limitations.

As for the CitiFinancial loans of August 21, 1996, and November 13, 1997, for which it is unclear whether Whitley purchased insurance, the Court finds that, for the reasons that follow, Whitley has not established a claim of fraudulent concealment and that the statute of limitations was not tolled as to her claims against Defendants. To establish a claim of fraudulent concealment under section 15-1-67, the Plaintiffs must (1) show "some act of an affirmative nature designed to prevent and which does prevent discovery of the claim," and (2) prove that "even though they acted with due diligence in attempting to discover [the claim], they were unable to do so." *Robinson v. Cobb,* 763 So.2d 883, 887 (Miss.2000).

**\*6** Whitley has not presented any evidence of affirmative acts by Defendants relating to any of these loans that prevented her from discovering her claims against them. The Court therefore finds that Whitley has not established a claim of fraudulent concealment and that the statute of limitations was not tolled as to her claims against Defendants. Accordingly, the Court finds that any claims Whitley

had as to her August 21, 1996,. and November 13, 1997, loans with CitiFinancial are barred by the statute of limitations.

3. Plaintiff Doris King's Loans with CitiFinancial

Plaintiff King took out a loan with CitiFinancial on January 5, 1998. *See* Rebuttal, Exhibit "14," Affidavit of King. King avers that, at the urging of the individual Defendants, she refinanced her loan with CitiFinancial on August 15, 1998. *See id.* None of the Defendants argue that King's claims as to her August 15, 1998, loan with CitiFinancial are barred by the statute of limitations. However, King also avers that, in order to obtain the January 5, 1998, loan, she was required to purchase credit life and disability insurance, and property insurance. *See id.* Defendants did not submit any documentation with regard to either King's January 5, 1998, or August 15, 1998, loans with CitiFinancial, or any evidence that her loans contained disclosures disclaiming the need to purchase credit life or disability insurance in order to obtain a loan.

As evidence of an affirmative act by the individual Defendants designed to conceal her cause of action, King testified that she did not receive a copy of her January 5, 1998, loan documents at the time of the closing, and that, while she was told by the individual Defendants that they would mail her a copy of her written contract, she never received it. *See* Rebuttal, Exhibit "4," at 25- 26. However, King has not presented any evidence that she acted with due diligence in attempting to discover her cause of action. Without a showing of both an affirmative act of concealment on the part of the individual Defendants, and due diligence on her own part, the Court cannot find that the statute of limitations was tolled as to her January 5, 1998, loan with CitiFinancial. *See Robinson,* 763 So.2d at 887. Accordingly, the Court finds that any claims King had as to her January 5, 1998, loan with CitiFinancial are barred by the statute of limitations.

4. Plaintiff Magee's Loans with CitiFinancial

None of the Defendants argue that Magee's January 19, 2001, loan with CitiFinancial is barred by the statute of limitations.

5. Plaintiff Newman's Loans with CitiFinancial

None of the Defendants argue that Newman's March, 1999, loan with CitiFinancial is barred by the statute of limitations.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

6. Plaintiff White's Loans with CitiFinancial

Plaintiff White took out loans with CitiFinancial on the following dates: January 23, 1996, May 10, 1996, and December 19, 1997. *See* Response, Exhibit "A6." With each of these loans, White purchased insurance and, as part of the loan transaction, signed disclosure statements or combined note and security agreements containing one or more of the following provisions:

*7 *"Insurance Disclosure:* Borrower is *not* required to purchase any type of insurance to obtain Credit, unless Borrower grants Lender a security interest as indicated in this document. In that event, insurance to protect the Lender's interest in the collateral may be required. Lender's decision to grant credit will *not* be affected by Borrower's decision to purchase or refuse optional insurance products....;"

"NOTE: NON-COMPULSORY INSURANCE VOLUNTARILY PURCHASED BY DEBTOR. I hereby declare that the purchase of the above insurance is entirely voluntary and has not been made compulsory by the creditor and that the creditor has in no way led me to believe that such insurance is a prerequisite to the extending of credit to me. I further declare that the option has been extended to me to purchase this insurance from any insurer or agent of my own choice. I freely choose the insurer and agent to whom the authorization is given."

*See id.* For the reasons stated in section III.A.1. above, the Court finds that any claims White had as to her January 23, 1996, May 10, 1996, and December 19, 1997, loans with CitiFinancial are barred by the statute of limitations. The Court therefore finds that, as a matter of law, White cannot prevail on any of her claims against the individual Defendants.

7. Plaintiff Ross' Loans with CitiFinancial

Plaintiff Ross took out a loan with CitiFinancial in 1996. *See* Rebuttal, Exhibit "17," Affidavit of Ross. She refinanced the loan in 1997 and avers that she was required to purchase credit disability insurance, credit life insurance and property insurance with the refinanced loan. [FN6] *See id.* Ross further avers that she "relied [on] the two white females' statements to [her] that she could not obtain the initial loan or refinance the loan balance unless [she] purchased the credit insurance." *See id.* However, as Ross has not presented any evidence of affirmative acts by Defendants relating to either of her loans that prevented her from discovering her claims against them, the Court finds that Ross has not established a claim of fraudulent concealment and that the statute

of limitations was not tolled as to her claims against Defendants. Accordingly, the Court finds that any claims Ross had as to her 1996 and 1997 loans with CitiFinancial are barred by the statute of limitations.

> FN6. Defendants did not submit any documentation regarding the 1996 loan, or the 1997 refinance of Ross' loan.

Having found that, as a matter of law, Plaintiffs White and Ross cannot prevail on any of their claims against the individual Defendants, the Court finds that the only claims before the Court are those relating to the following loans: Allen's July 22, 1999, loan; Whitley's September 111, 1998, May 10, 2000, and September 11, 2000, loans; King's August 15, 1998, loan; Magee's January 19, 2001, loan; and Newman's March, 1999, loan.

B. Plaintiffs' Breach of Fiduciary Duty Claim

Plaintiffs allege that Defendants breached their fiduciary duty to Plaintiffs to (1) obtain adequate insurance at a fair and reasonable price, (2) act in the best interests of Plaintiffs, and (3) disclose to Plaintiffs that Defendants directly or indirectly received remuneration for the insurance policies they sold to them. *See* ¶ ¶ 56-60. The individual Defendants argue that there is no reasonable possibility that Plaintiffs can succeed on their breach of fiduciary duty claims because the individual Defendants did not owe the Plaintiffs any fiduciary duty as a matter of Mississippi law. *See* Response.

*8 The Mississippi Supreme Court has held that "fiduciary relationship is a very broad term embracing both technical fiduciary relations and those formal relations which exist wherever one person trusts in or relies upon another." *Hopewell Enters., Inc. v. Trustmark Nat'l Bank,* 680 So.2d 812, 816 (Miss.1996). Therefore,

[w]henever there is a relation between two people in which one person is in a position to exercise a dominant influence upon the other because of the latter's dependency upon the former, arising from either weakness of mind or body, or through trust, the law does not hesitate to characterize such relationship as fiduciary in character. The basis of this relationship need not be legal; it may be moral, domestic, or personal.

*Id.* (quoting *Hendricks v. James,* 421 So.2d 1031, 1041 (Miss.1982)). Additionally, a "confidential relationship, which imposes a duty similar to a fiduciary relationship, may arise when one party

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

justifiably imposes special trust and confidence in another, so that the first party relaxes care and vigilance that he would normally exercise in entering into a transaction with a stranger." *Lowrey v. Guaranty Bank and Trust Co.*, 592 So.2d 79, 83 (Miss.1991). *But cf. Burley v. Homeowners Warranty Corp.*, 773 F.Supp. 844, 860 (S.D.Miss.1990) (Lee, J.) (stating "there is no fiduciary relationship between an insurer and insured in a first-party contract").

Based on the evidence in the record, and supporting and opposing authority, the Court finds that, as a matter of Mississippi law, no fiduciary relationship existed between the individual Defendants and Plaintiffs. The Court therefore finds that Defendants have satisfied their burden of showing that Plaintiffs cannot prevail on their claims of breach of fiduciary duty against the individual Defendants.

### C. Plaintiffs' Breach of Implied Covenants of Good Faith and Fair Dealing Claim

Plaintiffs allege that Defendants breached the implied covenants of good faith and fair dealing "by obtaining inadequate insurance for Plaintiffs and charging an exorbitant and grossly unfair premium which was far in excess of the market rate." Complaint, ¶ ¶ 67. Defendants argue that, because the individual Defendants were not parties to the subject insurance contracts, Plaintiffs cannot state a claim for breach of implied covenants of good faith and fair dealing. The Court agrees.

The duty of good faith and fair dealing is implied in the performance and enforcement of all contracts, *see Cenac v. Murry*, 609 So.2d 1257, 1272 (Miss.1992), but only "arises from the existence of a *contract* between parties." *American Bankers Ins. Co. of Florida v. Wells*, 2001 WL 1554028, * 9 (Miss.2001) (citing *Cenac*, 609 So.2d at 1272) (emphasis in original). Plaintiffs contracted with the Insurance Defendants. As the individual Defendants merely served as the agent of the Insurance Defendants in the subject loan transactions and were not parties to the subject contracts, the Court finds that the individual Defendants were not subject to the implied duty of good faith and fair dealing. *See Griffin v. Ware*, 457 So.2d 936, 940 (Miss.1984) (stating that "adjusters employed by an insurer, who were not parties to the agreement for insurance, are not subject to an implied duty of good faith and fair dealing to the insured"). *See also Burley*, 773 F.Supp. at 860 (stating "there is no implied covenant of good faith in a first-party insurance contract"). Moreover, the breaches alleged go to the formation of the contracts, rather than the performance and enforcement of the contracts.

Accordingly, the Court finds that, as a matter of law, Plaintiffs cannot prevail on their claims of breach of implied duty of good faith and fair dealing against the individual Defendants.

### D. Plaintiffs' Fraudulent and Negligent Misrepresentation and/or Omission Claims

*9 Plaintiffs allege that Defendants, by their deliberate and knowingly "fraudulent misrepresentations, omissions and concealment ... purposely deceive [d] Plaintiffs into believing that Defendants were obtaining and furnishing adequate credit life, credit disability, property and/or collateral protection insurance for them at a fair price...." Complaint ¶ 73. In order to succeed in a claim for fraudulent misrepresentation, a plaintiff must prove that: (1) defendant or his agent made a representation (2) that was false (3) and material (4) and that the person making the representation knew it to be false and (5) intended that the plaintiff act upon the representation in the manner reasonably contemplated. *See Levens v. Campbell*, 733 So.2d 753, 761-62 (Miss.1999). A plaintiff must also prove that (6) he was unaware that the representation was false, (7) he relied on the truth of the representation, (8) had a right to rely on the representation, and that (9) he suffered consequent and proximate injury. *See id.* A claim of negligent misrepresentation requires proof that: (1) defendant failed to exercise reasonable care in making (2) a misrepresentation or omission of a fact that was (2) material or significant, and that plaintiff reasonably relied on the misrepresentation or omission and was (5) damaged as a result of her reasonable reliance. *See id.* at 762.

### 1. The Fraudulent and Negligent Misrepresentation Claims of Allen, Whitley, and Magee

Defendants have submitted signed and dated loan documents associated with Allen's July 22, 1999, loan with CitiFinancial, and Whitley's September 11, 1998, and September 11, 2000, loans with CitiFinancial which contained express language regarding insurance and the fact that their loans were not conditioned upon the purchase of insurance. [FN7] *See* above sections III.A.1., III.A.3., and III.A.6. Although it is disputed whether Plaintiff Magee dealt with any of the individual Defendants, the Court notes that Magee also signed a disclosure statement in connection with her January 19, 2001, loan with CitiFinancial. The combined Disclosure Statement, Note and Security Agreement was dated January 19, 2001, and contained the following language: *Optional Insurance:* Credit life insurance,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

credit disability insurance, credit personal property insurance, involuntary unemployment insurance and any other insurance products that are not required per the above paragraph are optional to Borrower and are *not required* in order to obtain credit....Borrower is encouraged to inquire about coverage and refund provisions." [FN8]

FN7. Whitley also took out a loan with CitiFinancial on May 10, 2000. *See* Response, Exhibit "A7." However, as Whitley has presented no evidence that she purchased insurance in connection with this loan, the Court finds that, as a matter of law, Whitley cannot prevail on her claims of fraudulent and negligent misrepresentations against the individual Defendants relating to her May 10, 2000, loan with CitiFinancial.

FN8. The "above paragraph" provided that insurance against fire was required for loans secured by the borrower's interest in improved property and collision and comprehensive insurance was required if the collateral for the loan was a motor vehicle. *See* Response, Exhibit "A3."

As previously stated by the Court with regard to Plaintiffs' fraudulent concealment defense, Plaintiffs could not reasonably rely on a representation of Defendants contrary to the express language of the contracts which they signed. *See* section "III.A.2." As both fraudulent and negligent misrepresentation claims require a finding by the Court of reasonable reliance on the alleged misrepresentation or omission, the Court therefore finds that, as a matter of law, Plaintiffs Allen and Magee cannot prevail on their claims of fraudulent and negligent misrepresentation against the individual Defendants. The Court further finds that, as a matter of law, Whitley cannot prevail on her fraudulent and negligent misrepresentation claims against the individual Defendants relating to her CitiFinancial loans of September 11, 1998, and September 11, 2000.

2. The Fraudulent and Negligent Misrepresentation Claims of King

**\*10** King submitted conflicting evidence with regard to King's August 15, 1999, loan with CitiFinancial. King testified in her deposition of November 7, 2001, that the individual Defendants did not mention insurance during the closing of her loan. Rather, King

testified, "the only time [the individual Defendants] talked about insurance was on the phone and when [she] went into the [CitiFinancial] office" on January 5, 1998. *See* Rebuttal, Exhibit "4," at 45. However, with her affidavit of January 31, 2002, King averred that the individual Defendants "told [her that] in order for [her] to ... refinance [her] loan, [she] was required under [CitiFinancial] policy to purchase credit disability insurance, credit life insurance and property insurance." *See* Rebuttal, Exhibit "14." Thus, King's affidavit contradicts her own prior sworn testimony.

The United States Court of Appeals for the Fifth Circuit has held in the context of summary judgment motions, that such a conflict between sworn testimony must be explained. *See Copeland v. Wasserstein, Perella & Co., Inc.,* 278 F.3d 472, (5th Cir.2002) (citing *S.W.S. Erectors, Inc. v. Infax, Inc.,* 72 F.3d 489, 495 (5th Cir.1996) (stating "It is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony.")). The Court finds that this rule also applies in the context of motions to remand wherein the Court utilizes a summary judgment-like standard in determining whether a party has been fraudulently joined to defeat diversity jurisdiction. Therefore, a party seeking remand may not, without explanation, use an affidavit which conflicts with prior sworn testimony to create a factual dispute which, when resolved in the moving party's favor, requires remand of the action. As King has offered no explanation for the conflict between her affidavit and prior sworn testimony regarding the representations allegedly made by the individual Defendants on August 15, 1999, the Court does not consider the affidavit in its determination of whether King can state claims of fraudulent and negligent misrepresentation. However, even if the Court were to ignore the conflict in King's sworn testimonies and accept as true King's averment that the individual Defendants represented to her that the purchase of insurance was required to refinance her loan, the Court finds no evidence in the record to show that the conduct of the individual Defendants rises to the level of gross negligence, malice or reckless disregard for the rights of King. The Court therefore finds that King cannot prevail on her claims of fraudulent and negligent misrepresentation against the individual Defendants.

3. The Fraudulent and Negligent Misrepresentation Claims of Newman

With regard to Newman's March, 1999, loan with CitiFinancial, Defendants submitted evidence

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

showing that a check for $2,000 dated March 16, 1999, was written to Newman and drawn on the account of First Family Financial Services. Defendants did not submit any evidence that Newman signed or received a disclosure statement or any other document containing language like that quoted above. However, Newman did not allege that Mitchell, the individual Defendant with whom he worked on the March, 1999, loan, misrepresented the necessity of insurance with regard to his CitiFinancial loan. [FN9] Newman testified, in fact, that he could not remember ever discussing insurance with Mitchell, and did not know whether he had purchased insurance in connection with the subject loan. *See* Rebuttal, Exhibit "7," Deposition Testimony of Newman. The Court finds that, as Newman has not presented any admissible evidence showing that he purchased insurance from Defendants in connection with his March, 1999, CitiFinancial loan, there is no possibility that he can prevail on his claims of fraudulent or negligent misrepresentation and/or omission against Mitchell.

> FN9. Newman's fraudulent and negligent misrepresentation and/or omission claims appear to be based on alleged failures of Mitchell to inquire or disclose certain information regarding insurance. *See* Response, Exhibit "C6," Answer to Interrogatory.

### E. Plaintiffs' Civil Conspiracy Claim

*11 Plaintiffs allege that "Defendants entered into a civil conspiracy with each other and insurance companies to sell credit life, credit disability, property and/or collateral protection insurance to Plaintiffs that was unnecessary and at an exorbitant premium far in excess of the market rate." Complaint ¶ 87. However, the Fifth Circuit has held that

> [i]t is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.

*Nelson Radio & Supply Co. v. Motorola, Inc.,* 200 F.2d 911 (5th Cir.1952). Therefore, unless "individual defendants are ... shown to have acted outside of their employment capacities, they are incapable of conspiring with their corporate employer." *Cooper v. Drexel Chemical Co.,* 949 F.Supp. 1275, 1285 (N.D.Miss.1996). The Court finds no evidence in the record that the individual

Defendants acted "outside of their employment capacities" with regard to Plaintiffs' claims of civil conspiracy. *See id.* The Court therefore finds that, as a matter of law, Plaintiffs cannot prevail on their claims of civil conspiracy against the individual Defendants.

### F. Plaintiffs' Negligence Claim

Plaintiffs allege that Defendants breached their "duty to ... exercise reasonable care to ensure that Plaintiffs received credit life, credit disability, property and/or collateral protection insurance which was both adequately and fairly priced." Complaint ¶ ¶ 92-93. Plaintiffs allege that Defendants: failed to obtain adequate insurance for Plaintiffs, failed to obtain insurance at the prevailing market rate, charged an excessive interest rate and related charges for the subject insurance policies, and failed to provide Plaintiffs with a signed and dated copy of their insurance policies.

Defendants argue that the duties Plaintiffs allege were breached are essentially fiduciary duties and that failure to act where there is no duty to act is not negligence. The Court agrees. Having found that no fiduciary relationship existed between Plaintiffs and the individual Defendants, *see* section "III.B.," the Court finds that the individual Defendants had no duty to act or not act as Plaintiffs allege. Moreover, the Court finds no evidence in the record to show that the individual Defendants engaged in the conduct about which Plaintiffs complains, or which otherwise rises to the level of gross negligence, malice or reckless disregard for the rights of Plaintiffs. The Court therefore finds that Plaintiffs cannot prevail on their claim of negligence against the individual Defendants.

### G. Plaintiffs' Claim of Unconscionability Under the UCC

Plaintiffs allege that the "conduct, acts, and omissions of the Defendants constitutes [SIC] unconscionable practices, individually and collectively, under the UCC," Complaint ¶ 97, and seek both compensatory and punitive damages with regard to their unconscionability claim. Although not cited by Plaintiffs, the remedy for unconscionability under the UCC is set forth in section 75-2- 302 of the Mississippi Code (providing that the court, upon a finding as a matter of law that the contract or any clause of the contract is unconscionable, refuse to enforce the contract, or enforce that part of the contract that is not unconscionable or limit the application of the unconscionable clause so as to

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

avoid an unconscionable result). This section 75-2-302 only applies to the sale of goods, however. *See* MISS. CODE ANN. § 75-2-102 (providing that "this chapter applies to transactions in goods"). *See also Huff v. Hogbood,* 549 So.2d 951, 953 (Miss.1989) ("When one contracts for the sale of goods ..., the transaction is governed by the UCC as adopted in Miss.Code Ann. § § 75-2-101 to--725").

**\*12** Goods are defined by the UCC as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale...." MISS. CODE ANN. 75-2-105(1). The Court questions whether an insurance policy fits within the definition of "goods." Plaintiffs have not referred the Court to authority supporting their contention that the sale of insurance is a transaction in goods governed by the UCC. To the contrary, most courts have held that an insurance policy is not goods as defined by the UCC. *See Bartlev v. National Union Fire Ins. Co.,* 824 F.Supp. 624, 636 (N.D.Tex.1992) (finding that insurance contracts do not fit within the definition of goods promulgated by the Uniform Commercial Code); *Elrad v. United Life & Acc. Ins. Co.,* 624 F.Supp. 742, 744 (N.D.Ill.1985) (finding that, under the definition of "goods" adopted by Illinois, which is identical to the definition found at MISS. CODE ANN. § 75-2-105(1), life insurance contracts were not "goods" within the scope of the Uniform Commercial Code; *Oxford Lumber Co. v. Lumbermens Mutual Ins. Co.,* 472 So.2d 973, 978 (Ala.1975) (finding that the issuance of an insurance contract is a service, and not a product subject to the sales of goods provisions under the Uniform Commercial Code). *Compare Johnson Enter. of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1314 (11th Cir.1998) (finding the UCC inapplicable to a contract for the sale of services).

The Court therefore finds that the subject insurance contracts are not goods as defined by section 75-2-105 of the Mississippi Code. Accordingly, the Court finds that, as a matter of law, Plaintiffs cannot prevail on their claim of unconscionability under the UCC against the individual Defendants.

### IV. Conclusion

Having found that Plaintiffs cannot prevail on any of their claims against the individual Defendants, the Court finds that the individual Defendants were fraudulently joined as defendants in this action. [FN10] As all of the non- diverse Defendants in this case were fraudulently joined, their citizenship will not be considered for the purpose of diversity of citizenship jurisdiction analysis under 28 U.S.C. §

1332. Therefore, as the statutory requisites for diversity of citizenship jurisdiction are satisfied, the Court finds that it has federal subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332.

> FN10. Having found that the individual Defendants were fraudulently joined as defendants in this action, the Court need not consider whether they were misjoined under MISS. R. CIV. P. 20 and 82(c).

IT IS THEREFORE ORDERED that the Motion of Plaintiffs [6-1, 7-1] to Remand is hereby denied.

IT IS FURTHER ORDERED that the Motion of Plaintiffs [6-2, 7-2] for Attorneys' Fees is hereby denied.

2002 WL 461567 (S.D.Miss.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JUL -8 2003

LUTHER D. THOMAS, Clerk
By:                    Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DOUGLAS BRIAN MANN and LESLIE
ANN MANN,

        Plaintiffs,

    v.

GLAXO SMITHKLINE BEECHAM
CORPORATION; WYETH
CORPORATION; LEDERLE
LABORATORIES, INC.; ESI
LEDERLE, INC.; ELI LILLY
COMPANY, INC.; GALLIPOT, INC.;
INTEGRA BIOSCIENCES, INC.;
MEDISCA, INC.; MERIDAN
CHEMICAL AND EQUIPMENT, INC.;
SIGMA-ALDRICH, INC.; AMERICAN
INTERNATIONAL CHEMICAL;
SPECTRUM LABORATORY PRODUCTS;
UNIVERSITY HEALTH CARE SYSTEM;
UNIVERSITY HEALTH SERVICES,
INC.; JOHN DAVID ALLEN, M.D.;
MILDRED COOPER; and REBEKAH
THORPE,

        Defendants.

CIVIL ACTION

NO. 1:02-CV-2660-CAP

## O R D E R

This matter is currently before this court on a number of motions including the plaintiffs' motion for remand and several motions to dismiss. For the reasons set forth below, the defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) [Doc. No. 3-1] is GRANTED. This action is dismissed as against all remaining defendants without prejudice.

Accordingly, all other pending motions [Doc. No. 6-1, 8-1, 9-1, 11-1, 14-1, 14-2, 17-1, 17-2, 19-1, 19-2, 20-1, and 30-1] are rendered MOOT.

## LEGAL ANALYSIS

The plaintiffs brought this civil suit, alleging that their children suffer from the effects of heavy metal poisoning, specifically mercury poisoning, due to the conduct of the defendants. The plaintiffs did not bring this suit on behalf of their children. Instead, they have asserted a cause of action in their own personal capacities. This action was originally filed in state court. The defendants removed the action to this court invoking both the diversity of citizenship jurisdiction and the federal question jurisdiction of this court. The plaintiffs have challenged the defendants' assertions of jurisdiction with a motion to remand. Generally, a court may not hear or decide a case when it lacks subject matter jurisdiction. Accordingly, federal courts usually address the question of whether the action was properly removed before assessing other matters. Where, however, dismissal would be inevitable, a district court may pass directly to a procedurally dispositive issue without addressing the merits of the underlying action or a motion to remand. See generally Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 119 S.Ct. 1563 (1999).

2

The court's decision to dismiss this action without addressing the plaintiffs' motion to remand is the result of the careful consideration by this court of the legal standards and principles involved. The court bases the decision on the relatively straightforward subject matter jurisdictional question which would apply with equal force in the state court. Further, such a disposition obviates a more complex fraudulent joinder analysis. Moreover, the court finds the interests of judicial economy and the expedition of the resolution of this matter to weigh in favor of addressing the motion to dismiss.

The National Childhood Vaccine Injury Act ("Vaccine Act"), 42 U.S.C. § 300aa-1, *et seq.*, states:

> No person may bring a civil action for damages in an amount greater than $1,000 or in an unspecified amount against a vaccine administrator or manufacturer in a State or Federal court for damages arising from a vaccine-related injury or death . . . unless a petition has been filed in accordance with section 300aa-16 of this title, for compensation under the Program for such injury or death and . . .

42 U.S.C. § 300aa-11(a)(2)(A). Whenever a civil action is brought in violation of the above provision, the presiding court "shall dismiss the action." 42 U.S.C. § 300aa-11(2)(B).

The plaintiffs' allegations and claims arise out of the injuries allegedly sustained by their children as a result of

3

receiving vaccinations.[1]  The parties do not dispute that the plaintiffs' seek damages in excess of $1,000.  Moreover, this court has previously held that claims like the plaintiffs' are "vaccine-related" as contemplated in the Vaccine Act.  See Murphy v. Aventis Pasteur, Inc., et al., No. 1:02-CV-2258-CAP (N.D. Ga. Feb. 25, 2003); and see Murphy v. Aventis Pasteur, Inc., et al., No. 1:02-CV-2257-CAP (N.D. Ga. Feb. 25, 2003).  Additionally, the complaint reveals that the plaintiffs allege each of the defendants to be either manufacturer/distributors or administrators of the vaccines, or constituent components of the vaccines, administered to their children.  Further, the record shows that the plaintiffs had not filed a petition in accordance with § 300aa-16 at the time they filed this action.  Therefore, since their claims arise from a "vaccine-related" injury, this court and all state courts lack subject matter jurisdiction to entertain their complaint.  Thus, this court must dismiss those claims for failure to comply with the mandatory provisions of the Vaccine Act.[2]

---

[1]Legal representatives may petition the Court of Federal Claims and may recover for expenses incurred on behalf of the injured person.  See 42 U.S.C. §§ 300aa-11(b)1)(A) and 300aa-15(a).

[2]The court notes that the plaintiffs filed petitions in the Federal Court of Claims on behalf of their children.  Presumably, the plaintiffs view those claims as separate and distinct from the claims asserted here own their own behalf.  Thus, the filing of those petitions had no effect on the plaintiffs' claims in their own capacities.  As the childrens' petitions have now been lawfully

4

## CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) [Doc. No. 3-1] is GRANTED.   This action is dismissed as against all remaining defendants without prejudice.   Accordingly, all other pending motions [Doc. No. 6-1, 8-1, 9-1, 11-1, 14-1, 14-2, 17-1, 17-2, 19-1, 19-2, 20-1, and 30-1] are rendered MOOT.


SO ORDERED, this ____ day of July, 2003.


CHARLES A. PANNELL, JR.
United States District Judge


withdrawn, the claims of the plaintiffs' children may now be brought in any state or federal court where jurisdiction is otherwise proper.

5

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

DOUGLAS BRIAN MANN and LESLIE
ANN MANN,

                Plaintiffs,

vs.

GLAXO SMITHKLINE BEECHAM, et al

                Defendants.

CIVIL ACTION FILE

NO. 1:02-cv-2660-CAP

## J U D G M E N T

This action having come before the court, Honorable Charles A. Pannell, Jr., United

States District Judge, for consideration of defendants' motion to dismiss pursuant to F.R.C.P.

12(b)(1), and the court having granted said motion, it is

**Ordered and Adjudged** that the plaintiff take nothing; that the defendants recover its

costs of this action, and the action be, and the same hereby, is **dismissed without prejudice**.

Dated at Atlanta, Georgia, this 8th day of July, 2003.

LUTHER D. THOMAS
CLERK OF COURT

By: _____
    Deputy Clerk

Prepared, Filed, and Entered
in the Clerk's Office
  July 9, 2003
Luther D. Thomas
Clerk of Court
By: _____
    Deputy Clerk