Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States Court of Appeals,
Fifth Circuit.

Kelli **SMALLWOOD**, Plaintiff-Appellant,
v.
ILLINOIS CENTRAL RAILROAD COMPANY;
Mississippi Department of Transportation,
Defendants-Appellees.

No. 02-60782.

Sept. 10, 2004.

Background: Driver of vehicle that was struck by train brought negligence action against railroad and Department of Transportation. Railroad removed action to federal court, and driver filed motion to remand. The United States District Court for the Southern District of Mississippi, William H. Barbour, Jr., J., 203 F.Supp.2d 686, denied motion to remand, and appeal was taken.

Holding: In en banc decision, the Court of Appeals, Patrick E. Higginbotham, Circuit Judge, held that, where only showing made by diverse defendant that in-state defendant had been improperly joined, based on fact that plaintiff's state law claims against in-state defendant were allegedly preempted by federal law, equally disposed of plaintiff's state law claims against diverse defendant, there was no improper joinder of in-state defendant, such as would permit removal of case, but only the commencement of state court lawsuit that allegedly lacked merit, and district court should have remanded case to state court.

Vacated and remanded.

E. Grady Jolly, Circuit Judge, dissented and filed opinion, in which Edith H. Jones, Jerry E. Smith, Rhesa Hawkins Barksdale, Emilio M. Garza, Edith Brown Clement and Prado, Circuit Judges, joined.

Jerry E. Smith, Circuit Judge, dissented and filed opinion, in which Edith H. Jones and Rhesa Hawkins Barksdale joined.

Edith Brown Clement, Circuit Judge, dissented and concurred in judgment only and filed opinion.

[1] Removal of Cases ⚷ 107(7)

334k107(7)

To remove case based on diverse citizenship of parties, defendant must demonstrate that all of the prerequisites of diversity jurisdiction are satisfied. 28 U.S.C.A. §§ 1332, 1441(b).

[2] Removal of Cases ⚷ 1
334k1

Federal courts should not sanction devices intended to prevent removal of case to federal court where defendant has right to remove it, and should be equally vigilant to protect right to proceed in federal court as to permit state courts, in proper cases, to retain their own jurisdiction. 28 U.S.C.A. §§ 1332, 1441(b).

[3] Removal of Cases ⚷ 36
334k36

In deciding whether in-state defendant has been improperly joined, so as to prevent defendant from exercising right of removal, court's inquiry must focus on the joinder, and not on merits of plaintiff's case. 28 U.S.C.A. §§ 1332, 1441(b).

[4] Removal of Cases ⚷ 36
334k36

There are two ways in which diverse defendant may establish that in-state defendant was improperly joined for purpose of defeating its removal rights, by demonstrating: (1) actual fraud in pleading of jurisdictional facts; or (2) inability of plaintiff to establish cause of action against non-diverse party in state court. 28 U.S.C.A. §§ 1332, 1441(b).

[5] Removal of Cases ⚷ 36
334k36

Test for **fraudulent joinder** is whether the diverse defendant seeking to remove case has demonstrated that there is no reasonable basis for district court to predict that plaintiff might be able to recover against

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT
tabbles
1

Westlaw.

in-state defendant; mere theoretical possibility of recovery under local law will not preclude finding of improper joinder. 28 U.S.C.A. §§ 1332, 1441(b) .

[6] Removal of Cases ⚷ 36
334k36

In deciding whether in-state defendant has been improperly joined, so as to prevent defendant from exercising right of removal, district court may conduct a Rule 12(b)(6)-type analysis, looking initially at allegations of complaint to determine whether complaint states a claim under state law against in-state defendant. 28 U.S.C.A. §§ 1332, 1441(b); Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

[7] Removal of Cases ⚷ 36
334k36

Ordinarily, if plaintiff's claims against in-state defendant can survive motion to dismiss for failure to state cause of action, then there is no improper joinder, and diverse defendant cannot remove case on that basis. 28 U.S.C.A. §§ 1332, 1441(b); Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

[8] Removal of Cases ⚷ 107(4)
334k107(4)

In deciding whether in-state defendant has been improperly joined, so as to prevent defendant from exercising right of removal, district court, in its discretion, may pierce pleadings and conduct a summary inquiry, if it feels that plaintiff, while stating a claim against in-state defendant, has nevertheless misstated or omitted discrete facts that would determine propriety of joinder. 28 U.S.C.A. §§ 1332, 1441(b); Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

[9] Removal of Cases ⚷ 107(4)
334k107(4)

In deciding whether in-state defendant has been improperly joined, so as to prevent defendant from exercising right of removal, it is appropriate for district court to pierce the pleadings and to conduct a summary inquiry only to identify presence of discrete and undisputed facts which would preclude plaintiff's recovery against in-state defendant. 28 U.S.C.A. §§ 1332, 1441(b); Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

[10] Removal of Cases ⚷ 107(7)
334k107(7)

When district court, in exercise of its discretion, decides to pierce the pleadings and to conduct a summary inquiry to determine whether in-state defendant has been improperly joined, so as to prevent defendant from exercising right of removal, court should not consider motive or purpose of joinder, as it is not relevant in this inquiry. 28 U.S.C.A. §§ 1332, 1441(b).

[11] Removal of Cases ⚷ 107(4)
334k107(4)

When district court, in exercise of its discretion, decides to pierce the pleadings and to conduct a summary inquiry to determine whether in-state defendant has been improperly joined, so as to prevent defendant from exercising right of removal, any piercing of the pleadings should not entail substantial hearings; discovery by parties should not be allowed except on a tight judicial tether, sharply tailored to question at hand, and only after a showing of its necessity. 28 U.S.C.A. §§ 1332, 1441(b).

[12] Removal of Cases ⚷ 107(7)
334k107(7)

When district court, in exercise of its discretion, decides to pierce the pleadings and to conduct a summary inquiry to determine whether in-state defendant has been improperly joined, so as to prevent defendant from exercising right of removal, inability of court to make requisite decision in summary manner itself points to an inability of removing party to carry its burden of demonstrating that in-state defendant was improperly joined. 28 U.S.C.A. §§ 1332, 1441(b).

[13] Removal of Cases ⚷ 36
334k36

[13] Removal of Cases ⚷ 102
334k102

Where only showing made by diverse defendant that in-state defendant had been improperly joined, based

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

on fact that plaintiff's state law claims against in-state defendant were allegedly preempted by federal law, equally disposed of plaintiff's state law claims against diverse defendant, there was no improper joinder of in-state defendant, such as would permit removal of case, but only the commencement of state court lawsuit that allegedly lacked merit, and district court should not have exercised jurisdiction and reached merits of preemption defense, but should have remanded case to state court. 28 U.S.C.A. §§ 1332, 1441(b).

[14] Removal of Cases ⚿ 36
334k36

[14] Removal of Cases ⚿ 107(7)
334k107(7)

Burden on defendant seeking to remove case based upon improper joinder of in-state defendant(s) is to prove that joinder of in-state parties was improper, i.e., to show that sham defendants were added to defeat jurisdiction; when only proffered justification for improper joinder is that there is no reasonable basis for predicting recovery against in-state defendant, and when that showing is equally dispositive of all defendants rather than of in-state defendant(s) alone, requisite showing has not been made. 28 U.S.C.A. §§ 1332, 1441(b).

[15] Federal Courts ⚿ 3.1
170Bk3.1

Federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in federal courts of protection of their rights in those tribunals.

[16] Removal of Cases ⚿ 107(4)
334k107(4)

When defendant removes case to federal court on claim of improper joinder, district court's first inquiry is whether the removing party has carried its heavy burden of proving that joinder was improper; indeed, until removing party does so, district court does not have authority to do more, and lacks jurisdiction to dismiss case on its merits. 28 U.S.C.A. §§ 1332, 1441(b).

Cynthia H. Speetjens, Frazer & Davidson, Jackson, MS, Derek A. Wyatt, Pat M. Barrett, Jr., Barrett Law Office, Lexington, MS, Jeffrey Howard Schultz, Schultz & Murphy, Belleville, IL, for Plaintiff-Appellant.

Charles T. Ozier, George Howard Ritter, William B. Lovett, Jr., Wise, Carter, Child & Caraway, Susan L. Runnels, Kelly Dunleath Simpkins, Wells, Marble & Hurst, Jackson, MS, for Defendant-Appellee.

Emerson Barney Robinson, III, Butler, Snow, O'Mara, Stevens & Cannada, Charles Clark, Watkins & Eager, Jackson, MS, Dan K Webb, Winston & Strawn, Chicago, IL, Charles E. Griffin, Griffin & Associates, James William Craig, Phelps Dunbar, David W. Clark, Billy Berryhill, Bradley, Arant, Rose & White, William C. Brabec, Adams & Reese, Walter D Willson, Wells, Marble & Hurst, Jackson, MS, for Amicus Curiae.

Appeal from the United States District Court for the Southern District of Mississippi.

Before KING, Chief Judge, and JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART, DENNIS, CLEMENT, PRADO and PICKERING, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

*1 Today we decide a narrow but not unimportant question regarding diversity jurisdiction in federal courts and the application of the doctrine of "improper joinder." [FN1] This is the first time this Court en banc has addressed the issue of improper joinder, although a number of panels of this Court have previously addressed it. We hold that, when a nonresident defendant's showing that there is no reasonable basis for predicting that state law would allow recovery against an in-state defendant equally disposes of all defendants, there is no improper joinder of the in-state defendant. In such a situation, the entire suit must be remanded to state court. In this case, it is undisputed that the district court's decision that Smallwood's claims against the in-state defendant were preempted effectively decided the entire case. On these facts, we conclude that the district court erred in deciding the merits of the proffered defense of preemption and in not remanding the case to the state court from which it was removed.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

I

Kelli Smallwood is a Mississippi resident who was injured when a train struck her car at a railroad crossing in Florence, Mississippi. The train was operated by Illinois Central, an Illinois corporation, and the railroad crossing was controlled by an agency of the Mississippi state government, the Mississippi Department of Transportation ("MDOT"). At the time of the accident, the crossing did not have automatic gates; it was equipped only with warning lights, which had been installed using federal funds. After the accident, Smallwood filed suit in Mississippi state court against both Illinois Central and MDOT, raising claims of negligence. She alleged, in particular, that MDOT negligently failed to install gates at the crossing despite its knowledge that the crossing was unreasonably dangerous and extraordinarily hazardous.

Illinois Central removed the case to federal court. Illinois Central maintained that Smallwood's claims against MDOT were preempted by the Federal Railroad Safety Act ("FRSA"). [FN2] Reasoning that the preemption defense barred Smallwood's claims against MDOT, Illinois Central argued that Smallwood had improperly joined MDOT because, under the FRSA, there was no reasonable possibility of recovery against MDOT.

The district court accepted Illinois Central's argument, dismissed MDOT from the case, and denied Smallwood's motion to remand. Applying the "law of the case," the district court then granted summary judgment for Illinois Central on the basis that Smallwood's claim against the railroad was equally preempted. The railroad won its case when it persuaded the district court that the claims against the in-state defendant, MDOT, were preempted. [FN3]

A panel of this court concluded that Illinois Central had not carried its burden of demonstrating that the joinder of MDOT was fraudulent, reversed the district court's dismissal of the case on its merits, and ordered the case remanded to state court. We voted to rehear the case en banc.

II

*2 [1][2][3] The starting point for analyzing claims of improper joinder must be the statutes authorizing removal to federal court of cases filed in state court. The federal removal statute, 28 U.S.C. § 1441(a), allows for the removal of "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." Subsection (b) specifies that suits arising under federal law are removable without regard to the citizenship of the parties; all other suits are removable "only if none of the parties in interest *properly* joined and served as defendants is a citizen of the State in which such action is brought." [FN4] To remove a case based on diversity, the diverse defendant must demonstrate that all of the prerequisites of diversity jurisdiction contained in 28 U.S.C. § 1332 are satisfied. Relatedly, a district court is prohibited by statute from exercising jurisdiction over a suit in which any party, by assignment or otherwise, has been *improperly* or *collusively* joined to manufacture federal diversity jurisdiction. [FN5] As Professor Wright has noted:

> "[T]he Federal courts should not sanction devices intended to prevent the removal to a Federal court where one has that right, and should be equally vigilant to protect the right to proceed in the Federal court as to permit the state courts, in proper cases, to retain their own jurisdiction." [FN6]

The doctrine of improper joinder rests on these statutory underpinnings, which entitle a defendant to remove to a federal forum unless an in-state defendant has been "properly joined." Since the purpose of the improper joinder inquiry is to determine whether or not the in-state defendant was properly joined, the focus of the inquiry must be on the joinder, not the merits of the plaintiff's case.

[4][5] Given this focus, we have recognized two ways to establish improper joinder: "(1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court." [FN7] Only the second way is before us today, and we explained in *Travis v. Irby* [FN8] that the test for **fraudulent joinder** is whether the defendant has demonstrated that there is no possibility of recovery by the plaintiff against an in-state defendant, which stated differently means that there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant. To reduce possible confusion, we adopt this phrasing of the required proof and reject all

others, whether the others appear to describe the same standard or not. [FN9]

[6][7][8] There has also been some uncertainty over the proper means for predicting whether a plaintiff has a reasonable basis of recovery under state law. A court may resolve the issue in one of two ways. The court may conduct a Rule 12(b)(6)-type analysis, looking initially at the allegations of the complaint to determine whether the complaint states a claim under state law against the in-state defendant. [FN10] Ordinarily, if a plaintiff can survive a Rule 12(b)(6) challenge, there is no improper joinder. That said, there are cases, hopefully few in number, in which a plaintiff has stated a claim, but has misstated or omitted discrete facts that would determine the propriety of joinder. In such cases, the district court may, in its discretion, pierce the pleadings and conduct a summary inquiry. [FN11]

***3** [9][10][11][12] While the decision regarding the procedure necessary in a given case must lie within the discretion of the trial court, we caution that a summary inquiry is appropriate only to identify the presence of discrete and undisputed facts that would preclude plaintiff's recovery against the in-state defendant. [FN12] In this inquiry the motive or purpose of the joinder of in-state defendants is not relevant. We emphasize that any piercing of the pleadings should not entail substantial hearings. Discovery by the parties should not be allowed except on a tight judicial tether, sharply tailored to the question at hand, and only after a showing of its necessity. Attempting to proceed beyond this summary process carries a heavy risk of moving the court beyond jurisdiction and into a resolution of the merits, as distinguished from an analysis of the court's diversity jurisdiction by a simple and quick exposure of the chances of the claim against the in-state defendant alleged to be improperly joined. Indeed, the inability to make the requisite decision in a summary manner itself points to an inability of the removing party to carry its burden.

III

[13] Illinois Central argues that the district court's finding of improper joinder was appropriate because Smallwood's claims against MDOT were preempted by federal law. Illinois Central urges, moreover, that it is irrelevant that the FRSA equally bars claims against it.

Facing the question for the first time in an en banc proceeding, we reject the railroad's contention. To justify removal on improper joinder grounds, Illinois Central was required to prove that the joinder of MDOT was improper. Illinois Central, however, brought no contention going to the propriety of the joinder. Rather, the basis of its contention that Smallwood could not recover went, in fact, to the entire case, although it was first directed to Smallwood's claims against MDOT. Then, with jurisdiction secured, and with all the force of the "law of the case," this same preemption was directed to the merits of Smallwood's claims against the railroad.

A claim of improper joinder by definition is directed toward the joinder of the in-state party, a simple but easily obscured concept. The party seeking removal bears a heavy burden of proving that the joinder of the in-state party was improper. [FN13] Nevertheless, when, on a motion to remand, a showing that compels a holding that there is no reasonable basis for predicting that state law would allow the plaintiff to recover against the in-state defendant necessarily compels the same result for the nonresident defendant, there is no improper joinder; there is only a lawsuit lacking in merit. In such cases, it makes little sense to single out the in-state defendants as "sham" defendants and call their joinder improper. In such circumstances, the allegation of improper joinder is actually an attack on the merits of plaintiff's case as such--an allegation that, as phrased by the Supreme Court in *Chesapeake & O.R. Co. v. Cockrell,* "the plaintiff's case [is] ill founded as to all the defendants." [FN14] In reaching this conclusion, we are applying our traditional improper joinder analysis.

***4** In *Cockrell,* the Supreme Court reviewed an effort by a railroad to remove a case to federal court on improper joinder grounds. The railroad argued that the plaintiff's negligence charges against the defendants were "each and all 'false and untrue' " and that the in-state defendants were added simply to defeat diversity. [FN15] Emphasizing that "the showing must be such as compels the conclusion that the joinder is without right and made in bad faith," the Court rejected the railroad's argument. [FN16] The Court reasoned that although the plaintiff's petition "may have disclosed an absence of good faith on the part of the plaintiff in bringing the action at all, ... it did not show a **fraudulent**

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

**joinder** of the engineer and fireman." [FN17] Since "no negligent act or omission personal to the railway company was charged," the improper joinder allegations directed at the employees "manifestly went to the merits of the action as an entirety, and not to the joinder; that is to say, it indicated that the plaintiff's case was ill founded as to all the defendants." [FN18]

[14] The Supreme Court thus made clear that the burden on the removing party is to prove that the joinder of the in-state parties was improper--that is, to show that sham defendants were added to defeat jurisdiction. A showing that the plaintiff's case is barred as to all defendants is not sufficient. When the only proffered justification for improper joinder is that there is no reasonable basis for predicting recovery against the in-state defendant, and that showing is equally dispositive of all defendants rather than to the in-state defendants alone, the requisite showing has not been made.

[15] Our insistence that a removing defendant demonstrate that the joinder was improper does not impair a foreign defendant's right to remove. "[T]he Federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts of the protection of their rights in those tribunals." [FN19] In every case where a diverse defendant proves that the plaintiff's decision to join an in-state party is improper, the diverse defendant gains access to the federal courts. If, however, the foreign defendant fails to prove the joinder improper, then diversity is not complete, the diverse defendant is not entitled to remove, and remand is mandated.

Illinois Central contends, nonetheless, that our decision contradicts prior holdings of this circuit which have allowed a finding of improper joinder based on defenses going to the merits of the plaintiff's case, rather than to the joinder. [FN20] Yet we are not pointed to any decision of this Court where the assertion was made and rejected. It was asserted here, and our decision today fits squarely within our improper joinder doctrine and finds strong support in the Supreme Court's decision in *Cockrell* and the decision of the Third Circuit in *Boyer v. Snap-On Tools Corp.* [FN21]

*5 While we need not deploy the well-pleaded complaint rule, it is not unimportant that our application of the improper joinder doctrine here disallows circumvention of the well-pleaded complaint rule. The railroad could not remove on the basis of federal question jurisdiction because the only federal question appeared as a defense. Nonetheless, Illinois Central did just that: it removed on the basis of a defense of federal conflict preemption, urged as the bar to a reasonable basis for predicting recovery against MDOT, the in-state defendant. The appropriate application of the doctrine of improper joinder to this extent leaves intact the well-pleaded complaint doctrine with all its intended reach.

IV

It is urged that this application of the improper joinder doctrine undermines the purpose of diversity jurisdiction, which is to protect out-of-state defendants from local bias, the proverbial "home cooking." But our holding today is narrow. It applies only in that limited range of cases where the allegation of improper joinder rests only on a showing that there is no reasonable basis for predicting that state law would allow recovery against the in-state defendant and that showing is equally dispositive of all defendants.

The doctrine of improper joinder implements our duty to not allow manipulation of our jurisdiction. We are not persuaded that we can or should--as we are now urged to do--hold that *Strawbridge v. Curtiss* [FN22] does not apply to suits wholly lacking "merit," at least as seen by a federal court. That is not a rule of joinder, but a recrafting of *Strawbridge*. Until Congress changes our jurisdiction and allows us to hear cases based on something less than complete diversity, we cannot act. And make no mistake, whether to confer diversity jurisdiction in the absence of complete diversity is a quintessential political decision belonging to Congress, as congressional efforts to respond to abuses in state court class action litigation by allowing their removal on minimal diversity have so recently reminded us.

It is no accident that the first Congress conferred removal jurisdiction, accommodating competing political interests. Removal remains a centerpiece of our federalism. The cry of out-of-state interests seeking to escape local courts and local plaintiffs seeking to avoid more distant justice is in fact an old

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

and recurring song. It is a living dynamic, not an historic relic. To the point, our insistence that diversity removal, powerful as it is, remain within its congressionally marked traces is demanded by principles of comity and federalism--that a state court is to be trusted to handle the suit unless the suit satisfies the removal requirements.

[16] It is argued that our holding undermines judicial economy by forcing a federal district court to remand a meritless case to state court rather than dismiss it outright. This argument, however, misconstrues the inquiry on removal. When a defendant removes a case to federal court on a claim of improper joinder, the district court's first inquiry is whether the removing party has carried its heavy burden of proving that the joinder was improper. Indeed, until the removing party does so, the court does not have the authority to do more; it lacks the jurisdiction to dismiss the case on its merits. It must remand to the state court.

*6 Illinois Central seeks broader license to escape from state court, but we are not authorized to grant such a request, as compelling as it may be. It is the province of Congress to modify diversity jurisdiction.

V

The judgment of the district court is VACATED and the case is REMANDED to the district court with instructions to remand for want of jurisdiction to the state court from which it was removed.

E. GRADY JOLLY, Circuit Judge, with whom EDITH H. JONES, JERRY E. SMITH, RHESA HAWKINS BARKSDALE, EMILIO M. GARZA, EDITH BROWN CLEMENT and PRADO, Circuit Judges, join, dissenting:

I respectfully dissent from the majority's strange compulsion to amend the traditional rules of **fraudulent joinder** based on a seldom cited 1914 fact-specific case. [FN1] This is all the more strange in the light of the admonition we sounded recently: "[F]or the simple truth that we stand on the shoulders of those before us, if for no other reason, we must be hesitant when we act on recent flashes of 'new' insight to the fundamentals of governance". *Marathon Oil Co. v. Ruhrgas,* 145 F.3d 211, 227 (5th Cir.1998) (en banc), *rev'd,* 526 U.S. 574, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999) (Higginbotham, J., dissenting). In my view, the majority, in accepting the plaintiff's briefing and "new insights", misreads the Supreme Court decision, disregards established precedent, designs a troublesome and unnecessary "common-defense" rule to amend a long established and fairer rule, offers meaningless reasoning to support its decision and creates confusion for the district courts--all for no other reason, as far as I can determine, than the satisfaction in finding a "buried treasure" obscured from our judicial predecessors for almost a century. [FN2]

I

Up until today, our precedent has been rooted, established and clear, having evolved through the writings of solid and respected judges over many years. It asks a simple question and, eschewing personal motives of the plaintiff, applies an objective test to produce a fair answer: When a diverse defendant removes to federal court on grounds of **fraudulent joinder** we only ask, as the majority opinion acknowledges:

> [W]hether the defendant has demonstrated that there is no possibility of recovery by the plaintiff against an in-state defendant, which stated differently means that there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant.

*Smallwood v. Ill. Cent. R.R. Co.,* --- F.3d ----, ---- , Maj. Op. at ---- (5th Cir.2004) (en banc) ( *Smallwood III*). Our inquiry is designed to determine the single overarching question of whether the in-state defendant was joined "solely to deprive the federal courts of jurisdiction"; if our objective test determines that the plaintiff cannot recover, then the in-state defendant is deemed fraudulently joined and his "existence is disregarded for purposes of determining diversity". 16 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 107.14[2][c][iv][A] (3d ed.2004); *see also Smallwood v. Ill. Cent. R.R. Co.,* 342 F.3d 400, 407 (5th Cir.2003)(*Smallwood I*), *panel reh'g denied,* 352 F.3d 220 (*Smallwood II*), *reh'g en banc granted,* 355 F.3d 357 (stating that "the purpose of the **fraudulent joinder** doctrine ... is to prevent a plaintiff from naming a nondiverse party as a defendant solely for the purposes of depriving the court of jurisdiction").

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*7 The subjective intent of the plaintiff is irrelevant; instead, our precedent, unequivocally and without exception, has evaluated claims of **fraudulent joinder** with a simple, well-understood, objective two-prong test [FN3]--that is, until today. *See Travis v. Irby,* 326 F.3d 644, 647 (5th Cir.2003); *Ross v. Citifinancial, Inc.,* 344 F.3d 458, 461 (5th Cir.2003); *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 311-12 (5th Cir.2002); *Heritage Bank v. Redcom Lab., Inc.,* 250 F.3d 319, 323 (5th Cir.2001); *Griggs v. State Farm Lloyds,* 181 F.3d 694, 698-99 (5th Cir.1999); *Rodriguez v. Sabatino,* 120 F.3d 589, 591 (5th Cir.1997); *Burden v. Gen. Dynamics Corp.,* 60 F.3d 213, 217 (5th Cir.1995); *Cavallini v. State Farm Mut. Auto Ins. Co.,* 44 F.3d 256, 259 (5th Cir.1995); *Laughlin v. Prudential Ins. Co.,* 882 F.2d 187, 190 (5th Cir.1989); *Tedder v. F.M.C. Corp.,* 590 F.2d 115, 117 (5th Cir.1979); *Parks v. New York Times Co.,* 308 F.2d 474, 478 (5th Cir.1962).

Because we eschew a subjective test, our test does not seek to determine the "truth" of exactly why the nondiverse defendant was joined as a defendant in the lawsuit. [FN4] Instead, the many judges who have preceded us on this court have determined that this test produces a practical "truth": that is, it is reasonable and fair to assume that a lawyer, acting in accordance with the code of professional responsibility, will not sue someone against whom he has no reasonable basis of recovery, unless it is for an improper reason; on the other hand, when a lawyer sues someone against whom he has a reasonable basis of recovery, it is unlikely that the joinder was for an improper reason. [FN5] In short, it is always "improper"--professionally and ethically--to join any party to a suit if there is no basis of recovery, a point that apparently has no place in the reasoning of the majority.

Moreover, our established test is an efficient test because it focuses only on the joinder of the nondiverse defendant and does not require us to examine the case against the diverse defendant. The majority's "common-defense" rule, on the other hand, requires the district court to go one step further and examine the entirety of the case.

II

A

According to the majority, however, this traditional analysis is infected with error, long overlooked by scores of preceding judges but now revealed: The majority has declared that a New Legal Truth has been uncovered--The Common-Defense Theory. Although the panel's bold proclamation of the new discovery has been modulated by the en banc majority, and although the majority has narrowed the open-ended sweep of the panel, the unfortunate amendment to our traditional rule remains:

> When the nonresident defendant's showing that there is no reasonable basis for predicting that state law would allow recovery against the in-state defendant equally disposes of all defendants, there is no improper joinder of the in-state defendant.

*8 *Smallwood III,* --- F.3d at ----, Maj. Op. at ---- - ----. [FN6] Under this rule, even if the diverse defendant completely satisfies our traditional test and demonstrates that the plaintiff has no reasonable possibility of establishing a cause of action against the in-state defendant, the traditional rule is abrogated, and the case is remanded, irrespective of the plaintiff's inability to recover in state court, *if* the diverse and nondiverse defendants happen to possess the same defense.

B

The majority's support for its creation of the common defense rule is the turn of the century fact-specific Supreme Court case, *Chesapeake & Ohio Ry. Co. v. Cockrell,* 232 U.S. 146, 34 S.Ct. 278, 58 L.Ed. 544 (1914). The pertinent language--cherry-picked and shorn of context--upon which the majority relies as compelling a common-defense rule, states:

> As no negligent act or omission personal to the railway company was charged, and its liability, like that of the two employees, was, in effect, predicated upon the alleged negligence of the latter, the showing manifestly went to the merits of the action as an entirety, and not to the joinder; that is to say, it indicated that the plaintiff's case was ill founded as to all the defendants. Plainly, this was not such a showing as to engender or compel the conclusion that the two employees were wrongfully brought into a controversy which did not concern them. As they admittedly were in charge of the movement of the train, and their negligence was apparently the principal matter in dispute, the plaintiff had the same right, under the laws of Kentucky, to insist upon their presence as real



Westlaw.

defendants as upon that of the railway company.

*Cockrell,* 232 U.S. at 153, 34 S.Ct. 278. As discussed below, however, the correct reading of *Cockrell* does not justify, much less compel the creation of the "common-defense" rule.

Since *Cockrell* was decided in 1914, the only circuit court decision that, previous to today, has interpreted it as proclaiming a "common-defense" exception to the **fraudulent joinder** rule is the Third Circuit's opinion in *Boyer v. Snap-On Tools Corp.,* 913 F.2d 108 (3d Cir.1990). [FN7] Equally revealing of the novelty of the majority's position is that neither WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE nor MOORE'S FEDERAL PRACTICE--the two most authoritative treatises on federal practice--cites *Cockrell* as relating to such a theory as "common-defense" or, for that matter, even intimates that such a rule exists. [FN8]

C

I turn now to address the majority's reliance on *Cockrell.* In *Cockrell* the plaintiff sued the Railroad and the in-state engineer and fireman who operated the train that caused the death of the intestate. The plaintiff alleged that, although the negligence was that of the in-state engineer and fireman in the manner that they operated the train, the railroad--which committed no independent act of negligence--was nevertheless liable for the negligent conduct of its employees. In short, the entire suit was solely *founded* (or "ill-founded") on the conduct of the in-state defendants; *no argument* could be made, as the Court put it, that the two in-state defendants were joined to a suit in which they did not belong. Indeed, but for their conduct the railroad would not have been in the suit; the in-state defendants could not possibly have been fraudulently joined because their conduct was the *only* actionable conduct in the case; there was in essence but one case and it was against the joined defendants themselves.

*9 With respect to the grounds of **fraudulent joinder** of the two employees, the Railroad's *only* basis was that the plaintiff's allegations against these two in-state defendants were "false and untrue". *See Cockrell,* 232 U.S. at 153, 34 S.Ct. 278. To be sure, the Railroad's claim of **fraudulent joinder** would have required that a trial on the merits be conducted in a removal proceeding.

That the majority misreads *Cockrell* as calling for modification of our traditional rules of **fraudulent joinder** is demonstrated by how neatly the traditional rules decide the case for **fraudulent joinder** presented in *Cockrell:* We look at the complaint and first conclude that the complaint clearly states a claim against the fireman and the engineer for their negligent conduct, a claim that has a possibility of prevailing under state law; we next look at the railroad's claim of **fraudulent joinder**, that is, that the negligence claims were "false and untrue"; we then apply our rule that disputed factual merits will not be tried in removal proceedings; and we would have remanded. This exercise demonstrates that the majority has vastly overstated the implications of *Cockrell.* In fact, it is only by seizing language taken out of context and ignoring the sum of this case in all of its parts--factual and legal--that the majority creates its misguided amendment to our traditional rule.

Still further, however, in virtually all respects the instant case is distinguishable from *Cockrell.* First, there is no issue of vicarious liability here and consequently the "entirety" of the case against Illinois Central is not premised on the liability of MDOT. Unlike *Cockrell,* Smallwood seeks to hold Illinois Central liable for its own act of negligence--its negligent delay in installing safety devices. *Compare with Cockrell,* 232 U.S. at 153, 34 S.Ct. 278 (stating that "no negligent act or omission personal to the railway company was charged"). Consequently, unlike the Railroad in *Cockrell* whose liability was *totally* dependent upon the liability of the joined defendants (its employees), Illinois Central's liability was not predicated on the negligence of MDOT; instead, its liability was independent of MDOT's liability. *Compare with Cockrell* (stating that the railroad's liability "was, in effect, predicated upon the negligence of the [employees]"). *Id.* Therefore, the showing of conflict preemption in this case, unlike *Cockrell,* does not go the *merits* of the action in its entirety, that is, the defense is not a traverse of the allegations of the entire complaint, as in *Cockrell,* but only indicates that, as to MDOT, Smallwood's claims are procedurally barred; stated differently MDOT's defense does not attack the facts upon which the plaintiff's case against Illinois Central is founded nor automatically absolve Illinois Central of its own alleged negligence. *Compare with Cockrell,* 232 U.S. at 153, 34 S.Ct. 278 (stating that "the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

showing manifestly went to the merits of the action as an entirety, and not to the joinder, that is to say, it indicated that the plaintiff's case was *ill founded* as to all defendants" (emphasis added)).

***10** In sum, it is only through a strained application based on a serious misreading that the majority inflates the significance and relevance of *Cockrell,* a case that has lain basically dormant for all of its 90-year life.

III

Not only does the majority's misreading and misapplication of *Cockrell* betray the weakness of its position, the majority fails to come up with any compelling reasons that might otherwise support its misadventure.

It argues that its theory is justified, because the focus in **fraudulent joinder** cases should be on the joinder of the non-diverse defendant--*not* on the merits of the case. This "focus" argument is a strawman. Of course the focus should be on the joinder, but on the joinder as a whole. Beyond uttering the platitudinous axiom that the focus should be on the joinder, the majority fails to offer any explanation of why the viability of the cause of action against the joined defendant is not part of that focus; indeed, only a few lines later, the majority states that the joinder inquiry *is* whether the plaintiff can establish a cause of action against the joined party. But, as with other inconsistent and contradictory statements in the opinion, the common-defense rule duels with this professed statement of the governing rule.

The majority may be unwilling to face it, but the plain and undeniable fact is that *only* the traditional test focuses exclusively on the joinder; the common-defense theory *requires* that the court look beyond the joinder of the nondiverse defendant to the entirety of the case and determine the defenses of the diverse defendant as well. If the majority were serious in trumpeting a test that focuses on the joinder, and not the entire case, it would adhere to the traditional test.

The majority seems to forget that the overarching purpose of improper joinder inquiry is to determine if the defendant has been joined solely to defeat diversity. *See* JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 107.14[2][c][iv][A] (3d ed.2004). [FN9] The weakness of the majority's argument is that it fails to demonstrate how the common-defense rule serves the purpose of the improper joinder inquiry--that is, to determine whether the defendant has been joined solely to defeat diversity--any better than, or as well as, the traditional test does. Indeed, as we have demonstrated earlier, the traditional test produces a "practical truth", where the common defense theory does not even purport to do so.

The majority argues that even though Illinois Central showed there could be no recovery against the joined defendant, it failed to prove that the joinder of MDOT was improper and that Illinois Central "brought *no contention* going to the propriety of the joinder." *Smallwood III,* --- F.3d at ----, Maj. Op. at ---- (emphasis added). It is difficult to understand how the majority can make such a serious misstatement, unless it is somehow contending that Illinois Central had no right to rely upon 40 years of consistent precedent. Illinois Central relied upon our well-established precedent and demonstrated to the satisfaction of the district court--a result which the majority does not challenge--that the plaintiff had no reasonable possibility of recovering against MDOT; it was clearly improper to sue (and thus "join") MDOT when the plaintiff had no hope of recovery against MDOT. Furthermore, even in the light of *Cockrell,* the defense of MDOT did not go to the merits of the entire case that the plaintiff had alleged against Illinois Central; only a procedural defense was raised to bar Smallwood's claims against MDOT. Thus, it is a serious misstatement to suggest that Illinois Central "brought no contention going to the propriety of the joinder" when Illinois Central demonstrated that the plaintiff's claims against MDOT were barred; this showing meant, under the law existing until today, that MDOT was joined solely to defeat diversity jurisdiction. This argument goes directly to the propriety of the joinder by any standard and it is incorrect for the majority to assert otherwise.

***11** In an attempt to provide some logic to its argument, the majority argues that because MDOT's successful defense also requires the dismissal of the entire case, the joinder of MDOT is not improper because the removed case is only a meritless case, not a fraudulently joined case. The majority

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

connects no further dots to this argument. Left hanging, as its postulate is, it follows that the majority argues that the lack of merit of a case determines removability--which it surely does not. Seizing on a dichotomy between removable and meritless cases, the majority simply has not sorted out the confusion of its contention: it argues that when both defendants possess the same complete defense the claim is meritless and the case is non-removable; yet, it surely does not contend that the meritless case is non-removable when the respective defenses of the diverse and nondiverse defendants are different, and result in the dismissal of the entire case. Thus, it is clear that the attempted rationale of equating a completely meritless case with non-removability is meritless in itself.

The most baseless argument of the majority is that it is only "applying our traditional improper joinder analysis." *Smallwood III,* --- F.3d at ----, Maj. Op. at ----. This statement represents a retreat into major denial of what it has so plainly done. Indeed, it is incomprehensible how the majority would expect this statement to be taken seriously. We have previously string-cited the numerous cases applying our traditional **fraudulent joinder** analysis, none of which--I repeat, none of which--has any element of the common-defense rule that the majority tattoos on our traditional analysis. Even the majority acknowledges that under our traditional analysis:

> the test for **fraudulent joinder** is whether the defendant has demonstrated that there is no possibility of recovery by the plaintiff against an in-state defendant, which stated differently means that there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant.

*Smallwood III,* --- F.3d at ----, Maj. Op. at ----. Thus, there is no question but that, under the majority's own test, MDOT was fraudulently joined since the majority does not deny that there is no possibility of recovering against MDOT. Because it asserts that it is only following our traditional test, one would expect the majority to follow its own pronouncement of the traditional analysis. But no; notwithstanding the unequivocal words the majority expresses in one part of the opinion, the majority then contradicts itself and shapes a new rule: even though there is no reasonable basis for predicting that state law would allow recovery against MDOT, it is nevertheless *properly* joined and the case is not removable, because its defense disposes of the entire case and renders it a "meritless" case, not a "fraudulently joined" case. This clearly is a departure from the traditional test for **fraudulent joinder** and the majority's denial of what it has done demonstrates its ultimate lack of confidence in its novel theory.

***12** In sum, the arguments that the majority makes to shore up its misreading of *Cockrell* deflate under any careful examination and make unavoidable the conclusion that the majority has been beguiled by Smallwood's dare to this court to be modern--1914 style. [FN10]

IV

With fullest respect, I dissent because the majority, for no sound legal reason that I can determine, has taken upon itself to amend our established rules for determining diversity jurisdiction, while admonishing that such amendments should be left to Congress. It has done so in strange ways. It has relied on a Supreme Court case that has been dormant to the world for close to a century and has no relation to the facts here. The majority acknowledges our traditional rule as controlling. It then amends the rule by adding a "but if" clause. It then denies that it has done what it has just done. It offers meaningless ad hoc arguments that skirmish with its earlier pronouncements. It then sounds alarms that *Strawbridge v. Curtiss* is under attack--a gratuitous and phantom irrelevancy to the matter before us. It decries a closet attack on the well-pleaded complaint rule that seems to be a decoy. All of this, and yet there is no explanation why our traditional rule does not work better to serve the purpose of the **fraudulent joinder** inquiry: To determine whether the in-state defendant was joined "solely to deprive the federal courts of jurisdiction."

Even though I am baffled why the majority would produce this aberrant writing, it is nevertheless with collegial respect that I dissent. [FN11]

JERRY E. SMITH, Circuit Judge, with whom EDITH H. JONES and RHESA HAWKINS BARKSDALE, Circuit Judges, join, dissenting:

"Courts must be particularly circumspect in reconsidering decisions interpreting statutes." *Bhandari v. First Nat'l Bank of Commerce,* 829 F.2d 1343, 1353 (5th Cir.1987) (en banc)

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

(Higginbotham, J., concurring), *vacated,* 492 U.S. 901, 109 S.Ct. 3207, 106 L.Ed.2d 558 (1989). "As an inferior court we must not allow our version of a 'correct' result to deceive us into semantic games of reformulation and hair splitting in order to escape the force of a fairly resolved issue." *Id.* at 1352 (Higginbotham, J., concurring). Contrary to this well-established tenet of *stare decisis,* however, the majority, in an opinion by Judge Higginbotham that reflects lowest-common-denominator reasoning, has unnecessarily created a mess in this circuit's removal jurisprudence. Most significantly, in an offering worthy of the Oracle at Delphi, the majority, in an exercise of judicial activism, has made a quagmire out of what had been an orderly and fair process for determining **fraudulent joinder**.

In so doing, and by dusting off a forgotten decision of the Supreme Court, the majority has introduced needless friction and conflict into the federal-state rubric for determining the proper forum for civil diversity actions. And finally, in a remarkable showing of euphemistic chutzpah, the majority has renamed "**fraudulent joinder**" as "improper joinder," upsetting decades of nomenclature without apparent reason. Agreeing with every word of Judge Jolly's compelling dissent, I add a few comments.

I.

A.

***13** The majority insists that "the focus of the inquiry must be on the joinder, not the merits of the plaintiff's case." As Judge Jolly cogently shows, however, it is the majority's new-fangled common-defense theory that expands inquiry into the merits by, as Judge Jolly puts it, "*requir[ing]* that the court look beyond the joinder of the nondiverse defendant to the entirety of the case and determine the defenses of the diverse defendant as well."

The majority pretends that it avoids inquiry into the merits when making the determination of **fraudulent-joinder**-now-to-be-called-improper-joinder. The fatal flaw in this exercise is that under the majority's construction, it is impossible to decide **fraudulent-joinder**-now-to-be-called-improper-joinder without making decisions on the merits.

Because the district court has jurisdiction to decide its own jurisdiction, that court has not only the capacity but the duty, in deciding the issue of **fraudulent-joinder**-now-to-be-called-improper-joinder, to address any merits questions that are made necessary by the majority's scheme. The decision on any such merits issue then logically becomes a holding, because it is necessary to the result (i.e., remand) and therefore (again, logically) should be binding on the state court to which the action is returned.

If the majority were to respond (which it will not, *see infra*), it undoubtedly would counter that it is not deciding the merits at all--indeed, that it is prohibited from doing so, because, given that the ultimate result is that it is without jurisdiction over the merits, its power to decide is limited to determining its own jurisdiction. In the majority's words, "[a]ttempting to proceed beyond [a] summary process carries a heavy risk of moving the court beyond jurisdiction and into a resolution of the merits."

Overlooked in this reasoning is that it is at times not only desirable but necessary for a court to examine at least a portion of the merits as a precursor to deciding jurisdiction. "[A] federal court always has jurisdiction to determine its own jurisdiction. In order to make that determination, it was necessary for the [court of appeals] to address the merits." *United States v. Ruiz,* 536 U.S. 622, 628, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002).

B.

The problem with imposing a rule by which the district court must "address the merits" is that the state court that receives the remand will need to decide what to do with that decision. In the instant case, the majority blesses "a summary inquiry ... to identify the presence of discrete and undisputed facts that would preclude plaintiff's recovery against the in-state defendant." Where such preclusion is found, it "necessarily compels the same result for the nonresident defendant, [so] there is no improper joinder; there is only a lawsuit lacking in merit." In other words, as the majority further explains, "the allegation of improper joinder is actually an attack on the merits of plaintiff's case...."

***14** The majority makes no effort to examine the consequences of its own explanation. The majority imposes a process whereby the federal district court

is required to decide merits issues, even to the point of declaring that the lawsuit is entirely "lacking in merit." One would think that once a court of competent jurisdiction has made such a "decision" that a case is wholly without merit, that case is at an end, and no other court--state or federal--may reexamine it.

What, then, under the majority's formulation, is the state court supposed to do on remand? One option would be for the state court to dismiss the case ministerially and without making further inquiry into the correctness of the federal district court's decision. [FN1] But that would be a process of unnecessary formalism and, in any event, is not what the majority apparently contemplates.

The majority gives no hint that the state court will be in any way bound by the federal district court's pronouncement that, *as a matter of merits and substance,* the lawsuit is wholly lacking in merit. Very much to the contrary, under today's logic the state court will be free to disagree, to resurrect the case, and ultimately to award the plaintiff relief against the in-state and out-of-state defendants as well. In other words, the state court will be free to ignore whatever merits conclusions the federal court has reached.

II.

The majority thus unnecessarily and unwittingly creates friction between state and federal jurisdictions. The majority's new paradigm eviscerates what the majority venerates as the "principles of comity and federalism." By thinly-veiled implication, the majority declares that the federal court is incompetent to make a binding pronouncement on the merits issues as to which the majority insists that same federal court is *obliged* to reach non-binding conclusions.

This contrivance is at war with the collegial state-federal relations that the majority pretends to honor. The majority's novel plan invites parties to take one tack in federal court and another once remand has been achieved. The majority's reasoning invites disparate interpretations of the same issues of law by state and federal forums. It promotes manipulation and complication of a process that, until now, has been stable, predictable, and fair.

III.

By redesignating **"fraudulent joinder"** as "improper joinder," the majority has shown its agility in innovative nomenclature. What should the majority call its new breed of merits decisions that are not binding holdings? Perhaps they are "musings," or "asides" or "ruminations," or "advisory opinions" or *dicta,* or even "preliminary predictions"--something less than a holding but more than an idle thought. They are, in any event, a breed apart. They are rulings the majority says are necessary to the decision on **fraudulent-joinder**-now-to-be-called-improper-joinder, but, once these rulings or ruminations are issued, they disappear into the ether, after remand, as if they had never even been expressed. They are simultaneously indispensable and expendable, at once both necessary and superfluous.

IV.

***15** The majority's newly-concocted "common-defense" rule, raised by plaintiff for the first time on appeal, will cause resourceful defense counsel, in the vigorous defense of their clients' interests, to alter the way in which they plead defenses. The filing of defenses will be timed not in a way designed to ensure "the just, speedy, and inexpensive determination of [removed] action [s]," Fed.R.Civ.P. 1, but instead in such a manner as to avoid imposition of the majority's common-defense mechanism. Defenses will be described and fashioned so that they cannot be deemed to apply to diverse and non-diverse defendants alike. Such manipulation and contrivance, exacerbating the prospect of varying state-federal adjudications I have described above, can only undermine respect for the courts.

V.

Entirely overlooked in the majority's analysis is any concern for "the traditional values of *stare decisis.*" *Bhandari v. First Nat'l Bank of Commerce,* 829 F.2d 1343, 1352 (5th Cir.1987) (en banc) (Higginbotham, J., concurring), *vacated,* 492 U.S. 901, 109 S.Ct. 3207, 106 L.Ed.2d 558 (1989). This principle is especially important where, as here, we are interpreting statutes instead of the Constitution. "Courts must be particularly circumspect in reconsidering decisions interpreting statutes." *Id.* at

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

1353 (Higginbotham, J., concurring). "[I]f only a question of statutory construction were involved, we would not be prepared to abandon a doctrine so widely applied throughout nearly a century." *Erie R.R. v. Tompkins,* 304 U.S. 64, 77-78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (Brandeis, J.).

"[A]ny detours from the straight path of *stare decisis* in our past have occurred for articulable reasons, and only when the Court has felt obliged to bring its opinions into agreement with experience and with facts newly ascertained." *Vasquez v. Hillery,* 474 U.S. 254, 266, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (internal quotation and citation omitted). Here, the majority offers absolutely no reason why there is a problem, much less one that so badly needs to be fixed that it can trample *stare decisis* to achieve a questionable and bizarre result.

We should not break with a well-established rule of law unless it is "outdated, ill-founded, unworkable, or otherwise vulnerable to serious reconsideration." *Id.* "[T]here is a point at which the orderly accommodations of law-making and law-interpreting demands that we resist reconsideration because Congress may well have acquiesced in prior statutory interpretations." *Bhandari,* 829 F.2d at 1352 (Higginbotham, J., concurring). Here, there is not only no *good* reason to enact a change, there is no reason at all, except the majority's *ipse dixit.*

It would be bad enough that the majority effects a sea change in the heretofore orderly world of removal jurisprudence. It is worse still that the majority makes no attempt to offer compelling reason for its revolution. It appears, in fact, that the majority can identify no reason, for it provides no answer--not even a word--in response to the cogent points made by Judge Jolly in dissent, to Judge Clement's resourceful concurrence, or to the issues I have raised. The majority's silence harms the collegial judicial process by leaving the reader to wonder whether the majority has even examined the objections that have been raised or, instead, is intransigent because of fear of losing its majority status. It would be far better for the two sides to join issue, despite their differences, in the interest of frankly fleshing out these important questions. Perhaps the majority merely has no answer to the deficiencies in its reasoning that the dissents have identified.

VI.

***16** In sum, the majority is wrong for many reasons, not the least of which is that its pronouncement that a "defense [that] disposes of the entire case and renders it a 'meritless case' " logically should, if true, completely end the litigation, not prolong it in another forum. The proper answer, instead, is that we can easily avoid the potential state-federal conflict, not to mention the inefficiency imposed by the majority's new scheme, which, as Judge Jolly notes, will require mini-trials that turn simple proceedings into ordeals.

As Judge Jolly lucidly explains, "the [majority's] common-defense theory *requires* that the court look beyond the joinder of the nondiverse defendant to the entirely of the case and determine the defenses of the diverse defendant as well. If the majority were serious in trumpeting a test that focuses on the joinder, and not the entire case, it would adhere to the traditional test." That traditional test avoids all the pitfalls I have explained, and we are left with no explanation of why the majority is so determined to abandon it. Because our settled jurisprudence on **fraudulent joinder** should be left alone, I respectfully dissent.

EDITH BROWN CLEMENT, Circuit Judge, dissenting, concurring in judgment only:

For the reasons cited in Judge Jolly's dissent, I respectfully dissent from Part III of the majority opinion. *Cockrell* does not intimate the common-defense rule that the majority sets forth. Nevertheless, despite the majority's faulty common-defense rationale, the majority is correct in concluding that ICR does not prevail on its **fraudulent-joinder** claim. ICR fails to show that it is *un* reasonable to construe FRSA as *not* applying to Smallwood's state-law claim of negligence against MDOT. ICR attempts to prove **fraudulent joinder** by showing an "inability of the plaintiff to establish a cause of action against the non-diverse party in state court." *See Travis v. Irby,* 326 F.3d 644, 647 (5th Cir.2003). ICR argues that Smallwood is unable to establish a cause of action against MDOT because under FRSA, the affirmative defense of preemption applies to Smallwood's claim of negligence in delaying installation of warning devices. To support its preemption claim, ICR cites decisions in other circuits that suggest that where

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

federal funds were used to install railroad crossing devices, FRSA preempts claims of negligence in the delay of installation. *See Bock v. St. Louis Ry. Co.,* 181 F.3d 920, 923-24 (8th Cir.1999); *Armijo v. Atchison, Topeka & Santa Fe Ry. Co.,* 87 F.3d 1188, 1192 (10th Cir.1996).

Smallwood argues that FRSA does not preempt her negligence claim against MDOT. She first points out that this Circuit has not yet ruled on whether FRSA preempts claims of negligence in the delay of installation. Smallwood next points out that in applying the preemption doctrine under FRSA, this Court has stated that it "follow[s] the Supreme Court in eschewing broad categories such as 'railroad safety,' focusing instead on the specific subject matter contained in the federal regulation." *See Frank v. Delta Airlines Inc.,* 314 F.3d 195, 200 (5th Cir.2002) (internal quotations omitted). This Court has further stated that " 'FRSA preemption is even more disfavored than preemption generally.' " *United Transp. Union v. Foster,* 205 F.3d 851, 860 (5th Cir.2000) (quoting *Rushing v. Kansas City S. Ry. Co.,* 185 F.3d 496, 515 (5th Cir.1999)). Against this backdrop of Fifth Circuit precedent, Smallwood observes that the portion of FRSA that ICR cites as preemptive does not actually set forth guidelines regarding the time within which warning devices must be installed. [FN1] Lastly, Smallwood directs this Court to a federal district court decision that completely supports her position, *Powers v. CSX Transportation Inc.,* 97 F.Supp.2d 1297 (S.D.Ala.2000). There, the federal district court held that FRSA does not preempt state-law claims of negligence in the delay of installing warning devices. *Id.* at 1305-09. The court opined that preemption of the state-law claim would be contrary to the purpose of FRSA, reasoning:

> ***17** [I]f [FRSA] were construed to preempt negligent delay claims, railroads could indefinitely delay installation of additional warning devices approved by [a federal agency] with--as in this case--catastrophic effects on the very people Congress intended to protect.... [T]he Court cannot fathom any set of circumstances under which such a result could be consonant with Congress' purpose to "promote safety ... and to reduce railroad-related accidents."

*Id.* at 1305-06 (quoting 49 U.S.C. § 20101). According to *Powers,* FRSA does not substantially subsume the subject matter of timely installation. *Id.* Smallwood thus cites persuasive legal authority, in an area of law that this Circuit has not yet decided, to support her argument that federal preemption does not apply.

In the context of **fraudulent joinder**, this Court has not opined how courts should construe a federal affirmative defense to a state-law claim where the federal law is not clearly defined. This Court has, however, addressed the standard for construing unclear state law. Beginning with *Bobby Jones Garden Apartments, Inc. v. Suleski,* 391 F.2d 172, 176 (5th Cir.1968), this Court stated the standard as follows:

> [T]he question is whether there is arguably a reasonable basis for predicting that the state law might impose liability on the facts involved. If that possibility exists, a good faith assertion of such an expectancy in a state court is not a sham, is not colorable and is not fraudulent in fact or in law.

Recently, in *Travis v. Irby,* this Court thoroughly discussed the issue and concluded that a defendant must demonstrate the absence of a "reasonable basis for predicting that the state law might impose liability on the facts involved...." 326 F.3d 644, 647-48 (5th Cir.2003) (quoting *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 312 (5th Cir.2002)); *accord Griggs v. State Farm Lloyds,* 181 F.3d 694, 699 (5th Cir.1999) ("[W]e must determine whether there is any reasonable basis for predicting that [the plaintiff] might be able to establish [the defendant's] liability on the pleaded claims in state court."). The principle underlying this Court's construction of uncertain state law is, in the words of the majority, to discover "whether the defendant has demonstrated that there is no possibility of recovery by the plaintiff against an in-state defendant...." *Smallwood v. Ill. Cent. R.R. Co.,* --- F.3d ----, ----, Maj. Op. at ---- (5th Cir.2004).

This principle--that a defendant must demonstrate that there is no possibility of recovery by the plaintiff--suggests that courts should construe an unclear federal affirmative defense to a state-law claim in the plaintiff's favor, just as the principle requires courts to construe state law in favor of the plaintiff. To prevail on a **fraudulent-joinder** claim, then, a defendant must show that no reasonable basis exists for construing a federal affirmative defense as not applying. By showing that the affirmative defense *must* apply, a defendant will have shown that the "joinder is without right and made in bad

faith." *See Cockrell,* 232 U.S. at 152, 34 S.Ct. 278. In contrast, where the affirmative defense can reasonably be interpreted as not applying, the defendant has not shown that the joinder was made in bad faith. Thus, a joinder does not appear to be "made in bad faith" if there is at least a non-frivolous, reasonable basis for construing the federal affirmative defense so that it does not apply to the state-law cause of action.

***18** This rule implies that where an issue of whether a federal affirmative defense applies is *res nova,* and there is a non-frivolous, reasonable basis for construing the federal affirmative defense as not applying, a defendant cannot show **fraudulent joinder**. Under those circumstances, the resolution of that *res nova* issue is improper. Although a federal court can decide such a *res nova* federal question when it is properly before the court, the court should refrain from deciding it in the **fraudulent-joinder** context if a reasonable, non-frivolous basis exists for interpreting the issue in favor of the plaintiff: the reasonable basis is sufficient to determine the ultimate jurisdictional question of **fraudulent joinder**.

Applying this principle to the instant case reveals that ICR must show that a non-frivolous, reasonable basis does not exist for construing FRSA as not preempting Smallwood's state-law claim of negligence in the delay of installation. As stated above, ICR attempts to satisfy this burden by citing persuasive authority from the Eighth and Tenth Circuits, *Bock* and *Armijo,* which hold that FRSA preempts that claim. In the face of this authority, it is unquestionable that ICR has raised a strong argument for construing FRSA as applying. But the strength of ICR's argument falls short of showing that it is *un* reasonable to construe FRSA as *not* applying. Given that (1) this Court construes narrowly the doctrine of federal preemption (especially with respect to FRSA), (2) FRSA does not specify a time period for installing warning devices, and most importantly, (3) persuasive authority has held that FRSA does not preempt the same state-law claim, a non-frivolous, reasonable basis does exist for Smallwood's assertion that FRSA does not preempt her state-law claim.

It should be emphasized that this conclusion does *not* imply that FRSA does not preempt Smallwood's negligence claim. The **fraudulent-joinder** context of the preemption issue before this Court only requires that this Court determine whether Smallwood argued in bad faith that FRSA does not apply. Because a non-frivolous, reasonable basis exists supporting Smallwood's argument, the district court should not have reached that preemption issue to determine jurisdiction. ICR has not shown **fraudulent joinder**. Remand is appropriate.

FN1. We adopt the term "improper joinder" as being more consistent with the statutory language than the term "**fraudulent joinder**," which has been used in the past. Although there is no substantive difference between the two terms, "improper joinder" is preferred.

FN2. The Federal Railroad Safety Act prohibits states from enforcing state laws when the Secretary of Transportation has adopted regulations covering the same subject. *See* 49 U.S.C. §§ 20101-20153.

FN3. Smallwood raised two closely related claims against MDOT: that MDOT negligently failed to install gates and that its delay in installing gates was negligent. The district court rejected both of these claims on the basis of preemption, concluding that the FRSA preempted all of Smallwood's claims against MDOT. *See Smallwood v. Illinois Central RR Co.,* No. 3:01-cv-561BN (S.D.Miss. Aug. 14, 2002) (Opinion and Order); *see also Smallwood v. Illinois Central R.R. Co.,* 203 F.Supp.2d 686 (S.D.Miss.2002). At oral argument, Illinois Central conceded that resolution of its preemption defense required dismissal of Smallwood's case in its entirety.

FN4. 28 U.S.C. § 1441(b) (emphasis added).

FN5. 28 U.S.C. § 1359. Section 1359 reads in full: "A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court."

FN6. 14 Charles Alan Wright et al., Federal Practice and Procedure § 3641, at 173 (3d ed.1998) (alteration in original) (quoting *Wecker v. Nat'l Enameling & Stamping Co.,* 204 U.S. 176, 186, 27 S.Ct. 184, 51 L.Ed. 430 (1907)).

FN7. *Travis v. Irby,* 326 F.3d 644, 646-47 (5th Cir.2003).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

FN8. *Id.* at 648.

FN9. A "mere theoretical possibility of recovery under local law" will not preclude a finding of improper joinder. *Badon v. RJR Nabisco, Inc.*, 236 F.3d 282, 286 n. 4. (5th Cir.2000).

FN10. *See McKee v. Kansas City S. Ry. Co.*, 358 F.3d 329, 334 (5th Cir.2004); *see also Parks v. New York Times, Co.*, 308 F.2d 474, 478 (5th Cir.1962) (explaining that "there can be no **fraudulent joinder** unless it be clear that there can be no recovery under the law of the state on the cause alleged, or on the facts in view of the law as they exist when the petition to remand is heard").

FN11. *Badon*, 224 F.3d at 389 n. 10.

FN12. For example, the in-state doctor defendant did not treat the plaintiff patient, the in-state pharmacist defendant did not fill a prescription for the plaintiff patient, a party's residence was not as alleged, or any other fact that easily can be disproved if not true. *See Irby*, 326 F.3d at 648-49.

FN13. *See, e.g., Griggs v. State Farm Lloyds*, 181 F.3d 694, 701 (5th Cir.1999).

FN14. 232 U.S. 146, 153, 34 S.Ct. 278, 58 L.Ed. 544 (1914).

FN15. *Id.* at 151, 34 S.Ct. 278.

FN16. *Id.* at 152, 34 S.Ct. 278.

FN17. *Id.* at 153, 34 S.Ct. 278.

FN18. *Id.*

FN19. *Alabama Great S. Ry. Co. v. Thompson*, 200 U.S. 206, 218, 26 S.Ct. 161, 50 L.Ed. 441 (1906).

FN20. This argument was not presented to the able district judge. Going as it does to our subject-matter jurisdiction, we must decide it.

FN21. 913 F.2d 108 (3d Cir.1990); *see also In re New England Mutual Life Ins. Co. Sales Practices Litig.*, 324 F.Supp.2d 288 (D.Mass.2004). *But cf. Ritchey v. Upjohn Drug Co.*, 139 F.3d 1313, 1320 (9th Cir.1998).

FN22. 7 U.S. (3 Cranch.) 267, 2 L.Ed. 435 (1806).

FN1. It is also odd that the majority has jettisoned the term "**fraudulent joinder**", used by all of our cases for five decades and by the treatises, for the term "improper" joinder. Apparently the majority has concluded that it better serves its new way of looking at an established concept. We note, however, that "**fraudulent joinder**" was the term used by the Supreme Court in *Chesapeake & Ohio Ry. Co. v. Cockrell*, 232 U.S. 146, 34 S.Ct. 278, 58 L.Ed. 544 (1914), which happens to be the source of authority for the majority's new rule.

FN2. In fairness to the district court and to the defendants, it should be noted that "common defense" argument was never raised until new attorneys entered the case on appeal. Thus, the defendants were deprived of developing any arguments below to counter the "common defense rule" and the district court has been denied the opportunity to express itself on the subject. Nevertheless, the majority proceeds straightforward to accept and adopt this untimely raised argument, contending that it is permitted to do so, because it is jurisdictional. See fn. 20 Maj. Op.

FN3. Under our two-prong test the diverse defendant must establish either "(1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court." *Travis v. Irby*, 326 F.3d 644, 647 (5th Cir.2003). Only the second prong is before us today.

FN4. Subjective tests could often require attempts to penetrate the mind of the plaintiff and turn removal hearings into lengthy proceedings.

FN5. "Rule 11 imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well-grounded in fact, legally tenable, and 'not interposed for any improper purpose.' " *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) (quoting Fed.R.Civ.P. 11); *See also* Model Rules of Professional Conduct Rule 3.1 (2002) (stating that "[a] lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous").

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

FN6. Notwithstanding the objections we have with respect to the majority opinion, we commend the majority's efforts to define more precisely the rule's narrow application. The majority has restricted the rule to apply only when the in-state defendant's defense is identical to the one asserted by the diverse defendant, which defense automatically and simultaneously disposes of the plaintiff's case against the diverse defendant as well. *See Smallwood III*, --- F.3d at ----, Maj. Op. at ---- (stating that the defense must "equally dispose of" the diverse defendant); *id.* at ----, Maj. Op. at ---- (stating that the defense must "necessarily compel[]" the same result as to the diverse defendant); *id.* at ----, Maj. Op. at ---- (stating that the defense must be "equally dispositive of all defendants").
A somewhat more complicated application of the "common defense" rule occurs when there are two or more defenses available to the non-diverse defendant, only one of which is "common" to the diverse defendant. In such a case, the federal court may nevertheless have jurisdiction if, on a motion to remand by the plaintiff, the removing party asserts and proves only the non-common defense. Because the defense at issue would not be "common," the traditional rule (no reasonable possibility of recovery in the state court against the instate defendant) would apply--not the "common defense" rule adopted here by the majority.

FN7. In *Boyer*, the Third Circuit relied on the same passage from *Cockrell* as mandating a common defense rule. *Boyer*, 913 F.2d 108. In fact, in *Smallwood I*, the panel relied heavily on *Boyer's* interpretation of *Cockrell* and adopted verbatim *Boyer's* version of the "common defense" rule. *Smallwood I*, 342 F.3d at 405.

FN8. FEDERAL PRACTICE AND PROCEDURE mentions *Cockrell* only for the propositions that (1) "the burden on the party seeking removal on the basis of **fraudulent joinder** is a heavy one," (14B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Jurisdiction 3d § 3723 (3d ed.1998)), (2) "[r]esort to the allegations in the notice of removal also may be necessary to show that one or more parties have been fraudulently joined to defeat removal," (14C Federal Practice and Procedure: Jurisdiction 3d § 3734 (3d ed.1998)), and (3) "[a]llegations in the notice may be used to show that parties have been fraudulently joined to defeat removal." 20 Charles Alan Wright & Mary Kay Kane, Federal Practice and Procedure: Federal Practice Deskbook § 42 (2002). Moore's Federal Practice, on the other hand, does not appear to cite *Cockrell* at all.

FN9. The panel opinion expressly agreed with this statement of purpose, as indeed does the unanimous precedent of our circuit. *See Smallwood I*, 342 F.3d at 407. The majority, however, finds this statement of purpose inconvenient to the arguments it is now making and in a circular fashion says that "the purpose of the improper joinder inquiry is to determine whether or not the in-state defendant was properly joined". *Smallwood III*, --- F.3d at ----, Maj. Op. at ----. It cites no authority for its circular statement of purpose.

FN10. We do note that the majority opinion contains what we consider to be several irrelevancies, which we suppose are inserted as rhetoric to bolster its effort to sell the "common-defense" rule: to-wit, the reference to *Strawbridge v. Curtiss* and the well-pleaded complaint rule among others, which have nothing to do with the case.
Of more importance, the majority, with no call to do so, addresses procedure and discovery issues that arise in remand proceedings. This writing is fairly unremarkable except that it appears to be written to underscore one side of our precedent. It certainly has no precedential effect. These remarks are pure dicta because no one has made an issue of this subject at any point in these proceedings. It certainly has no relevance to deciding this case. The further insignificance of this writing is demonstrated by the majority's failure to cite any authority, notwithstanding the fact that we have a long list of precedents addressing the appropriateness of discovery in removal proceedings. *See Badon v. RJR Nabisco, Inc.*, 224 F.3d 382, 389, 393-94 (5th Cir.2000); *Fields v. Pool Offshore, Inc.*, 182 F.3d 353, 356-57 (5th Cir.1999); *Burden v. General Dynamics Corp.*, 60 F.3d 213, 217 & n. 18 (5th Cir.1995); *Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256, 263 (5th Cir.1995); *Burchett v. Cargill, Inc.*, 48 F.3d 173, 175-76 (5th Cir.1995); *Jernigan v. Ashland Oil Inc.*, 989 F.2d 812, 815-16 (5th Cir.1993); *LeJeune v. Shell Oil Co.*, 950 F.2d 267, 271 (5th Cir.1992); *Carriere v. Sears Roebuck & Co.*, 893 F.2d 98, 100 (5th Cir.1990); *Keating v. Shell Chemical Co.*, 610 F.2d 328, 333 (5th Cir.1980). It is this authority that has precedential value.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

FN11. Judge Clement's dissent is insightful and states a principle that is not only consistent with our traditional rule, but is the embodiment of that rule: In removal proceedings, it is not for the district courts to decide a contested and undecided legal issue when the court must choose between two arguments, each with plausible merit. In such a situation, it cannot be said that there is no reasonable possibility of recovery in state court. The joinder, therefore, is not improper, irrespective of what the district court may think is the correct answer. Yet, the majority ignores her writing, never addressing whether this case might be decided and remanded under Judge Clement's approach, which could render its common defense theory unnecessary for a remand of this case.
Judge Smith's dissent raises credible issues that demonstrate the confusing jurisdictional and collateral estoppel possibilities that the majority opinion creates, and then refuses to address. For example, because the majority's explanation for distinguishing between the traditional rule and the common defense rule is that the entire case is a *meritless* case--not a fraudulently joined case--it would appear that it is necessary, under the common defense rule, to determine the merits of the common defense in order to determine if it is a "meritless case." And, although the common defense analysis may ultimately determine that the federal court has no jurisdiction to entertain the case, the federal court surely would have had jurisdiction to determine its own jurisdiction, and the finding of a meritless case would have been made when the federal court was acting within its jurisdiction. As such, the federal court decision may, on remand to the state court, constitute a binding finding in the state case.
The majority would act more responsibly by confronting and attempting to resolve the confusion that arises from its aberrant and troublesome decision. Its silence is truly regrettable and will be costly to the administration of justice.

FN1. *See, e.g., FDIC v. Meyerland Co. (In re Meyerland Co.),* 960 F.2d 512, 520 (5th Cir.1992) (en banc) (requiring court that receives an action to take it as it finds it and enter prescribed judgment without making independent evaluation of the merits).

FN1. FRSA does address a timeline for an *accelerated* project, but such a project is not at issue here. *See* 23 C.F.R. § 646.218.

2004 WL 2047314 (5th Cir.(Miss.))

Briefs and Other Related Documents (Back to top)

. 02-60782 (Docket)
(Sep. 24, 2002)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Briefs and Other Related Documents

United States Court of Appeals,
Fifth Circuit.

Scott MOSS, Individually and On Behalf of Amber Moss; Janice Moss, Plaintiffs-Appellants,
v.
MERCK & COMPANY, et al., Defendants,
Merck & Company, Aventis Pasteur Inc., Individually and as Successor in Interest, Also Known as Connaught Laboratories Inc., Also Known as Pasteur Merieux, Also Known as Pasteur Merieux Connaught; Eli Lilly & Company, and Wyeth, Defendants-Appellees,

**No. 03-30958.**

Aug. 16, 2004.

**Background:** Parents of a young child who allegedly developed autism as a result of receiving vaccines containing mercury brought state law tort claims against manufacturers of vaccine or components thereof for injuries they suffered as a result of the child's condition. The United States District Court for the Western District of Louisiana, Rebecca F. Doherty, J., dismissed the claims, and parents appealed.

**Holdings:** The Court of Appeals, Jerry E. Smith, Circuit Judge, held that:
(1) manufacturer of a component of a vaccine was not a "vaccine manufacturer" within meaning of National Childhood Vaccine Injury Act;
(2) Act's restriction on the filing of tort suits did not apply to parents; and
(3) tort claims were not implicitly preempted by Act.

Reversed and remanded with instructions.

West Headnotes

**[1] Health 389**
198Hk389 Most Cited Cases

Manufacturer of a component of a vaccine was not a "vaccine manufacturer" within meaning of National Childhood Vaccine Injury Act. Public Health Service Act, § 2133(3), as amended, 42 U.S.C.A. § 300aa-33(3).

**[2] Health 389**
198Hk389 Most Cited Cases

Because parents of a young child who allegedly developed autism as a result of receiving vaccines containing mercury neither received a vaccine nor contracted polio from someone who did, they were ineligible to recover in the Vaccine Court, and therefore National Childhood Vaccine Injury Act's restriction on the filing of tort suits did not apply to them. Public Health Service Act, § 2133(5), as amended, 42 U.S.C.A. § 300aa-33(5).

**[3] States 18.11**
360k18.11 Most Cited Cases

Court will not lightly infer that Congress has implicitly preempted state claims using an instrument that explicitly preempts other claims.

**[4] Products Liability 46.4**
313Ak46.4 Most Cited Cases

**[4] States 18.65**
360k18.65 Most Cited Cases

State tort claims brought against vaccine manufacturers by parents of a young child who allegedly developed autism as a result of receiving vaccines containing mercury were not implicitly preempted by National Childhood Vaccine Injury Act. Public Health Service Act, § 2101 et seq., as amended, 42 U.S.C.A. § 300aa-1 et seq.
*502 Scott R. Bickford, Spencer R. Doody, Martzell & Bickford, New Orleans, LA, Charles S. Siegel (argued), Waters & Kraus, Dallas, TX, for Plaintiffs-Appellants.

Erick Yukihiko Miyagi, Taylor, Porter, Brooks & Phillips, Baton Rouge, LA, for Merck & Co.

Bradley S. Wolff, Swift, Currie, McGhee & Hiers, Atlanta, GA, C. Edgar Cloutier, Christopher Jude Alfieri, Christovich & Kearney, New Orleans, LA, for Aventis Pasteur, Inc.

Bruce Robert Tepikian (argued), Deborah A. Moeller, Shook, Hardy & Bacon, Kansas City, MO, Charles L. Chassaignac, Brent A. Talbot, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, LA, for Eli Lilly & Co.

Kathleen A. Manning, McGlinchey Stafford, New Orlans, LA, Richard William Mark (argued), Orrick, Herrington & Sutcliffe, New York City, for Wyeth.

Appeal from the United States District Court for the Western District of Louisiana.

Before SMITH, BENAVIDES and PICKERING, Circuit

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT
tabbles
2

Judges.

JERRY E. SMITH, Circuit Judge:

Plaintiffs Scott and Janice Moss ("the Mosses"), the parents of a young child who, they allege, developed autism as a result of receiving vaccines containing mercury, wish to pursue state law tort claims for injuries they suffered as a result of the child's condition. Although their claims are not barred by the literal terms of the National Childhood Vaccine Injury Act of 1986 (the "Vaccine Act"), 42 U.S.C. § 300aa-1 *et seq.*, defendants urge the alternate theories that the statute is broad enough implicitly to preempt any claims it fails directly to address, and that the purpose of the statute requires us to construe its express terms broadly and in a way that robs the plaintiffs of the right to sue.

In the district court, defendants Merck & Company, Aventis Pasteur Inc., and Wyeth, Inc. (the "Vaccine Defendants"), obtained a dismissal on the ground that the Vaccine Act precludes the Mosses' pursuit of a tort remedy for a vaccine-related injury. *Cf.* Fed.R.Civ.P. 12(b)(1). Defendant Eli Lilly & Company ("Eli Lilly"), the manufacturer of Thimerosal, the mercury-containing preservative used in several childhood vaccines, obtained a dismissal on the ground that it too is a vaccine manufacturer entitled to the protections of the Vaccine Act. Relying on the text of the ***503** statute and eschewing the defendants' invitation to re-write a complex federal regulatory scheme to suit their purposes, we reverse and remand with instruction.

I.
A.

Eli Lilly seeks to be treated on like terms as the Vaccine Defendants. Because Thimerosal is not a vaccine, its producers are not vaccine manufacturers as that term is defined in the Vaccine Act, 42 U.S.C. § 300aa-33(3), so they are not entitled to the protections of the Act's restriction on the filing of suits. [FN1]

FN1. The Mosses initially pursued claims against Eli Lilly for Amber's injuries as well as their own, but withdrew all except the claims seeking redress for injuries incurred in a personal capacity, primarily through loss of consortium with Amber. We reject the Vaccine Defendants' contention, premised on a strained construction of § 300aa-11(a)(2)(B), that the entire suit should be dismissed because it once contained claims that did not properly belong in federal court. Even assuming Amber could not pursue her claims against Eli Lilly in federal court (a proposition we need not decide but is nevertheless strongly in doubt given our conclusion that Eli Lilly is not a vaccine manufacturer), the district court did not abuse its discretion in allowing the Mosses to amend their pleadings. *Cf.* *Bass v. Parkwood Hosp.*, 180 F.3d 234, 241 (5th Cir.1999).

The Vaccine Act is a remedial program designed to provide swift compensation for persons injured by vaccines, while ensuring that the nation's supply of vaccines isn't unduly threatened by the costs and risks of tort litigation. To that end, victims of a "vaccine-related injury or death," as that term is defined in 42 U.S.C. § 300aa-33(5), are barred from seeking redress in the courts unless they have first filed a claim for recovery in a specialized Vaccine Court. [FN2] *See* § 300aa-11(a)(2)(A).

FN2. We use the term "Vaccine Court" as shorthand for the adjudicative procedures set up for processing claims under the Vaccine Act. *See* 42 U.S.C. § 300aa-12. The "Vaccine Court" consists of a special master under the jurisdiction of the Court of Federal Claims.

Operating under lower standards of proof, claimants can seek a compensatory award from the government, acceptance of which causes them to waive any further tort rights. *See* § 300aa-21(a). The claimant may instead decline the award and pursue traditional tort relief, but with certain restrictions such as an inability to recover punitive damages. *See* §§ 300aa-21(a), 300aa-22. *See also* *Schafer v. Am. Cyanamid Co.*, 20 F.3d 1, 3 (1st Cir.1994) (Breyer, C.J.) (detailing the restrictions on suits).

The Vaccine Act does not apply to all vaccine-related lawsuits, however, but only those brought against a "vaccine administrator or manufacturer." § 300aa-11(a)(2)(A). The Act defines "vaccine manufacturer" as "any corporation, organization, or institution, whether public or private ... which manufactures, imports, processes, or distributes under its label any vaccine set forth in the Vaccine Injury Table." § 300aa-33(3). Still, the statute does not define the term "vaccine," requiring us to ascertain the meaning of that word through ordinary principles of statutory construction. In the absence of a controlling definition, we interpret statutes according to their plain, ordinary meaning. [FN3]

FN3. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Limited P'ship*, 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993); *Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 260 (5th Cir.2002).

[1] Under the plain meaning of the Vaccine Act, Eli Lilly is not a vaccine manufacturer, so the Mosses are not barred from suing it. It is settled that ***504** Thimerosal, when used as a preservative, is a component of a vaccine rather than an adulterant. Leroy v. Sec'y of Health & Human Servs., 2002 WL 31730680, *4-*5, 2002 U.S. Claims LEXIS 284, *18-*19 (Fed.Cl.2002) (citing cases). Nonetheless, its status as a vaccine component no more makes Thimerosal a "vaccine" than does the inclusion of a piston under the hood of an automobile make that object an "engine."

Thimerosal is part of the finished product, to be sure, but it is not the finished product itself, and on its face the statute governs only lawsuits filed against manufacturers of a completed vaccine shipped under its own label and listed in the Vaccine Injury Table. Not surprisingly, Thimerosal is not sold as a vaccine, nor is it listed in the statute's table.

If a plaintiff is able to trace his injury to the manufacturer of a chemical that does not, in and of itself, qualify for protection under the Vaccine Act, there is nothing in the Act that prevents him from going to court and attempting to prove that his injuries were caused by that chemical. The burden of proof at trial may be complicated by the difficulty inherent in demonstrating that the injury was proximately caused by that singular component, rather than the vaccine itself, but this does not mean the Vaccine Act prevents plaintiffs from trying; it only prohibits them from filing the Thimerosal-based claim against the manufacturer of a vaccine, something Eli Lilly cannot claim to be solely on the basis of its manufacture of Thimerosal.

B.

Eli Lilly argues that our conclusion contradicts the Vaccine Court's analysis in Leroy. Specifically, it reads *Leroy* as having decided that victims of Thimerosal-related injuries are free to pursue claims for relief in the Vaccine Court, and that today's decision gives rise to the prospect of double recovery.

We disagree. In Leroy, the Vaccine Court was presented with a jurisdictional challenge premised on the notion that Thimerosal is present in vaccines only as an adulterant or contaminant. Leroy, 2002 WL 31730680 at * 3, 2002 U.S. Claims LEXIS 284, at *10. Because the Vaccine Act does not apply to injuries caused by those sorts of impurities, *see* § 300aa-33(5), the classification of Thimerosal under one of those headings would have left plaintiffs free to sue vaccine manufacturers in traditional courts so long as they argued that it was the Thimerosal and not the vaccine that caused their injuries. The Vaccine Court rejected the challenge, however, concluding that Thimerosal is a component of the vaccines in which it is found. *Id.* at *6-* 7, *27-*29. As a result, the Vaccine Court concluded, the Vaccine Act encompasses claims filed *against a manufacturer or administrator* of a vaccine premised on the allegation that an injury was caused by a vaccine containing Thimerosal. *Id.* at *17, *66.

Leroy, therefore, stands for nothing more than the unremarkable proposition that a Thimerosal-related injury, occurring as a result of the administration of a vaccine, is a vaccine-related injury within the meaning of the Vaccine Act. That does not end our inquiry, however, because a claim is barred under the statute only if it alleges a vaccine-related injury and is filed against a vaccine manufacturer. § 300aa-11(a)(2)(A). It is this latter requirement that Eli Lilly fails to meet, and, as a result, the Vaccine Act affords it no cover from the Mosses' claims.

II.

The Mosses' suit against the Vaccine Defendants relies on Louisiana tort law ***505** and seeks recompense for injuries incurred in a personal capacity. Just as the Vaccine Act does not protect all defendants, it does not apply to all tort suits having some connection to the administration of a vaccine. Rather, the restriction on filing tort claims applies only to those who have "sustained a vaccine-related injury or death and who [are] qualified to file a petition for compensation under the Program." § 300aa-11(a)(9). In this way, the Vaccine Act treats "the tort suit procedural bar and Vaccine Court compensation as opposite sides of the same coin." Schafer, 20 F.3d at 5. The program delays the filing of only those tort claims for which it first provides an alternate source of compensation.

To file a petition for compensation, a claimant must be either a person who has sustained a vaccine-related injury, or--if the victim is a minor, disabled or deceased--that person's legal representative. § 300aa-11(b)(1)(A). Any person who fits one of those descriptions and "meets the requirements of subsection (c)(1) of this section" may file a petition for compensation. *Id.*

[2] Of singular importance is the requirement in § 300aa-11(c)(1)(A) that the claimant be able to state in an affidavit that he "received a vaccine set forth in the Vaccine Injury Table or, if such person did not receive such a vaccine, contracted polio, directly or indirectly, from another person who received an oral polio vaccine." Because Scott and Janice Moss neither received a vaccine nor contracted polio from someone who did, they are unable to satisfy the requirements of subsection (c)(1). As a result, they are ineligible to file a petition, *see* § 300aa-11(b)(1)(a),

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

and the Vaccine Act's restriction on the filing of tort suits does not apply to them, *see* § 300aa-11(a)(9). [FN4]

FN4. The Mosses are eligible to file a claim with the Vaccine Court, but only in their capacity as Amber's legal representatives, and only to seek redress of her injuries. *See* § 300aa-11(b)(1)(A); *Head v. Sec'y of Health & Human Servs.*, 26 Cl.Ct. 546, 547 n. 1 (1992).

That much is plain on the face of the statute, but the lack of statutory ambiguity does not stop the Vaccine Defendants from arguing that a literal application of the regulatory scheme "will thwart the intent and purpose of the Act, and interfere with its operation." Because the Vaccine Act was motivated by a desire to unburden vaccine manufacturers from the costs and risks of tort litigation, the argument goes, the Act should be construed as barring those claims as well.

We disagree. If it is indeed the case that loss-of-consortium claims frustrate this complex federal regime, Congress can enact a change. For all we know, this possibility *was* considered, and a conscious decision was made not to regulate consortium claims. Either way, it is not for this court to decide what Congress should have done, but only to apply a statute that on its face has nothing to say about consortium claims. Because the Vaccine Act neither provides a mechanism for their recovery on a loss of consortium suit, nor openly bars their right to pursue remedies afforded by state tort law, the Mosses may pursue their claims. [FN5]

FN5. It is also far from obvious that this result will wreak the apocalyptic results foretold by the Vaccine Defendants. The same observation was made in *Schafer,* with a concurrence openly calling on Congress to revisit the issue. *Schafer,* 20 F.3d at 7 (Stahl, J., concurring). In light of the fact that Congress took no action to amend the statute in the intervening decade, it is not unreasonable to conclude that the consequences of today's holding are not so extreme as the Vaccine Defendants would have us believe.

***506** [3][4] As an alternate strain of their defense, the Vaccine Defendants contend that the district court properly dismissed the Mosses' claims because they are implicitly preempted by the Vaccine Act. We reject this argument, too, for we will not lightly infer that Congress has implicitly preempted state claims using an instrument that explicitly preempts other claims, *see, e.g., Freightliner Corp. v. Myrick,* 514 U.S. 280, 288, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995), and the Vaccine Defendants offer no persuasive reason to make that inferential leap in this case. *Accord Schafer,* 20 F.3d at 6-7.

Congress could not have been much more plain in its desire *not* to preempt tort claims filed by persons who are ineligible to recover in the Vaccine Court. [FN6] We therefore agree with the First Circuit that--assuming *arguendo* that state tort law permits claims for loss of consortium (and about which we express no opinion)--there is nothing in the Vaccine Act that implicitly or explicitly prevents this suit from going forward. *Schafer,* 20 F.3d at 2.

FN6. *Cf.* § 300aa-11(a)(9) ("This subsection applies only to a person who has sustained a vaccine-related injury or death and who is qualified to file a petition for compensation under the Program.").

III.

For the foregoing reasons, the judgment is REVERSED and the Mosses' claims reinstated. At oral argument, the Mosses represented that they would be satisfied with an order staying their suit until the Vaccine Court renders a decision on the award, if any, to Amber. The case is therefore REMANDED with instruction to stay the proceeding pending a result in the Vaccine Court, and for any further proceedings that are not inconsistent with this opinion.

381 F.3d 501

Briefs and Other Related Documents (Back to top)

• 03-30958 (Docket) (Oct. 13, 2003)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

031/63-02-03

MOTIONS/ORDERS

SOUTHERN DISTRICT OF MISSISSIPPI
FILED
SEP 28 2004
J T NOBLIN CLERK
BY _______________ DEPUTY

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

MABEL ANNETTE HUGHES MCDONAL, ET AL — PLAINTIFFS

V. — CIVIL ACTION NO. 3:02-cv-78WS

ABBOTT LABORATORIES, ET AL. — DEFENDANTS

## ORDER

Before this court is the motion of the plaintiffs asking this court to remand this lawsuit to the Circuit Court of Hinds County, Mississippi. Plaintiffs bring their motion to remand under the authority of Title 28 U.S.C. § 1447(c).[1] Plaintiffs here are Mable Annette Hughes McDonal and Darryl A. McDonal, the parents of Jamielee Hughes McDonal, a minor child. By this lawsuit filed in state court on January 11, 2002, plaintiffs sue the various manufacturers of childhood vaccines which contain the preservative Thimerosal;[2] the pharmaceutical companies that dispensed those vaccines; the physicians who prescribed them; and River Oaks Hospital of Jackson, Mississippi. Plaintiffs, the defendant physicians, and River Oaks Hospital are all

---

[1]Title 28 U.S.C. § 1447 provides in pertinent part: **(c)** A motion to remand the case on the basis of any defect other than subject matter jurisdiction must be made within 30 days after the filing of the notice or removal under section 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. An order remanding the case may require payment of just costs and nay actual expenses including attorney fees, incurred as a result of the removal. A certified copy of the order of remand shall be mailed by the clerk to the clerk of the State court. The State court may thereupon proceed with such case.

[2]Thimerosal is a mercury-containing organic compound which has been used widely as a preservative in a number of biological and drug products, including many vaccines, to help prevent potentially life threatening contamination from harmful microbes. *See* United States Food & Drug Administration Vaccine Adverse Event Reporting System (VAERS).

EXHIBIT
tabbles
3

49

citizens of the State of Mississippi. Charging in their First Amended Complaint that the minor plaintiff Jamielee Hughes McDonal now suffers from mercury poisoning resulting from the injections of childhood vaccines preserved with thimerosal, the plaintiffs assert causes of action for strict liability, negligence, gross negligence, breach of implied warranty and medical malpractice under state law. Plaintiffs seek future costs and expenses relating to the medical treatment of Jamielee Hughs McDonal, lost wages, damages for emotional distress, and damages for loss of consortium. Plaintiffs also seek punitive damages and attorney fees.[3]

Plaintiffs' complaint alleges no specific claims under federal law. Moreover, the plaintiffs specifically deny that any part of this case is subject to the National Childhood Vaccine Injury Act, Title 42 U.S.C. § 300aa-11(2)(A)[4] referred to as the "Vaccine Act" because, say plaintiffs, the substance Thimerosal is not covered by the Vaccine Act since it is an adulterant or contaminant intentionally added to the vaccines which allegedly injured Jamielee Hughes McDonal.

---

[3]The plaintiffs have not limited their claims against the vaccine manufacturers and administrators to any amount below $1000.00.

[4]Title 42 U.S.C. § 300aa-11(2)(A) provides in pertinent part that "[n]o person may bring a civil action for damages in an amount greater than $1,000 or in an unspecified amount *against a vaccine administrator or manufacturer in a State or Federal court for damages* arising from a vaccine-related injury or death associated with the administration of a vaccine after October 1, 1988, and no such court may award damages in an amount greater than $1,000 in a civil action for damages for such a vaccine-related injury or death, unless a petition has been filed, in accordance with section 300aa-16 of this title, for compensation under the Program for such injury or death and – (i)(I) the United States Court of Federal Claims has issued a judgment under section 300aa-12 of this title on such petition.

Thus, say plaintiffs, this court lacks subject matter jurisdiction either under diversity of citizenship, Title 28 U.S.C. § 1332,[5] or under Title 28 U.S.C. § 1331[6], federal question jurisdiction, to exercise jurisdiction here. Accordingly, say plaintiffs, this court should grant their motion for remand.

This lawsuit was removed to federal court by defendant Eli Lilly & Company pursuant to Title 28 U.S.C. § 1441(a).[7] Joining in this removal are the defendants Abbott Laboratories, Inc.; Aventis Pastuer, Inc., individually and as successor to Connaught; Baxter International, Inc.; SmithKline Beecham Corporation d/b/a GlaxoSmithKline; Merck & Company, Inc.; and Sigma Aldrich. The non-diverse defendants Mitizi Ferguson, M.D.; Leslie Lamar Jones, M.D.; and River Oaks Hospital, did not join in the removal, an act not required since they are identified as fraudulently joined defendants. *Tedder v. F.M.C. Corporation*, 590 F.2d 115, 117 (5th Cir. 1979) (noting that the citizenship of non-diverse defendants will be disregarded for purposes of determining removability).

The removing defendants contend that this court has subject matter jurisdiction over this case under the authority of Title 28 U.S.C. § 1332, diversity of citizenship, on

---

[5]Title 28 U.S.C. § 1332(a) provides in pertinent part that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between - (1) citizens of different States; ..."

[6]Title 28 U.S.C. § 1331 provides that "[t]he district courts shall have original jurisdiction of all civil cases arising under the Constitution, laws, or treaties of the United States."

[7]Title 28 U.S.C. § 1441(a) states in pertinent part that, "[e]xcept as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."

the basis that the non-diverse defendants, River Oaks Hospital and Drs. Ferguson and Jones, all residents of Mississippi, were fraudulently joined in order to defeat this court's subject matter jurisdiction. Other defendants, namely Wyeth, in all its various forms such as American Home Products, Wyeth-Ayerst etc., Emerck, GDL International, Inc., GlaxoSmithKline Belgium, King Pharmaceuticals, Medeve Pharmaceuticals, Inc., Spectrum Chemical Manufacturing Corporation, and Urquima, who were not served with process at the time of this removal, also did not join in the removal, which, say the removing defendants, is not required. *See Miranti v. Lee*, 3 F.3d 925, 929 (5th Cir. 1993); *Jones v. Houston Independent School Dist*rict, 979 F.2d 1004, 1007 (5th Cir. 1992); and *McKnight v. Illinois Cent. R.R.*, 967 F.Supp. 182, 185 n. 6 (E.D. La. 1997) (a defendant who has not been properly served need not consent to the notice of removal).

The removing defendants also contend that this court has subject matter jurisdiction over this case predicated on Title 28 U.S.C. § 1331, federal question, because the plaintiffs' claims are governed by the provisions of Title 42 U.S.C. § 300aa-1 *et seq.*, the Vaccine Act, at least with regard to the pediatricians, the hospital, and the manufacturers of vaccines, namely defendants Aventis Pasteur, GlaxoSmithKline, and Merck.

So, the instant case presents two sets of diverse defendants, and one set of non-diverse defendants. One group of diverse defendants, such as Eli Lilly and Sigma Aldrich, are manufacturers of Thimerosal, while the other group, namely Aventis Pasteur, GlaxoSmithKline, and Merck manufactures vaccines. The non-diverse defendants are two pediatricians and a hospital. Some of the plaintiffs' claims are

against vaccine manufacturers and administrators, while the rest of the plaintiffs' claims are against the manufacturers of the preservative Thimerosal. The manufacturers of vaccines, the physicians and the hospital (administrators of vaccines) all claiming to be covered by the Vaccine Act, contend that the plaintiffs' claims against them must be presented to the Federal Court of Claims (Vaccine Court) pursuant to the Vaccine Act.

The parties also have appeared for hearings before this court to address the impact of the decision of the United States Court of Appeals for the Fifth Circuit in *Smallwood v. Illinois Central R. Co.*, 342 F.3d 400 (5th Cir. 2003). *Smallwood* addresses an aspect of removal and remand jurisprudence.

## REMOVAL AND REMAND STANDARDS

Generally, "the remand of a case that has been removed to federal court is governed by statutory provisions found at 28 U.S.C. §§ 1441(c) and 1447(c)." *Buchner v. F.D.I.C.*, 981 F.2d 816, 819 (5th Cir.1993). Section 1441(c) provides that, "[w]henever a separate and independent claim or cause of action within the jurisdiction conferred by section 1331 of this title [federal question jurisdiction], is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters in which state law predominates." Section 1447(c) provides in pertinent part that, "[a] motion to remand the case on the basis of any defect in removal procedure must be made within 30 days after the filing of the notice of removal under section 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. These two

sections provide district courts with the general authority to remand a case over which there is no subject matter jurisdiction. *See Buchner*, 981 F.2d at 819.

In order to determine whether a case has been removed properly to federal court on the basis of federal question jurisdiction, this court examines plaintiff's complaint under the well-pleaded complaint rule. *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998). Under that doctrine, "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Id.* Of course, a plaintiff may choose to forgo federal claims in order to prevent removal. "The [well-pleaded complaint] rule makes the plaintiff master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). "When a party has a choice between federal and state law claims, the party may proceed in state court on the exclusive basis of state law, thus defeating the defendant's opportunity to remove." *Medina v. Ramsey Steel Company*, 238 F.3d 674, 680 (5th Cir. 2001).

Whether on the basis for federal question or diversity, the removing party has the burden of proving that the federal court has jurisdiction to hear the case. *See Jernigan v. Ashland Oil, Inc.*, 989 F.2d 812, 815 (5th Cir. 1993), *cert. denied*, 510 U.S. 868, 114 S.Ct. 192, 126 L.Ed.2d 150 (1993); *Laughlin v. Prudential Insurance Company*, 882 F.2d 187, 190 (5th Cir. 1989) (holding that the "removing party bears the burden of establishing federal jurisdiction."). Where the removing party alleges diversity of citizenship jurisdiction on the basis of improper joinder, it must prove the basis for improper joinder (formerly fraudulent joinder). *Laughlin*, 882 F.2d at 190;

*Carriere v. Sears, Roebuck & Co.*, 893 F.2d 98, 100 (5th Cir.1990), *cert. denied,* 498 U.S. 817, 111 S.Ct. 60, 112 L.Ed.2d 35 (1990). To establish improper joinder, the removing party must prove: (1) that there was actual fraud in the plaintiff's pleading of the jurisdictional facts or (2) that the plaintiff has no possibility of establishing a cause of action against the non-diverse defendant in state court. *Griggs v. State Farm Lloyds*, 181 F.3d 694, 699 (5th Cir. 1999) (citations omitted); *Burden v. General Dynamics Corporation*, 60 F.3d 213, 217 (5th Cir. 1995); *Cavallini v. State Farm Mutual Auto Insurance Company*, 44 F.3d 256, 259 (5th Cir. 1995).

In order to determine the propriety of removal, this court may "pierce the pleadings" of the complaint and consider "summary judgment-type evidence such as affidavits and deposition testimony." *Cavallini*, 44 F.3d at 256; *LeJeune v. Shell Oil Company*, 950 F.2d 267, 271 (5th Cir. 1992). Under this standard, plaintiffs "may not rest upon the mere allegations or denials of [their] pleadings." *Beck v. Texas State Board of Dental Examiners*, 204 F.3d 629, 633 (5th Cir. 2000). *See also Badon v. RJR Nabisco, Inc.*, 236 F.3d 282, 286 n. 4 (5th Cir. 2000) (finding that the "mere theoretical possibility of recovery under local law" does not preclude removal. "[T]here must at least be arguably a reasonable basis for predicting that state law would allow recovery in order to preclude a finding of fraudulent joinder."). Removal is proper "if the plaintiff's pleading is pierced and it is shown that as a matter of law there is no reasonable basis for predicting that the plaintiff might establish liability on that claim against the in-state defendant." *Id.*

In *Smallwood v. Illinois Cent. R.R. Co.*, --- F.3d ----, 2004 WL 2047314 (5th Cir. (Miss.) Sep 10, 2004) (NO. 02-60782), the United States Court of Appeals for the Fifth

Circuit held that there is no improper joinder of an in-state defendant with a diverse defendant where the showing that there is no reasonable basis for predicting that state law would allow recovery against the in-state defendant applies equally to dispose of the plaintiff's claims against all the defendants (common claim or defense).

This court first shall address the scope of the Vaccine Act, and then the matter of *Smallwood's* impact on this case.

**THE VACCINE ACT**

Specifically crafted for manufacturers and administrators of vaccine, the Vaccine Act establishes a no-fault compensation Program, designed to curb the time and expense of traditional tort litigation. Congress envisioned a system where awards to an injured vaccinee or a person suing on the vaccinee's behalf were to be "made quickly, easily, and with certainty and generosity." *Knudsen v. Secretary of HHS*, 35 F.3d 543, 549 (Fed.Cir. 1994) (quoting H.R.Rep. No. 99-908, at 3, reprinted in 1986 U.S.C.C.A.N. 6344, 6344). *See also Shalala v. Whitecotton*, 514 U.S. 268, 270, 115 S.Ct. 1477, 131 L.Ed.2d 374 (1995).

The Vaccine Act directs an individual who is injured by a vaccine to file a Program petition in the Federal Court of Claims against the United States government, namely the Secretary for the Department of Health and Human Services, rather than against the vaccine manufacturers who provide the vaccines to doctors, and against hospitals who administer the vaccines. As the Federal Circuit recognized, the Vaccine Program "stems from Congress's recognition that '[w]hile most of the Nation's children enjoy great benefit from immunization programs, a small but significant number have been gravely injured.'" *Knudsen*, 35 F.3d at 549 (quoting H.R.Rep. No.

99-908, at 4, reprinted in 1986 U.S.C.C.A.N. at 6345). All persons alleging a vaccine-related injury are entitled to take advantage of the Program's "streamlined" process.

Significantly, the Vaccine Act prohibits a victim of a vaccine-related injury or death from filing a civil action for damages of more than $1,000 against a vaccine manufacturer or an administrator unless the victim first files a petition in Vaccine Court pursuant to the Vaccine Act. *See* Title 42 U.S.C. § 300aa-11(a)(2)(A).[8] If the victim of a vaccine-related injury or death first files a civil action in either state or federal court, "the court shall dismiss the action." Title 42 U.S.C. § 300aa(a)(2)(B)[9] and § 11(a)(3).[10]

The plaintiffs claim that since Thimerosal is an adulterant or contaminant, it is not covered by the Vaccine Act. This court disagrees for the reasons that follow.

**<u>THE THIMEROSAL CLAIMS ARE VACCINE RELATED</u>**

Federal courts addressing this issue have decided that Thimerosal is not an "adulterant" or "contaminant" within the meaning of the Vaccine Act and, therefore,

---

[8]Title 42 U.S.C. § 300aa-11(a)(2)(A) provides that "[n]o person may bring a civil action for damages in an amount greater than $1,000 or in an unspecified amount against a vaccine administrator or manufacturer in a State or Federal court for damages arising from a vaccine-related injury or death associated with the administration of a vaccine after October 1, 1988 ... ."

[9]Title 42 U.S.C. § 300aa-11(a)(2)(B) provides in part that "[i]f a civil action which is barred under subparagraph (A) is filed in a State or Federal court, the court shall dismiss the action."

[10]Section 11(a)(3) provides that "[n]o vaccine administrator or manufacturer may be made a party to a civil action (other than a civil action which may be brought under paragraph (2)) for damages for a vaccine-related injury or death associated with the administration of a vaccine after October 1, 1988."

lawsuits for injuries allegedly resulting from the use of Thimerosal in vaccines are not excluded from being heard by special masters in the United States Court of Federal Claims. *See, e.g., Liu v. Aventis Pasteur, Inc.*, 219 F.Supp.2d 762 (W.D. Tex. 2002); *Owens v. American Home Products Corporation*, 203 F.Supp.2d 748 (S.D. Tex. May 7, 2002); *O'Connell v. American Home Products Corporation*, No. G-02-184, slip op. (S.D. Tex. May 7, 2002). *See also Bertrand v. Aventis Pasteur, Labs., Inc.*, 2002 WL 31194226, at *5-*6 (D.Ariz. Sept. 23, 2002) (declining to resolve whether thimerosal is an adulterant or contaminant, but noting that "every federal court to have ruled on the issue has held that injuries resulting from Thimerosal contained in vaccines are vaccine-related under the meaning of the Act"); *Blackmon v. American Home Products Corporation*, No. G-02-179, slip op. (S.D. Tex. May 8, 2002), which holds that thimerosal cases are vaccine-related cases under the meaning of the Vaccine Act; and *Collins v. American Home Products Corporation*, No. 01-979, slip op. (S.D. Miss. Aug.1, 2002), dismissing the plaintiffs' thimerosal claims because Autism Order # 1 'foreclose[d] any reasonable possibility that the plaintiffs had stated a cognizable claim against the resident defendants); *McDonald v. Abbott Labs.*, No. 02-77, slip op. (S.D. Miss. Aug. 1, 2002); and *Stewart v. American Home Products Corporation*, No. 02-427, slip op. (S.D. Miss. Aug. 1, 2002), cases holding that claims arising from thimerosal are covered by the Vaccine Act; and *Chiles v. American Home Products Corporation*, 2003 WL 22287527 (N.D. Tex.), holding that the thimerosal claims asserted on behalf of the minor plaintiffs were "vaccine-related injuries" which had to be pursued in accordance with the Vaccine Act, Title 42 U.S.C. § 300aa-11(a)(2)(A), citing *Owens ex rel. Schafer v. American Home Products*, 203 F.Supp.2d at 754-56.

The *Owens* court noted that the Federal Drug Administration has long recognized that preservatives such as thimerosal are "constituent materials" of vaccines, citing 21 C.F.R. § 610.15 (indicating that constituents of biological materials include ingredients, preservatives, diluents and adjuvants). That thimerosal is not mentioned by name in the regulation, said the *Owens* court, does not necessarily exclude it as an acceptable additive or as a component of the vaccine preparation. *Id.*, 203 F.Supp.2d at 755, n. 10.

The Federal Court of Claims has noted that the legislative history of the Vaccine Act supports the finding that Congress intended injuries allegedly related to thimerosal be brought under the "Program" provided by the statute for informal hearings before a Federal Court of Claims. *Leroy v. Secretary of Department of Health and Human Services*, 2002 WL 31730680 (Fed. Cl. Oct. 11, 2002). In *Leroy*, the Secretary of Health and Human Services successfully argued that, "[g]iven the congressional purpose of channeling liability for vaccine injuries to the Program and the fact the vaccines chosen for coverage contained thimerosal, it is incongruous to argue that at the same time Congress extended coverage to these vaccines, it intended to define away that coverage for any injury related to thimerosal." *Id.*

Other courts addressing the same issue have concluded that claims of injuries resulting from Thimerosal are vaccine related. *See Wax v. Aventis Pasteur Inc.*, 240 F.Supp.2d 191 (E.D. N.Y. 2002) (upholding the determination of the Secretary of Health and Human Services that the preservative thimerosal was not adulterant to or contaminant of vaccines, and that individuals claiming thimerosal in vaccines caused their autism were required under the Vaccine Act to present their claims to the Vaccine

Court before pursuing any other civil litigation; Public Health Service Act, §§ 2111(a)(2)(A), 2133(5), as amended, Title 42 U.S.C. §§ 300aa-11(a)(2)(A), 300aa-33(5); 21 C.F.R. § 610.15). In *Murphy v. Aventis Pastuer, Inc.*, 270 F.Supp.2d 1368 (N.D. Ga. 2003), the district court concluded that whenever a civil action is brought in violation of Title 42 U.S.C. § 300aa-11(a)(2)(A), which provides that no person may bring a civil action for damages in an amount greater than $1,000 or in an unspecified amount against a vaccine administrator or manufacturer in a state or federal court for damages arising from a vaccine-related injury or death, the presiding court "shall dismiss the action." *Id.*, at 1375-76.

In the instant case, the plaintiffs' claims against the vaccine manufacturers such as Aventis Pastuer, Inc., GlaxoSmithKline; and Merck & Company, Inc., are subject to the Vaccine Act, as are the plaintiffs' claims against the non-diverse defendants Mitizi Ferguson, M.D.; Leslie Lamar Jones, M.D.; and River Oaks Hospital.

The remaining defendants who manufacture or distribute Thimerosal are parties of diverse citizenship to the plaintiffs. Thus, the plaintiffs claims against them properly are removed to federal court pursuant to Title 28 U.S.C. § 1332. *See Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806); *Owen Equipment & Erection Company v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978) (all defendants must be of diverse citizenship from the plaintiff(s)). The requisite amount in controversy for this court's jurisdiction is present since the amount of the plaintiffs' damages claims is unspecified. Federal courts in Mississippi have consistently held that a claim for an unspecified amount of punitive damages under Mississippi law is deemed to exceed the amount necessary for federal jurisdiction. *St. Paul Reinsurance*

*Co., Ltd. v. Greenberg*, 134 F.3d 1250, 1255 (5th Cir. 1998); *Marcel v. Pool Company*, 5 F.3d 81, 84-85 (5th Cir. 1993); *Allstate Insurance Company v. Hilbun*, 692 F.Supp. 698, 701 (S.D. Miss. 1988).

**THE _SMALLWOOD_ DECISION**

In *Smallwood v. Illinois Cent. R.R. Co.*, --- F.3d ----, 2004 WL 2047314 (5th Cir. (Miss.) Sep 10, 2004) (NO. 02-60782), the Fifth Circuit upheld its previous conclusion reached in *Smallwood v. Illinois Central R. Co.*, 342 F.3d 400 (5th Cir. 2003), that there is no improper joinder of an in-state defendant with a diverse defendant where the showing that there is no reasonable basis for predicting that state law would allow recovery against the in-state defendant applies equally to dispose of the plaintiff's claims against all the defendants (common claim or defense). The Fifth Circuit stated as follows:

> ...[O]ur holding today is *narrow*. It applies only in that limited range of cases where the allegation of improper joinder rests only on a showing that there is no reasonable basis for predicting that state law would allow recovery against the in-state defendant and that showing is *equally dispositive of all defendants*... (emphasis added).

*Smallwood v. Illinois Cent. R.R. Co.*, --- F.3d ----, 2004 WL 2047314 *5-*6 (5th Cir. (Miss.) Sep 10, 2004) (NO. 02-60782).

In the instant case, the defendants' showing that there is no reasonable basis for predicting that state law would allow recovery against the in-state defendant applies only to the vaccine manufacturers and administrators, not to the manufacturers of Thimerosal.

## CONCLUSION

Therefore, in accordance with the foregoing authority, this court hereby denies the motion of the plaintiffs to remand this case to the Circuit Court of Hinds County, Mississippi **[Docket No. 7-1]**. The plaintiff's claims against the vaccine manufacturers and the non-diverse defendants Mitizi Ferguson, M.D.; Leslie Lamar Jones, M.D.; and River Oaks Hospital are subject to the Vaccine Act and are dismissed. The motion of the vaccine defendant GlaxoSmithKline to stay **[Docket No. 42-1]** is terminated as moot.

**SO ORDERED AND ADJUDGED, this the** 28th **day of** September**, 2004.**

Henry T. Wingate
**CHIEF UNITED STATES DISTRICT JUDGE**

Civil Action No. 3:02-cv-78WS
Order Denying Remand