United States Court of Appeals
Fifth Circuit

**F I L E D**

September 10, 2004

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 02-60782

KELLI SMALLWOOD,

Plaintiff-Appellant,

versus

ILLINOIS CENTRAL RAILROAD COMPANY;
MISSISSIPPI DEPARTMENT OF TRANSPORTATION,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Mississippi

Before KING, Chief Judge, and JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART, DENNIS, CLEMENT, PRADO, and PICKERING, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Today we decide a narrow but not unimportant question regarding diversity jurisdiction in federal courts and the application of the doctrine of "improper joinder."[1] This is the first time this Court en banc has addressed the issue of improper joinder, although a number of panels of this Court have previously

---

[1] We adopt the term "improper joinder" as being more consistent with the statutory language than the term "fraudulent joinder," which has been used in the past. Although there is no substantive difference between the two terms, "improper joinder" is preferred.

A

addressed it.  We hold that, when a nonresident defendant's showing that there is no reasonable basis for predicting that state law would allow recovery against an in-state defendant equally disposes of all defendants, there is no improper joinder of the in-state defendant.  In such a situation, the entire suit must be remanded to state court.  In this case, it is undisputed that the district court's decision that Smallwood's claims against the in-state defendant were preempted effectively decided the entire case.  On these facts, we conclude that the district court erred in deciding the merits of the proffered defense of preemption and in not remanding the case to the state court from which it was removed.

I

Kelli Smallwood is a Mississippi resident who was injured when a train struck her car at a railroad crossing in Florence, Mississippi.  The train was operated by Illinois Central, an Illinois corporation, and the railroad crossing was controlled by an agency of the Mississippi state government, the Mississippi Department of Transportation ("MDOT").  At the time of the accident, the crossing did not have automatic gates; it was equipped only with warning lights, which had been installed using federal funds.  After the accident, Smallwood filed suit in Mississippi state court against both Illinois Central and MDOT, raising claims of negligence.  She alleged, in particular, that MDOT negligently failed to install gates at the crossing despite its knowledge that the crossing was unreasonably dangerous and

2

extraordinarily hazardous.

Illinois Central removed the case to federal court. Illinois Central maintained that Smallwood's claims against MDOT were preempted by the Federal Railroad Safety Act ("FRSA").[2] Reasoning that the preemption defense barred Smallwood's claims against MDOT, Illinois Central argued that Smallwood had improperly joined MDOT because, under the FRSA, there was no reasonable possibility of recovery against MDOT.

The district court accepted Illinois Central's argument, dismissed MDOT from the case, and denied Smallwood's motion to remand. Applying the "law of the case," the district court then granted summary judgment for Illinois Central on the basis that Smallwood's claim against the railroad was equally preempted. The railroad won its case when it persuaded the district court that the claims against the in-state defendant, MDOT, were preempted.[3]

A panel of this court concluded that Illinois Central had not carried its burden of demonstrating that the joinder of MDOT was fraudulent, reversed the district court's dismissal of the case on

---

[2] The Federal Railroad Safety Act prohibits states from enforcing state laws when the Secretary of Transportation has adopted regulations covering the same subject. *See* 49 U.S.C. §§ 20101-20153.

[3] Smallwood raised two closely related claims against MDOT: that MDOT negligently failed to install gates and that its delay in installing gates was negligent. The district court rejected both of these claims on the basis of preemption, concluding that the FRSA preempted all of Smallwood's claims against MDOT. *See Smallwood v. Illinois Central RR Co.*, No. 3:01-cv-561BN (S.D. Miss. Aug. 14, 2002) (Opinion and Order); *see also Smallwood v. Illinois Central R.R. Co.*, 203 F.Supp.2d 686 (S.D. Miss. 2002). At oral argument, Illinois Central conceded that resolution of its preemption defense required dismissal of Smallwood's case in its entirety.

its merits, and ordered the case remanded to state court. We voted to rehear the case en banc.

## II

The starting point for analyzing claims of improper joinder must be the statutes authorizing removal to federal court of cases filed in state court. The federal removal statute, 28 U.S.C. § 1441(a), allows for the removal of "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." Subsection (b) specifies that suits arising under federal law are removable without regard to the citizenship of the parties; all other suits are removable "only if none of the parties in interest *properly* joined and served as defendants is a citizen of the State in which such action is brought."[4]   To remove a case based on diversity, the diverse defendant must demonstrate that all of the prerequisites of diversity jurisdiction contained in 28 U.S.C. § 1332 are satisfied. Relatedly, a district court is prohibited by statute from exercising jurisdiction over a suit in which any party, by assignment or otherwise, has been *improperly* or *collusively* joined to manufacture federal diversity jurisdiction.[5]   As Professor Wright has noted:

---

[4] 28 U.S.C. § 1441(b) (emphasis added).

[5] 28 U.S.C. § 1359.  Section 1359 reads in full: "A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court."

4

"[T]he Federal courts should not sanction devices intended to prevent the removal to a Federal court where one has that right, and should be equally vigilant to protect the right to proceed in the Federal court as to permit the state courts, in proper cases, to retain their own jurisdiction."[6]

The doctrine of improper joinder rests on these statutory underpinnings, which entitle a defendant to remove to a federal forum unless an in-state defendant has been "properly joined." Since the purpose of the improper joinder inquiry is to determine whether or not the in-state defendant was properly joined, the focus of the inquiry must be on the joinder, not the merits of the plaintiff's case.

Given this focus, we have recognized two ways to establish improper joinder: "(1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court."[7] Only the second way is before us today, and we explained in *Travis v. Irby*[8] that the test for fraudulent joinder is whether the defendant has demonstrated that there is no possibility of recovery by the plaintiff against an in-state defendant, which stated differently means that there is no reasonable basis for the district court to predict that the plaintiff might be able to

---

[6] 14 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3641, at 173 (3d ed. 1998) (alteration in original) (quoting *Wecker v. Nat'l Enameling & Stamping Co.*, 204 U.S. 176, 186 (1907)).

[7] *Travis v. Irby*, 326 F.3d 644, 646-47 (5th Cir. 2003).

[8] *Id.* at 648.

5

recover against an in-state defendant. To reduce possible confusion, we adopt this phrasing of the required proof and reject all others, whether the others appear to describe the same standard or not.[9]

There has also been some uncertainty over the proper means for predicting whether a plaintiff has a reasonable basis of recovery under state law. A court may resolve the issue in one of two ways. The court may conduct a Rule 12(b)(6)-type analysis, looking initially at the allegations of the complaint to determine whether the complaint states a claim under state law against the in-state defendant.[10] Ordinarily, if a plaintiff can survive a Rule 12(b)(6) challenge, there is no improper joinder. That said, there are cases, hopefully few in number, in which a plaintiff has stated a claim, but has misstated or omitted discrete facts that would determine the propriety of joinder. In such cases, the district court may, in its discretion, pierce the pleadings and conduct a summary inquiry.[11]

---

[9] A "mere theoretical possibility of recovery under local law" will not preclude a finding of improper joinder. *Badon v. RJR Nabisco, Inc.*, 236 F.3d 282, 286 n.4. (5th Cir. 2000).

[10] *See McKee v. Kansas City S. Ry. Co.*, 358 F.3d 329, 334 (5th Cir. 2004); *see also Parks v. New York Times, Co.*, 308 F.2d 474, 478 (5th Cir. 1962) (explaining that "there can be no fraudulent joinder unless it be clear that there can be no recovery under the law of the state on the cause alleged, or on the facts in view of the law as they exist when the petition to remand is heard").

[11] *Badon*, 224 F.3d at 389 n.10.

While the decision regarding the procedure necessary in a given case must lie within the discretion of the trial court, we caution that a summary inquiry is appropriate only to identify the presence of discrete and undisputed facts that would preclude plaintiff's recovery against the in-state defendant.[12]   In this inquiry the motive or purpose of the joinder of in-state defendants is not relevant.  We emphasize that any piercing of the pleadings should not entail substantial hearings.  Discovery by the parties should not be allowed except on a tight judicial tether, sharply tailored to the question at hand, and only after a showing of its necessity.  Attempting to proceed beyond this summary process carries a heavy risk of moving the court beyond jurisdiction and into a resolution of the merits, as distinguished from an analysis of the court's diversity jurisdiction by a simple and quick exposure of the chances of the claim against the in-state defendant alleged to be improperly joined.  Indeed, the inability to make the requisite decision in a summary manner itself points to an inability of the removing party to carry its burden.

### III

Illinois Central argues that the district court's finding of improper joinder was appropriate because Smallwood's claims against MDOT were preempted by federal law.   Illinois Central urges,

---

[12] For example, the in-state doctor defendant did not treat the plaintiff patient, the in-state pharmacist defendant did not fill a prescription for the plaintiff patient, a party's residence was not as alleged, or any other fact that easily can be disproved if not true. *See Irby*, 326 F.3d at 648-49.

moreover, that it is irrelevant that the FRSA equally bars claims against it.

Facing the question for the first time in an en banc proceeding, we reject the railroad's contention. To justify removal on improper joinder grounds, Illinois Central was required to prove that the joinder of MDOT was improper. Illinois Central, however, brought no contention going to the propriety of the joinder. Rather, the basis of its contention that Smallwood could not recover went, in fact, to the entire case, although it was first directed to Smallwood's claims against MDOT. Then, with jurisdiction secured, and with all the force of the "law of the case," this same preemption was directed to the merits of Smallwood's claims against the railroad.

A claim of improper joinder by definition is directed toward the joinder of the in-state party, a simple but easily obscured concept. The party seeking removal bears a heavy burden of proving that the joinder of the in-state party was improper.[13] Nevertheless, when, on a motion to remand, a showing that compels a holding that there is no reasonable basis for predicting that state law would allow the plaintiff to recover against the in-state defendant necessarily compels the same result for the nonresident defendant, there is no improper joinder; there is only a lawsuit lacking in merit. In such cases, it makes little sense to single

---

[13] See, e.g., Griggs v. State Farm Lloyds, 181 F.3d 694, 701 (5th Cir. 1999).

8

out the in-state defendants as "sham" defendants and call their joinder improper.    In such circumstances, the allegation of improper joinder is actually an attack on the merits of plaintiff's case as such – an allegation that, as phrased by the Supreme Court in *Chesapeake & O. R. Co. v. Cockrell*, "the plaintiff's case [is] ill founded as to all the defendants."[14]    In reaching this conclusion, we are applying our traditional improper joinder analysis.

In *Cockrell*, the Supreme Court reviewed an effort by a railroad to remove a case to federal court on improper joinder grounds.    The railroad argued that the plaintiff's negligence charges against the defendants were "each and all 'false and untrue'" and that the in-state defendants were added simply to defeat diversity.[15]    Emphasizing that "the showing must be such as compels the conclusion that the joinder is without right and made in bad faith," the Court rejected the railroad's argument.[16]    The Court reasoned that although the plaintiff's petition "may have disclosed an absence of good faith on the part of the plaintiff in bringing the action at all, . . . it did not show a fraudulent joinder of the engineer and fireman."[17]    Since "no negligent act or

---

[14] 232 U.S. 146, 153 (1914).

[15] *Id.* at 151.

[16] *Id.* at 152.

[17] *Id.* at 153.

omission personal to the railway company was charged," the improper joinder allegations directed at the employees "manifestly went to the merits of the action as an entirety, and not to the joinder; that is to say, it indicated that the plaintiff's case was ill founded as to all the defendants."[18]

The Supreme Court thus made clear that the burden on the removing party is to prove that the joinder of the in-state parties was improper - that is, to show that sham defendants were added to defeat jurisdiction. A showing that the plaintiff's case is barred as to all defendants is not sufficient. When the only proffered justification for improper joinder is that there is no reasonable basis for predicting recovery against the in-state defendant, and that showing is equally dispositive of all defendants rather than to the in-state defendants alone, the requisite showing has not been made.

Our insistence that a removing defendant demonstrate that the joinder was improper does not impair a foreign defendant's right to remove. "[T]he Federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts of the protection of their rights in those tribunals."[19] In every case where a diverse defendant proves that the plaintiff's decision to join an in-state party is improper, the

---

[18] *Id.*

[19] *Alabama Great S. Ry. Co. v. Thompson*, 200 U.S. 206, 218 (1906).

diverse defendant gains access to the federal courts. If, however, the foreign defendant fails to prove the joinder improper, then diversity is not complete, the diverse defendant is not entitled to remove, and remand is mandated.

Illinois Central contends, nonetheless, that our decision contradicts prior holdings of this circuit which have allowed a finding of improper joinder based on defenses going to the merits of the plaintiff's case, rather than to the joinder.[20] Yet we are not pointed to any decision of this Court where the assertion was made and rejected. It was asserted here, and our decision today fits squarely within our improper joinder doctrine and finds strong support in the Supreme Court's decision in *Cockrell* and the decision of the Third Circuit in *Boyer v. Snap-On Tools Corp.*[21]

While we need not deploy the well-pleaded complaint rule, it is not unimportant that our application of the improper joinder doctrine here disallows circumvention of the well-pleaded complaint rule. The railroad could not remove on the basis of federal question jurisdiction because the only federal question appeared as a defense. Nonetheless, Illinois Central did just that: it removed on the basis of a defense of federal conflict preemption, urged as the bar to a reasonable basis for predicting recovery against MDOT,

---

[20] This argument was not presented to the able district judge. Going as it does to our subject-matter jurisdiction, we must decide it.

[21] 913 F.2d 108 (3d Cir. 1990); *see also In re New England Mutual Life Ins. Co. Sales Practices Litig.*, 324 F.Supp.2d 288 (D. Mass. 2004). *But cf. Ritchey v. Upjohn Drug Co.*, 139 F.3d 1313, 1320 (9th Cir. 1998).

11

the in-state defendant.   The appropriate application of the
doctrine of improper joinder to this extent leaves intact the well-
pleaded complaint doctrine with all its intended reach.

IV

It is urged that this application of the improper joinder
doctrine undermines the purpose of diversity jurisdiction, which is
to protect out-of-state defendants from local bias, the proverbial
"home cooking." But our holding today is narrow.  It applies only
in that limited range of cases where the allegation of improper
joinder rests only on a showing that there is no reasonable basis
for predicting that state law would allow recovery against the in-
state defendant and that showing is equally dispositive of all
defendants.

The doctrine of improper joinder implements our duty to not
allow manipulation of our jurisdiction.  We are not persuaded that
we can or should - as we are now urged to do - hold that
*Strawbridge v. Curtiss*[22] does not apply to suits wholly lacking
"merit," at least as seen by a federal court.  That is not a rule
of joinder, but a recrafting of *Strawbridge*.   Until Congress
changes our jurisdiction and allows us to hear cases based on
something less than complete diversity, we cannot act.  And make no
mistake, whether to confer diversity jurisdiction in the absence of
complete diversity is a quintessential political decision belonging

---

[22] 7 U.S. (3 Cranch.) 267 (1806).

12

to Congress, as congressional efforts to respond to abuses in state court class action litigation by allowing their removal on minimal diversity have so recently reminded us.

It is no accident that the first Congress conferred removal jurisdiction, accommodating competing political interests. Removal remains a centerpiece of our federalism. The cry of out-of-state interests seeking to escape local courts and local plaintiffs seeking to avoid more distant justice is in fact an old and recurring song. It is a living dynamic, not an historic relic. To the point, our insistence that diversity removal, powerful as it is, remain within its congressionally marked traces is demanded by principles of comity and federalism - that a state court is to be trusted to handle the suit unless the suit satisfies the removal requirements.

It is argued that our holding undermines judicial economy by forcing a federal district court to remand a meritless case to state court rather than dismiss it outright. This argument, however, misconstrues the inquiry on removal. When a defendant removes a case to federal court on a claim of improper joinder, the district court's first inquiry is whether the removing party has carried its heavy burden of proving that the joinder was improper. Indeed, until the removing party does so, the court does not have the authority to do more; it lacks the jurisdiction to dismiss the case on its merits. It must remand to the state court.

Illinois Central seeks broader license to escape from state

13

court, but we are not authorized to grant such a request, as compelling as it may be. It is the province of Congress to modify diversity jurisdiction.

V

The judgment of the district court is VACATED and the case is REMANDED to the district court with instructions to remand for want of jurisdiction to the state court from which is was removed.

E. GRADY JOLLY, Circuit Judge, with whom JONES, SMITH, BARKSDALE, EMILIO M. GARZA, CLEMENT, and PRADO, Circuit Judges, join, dissenting:

I respectfully dissent from the majority's strange compulsion to amend the traditional rules of fraudulent joinder based on a seldom cited 1914 fact-specific case.[23]   This is all the more strange in the light of the admonition we sounded recently:   "[F]or the simple truth that we stand on the shoulders of those before us, if for no other reason, we must be hesitant when we act on recent flashes of "new" insight to the fundamentals of governance". Marathon Oil Co. v. Ruhrgas, 145 F.3d 211, 227 (5th Cir. 1998) (en banc), rev'd, 526 U.S. 574 (1999) (Higginbotham, J., dissenting).   In my view, the majority, in accepting the plaintiff's briefing and "new insights", misreads the Supreme Court decision, disregards established precedent, designs a troublesome and unnecessary "common-defense" rule to amend a long established and fairer rule, offers meaningless reasoning to support its decision and creates confusion for the district courts -- all for no other reason, as far as I can determine, than the satisfaction in finding a "buried

---

[23] It is also odd that the majority has jettisoned the term "fraudulent joinder", used by all of our cases for five decades and by the treatises, for the term "improper" joinder.  Apparently the majority has concluded that it better serves its new way of looking at an established concept.  We note, however, that "fraudulent joinder" was the term used by the Supreme Court in Chesapeake & Ohio Ry. Co. v. Cockrell, 232 U.S. 146 (1914), which happens to be the source of authority for the majority's new rule.

treasure" obscured from our judicial predecessors for almost a century.[24]

I

Up until today, our precedent has been rooted, established and clear, having evolved through the writings of solid and respected judges over many years. It asks a simple question and, eschewing personal motives of the plaintiff, applies an objective test to produce a fair answer: When a diverse defendant removes to federal court on grounds of fraudulent joinder we only ask, as the majority opinion acknowledges:

> [W]hether the defendant has demonstrated that there is no possibility of recovery by the plaintiff against an in-state defendant, which stated differently means that there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant.

Smallwood v. Ill. Cent. R.R. Co., __ F.3d __, __, Maj. Op. at 5-6 (5th Cir. 2004) (en banc) (Smallwood III). Our inquiry is designed to determine the single overarching question of whether the in-state defendant was joined "solely to deprive the federal courts of jurisdiction"; if our objective test determines that the plaintiff cannot recover, then the in-state defendant is deemed fraudulently

---

[24] In fairness to the district court and to the defendants, it should be noted that "common defense" argument was never raised until new attorneys entered the case on appeal. Thus, the defendants were deprived of developing any arguments below to counter the "common defense rule" and the district court has been denied the opportunity to express itself on the subject. Nevertheless, the majority proceeds straightforward to accept and adopt this untimely raised argument, contending that it is permitted to do so, because it is jurisdictional. See fn 20 maj. Op.

16

joined and his "existence is disregarded for purposes of determining diversity".  16 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 107.14[2][c][iv][A] (3d ed. 2004); see also Smallwood v. Ill. Cent. R.R. Co., 342 F.3d 400, 407 (5th Cir. 2003)(Smallwood I), panel reh'g denied, 352 F.3d 220 (Smallwood II), reh'g en banc granted, 355 F.3d 357 (stating that "the purpose of the fraudulent joinder doctrine ... is to prevent a plaintiff from naming a nondiverse party as a defendant solely for the purposes of depriving the court of jurisdiction").

The subjective intent of the plaintiff is irrelevant; instead, our precedent, unequivocally and without exception, has evaluated claims of fraudulent joinder with a simple, well-understood, objective two-prong test[25] -- that is, until today.  See Travis v. Irby, 326 F.3d 644, 647 (5th Cir. 2003); Ross v. Citifinancial, Inc., 344 F.3d 458, 461 (5th Cir. 2003); Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 311-12 (5th Cir. 2002); Heritage Bank v. Redcom Lab., Inc., 250 F.3d 319, 323 (5th Cir. 2001); Griggs v. State Farm Lloyds, 181 F.3d 694, 698-99 (5th Cir. 1999); Rodriguez v. Sabatino, 120 F.3d 589, 591 (5th Cir. 1997); Burden v. Gen. Dynamics Corp., 60 F.3d 213, 217 (5th Cir. 1995); Cavallini v. State Farm Mut. Auto Ins. Co., 44 F.3d 256, 259 (5th Cir. 1995); Laughlin v. Prudential Ins. Co., 882 F.2d 187, 190

---

[25] Under our two-prong test the diverse defendant must establish either "(1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court."  Travis v. Irby, 326 F.3d 644, 647 (5th Cir. 2003).  Only the second prong is before us today.

(5th Cir. 1989); <u>Tedder v. F.M.C. Corp.</u>, 590 F.2d 115, 117 (5th Cir. 1979); <u>Parks v. New York Times Co.</u>, 308 F.2d 474, 478 (5th Cir. 1962).

Because we eschew a subjective test, our test does not seek to determine the "truth" of exactly why the nondiverse defendant was joined as a defendant in the lawsuit.[26]  Instead, the many judges who have preceded us on this court have determined that this test produces a practical "truth":  that is, it is reasonable and fair to assume that a lawyer, acting in accordance with the code of professional responsibility, will not sue someone against whom he has no reasonable basis of recovery, unless it is for an improper reason; on the other hand, when a lawyer sues someone against whom he has a reasonable basis of recovery, it is unlikely that the joinder was for an improper reason.[27]  In short, it is always "improper" -- professionally and ethically -- to join any party to a suit if there is no basis of recovery, a point that apparently has no place in the reasoning of the majority.

Moreover, our established test is an efficient test because it focuses only on the joinder of the nondiverse defendant and does

---

[26] Subjective tests could often require attempts to penetrate the mind of the plaintiff and turn removal hearings into lengthy proceedings.

[27] "Rule 11 imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well-grounded in fact, legally tenable, and 'not interposed for any improper purpose.'" <u>Cooter & Gell v. Hartmarx Corp.</u>, 496 U.S. 384, 393 (1990) (quoting FED. R. CIV. P. 11); <u>See also</u> MODEL RULES OF PROFESSIONAL CONDUCT Rule 3.1 (2002) (stating that "[a] lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous").

18

not require us to examine the case against the diverse defendant.
The majority's "common-defense" rule, on the other hand, requires
the district court to go one step further and examine the entirety
of the case.

II

A

According to the majority, however, this traditional analysis
is infected with error, long overlooked by scores of preceding
judges but now revealed:   The majority has declared that a New
Legal Truth has been uncovered -- The Common-Defense Theory.
Although the panel's bold proclamation of the new discovery has
been modulated by the en banc majority, and although the majority
has narrowed the open-ended sweep of the panel, the unfortunate
amendment to our traditional rule remains:

> When the nonresident defendant's showing that
> there is no reasonable basis for predicting
> that state law would allow recovery against
> the in-state defendant equally disposes of all
> defendants, there is no improper joinder of
> the in-state defendant.

19

Smallwood III, __ F.3d at __, Maj. Op. at 2.[28]  Under this rule, even if the diverse defendant completely satisfies our traditional test and demonstrates that the plaintiff has no reasonable possibility of establishing a cause of action against the in-state defendant, the traditional rule is abrogated, and the case is remanded, irrespective of the plaintiff's inability to recover in state court, if the diverse and nondiverse defendants happen to possess the same defense.

B

The majority's support for its creation of the common defense rule is the turn of the century fact-specific Supreme Court case, Chesapeake & Ohio Ry. Co. v. Cockrell, 232 U.S. 146 (1914).  The pertinent language -- cherry-picked and shorn of context -- upon which the majority relies as compelling a common-defense rule, states:

---

[28] Notwithstanding the objections we have with respect to the majority opinion, we commend the majority's efforts to define more precisely the rule's narrow application.  The majority has restricted the rule to apply only when the in-state defendant's defense is identical to the one asserted by the diverse defendant, which defense automatically and simultaneously disposes of the plaintiff's case against the diverse defendant as well.  See Smallwood III, __ F.3d at __, Maj. Op. at 2 (stating that the defense must "equally dispose of" the diverse defendant); id. at __, Maj. Op. at 8 (stating that the defense must "necessarily compel[]" the same result as to the diverse defendant); id. at __, Maj. Op. at 10 (stating that the defense must be "equally dispositive of all defendants").

A somewhat more complicated application of the "common defense" rule occurs when there are two or more defenses available to the non-diverse defendant, only one of which is "common" to the diverse defendant.  In such a case, the federal court may nevertheless have jurisdiction if, on a motion to remand by the plaintiff, the removing party asserts and proves only the non-common defense.  Because the defense at issue would not be "common," the traditional rule (no reasonable possibility of recovery in the state court against the instate defendant) would apply - not the "common defense" rule adopted here by the majority.

20

> As no negligent act or omission personal to
> the railway company was charged, and its
> liability, like that of the two employees,
> was, in effect, predicated upon the alleged
> negligence of the latter, the showing
> manifestly went to the merits of the action as
> an entirety, and not to the joinder; that is
> to say, it indicated that the plaintiff's case
> was ill founded as to all the defendants.
> Plainly, this was not such a showing as to
> engender or compel the conclusion that the two
> employees were wrongfully brought into a
> controversy which did not concern them. As
> they admittedly were in charge of the movement
> of the train, and their negligence was
> apparently the principal matter in dispute,
> the plaintiff had the same right, under the
> laws of Kentucky, to insist upon their
> presence as real defendants as upon that of
> the railway company.

<u>Cockrell</u>, 232 U.S. at 153. As discussed below, however, the correct reading of <u>Cockrell</u> does not justify, much less compel the creation of the "common-defense" rule.

Since <u>Cockrell</u> was decided in 1914, the only circuit court decision that, previous to today, has interpreted it as proclaiming a "common-defense" exception to the fraudulent joinder rule is the Third Circuit's opinion in <u>Boyer v. Snap-On Tools Corp.</u>, 913 F.2d 108 (3d Cir. 1990).[29] Equally revealing of the novelty of the majority's position is that neither WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE nor MOORE'S FEDERAL PRACTICE -- the two most authoritative treatises on federal practice -- cites <u>Cockrell</u> as relating to such

---

[29] In <u>Boyer</u>, the Third Circuit relied on the same passage from <u>Cockrell</u> as mandating a common defense rule. <u>Boyer</u>, 913 F.2d 108. In fact, in <u>Smallwood I</u>, the panel relied heavily on <u>Boyer</u>'s interpretation of <u>Cockrell</u> and adopted verbatim <u>Boyer</u>'s version of the "common defense" rule. <u>Smallwood I</u>, 342 F.3d at 405.

a theory as "common-defense" or, for that matter, even intimates that such a rule exists.[30]

C

I turn now to address the majority's reliance on <u>Cockrell</u>. In <u>Cockrell</u> the plaintiff sued the Railroad and the in-state engineer and fireman who operated the train that caused the death of the intestate. The plaintiff alleged that, although the negligence was that of the in-state engineer and fireman in the manner that they operated the train, the railroad -- which committed no independent act of negligence -- was nevertheless liable for the negligent conduct of its employees. In short, the entire suit was solely <u>founded</u> (or "ill-founded") on the conduct of the in-state defendants; <u>no argument</u> could be made, as the Court put it, that the two in-state defendants were joined to a suit in which they did not belong. Indeed, but for their conduct the railroad would not have been in the suit; the in-state defendants could not possibly have been fraudulently joined because their conduct was the <u>only</u> actionable conduct in the case; there was in essence but one case and it was against the joined defendants themselves.

---

[30] FEDERAL PRACTICE AND PROCEDURE mentions <u>Cockrell</u> only for the propositions that (1) "the burden on the party seeking removal on the basis of fraudulent joinder is a heavy one," (14B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 3D § 3723 (3d ed. 1998), (2) "[r]esort to the allegations in the notice of removal also may be necessary to show that one or more parties have been fraudulently joined to defeat removal," (14C FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 3D § 3734 (3d ed. 1998), and (3) "[a]llegations in the notice may be used to show that parties have been fraudulently joined to defeat removal." 20 CHARLES ALAN WRIGHT & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: FEDERAL PRACTICE DESKBOOK § 42 (2002). MOORE'S FEDERAL PRACTICE, on the other hand, does not appear to cite <u>Cockrell</u> at all.

22

With respect to the grounds of fraudulent joinder of the two employees, the Railroad's <u>only</u> basis was that the plaintiff's allegations against these two in-state defendants were "false and untrue". <u>See</u> <u>Cockrell</u>, 232 U.S. at 153. To be sure, the Railroad's claim of fraudulent joinder would have required that a trial on the merits be conducted in a removal proceeding.

That the majority misreads <u>Cockrell</u> as calling for modification of our traditional rules of fraudulent joinder is demonstrated by how neatly the traditional rules decide the case for fraudulent joinder presented in <u>Cockrell</u>: We look at the complaint and first conclude that the complaint clearly states a claim against the fireman and the engineer for their negligent conduct, a claim that has a possibility of prevailing under state law; we next look at the railroad's claim of fraudulent joinder, that is, that the negligence claims were "false and untrue"; we then apply our rule that disputed factual merits will not be tried in removal proceedings; and we would have remanded. This exercise demonstrates that the majority has vastly overstated the implications of <u>Cockrell</u>. In fact, it is only by seizing language taken out of context and ignoring the sum of this case in all of its parts -- factual and legal -- that the majority creates its misguided amendment to our traditional rule.

Still further, however, in virtually all respects the instant case is distinguishable from <u>Cockrell</u>. First, there is no issue of vicarious liability here and consequently the "entirety" of the

case against Illinois Central is not premised on the liability of MDOT. Unlike Cockrell, Smallwood seeks to hold Illinois Central liable for its own act of negligence -- its negligent delay in installing safety devices. Compare with Cockrell, 232 U.S. at 153 (stating that "no negligent act or omission personal to the railway company was charged"). Consequently, unlike the Railroad in Cockrell whose liability was totally dependent upon the liability of the joined defendants (its employees), Illinois Central's liability was not predicated on the negligence of MDOT; instead, its liability was independent of MDOT's liability. Compare with Cockrell (stating that the railroad's liability "was, in effect, predicated upon the negligence of the [employees]"). Id. Therefore, the showing of conflict preemption in this case, unlike Cockrell, does not go the merits of the action in its entirety, that is, the defense is not a traverse of the allegations of the entire complaint, as in Cockrell, but only indicates that, as to MDOT, Smallwood's claims are procedurally barred; stated differently MDOT's defense does not attack the facts upon which the plaintiff's case against Illinois Central is founded nor automatically absolve Illinois Central of its own alleged negligence. Compare with Cockrell, 232 U.S. at 153 (stating that "the showing manifestly went to the merits of the action as an entirety, and not to the joinder, that is to say, it indicated that the plaintiff's case was ill founded as to all defendants" (emphasis added)).

24

In sum, it is only through a strained application based on a serious misreading that the majority inflates the significance and relevance of Cockrell, a case that has lain basically dormant for all of its 90-year life.

### III

Not only does the majority's misreading and misapplication of Cockrell betray the weakness of its position, the majority fails to come up with any compelling reasons that might otherwise support its misadventure.

It argues that its theory is justified, because the focus in fraudulent joinder cases should be on the joinder of the non-diverse defendant - not on the merits of the case. This "focus" argument is a strawman. Of course the focus should be on the joinder, but on the joinder as a whole. Beyond uttering the platitudinous axiom that the focus should be on the joinder, the majority fails to offer any explanation of why the viability of the cause of action against the joined defendant is not part of that focus; indeed, only a few lines later, the majority states that the joinder inquiry is whether the plaintiff can establish a cause of action against the joined party. But, as with other inconsistent and contradictory statements in the opinion, the common-defense rule duels with this professed statement of the governing rule.

The majority may be unwilling to face it, but the plain and undeniable fact is that only the traditional test focuses exclusively on the joinder; the common-defense theory requires that

25

the court look beyond the joinder of the nondiverse defendant to the entirety of the case and determine the defenses of the diverse defendant as well.  If the majority were serious in trumpeting a test that focuses on the joinder, and not the entire case, it would adhere to the traditional test.

The majority seems to forget that the overarching purpose of improper joinder inquiry is to determine if the defendant has been joined solely to defeat diversity.  See JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 107.14[2][c][iv][A] (3d ed. 2004).[31]  The weakness of the majority's argument is that it fails to demonstrate how the common-defense rule serves the purpose of the improper joinder inquiry -- that is, to determine whether the defendant has been joined solely to defeat diversity -- any better than, or as well as, the traditional test does.  Indeed, as we have demonstrated earlier, the traditional test produces a "practical truth", where the common defense theory does not even purport to do so.

The majority argues that even though Illinois Central showed there could be no recovery against the joined defendant, it failed to prove that the joinder of MDOT was improper and that Illinois Central "brought no contention going to the propriety of the joinder."  Smallwood III, ___ F.3d at ___, Maj. Op. at 8(emphasis

---

[31] The panel opinion expressly agreed with this statement of purpose, as indeed does the unanimous precedent of our circuit.  See Smallwood I, 342 F.3d at 407.  The majority, however, finds this statement of purpose inconvenient to the arguments it is now making and in a circular fashion says that "the purpose of the improper joinder inquiry is to determine whether or not the in-state defendant was properly joined".  Smallwood III, ___ F.3d at ___, Maj. Op. at 5.  It cites no authority for its circular statement of purpose.

26

added).   It is difficult to understand how the majority can make such a serious misstatement, unless it is somehow contending that Illinois Central had no right to rely upon 40 years of consistent precedent.   Illinois Central relied upon our well-established precedent and demonstrated to the satisfaction of the district court -- a result which the majority does not challenge -- that the plaintiff had no reasonable possibility of recovering against MDOT; it was clearly improper to sue (and thus "join") MDOT when the plaintiff had no hope of recovery against MDOT.   Furthermore, even in the light of <u>Cockrell</u>, the defense of MDOT did not go to the merits of the entire case that the plaintiff had alleged against Illinois Central; only a procedural defense was raised to bar Smallwood's claims against MDOT.   Thus, it is a serious misstatement to suggest that Illinois Central "brought no contention going to the propriety of the joinder" when Illinois Central demonstrated that the plaintiff's claims against MDOT were barred; this showing meant, under the law existing until today, that MDOT was joined solely to defeat diversity jurisdiction.   This argument goes directly to the propriety of the joinder by any standard and it is incorrect for the majority to assert otherwise.

In an attempt to provide some logic to its argument, the majority argues that because MDOT's successful defense also requires the dismissal of the entire case, the joinder of MDOT is not improper because the removed case is only a meritless case, not a fraudulently joined case.   The majority connects no further dots

27

to this argument. Left hanging, as its postulate is, it follows
that the majority argues that the lack of merit of a case
determines removability -- which it surely does not. Seizing on a
dichotomy between removable and meritless cases, the majority
simply has not sorted out the confusion of its contention: it
argues that when both defendants possess the same complete defense
the claim is meritless and the case is non-removable; yet, it
surely does not contend that the meritless case is non-removable
when the respective defenses of the diverse and nondiverse
defendants are different, and result in the dismissal of the entire
case. Thus, it is clear that the attempted rationale of equating
a completely meritless case with non-removability is meritless in
itself.

The most baseless argument of the majority is that it is only
"applying our traditional improper joinder analysis." Smallwood
III, __ F.3d at __, Maj. Op. at 9. This statement represents a
retreat into major denial of what it has so plainly done. Indeed,
it is incomprehensible how the majority would expect this statement
to be taken seriously. We have previously string-cited the
numerous cases applying our traditional fraudulent joinder
analysis, none of which -- I repeat, none of which -- has any
element of the common-defense rule that the majority tattoos on our
traditional analysis. Even the majority acknowledges that under
our traditional analysis:

the test for fraudulent joinder is whether the
defendant has demonstrated that there is no
possibility of recovery by the plaintiff
against an in-state defendant, which stated
differently means that there is no reasonable
basis for the district court to predict that
the plaintiff might be able to recover against
an in-state defendant.

Smallwood III, __ F.3d at __, Maj. Op. at 5-6. Thus, there is no

question but that, under the majority's own test, MDOT was

fraudulently joined since the majority does not deny that there is

no possibility of recovering against MDOT. Because it asserts that

it is only following our traditional test, one would expect the

majority to follow its own pronouncement of the traditional

analysis. But no; notwithstanding the unequivocal words the

majority expresses in one part of the opinion, the majority then

contradicts itself and shapes a new rule: even though there is no

reasonable basis for predicting that state law would allow recovery

against MDOT, it is nevertheless _properly_ joined and the case is

not removable, because its defense disposes of the entire case and

renders it a "meritless" case, not a "fraudulently joined" case.

This clearly is a departure from the traditional test for

fraudulent joinder and the majority's denial of what it has done

demonstrates its ultimate lack of confidence in its novel theory.

In sum, the arguments that the majority makes to shore up its

misreading of Cockrell deflate under any careful examination and

29

make unavoidable the conclusion that the majority has been beguiled by Smallwood's dare to this court to be modern -- 1914 style.[32]

                                    IV

     With fullest respect, I dissent because the majority, for no sound legal reason that I can determine, has taken upon itself to amend our established rules for determining diversity jurisdiction, while admonishing that such amendments should be left to Congress. It has done so in strange ways.  It has relied on a Supreme Court case that has been dormant to the world for close to a century and has no relation to the facts here.  The majority acknowledges our traditional rule as controlling.  It then amends the rule by adding a "but if" clause.  It then denies that it has done what it has just done.  It offers meaningless ad hoc arguments that skirmish with its earlier pronouncements.  It then sounds alarms that

---

[32] We do note that the majority opinion contains what we consider to be several irrelevancies, which we suppose are inserted as rhetoric to bolster its effort to sell the "common-defense" rule: to-wit, the reference to Strawbridge v. Curtiss and the well-pleaded complaint rule among others, which have nothing to do with the case.

     Of more importance, the majority, with no call to do so, addresses procedure and discovery issues that arise in remand proceedings.  This writing is fairly unremarkable except that it appears to be written to underscore one side of our precedent.  It certainly has no precedential effect.  These remarks are pure dicta because no one has made an issue of this subject at any point in these proceedings.  It certainly has no relevance to deciding this case.  The further insignificance of this writing is demonstrated by the majority's failure to cite any authority, notwithstanding the fact that we have a long list of precedents addressing the appropriateness of discovery in removal proceedings. See Badon v. RJR Nabisco, Inc., 224 F.3d 382, 389, 393-94 (5th Cir. 2000); Fields v. Pool Offshore, Inc., 182 F.3d 353, 356-57 (5th Cir. 1999); Burden v. General Dynamics Corp., 60 F.3d 213, 217 & n.18 (5th Cir. 1995); Cavallini v. State Farm Mut. Auto Ins. Co., 44 F.3d 256, 263 (5th Cir. 1995); Burchett v. Cargill, Inc., 48 F.3d 173, 175-76 (5th Cir. 1995); Jernigan v. Ashland Oil Inc., 989 F.2d 812, 815-16 (5th Cir. 1994); LeJeune v. Shell Oil Co., 950 F.2d 267, 271 (5th Cir. 1992); Carriere v. Sears Roebuck & Co., 893 F.2d 98, 100 (5th Cir. 1990); Keating v. Shell Chemical Co., 610 F.2d 328, 333 (5th Cir. 1980). It is this authority that has precedential value.

                                    30

<u>Strawbridge v. Curtiss</u> is under attack -- a gratuitous and phantom irrelevancy to the matter before us. It decries a closet attack on the well-pleaded complaint rule that seems to be a decoy. All of this, and yet there is no explanation why our traditional rule does not work better to serve the purpose of the fraudulent joinder inquiry: To determine whether the in-state defendant was joined "solely to deprive the federal courts of jurisdiction."

Even though I am baffled why the majority would produce this aberrant writing, it is nevertheless with collegial respect that I dissent.[33]

---

[33] Judge Clement's dissent is insightful and states a principle that is not only consistent with our traditional rule, but is the embodiment of that rule: In removal proceedings, it is not for the district courts to decide a contested and undecided legal issue when the court must choose between two arguments, each with plausible merit. In such a situation, it cannot be said that there is no reasonable possibility of recovery in state court. The joinder, therefore, is not improper, irrespective of what the district court may think is the correct answer. Yet, the majority ignores her writing, never addressing whether this case might be decided and remanded under Judge Clement's approach, which could render its common defense theory unnecessary for a remand of this case.

Judge Smith's dissent raises credible issues that demonstrate the confusing jurisdictional and collateral estoppel possibilities that the majority opinion creates, and then refuses to address. For example, because the majority's explanation for distinguishing between the traditional rule and the common defense rule is that the entire case is a <u>meritless</u> case – not a fraudulently joined case – it would appear that it is necessary, under the common defense rule, to determine the merits of the common defense in order to determine if it is a "meritless case." And, although the common defense analysis may ultimately determine that the federal court has no jurisdiction to entertain the case, the federal court surely would have had jurisdiction to determine its own jurisdiction, and the finding of a meritless case would have been made when the federal court was acting within its jurisdiction. As such, the federal court decision may, on remand to the state court, constitute a binding finding in the state case.

The majority would act more responsibly by confronting and attempting to resolve the confusion that arises from its aberrant and troublesome decision. Its silence is truly regrettable and will be costly to the administration of justice.

31

JERRY E. SMITH, Circuit Judge, with whom JONES and BARKSDALE, Circuit Judges, join, dissenting:

"Courts must be particularly circumspect in reconsidering decisions interpreting statutes." *Bhandari v. First Nat'l Bank of Commerce*, 829 F.2d 1343, 1353 (5th Cir. 1987) (en banc) (Higginbotham, J., concurring), *vacated*, 492 U.S. 901 (1989). "As an inferior court we must not allow our version of a 'correct' result to deceive us into semantic games of reformulation and hair splitting in order to escape the force of a fairly resolved issue." *Id.* at 1352 (Higginbotham, J., concurring). Contrary to this well-established tenet of *stare decisis*, however, the majority, in an opinion by Judge Higginbotham that reflects lowest-common-denominator reasoning, has unnecessarily created a mess in this circuit's removal jurisprudence. Most significantly, in an offering worthy of the Oracle at Delphi, the majority, in an exercise of judicial activism, has made a quaqmire out of what had been an orderly and fair process for determining fraudulent joinder.

In so doing, and by dusting off a forgotten decision of the Supreme Court, the majority has introduced needless friction and conflict into the federal-state rubric for determining the proper forum for civil diversity actions. And finally, in a remarkable showing of euphemistic chutzpah, the majority has renamed "fraudulent joinder" as "improper joinder," upsetting decades of nomen-

clature without apparent reason.  Agreeing with every word of Judge

Jolly's compelling dissent, I add a few comments.


I.

A.

The majority insists that "the focus of the inquiry must be on

the joinder, not the merits of the plaintiff's case."  As Judge

Jolly cogently shows, however, it is the majority's new-fangled

common-defense theory that expands inquiry into the merits by, as

Judge Jolly puts it, "*requir[ing]* that the court look beyond the

joinder of the nondiverse defendant to the entirety of the case and

determine the defenses of the diverse defendant as well."

The majority pretends that it avoids inquiry into the merits

when making the determination of fraudulent-joinder-now-to-be-

called-improper-joinder.  The fatal flaw in this exercise is that

under the majority's construction, it is impossible to decide

fraudulent-joinder-now-to-be-called-improper-joinder without making

decisions on the merits.

Because the district court has jurisdiction to decide its own

jurisdiction, that court has not only the capacity but the duty, in

deciding the issue of fraudulent-joinder-now-to-be-called-improper-

joinder, to address any merits questions that are made necessary by

the majority's scheme.  The decision on any such merits issue then

logically becomes a holding, because it is necessary to the result

33

(i.e., remand) and therefore (again, logically) should be binding on the state court to which the action is returned.

If the majority were to respond (which it will not, *see infra*), it undoubtedly would counter that it is not deciding the merits at all—indeed, that it is prohibited from doing so, because, given that the ultimate result is that it is without jurisdiction over the merits, its power to decide is limited to determining its own jurisdiction. In the majority's words, "[a]ttempting to proceed beyond [a] summary process carries a heavy risk of moving the court beyond jurisdiction and into a resolution of the merits."

Overlooked in this reasoning is that it is at times not only desirable but necessary for a court to examine at least a portion of the merits as a precursor to deciding jurisdiction. "[A] federal court always has jurisdiction to determine its own jurisdiction. In order to make that determination, it was necessary for the [court of appeals] to address the merits." *United States v. Ruiz*, 536 U.S. 622, 628 (2002).

### B.

The problem with imposing a rule by which the district court must "address the merits" is that the state court that receives the remand will need to decide what to do with that decision. In the instant case, the majority blesses "a summary inquiry . . . to identify the presence of discrete and undisputed facts that would

preclude plaintiff's recovery against the in-state defendant." Where such preclusion is found, it "necessarily compels the same result for the nonresident defendant, [so] there is no improper joinder; there is only a lawsuit lacking in merit."   In other words, as the majority further explains, "the allegation of improper joinder is actually an attack on the merits of plaintiff's case . . . ."

The majority makes no effort to examine the consequences of its own explanation.   The majority imposes a process whereby the federal district court is required to decide merits issues, even to the point of declaring that the lawsuit is entirely "lacking in merit."   One would think that once a court of competent jurisdiction has made such a "decision" that a case is wholly without merit, that case is at an end, and no other court—state or federal—may reexamine it.

What, then, under the majority's formulation, is the state court supposed to do on remand?   One option would be for the state court to dismiss the case ministerially and without making further inquiry into the correctness of the federal district court's decision.[34]   But that would be a process of unnecessary formalism and, in any event, is not what the majority apparently contemplates.

_____

[34] See, e.g., FDIC v. Meyerland Co. (In re Meyerland Co.), 960 F.2d 512, 520 (5th Cir. 1992) (en banc) (requiring court that receives an action to take it as it finds it and enter prescribed judgment without making independent evaluation of the merits).

The majority gives no hint that the state court will be in any way bound by the federal district court's pronouncement that, *as a matter of merits and substance*, the lawsuit is wholly lacking in merit. Very much to the contrary, under today's logic the state court will be free to disagree, to resurrect the case, and ultimately to award the plaintiff relief against the in-state and out-of-state defendants as well. In other words, the state court will be free to ignore whatever merits conclusions the federal court has reached.

## II.

The majority thus unnecessarily and unwittingly creates friction between state and federal jurisdictions. The majority's new paradigm eviscerates what the majority venerates as the "principles of comity and federalism." By thinly-veiled implication, the majority declares that the federal court is incompetent to make a binding pronouncement on the merits issues as to which the majority insists that same federal court is *obliged* to reach non-binding conclusions.

This contrivance is at war with the collegial state-federal relations that the majority pretends to honor. The majority's novel plan invites parties to take one tack in federal court and another once remand has been achieved. The majority's reasoning invites disparate interpretations of the same issues of law by state and federal forums. It promotes manipulation and complica-

36

tion of a process that, until now, has been stable, predictable, and fair.

## III.

By redesignating "fraudulent joinder" as "improper joinder," the majority has shown its agility in innovative nomenclature. What should the majority call its new breed of merits decisions that are not binding holdings? Perhaps they are "musings," or "asides" or "ruminations," or "advisory opinions" or *dicta*, or even "preliminary predictions"—something less than a holding but more than an idle thought. They are, in any event, a breed apart. They are rulings the majority says are necessary to the decision on fraudulent-joinder-now-to-be-called-improper-joinder, but, once these rulings or ruminations are issued, they disappear into the ether, after remand, as if they had never even been expressed. They are simultaneously indispensable and expendable, at once both necessary and superfluous.

## IV.

The majority's newly-concocted "common-defense" rule, raised by plaintiff for the first time on appeal, will cause resourceful defense counsel, in the vigorous defense of their clients' interests, to alter the way in which they plead defenses. The filing of defenses will be timed not in a way designed to ensure "the just, speedy, and inexpensive determination of [removed] action[s]," FED.

37

R. CIV. P. 1, but instead in such a manner as to avoid imposition of the majority's common-defense mechanism. Defenses will be described and fashioned so that they cannot be deemed to apply to diverse and non-diverse defendants alike. Such manipulation and contrivance, exacerbating the prospect of varying state-federal adjudications I have described above, can only undermine respect for the courts.

V.

Entirely overlooked in the majority's analysis is any concern for "the traditional values of *stare decisis*." *Bhandari v. First Nat'l Bank of Commerce*, 829 F.2d 1343, 1352 (5th Cir. 1987) (en banc) (Higginbotham, J., concurring), *vacated*, 492 U.S. 901 (1989). This principle is especially important where, as here, we are interpreting statutes instead of the Constitution. "Courts must be particularly circumspect in reconsidering decisions interpreting statutes." *Id.* at 1353 (Higginbotham, J., concurring). "[I]f only a question of statutory construction were involved, we would not be prepared to abandon a doctrine so widely applied throughout nearly a century." *Erie R.R. v. Tompkins*, 304 U.S. 64, 77-78 (1938) (Brandeis, J.).

"[A]ny detours from the straight path of *stare decisis* in our past have occurred for articulable reasons, and only when the Court has felt obliged to bring its opinions into agreement with experi-

38

ence and with facts newly ascertained." *Vasquez v. Hillery*, 474
U.S. 254, 266 (1986) (internal quotation and citation omitted).
Here, the majority offers absolutely no reason why there is a prob-
lem, much less one that so badly needs to be fixed that it can
trample *stare decisis* to achieve a questionable and bizarre result.

  We should not break with a well-established rule of law unless
it is "outdated, ill-founded, unworkable, or otherwise vulnerable
to serious reconsideration." *Id.* "[T]here is a point at which the
orderly accommodations of law-making and law-interpreting demands
that we resist reconsideration because Congress may well have ac-
quiesced in prior statutory interpretations." *Bhandari*, 829 F.2d
at 1352 (Higginbotham, J., concurring). Here, there is not only no
*good* reason to enact a change, there is no reason at all, except
the majority's *ipse dixit*.

  It would be bad enough that the majority effects a sea change
in the heretofore orderly world of removal jurisprudence. It is
worse still that the majority makes no attempt to offer compelling
reason for its revolution. It appears, in fact, that the majority
can identify no reason, for it provides no answer—not even a
word—in response to the cogent points made by Judge Jolly in dis-
sent, to Judge Clement's resourceful concurrence, or to the issues
I have raised. The majority's silence harms the collegial judicial
process by leaving the reader to wonder whether the majority has
even examined the objections that have been raised or, instead, is

intransigent because of fear of losing its majority status.   It
would be far better for the two sides to join issue, despite their
differences, in the interest of frankly fleshing out these impor-
tant questions.   Perhaps the majority merely has no answer to the
deficiencies in its reasoning that the dissents have identified.


                                VI.

     In sum, the majority is wrong for many reasons, not the least
of which is that its pronouncement that a "defense [that] disposes
of the entire case and renders it a 'meritless case'" logically
should, if true, completely end the litigation, not prolong it in
another forum.   The proper answer, instead, is that we can easily
avoid the potential state-federal conflict, not to mention the
inefficiency imposed by the majority's new scheme, which, as Judge
Jolly notes, will require mini-trials that turn simple proceedings
into ordeals.

     As Judge Jolly lucidly explains, "the [majority's] common-
defense theory *requires* that the court look beyond the joinder of
the nondiverse defendant to the entirely of the case and determine
the defenses of the diverse defendant as well.   If the majority
were serious in trumpeting a test that focuses on the joinder, and
not the entire case, it would adhere to the traditional test."
That traditional test avoids all the pitfalls I have explained, and
we are left with no explanation of why the majority is so deter-

                                40